IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| NATIONAL PARKS CONSERVATION ASSOCIATION<br>1300 19th Street, NW – Suite 300<br>Washington, DC 20036<br>(800) 628-7275<br><br>           Plaintiff,<br><br>      v.<br><br>UNITED STATES DEPARTMENT OF THE INTERIOR<br>1849 C Street, NW<br>Washington, DC 20240<br>(202) 208-3100<br><br>NATIONAL PARK SERVICE<br>1849 C Street, NW<br>Washington, DC 20240<br>(202) 208-3100<br><br>          Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br><br>Case No. 1:07-cv-02112 (JR) |

**FIRST AMENDED PETITION FOR REVIEW OF AGENCY ACTION**

1.     Plaintiffs bring this action under the Administrative Procedure Act, 5 U.S.C. § 551 *et seq.*, and the National Environmental Policy Act, 42 U.S.C. § 4321 *et seq.*, to seek review of and to challenge (i) Defendants' amendment of 36 C.F.R. §§ 7.13, 7.21 and 7.22 to permit recreational snowmobiles in Yellowstone National Park ("Yellowstone"), Grand Teton National Park ("Grand Teton") and the John D. Rockefeller, Jr. Memorial Parkway (together, the "Parks") and (ii) the final environmental impact statement (the "FEIS") and resulting decision (the "Record of Decision," or "ROD") on which those amended regulations are based. Those regulations,

as amended, (the "Winter Use Plan"), allow 540 snowmobiles per day in Yellowstone, among other things. Despite the fact that the Winter Use Plan would cause serious harm to Yellowstone's natural soundscape, wildlife and air quality, Defendants decided it was nevertheless permissible.

2.     The Winter Use Plan is the latest in a series of efforts by Defendants to permit snowmobiles in Yellowstone, and this action accordingly represents the third legal challenge to those efforts. But this action should be the last because it is now clear, after Defendants have spent $10 million on studies of this issue, that permitting recreational snowmobiles in Yellowstone and the other Parks is inconsistent with the governing statutes and rules. Those statutes and rules preclude Defendants from permitting snowmobiles in any of these Parks because, among other things, snowmobiles disturb wildlife, damage park resources and are inconsistent with Congress' requirement that Defendants provide for the preservation of Yellowstone's natural wonders against injury or spoliation.

3.     These Defendants reaffirmed only last year that the statute which governs their administration of the National Park System must be interpreted as prohibiting recreational opportunities when those activities conflict with the predominant statutory requirement that Defendants conserve the resources and values of the parks in the National Park System. The Winter Use Plan, based on Defendants' own evaluations and studies, would indeed be inconsistent with the conservation of park resources and values.

4.     In order to permit a conclusion in the FEIS and the ROD that the Winter Use Plan would not cause impermissible adverse impacts, Defendants manipulated the analytical process; ignored their own scientists' conclusions about the adverse impacts

the proposed use would cause; ignored those scientists' recommendation against adopting the proposed Winter Use Plan; and changed — without explanation or justification — important NPS policies and interpretations concerning the protection of wildlife, among other things.

5.     For these and other reasons set forth below, this Court should find the Winter Use Plan, the FEIS and the ROD to be unlawful and should invalidate them.

## JURISDICTION AND VENUE

6.     This actions arises under the National Environmental Policy Act, 42 U.S.C. § 4321 *et seq.* and the Administrative Procedure Act, 5 U.S.C. § 551 *et seq.* This Court accordingly has jurisdiction over this action pursuant to 28 U.S.C. § 1331.

7.     Venue is proper in this Court as defendants are located in this District.

## PARTIES AND STANDING

8.     Plaintiff National Parks Conservation Association ("NPCA") is a nonprofit membership organization headquartered in Washington, D.C. The NPCA is the largest national organization in the United States dedicated to the protection and enhancement of the National Park System. The NPCA was founded in 1919 by, among others, Frederick Laws Olmstead, Jr., who was instrumental in crafting the legislation that created the National Park System in 1916. Today, the NPCA has approximately 330,000 members. More than 3,800 of those members reside in the states bordering on Yellowstone: Wyoming, Idaho and Montana. Many members of the NPCA have visited, and will continue to visit, the Parks to enjoy, observe and photograph the wildlife, flora and scenery of the Parks. During the winter months, NPCA members frequently

3

snowshoe or cross-country ski in Yellowstone to enjoy the peace, solitude, quiet and serenity of the park and its wildlife, and to enjoy Yellowstone's fresh air, and they plan to continue doing so in the future. The use of snowmobiles by others in Yellowstone has adversely impacted the ability of these members to enjoy that park in the winter, due to the noise and emissions created by the vehicles, as well as the substantial adverse impacts of snowmobiles on wildlife. The Winter Use Plan will adversely affect the ability of NPCA members to observe, study, photograph and otherwise enjoy Yellowstone's wildlife and scenery and to enjoy its natural soundscapes and fresh air.

9.    Defendants are a department and an agency of the United States and are charged by Congress with administering and conserving the lands within the National Park System. The Defendants are the federal agencies that took the actions challenged herein.

## FACTUAL BACKGROUND

10.    Yellowstone is this nation's oldest and first national park, established by Congress in 1872. A majestic symbol of this country and arguably the crown jewel of the national park system, this treasure, as with all national parks, has "been set aside by the American people to preserve, protect, and share, the legacies" of this country. (National Park Service, http://www.nps.gov/aboutus/index.htm.)

11.    The legacy of Yellowstone "is far greater than [the preservation] of a unique landscape" and encompasses the birth of a national park system. "This idea conceived wilderness to be the inheritance of all people, who gain more from an experience in nature than from private exploitation of the land." (National Park Service, *Yellowstone, A Brief History of the Park,* http://www.nps.gov/yell/planyourvisit/

upload/Yell257.pdf.)  As a result of the creation of Yellowstone, "[s]cores of nations have preserved areas of natural beauty and historical worth so that all people will have the opportunity to reflect on their natural and cultural heritage and to return to nature and be spiritually reborn.  Of all the benefits resulting from the establishment of Yellowstone National Park, this may be the greatest."  (*Id.*)

### *The Legal Framework*

12.    The National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 *et seq.*, requires federal agencies to prepare environmental impact statements regarding "proposals for … major Federal actions significantly affecting the quality of the human environment."  42 U.S.C. § 4332(2)(C).  As interpreted by the courts, NEPA requires that, when federal agencies prepare such an environmental impact statement, the agency must reasonably define its objective so as to carry out the purpose and requirements of the underlying legislation and that the agency must use reasonable tests and methods for evaluating the degree to which the considered alternatives meet that objective.  The agency may not define the objective unreasonably so as to permit a favored result.

13.    Yellowstone and the other Parks, like the whole National Park System, have been set aside and are to be "preserved and managed for the benefit and inspiration of all the people of the United States."  16 U.S.C. § 1a-1.  Regardless of whether this enjoyment is derived from appreciating the park from afar or by directly visiting the park, Yellowstone belongs to all the American people.

14.    Congress created the NPS in 1916 to "promote and regulate" the public use of our national parks, "by such means and measures" as necessary to conform to the "fundamental purpose" of the parks, which is to "conserve the scenery and the natural

and historic objects and the wild life therein and to provide for the enjoyment of the same [so as to] leave them unimpaired for the enjoyment of future generations." 16 U.S.C. § 1 (the "Organic Act"). Congress reaffirmed this commitment in 1970, instructing that the NPS shall not administer the parks "in derogation of the values and purposes for which these various areas have been established ...." 16 U.S.C. § 1a-1 (the "General Authorities Act, as amended").

15.    In 2005, the NPS published for public comment a revision, among other things, of its interpretation of the Organic Act, proposing that that interpretation should henceforth be that recreational opportunities and conservation stand on an equal footing and that the NPS should balance those conflicting purposes supposedly found in the Organic Act. After a massive outcry from the American public against such a change, the Secretary of the Defendant Department of the Interior and the Director of the Defendant NPS jointly announced that they were rejecting such a change in interpretation. Instead, on August 31, 2006, the NPS adopted the 2006 Management Policies, which stated unequivocally that "when there is a conflict between conserving resources and values and providing for enjoyment of them, conservation is to be predominant." 2006 Management Policies § 1.4.3. Furthermore, the "fundamental purpose of the national park system, established by the Organic Act and reaffirmed by the General Authorities Act, as amended, begins with a mandate to conserve park resources and values. This mandate is independent of the separate prohibition on impairment and applies all the time with respect to all park resources and values, even when there is no risk that any park resources or values may be impaired." *Id.*

16.     Congress has further limited the NPS's authority to regulate Yellowstone, recognizing its special place in the National Park System as the first national park.  While 16 U.S.C. § 3 generally authorizes the NPS to regulate the National Park System consistent with the Organic Act and the General Authorities Act, as amended, Section 22 of that Title expressly limits the NPS's authority further as it relates to Yellowstone. Section 22 provides that, as to Yellowstone, the NPS may adopt regulations under its more general regulatory authority only to the extent "not inconsistent with" Section 22. Section 22 instructs the Secretary of the Interior to "make regulations providing for the preservation, from injury or spoliation, of all … natural curiosities, or wonders, within the park, and their retention and their natural condition."  16 U.S.C. § 22.  Consistent with Section 22, therefore, the NPS may not adopt regulations inconsistent with its obligation to provide for the preservation of the natural wonders in Yellowstone against injury or spoliation.

17.     In 1972, President Nixon signed Executive Order ("EO") 11644, which provided for the regulation of off-road vehicles, including snowmobiles, on public lands. EO 11644 (Feb. 8, 1972).  The EO instructs the public lands agencies to promulgate regulations for that purpose to "protect[] the resources of the public lands."  *Id.* § 3. Executive Order 11644 expressly provides that the Defendants may not authorize the use of off-road vehicles in the National Park System unless the Secretary of the Interior "determines that off-road vehicle use in such locations will not adversely affect their natural, aesthetic or scenic values."

18.     In 1974, the NPS promulgated the predecessor to what is now 36 C.F.R. § 2.18 to implement the requirements of Executive Order 11644.  That predecessor rule

and currently Section 2.18(c) have established a long-standing prohibition on

snowmobile use in the National Park System, subject to narrow exceptions.  Among other

things, the rule provides:

> Snowmobiles are prohibited except where designated and
> only when their use is consistent with the park's natural,
> cultural, scenic and aesthetic values, safety considerations,
> park management objectives, and will not disturb wildlife
> or damage park resources.

### *The History of Snowmobile Regulation in Yellowstone*

19.    In 1997, a number of plaintiffs brought suit in the U.S. District Court for

the District of Columbia, challenging the use of snowmobiles in these Parks.  In settling

that suit, the NPS agreed to prepare an environmental impact statement for new winter

use plans for these Parks.  The resulting studies concluded that snowmobile use should be

phased out in these Parks by the winter of 2003-2004 and that visitor access should be

provided instead only by an NPS-managed mass-transit snowcoach system.  The NPS

adopted such a rule in January 2001 (the "2001 Rule").  That rule was based upon the

NPS's finding that snowmobile use at that time — approximately 795 snowmobiles per

day — "**harms the integrity of the resources and values of [Yellowstone] and so

constitutes an impairment of resources and values, which is not permissible under

the NPS Organic Act**.  In [Yellowstone] the impairment is the result of impacts from

snowmobile use on air quality, wildlife, the natural soundscape, and opportunities for

enjoyment of the park by visitors."  (emphasis added)

20.    The snowmobile industry and other plaintiffs challenged the 2001 Rule in

the U.S. District Court for the District of Wyoming.  In a settlement of that suit, the NPS,

now under a new Administration, agreed to prepare a Supplemental Environmental

Impact Statement. The NPS then stayed implementation of the 2001 Rule. In 2003, the NPS adopted a rule that instead authorized the use of up to 950 snowmobiles per day in Yellowstone, among other things (the "2003 Rule").

21.     In December 2003, in a suit by the 1997 plaintiffs and others, the United States District Court for the District of Columbia vacated the 2003 Rule, in part on the ground that the NPS had failed adequately to explain why the 2003 Rule would not create the same impairment and adverse impacts on Yellowstone that the NPS had found to be caused by the conditions existing at the time the 2001 Rule was enacted. That ruling left the 2001 Rule in effect.

22.     In December 2003, the Wyoming plaintiffs then reopened their settled action and sought and obtained a preliminary injunction from the United States District Court for the District of Wyoming setting aside the 2001 Rule on the ground that the NPS had provided an inadequate period for public comment and had inadequately explained the basis for the 2001 Rule.

23.     The NPS then adopted a temporary rule applicable for the three winter seasons beginning 2004-2005 (the "2004 Rule"). The 2004 Rule permitted 720 snowmobiles per day in Yellowstone. That Rule also required that all snowmobile users be accompanied by a commercial guide and that all recreational snowmobiles must meet what were referred to as "best available technology" ("BAT"). The 2004 Rule also permitted the continued use of snowcoaches in Yellowstone.

24.     Several litigants challenged the 2004 Rule in both the Wyoming District Court and the D.C. District Court, but neither Court struck down the 2004 Rule.

25.    At the time that it adopted the 2004 Rule, the NPS stated that it planned to conduct further studies concerning the impact of snowmobiles on Yellowstone while the temporary rule was in effect, with the goal of then enacting a permanent rule based on the findings of those further studies.

26.    While the 2004 Rule allowed 720 snowmobiles per day in Yellowstone, the number of snowmobiles there over the past four winter seasons has only been approximately 250 snowmobiles per day for various reasons.  This significantly reduced number of snowmobiles has resulted in markedly improved park health, with cleaner air, less impact on wildlife, quieter soundscapes, sharper views and an all-around more positive park experience for visitors.

### *The 2007 Environmental Impact Statement*

27.    In March 2007, the NPS issued for public comment a draft environmental impact statement (the "DEIS") relating to a permanent winter use plan for the Parks.  The DEIS described the further studies that the NPS had conducted since adopting the 2004 Rule.  The DEIS evaluated six alternative approaches to allowing oversnow vehicles in Yellowstone and the other Parks.  One of those alternatives was to eliminate the use of snowmobiles and snowcoaches in Yellowstone.  The NPS acknowledged that this was the "environmentally preferred alternative" and that this alternative "best preserves the unique historic, cultural, and natural resources associated with the parks."  The NPS further acknowledged that this alternative "yields the least impacts to air quality, wildlife, and natural soundscapes."

28.    Nonetheless, the NPS identified as its preferred alternative one under which 720 snowmobiles per day would be allowed in Yellowstone.  The NPS recognized

that its preferred alternative "increases the adverse impacts to air quality, natural soundscapes and wildlife."

29.     The NPS received comments on the DEIS from more than 122,000 commentors, including individuals, organizations, government agencies and businesses. More than 89,000 of these commentors — in excess of 70% — urged the NPS to eliminate recreational snowmobiling in Yellowstone.  More than 115,000 of the commentors stated that snowmobiles in the parks destroy Yellowstone's natural winter soundscape.  More than 96,000 of the commentors stated that snowmobiles have a negative impact on air quality.

30.     In September 2007, the NPS issued a Final Environmental Impact Statement (the "FEIS").  The FEIS stated that rather than permitting 720 snowmobiles per day in Yellowstone, the NPS now preferred a revised alternative permitting 540 snowmobiles per day there.

31.     The FEIS, like the DEIS, acknowledged that eliminating snowmobile use was the "environmentally preferred alternative" which best "promotes the national environmental policy as expressed by … the National Environmental Policy Act."  The NPS acknowledged that eliminating snowmobiles would provide a "clear benefit to the natural environment, relative to all other alternatives" and would best "preserve[] the unique historic, cultural, and natural resources in the parks."  The NPS recognized that allowing 540 snowmobiles per day at Yellowstone would "increase[] impacts to air quality, natural soundscapes, and wildlife as compared to [the no-snowmobile alternative]."  The NPS chose the 540 snowmobile alternative, however, because it "achieves a balance of resources use and sharing life's amenities."  That statement is

consistent with the very first statement in the FEIS: "the purpose of this project or planning effort is to ensure park visitors have a range of winter recreation opportunities that are appropriate to the national park setting, and that these activities do not impair or irreparably harm park resources or values."

### *The Adverse Effects of the Winter Use Plan Identified in the FEIS and the NPS's Studies*

32.    The FEIS and the studies conducted by the NPS establish that the Winter Use Plan will have severe adverse effects on Yellowstone.  The adverse effects include harm to Yellowstone's natural soundscapes, wildlife and air quality.

#### ADVERSE IMPACT ON NATURAL SOUNDSCAPES

33.    The FEIS recognizes that one of the reasons for the adoption of the Organic Act was a recognition that the American people "wanted places to go that were undisturbed and natural and which offered a retreat from the signs and stresses of everyday life."  The NPS therefore recognizes the natural winter soundscapes of Yellowstone as a "key resource" to be protected.

34.    The FEIS concludes, however, that 540 snowmobiles per day in Yellowstone would not create any impairment of the natural soundscapes and finds that that plan would have only a "moderate adverse impact" on natural soundscapes.  But the facts set forth in the FEIS demonstrate instead that 540 snowmobiles per day will have a significant adverse impact on Yellowstone's natural winter soundscapes.

35.    The NPS's principal test for evaluating the impact of snowmobile noise is based on a flawed, outcome-determinative analysis — one that measures the percentage of the **entire park area** in which the 540 snowmobiles could be heard.  In order to be

considered as having a "major" impact on natural soundscapes at Yellowstone, that test requires that noise be audible in more than 20% of Yellowstone's entire area. But no amount of noise created by snowmobiles could ever meet that test because Yellowstone occupies more than 2.2 million acres, an enormous area the size of Delaware and Rhode Island combined. Thus NPS's choice of the "entire park area" test predetermined — before any data were collected and before any alternatives were purportedly considered — that no alternative involving the use of snowmobiles, regardless of how many snowmobiles it involved, would be found to generate a major noise impact. The "entire park area" test was therefore an unreasonable basis for concluding that the Winter Use Plan would cause no undue harm to park resources.

36.    The FEIS also analyzes the audibility of snowmobile noise in a number of specific locations in Yellowstone. That FEIS concedes, based on hypothetical models, that the Winter Use Plan would result in noise that could be heard more than 69% of the time in those areas. Indeed, actual monitoring conducted over the last several years — when an average of 250 snowmobiles per day were present — found that oversnow vehicles could be heard at the popular Old Faithful geyser 67% of the time. That number is 100% of the time on busy weekends with higher snowmobile traffic. These figures are comparable to those previously found to constitute impairment. Not surprisingly therefore, the FEIS concludes that the adverse impacts due to percent time audible would be "major" at Yellowstone.

37.    Nevertheless, the NPS views this intrusion into the natural soundscapes as acceptable, perhaps because the NPS concludes that the loudness of the sounds would be

"minor." But that conclusion is based on a hypothetical model, which grossly understates how loud the sound of 540 snowmobiles per day would be.

38. The NPS's own monitoring of actual conditions, rather than supporting the NPS's conclusions, demonstrates instead that the modeling study is erroneous. The NPS monitoring studies report that the loudest daily sound for oversnow vehicles during the last three winter seasons at Old Faithful, along popular travel corridors and at the West Yellowstone entrance exceeded the sound of a vacuum cleaner in an indoor room. Burson *et al.*, "Natural Soundscape Monitoring in Yellowstone National Park" at 2. The NPS's own studies define that level of noise as having "an easily recognizable adverse effect on the natural soundscape and potential for its enjoyment." Burson at 12. Since the Winter Use Plan would <u>double</u> the number of snowmobiles at Yellowstone from the level experienced during this monitoring — which already showed adverse impacts on scoundscapes — the NPS's own monitoring studies demonstrate that the Winter Use Plan will have a significant adverse effect on Yellowstone's winter soundscapes.

39. The FEIS claims that 540 snowmobiles in Yellowstone would not unduly impact natural soundscapes and visitor experiences in part because the Winter Use Plan would require the use of snowmobiles using "best available technology," or "BAT" and because all snowmobilers would be required to use commercial guides. But the 2004 Rule in effect during the NPS's monitoring studies already required snowmobiles to use BAT and required commercial guides. Imposing those requirements under the new Winter Use Plan would therefore not reduce the noise experienced under the 2004 Rule. Doubling the number of snowmobiles from the average of 250 per day during the study

period would therefore double the adverse impact demonstrated by the NPS's own monitoring studies.

40.     The FEIS itself makes clear that modern snowmobiles using BAT, including "4-stroke" instead of "2-stroke" engines, would continue to be extremely noisy. The NPS states that **each** of these BAT snowmobiles produces noise one-third louder than listening to a vacuum cleaner in an indoor room.  The FEIS also acknowledges that the noises resulting from snowmobiles are "concentrated to a large degree around travel corridors and park attractions and affect the areas most accessible by the vast majority of park visitors."  Such a concentration of snowmobiles can be expected to have a significant impact on natural soundscapes in those travel corridors and park attractions and other areas most accessible by the vast majority of park visitors.

### ADVERSE IMPACT ON WILDLIFE

41.     The Winter Use Plan will have significant detrimental effects on wildlife in Yellowstone.

42.     The FEIS acknowledges that the increases in winter traffic levels proposed to be permitted would "cause increases in vehicle-caused mortality, wildlife displacement, behavior- or physiology-related energy costs" in bison, elk, wolves, lynx, wolverines, bald eagles and swans.

43.     The NPS's own scientists conducted a study of oversnow vehicle impacts on wildlife during the last several winter seasons while the 2004 Rule was in effect. They concluded that the reduced number of snowmobiles during those seasons to 250 per day was "effective at reducing disturbances to wildlife below a level that would cause measurable fitness effects."  However, they acknowledged "the potential for fitness

effects to develop if [oversnow vehicles] or other stressors become more severe or prolonged. Thus we recommend park managers consider maintaining [oversnow vehicle] traffic levels at or below those observed during our monitoring." Yet the NPS's Winter Use Plan will permit a doubling of the number of snowmobiles permitted in Yellowstone from that experienced during the observation period. The NPS has failed even to explain its departure from its own scientists' recommendation.

44.     The NPS considers the acknowledged adverse impacts on wildlife to be acceptable because the NPS measures the wildlife impact of snowmobiles only to the extent the population of each species **as a whole** is threatened. An adverse impact on an individual animal — regardless of the seriousness of the impact, even resulting in death — is not considered important so long as the effect "would not be of any measurable or perceptible consequence to the population." This approach represents a radical departure from decades of NPS policy. The environmental impact statement performed before the 2003 Rule was adopted, for example, states that "park policies, regulations, and [executive orders] clearly state that disturbance to wildlife, regardless of population-level effects, is unacceptable in the national parks." The NPS's Management Policies make clear that it views impacts on animals or communities of animals just as much to be avoided as impacts on whole population of animals. *See* 2006 NPS Management Policies § 4.4.1 (requiring the NPS to "minimiz[e] human impacts on native plants, animals, populations, communities and ecosystems ...."). Yet the NPS has provided no explanation for the radical change in policy toward wildlife reflected in the FEIS.

**ADVERSE IMPACT ON AIR QUALITY**

45.     The Winter Use Plan will create a significant increase in hydrocarbon emissions that would have a severe adverse impact on air quality in Yellowstone.

46.     The FEIS acknowledges that "air quality is a key resource, in itself, as well as a highly prized (and expected) element of the park visitor experience." The FEIS acknowledges that "an overall reduction in snowmobiles from previous years" has, along with BAT and other factors, led to a "marked reduction in ambient pollution levels" at Yellowstone. Yet the NPS's Winter Use Plan will double the number of snowmobiles from the number experienced during the last several seasons, which have averaged approximately 250 per day. Compared to the conditions under the 2004 Rule, the FEIS acknowledges that emissions impact would be more adverse. The FEIS acknowledges that the impact of emissions from 540 snowmobiles per day would be "moderate, adverse, long-term … direct [and] park-wide."

47.     According to the FEIS, carbon monoxide is a "colorless, odorless, and poisonous gas produced by incomplete burning of carbon in fuels. When [carbon monoxide] enters the bloodstream, it reduces the delivery of oxygen to the body's organs and tissues. Health effects may include impairment of visual perception, manual dexterity, learning ability, and performance of complete tasks; headaches and fatigue; or respiratory failure and death." Based on hypothetical modeling, the NPS estimates in the FEIS that adoption of the Winter Use Plan will more than double the amount of carbon monoxide in some areas of Yellowstone from that experienced with only 250 snowmobiles per day.

48.     Particulate matter ("PM") includes, according to the FEIS, "dust, dirt, soot, smoke, and liquid droplets from sources such as … vehicles …. Health effects from

PM emissions include reduced lung function, long-term risk of increased cancer rates, and the development or aggravation of respiratory problems." Yet the Winter Use Plan will increase the amount of fine particulate matter by up to 40% in some areas.

49.     Moreover, the NPS concedes that the modeling on which it relied was based on assumptions that cause the modeling to **understate** the actual adverse impact of the Winter Use Plan on air quality. For example, the FEIS admits that "snowmobile laboratory test data utilized [in the model] may not reflect actual operating conditions in Yellowstone … as high altitude and low winter temperatures in the parks are likely to decrease overall snowmobile engine performance and increase relative emissions." The FEIS concedes that, at least at one site, monitored actual conditions reflected more than 50% more particulate matter than predicted under the model relied on by the FEIS.

50.     In addition, the NPS's model assumes that snowmobiles will meet the BAT criteria, but an NPS study issued in January 2007 found that actual emissions are likely to produce more pollution than the maximum under those criteria. That study makes clear that actual emissions depend on factors not considered when testing snowmobiles against those BAT criteria. Those factors include the amount of time the driver spends idling (for example, while taking photographs) or accelerating or decelerating. The study found that, during time spent idling, accelerating or decelerating, some models certified as meeting BAT criteria actually created emissions higher than those criteria. Because it is certain that many drivers will in fact spend time idling, accelerating and decelerating, the NPS's models clearly understate the actual pollution likely to result from 540 snowmobiles per day.

51.    Nevertheless, the FEIS set the "desired conditions," which are the objective of its analysis, at an unreasonably low threshold in order to permit the NPS to find that the Winter Use Plan's impact on air quality would be acceptable.  The FEIS merely states that its "desired condition" relating to air quality is that "reduced oversnow vehicle … emission levels protect air quality," referring to a reduction from emission levels in the late 1990's.  But the NPS's Winter Use Plan will permit an increase in emission levels when compared with air quality during the last several seasons.

## *The Record of Decision*

52.    On November 20, 2007, Defendants decided, based on the FEIS, that the proposed Winter Use Plan would be consistent with the underlying statues and other legal requirements.  But the FEIS was flawed, as discussed above.

## *Adoption of the Regulation*

53.    On December 10, 2007, Defendants adopted the Winter Use Plan by amending 36 C.F.R. §§ 7.13, 7.21 and 7.22.

## FIRST CLAIM FOR RELIEF
### (Section 10(e)(2) of the Administrative Procedure Act for Agency Action Not in Accordance with Law)

54.    Section 10(e)(2) of the Administrative Procedure Act, 5 U.S.C. § 706(2) authorizes a reviewing court to "hold unlawful and set aside agency action, findings and conclusions found to be … not in accordance with law."

55.    Defendants' Winter Use Plan for the Parks is not in accordance with law, including the following legal prohibitions and requirements:

(a)    The Winter Use Plan is prohibited by 16 U.S.C. § 22 because the Winter Use Plan is inconsistent with the requirements of that section mandating that Defendants make regulations to preserve the natural wonders of Yellowstone against injury or spoliation and to preserve them in their natural condition. The Winter Use Plan would, according to the NPS's own evaluation, permit injury and spoliation of Yellowstone's wildlife, natural soundscapes and air quality, all of which are among Yellowstone's natural curiosities or wonders.

(b)    Defendants acted contrary to Executive Order 11644 in adopting the Winter Use Plan. That Executive Order prohibits Defendants from authorizing the use of snowmobiles in the Parks unless the Secretary of the Interior "determines that off-road vehicle use in such locations will not adversely affect the natural, aesthetic or scenic values." EO 11644 § 3. Yet, based on the NPS's own FEIS, the Winter Use Plan will adversely affect the natural, aesthetic and scenic values within the Parks.

(c)    The Winter Use Plan is contrary to the prohibition on snowmobile authorization under the NPS's own regulation, 36 C.F.R. § 2.18(c). That regulation prohibits snowmobile use to be designated when their use is not consistent with the park's natural, cultural, scenic and aesthetic values, safety considerations, park management objectives, and will not disturb wildlife or damage park resources. Yet the NPS's own evaluation demonstrates that the Winter Use Plan will in fact disturb wildlife and damage park resources, and that the Winter Use Plan is inconsistent at least with Yellowstone's natural, cultural, scenic and aesthetic values.

(d)    The Winter Use Plan is contrary to the Organic Act and the General Authorities Act, as amended. 16 U.S.C. §§ 1, 1a-1. Among other things, those

statutes prohibit the NPS from permitting an "impairment" of the scenery, natural and

historic objects and wild life within the National Park System, and prohibit the NPS from

administering the parks within that System "in derogation of the values and purposes for

which these various areas have been established." The NPS has itself interpreted these

requirements as mandating that conservation predominate over recreation whenever there

is a conflict between conserving resources and values and providing for their enjoyment.

2006 Management Policies § 1.4.3. The Defendants recognize that conflict at

Yellowstone yet, by adopting the Winter Use Plan, are permitting snowmobile recreation

there at the expense of conservation.

### SECOND CLAIM FOR RELIEF
**(Section 10(e)(2) of the Administrative Procedure Act for Agency Action, Findings
and Conclusions that Are Arbitrary, Capricious and an Abuse of Discretion)**

56.     Section 10(e)(2) of the Administrative Procedure Act, 5 U.S.C. § 706(2),

authorizes a reviewing court to "hold unlawful and set aside agency action, findings, and

conclusions found to be arbitrary, capricious and an abuse of discretion ...." The ROD

and the FEIS are arbitrary, capricious and an abuse of discretion, because, among other

things, there is no rational connection between the facts and the NPS's conclusions. For

example:

(a)     Defendants set a standard for evaluating impact on natural winter

soundscapes at Yellowstone which was unreasonable but which permitted Defendants'

desired conclusion, that permitting 540 snowmobiles per day would not cause prohibited

adverse effects. That impact standard was based on the percentage of the "total park

area" in which sounds could be heard. Because of the enormous size of Yellowstone,

that standard would permit a finding of little or no impact even when the sounds being

evaluated are extremely loud and carry for long distances, interfering with the enjoyment of Yellowstone by visitors not using snowmobiles. The unreasonableness of that analytical method is further heightened by the fact that the same areas of the park in which snowmobiles would be used are those areas in which other visitors and wildlife tend to congregate, according to the NPS's own analysis.

        (b)    Defendants set a standard for evaluating the impact of snowmobiles on wildlife which was unreasonable but which permitted Defendants' desired conclusion, that permitting 540 snowmobiles per day at Yellowstone would not cause prohibited adverse effects. That standard was based on the impact on the "total population" of a species, regardless of the significance of impacts on individual animals or smaller groups of them. That "total population" standard permitted Defendants to conclude that 540 snowmobiles per day would have little or no impact on wildlife.

        (c)    Defendants set unreasonably low the "desired conditions" for evaluating impacts on air quality in order to permit a finding that the Winter Use Plan's impact on air quality would be acceptable. The FEIS's "desired condition" relating to air quality is merely that there be "reduced oversnow vehicle … emission levels [that] protect air quality," referring to a reduction from emission levels prior to the adoption of the 2001 Rule.

        (d)    Defendants unreasonably chose not to follow the recommendations of its own scientists concerning the effects of snowmobiles on wildlife in Yellowstone and provided no rational explanation of why that recommendation was being disregarded. The NPS's own scientists recommended that oversnow vehicle use not be permitted to an

extent greater than that experienced during the winter seasons in which the 2004 Rule was in effect. Yet the ROD would permit double that number of oversnow vehicles.

(e)     Defendants unreasonably based the conclusion that 540 snowmobiles would have limited impact on natural soundscapes, wildlife and air quality by relying on hypothetical modeling, despite Defendants' recognition that that modeling understates those impacts and relies on inaccurate assumptions and despite the fact that that modeling is contrary to the NPS's own monitoring of actual conditions.

(f)     The NPS departed in several critical respects from prior agency policies or interpretations in order to permit a finding of little or no adverse impact arising from the proposed Winter Use Plan, yet Defendants provided no justification for those departures, including the following:

> (i)     The NPS's long-standing interpretation that applicable statutes and regulations preclude adverse impacts to individual wildlife or groups of wildlife, replacing that interpretation with one that only considers the impact upon a total population of a species of animal.

> (ii)    The NPS's long-standing interpretation of the applicable statutory and regulatory requirements relating to soundscapes which take into account the impact on natural soundscapes in areas likely to be visited by visitors and/or wildlife and replacing that interpretation with one that only considers impacts on natural soundscapes which affect the entire area of a park unit.

(g)     Defendants failed to articulate a rational basis for the determination that none of the seven alternatives examined would impair park resources, relying on the same repetitive, boilerplate and nearly identical conclusory statements in each impairment analysis.

## THIRD CLAIM FOR RELIEF

### (Section 10(e)(2) of the Administrative Procedure Act for Violation of the National Environmental Policy Act)

57.    The National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 *et seq.*, requires federal agencies to prepare environmental impact statements regarding "proposals for … major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). As interpreted by the courts, NEPA requires that, when federal agencies prepare such an environmental impact statement, the agency must reasonably define its objective so as to carry out the purpose and requirements of the underlying legislation and that the agency must use reasonable tests and methods for evaluating the degree to which the considered alternatives meet that objective. The agency may not define the objective unreasonably so as to permit a favored result.

58.    Defendants acted contrary to these requirements in preparing the FEIS and in reaching their conclusions as set forth in the ROD. Among other things:

(a)    The NPS's definition of its objective, "to ensure park visitors have a range of winter recreation opportunities that are appropriate to the national park setting, and that these activities do not impair or irreparably harm park resources or values," does not reasonably reflect the purpose or requirements of the Organic Act, the General Authorities Act, as amended, the act establishing Yellowstone, the NPS's own snowmobile regulation or the Executive Order on which it was based. *See* 16 U.S.C. §§ 1, 1a-1 and 22; 36 C.F.R. § 2.18(c); EO 11644. "Impairment" is not the only requirement established by these statutes or other authorities, nor must harm to park resources or values be "irreparable" in order to be prohibited by these authorities.

24

(b)    Defendants' statements of its "desired conditions" fail reasonably to reflect the requirements of the authorities cited in the preceding subparagraph. For example, Defendants set unreasonably low the "desired conditions" for evaluating impacts on air quality in order to permit a finding that the Winter Use Plan's impact on air quality would be acceptable. The FEIS's "desired condition" relating to air quality is merely that there be "reduced oversnow vehicle … emission levels [that] protect air quality," referring to a reduction from emission levels in the late 1990's. But "protect air quality" is too lacking in substantive content to serve as a meaningful desired condition.

(c)    Defendants set a standard for evaluating impact on natural winter soundscapes at Yellowstone which was not a reasonable means of evaluating whether those impacts violated the requirements of the underlying legislative and other authorities. That test of impact was based on the percentage of the "total park area" in which sounds could be heard. Because of the enormous size of Yellowstone, that test would permit a finding of little or no impact even when sounds being evaluated are extremely loud and carry for long distances, interfering with the enjoyment of the park by other visitors. The unreasonableness of that analytical method is further heightened by the fact that the same areas of the park in which snowmobiles would be used are those areas in which other visitors and wildlife tend to congregate, according to the NPS's own analysis.

(d)    Defendants used an analytical method for evaluating the impact of snowmobiles on wildlife which was not a reasonable means of evaluating whether those impacts violated the requirements of the underlying legislative and other authorities. That method was to examine the impact on the total population of each species, despite

25

the recognition that the Winter Use Plan would in fact have significant impact on individual animals or groups of animals.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully pray that this Court:

(1)     Find that the Winter Use Plan, the ROD and the FEIS are unlawful and set them aside; and

(2)     Grant Plaintiffs such other and further relief as the Court may deem proper.

Respectfully submitted,

Robert D. Rosenbaum (D.C. Bar No. 090498)
Donna E. Patterson (D.C. Bar No. 358701)
Ingo W. Sprie
Kwame A. Clement (D.C. Bar No. 467377)
Meetu Kaul (D.C. Bar No. 468146)
ARNOLD & PORTER LLP
555 Twelfth Street, NW
Washington, DC  20004
Phone:    (202) 942-5862
Fax:        (202) 942-5999

Attorneys for Plaintiff

Dated:  December 18, 2007

## CERTIFICATE OF SERVICE

I hereby certify that, on this 18th day of December 2007, I served on the following a copy of the Plaintiff's First Amended Petition for Review of Agency Action in the case captioned *National Parks Conservation Association v. U.S. Department of the Interior and National Park Service*, 1:07-cv-02112 (JR) pending in the U.S. District Court for the District of Columbia, by sending a copy of that document by Certified Mail, Return Receipt Requested.

The Hon. Michael B. Mukasey
Attorney General of the United States
United States Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC  20530

Jeffrey A. Taylor, Esq.
United States Attorney for the
    District of Columbia
555 Fourth Street, NW
Washington, DC  20530

The Honorable Dirk Kempthorne
Secretary
United States Department of the Interior
1849 C Street, NW
Washington, DC  20240

The Honorable Mary Bomar
Director
National Park Service
1849 C Street NW
Washington, DC  20240

Robert D. Rosenbaum