IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
)
GREATER YELLOWSTONE COALITION,    )
et al.,                                                        )
                        Plaintiffs,           )
                                                              )        Case No. 07-cv-2111 (EGS)
        v.                                                  )
                                                              )        [Hearing on Motions for Summary
DIRK KEMPTHORNE, et al.,                    )        Judgment on August 27, 2008]
                                                              )
                        Defendants.          )
_____)

_____
)
NATIONAL PARKS CONSERVATION        )
ASSOCIATION,                                       )
                                                              )
                        Plaintiff,             )
                                                              )        Case No. 07-cv-2112 (EGS)
        v.                                                  )
                                                              )        [Hearing on Motions for Summary
UNITED STATES DEPARTMENT OF THE   )        Judgment on August 27, 2008]
INTERIOR; NATIONAL PARK SERVICE,   )
                                                              )
                        Defendants.          )
_____)

## PLAINTIFF NATIONAL PARKS CONSERVATION ASSOCIATION'S OPPOSITION TO THE GOVERNMENT'S MOTION TO TRANSFER

### INTRODUCTION AND SUMMARY

Under 28 U.S.C. § 1404(a), the moving party bears the burden of showing that the

interests of convenience and justice weigh in favor of transfer, applying the private and public

interest considerations used by this Court in its denial of prior transfer motions in the

snowmobile litigation.  *See, e.g.*, *Fund for Animals v. Norton*, 352 F. Supp. 2d 1 (D.D.C. 2005)

("2005 Prior Transfer Denial") (denying motion to transfer prior snowmobile litigation, stating

that "the moving party 'bears the burden' of establishing that transfer is appropriate.").

> The private interest considerations include:  (1) the plaintiff's
> choice of forum, unless the balance of convenience is strongly in
> favor of the defendants; (2) the defendants' choice of forum;
> (3) whether the claim arose elsewhere; (4) the convenience of the
> parties; (5) the convenience of the witnesses of the plaintiff and
> defendant, but only to the extent that the witnesses may actually be
> unavailable for trial in one of the fora; and (6) the ease of access to
> sources of proof.

*Fund for Animals v. Norton*, Civ. Act. No. 02-2367, Order dated Sept. 15, 2003 ("2003 Prior

Transfer Denial") (Federal Defs. Ex. O attached to Declaration of Guillermo A. Montero

("Montero Decl.") [25-2], at 7) (quoting *Trout Unlimited v. U.S. Department of Agriculture*, 944

F. Supp. 13, 16 (D.D.C. 1996).

All the private interest factors here weigh against transfer.  The presumption in favor of

honoring Plaintiff NPCA's choice of forum is particularly strong when, as here, there is a

substantial nexus between the chosen forum and the controversy.  As discussed below, the Bush

Administration's drive to permit snowmobiles at Yellowstone and Grand Teton National Parks

has originated in the White House and has been implemented at the highest levels of the Interior

Department.

The Government attempts to overcome the private interest factors by pointing to "public

interest factors."  First, the Government claims this is a "localized dispute," but this is simply not

so.  The national nature of this controversy is exemplified by the fact that the Government's

proposal to permit snowmobiles in these parks generated a vast number of comments — almost

125,000 — from all 50 States.  Only 4.1% of those comments were from Wyoming, Idaho or

Montana.  Moreover, the snowmobile dispute has been covered in the nationwide media and has

generated opposition from Congressmen from at least 27 States outside of the immediate area in

which these parks are located.  The Wyoming Plaintiffs challenge the NPS decision about

opening or closing one mountain pass, "Sylvan Pass," but the record is clear that no final

decision has been made on that issue.  It is therefore not ripe for adjudication under the

Administrative Procedure Act ("APA") and has no role in the Government's "localized dispute"

argument.

The Government also argues that it is at risk of inconsistent judgments in light of the

litigation filed in the District of Wyoming by the State of Wyoming and Park County, Wyoming

concerning the same Winter Use Plan as that at issue here.  But there are several problems with

the Government's position.  First, the subject matter jurisdiction of the Wyoming Court in those

cases is highly dubious.  The Government could have, but has not, filed a motion to dismiss the

Wyoming cases based on lack of subject matter jurisdiction.  Instead, the Government puts the

burden of its claimed risk of inconsistent judgments on this Court.  Under these circumstances,

its claimed concerns should be given little weight.

The Wyoming Court lacks subject matter jurisdiction because Plaintiffs in the two actions

initiated there are the State of Wyoming and Park County, Wyoming, neither of which has

standing, under long-established legal principles, to assert claims on behalf of its citizens.  *See,

e.g., State ex. rel. Sullivan v. Lujan*, 969 F.2d 877, 883 (10th Cir. 1992).  At most, those Plaintiffs

might have standing to assert a procedural objection, namely the claim of the State of Wyoming

that the Federal Defendants made their decision to decrease the number of daily snowmobile

entries without consulting with the State to the extent it believes it was entitled to be consulted.

Which leads us to the second fundamental problem with the Government's claim that it is

at risk of inconsistent judgments.  While the litigation in both fora challenge the same Winter

Use Plan, the nature of the claims are very different.  *See* 2005 Prior Transfer Denial, 352 F.

Supp. 2d at 2.  The NPCA asserts primarily that the studies conducted by the NPS in the last

several years demonstrate that the NPS may not permit snowmobiles in these parks, consistent

with the applicable legal requirements.  Assuming *arguendo* that the State of Wyoming has standing to assert its narrow procedural claim, there is little or no risk of inconsistent judgments between that claim and the NPCA's claim.  If the State were to prevail on that claim, that result would be mooted by an order of this Court finding that the NPS violated substantive prohibitions by permitting snowmobiles in these parks.  There are of course a variety of other possible outcomes, but not many that would present truly inconsistent orders.

Finally, it must be noted that the NPCA filed its claims 3 weeks and 6 weeks, respectively, before the Wyoming actions were commenced and 3 months before the snowmobile industry intervened in that litigation.  Yet the Wyoming Plaintiffs chose to sue in Wyoming rather than before this Court.  Under well-established principles, the first-filed cases before this Court should be given deference in resolving the two-court issue.

## I.    THE "PARAMOUNT IMPORTANCE" OF PLAINTIFFS' CHOICE OF FORUM AND THE OTHER PRIVATE INTEREST FACTORS ALL POINT TO A DENIAL OF TRANSFER

All of the private interest factors weigh heavily against transfer.  It is well-established that the plaintiff's choice of forum is to be given substantial deference.  *Wilderness Soc'y v. Babbit*, 104 F. Supp. 2d 10, 12 (D.D.C. 2000).  The presumption in favor of the plaintiff's chosen forum is particularly strong when, as here, there is a meaningful factual nexus between the plaintiff's chosen forum and the controversy.  *See Greater Yellowstone v. Bolsworth*, 180 F. Supp. 2d 124, 128 (D.D.C. 2001).

### A.    All the Private Interest Factors Weigh Against Transfer

Not surprisingly, the Government does not argue that any of the private interest considerations favor its transfer motion.  As this Court found in its 2003 Prior Transfer Denial:

> All of these factors weigh in favor of vindicating plaintiffs' choice
> of forum. "It is plaintiffs' privilege to chose the forum and their
> preference must be given substantial weight in the transfer
> analysis." *Adams v. Bell*, 711 F.2d 161, 194 n.115 (D.C. Cir.
> 1983) (*en banc*). Defendants have not persuaded the Court that it
> would be any more convenient for the parties to litigate in the
> District of Wyoming, and this being a suit brought pursuant to the
> APA, there are no witnesses whose convenience is at issue.

*See* 2003 Prior Transfer Denial, at 8.

Plaintiff NPCA has its headquarters in the District of Columbia. Declaration of Tony Jewett ("Jewett Decl.") ¶ 1. This litigation is being directed by the NPCA by its General Counsel, who is based in the District of Columbia. *Id.* ¶ 2. And the NPCA's outside counsel, the firm of Arnold & Porter LLP, is located in the District of Columbia. *Id.* Moreover, the Federal Defendants' headquarters are located here, and their counsel in the Department of Justice who are handling this case are based in the District of Columbia. *See* 2005 Prior Transfer Denial, 352 F. Supp. 2d at 2 (noting the relevance of the fact that the Federal Defendants "and their counsel" are located in this District.). The proposed intervenors' counsel, the firm of Birch, Horton, Bittner and Cherot, also has its offices here in the District of Columbia. *See, e.g.*, Applicant Intervenors' Memorandum in Support of Motion to Intervene [15], at 30.

Here, as in the prior snowmobile litigations before this Court, there are no witnesses whose convenience is at issue because this is a petition for review of administrative action under the APA based on the written record. *See* 2005 Prior Transfer Denial, 352 F. Supp. 2d at 2. And sources of proof are equally available in this Court as in the District of Wyoming.

**B.      There Is a Substantial Nexus Between This Controversy and This District**

There is a meaningful nexus between this controversy and this District. *See Greater Yellowstone*, 180 F. Supp. 2d at 128-29. The Government's snowmobile policy in Yellowstone was not developed at the level of the superintendents of Yellowstone or of the other affected

parks.  Instead, there has been substantial involvement on the part of Washington-based officials, including those at the Department of the Interior, those at the Washington Headquarters of the National Park Service ("NPS") and even those in the White House.  *See Wilderness Soc'y*, 104 F. Supp. 2d at 14 (relevance of the involvement of high-level, Washington-based officials in establishing a factual nexus).  Indeed, the final regulations implementing the Winter Use Plan were signed, not by the superintendents of those parks, and not even by an official of the NPS, but by the Assistant Secretary of the Interior for Fish and Wildlife and Parks, Lyle Laverty, based in Washington.  72 Fed. Reg. 70781, 70804 (Dec. 13, 2007).  Jewett Decl., Ex. I, at 70804.

It has been extensively reported in the press that the Bush Administration has from its earliest days advocated promoting greater recreational use of the national parks, including snowmobiles.  *See, e.g.*, Jewett Decl., Ex. L (Jo Becker and Barton Gellman, *Leaving No Tracks*, WASH. POST (June 27, 2007)).  Vice President Richard Cheney, who grew up in Casper, Wyoming, just 50 miles from Wyoming and who served six terms as a Congressman representing Wyoming, has long taken a personal interest in the policies regulating the use of snowmobiles in Yellowstone and in Grand Teton National Park.  *Id.*, at 2.  According to a former aide to the Vice President, Ronald I. Christie, "Vice President Cheney impressed upon us that so many people enjoyed snowmobiling in the Tetons."  *Id.*

In 2002, Vice President Cheney recommended Paul Hoffman, one of his former congressional aides, to be Deputy Assistant Interior Secretary for Fish and Wildlife and Parks. *Id.*  Mr. Hoffman, according to reports, had as one of his primary objectives making the national parks more open to recreational activities, such as snowmobiling and jet skiing.  Jewett Decl., Ex. M (Michael Shnayerson, *Who's Running Our National Parks*, VANITY FAIR (June 7, 2006)), at 2.  Mr. Hoffman suggested in an interview that he supported the use of snowmobiles in

national parks because he knew that such a policy was consistent with the goals of Vice

President Cheney.  Jewett Decl., Ex. L, at 2.  Mr. Hoffman said about the Vice President:  "His

genius is that he builds networks and puts the right people in the right place, and that he trusts

them to make well informed decisions that comport with his overall vision."  *Id.*

In late 2004, Vice President Cheney explained that vision publicly:

> Right now the battle in Wyoming is over snowmobiles in
> Yellowstone . . . . And for years, we've used snowmobiles in
> Yellowstone . . . But there's been a battle raging now for several
> years, and *the Clinton administration tried basically to shut down
> all snowmobiles in Yellowstone National Park.  That doesn't make
> any sense at all.*  Reasonable regulations and so forth, be sensitive
> to other uses — so there is this battle, that the only way I know
> about it is to go into the normal process, the political process,
> participate and get actively involved, work with your member of
> Congress, work with the administration.

Jewett Decl., Ex. N (Press Release, White House, *Vice President and Mrs. Chaney Remarks and

Q&A at a Town Hall Meeting in Duluth, Minnesota* (Sept. 29, 2004)), at 12 (emphasis added).

Only a few months later, in February 2005, then Interior Secretary Gale A. Norton

showed her support for snowmobiling in Yellowstone by making a well-publicized snowmobile

trip to the Park.  The New York Times characterized the trip as constituting an "unusual personal

endorsement to the machines."  Jewett Decl., Ex. O (Felicity Barringer, *A 3-Day Yellowstone

Tour in Support of Snowmobiling*, NEW YORK TIMES (Feb. 17, 2005)), at 1.  The newspaper said

that "the secretary's three-day show of solidarity with snowmobiles was unambiguous as she

gave one mini news conference after another."  *Id.*  At about the same time, Paul Hoffman, one

of Secretary Norton's assistants, commenced work on a project to amend the NPS's mission

statement and internal operating manual, its "Management Policies," in a manner that would

radically revise that mission and the NPS's interpretation of its governing statutes.  Jewett Decl.,

Ex. L, at 2.

The Director of the NPS during the relevant time period up to mid-2006, Fran Mainella, left no doubt in one interview after she had resigned that it was the officials at the Department of the Interior, not those at the NPS, who were making the decisions about recreational snowmobiling in Yellowstone.  The interviewer summarized her position in a November 2007 interview as follows:

> Her bosses in the Interior Department, in effect, tied her hands on the question of recreational snowmobiling in Yellowstone National Park.

Jewett Decl., Ex. P (Kurt Repanshek, *Former Park Service Director Mainella:  Interior Department called Yellowstone Snowmobile Decisions*, NATIONAL PARKS TRAVELER, Nov. 29, 2007), at 2.

While both Secretary Norton and Director Mainella have since resigned, and Mr. Hoffman failed in his efforts to revise the NPS's mission and has been reassigned, there is ample evidence of ongoing involvement of Washington-based officials in the development of the 2007 Winter Use Plan.  Declaration of Robert D. Rosenbaum ("Rosenbaum Decl."), Ex. T (Record Doc. 119737 (email describing Hoffman conversation with Yellowstone superintendent concerning snowmobiles, 12/9/2005); Doc. 113523-24 (3/28/07 draft schedule for finalization of environmental impact statement and final rule, noting scheduled meeting with Department of the Interior Solicitor's Office and Department of Justice and scheduled review by White House Council on Environmental Quality); Doc. 114773 (email from Sue Masica, Interior's Chief of Staff, to Yellowstone's Superintendent Lewis, referring to Deputy Interior Secretary Scarlett's "intervention with EPA region in Denver to get them to re-write their cooperating agency comments"); Doc. 113508 (memo of conversation with Superintendent Lewis, referring to the fact that proposed rule is "bogged down . . . at Interior" and making clear (113510) that the

Department of the Interior will have the ultimate say, rather than the NPS).  *See also* Greater

Yellowstone Coalition Opp'n to Def. Mot. to Transfer, at 20 and exhibits cited.

     The Government has advised the Plaintiffs that other documents have been withheld from

the Administrative Record based on a claim of pre-decisional agency deliberations on legal or

policy matters, although the Government has not provided any identification or justification for

the withholding of those documents.  According to the Government, "the majority of the

deliberative materials are communications between officials at the National Park Service,

Department of the Interior, and officials of the Office of Management and Budget, and other

Executive Branch officials."  Rosenbaum Decl., Ex. V.  Without regard to the appropriateness of

the withholding of such materials, it is clear from the Government's explanation that "Executive

Branch" officials outside of the Department of the Interior and NPS were involved in the

decision-making process at issue in this controversy.

*    *    *

     Accordingly, there is a strong nexus between this District and this controversy.

Plaintiff's choice of forum accordingly deserves substantial weight.  As we now will

demonstrate, no public interest factors outweigh that choice.

## II.     THE PUBLIC INTEREST FACTORS WEIGH HEAVILY IN SUPPORT OF PLAINTIFF NPCA'S CHOICE OF FORUM

     The Government has the burden of explaining why the "interests of justice" require the

later-filed cases in the District of Wyoming to take precedence over this litigation.  The

Government makes two arguments:  that this litigation supposedly involves a "localized

controversy" in Wyoming and that the Government would be at risk of inconsistent judgments if

the litigation were not consolidated in a single District.  But the Government's first argument is

clearly wrong as a factual matter.  And the Government's second argument is nothing more than

9

an effort to put the burden on this Court of resolving a problem that, if it exists at all, should be resolved by the Government itself.

   **A.    This Litigation Involves an Issue of National Importance, Not a "Localized Controversy"**

The Government argues that the D.C. litigation involves a "localized controversy" and should therefore be transferred to the Wyoming Court because:

>    the implications of a decision resolving the current winter use
>    litigation *will be felt more acutely in Wyoming*, where its citizens
>    are affected *more proximately* not only by the conservation and
>    preservation concerns of the plaintiffs in the above-captioned
>    cases, but also by the local business, livelihood, and recreational
>    concerns implicated by the Park Services winter use regulations
>    challenged here.

Govt. Br. at 15 (emphasis added).

The determination of whether a controversy is localized in nature, however, depends on the careful weighing of a number of factors, including:

>    where the challenged decision was made, whether the decision
>    directly affected the citizens of the transferee state, the location of
>    the controversy, whether the issue involved federal constitutional
>    issues rather than local property laws or statutes, whether the
>    controversy has some national significance, and whether there was
>    personal involvement by a DC official.

*Nat'l Wildlife Fed'n v. Harvey*, 437 F. Supp. 2d 42, 49 (D.D.C. 2006) (citations omitted). The "geographical location of specific land at issue in a case is not necessarily an indication that the effect of litigation . . . [regarding] that land is restricted to the district where the land lies." *Sierra Club v. Van Antwerp*, 523 F. Supp. 2d 5, 13 (D.D.C. 2007) (citing *Wilderness Soc'y v. Babbit*, 104 F. Supp. 2d at 13-14).

Yellowstone National Park was this Nation's <u>first</u> national park. *Fund for Animals v. Norton*, 294 F. Supp. 2d 92, 98 (D.D.C. 2003). That park is truly a national icon. The first case

challenging the winter use plan for the Parks was litigated in this District precisely because conserving the scenery, natural object and wildlife of that park is a matter of great national importance.  *See id.* at 102-03 (citing 16 U.S.C. § 1).  And Congress expressly mandated that the National Parks are to be "preserved and managed for the benefit and inspiration *of all the people of the United States*," not just local communities.  16 U.S.C. § 1a-1 (emphasis added).  The NPS itself interprets that statutory mission statement as referring to enjoyment "both by people who visit parks and by those who appreciate them from afar."  Jewett Decl., Ex. Q.

        The NPS's own statistics demonstrate that this is no localized controversy.  *See generally* Jewett Decl., ¶¶ 4-6.  More than 70% of the visitors to Yellowstone and Grand Teton National Parks were from states other than Wyoming, Montana and Idaho, the States in which those Parks are located in whole or in part.  *Id.*, Ex. A.  And when the NPS opened its 2007 draft environmental impact statement ("DEIS") to public comment, the response was overwhelmingly national in scope.  Public response to the DEIS consisted of 122,190 comments from all 50 states, D.C., Guam, Puerto Rico, the Virgin Islands and 14 foreign countries.  Of these comments, only 4.1% were from Wyoming, Idaho or Montana.  *Id.*, Ex. B, at 5-6.  When the NPS published its proposed regulation for comment, public response similarly consisted of only 5.1% from Wyoming, Idaho or Montana.  The others were from all 50 states and D.C., Puerto Rico and the Virgin Islands.  *Id.*, Ex. C, at 4-5.

        Moreover, the snowmobile controversy is national news, with major newspapers such as the New York Times and Washington Post reporting and commenting on developments.  Jewett Decl., Ex. D (sample articles).  *See Wilderness Soc'y*, 104 F. Supp. 2d at 17 (*New York Times* editorial was evidence that national, not local, dispute).  Even an Idaho news source referred to the snowmobile conflict as "a national environmental issue."  *See* Jewett Decl., Ex. E.  Editorials

on the snowmobile proposal appeared in the Albuquerque Tribune; Ashville, N.C. Citizen Times; Columbus Dispatch; Denver Post; Harford, Connecticut, Courant; San Francisco Chronicle; and Toledo Blade, among others.  Rosenbaum Decl., Ex. S.

On October 29, 2007, the nationwide concerns about the Yellowstone snowmobile proposal were reflected in a letter of objection to the Director of the NPS signed by 86 members of Congress representing 27 States outside of the immediate area in which the parks are located. Jewett Decl., Ex. F.  A grouping of those signatories by State is enclosed at Jewett Decl., Ex. G. Among other things, they pointed out that the snowmobile proposals were inconsistent with the emphasis in the revised Management Policies on conservation.  The letter stated, "Your decision will either demonstrate a commitment to the 2006 National Park Service Management Policies based on the best science available or a disregard for them."[1]  Jewett Decl., Ex. F, at 1.

### B.  The Government Has Not Demonstrated a Risk of Inconsistent Judgments Because There Is No Subject Matter Jurisdiction in the Wyoming Litigation

The Government places its primary emphasis on its claim that, absent a transfer, it will risk being subjected to inconsistent judgments.  But if the Government is truly concerned about that risk, there are more appropriate steps for it to take than seeking a transfer of these first-filed D.C. cases to Wyoming.  The standing of the plaintiffs in the Wyoming cases is highly dubious. And one of the claims asserted there, concerning Sylvan Pass, is clearly not ripe.  Yet the Government seeks a transfer of these first-filed D.C. cases based on the existence of those Wyoming cases rather than moving to dismiss the Wyoming cases for lack of subject matter

---

[1]    As to the specific controversy concerning Sylvan Pass, see the discussion below at pages 16 to 18, demonstrating that that controversy is not ripe for adjudication.  That issue is therefore not part of the "localized controversy" analysis.

jurisdiction.  Under these circumstances, the Government's concern for inconsistent judgments cannot be taken seriously.

The Wyoming Plaintiffs challenge the following aspects of the Winter Use Plan:  (1) the NPS's imposing a requirement that there be a commercial guide accompanying all recreational snowmobile users, (2) the decision to close Sylvan Pass, (3) variously formulated challenges to the manner in which the NPS imposed limitations on the number of snowmobiles (*e.g.*, per season versus per day, 520 per day versus 720 per day) and (4) by "not allowing the State, in its role as a cooperating agency in the NEPA process, to meaningly participate in the development of the revised preferred alternative in the final EIS" (State of Wyoming only).  Federal Defs.' Ex. K and Ex. L attached to Montero Decl. [25-2]; *see* Ex. K,  ¶ 2b.

### 1.    The Standing of the Wyoming Plaintiffs Is Questionable at Best

"The irreducible constitutional minimum of standing is that the plaintiff must have suffered an injury in fact."  Wright & Miller, FEDERAL PRACTICE AND PROCEDURE §2:297; *Whitmore v. Arkansas,* 495 U.S. 149 (1990).  The State of Wyoming and Park County make no allegations in their petitions to support their standing to sue.

Perhaps they would argue that their citizens will suffer by being unable to use their snowmobiles in the parks as much as they would wish.  Or perhaps these Plaintiffs would argue that their citizens will sustain economic injuries (*e.g.*, loss of income due to decreased snowmobile rental activity not offset by increased fees to commercial guides) as a result of the Winter Use Plan.  However, it is well established that a "State does not have standing as a *parens patriae* to bring an action on behalf of its citizens against the federal government because the federal government is presumed to represent the State's citizens."  *State ex rel. Sullivan v. Lujan*, 969 F.2d 877, 883 (10th Cir. 1992) (citing *Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel.*

*Barez*, 458 U.S. 592 (1982)); *see also Pennsylvania v. Kleppe*, 533 F.2d 668 (D.C. Cir. 1976) (same); *City of Olmstead Falls v. FAA*, 292 F.3d 261, 268 (D.C. Cir. 2002) (same re municipality); *City of Sausalito v. O'Neill*, 386 F.3d 1186, 1187 (9th Cir. 2004) (same).[2]

Or perhaps those Plaintiffs would argue that they will lose tax revenue if local businesses suffer (although the commercial guiding requirement would likely increase taxes paid by commercial guides). But within the context of a review of an agency action under the APA, a person must be "adversely affected or aggrieved by the agency action within the meaning of a relevant statute." 5 U.S.C. § 702 (emphasis added); *see also Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 882 (1990). To be "aggrieved" within the meaning of a statute requires that the injury complained of must fall within the "zone of interests protected by the statutory provisions whose violation forms the legal basis" of the complaint. *Lujan*, 497 U.S. at 883. None of the statutes on which the Wyoming claims are based protect tax revenues of local jurisdictions. And in any event, the NPS's economic studies demonstrate that "all estimated socioeconomic impacts were negligible" under each of the proposed alternatives studied in its environmental impact statement. Jewett Decl., Ex. R, at 215.[3]

---

[2]    *Massachusetts v. EPA*, 127 S. Ct. 1438 (2007) is not to the contrary. There, Massachusetts was held to have standing to challenge the EPA's refusal to act on global warming concerns based on Massachusetts' affidavits stating that "EPA's failure to curb greenhouse gas emissions contributed to the sea level changes that threaten Massachusetts' coastal property." 127 S. Ct. at 1452; *see also id.* at 1454 ("Massachusetts' well-founded desire to preserve its sovereign territory" supports its standing.); *id.* at 1455 n.17 (distinguishing between allowing a State to sue *in parens patriae* for its citizens and allowing a state to protect its own interest).

[3]    The Final Environmental Impact Statement ("FEIS") discusses winter lodging tax collections (a key "tourism-targeted" variable) in the Greater Yellowstone Area counties bordering the parks to obtain information on the degree to which the economies of these counties and communities are economically dependent on park winter visitation. Jewett Decl., Ex. R (Winter Use Plans, FEIS, § 3.3.3.3 (2007)), at 83. For Park County, Wyoming and Freemont County, Idaho, the FEIS states "winter lodging tax collections did not follow the decrease in [Yellowstone National Park Over Snow Vehicles] visitation during 2002-2006" and thus, "[t]he

*Footnote continued on next page*

Or perhaps Wyoming will argue that it has standing to assert a separate "procedural" injury based on its status as a "cooperating agency." NEPA provides that federal agencies responsible for preparing NEPA analyses should do so "in cooperation with State and local governments" and other agencies with jurisdiction by law or special expertise. 42 U.S.C. §§ 4331(a), 4332(2). Wyoming claims that, in its role as a "cooperating agency in the NEPA process," it was not allowed to "meaningfully participate in the development of the revised preferred alternative in the FEIS. Specifically the Park Service did not confer with, or seek input from" the State when making the decision to decrease the number of daily snowmobile entries from 720 (the original preferred alternative) to 540 (that finally adopted). Federal Defs.' Ex. K attached to Montero Decl. [25-2], ¶ 2b. There is nothing in NEPA or its implementing regulations, however, that require every decision made by a lead agency must first be vetted with all of the cooperating agencies. In fact, the regulations are clear that lead agencies are to use the environmental analysis and proposals of the cooperating agencies "consistent with [their] responsibility as lead agency." 40 C.F.R. § 1501.6(a)(2). The Memorandum of Understanding signed by the State of Wyoming made its limited role clear. Rosenbaum Decl., Ex. U, at 2.

But even accepting Wyoming's claim at face value, it is unlikely that any such procedural injury is sufficiently redressable to meet the constitutional requirements of standing. To meet the redressability prong of the standing test, a "plaintiff must demonstrate a substantial likelihood

_____

*Footnote continued from previous page*
recent lodging and tax data for Freemont and Park Counties . . . indicate that declines in snowmobile entries into YNP in particular, and in winter visitation in the park in general, have not detectably impacted the overall winter tourist economy in the counties as measured by monthly lodging tax collections. This is despite the fact that the economies of these counties are relatively small. Two other adjoining counties . . . have relatively large economies where even substantial changes in YNP and GTNP winter visitation would not be detectable . . . . Similarly, impacts from changes in the parks' winter visitation levels for the three-state economy would not be detectable." *Id.*, Ex. R, at 85-86.

exists that the relief requested will redress the injury claimed." *Lujan*, 497 U.S. at 877. Plaintiff

Wyoming has asked the court to vacate and remand portions of the FEIS and rule. It is by no

means clear that the relief requested would in any way address the injuries claimed by Wyoming

(a lack of meaningful participation in the decision-making process). If a court can "fashion no

order which would redress the injuries claimed by plaintiff" then "there is no substantial nexus

between the relief requested and the elimination of plaintiff's injury" and thus the Constitutional

requirement of a "redressable" injury is not met. *Ash Creek Mining Co. v. Lujan*, 969 F.2d 868,

872 (10th Cir. 1992). And if Wyoming is really saying it disagrees with the decisions made by

the NPS, this claim is simply a transparent attempt to construct standing where it does not exist.

>    **2.    The Wyoming Plaintiffs' Sylvan Pass Claim Is Not Ripe for Adjudication**

Even if the Wyoming Plaintiffs could somehow demonstrate their standing, the Wyoming

Court lacks subject matter jurisdiction over at least one claim asserted in both complaints

because that claim is not ripe for adjudication. An agency action is not reviewable under the

APA unless it is "final." *DRG Funding Corp. v. Secretary of Housing & Urban Dev.*, 76 F.3d

1212, 1214 (D.C. Cir. 1996) ("[t]he requirement of a final agency action is considered

jurisdictional. If the agency action is not final, the court therefore cannot reach the merits of the

dispute."). "A final agency action (1) 'marks the consummation of the agency's decision making

process — it must not be of a merely tentative or interlocutory nature'; and (2) the action 'must

be one of which rights or obligations have been determined or from which legal consequences

will flow.'" *Domestic Secs. v. SEC*, 333 F.3d 239, 246 (D.C. Cir. 2003) (quoting *Bennett v.

Spear*, 520 U.S. 154, 177-78 (1997)). One issue addressed in the Winter Use Plan is the question

of whether or not the NPS will continue to open Sylvan Pass in the winter despite avalanche

risks and other difficulties. That is a pass through which some snowmobilers travel from the

east, in Wyoming, into Yellowstone.  Both complaints challenge the NPS's preferred alternative, in the FEIS, of closing Sylvan Pass during the winter.

There is no final agency action to close that Pass, however.  *See* Jewett Decl., ¶¶ 7-10.  Both the ROD and the Final Rule stated that "[a]fter the winter of 2007-2008, in order to maximize risk reduction, [Sylvan] pass would be <u>open</u> and managed using full avalanche forecasting (as defined in the Sylvan Pass Operational Risk Management Assessment)."  Jewett Decl., Ex. H, at 6; Ex. I, at 70786 (emphasis added).  And <u>the NPS expressly agreed to further consideration of this issue</u>:  "The National Park Service will meet with representatives of the State of Wyoming, Park County, Wyoming [the Wyoming Plaintiffs] and the town of Cody to further explore reasonable avalanche and access mitigation safety measures and costs.  In order to provide adequate time to amend this Record of Decision reflecting a potential consensus of the parties and to promulgate a new regulation reflecting the amended decision for the 2008-2009 winter use season and beyond, consensus should be reached by June 1, 2008."  Jewett Decl., Ex. I, at 70787.

The meetings between Wyoming representatives and the NPS began on December 17, 2007 and have been formalized into a "Sylvan Pass Study Group" that holds regular meetings.  Jewett Decl., ¶ 9 and Ex. J.  The last meeting of the Sylvan Pass Study Group was held on March 11, 2008, and another meeting is scheduled for April 24 and 25, 2008.  *See id.*, Ex. K.  NPS has indicated that the discussions with the Sylvan Pass Study Group will likely lead to the promulgation of a new rule concerning Sylvan Pass avalanche mitigation.  *See id.*, ¶ 9.

Accordingly, the Wyoming Plaintiffs' dispute, if any, over Sylvan Pass is not ripe for adjudication.  Even assuming *arguendo* that the Wyoming Plaintiffs have standing, therefore, the Wyoming Court lacks subject matter jurisdiction over the Wyoming Plaintiffs' claim relating to

Sylvan Pass.  Clearly, the NPS has not completed its decision-making process as to that issue. *See Domestic Secs.*, 333 F.3d at 246.

### C.    The Government's Claim of a Risk of Inconsistent Judgments Is In Any Event Overstated

The Government's claim that it risks inconsistent judgments is not entitled to much weight in light of the fact that it has taken no steps to obtain the dismissal or at least substantial narrowing of the Wyoming litigation.  In any event, there are many possible outcomes of the various claims asserted in the two fora, and not many of them put the Government at such a risk, particularly in light of the lack of subject matter jurisdiction in Wyoming.

First, even if the State of Wyoming were found to have standing to assert its procedural claim (that it was not given sufficient consultation rights), that narrow claim should not drive a decision on the transfer of these District of Columbia cases.  It is highly unlikely that any outcome in the District of Columbia would be inconsistent with a victory by the State of Wyoming on that procedural claim.  The NPCA asserts that the studies performed over the last several years now conclusively demonstrate that snowmobiles may not be permitted in these national parks under the governing statutes.  *See* NPCA's First Amended Petition for Review of Agency Action, at 2, 19-21.

Secondarily, the NPCA asserts that the Federal Defendants acted arbitrarily and capriciously in adopting their Winter Use Plan.  *See id.* at 21-26.  If the NPCA is victorious on those secondary claims, there will be ample opportunity on remand for the NPS to provide the State of Wyoming with whatever additional consultation rights the Wyoming Court finds that the State has.  Alternatively, if the NPCA fails in all of its claims, there will be no inconsistency, regardless of how the State of Wyoming's procedural claim is resolved in Wyoming.

Even assuming *arguendo* that the Wyoming Plaintiffs have standing to assert their broader claims, those claims are to a large extent not inconsistent with the NPCA's claims. One of the Wyoming Plaintiffs' principal claims challenges the NPS's decision to require recreational snowmobilers to be accompanied by commercial guides. But even if the Wyoming Plaintiffs were to succeed on those claims, there would be no inconsistency with the claims asserted by the NPCA. That is so because the NPS relies on the commercial guide requirement as a mitigating factor to its permitting snowmobiles in the parks. *See, e.g.*, Jewett Decl., Ex. R, at 238. If the Wyoming Plaintiffs succeed in invalidating the commercial guiding requirement, that result will only strengthen the position of the NPCA that snowmobiles should not be permitted at all.

There is a narrow set of results in both fora which could theoretically be inconsistent. It is possible that this Court will reject the NPCA's position that no snowmobiles should be permitted but decide in its favor on the claims that the Government acted arbitrarily and capriciously in setting such a high number of daily entries, 540. And it is possible that the Wyoming Court would find that the NPS had acted arbitrarily in setting such a supposedly low number of daily entries. But again, under those circumstances, the Government would have a remedy in the form of an appeal based upon the fact that the Wyoming Court should not have reached the merits of that issue, on which it lacked subject matter jurisdiction.

In sum, there are many possibilities of outcomes in both Courts, and it is unfortunate that the Wyoming Plaintiffs chose to bring their actions in Wyoming rather than before this Court, where the District of Columbia Plaintiffs had already filed suit. Yet the chances of the Government's being placed in an untenable risk of inconsistent orders are slim and highly theoretical, not justifying a transfer to Wyoming.

**D.    The Fact That the D.C. Cases Were Filed First Weighs Heavily in the Public Interest Balance**

The Government neglects to acknowledge that when considering Section 1404(a) motions to transfer in cases involving parallel litigation with overlapping issues and parties, courts in both the District of Columbia and the Tenth Circuits have applied a discretionary doctrine based in federal comity that gives priority to the first-filed case. *See Washington Metro. Area Transit Auth. v. Ragarose*, 617 F.2d 828, 830 (D.C. Cir. 1980) ("For more than three decades the rule in this circuit has been that '[w]here two cases between the same parties on the same cause of action are commenced in two different Federal courts, the one which is commenced first is to be allowed to proceed to its conclusion first …."); *Cessna Aircraft Co. v. Brown*, 348 F.2d 689, 692 (10th Cir. 1965) ("The rule is that the first federal district court which obtains jurisdiction of parties and issues should have priority and the second court should decline consideration of the action until the proceedings before the first court are terminated.").

Under the so called "first-to-file rule," the "first court in which jurisdiction attaches has priority to consider the case." *Entines v. United States*, 495 F. Supp. 2d 84, 85 (D.D.C. 2007) (citations omitted). The rule has been invoked by courts in both the D.C. and Tenth Circuits to stay, transfer, and occasionally dismiss later-filed litigation. *See, e.g., O'Hare Int'l Bank v. Lambert*, 459 F.2d 328, 331(10th Cir. 1972) (finding district court abused discretion in not staying later-filed litigation until earlier suit had been resolved); *Washington Metro. Area Transit Auth.*, 617 F.2d at 830 (affirming dismissal of later-filed case); *Nature's Way Prods., Inc. v. Zila Nutraceuticals, Inc.*, No. 2:06cv00667, 2006 WL 2883205 (D. Utah Oct. 5, 2005) (transferring action to district of earlier filed action). And the rule has been used by courts in both jurisdictions as a basis to deny Section 1404(a) motions to transfer earlier filed litigation to the venue of later-filed litigation. *See Navajo Nation v. Peabody Holding*, 209 F. Supp. 2d 269, 279

20

(D.D.C. 2002); *Raytheon Aircraft v. McKittrick*, No. 07-1081-JTM, 2007 WL 2333325 at *5 (D. Kan. Aug. 14, 2007); *Payless Shoesource, Inc. v. St. Paul Fire and Marine Ins. Co.*, No. 06-4124-RDR, 2006 WL 3747558 at *2 (D. Kan. Dec. 18, 2006).

Even when related litigation does not involve the same parties or identical legal claims, courts in this jurisdiction have found that the "interest of justice" can weigh in favor of giving priority to earlier filed litigation.  *See, e.g., Martin-Trigona v. Meister*, 668 F. Supp. 1, 3 (D.D.C. 1987) (transferring case to district in which related actions were pending which "involved similar facts and players"); *Smiths Indus. Med. Sys., Inc. v. Ballard Med. Prods.*, 728 F. Supp. 6, 6 (D.D.C. 1989) (transferring case to the district having "a first-filed, comprehensive, relatively advanced related action").  This Court has transferred an action to a district with earlier-filed litigation — even where the earlier-filed litigation involved different legal claims — on the grounds that litigation had a common "factual underpinning."  *Comptroller v. Calhoun First Nat'l Bank*, 626 F. Supp. 137, 141 (D.D.C. 1985).

## III.   CONCLUSION

For all these reasons, Plaintiff NPCA respectfully requests that the Court deny the

Government's transfer motion.

Respectfully submitted,


/s/ Robert D. Rosenbaum
Robert D. Rosenbaum (D.C. Bar No. 090498)
Ingo W. Sprie
Meetu Kaul (D.C. Bar No. 468146)
Francis A. Franze-Nakamura (D.C. Bar No. 497985)
ARNOLD & PORTER LLP
555 Twelfth Street, NW
Washington, DC  20004
Phone:     (202) 942-5862
Fax:          (202) 942-5999
Attorneys for Plaintiff

Dated:  April 11, 2008

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____

GREATER YELLOWSTONE COALITION,      )
et al.,                             )
                   Plaintiffs,  )
                          )   Case No. 07-cv-2111 (EGS)
          v.                 )
                          )
DIRK KEMPTHORNE, et al.,            )
                          )
              Defendants.   )
_____)

_____

NATIONAL PARKS CONSERVATION          )
ASSOCIATION,                         )
                          )
              Plaintiff,    )
                          )   Case No. 07-cv-2112 (EGS)
          v.                 )
                          )
UNITED STATES DEPARTMENT OF THE      )
INTERIOR; NATIONAL PARK SERVICE      )
                          )
              Defendants.   )
_____)

## DECLARATION OF TONY JEWETT

      Tony Jewett, hereby declares under penalty of perjury pursuant to 28 U.S.C. § 1746 as

follows:

      1.      I am Senior Director, Northern Rockies Region of the National Parks

Conservation Association ("NPCA"). The NCPA is a non-profit membership organization

headquartered in Washington, D.C. dedicated to the protection and enhancement of the National

Park System. Yellowstone National Park is within the Northern Rockies Region of the NPCA.

In my capacity as Senior Director of the Northern Rockies Region, I am familiar with NPCA's

work to formulate its position with respect to the Winter Use Plan for Yellowstone National Park

(the "Winter Use Plan"), monitor developments with respect to the Winter Use Plan, and bring

and direct the current lawsuit challenging the Winter Use Plan.

      2.     The current litigation is being directed for the NPCA by its General Counsel, who

is based in the District of Columbia.  The NCPA's outside counsel is Arnold & Porter, LLP,

which is also based in the District of Columbia.

      3.     I make this declaration to address two of the issues that I understand have been

raised by the motion that the government has filed to transfer this action to the United States

District Court for the District of Wyoming: (a) whether the controversy surrounding the Winter

Use Plan is a national or local controversy, and (b) whether the National Park Service ("NPS")

has reached a final decision with respect to opening Sylvan Pass.  I also make this declaration to

supply the Court with copies of certain documents referred to in NPCA's opposition to the

motion to transfer.

**The Controversy Surrounding The Winter Use Plan Is National, Not Local**

      4.     The controversy concerning the Winter Use Plan is a national controversy.

Yellowstone National Park was this country's first national park.  Statistics compiled by the NPS

demonstrate the national nature of the controversy concerning the Winter Use Plan.  A 2002-

2003 winter survey showed that more than 70% of the visitors to Yellowstone and Grand Teton

National Parks are from states other than Wyoming, Montana and Idaho, the states in which

those Parks are located in whole or in part.  A copy of excerpts from the NPS Winter 2002-2003

Visitor Survey (2005), as obtained from the NPS website, is attached as Exhibit A.  When the

NPS opened its 2007 draft environmental impact statement ("DEIS") to public comment, the

response was national in scope.  NPS received 122,190 comments to the DEIS from all 50 states,

D.C., Guam, Puerto Rico, the Virgin Islands and 14 foreign countries.  Of these comments, only

4.1% were from Wyoming, Idaho or Montana.  A copy of excerpts from the NPS Public

Comment Report, Winter Use Plans, DEIS (2007), as obtained from the NPS website, showing

this distribution of comments is attached as Exhibit B.  When the NPS published its proposed

regulation for comment, public response similarly consisted of only 5.1% from Wyoming, Idaho

or Montana.  The others were from all 50 states and D.C., Puerto Rico and the Virgin Islands.  A

copy of excerpts from the NPS Public Comments on the Proposed Rule, 36 CFR Part 7 (2007),

as obtained from the NPS website, showing this response, is attached as Exhibit C.

     5.     The snowmobile controversy has appeared in the national news, with major

newspapers such as the New York Times, Washington Post, and Seattle Times reporting on

developments.  Copies of a sample of articles as obtained from an online search of news services

are attached as Exhibit D.  Even an Idaho news service referred to the snowmobile conflict as "a

national environmental issue."  A copy of an editorial from IdahoStatesman.com, Nov. 28, 2007,

as obtained in an online search of news services, is attached as Exhibit E.

     6.     On October 29, 2007, the nationwide concerns about the Winter Use Plan were

reflected in a letter of objection to the Director of the NPS signed by 86 members of Congress

representing 27 States outside of the immediate area in which the parks are located.  A copy of

the letter is attached as Exhibit F.  A grouping of the signatories by state, as prepared by a person

under my supervision, is attached as Exhibit G.  Those Congressmen urged the NPS not to adopt

the proposal.  Among other things, they pointed out that the snowmobile proposals were

inconsistent with the emphasis in the revised Management Policies on conservation.  The letter

stated, "Your decision will either demonstrate a commitment to the 2006 National Park Service

Management Policies based on the best science available or a disregard for them."

**NPS Has Not Reached A Final Decision Regarding Sylvan Pass**

7.      One issue addressed in the Winter Use Plan is the question of whether or not the NPS will continue to open Sylvan Pass in the winter despite avalanche risks and other difficulties.  That is a pass through which some snowmobilers travel from the east, in Wyoming, into Yellowstone. The NPS's environmental impact statement stated the closing of Sylvan Pass during the winter as a preferred alternative.  But both the NPS Record of Decision ("ROD") and the Final Rule did not adopt that preferred alternative.

8.      Both the ROD and the Final Rule stated that "[a]fter the winter of 2007-2008, in order to maximize risk reduction, [Sylvan] pass would be open and managed using full avalanche forecasting (as defined in the Sylvan Pass Operational Risk Management Assessment)."  A copy of excerpts from the NPS ROD (2007), as obtained from the NPS website, are attached as Exhibit H.  A copy of excerpts from the NPS Final Rule, 72 FR 70781, as obtained from the Federal Register,  is attached as Exhibit I.  This meant that the pass would be open to snowmobiles and snowcoaches when it was declared safe.  However, the NPS expressly agreed to further consideration of this issues:  "The National Park Service will meet with representatives of the State of Wyoming, Park County, Wyoming [the Wyoming Plaintiffs] and the town of Cody to further explore reasonable avalanche and access mitigation safety measures and costs.  In order to provide adequate time to amend this Record of Decision reflecting a potential consensus of the parties and to promulgate a new regulation reflecting the amended decision for the 2008-2009 winter use season and beyond, consensus should be reached by June 1, 2008."  A copy of excerpts from the NPS Final Rule, 72 FR 70781, as obtained from the Federal Register, is attached as Exhibit I.

-4-

9. The meetings between Wyoming representatives and the NPS began on December 17, 2007 and have been formalized into a "Sylvan Pass Study Group" that holds regular meetings. A copy of a Press Release from the Sylvan Pass Study Group, February 1, 2008, as distributed by the NPS to interested parties, is attached as Exhibit J. The last meeting of the Sylvan Pass Study Group was held on March 11, 2008 and another meeting is scheduled for April 24 and 25, 2008. A copy of a report of a March 11, 2008 meeting memorializing this fact, by the NPS to interested parties, is attached as Exhibit K. It is my understanding that NPS has indicated that the discussions with the Sylvan Pass Study Group will likely lead to the promulgation of a new rule concerning Sylvan Pass avalanche mitigation. NPS has even set a date by which a decision should be reached so that the rule can take effect for the next winter season: The NPS Winter Use Plans Record of Decision states at page 6: "In order to provide adequate time to amend this Record of Decision reflecting a potential consensus of the parties and to promulgate a new regulation reflecting the amended decision for the 2008-2009 winter use season and beyond, consensus should be reached by June 1, 2008." A copy of excerpts from the NPS ROD (2007), as obtained from the NPS website, are attached as Exhibit H.

10. Thus, it is clear that the NPS has not made a final decision with respect to Sylvan Pass.

**Additional Documents Referred To In NPCA's Opposition To Transfer**

11. A copy of Jo Becker and Barton Gellman, *Leaving No Tracks*, Wash. Post, June 27, 2007 at A1, as obtained from a search of newspapers, is attached as Exhibit L.

12. A copy of Michael Shnayerson, *Who's Ruining Our National Parks*, Vanity Fair, June 7, 2006, as obtained from an online search of news sources, is attached as Exhibit M.

13.    A copy of Press Release, White House, Vice President and Mrs. Cheney Remarks and Q&A at a Town Hall Meeting in Duluth, Minnesota (Sept. 29, 2004), as obtained from the White House website, is attached as Exhibit N.

14.    A copy of Felicity Barringer, *A 3-Day Yellowstone Tour in Support of Snowmobiles*, N.Y. Times, Feb. 17, 2005, as obtained from an online search of news sources, is attached as Exhibit O.

15.    A copy of Kurt Repanshek, *Former Park Service Director Mainella: Interior Department called Yellowstone Snowmobile Decisions*, National Parks Traveler, Nov. 29, 2007, as obtained from an online search of news sources, is attached as Exhibit P.

16.    A copy of excerpts from the NPS 2006 Management Policies, as obtained from the NPS website, is attached as Exhibit Q.

17.    A copy of excerpts from the Final Environmental Impact Statement ("FEIS), (2007), as obtained from the NPS website, are attached as Exhibit R.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on April 10, 2008.

Tony Jewett

July 2005

# Winter 2002–2003 Visitor Survey: Yellowstone and Grand Teton National Parks

## Revised Final Report

Prepared for

**National Park Service**
**Environmental Quality Division**
**Dr. Bruce Peacock**
1201 Oakridge Drive, Suite 200
Fort Collins, CO 80525

Prepared by

**MACTEC Engineering and Consulting, Inc.**
(f/k/a LAW Engineering and Environmental Services, Inc.)
Kennesaw, GA  30144

**BBL Sciences**
Long Beach, CA  90802

**RTI International**
Health, Social, and Economics Research
Research Triangle Park, NC  27709

### 5.2.1   Yellowstone National Park Sample

#### Demographics

Visitors to YNP in the winter come from all over the U.S., although a majority live in western states. In Table 5-2, column 1 lists each state, and column 2 gives the unweighted percentage of visitors from that state in the sample. Column 3 presents the weighted percentages using the person-level nonresponse-adjusted weights (see Section 5.1). The weighted percentages indicate the estimated percentage of the total population of winter visitors to YNP from each state based on the results of the survey. Montana supplied the most visitors to YNP, and a majority of visitors live west of the Mississippi River.

*Overall, visitors to YNP in the winter are well educated and have a higher income compared to the general U.S. population. Compared to snowmobile riders, nonsnowmobile visitors are somewhat more educated, more of them are retired, and they earn on average somewhat less income.*

Table 5-3 contains demographic information about the sample intercepted in YNP. The weighted percentages are provided for the sample as a whole and for snowmobile riders and nonsnowmobile visitors separately. Overall, visitors to YNP in the winter are well educated and have a higher income compared to the general U.S. population. Compared to snowmobile riders, nonsnowmobile visitors are somewhat more educated, more of them are retired, and they earn on average somewhat less income. Visitors are generally married with an average age between 40 and 50 years. Males compose a larger fraction of the snowmobile riders, compared to the nonsnowmobile visitors.

More than one quarter of the snowmobile riders own a snowmobile, and about 30 percent own snowmobiles that employ fuel-injected two-stroke engines or four-stroke engines. On average, snowmobile riders have been riding for 12 years. Although nonsnowmobile visitors are more likely to own cross-country skis and snowshoes, a significant percentage of snowmobile riders own other winter recreation equipment as well. In terms of club memberships, about a third of nonsnowmobile visitors belong to an environmental organization compared to 10 percent of snowmobile riders.

#### Activities and Trip Characteristics

Respondents were asked to indicate all the activities they participated in on their most recent trip and the location of the activity. People on day trips were given the choice of YNP and GTNP as locations. People on overnight trips were also given the

**Table 5-2.  Yellowstone National Park Visitation by State—All Entrances**

| State | Unweighted Share of Total | Weighted Share of Total[a] |
|---|---|---|
| AL | 0.55% | 0.36% (0.16%) |
| AR | 0.39% | 0.57% (0.29%) |
| AZ | 0.70% | 0.75% (0.34%) |
| CA | 4.52% | 5.97% (1.01%) |
| CO | 2.57% | 2.58% (0.67%) |
| CT | 0.55% | 0.42% (0.21%) |
| DC | 0.23% | 0.19% (0.18%) |
| FL | 4.91% | 5.99% (1.15%) |
| GA | 3.66% | 4.26% (0.82%) |
| IA | 0.94% | 0.72% (0.29%) |
| ID | 5.77% | 5.96% (0.85%) |
| IL | 2.03% | 2.08% (0.48%) |
| IN | 1.48% | 1.70% (0.51%) |
| KS | 0.23% | 0.13% (0.12%) |
| KY | 0.39% | 0.39% (0.21%) |
| LA | 0.78% | 1.18% (0.47%) |
| MA | 0.55% | 0.48% (0.21%) |
| MD | 0.62% | 0.55% (0.25%) |
| ME | 0.31% | 0.50% (0.34%) |
| MI | 2.73% | 3.02% (0.74%) |
| MN | 4.21% | 5.11% (1.33%) |

(continued)

*Winter 2002–2003 Visitor Survey: Yellowstone and Grand Teton National Parks*

**Table 5-2. Yellowstone National Park Visitation by State—All Entrances (continued)**

| State | Unweighted Share of Total | Weighted Share of Total[a] |
|:-----:|:-------------------------:|:--------------------------:|
| MO | 0.55% | 0.57%<br>(0.27%) |
| MS | 0.23% | 0.23%<br>(0.14%) |
| MT | 20.27% | 13.75%<br>(1.33%) |
| NC | 1.33% | 1.56%<br>(0.41%) |
| ND | 0.55% | 0.66%<br>(0.35%) |
| NE | 0.39% | 0.35%<br>(0.19%) |
| NH | 0.39% | 0.21%<br>(0.15%) |
| NJ | 1.33% | 1.72%<br>(0.43%) |
| NM | 0.23% | 0.24%<br>(0.15%) |
| NV | 0.94% | 1.05%<br>(0.55%) |
| NY | 3.04% | 3.35%<br>(0.71%) |
| OH | 2.03% | 2.07%<br>(0.52%) |
| OK | 0.94% | 0.52%<br>(0.26%) |
| OR | 0.55% | 0.50%<br>(0.23%) |
| PA | 2.10% | 1.69%<br>(0.41%) |
| RI | 0.16% | 0.18%<br>(0.14%) |
| SC | 0.62% | 0.71%<br>(0.25%) |
| SD | 0.62% | 0.51%<br>(0.24%) |
| TN | 1.71% | 2.01%<br>(0.54%) |
| TX | 3.51% | 4.43%<br>(0.80%) |
| UT | 5.61% | 7.05%<br>(1.52%) |

(continued)

**Table 5-2. Yellowstone National Park Visitation by State—All Entrances (continued)**

| State | Unweighted Share of Total | Weighted Share of Total[a] |
|---|---|---|
| VA | 0.62% | 0.60% (0.36%) |
| VT | 0.62% | 0.69% (0.28%) |
| WA | 3.66% | 3.98% (0.74%) |
| WI | 2.65% | 2.58% (0.56%) |
| WV | 0.16% | 0.10% (0.07%) |
| WY | 5.53% | 4.94% (1.12%) |
| Canada | 0.55% | |
| Other countries | 1.01% | |
| Other | | 0.85% (0.30%) |

[a]Weighted estimates calculated using nonresponse-adjusted person-level weights.  Numbers in parentheses are standard errors on weighted percentage calculations.

choice of recreating in the GYA outside the parks.  Table 5-4 presents the percentage of visitors who indicated each activity for each location.  After indicating all the activities they participated in, respondents were asked to select one activity as their primary activity for the trip.  The last column of Table 5-4 lists the percentage of visitors who indicated that a particular activity was their primary activity.

A majority of winter visitors in YNP rode a snowmobile without a guide, and 55 percent indicated riding a snowmobile without a guide was the primary activity on their most recent trip.  Many visitors also indicated that they rode a snowmobile outside the parks on their trip.  Downhill skiing was the next most popular primary activity, indicating that many visitors to YNP come to the area to recreate outside the parks.[3]  Thirteen percent of visitors indicated that they took a snowcoach tour of YNP; however, slightly less than 5 percent listed snowcoach tour as the primary activity for their most recent trip.

---

[3]Several respondents indicated that they went downhill skiing in YNP or GTNP, although there is no downhill skiing in the parks.  It is possible these visitors did some other kind of skiing in the parks.

*North Wind*

**PUBLIC COMMENT REPORT**
**Winter Use Plans, Draft Environmental Impact Statement**
**Yellowstone and Grand Teton National Parks and the John D. Rockefeller, Jr., Memorial Parkway**

**NATIONAL PARK SERVICE**

This report summarizes public comments received by the National Park Service (NPS) for the Draft
Winter Use Plans Environmental Impact Statement (DEIS), to plan winter visitation and recreation
management in Yellowstone National Park, Grand Teton National Park (GTNP), and the John D.
Rockefeller, Jr., Memorial Parkway. This long-term plan will guide the management of winter use in the
parks, including snowmobiles, snowcoaches and possibly buses. It is intended to ensure that park visitors
have a range of winter recreational opportunities in an appropriate setting, and that these do not impair or
irreparably harm park resources or values.

**BACKGROUND**

Winter use management of Yellowstone and Grand Teton National Parks and the John D. Rockefeller, Jr.,
Memorial Parkway has been the subject of intensive study and public involvement for over a decade,
comprising planning efforts, litigation, and National Environment Policy Act (NEPA) documentation.
The following summarizes events that have occurred to date:

| | |
|---|---|
| 1990 | The NPS completed an Environmental Assessment and Winter Use Plan for the parks. The Greater Yellowstone Coordinating Committee (including the NPS and U.S. Forest Service) subsequently began work on an interagency assessment of winter use issues (published in 1999 as *Winter Visitor Use Management: a Multi-agency Assessment*). |
| 1997 | The Fund for Animals filed suit against the NPS, resulting in a settlement that required the NPS to produce a Final Environmental Impact Statement (FEIS) and make a new decision on winter use. |
| November 22, 2000 | The NPS signed a Record of Decision on the FEIS. The decision eliminated recreational snowmobile and snowplane use from the parks by the winter of 2003-2004. |
| December 6, 2000 | The International Snowmobile Manufacturers Association sued the NPS asking that the decision eliminating snowmobile and snowmobile use be set aside based on NEPA process infractions. |
| June 29, 2001 | A procedural settlement negotiated by the Office of the Secretary of Interior became final. As provided in that settlement agreement, the NPS acted as lead agency to prepare a Supplemental Environmental Impact Statement (SEIS), with the State of Wyoming and nine others acting as cooperating agencies. |
| March 2002 | The NPS published the draft SEIS, and a 60-day public comment period followed during which the NPS received over 300,000 comment documents. |
| March 25, 2003 | The NPS issued a Record of Decision for the SEIS. |
| August 27, 2003 | The Proposed Rule based on the March 2003 Record of Decision was published in the *Federal Register*; the public comment period closed on October 14, 2003. |

1

PUBLIC COMMENT REPORT
Winter Use Plans, Draft Environmental Impact Statement
August 2007                                                                               North Wind, Inc.

| December 2003 | The NPS published the new regulation based on the Record of Decision, but these actions were subsequently vacated and remanded to the NPS by the Washington, D.C., District Court. |
|---|---|
| February 2004 | A federal court in Wyoming issued a preliminary injunction preventing the NPS from implementing the January 2001 regulation phasing out snowmobile use in the three parks. As a result, the parks issued emergency orders to comply with the court's order. |
| June 2004 | The NPS began work on an Environmental Assessment (EA) for a Temporary Winter Use Plan for the parks, to guide management of winter use for the interim period (2004-2005, 2005-2006, and 2006-2007). |
| August 20, 2004 | The NPS issued the EA for a 30-day public review and comment and received 95,006 comment documents. |
| September 7, 2004 | The NPS published a Proposed Rule in conjunction with the EA, followed by a 30-day comment period that ended on October 7, 2004. |
| November 10, 2004 | Implementing regulations for the temporary use plan, which remained in effect through the 2006–2007 winter season, were published in the *Federal Register*. |
| June 24, 2005 | NPS published a Notice of Intent to prepare the Winter Use Plans Environmental Impact Statement and began a 60-day public scoping period beginning on July 24, 2005. |
| September 1, 2005 | The scoping comment period ended, with stakeholders submitting a total of 33,365 comment documents. |
| Fall 2005 | The Wyoming District Court upheld the validity of the 2004 temporary winter use plan, ruling on challenges filed by several litigants. The D.C. District Court denied the Fund for Animals and Federal defendants' motions for summary judgment, as well as a motion by the Greater Yellowstone Coalition enforcing the adaptive management standards of the 2003 decision. |
| September 2006 | The Fund for Animals filed a motion renewing a previous request for summary judgment. That suit is still pending. |
| June 2007 | The Wyoming District Court ruled on a suit from Save Our Snowplanes, upholding the validity of the temporary winter use plan and final regulation and their provisions prohibiting snowplane use on Jackson Lake. |

## CONTRACTOR ACTIVITIES and RESULTS

The comment period for the DEIS began on 03/27/2007 and ended on 06/05/2007. The NPS contracted with North Wind, Inc. (North Wind) to analyze public comments on the DEIS using the NPS Planning, Environment, and Public Comment (PEPC) system, a World Wide Web-based interface through which stakeholders submitted correspondence electronically. Stakeholders also sent paper documents directly to the NPS and provided oral and written comments at public meetings; these were forwarded to North Wind for hand processing (either scanning or data entry into the system).

North Wind received and analyzed 122,190 documents and considered the content of each through a coding process. North Wind reviewed and analyzed each document for concern statements; each concern statement was assigned a code. Codes represent text statements that, taken together, summarize the content of all similar comments received. The result is a profile for each comment document that reflects the content.

August 2007                                                                                                    North Wind, Inc.

## SUMMARY TABLES

The following queries based on data from PEPC summarize the results:

- Total number of documents and comments received
- Number of comment documents favoring each alternative
- Number of documents from each state/province/country
- Number of documents containing comments on each summary code
- Number of documents from gateway communities
- Number of form letters and non-form letters
- Total number for each form letter, and number responding via the web, email or U.S. mail, for form letters (for both form and non-form letters)

Also included is an appendix (Correspondence Text from DEIS Form Letters) of form letters received during the public comment period.

## Number of Documents and Comments Received

| | |
|---|---|
| Total correspondence documents | 122,190 |
| Total number of comments | 1,276,393 |

## Number of Documents Favoring Each Alternative

| Alternative | Number * |
|---|---|
| Alternative 1: Continue Current Plan (Preferred Alternative) | 193 |
| Alternative 2: Snowcoaches only | 88,934 |
| Alternative 3a: Eliminate Most Oversnow Roads/Road Grooming | 31 |
| Alternative 3b: Close Oversnow Roads - No Action | 69 |
| Alternative 4: Expand Recreational Use | 3,244 |
| Alternative 5: Provide for Unguided Access | 52 |
| Alternative 6: Mixed Use | 10 |

\*     Total expressing a preference for a particular alternative does not equal the total number of correspondence
documents because not all commentors expressed a preference.

PUBLIC COMMENT REPORT
Winter Use Plans, Draft Environmental Impact Statement

August 2007                                                                                    North Wind, Inc.

## Number of Letters from Each State/Province/Country *

| Number of Letters from Each State/Province | |
|---|---|
| **USA** | |
| AK | 359 |
| AL | 512 |
| AR | 452 |
| AZ | 2797 |
| CA | 21246 |
| CO | 4774 |
| CT | 1695 |
| DC | 214 |
| DE | 239 |
| FL | 6333 |
| GA | 1778 |
| GU (Guam) | 6 |
| HI | 602 |
| IA | 847 |
| ID | 639 |
| IL | 4680 |
| IN | 1421 |
| KS | 716 |
| KY | 713 |
| LA | 442 |
| MA | 3503 |
| MD | 1984 |
| ME | 891 |
| MI | 3059 |
| MN | 2824 |
| MO | 1468 |
| MS | 204 |
| MT | 863 |
| NC | 2543 |
| ND | 82 |
| NE | 389 |
| NH | 843 |
| NJ | 3095 |
| NM | 1392 |
| NV | 771 |
| NY | 8435 |
| OH | 3406 |
| OK | 434 |

| Number of Letters from Each State/Province | |
|---|---|
| OR | 3641 |
| PA | 4352 |
| PR | 60 |
| RI | 427 |
| SC | 679 |
| SD | 156 |
| TN | 1381 |
| TX | 4519 |
| UT | 802 |
| VA | 2442 |
| VI | 18 |
| VT | 614 |
| WA | 5078 |
| WI | 2179 |
| WV | 261 |
| WY | 3497 |
| AA (Armed Forces Americas) | 5 |
| AE (Armed Forces Europe) | 68 |
| AP (Armed Forces Pacific) | 15 |
| AS (American Samoa) | 7 |
| FM Federated States of Micronesia | 1 |
| MH (Marshall Islands) | 1 |
| UM (U.S. Minor Outlying Islands) | 7 |
| USA (other) | 57 |
| **Canada** | |
| AB (Alberta) | 49 |
| BC (British Columbia) | 122 |
| MB (Manitoba) | 18 |
| NB (New Brunswick) | 9 |
| NL (Newfoundland and Labrador) | 7 |
| NS (Nova Scotia) | 12 |
| NT (Northwest Territories) | 3 |
| NU (Nunavut) | 4 |
| ON (Ontario) | 211 |
| PE (Prince Edward Island) | 2 |
| QC (Quebec) | 55 |
| SK (Saskatchewan) | 9 |
| YT (Yukon Territory) | 6 |
| Canada (other) | 1 |

PUBLIC COMMENT REPORT
Winter Use Plans, Draft Environmental Impact Statement

August 2007                                                        North Wind, Inc.

| Number of Letters from Each State/Province | |
| --- | --- |
| Other countries | |
| Baranya (Hungary) | 1 |
| Finland | 1 |
| Japan | 2 |
| Maharashtra (India) | 1 |
| Mendoza (Argentina) | 1 |
| North Holland (Netherlands) | 1 |
| NSW Australia | 1 |

| Number of Letters from Each State/Province | |
| --- | --- |
| PW Palau | 1 |
| Serbia | 1 |
| Songkhla (Thailand) | 1 |
| Spain | 1 |
| Sweden | 9 |
| United Kingdom | 7 |
| No or Incomplete Address | 4,736 |
| Total | 122,190 |

\*    Data extracted from NPS PEPC system. Commentors enter their own information, so breakout is not restricted to 50 states. Some address corrections (Zip Codes, etc.) were incorporated before totals were calculated.

PUBLIC COMMENT REPORT
Winter Use Plans, Draft Environmental Impact Statement

August 2007                                                          North Wind, Inc.

## Number of Documents from Gateway Communities

| | | |
|---|---|---|
| Driggs | ID | 14 |
| Island Park | ID | 4 |
| Tetonia | ID | 4 |
| Victor | ID | 17 |
| Absarokee | MT | 0 |
| Big Sky | MT | 5 |
| Cooke City | MT | 4 |
| Gardiner | MT | 5 |
| Gateway | MT | 0 |
| West Yellowstone | MT | 58 |
| Alpine | WY | 9 |
| Alta | WY | 4 |
| Cody | WY | 462 |
| Jackson | WY | 167 |
| Moran | WY | 5 |
| Teton Village | WY | 4 |
| Thayne | WY | 5 |
| Wapiti | WY | 63 |
| Wilson | WY | 23 |
| Yellowstone NP | WY | 4 |



**PUBLIC COMMENTS ON THE PROPOSED RULE**
**36 CFR Part 7: Special Regulations, Areas of the National Park System**
**Yellowstone and Grand Teton National Parks and the John D. Rockefeller, Jr., Memorial Parkway**

**NATIONAL PARK SERVICE**

This report presents the results of the public comment period for the National Park Service (NPS) Proposed Rule to manage winter visitation and recreational use in Yellowstone National Park and Grand Teton National Park (GTNP) and the John D. Rockefeller, Jr., Memorial Parkway. The text of the Proposed Rule appeared in the *Federal Register* on Wednesday, May 16, 2007 (Vol. 72, No. 94, 27499 - 27519).

**BACKGROUND**

The National Park Service has been considering winter use management of Yellowstone and Grand Teton National Parks and the John D. Rockefeller, Jr., Memorial Parkway for over a decade. This effort has included planning, public participation, litigation, and National Environment Policy Act (NEPA) documentation. The following is a short summary of events to date:

| | |
|---|---|
| 1990 | The NPS completed an Environmental Assessment and Winter Use Plan for the parks. The Greater Yellowstone Coordinating Committee (including the NPS and U.S. Forest Service) subsequently began work on an interagency assessment of winter use issues (published in 1999 as *Winter Visitor Use Management: a Multi-agency Assessment*). |
| 1997 | The Fund for Animals filed suit against the NPS, resulting in a settlement that required the NPS to produce a Final Environmental Impact Statement (FEIS) and make a new decision on winter use. |
| November 22, 2000 | The NPS signed a Record of Decision on the FEIS. The decision eliminated recreational snowmobile and snowplane use from the parks by the winter of 2003-2004. |
| December 6, 2000 | The International Snowmobile Manufacturers Association sued the NPS asking that the decision eliminating snowmobile and snowplane use be set aside based on NEPA process infractions. |
| June 29, 2001 | A procedural settlement negotiated by the Office of the Secretary of Interior became final. As provided in that settlement agreement, the NPS acted as lead agency to prepare a Supplemental Environmental Impact Statement (SEIS), with the State of Wyoming and nine others acting as cooperating agencies. |
| March 2002 | The NPS published the draft SEIS and a 60-day public comment period followed during which the NPS received over 300,000 comment documents. |
| March 25, 2003 | The NPS issued a Record of Decision for the SEIS. |
| August 27, 2003 | The Proposed Rule based on the March 2003 Record of Decision appeared in the *Federal Register*; the public comment period closed on October 14, 2003. |
| December 2003 | The NPS published the new regulation based on the Record of Decision, but these actions were subsequently vacated and remanded to the NPS by the Washington, D.C., District Court. |
| February 2004 | A federal court in Wyoming issued a preliminary injunction preventing the NPS from implementing the January 2001 regulation phasing out snowmobile use in |

Draft Report: Public Comments on the Proposed Rule
Yellowstone and Grand Teton National Parks and the John D. Rockefeller, Jr., Memorial Parkway

August 31, 2007                                                                                          North Wind, Inc.

|  |  |
|---|---|
|  | the three parks. As a result, the parks issued emergency orders to comply with the court's order. |
| June 2004 | The NPS began work on an Environmental Assessment (EA) for a Temporary Winter Use Plan for the parks, to guide management of winter use for the interim period (2004-2005, 2005-2006, and 2006-2007). |
| August 20, 2004 | The NPS issued the EA for a 30-day public review and comment and received 95,006 comment documents. |
| September 7, 2004 | The NPS published a Proposed Rule in conjunction with the EA, followed by a 30-day comment period that ended on October 7, 2004. |
| November 10, 2004 | Implementing regulations for the temporary use plan, which remained in effect through the 2006–2007 winter season, appeared in the *Federal Register*. |
| June 24, 2005 | NPS published a Notice of Intent to prepare the Winter Use Plans Environmental Impact Statement and began a 60-day public scoping period beginning on July 24, 2005. |
| September 1, 2005 | The scoping comment period ended, with stakeholders submitting 33,365 comment documents. |
| Fall 2005 | The Wyoming District Court upheld the validity of the 2004 temporary winter use plan, ruling on challenges filed by several litigants. The D.C. District Court denied the Fund for Animals and Federal defendants' motions for summary judgment, as well as a motion by the Greater Yellowstone Coalition enforcing the adaptive management standards of the 2003 decision. |
| September 2006 | The Fund for Animals filed a motion renewing a previous request for summary judgment. That suit is still pending. |
| April 2, 2007 | The NPS issued the Winter Use Plans Draft Environmental Impact Statement (DEIS) for review, with the comment period extending through June 5, 2007. NPS received 122,190 documents containing comments on the DEIS. |
| May 16, 2007 | The Proposed Rule based on the DEIS appeared in the *Federal Register*, announcing a public comment period that extended through July 16, 2007. |
| June 2007 | The Wyoming District Court ruled on a suit from Save Our Snowplanes, upholding the validity of the temporary winter use plan and final regulation and their provisions prohibiting snowplane use on Jackson Lake. |

## CONTRACTOR ACTIVITIES and RESULTS

The NPS contracted with North Wind, Inc. (North Wind) to collect and analyze the comments on the Proposed Rule. Stakeholders sent paper comment letters directly to the NPS, and these were forwarded to North Wind for processing. Additional comments came through *Regulations.gov*, an electronic Internet-based system, or were hand-delivered to park headquarters.

North Wind received 1,481 documents including 1,444 in hard copy and 37 in electronic form. Staff considered all documents, analyzing each document and associating the content with one or more text statements that summarized the content of all comments received. The result is a profile for each comment document that reflects its content.

## SUMMARY TABLES

Draft Report: Public Comments on the Proposed Rule
Yellowstone and Grand Teton National Parks and the John D. Rockefeller, Jr., Memorial Parkway

August 31, 2007                                                                                          North Wind, Inc.

The following database queries developed by North Wind provide tabular summaries of the content analysis:

- Number of Commentors and Letters from Each State
- Number of Commentors Who Expressed Each Comment
- Number of Commentors and Letters from "Gateway Communities"
- Number of Form Letter and Non-form Letter Commentors
- Number of Commentors for each type of Form Letter
- Number of Commentors that Responded via the Web or US Mail, for Form Letters and non-Form Letters
- Number of Commentors - By State and Position on Rule

These tables are provided on the following pages.

Draft Report: Public Comments on the Proposed Rule
Yellowstone and Grand Teton National Parks and the John D. Rockefeller, Jr., Memorial Parkway

August 31, 2007                                                                    North Wind, Inc.

## Number of Commentors and Letters from Each State

| State | Number of Letters | Number of Commentors | % of Total Commentors |
|-------|-------------------|----------------------|-----------------------|
| AK | 4 | 4 | 0.28 |
| AL | 3 | 3 | 0.21 |
| AR | 2 | 2 | 0.14 |
| AZ | 20 | 20 | 1.38 |
| CA | 155 | 155 | 10.69 |
| CO | 81 | 81 | 5.59 |
| CT | 13 | 13 | 0.90 |
| DC | 7 | 7 | 0.48 |
| DE | 2 | 2 | 0.14 |
| FL | 42 | 42 | 2.90 |
| GA | 12 | 12 | 0.83 |
| HI | 7 | 7 | 0.48 |
| IA | 33 | 30 | 2.07 |
| ID | 17 | 17 | 1.17 |
| IL | 49 | 49 | 3.38 |
| IN | 14 | 14 | 0.97 |
| KS | 7 | 7 | 0.48 |
| KY | 7 | 7 | 0.48 |
| LA | 1 | 1 | 0.07 |
| MA | 41 | 41 | 2.83 |
| MD | 17 | 17 | 1.17 |
| ME | 6 | 6 | 0.41 |
| MI | 69 | 65 | 4.48 |
| MN | 138 | 132 | 9.10 |
| MO | 16 | 16 | 1.10 |
| MS | 2 | 2 | 0.14 |
| MT | 34 | 32 | 2.21 |
| NC | 28 | 28 | 1.93 |
| ND | 29 | 28 | 1.93 |
| NE | 11 | 9 | 0.62 |
| NH | 18 | 17 | 1.17 |
| NJ | 18 | 18 | 1.24 |
| NM | 15 | 14 | 0.97 |
| NV | 12 | 12 | 0.83 |
| NY | 69 | 68 | 4.69 |
| OH | 27 | 26 | 1.79 |
| OK | 4 | 4 | 0.28 |
| OR | 38 | 38 | 2.62 |

Draft Report: Public Comments on the Proposed Rule
Yellowstone and Grand Teton National Parks and the John D. Rockefeller, Jr., Memorial Parkway

August 31, 2007                                                    North Wind, Inc.

| State | Number of Letters | Number of Commentors | %Total Commentors |
|---|---|---|---|
| PA | 37 | 37 | 2.55 |
| PR | 3 | 3 | 0.21 |
| RI | 4 | 4 | 0.28 |
| SC | 7 | 7 | 0.48 |
| SD | 13 | 13 | 0.90 |
| TN | 16 | 16 | 1.10 |
| TX | 39 | 39 | 2.69 |
| UT | 21 | 21 | 1.45 |
| VA | 19 | 19 | 1.31 |
| VI | 2 | 2 | 0.14 |
| VT | 19 | 18 | 1.24 |
| WA | 69 | 69 | 4.76 |
| WI | 76 | 71 | 4.90 |
| WV | 2 | 2 | 0.14 |
| WY | 26 | 25 | 1.72 |
| OTHER * | 60 | 58 | 4.00 |
| Totals ** | 1,481 | 1,450 | 100.00 |

\*    "OTHER" includes letters with missing, incomplete, or overseas addresses.
\*\*   Some commentors submitted multiple letters, and some letters had multiple signatures. Therefore, totals for letters and commentors may differ.

5

Draft Report: Public Comments on the Proposed Rule
Yellowstone and Grand Teton National Parks and the John D. Rockefeller, Jr., Memorial Parkway

August 31, 2007                                                                                       North Wind, Inc.

## Number of Commentors from "Gateway Communities"

| State | City | Number of Commentors | Number of Letters |
|-------|------|---------------------|-------------------|
| ID | Island Park | 1 | 1 |
| MT | West Yellowstone | 7 | 9 |
| WY | Cody | 2 | 2 |
| WY | Jackson | 12 | 13 |
| | Totals * | 22 | 25 |

\*    Some commentors submitted multiple letters, and some letters had multiple signatures. Therefore, totals for letters and commentors may differ.

THE NEW YORK TIMES NATIONAL MONDAY, FEBRUARY 5, 2007

A16

YT





# Yellowstone Proposal Sets Greater Snowmobile Access

**By JIM ROBBINS**

YELLOWSTONE NATIONAL PARK, Wyo. — The latest installment in the long-running debate over the use of snowmobiles in Yellowstone National Park is a proposal to allow as many as 720 to enter each day, nearly three times as many as permitted in the last several years.

The plan, which could be adopted by the end of the year, has drawn fire from environmentalists and praise from snowmobile advocates and some businesses in the communities around the park.

The plan is described in a preliminary draft environmental impact statement that was released to agencies and governments near the park for comment in December. The Park Service could change the plan before releasing a final version to the public next month for comment, but so far it is favoring greatly expanded winter use. About 250 snowmobiles a day use the park now. The historical average in the 1990s was 795 a day, before access was banned by the Clinton administration.

Critics say that snowmobiles will be detrimental to the park's pristine air, wildlife and quiet. Michael Finley, who was superintendent of Yellowstone for more than six years,

and who oversaw the plan that banned snowmobiles, said the Park Service was skirting its responsibilities under the new plan.

"The facts and science gave them a direction to take, then they softened, twisted and contorted the science," Mr. Finley said. "The plan deserves to be challenged. It deserves burial in deep snow."

In late 2006, Interior Secretary Dirk Kempthorne reaffirmed the parks' commitment to policies emphasizing the conservation of natural and cultural resources over recreation.

"Instead of meeting the bars they set for themselves, they lowered the bars," Mr. Stevens said.

John Sacklin, a management assistant at Yellowstone who has worked on the issue since the 1980s, said that the park had not abdicated its responsibilities and that the new plan still protected the park's natural beauty while managing snowmobile traffic.

"We can achieve those goals," Mr. Sacklin said, "with a managed program that allows limited snowmobile and snow-coach use."

As many as 720 snowmobiles would be allowed to enter Yellowstone National Park each day under a new plan, which has fans and critics alike.

tion, harassment of wildlife and moving violations became serious problems. A lawsuit by a wildlife group, the Fund for Animals, forced the park to take a hard look at the issue.

The first study, in the late 1990s, found that banning snowmobiles and allowing only snow-coaches — buses or vans on large skis or treads — would protect the park the best. In 2000, near the end of the Clinton administration, the Park Service adopted that recommendation.

That decision was reversed after the Bush administration took over. Hundreds of vehicles with roaring two-stroke motors entered the park daily, and noise, pollu-

But Tim Stevens, Yellowstone program director for the National Parks and Conservation Association, said the proposed standards were misguided.

compatible with park values. A lawsuit has followed each study and forced another.

The latest preliminary draft is faulty in three major areas, including its effects on air quality and on wildlife, critics say. Perhaps the most evident is the noise levels it would allow.

In the winter of 2003-4, a study by the Park Service looked at whether snowmobiles were audible more than 50 percent of the time at Old Faithful. Even the new, quieter snowmobiles, numbering about 250 a day, exceeded that threshold, creating "major adverse effects."

As far as increasing the limit from current use, he said. "It's hard to know what the real demand and desire might be."

"We were comfortable with a middle ground of 720," he added.

Before 2000, snowmobile use was unregulated. Hundreds of vehicles with roaring two-stroke motors entered the park daily, and noise, pollu-

Mr. Sacklin said snowmobile technology had gotten much cleaner and quieter. And all snowmobiles must travel with a guide, who enforces strict rules. The new plan also requires noise reduction technology on snow-coaches.

The last two environmental studies raised the threshold. Major adverse effects were considered so serious that if visitors to Old Faithful heard snowmobiles more than 75 percent of the time. This relaxed standard was still exceeded with 250 snowmobiles a day entering the park.

"People go to Yellowstone to times in their lives with a few hours at Old Faithful," said Jim Catton, an dependent environmentalist who has worked on the issue for eight years.

"You can hear the hiss and splash of Old Faithful, the howl of a wolf, the persistent buzz, whine and roar of snowmobiles."

Photograph by José Bernaud for The New York Times

Advertisement

**washingtonpost.com**

# Judge Rejects Bush's Park Plan
Yellowstone Curbs Snowmobile Use

By Rene Sanchez
Washington Post Staff Writer
Thursday, December 18, 2003; Page A33

LOS ANGELES, Dec. 17 -- A federal judge has blocked a Bush administration plan to expand the use of snowmobiles in Yellowstone National Park, giving a victory to environmental groups in what has been a long and contentious debate over motorized recreation at one of the country's natural wonders.

Ruling only hours before the park's winter season for visitors began, U.S. District Judge Emmet G. Sullivan said the move by Bush officials to overturn a Clinton administration plan that would have phased out snowmobiles at Yellowstone appeared to be "completely politically driven." He said it contradicted recent National Park Service conclusions on the issue.

The judge's decision, announced late Tuesday, created immediate turmoil at Yellowstone, which had been bracing for a new wave of snowmobile enthusiasts. Park Service officials expected to turn many riders away this week.

Under the Bush plan, nearly 1,000 snowmobiles would have been allowed into the park per day beginning Wednesday, an increase from past winters. But now park officials must limit the number this winter to less than 500 per day, and restrict their use to small, guided tours. Next winter, snowmobiles will be outlawed there. The same rules also apply to Grand Teton National Park, another hub for snowmobiling.

Opponents of the Bush plan praised the judge's decision, saying it would greatly reduce noise and air pollution at the famed Yellowstone Park and protect its wildlife.

"Our duty is to take care of our national parks as fully as possible so that we pass them in good health to our grandchildren," said Denis P. Galvin, the deputy director of the Park Service during the Clinton administration. "Had we let that principle slip in Yellowstone to benefit the snowmobile industry, it would have set a terrible precedent in all our national parks."

Advocates of the Bush plan vowed Wednesday to challenge the ruling. Interior Secretary Gale A. Norton said it would limit or deny many Americans access to Yellowstone's beauty.

Norton said that the Bush plan is a balanced response to the snowmobile debate because instead of banning visitors from using the popular vehicles, it would force them to use new models that are much cleaner and quieter. She said the rules created during the Clinton administration did not take into account new and environmentally friendly advances in snowmobile technology.

"The Park Service plan can be adapted to ensure that wildlife, park personnel, park resources and the public are protected," she said.

About 140,000 people visit Yellowstone every winter, and many of them come to ride snowmobiles. The vehicles, which can reach speeds of 60 mph, have been subject to few regulations at the park.

But their growing popularity over the past decade has created an emotional debate. It is partly a culture clash between visitors who contend that the park's splendor is being ruined by the constant rumble of the machines and others who call snowmobiles a thrilling form of recreation.

Under the Clinton plan that is being hastily revived, snowmobiles will be banned in Yellowstone and Grant Teton next winter, and visitors will be allowed to use only skis or snowshoes, or ride in mass-transit snow coaches there.

Three years ago, the Park Service supported that approach, concluding after a scientific analysis on air quality and wildlife that snowmobiles posed an assortment of risks for nature and people.

Sullivan noted that one study on the effect of snowmobiles in Yellowstone found that at times the park had carbon monoxide levels as high as in Los Angeles.

But Norton and other advocates of the Bush administration's plan said they feared that the judge's ruling could lead to many other restrictions against human activity in national parks.

"If environmental extremists continue to have their way," Rep. Richard W. Pombo (R-Calif.) said in a statement, "people will be looking at Yellowstone through a plate glass window."

© 2003 The Washington Post Company



# The Seattle Times

Monday, October 29, 2007 - Page updated at 07:20 PM

*Permission to reprint or copy this article or photo, other than personal use, must be obtained from The Seattle Times. Call 206-464-3113 or e-mail resale@seattletimes.com with your request.*

## Get rid of Yellowstone snowmobiles, say 86 in Congress

**By MATTHEW BROWN**
*The Associated Press*

BILLINGS, Mont. — Eighty-six members of Congress are asking the National Park Service to phase out snowmobiles in Yellowstone National Park. They contend the agency is ignoring the increased noise and air pollution that would result from a plan to allow up to 540 of the machines daily.

The congressional opposition, voiced in a letter sent Monday to Park Service Director Mary Bomar, comes as Yellowstone is set to finalize its snowmobiles rules in the next three weeks.

More than a decade in the making, the park's snowmobile policy has engendered a nationwide debate pitting public access advocates against conservationists who say Yellowstone should be closed to unguided motorized use during winter months.

The members of Congress — none of them from the Yellowstone area — told Bomar that snowmobiles should be replaced by a smaller number of guided snowcoaches. Those are essentially busses on skis.

Allowing snowmobiles, they wrote, would provide "inferior protection" of the park and show a "disregard" for the Park Service's conservation mission.

"The agency's studies have repeatedly demonstrated that the best way to protect the health and safety of Yellowstone's visitors, staff, wildlife and natural resources ... is to phase out snowmobile use entirely and increase public access by modern, multi-passenger, guide-driven snowcoaches," they wrote.

Park officials contend their plan for up to 540 snowmobiles a day fairly balances competing needs: conservation and visitor access.

Yellowstone had as many as 1,400 snowmobiles daily during the 1990s, when louder, more polluting two-stroke engines were the norm. After animal rights and environmental groups filed a lawsuit in 1997, claiming in part that snowmobiles were harming wildlife, the park in 2000 attempted to prohibit snowmobiles outright. That move that was later blocked in the courts by a snowmobile manufacturers group.

Park officials said today's cleaner and quieter four-stroke engines make the issue less pressing, although they have acknowledged that phasing out snowmobiles entirely would result in the most pollution reduction.

"We've had good success in reducing impacts from historical levels," said park spokesman Al Nash. "Our job is to protect this wonderful place, and provide protection and high quality visitor experience."

The park's recommended plan, he added, "is in line and in accord with Park Service management policies."

Over the past two years, Yellowstone considered but rejected a plan to allow 120 snowcoaches daily and no snowmobiles.



Ford FOCUS     The New 2008 Focus     ROLLOVER TO EXPAN



**IdahoStatesman.com**

IDAHO'S #1 WEBSITE FOR NEWS AND INFORMATION

  

**Traffic**
Live cameras
Traffic map
Construction

**Weather**     Mo
Boise, ID
Currently
45F overcast     53|3

Today's 6 Pre

HOME   NEWS   SPORTS   BUSINESS   POLITICS   OPINION   ENTERTAINMENT   LIFESTYLES   OUTDOORS   SPECIAL C

**Monday, March 24, 2008** Welcome **Guest** Login | Register                              SEARC

News > Opinion > Editorial

## Our View: Feds should put preservation over snowmobiles

- Idaho Statesman

Edition Date: 11/28/07

Say this much for the feds' new policy on snowmobiles in Yellowstone: It could be worse.

The guideline allows no more than 540 snowmobiles a day into Yellowstone and Grand Teton national parks, starting in the winter of 2008. It's an improvement over the current limit of 720 snowmobiles a day, and a far cry from the noisy, smoky let-'er-rip days of the 1990s, when some 1,400 snowmobiles showed up daily.



Printer Friendly     Email to a Friend

Enlarge Font     Decrease Font

BOOKMARK

See All Photo Galleries

But 540 will not end the debate over snowmobiles in America's first national park. This is a temporary fix - and for the Yellowstone gateway communities hoping to build a year-round tourist trade, it is cold comfort.

These communities should instead focus on promoting the abundant snowmobile country surrounding Yellowstone, near Idaho communities such as Island Park and Ashton. They can still market the Yellowstone winter experience by promoting snowcoaches, which take groups of tourists into the park and limit the impact on sensitive big game.

This is a sensible, sustainable business model. It beats fighting - year after year, it seems - to keep snowmobiles in the park.

Here's the short political history. The Clinton administration tried to phase out snowmobiles. The Bush administration has spent the better part of its two terms taking up the cause of snowmobile access. In a recent letter, 86 members of Congress signed a letter supporting a phaseout. On Nov. 14, the Idaho, Wyoming and Montana congressional delegations wrote a bipartisan letter urging the National Park Service to continue to allow snowmobile access.

See the pattern here?

Snowmobiling in Yellowstone, perhaps the most prized real estate in federal ownership, is a national environmental issue. The new Yellowstone winter policy will go into effect next year, within weeks of



Fi

Ke

the next presidential election, depending on how early the snows come. It's impossible to guess how the next president will approach Yellowstone winter recreation - but it's safe to assume the next administration will have something to say on the matter.

This both is a political free-for-all and an emotional issue. Idaho Rep. Mike Simpson, whose 2nd Congressional District includes a sliver of Yellowstone, says Yellowstone snowmobiling is an "incredible" experience. "I don't even care if I go into Yellowstone in the summer anymore," he said Tuesday.

For some, like Simpson, snowcoaches won't measure up. We appreciate that - but we also think Yellowstone's wintering wildlife needs some respite from human traffic.

Simpson agrees local communities could do more to promote winter recreation outside the park. However, it's not going to happen as long as Simpson and his Western colleagues hold out hope that snowmobiles have a place in Yellowstone.

Yellowstone is special. That's one reason why the politicians fight over it. This is one place where the federal government should put preservation first - and encourage snowmobiling on public lands best suited for multiple use.

## Comments

The Idaho Statesman is pleased to offer this opportunity to share information and observations about what's in the news. Some comments may be reprinted elsewhere in the site or in the newspaper. **We encourage lively, open debate but ask that you remain on topic. Comments that are profane, personal attacks or otherwise inappropriate are subject to removal.** To register a complaint about another user's conduct, please send an e-mail to onlinenews@idahostatesman.com.

**See all 14 comments**

Please log in or register to post comments.

### TODAY'S MOST POPULAR STORIES

How did notorious Idaho outlaw, Claude Dallas, escape?

Deaths

Is your kid's school in crosshairs of No Child Left Behind?

Meridian man charged with burglary and battery

Ada, Boise eye site for shooting range

Challenges mount in Eagle's water company bid

Idaho lawmakers want out by Friday. There's lots to do.

5:41 p.m. -- Teen arrested after drunken driving damage to yards

11:08 a.m. -- Boise man dies, two teens injured in crash in Canyon County

5:36 p.m. -- Police arrest man in attempted rape

**Refinance and Save $1,000S**
$150,000 Mortgage for $483/month.
Compare up to 4 free
www.pickamortgage.com

**Free Credit Report with All 3 Scores**
Free 3-bureau Credit Report includes
Transunion,
FreeCreditReportsInstantly.com

**Refinance $3**
**$965/Month**
$300,000 Mor
Save $1,000':
www.HomeLoa

**IdahoStatesman.com**

**SECTIONS:** home | news | sports | business | politics | opinion | entertainment | lifestyles | outdoors | special content |

**CUSTOMER SERVICE:** terms of service & privacy policy | about us | work for us | contact us | Newspapers in Education

**SUBSCRIBER SERVICES:** subscribe now | pay your bill | vacation stop

 RSS feeds 

# Congress of the United States
### Washington, DC 20515

October 29, 2007

The Honorable Mary Bomar
Director
National Park Service
1849 C Street NW
Washington, D.C. 20240

Dear Director Bomar,

We are writing to convey our deepening concern that you have not as yet upheld a commitment that you made in testimony to Congress earlier this year. Your pledge concerned the momentous decision that the National Park Service will soon make regarding snowmobile use in Yellowstone National Park.

Both you and Interior Secretary Kempthorne have declared that an emphasis on conservation of our national parks is the "heart" of the Management Policies and the "lifeblood" of our Nation's commitment to national park stewardship. $10 million in taxpayer funded studies have repeatedly shown that conservation of Yellowstone requires the phase out of snowmobile usage. Your decision will either demonstrate a commitment to the 2006 National Park Service Management Policies based on the best science available or a disregard for them.

On March 1, 2007, in your first appearance before the House Subcommittee on National Parks, Forests and Public Lands, you assured Congress of your strong belief in the conservation-first priority embedded throughout the National Park Service Management Policies. You testified that when managers at Yellowstone National Park neared a decision later in 2007 regarding the issue of winter access in the country's first national park, your unequivocal intention was to ensure that these policies would be upheld and that scientific findings bearing on the best available protection of Yellowstone's air quality, natural soundscapes and wildlife would be applied.

Yellowstone's managers recently announced that they have abandoned a "Preferred Alternative" that would have allowed as many as 720 snowmobiles each day in Yellowstone National Park. They acknowledged it was necessary to revise the number of snowmobiles downward to protect Yellowstone's air quality, employee and visitor health, the Park's wildlife, and the opportunity of visitors to enjoy, unimpaired by noise of engines, the subtle sounds of erupting geysers and other wonders in the country's oldest national park.

However, the new proposal by Yellowstone's managers to allow 540 snowmobiles per day in the Park is still more than double the average daily snowmobile use of the past four winters (250 per day). Scientific findings verified by the National Park Service and independently corroborated by the Environmental Protection Agency have demonstrated that adopting this proposal would:

- Undermine improvements in the health and clarity of Yellowstone's air. Both agencies say these air quality improvements have resulted largely from the reduction of snowmobile numbers to an average of 250 per day;

- Add to noise problems which, even with an average of 250 snowmobiles per day, have exceeded Yellowstone's standards and compromised visitor enjoyment; and

- Go in the opposite direction recommended to Yellowstone's managers by the agency's wildlife scientists, who advised that traffic be capped at recent averages or further reduced to protect the Park's animals from increased disturbance and harassment.

We urge you not to accept this new proposal. It explicitly violates these resource protection duties in the 2006 National Park Service Management Policies:

- "The National Park Service will preserve, to the greatest extent possible, the natural soundscapes of parks."
- "...the Service will seek to perpetuate the best possible air quality in parks..."
- "Where such use is necessary and appropriate, the least impacting equipment, vehicles, and transportation systems should be used."
- "NPS managers must always seek ways to avoid, or to minimize to the greatest degree practicable, adverse impacts on park resources and values."

Madame Director, these policies give specific meaning to the conservation emphasis that you and Secretary Kempthorne rightly vowed to uphold. To ignore these policies is to choose inferior protection of Yellowstone's air, quiet and wildlife and to opt for a form of access— snowmobiles—that is not only more harmful to Yellowstone's resources and values and the enjoyment of other visitors, but which also costs visitors substantially more and is less conducive to their learning about the Park.

The agency's studies have repeatedly demonstrated that the best way to protect the health and safety of Yellowstone's visitors, staff, wildlife, and national resources while promoting more affordable and educational access, is to phase out snowmobile use entirely and increase public access by modern, multi-passenger, guide-driven snowcoaches. As you know, this form of access has grown strongly in popularity during the past four winters as your agency's studies have verified its multiple benefits.

The Management Policies make clear that this is the choice you should make in Yellowstone to uphold the conservation emphasis that you have said is of paramount importance. We expect you to live up to your commitment.

Sincerely,


_____
Member of Congress

_____
Member of Congress

_____
Member of Congress

_____
Member of Congress

Member of Congress

Member of Congress

Member of Congress

Member of Congress

Member of Congress

Member of Congress

Member of Congress

Member of Congress

Member of Congress

Member of Congress

Member of Congress

Member of Congress

Member of Congress

Member of Congress

Member of Congress

Member of Congress



Member of Congress

Member of Congress

Member of Congress

Member of Congress

Member of Congress

Member of Congress

Member of Congress

Member of Congress

Member of Congress

Member of Congress

Member of Congress

Member of Congress

Member of Congress

Member of Congress



Member of Congress

Member of Congress

Member of Congress

Member of Congress

Member of Congress

Member of Congress

Member of Congress

Member of Congress

Member of Congress

Member of Congress

Member of Congress

Member of Congress

Member of Congress

Member of Congress

Member of Congress

Member of Congress

Member of Congress

Member of Congress

Member of Congress

Member of Congress

Member of Congress

Member of Congress

Member of Congress

Member of Congress

Member of Congress

Member of Congress

Member of Congress

Member of Congress

Member of Congress

Member of Congress

Grace F. Napolitano
Member of Congress

Edward J. Markey
Member of Congress

Rahm Emanuel
Member of Congress

Henry A. Waxman
Member of Congress

Peter DeFazio
Member of Congress

George Miller
Member of Congress

Danny K Davis
Member of Congress

Donald M Payne
Member of Congress

Eliot L. Engel
Member of Congress

Member of Congress

Howard L. Berman
Member of Congress

J. Saxton
Member of Congress

Ec T Burns
Member of Congress

Joe E. Serran
Member of Congress

Elijah E. Cummings
Member of Congress

John F. Tierney
Member of Congress

_____
Member of Congress

_____
Member of Congress

_____
Member of Congress

_____
Member of Congress

_____
Member of Congress

_____
Member of Congress

_____
Member of Congress

_____
Member of Congress

_____
Member of Congress

_____
Member of Congress

_____
Member of Congress

_____
Member of Congress

_____
Member of Congress

_____
Member of Congress

_____
Member of Congress

_____
Member of Congress

**Congressional Signatories**

**Arizona**
Giffords, Gabrielle
Grijalva, Raul M.

**California**
Berman, Howard L.
Capps, Lois
Davis, Susan A.
Eshoo, Anna G.
Harman, Jane
Honda, Michael
Lee, Barbara
Lofgren, Zoe
Matsui, Doris O.
Miller, George
Napolitano, Grace F.
Sanchez, Linda T.
Schiff, Adam B.
Stark, Fortney Pete
Tauscher, Ellen O.
Waters, Maxine
Waxman, Henry A.
Woolsey, Lynn C.

**Colorado**
DeGette, Diana
Udall, Mark

**Connecticut**
DeLauro, Rosa L.
Larson, John B.
Shays, Christopher

**Delaware**
Castle, Michael N.

**Florida**
Brown, Corrine
Wexler, Robert

**Georgia**
Lewis, John

**Hawaii**
Abercrombie, Neil
Hirono, Mazie K.

**Illinois**
Davis, Danny
Emanuel, Rahm
Gutierrez, Luis V.
Jackson, Jesse L.
Johnson, Timothy V.
Kirk, Mark Steven

**Kansas**
Moore, Dennis

**Maryland**
Cummings, Elijah E.
Gilchrest, Wayne T.
Van Hollen, Chris

**Massachusetts**
Frank, Barney
Markey, Edward J.
Olver, John W.
Tierney, John F.

**Michigan**
Levin, Sander M.

**Minnesota**
McCollum, Betty

**Missouri**
Clay, Wm. Lacy

**New Jersey**
Ferguson, Mike
Holt, Rush D.
Pallone, Frank Jr.
Payne, Donald M.
Rothman, Steven R.
Saxton, Jim

**New York**
Ackerman, Gary, L.
Bishop, Timothy H.
Engel, Eliot L.
Hinchey, Maurice D.
Lowey, Nita M.
Maloney, Carolyn B.
McNulty, Michael R.
Nadler, Jerrold

Rangel, Charles B.
Serrano, Jose E.
Towns, Edolphus

**Nevada**
Berkley, Shelley

**Ohio**
Kucinich, Dennis J.
Ryan, Tim

**Oregon**
Blumenauer, Earl
DeFazio, Peter A.
Hooley, Darlene
Wu, David

**Pennsylvania**
Fattah, Chaka

**Rhode Island**
Kennedy, Patrick J.
Langevin, James R.

**Tennessee**
Cooper, Jim

**Texas**
Gonzalez, Charles A.
Green, Gene

**Virginia**
Moran, James P.

**Washington**
Baird, Brian
Inslee, Jay
McDermott, Jim

**Wisconsin**
Baldwin, Tammy



**National Park Service**
**U.S. Department of the Interior**

**Yellowstone National Park**
**Grand Teton National Park**
**John D. Rockefeller, Jr. Memorial Parkway**
**Wyoming, Montana, Idaho**

# Winter Use Plans
# Record of Decision

Recommended:

Suzanne Lewis
Superintendent
Yellowstone National Park

Approved:

Michael D. Snyder
Intermountain Regional Director
National Park Service

Effective on:

November 20, 2007          2:30 p.m. MST

Date                       Time

WINTER USE PLANS RECORD OF DECISION
Yellowstone and Grand Teton National Parks and the John D. Rockefeller, Jr. Memorial Parkway

## UNITED STATES DEPARTMENT OF THE INTERIOR

## NATIONAL PARK SERVICE

## RECORD OF DECISION

## WINTER USE PLANS
## ENVIRONMENTAL IMPACT STATEMENT

## Yellowstone National Park
## Grand Teton National Park
## John D. Rockefeller, Jr. Memorial Parkway

## Wyoming, Montana, Idaho

The Department of the Interior, National Park Service has prepared this Record of Decision on the Winter Use Plans/Final Environmental Impact Statement (FEIS) for Yellowstone and Grand Teton national parks and the John D. Rockefeller, Jr. Memorial Parkway. This Record of Decision (ROD) includes a description of the background of the project, a statement of the decision made, a listing of measures to minimize environmental harm, synopses of other alternatives considered, the basis for the decision, findings on impairment of park resources and values, a description of the environmentally preferable alternative, and an overview of public and agency involvement in the decision-making process.

### BACKGROUND OF THE PROJECT

The purpose of the winter use plans is to provide a framework for managing winter use activities in Yellowstone and Grand Teton national parks and the John D. Rockefeller, Jr. Memorial Parkway (Parkway; collectively Parks). The goal of the plans is to provide park visitors with a range of appropriate winter recreational opportunities, while ensuring that these activities do not lead to unacceptable impacts or the impairment of park resources and values. This purpose is underpinned by laws, regulations and policies that establish the basis for managing units of the National Park System.

The intent of a plan is to achieve, as well as practicable, a set of desired conditions or goals. The existing conditions, for purposes of this planning effort, are the historical conditions that existed prior to the last four winters of managed use. Because those conditions led to impairment of park soundscapes, wildlife, air quality, and visitor experience, they clearly indicated a need for change. Thus, the term "historical conditions" is used to describe the conditions that existed during the 1990s. Between 1963 and 2003, snowmobile use was largely unmanaged. Use during those decades peaked in the 1990s. The historical conditions, compared to the desired conditions, illustrate the need for action, or the need for a winter use plan.

Desired and historical conditions are juxtaposed in Table 1. Throughout the several winter use planning efforts undertaken by the NPS since 1990, the planning goals and existing conditions have remained essentially the same. They are restated here in a way that articulates each condition as a discrete topic, for ease in analysis. The desired conditions have been updated in light of the *Management Policies 2006*.

Also, consistent with the decisions of the United States District Court for the District of Columbia, the FEIS addresses various concerns regarding the winter use 2003 Supplemental EIS. These include road grooming and bison movement, compliance with NPS mandates,

WINTER USE PLANS RECORD OF DECISION
Yellowstone and Grand Teton National Parks and the John D. Rockefeller, Jr. Memorial Parkway

of use levels of snowmobiles and snowcoaches allowed under this Record of Decision indicates acceptable conditions, the NPS will increase use levels to the extent acceptable conditions can be maintained. Conversely, if monitoring of use levels of snowmobiles and snowcoaches allowed under this Record of Decision indicates unacceptable conditions, the NPS will reduce use levels to the extent acceptable conditions can be maintained.

This decision addresses Sylvan Pass in Yellowstone. For the winter season of 2007-2008 the pass will be managed continuing the combined program outlined in the 2004 Temporary Plan. After the winter of 2007-2008, in order to maximize risk reduction, the pass would be open and managed using full avalanche forecasting (as defined in the Sylvan Pass Operational Risk Management Assessment). When full forecasting indicates the pass is safe, the pass would be open to oversnow travel (both motorized and non-motorized access).

The National Park Service will, in good faith, work cooperatively with the State of Wyoming, Park County, Wyoming and the town of Cody to determine how to provide continued snowmobile and snowcoach motorized oversnow access to Yellowstone National Park through the East Gate via Sylvan Pass in the winter use seasons beyond 2007-2008.

The National Park Service will meet with representatives of the State of Wyoming, Park County, Wyoming and the town of Cody to further explore reasonable avalanche and access mitigation safety measures and costs. In order to provide adequate time to amend this Record of Decision reflecting a potential consensus of the parties and to promulgate a new regulation reflecting the amended decision for the 2008-2009 winter use season and beyond, consensus should be reached by June 1, 2008.

In future years, when Sylvan Pass is not open due to safety, the NPS will maintain the road segment from the East Entrance to a point approximately four miles west of the entrance station to provide for opportunities for cross-country skiing and snowshoeing. Limited snowmobile and snowcoach use will be allowed in order to provide drop-offs for such purposes. In addition, when the pass is not open due to safety, oversnow vehicle travel will be allowed on the road segment between Fishing Bridge and Lake Butte Overlook.

In Grand Teton National Park, 40 snowmobiles will be allowed on Jackson Lake each day in order to provide access for ice fishing, subject to the condition that they meet BAT requirements for air and sound emissions. In addition, the use of snowmobiles not meeting BAT requirements will continue to be allowed on certain designated routes in order to access inholdings or adjacent public and private lands.

Within the John D. Rockefeller, Jr. Memorial Parkway, 25 snowmobiles will be allowed to access the Grassy Lake Road at Flagg Ranch each day. The BAT requirement will not apply to snowmobiles using the Grassy Lake Road, and the daily entry limit will apply to snowmobiles originating a trip at Flagg Ranch.

The Continental Divide Snowmobile Trail (CDST) within both Grand Teton and the Parkway is a portion of a much longer trail that extends through northwest Wyoming to the Pinedale and Lander areas. Except for the segment of the CDST between the east boundary of Grand Teton and the vicinity of Moran Junction, this route will no longer be designated for snowmobile use, in essence converting it to a trailered segment of the CDST. Snowmobiles could be hauled between Moran Junction and Flagg Ranch, at that point connecting with the Grassy Lake Road and oversnow access to points in the Caribou-Targhee National Forest and beyond.

This decision also keeps in place for the 2007-2008 winter season a number of elements of the temporary winter use plan that has guided use of the Parks for the past three winters. This will provide for continuity of operations over a one-season period, thereby avoiding

WINTER USE PLANS RECORD OF DECISION
Yellowstone and Grand Teton National Parks and the John D. Rockefeller, Jr. Memorial Parkway

disruptions to park visitors, snowmobile and snowcoach operators, and local communities. Specifically, for the winter of 2007-2008, 720 BAT snowmobiles and 78 snowcoaches will continue to be allowed into Yellowstone, and Sylvan Pass will remain open for motorized oversnow vehicle travel (using a combination of helicopter and howitzer dispensed explosives to mitigate avalanche danger). In Grand Teton and the Parkway, a combined total of 140 snowmobiles will be allowed on Jackson Lake, the CDST, and the Grassy Lake Road, subject to the same BAT requirements that have been in effect the past three winters.

This decision addresses the purpose and need identified in the FEIS. Previous impairment to air quality and wildlife will be mitigated and the visitor experience, employee and visitor health and safety, and natural soundscape conditions will be improved. Visitor access will be facilitated through managed snowmobile and snowcoach use.

## Key Actions

### Actions Specific to Yellowstone

#### Routes Open to Snowmobile Use

The superintendent may open or close these routes, or portions thereof, for snowmobile travel after taking into consideration the location of wintering wildlife, adequate snowpack, public safety, and other factors. Notice of such opening or closing will be provided by one or more of the methods listed in 36 CFR 1.7(a).

The following routes are designated for snowmobile use:

- Grand Loop Road, from its junction with Upper Terrace Drive to Norris Junction
- Norris Junction to Canyon Junction
- Grand Loop Road, from Norris Junction to Madison Junction
- West Entrance Road, from the park boundary at West Yellowstone to Madison Junction
- Grand Loop Road, from Madison Junction to West Thumb
- South Entrance Road, from the South Entrance to West Thumb
- Grand Loop Road, from West Thumb to its junction with the East Entrance Road
- East Entrance Road, from the East Entrance to its junction with the Grand Loop Road
- Grand Loop Road, from its junction with the East Entrance Road to Canyon Junction
- South Canyon Rim Drive
- Lake Butte Road
- Firehole Canyon Drive, from noon to 9 p.m. only
- North Canyon Rim Drive, from noon to 9 p.m. only
- Riverside Drive, from noon to 9 p.m. only
- Cave Falls Road, with no BAT or guiding requirement, and a daily entry limit of 50 snowmobiles (which does not count against the 540 total in Yellowstone)
- Roads in the developed areas of Madison Junction, Old Faithful, Grant Village, West Thumb, Lake, East Entrance, Fishing Bridge, Canyon, Indian Creek, and Norris.

#### Routes Open to Snowcoach Use

The superintendent may open or close the following oversnow routes, or portions thereof, or designate new routes for snowcoach travel after taking into consideration the location of

WINTER USE PLANS RECORD OF DECISION
Yellowstone and Grand Teton National Parks and the John D. Rockefeller, Jr. Memorial Parkway

program restricts backcountry use of the park when winter snowpack and weather conditions become severe and appear to be adversely affecting wildlife.

- Snow road edges may continue to have track set for skiing where feasible.
- About 35 miles of roads will continue to be groomed for cross country skiing in Yellowstone. These are mainly roads used by summer vehicles, but which are closed to oversnow vehicle travel. These roads may continue to be machine groomed for skiing. Existing and new routes could be evaluated in the future, and changes announced through one or more of the methods listed in 36 CFR 1.7(a). The Virginia Cascades Road in Yellowstone may be groomed for skiing.
- Ski and snowshoe use of the South Entrance Road and East Entrance Road will be allowed to continue after the balance of roads close to winter operations (during spring plowing). When spring plowing operations approach the entrances, the roads will then be closed to skiing and snowshoeing for safety concerns. Bear management closures of the park's backcountry will continue as in previous years.
- Sensitive areas within the inner gorge of the Grand Canyon of the Yellowstone and the McMinn Bench bighorn sheep area will continue to be closed to recreational winter use.

### *East Entrance Road*

- This decision addresses Sylvan Pass in Yellowstone. For the winter season of 2007-2008 the pass will be managed continuing the combined program outlined in the 2004 Temporary Plan. After the winter of 2007-2008, in order to maximize risk reduction, the pass would be open and managed using full avalanche forecasting (as defined in the Sylvan Pass Operational Risk Management Assessment). When full forecasting indicates the pass is safe, the pass would be open to oversnow travel (both motorized and non-motorized access).
- The National Park Service will, in good faith, work cooperatively with the State of Wyoming, Park County, Wyoming and the town of Cody to determine how to provide continued snowmobile and snowcoach motorized oversnow access to Yellowstone National Park through the East Gate via Sylvan Pass in the winter use seasons beyond 2007-2008.
- The National Park Service will meet with representatives of the State of Wyoming, Park County, Wyoming and the town of Cody to further explore reasonable avalanche and access mitigation safety measures and costs. In order to provide adequate time to amend this Record of Decision reflecting a potential consensus of the parties and to promulgate a new regulation reflecting the amended decision for the 2008-2009 winter use season and beyond, consensus should be reached by June 1, 2008.
- In future years, when Sylvan Pass is not open due to safety, the NPS will maintain the road segment from the East Entrance to a point approximately four miles west of the entrance station to provide for opportunities for cross-country skiing and snowshoeing. Limited snowmobile and snowcoach use will be allowed in order to provide drop-offs for such purposes. In addition, when the pass is not open due to safety the road segment between Fishing Bridge and Lake Butte Overlook will be maintained for oversnow vehicle travel.

### *Speed Limits*

The speed limit from the West Entrance to Madison to Old Faithful will remain at 35 mph except where posted at 25 mph in designated segments to protect wildlife and natural soundscapes, and to enhance visitor safety.

WINTER USE PLANS RECORD OF DECISION
Yellowstone and Grand Teton National Parks and the John D. Rockefeller, Jr. Memorial Parkway

After five years of such data gathering and analysis, the NPS will consider closing the main road between Madison and Norris in its entirety to observe bison response. It is uncertain until the five-year period of data gathering and analysis has finished whether such closure will yield informative data or conclusions. Such a closure, if determined to be appropriate, would likely be a multi-year closure. The NPS does not intend to perform further NEPA analysis on this closure because the concept of closing the Gibbon Canyon road was specifically analyzed during modeling for the FEIS as an option within alternatives 1 and 7. For those alternatives, the impacts have been analyzed assuming that the road segment between Madison and Norris would be closed to all motorized oversnow travel.  The agency will announce the closure using the monitoring program procedures described below.

A fourth key issue has been visitor experience. As explained above, mandatory commercial guiding has improved the visitor experience for many, although it has eliminated the freedom of touring Yellowstone on one's own. For most visitors, though, it has restored order and safety to visiting Yellowstone, and has virtually eliminated the wildlife harassment that occurred when visitors were unguided. Additionally, many visitors enjoy the interpretation they receive from their guides. BAT has certainly also improved the visitor experience, substantially reducing noise and air emissions. These changes again affirm the decision to retain 100% commercial guiding and BAT requirements for snowmobiles.

The decision to continue allowing snowmobiles into Yellowstone may adversely affect the visitor experience of those who do not wish to see snowmobiles in the parks. However, not all visitors enjoy the group travel experience provided by snowcoach tours, or the fact that snowcoach travel is slower than snowmobile travel. Providing both snowmobile and snowcoach transportation options gives visitors a choice of modes of travel. This decision affirms that choice.

This decision also calls for continued temporal and spatial zoning. The Firehole Canyon Drive, North Rim Drive and Riverside Drive will continue to be restricted to snowcoaches only in the mornings, but each will be open to both snowcoaches and snowmobiles from Noon to 9:00 p.m. daily. This temporal separation will provide snowcoach users the opportunity to select periods of snowcoach-only travel. Additionally, the road from Canyon Junction to Washburn Hot Springs Overlook and the Fountain Freight Road will continue to be snowcoach-only access.

This decision addresses Sylvan Pass in Yellowstone.  For the winter season of 2007-2008 the pass will be managed continuing the combined program outlined in the 2004 Temporary Plan. After the winter of 2007-2008, in order to maximize risk reduction, the pass would be open and managed using full avalanche forecasting (as defined in the Sylvan Pass Operational Risk Management Assessment). When full forecasting indicates the pass is safe, the pass would be open to oversnow travel (both motorized and non-motorized access).

The National Park Service will, in good faith, work cooperatively with the State of Wyoming, Park County, Wyoming and the town of Cody to determine how to provide continued snowmobile and snowcoach motorized oversnow access to Yellowstone National Park through the East Gate via Sylvan Pass in the winter use seasons beyond 2007-2008.

The National Park Service will meet with representatives of the State of Wyoming, Park County, Wyoming and the town of Cody to further explore reasonable avalanche and access mitigation safety measures and costs.  In order to provide adequate time to amend this Record of Decision reflecting a potential consensus of the parties and to promulgate a new regulation reflecting the amended decision for the 2008-2009 winter use season and beyond, consensus should be reached by June 1, 2008.

WINTER USE PLANS RECORD OF DECISION
Yellowstone and Grand Teton National Parks and the John D. Rockefeller, Jr. Memorial Parkway

This approach both addresses the concerns of the communities and the National Park Service. The City of Cody, Wyoming, as well as Park County, Wyoming, and the State of Wyoming have clearly articulated the importance of this route to the community and the historical relationship between Cody and Yellowstone's East Entrance. They have spoken for the businesses near Yellowstone's East Entrance and how those businesses have been hurt in recent years by the changing patterns of winter visitation. They have stated how those businesses will continue to be harmed if the pass is closed to oversnow vehicle travel in the winter. The community and businesses have also stated the value they place on the certainty of the road being open in the winter and the importance of that certainty to their businesses and guests. NPS acknowledges that those values and concerns are real and has carefully weighed those considerations.

Avalanche control at Sylvan Pass has long represented a safety concern to the National Park Service. It is evident in reviewing the original winter use plan EIS, the Supplemental Environmental Impact Statement, and the Temporary Winter Use Plan EA, that the avalanche danger on Sylvan Pass is significant and has been well-known for many years. It is also evident from reviewing those documents and other files related to Sylvan Pass that the historical way of doing avalanche control cannot continue indefinitely. There are approximately 20 avalanche paths that cross the road at Sylvan Pass. They average over 600 feet of vertical drop, and the East Entrance Road crosses the middle of several of the paths, putting travelers at risk of being hit by an avalanche and swept down the slope, almost certainly to their deaths. NPS employees must cross several uncontrolled avalanche paths to reach the howitzer used for discharging those avalanches, which is itself at the base of a cliff prone to both rock-fall and additional avalanche activity (the howitzer cannot be moved without compromising its ability to reach all avalanche zones). Duds (artillery shells that do not explode on impact) occur and exist on the slopes, presenting year-round hazards to both employees and visitors, both in Yellowstone and the Shoshone National Forest. Natural avalanches can and do occur, both before and after howitzer use. Using a helicopter instead of a howitzer also is a high risk activity because of other risks a contractor would have to incur, as identified in the Operational Risk Management Report completed by the NPS in October 2007. Using full forecasting will ensure that visitors and personnel are not exposed to avalanche risk because the pass will be open only when forecasting indicates it is safe.

Some in the community of Cody, Wyoming and elsewhere do not believe there is a safety issue at Sylvan Pass, because there has not been a serious incident at the pass in the 30+ years of avalanche control activity. Yet an employee lost his life traveling to the pass to check on conditions to determine if the pass was safe to open, and several close calls have occurred. Further, safety and safety management in the National Park Service is no longer about past records and good fortune, but rather taking a hard look at what we do, why we do it, and continually asking ourselves, "Are we accomplishing this work in the safest manner possible?" It is unacceptable to knowingly continue a dangerous practice when report after report and analysis after analysis says that an operation has inherent safety risks.

During this FEIS process, the additional, independent work by avalanche expert Bob Comey and the Operational Risk Management Assessment (into which several avalanche experts, including Mr. Comey, had direct input) reinforced that the past ways of doing avalanche control (through howitzer or helicopter) pose an unacceptably high risk to NPS employees. These reports also identified options describing how avalanche mitigation could be conducted in safer ways. NPS has reviewed those options, including the cost information and the additional planning, geotechnical investigations, compliance, design, contracting, construction, and testing that would be required to implement some of these options. A significant one-time investment would apparently be needed, along with additional operating

WINTER USE PLANS RECORD OF DECISION
Yellowstone and Grand Teton National Parks and the John D. Rockefeller, Jr. Memorial Parkway

monies, in order to implement any of these options. It could take three or four years before a new system could be in place and functional. That is why it is important to resolve the issues regarding avalanche management early in 2008 to provide the summer to begin implementation if necessary.

During the winter of 2007-2008 NPS will use a combination of techniques that have been used in the past (howitzer and helicopter). Local staff may use whichever tool is the safest and most appropriate that winter, with the full understanding that safety of employees and visitors comes first. The NPS will not take unacceptable risks. When the pass is safe, it will be open; when it is not, the pass will remain closed. As with past winters, extended closures of the pass may occur in 2007-2008.

Use levels have always been relatively low on Yellowstone's East Entrance. Even during the highest winter use years in the 1990s, total use for the season rarely exceeded 5,000 people, less than 5% of Yellowstone's total winter visitation. The winter season at the East Entrance averages about 82 days, while the summer season there averages about 180 days, from the first Friday in May until the first Friday in November. Historically, Sylvan Pass has been closed for several days during the winter to allow safe avalanche management to occur. That is, the pass has almost never been open for the entire 82-day season. Most reasonable avalanche mitigation techniques would result in the pass being closed for at least some days in the winter to conduct avalanche mitigation.

Historically the East Entrance has been closed for a total of about 98 days from mid-March to early May (for spring plowing) and from early November to mid-December (to allow for snow accumulation). During the peak summer season in July and August, use on a single busy day exceeds that of the entire winter season.

Visitor access over Sylvan Pass is purely for recreational purposes. The East Entrance Road is not a major highway nor a railroad. Other avalanche mitigation programs in this country are focused on routes with far higher traffic volume and economic value, often including high value interstate commerce. For example, Glacier National Park is addressing avalanche issues on a major trans-continental railroad. In contrast, the NPS believes Sylvan Pass is the only route of its kind where active avalanche mitigation is occurring for a discretionary, recreational activity.

It is the intent of this decision and the subsequent discussions that occur between now and June 1, 2008 to see if there are ways to address the concerns of the community and the NPS outlined above regarding Sylvan Pass.

No matter what the outcome of the discussion with the community, for some uses, the East Entrance will remain open. People will still be able to travel through this entrance to enjoy several miles of cross country skiing or snowshoeing in Yellowstone's East Entrance and the Middle Fork area. The trails in Yellowstone's East Entrance area connect to the 25 km of groomed ski trails on adjacent forest and private lands. The park will work with its neighbors and the local Nordic ski association to help ensure that these opportunities remain whether the pass is open to motorized travel or not.

### Grand Teton National Park and the John D. Rockefeller, Jr. Memorial Parkway

This decision makes modifications to the management of snowmobile use in Grand Teton National Park and the John D. Rockefeller, Jr. Memorial Parkway. A daily entry limit of 25 snowmobiles per day will be established for the Grassy Lake Road, as measured in terms of snowmobiles originating a westbound trip at Flagg Ranch. Snowmobiles using the Grassy Lake Road will not be required to meet BAT requirements. In this manner, the Grassy Lake road will function primarily as an access route to snowmobile areas on the Caribou-Targhee

WINTER USE PLANS RECORD OF DECISION
Yellowstone and Grand Teton National Parks and the John D. Rockefeller, Jr. Memorial Parkway

"NPS managers must always seek ways to avoid, or to minimize to the greatest extent practicable, adverse impacts on park resources and values. However, the laws do give the Service the management discretion to allow impacts to park resources and values when necessary and appropriate to fulfill the purposes of a park, so long as the impact does not constitute impairment of the affected resources and values."

This decision will reduce impacts, especially to soundscapes. The decision will also keep impacts upon air quality, wildlife, visitor access and experience, and employee and visitor health and safety, to acceptable levels, by utilizing 100% guiding in Yellowstone, BAT requirements for both snowmobiles and snowcoaches, and strict daily limits on both snowmobiles and snowcoaches, and by addressing Sylvan Pass and the CDST. Although some impacts will continue to occur, they will not result in impairment.

Section 4.7.1, Air Quality:

"The Service will seek to perpetuate the best possible air quality in parks to (1) preserve natural resources and systems; (2) preserve cultural resources; and (3) sustain visitor enjoyment, human health, and scenic vistas."

This decision will assure that clean air is preserved in the parks and will ensure that levels of formaldehyde and benzene remain low enough to protect human health. At present, with oversnow vehicle use levels similar to what would likely be experienced under this decision (including the air quality on the busiest days, with oversnow vehicle numbers at or near the maximum that will be allowed under this decision), air quality in the parks is in full compliance with the requirements of the Clean Air Act and NPS Management Policies. Both carbon monoxide and particulate levels were well below national standards; carbon monoxide levels were a tenth of the national standard and particulate levels were less than one-fourth of the standard, as documented in the FEIS. No visibility impairment currently occurs in the parks due to oversnow vehicles.

Section 4.9, Soundscapes:

"The National Park Service will preserve, to the greatest extent possible, the natural soundscapes of parks.... The Service will restore to the natural condition wherever possible those park soundscapes that have become degraded by unnatural sounds (noise)..."

The decision will preserve natural soundscapes and will, in combination with the implementation of a snowcoach BAT requirement and adaptive management procedures to take further actions if impacts continue, make consistent progress toward protecting the parks' winter soundscape. Additionally, requiring park employees, contractors, and permittees to use BAT snowmobiles will help reduce oversnow vehicle audibility.

Section 8.2, Visitor Use:

"The Service is committed to providing appropriate, high quality opportunities for visitors to enjoy the parks, and the Service will maintain within the parks an atmosphere that is open, inviting, and accessible to every segment of American society. ...

To provide for enjoyment of the parks, the National Park Service will encourage visitor activities that:

- are appropriate to the purpose for which the park was established; and
- are inspirational, educational, or healthful, and otherwise appropriate to the park environment; and
- will foster an understanding of and appreciation for park resources and values, or will

WINTER USE PLANS RECORD OF DECISION
Yellowstone and Grand Teton National Parks and the John D. Rockefeller, Jr. Memorial Parkway

- o  Research proposal evaluating key uncertainties regarding road grooming and bison movements
- Consulted with the U.S. Fish and Wildlife Service under Section 7 of the Endangered Species Act, and the U.S.F.W.S. concurred that the FEIS preferred alternative may affect, but will not likely adversely affect either the lynx or the grey wolf (letter dated October 23, 2007). The consultation assumed that Sylvan Pass would be open in the winter of 2007-2008 and closed to motorized travel in subsequent winters. Additional consultation with the U.S. Fish and Wildlife Service will occur, if necessary, prior to the winter of 2008-2009 regarding Sylvan Pass.
- Consultation and public and agency review of the DEIS did not identify any impacts on archeological or historical resources, ethnographic resources, cultural landscapes, sacred sites or Indian Trust resources from the range of alternatives considered. Scoping for this EIS did not identify any new issues relative to these resources. As part of government-to-government relationships, consultation with affiliated tribes has and will occur on on-going winter use and other planning and management topics.

### *Public Comment on the DEIS*

The Draft EIS was on public review from March 27 – June 5, 2007. The NPS received approximately 120,000 documents commenting on the DEIS. A summary of comments and responses is found in Appendix I of the FEIS. Four public meetings were held during the DEIS comment period: Cody, Wyoming; West Yellowstone, Montana; St. Paul, Minnesota; and Lakewood, Colorado. A detailed report is available at the above web site.

Table 4: Summary of Public Comment on the DEIS

| Issues | Users | Conservation Interests | State of Wyoming and Park County, Wyoming |
|---|---|---|---|
| Air Quality | Generally support BAT to reduce pollution | Believe snowcoaches only best reduces pollution | Generally disagree there is a concern |
| Wildlife | Generally support guiding | Believe snowcoaches only best addresses wildlife concerns | Generally disagree there is a concern |
| Guiding | Desire some unguided access (about 20% unguided) | If small number of snowmobiles allowed, 100% commercially guided | Generally desire unguided access |
| Sound | Generally support BAT to reduce noise | Believe snowcoaches only best addresses noise | Generally disagree there is a concern |
| Sylvan Pass (East Entrance) | Desire to see pass kept open | Generally support closing pass | Believe howitzer program was safe; keep pass open |
| Management Policies | Believe Management Policies call for balanced use of parks | Believe Management Policies call for snowcoaches only | Believe Management Policies require that park be open for access |
| Continental Divide Snowmobile Trail (CDST) | Keep open and allow EPA-compliant snowmobiles to use trail | Close | Keep open and allow EPA-compliant snowmobiles to use trail |

# DEPARTMENT OF THE INTERIOR

## National Park Service

### 36 CFR Part 7

### RIN 1024–AD55

### Special Regulations; Areas of the National Park System

**AGENCY:** National Park Service, Interior.

**ACTION:** Final rule.

**SUMMARY:** This rule governs winter visitation and certain recreational use in Yellowstone and Grand Teton National Parks and the John D. Rockefeller, Jr. Memorial Parkway. This final rule is issued to implement the Record of Decision (ROD) for the Winter Use Plans Final Environmental Impact Statement (FEIS) approved November 20, 2007, and will ensure that visitors have an appropriate range of winter recreation opportunities that are appropriate to the national park setting, and that these activities do not impair park resources and values. The rule requires that most recreational snowmobiles and snowcoaches operating in the parks meet certain air and sound emissions requirements, that snowmobilers and snowcoach riders in Yellowstone be accompanied by a commercial guide, and sets daily entry limits on the numbers of snowmobiles and snowcoaches that may enter the parks. Traveling off designated oversnow routes will remain prohibited. The FEIS, ROD, and other documents pertaining to winter use management in the parks can be found at *http://www.nps.gov/yell/planyourvisit/winteruse.htm*.

**DATES:** This regulation is effective on December 19, 2007.

**FOR FURTHER INFORMATION CONTACT:** John Sacklin, Management Assistant's Office, Yellowstone National Park, 307–344–2019.

**SUPPLEMENTARY INFORMATION:** The National Park Service (NPS) has been managing winter use issues in Yellowstone National Park, Grand Teton National Park, and the John D. Rockefeller, Jr. Memorial Parkway (the Parks) for several decades. In 1997, the Fund for Animals and others filed suit, alleging non-compliance with the National Environmental Policy Act (NEPA), among other laws. The suit resulted in a settlement agreement in October 1997 which, among other things, required the NPS to prepare a new winter use plan for the Parks. On October 10, 2000, a Winter Use Plans Final Environmental Impact Statement (2000 FEIS) was published. A Record of Decision (2000 ROD) was signed on

November 22, 2000, and subsequently distributed to interested and affected parties. The 2000 ROD was to eliminate both snowmobile and snowplane use from the Parks by the winter of 2003–2004 and provide access via an NPS-managed, mass-transit snowcoach system. This decision was based on a finding that the snowmobile and snowplane use existing at that time—and the snowmobile use analyzed in the 2000 FEIS alternatives—impaired park resources and values, thus violating the statutory mandate of the NPS.

Implementing aspects of this decision required a special regulation for each park unit in question. Following publication of a proposed rule and the subsequent public comment period, a final rule was published in the **Federal Register** on January 22, 2001 (66 FR 7260). That rule became effective on April 22, 2001.

On December 6, 2000, the Secretary of the Interior, the Director of the National Park Service and others were named as defendants in a lawsuit brought by the International Snowmobile Manufacturers' Association (ISMA) and others. The States of Wyoming and Montana subsequently intervened on behalf of the plaintiffs. The lawsuit asked for the decision, as reflected in the 2000 ROD, to be set aside. The lawsuit alleged, among other things, a violation of NEPA. A settlement was reached on June 29, 2001, under which NPS agreed to prepare a Supplemental Environmental Impact Statement (SEIS) incorporating "any significant new or additional information or data submitted with respect to a winter use plan." Additionally, the NPS provided the opportunity for additional public participation in furtherance of the purposes of NEPA. A Notice of Intent to prepare a Supplemental Environmental Impact Statement was published in the **Federal Register** on July 27, 2001 (66 FR 39197).

A draft SEIS was published on March 29, 2002, and distributed to interested and affected parties. NPS accepted public comments on the draft for 60 days, and 357,405 pieces of correspondence were received. The SEIS focused its analysis only on the issues relevant to allowing recreational snowmobile and snowcoach use in the parks. These impact topics included air quality and air quality-related values, public and employee health and safety, natural soundscapes, socioeconomics, wildlife (bison and elk), and visitor experience. The SEIS did not re-evaluate the decision to ban snowplane use on Jackson Lake because this was not at issue in the lawsuit and because the resulting settlement and because the

NPS had no reason to doubt the validity of its finding that snowplane use impaired park resources.

On November 18, 2002, the NPS published a final rule (67 FR 69473) ("delay rule") based on the 2000 FEIS, which generally postponed implementation of the phase-out of snowmobiles in the Parks for one year. This rule allowed for additional time to plan and implement the NPS-managed mass-transit, snowcoach-only system outlined in the 2000 FEIS as well as time for completion of the SEIS. The rule delayed the implementation of the daily entry limits on snowmobiles until the winter of 2003–2004 and the complete prohibition on snowmobiles until 2004–2005. The 2001 regulation's transitional requirement that snowmobile parties use an NPS-permitted guide was also delayed until the 2003–2004 winter use season.

Other provisions under the January 2001 regulation concerning licensing requirements, limits on hours of operation, Yellowstone side road use, and the ban on snowplane use remained effective for the winter use season of 2002–2003.

The Notice of Availability for the final SEIS was published on February 24, 2003 (68 FR 8618). The final SEIS included a new alternative, alternative 4, which called for 950 snowmobiles in Yellowstone and 190 in Grand Teton. Most would be subject to air and sound emission requirements, and 80% of the Yellowstone snowmobiles would be commercially guided and 20% would be non-commercially guided. In addition, the final SEIS included changes to the alternatives, changes in modeling assumptions and analysis, and incorporated additional new information. Effective on March 25, 2003, NPS signed a ROD for the SEIS, which selected final SEIS alternative 4 for implementation and enumerated additional modifications to that alternative. The final SEIS and ROD found that implementation of final SEIS alternatives 1a, 1b, 3, or 4 would not be likely to impair park resources or values due to motorized oversnow recreation. On December 11, 2003, the new regulation governing winter use in the parks was published.

On December 16, 2003, the U.S. District Court for the District of Columbia, ruling in *Fund for Animals* v. *Norton*, vacated and remanded the December 11, 2003, regulation and SEIS. The court effectively reinstated the January 22, 2001, regulation phasing out recreational snowmobiling subject to the delay rule. Specifically, up to 493 snowmobiles a day were to be allowed into Yellowstone for the 2003–2004

employed by local businesses; those jobs are not performed by NPS employees.

Commercial guides use a "follow-the-leader" approach, stopping often to talk with the group. They lead snowmobiles single-file through the park, using hand signals to pass information down the line from one snowmobile to the next, a system which has proven to be effective. Signals are used to warn group members about wildlife and other road hazards, indicate turns, and when to turn on or off the snowmobile. Further, all commercial guides are trained in basic first aid and CPR. In addition to first aid kits, they often carry satellite or cellular telephones, radios, and other equipment for emergency use. Guides are thus well-equipped to ensure that park regulations are enforced and to provide a safer overall experience for visitors.

Since the winter of 2003–2004, all snowmobilers in Yellowstone have been led by commercial guides, resulting in significant positive effects on visitor health and safety. Guides have been proven to be very effective at enforcing proper touring behavior, such as adherence to speed limits, staying on the groomed road surfaces, and other snowmobiling behaviors that are appropriate to safely and responsibly visiting the park. Since implementation of the guiding program there have been pronounced reductions in the number of law enforcement incidents and accidents associated with the use of snowmobiles, even when accounting for the reduced number of snowmobilers relative to historic use levels. The use of guides is also beneficial to wildlife, since guides are trained to respond appropriately when encountering wildlife.

No more than eleven snowmobiles will be permitted in a group, including that of the guide. Except in emergency situations, guided parties must travel together and remain within a maximum distance of one-third mile of the first snowmobile in the group. These size and distance limits will ensure that guided parties do not become separated, will allow for sufficient and safe spacing between individual snowmobiles within the guided party, allow the guide(s) to maintain control over the group and minimize the impacts on wildlife and natural soundscapes. NPS thus expects that the continuation of the guiding requirement will help ensure compliance with park regulations and protect park resources.

Scientific studies and monitoring of winter visitor use and park resources (including air quality, natural soundscapes, wildlife, employee health

and safety, water quality, and visitor experience) will continue. As part of its adaptive management of winter use activities, NPS will close selected areas of the Parks to visitor use, including sections of roads, if these studies indicate that human presence or activities have a substantial adverse effect on wildlife or other park resources that cannot otherwise be mitigated. A one-year notice will ordinarily be provided before any such closure is implemented unless immediate closure is deemed necessary to avoid impairment of park resources. Most non-emergency changes in park management implemented under the adaptive management framework will be implemented only after at least one or 2 years of monitoring, followed by a 6-to 12-month implementation period. The Superintendent will continue to have the authority under 36 CFR 1.5 to take emergency actions to protect park resources or values.

The adaptive management program described in the ROD provides park managers with a wide variety of tools to ensure that the goals and objectives of the winter use plans are being achieved. Some of the techniques available include adjustments in snowmobile or snowcoach use levels (up or down), adjustments in air and sound emissions requirements, visitor and guide education, timing of entries, and group sizes. Also, the future improvements in snowcoach air and sound emissions will assist park managers in meeting goals and objectives. Through adaptive management, if monitoring of use levels of snowmobiles and snowcoaches allowed under the Record of Decision indicates acceptable conditions, the NPS will increase use levels to an extent acceptable conditions can be maintained. Conversely, if monitoring of use levels of snowmobiles and snowcoaches allowed under the Record of Decision indicates unacceptable conditions, the NPS will reduce use levels to an extent acceptable conditions can be maintained. In some cases, additional rulemaking would be required in order to implement certain changes.

The NPS is implementing a multi-year research proposal intended to specifically address the question of whether grooming of the Madison to Norris road segment in Yellowstone has led to alterations of bison movements and distribution. The question was identified in a report by Dr. Cormack Gates et al., entitled "The Ecology of Bison Movements and Distribution in and Beyond Yellowstone National Park" (2005). The research program will involve a linked series of experiments

that will enable researchers to gain insight into how road grooming and other factors currently affect bison travel. Initially, the research program will include the analysis of existing data on GPS-collared bison, the tracking of additional GPS-collared bison, and the deployment of cameras along travel routes to gain information on the relationship between road grooming and bison travel, without necessitating the closure of the Gibbon Canyon road segment to public oversnow vehicle travel. During the 5 year period, other roads or routes may be investigated to help understand the relationship between snow depth, grooming, and bison movement. For example, the Firehole Canyon Drive may be closed to oversnow travel and the Grand Loop Road gated in that area to allow snowmobile and snowcoach travel, but not bison movement on the main road. Bison would then be forced to travel cross country or along the ungroomed Firehole Canyon Road. Similarly, the Madison to Norris Road may be fenced or gated in the vicinity of the new bridge over the Gibbon River to restrict bison movement on the Madison to Norris Road and force bison to travel cross country. Thus bison movement and snow depth and roads may be tested without closing a main road. However, following the 5 years of data gathering and analysis, the NPS, in consultation with the researchers, will consider closing the main Madison to Norris route to observe bison response. That decision will rely on the results of the data gathering and analysis and whether such a closure would be likely to yield informative data or conclusions. If implemented, such a closure would likely last several seasons.

Snowmobiles and snowcoaches will continue to be restricted to designated routes, which are a subset of the same roads that are traveled by motor vehicles during the remainder of the year, or in the case of Jackson Lake, by motorboats during the summer. In Yellowstone, in addition to most of the Grand Loop Road, certain side roads will be open for snowmobile use after noon, based on the successful experience of the NPS with temporal zoning on Firehole Canyon Drive. Virginia Cascades will be accessible only via ski and snowshoe.

This rule addresses Sylvan Pass in Yellowstone. For the winter season of 2007–2008 the pass will be managed continuing the combined program outlined in the 2004 Temporary Plan. After the winter of 2007–2008, in order to maximize risk reduction, the pass would be open and managed using full avalanche forecasting (as defined in the Sylvan Pass Operational Risk

Management Assessment and may be viewed at: *http://www.nps.gov/yell/parkmgmt/winterusetechnicaldocuments.htm).* When full forecasting indicates the pass is safe, the pass would be open to oversnow travel (both motorized and non-motorized access).

The National Park Service will, in good faith, work cooperatively with the State of Wyoming, Park County, Wyoming and the town of Cody to determine how to provide continued snowmobile and snowcoach motorized oversnow access to Yellowstone National Park through the East Gate via Sylvan Pass in the winter use seasons beyond 2007–2008.

The National Park Service will meet with representatives of the State of Wyoming, Park County, Wyoming and the town of Cody to further explore reasonable avalanche and access mitigation safety measures and costs. In order to provide adequate time to implement actions that reflect a potential consensus of the parties, and to promulgate a new regulation, if necessary, that reflects an amended decision for the 2008–2009 winter use season and beyond, consensus should be reached by June 1, 2008.

If the pass is closed at times to oversnow vehicle travel, the segment of road from the East Entrance to a point about four miles west, short of the Sylvan Pass avalanche zone, will be groomed and/or tracked for cross-country skiing. The commercial snowmobiles or snowcoaches authorized to operate from East Entrance may be allowed on that segment in order to provide skier drop-offs or shuttles. In addition, when the pass is not open due to safety, the road segment between Fishing Bridge and Lake Butte Overlook will be maintained for oversnow vehicle travel.

Beginning with the winter season of 2008–2009, the NPS will discontinue maintaining the Continental Divide Snowmobile Trail (CDST) as an oversnow vehicle route through most of Grand Teton and the Parkway, in essence converting this portion of the CDST into a trailered segment. Experience over the past several winters strongly suggests that the minimal amount of use on this route would not substantially increase since much of the previous use of the CDST was associated with visitors traveling through Yellowstone. The NPS recognizes that the guiding and air and sound emissions requirements for Yellowstone have contributed to a substantial reduction in the use of the CDST, since visitors have not been able to continue into Yellowstone without a

guide and a snowmobile that meets the emissions requirements, as well as being subject to the daily entrance caps.

The NPS also recognizes, however, that snowmobile access to and from the Targhee National Forest is important to some visitors. While the CDST will no longer be maintained or designated for snowmobile use, the air and sound emissions requirements for the Grassy Lake Road will be removed beginning with the 2008–2009 winter season. Snowmobilers will be able to transport their machines by trailer between Moran and Flagg Ranch using plowed roads, in order to connect to the Grassy Lake Road and the national forest lands to the west of the Parkway. The daily entry limit of 25 is similar to the level of use that occurred in the past.

## Summary of and Responses to Public Comments

The NPS published a proposed rule on May 16, 2007 (72 FR 27499) and accepted public comments through July 16, 2007. Comments were accepted through the mail, hand delivery, and through the Federal eRulemaking Portal: *http://www.regulations.gov.* A total of 1,450 people commented on the proposed rule, and 1,481 comment documents were received (some commentors submitted multiple letters). Thirty-seven letters were submitted electronically, and the remainder were submitted in paper form. Approximately 42% of commentors submitted form letters while the remaining 58% were unique letters.

### Snowmobiles and Snowcoaches

1. *Comment:* The NPS should revise the proposed rule to prohibit the use of snowmobiles and require that all oversnow access to the parks be via snowcoaches.

*Response:* Snowcoaches and snowmobiles provide two very different types of experiences for park visitors seeking to enjoy Yellowstone during the winter. The use of both types of travel is well-established in the Parks, extending back more than 4 decades. In seeking to provide a range of opportunities and means to enjoy the Parks, the NPS believes that the managed use of both types of oversnow travel best meets that purpose and, as described in the FEIS and ROD, can be accomplished without harming the integrity of park resources or values. In addition, both types of access facilitate a wide range of non-motorized activities within the park by providing access to interior destinations such as Old Faithful and other areas that would otherwise be unreachable by the vast majority of visitors.

2. *Comment:* The use of snowmobiles results in a waste of resources and contributes to climate change.

*Response:* As disclosed in the FEIS, snowmobiles that currently meet the NPS's air and sound emissions requirements are more fuel-efficient than conventional snowmobiles and therefore contribute less to climate change. On a per capita basis, snowmobiles meeting NPS air and sound emissions requirements are slightly more fuel-efficient than snowcoaches, based on NPS analysis of current ridership and gas mileage within Yellowstone.

3. *Comment:* The proposed rule would continue to allow the use of snowcoaches, which would result in adverse impacts on air quality and the natural soundscape of Yellowstone.

*Response:* The NPS fully evaluated the impacts of snowcoaches on the air quality and natural soundscapes of Yellowstone, as described in the FEIS. The NPS recognizes that certain types of snowcoaches, predominantly the historic Bombardier models with upright exhaust stacks, operate with relatively high levels of noise and have been responsible for a large percentage of the instances in which sound levels exceeded adaptive management thresholds established by the NPS. Beginning with the 2011–2012 winter season, the NPS will require that all snowcoaches meet a noise emissions requirement of no greater than 73 dBA and an air emissions requirement that is the functional equivalent of having EPA Tier I emissions control equipment into the engine and drive train for the vehicle class (size and weight) as a wheeled vehicle. The NPS, through contracts and permits, will encourage snowcoaches to have EPA Tier II emissions control equipment for the vehicle class.

4. *Comment:* The NPS should require all snowcoaches to meet air and sound emissions requirements sooner than the 2011–2012 winter season.

*Response:* The NPS believes that the 4-year period allowed for the phase-in of air and sound emissions requirements is reasonable given the expense of upgrading snowcoaches to meet these requirements, and is necessary in order to avoid a disruption of visitor services.

### Park Resource Issues

5. *Comment:* The use of snowmobiles under the proposed rule will continue to result in adverse impacts on air and water quality, natural soundscapes, vegetation, wildlife, visitor experience, and public health and safety.

*Response:* The NPS fully evaluated the environmental impacts of

to provide reasonable access to inholdings or adjacent private property.

(viii) Maps detailing designated routes will be available from Park Headquarters.

(19) *For what purpose may I use the routes designated in paragraph (g)(18) of this section?* The routes designated in paragraph (g)(18) of this section are only to access private property within or directly adjacent to the park boundary. Use of these roads via snowmobile is authorized only for the landowners and their representatives or guests. Use of these roads by anyone else or for any other purpose is prohibited.

(20) *Is violating any of the provisions of this section prohibited?* Violating any of the terms, conditions or requirements of paragraphs (g)(1) through (g)(19) of this section is prohibited. Each occurrence of non-compliance with these regulations is a separate violation.

Dated: December 10, 2007.

**Lyle Laverty,**
*Assistant Secretary for Fish and Wildlife and Parks.*

[FR Doc. E7–24175 Filed 12–12–07; 8:45 am]

**BILLING CODE 4312-CT-P**

---

**ENVIRONMENTAL PROTECTION AGENCY**

**40 CFR Part 52**

**[EPA–R05–OAR–2004–IL–0002; FRL–8503–5]**

**Approval and Promulgation of Implementation Plans; Illinois; Source-Specific Revision for Cromwell-Phoenix, Incorporated**

**AGENCY:** Environmental Protection Agency (EPA).

**ACTION:** Direct final rule.

**SUMMARY:** The EPA is approving a revision to the Illinois State Implementation Plan (SIP) to incorporate site-specific Volatile Organic Compounds (VOC) regulations for the Corrosion Inhibiting (CI) packaging production facility of Cromwell-Phoenix, Incorporated (Cromwell-Phoenix) located in Alsip, Illinois (Cook County). The EPA is approving an adjusted standard from Illinois' paper coating regulations for Cromwell-Phoenix's CI packaging production facility.

**DATES:** This "direct final" rule is effective on February 11, 2008, unless EPA receives adverse written comments by January 14, 2008. If an adverse comment is received, EPA will publish a timely withdrawal of the rule in the **Federal Register** and inform the public that the rule will not take effect.

**ADDRESSES:** Submit your comments, identified by Docket ID No. EPA–R05–OAR–2004–IL–0002, by one of the following methods:

1. *http://www.regulations.gov:* Follow the online instructions for submitting comments.

2. *E-mail: mooney.john@epa.gov.*

3. *Fax:* (312) 886–5824.

4. *Mail:* John M. Mooney, Chief, Criteria Pollutant Section, Air Programs Branch (AR–18J), U.S. Environmental Protection Agency, 77 West Jackson Boulevard, Chicago, Illinois 60604.

5. *Hand Delivery:* John M. Mooney, Chief, Criteria Pollutant Section, Air Programs Branch (AR–18J), U.S. Environmental Protection Agency, 77 West Jackson Boulevard, Chicago, Illinois. Such deliveries are only accepted during the Regional Office's normal hours of operation, and special arrangements should be made for deliveries of boxed information. The Regional Office's official hours of operation are Monday through Friday, 8:30 a.m. to 4:30 p.m., excluding Federal holidays.

*Instructions:* Direct your comments to Docket ID No. EPA–R05–OAR–2004–IL–0002. EPA's policy is that all comments received will be included in the public docket without change and may be made available online at *www.regulations.gov,* including any personal information provided, unless the comment includes information claimed to be Confidential Business Information (CBI) or other information whose disclosure is restricted by statute. Do not submit information that you consider to be CBI, or otherwise protected, through *www.regulations.gov* or e-mail. The *www.regulations.gov* Web site is an "anonymous access" system, which means EPA will not know your identity or contact information unless you provide it in the body of your comment. If you send an e-mail comment directly to EPA without going through *www.regulations.gov,* your e-mail address will be automatically captured and included as part of the comment that is placed in the public docket and made available on the Internet. If you submit an electronic comment, EPA recommends that you include your name and other contact information in the body of your comment and with any disk or CD–ROM you submit. If EPA cannot read your comment due to technical difficulties and cannot contact you for clarification, EPA may not be able to consider your comment. Electronic files should avoid the use of special characters and any form of encryption, and should be free of any defects or viruses. For additional instructions on submitting comments,

go to section I of the **SUPPLEMENTARY INFORMATION** section of this document.

*Docket:* All documents in the docket are listed in the *www.regulations.gov* index. Although listed in the index, some information is not publicly available, e.g., CBI or other information whose disclosure is restricted by statute. Certain other material, such as copyrighted material, will be publicly available only in hardcopy. Publicly available docket materials are available either electronically in *www.regulations.gov* or in hardcopy at the Environmental Protection Agency, Region 5, Air and Radiation Division, 77 West Jackson Boulevard, Chicago, Illinois 60604. This facility is open from 8:30 a.m. to 4:30 p.m., Monday through Friday, excluding Federal holidays. It is recommended that you telephone Edward Doty, Environmental Scientist, at (312) 886–6057, before visiting the Region 5 office.

**FOR FURTHER INFORMATION CONTACT:** Edward Doty, Environmental Scientist, Criteria Pollutant Section, Air Programs Branch (AR–18J), U.S. Environmental Protection Agency, Region 5, 77 West Jackson Boulevard, Chicago, Illinois 60604. Telephone: (312) 886–6057. E-mail address: *doty.edward@epa.gov.*

**SUPPLEMENTARY INFORMATION:** Throughout this document, whenever "we," "us," or "our" are used, we mean EPA. This **SUPPLEMENTARY INFORMATION** section is organized as follows:

I. General Information
  Does this action apply to me?
II. Today's Action
  A. What action is EPA taking today?
  B. Why is EPA taking this action?
  C. What are the alternative control requirements included in the Adjusted Standard?
  D. What information did Illinois submit in support of this SIP revision?
  E. Was a public hearing held?
  F. Why is this SIP revision being approved?
III. Final Rulemaking Action
IV. Statutory and Executive Order Reviews

**I. General Information**

*Does this action apply to me?*

This action only applies to Cromwell-Phoenix, Incorporated (Cromwell-Phoenix) and, in particular, to Cromwell-Phoenix's CI packaging production facility located in Alsip, Illinois (Cook County). If you are the owner or operator of this source, this action affects the air pollution control rules that apply to your source as contained in the Illinois SIP.

# PRESS RELEASE FROM THE SYLVAN PASS STUDY GROUP

February 1, 2008

Contact:  Carl Moore
The Community Store
16 Camino Delilah
(505) 820-6826

The Sylvan Pass Study Group met Monday (January 28) and Tuesday (January 29) 2008, to explore reasonable avalanche and access mitigation safety measures and costs to determine how to provide continued snowmobile and snowcoach motorized oversnow access to Yellowstone National Park through the East Gate via Sylvan Pass in the winter uses seasons beyond 2007-2008.

The group reviewed the history of decisions and activities regarding winter use in Yellowstone National Park and heard presentations on the geography of Sylvan Pass, what the park does to inform visitation to the park, how the city of Cody encourages tourism to their community and how they view the impact on their economy due to winter use within the park, how the park conducts avalanche forecasting, and what are best approaches to avalanche safety mitigation.

Presenters included:

• Dale Reinhart, a landscape architect, and  Craig Dewey, from the Federal Highway Administration, have done considerable work on the road through Sylvan Pass and spoke on the unique geography of the Pass;

• Maura Longden, a ranger in the park, spoke on how the park does avalanche forecasting and mitigation;

• John Lounsbury, a retired former employee from the park, spoke on the history and practices of avalanche safety mitigation in the park; and

• Don Bachman, Bob Comey, and Ted Wells – all people with extensive avalanche safety backgrounds – presented  information regarding avalanche behavior and control measures. Don Bachman has spent most of the last 48 years as a snow safety specialist and has avalanche forecasting and control experience on several highway corridors.  Bob Comey is Director of the Bridger-Teton National Forest Avalanche Center and lead forecaster at the Jackson Hole Mountain Resort.  Ted Wells is an engineer with the Wyoming Department of Transportation and responsible for avalanche safety mitigation.

The Sylvan Pass Study group concluded that there was "significant learning as a result of high quality, informative presentations that reflected a range of opinions and experiences."

The group will meet next on March 13, 2008.

Sylvan Pass Study Group
Meeting on March 11, 2008
Crowne Plaza, Billings, MT

The next meeting of the SPSG will be April 24 (1:30 - 6:30) and April 25 (8 - 4).

The meeting on the 24th will be informational and open to the public.  The meeting will include the following topics:
- An examination of the costs of full forecasting as defined in the Record of Decision and the actual itemized costs of those elements of avalanche hazard mitigation exercised during the winter season of 2007-2008, including, but not limited to, the weather station, the groomer and the use of a howitzer and a helicopter.  Presentations will be made on:
    - Actual costs for 2006-2007 winter season
    - Actual costs for 2007-2008 winter season
    - Estimated costs for a season of full forecasting
    - Estimated costs for additions to current (2007-2008) program
    - Estimated costs for other potential avalanche management programs
- A consideration of a potential community education and communications plan; and
- An exploration of potential reasonable limits upon YNP's provision of avalanche hazard mitigation.

The meeting on the 25th is not open to the public.  The primary agenda for the 25th is to reach agreement on the key question of how to keep Sylvan Pass open for winter use.

The Group was asked to reserve May 21 as a date for a potential future meeting (if needed), to be held in Cody.

<u>Meeting Report,  March 11, 2008, Crowne Plaza, Billings, MT</u>

The Group reviewed and confirmed their desire to be guided by the Ground Rules.

The Group generated ideas for the agenda and then spent their time discussing:
- Two reports prepared by the National Park Service:
    - "Yellowstone National Park 2007-2008 Winter Summary (draft, March 10, 2008)," and
    - "Current Status-Sylvan Operations Winter 2007-2008 (through March 9)"
- The mission of Yellowstone National Park, and
- Whether or not there were things they wanted to say to each other but had not yet done that.

They then turned their attention to the core purpose of the Group: What are reasonable avalanche and access mitigation safety measures and cost to determine how to provide continued snowmobile and snowcoach motorized oversnow access to YNP through East Gate via Sylvan Pass in the winter use seasons beyond 2007-08?

In three small heterogeneous groups (representing the diversity of governments on the Study Group), they answered the question.

After hearing the answers of all of the groups, the three small groups were then asked to answer the following four questions:
1. What do the answers of all three groups have in common?
2. What could everyone agree with, even if all the groups do not have it in common?
3. What, if anything, can you not accept in the answers of the groups?
4. What one thing do you care most about?

The full Group then collectively identified what their answers have in common, what they could agree with in the answers to the questions, what they could not agree with, and what they care most about.

This work guided the Group in determining the agenda for the next meeting.

Carl Moore
The Community Store
16 Camino Delilah
Santa Fe, NM 87506

carl@thecommunitystore.com
www.thecommunitystore.com
505.820-6826



## ANGLER
### THE CHENEY VICE PRESIDENCY

# Leaving No Tracks



BY DAVID HUME KENNERLY — GETTY IMAGES

**The vice president has intervened in many cases to undercut long-standing environmental rules for the benefit of business.**

*By* Jo Becker *and* Barton Gellman
*Washington Post Staff Writers*

Sue Ellen Wooldridge, the 19th-ranking Interior Department official, arrived at her desk in Room 6140 a few months after Inauguration Day 2001. A phone message awaited her.

"This is Dick Cheney," said the man on her voice mail, Wooldridge recalled in an interview. "I understand you are the person handling this Klamath situation. Please call me at — hmm, I guess I don't know my own number. I'm over at the White House."

Wooldridge wrote off the message as a prank. It was not. Cheney had reached far down the chain of command, on so unexpected a point of vice presidential concern, because he had spotted a political threat arriving on Wooldridge's desk.

In Oregon, a battleground state that the Bush-Cheney ticket had lost by less than half of 1 percent, drought-stricken farmers and ranchers were about to be cut off from the irrigation water that kept their cropland and pastures green. Federal biologists said the Endangered Species Act left the government no choice: The survival of two imperiled species of fish was at stake.

Law and science seemed to be on the side of the fish. Then the vice president stepped in.

First Cheney looked for a way around the law, aides said. Next

he set in motion a process to challenge the science protecting the fish, according to a former Oregon congressman who lobbied for the farmers.

Because of Cheney's intervention, the government reversed itself and let the water flow in time to save the 2002 growing season, declaring that there was no threat to the fish. What followed was the largest fish kill the West had ever seen, with tens of thousands of salmon rotting on the banks of the Klamath River.

Characteristically, Cheney left no tracks.

The Klamath case is one of many in which the vice president took on a decisive role to undercut long-standing environmental regulations for the benefit of business.

By combining unwavering ideological positions — such as the priority of economic interests over protected fish — with a deep practical knowledge of the federal bureaucracy, Cheney has made an indelible mark on the administration's approach to everything from air and water quality to the preservation of national parks and forests.

It was Cheney's insistence on easing air pollution controls, not the personal reasons she cited at the time, that led Christine Todd Whitman to resign as administrator of the Environmental Protection Agency, she said in an interview that provides the

See CHENEY, A8, Col. 1

■ **Cheney's chief of staff explains stance on classified material order.** | A5

1 of 7



## ANGLER
### THE CHENEY VICE PRESIDENCY

# 'Some Way Around It'



Bush and Cheney, who lost in Oregon by less than half of 1 percent in 2000, couldn't afford to anger thousands of Republican farmers and ranchers in the state during the 2002 midterm elections and beyond.

BY PETE FESSICK — AURORA VIA GETTY IMAGES

CHENEY, From A1

most detailed account so far of her departure.

The vice president also pushed to make Nevada's Yucca Mountain the nation's repository for nuclear and radioactive waste, aides said, a victory for the nuclear power industry over those with long-standing safety concerns. And his office was a powerful force behind the White House's decision to rewrite a Clinton-era land-protection measure that put nearly a third of the national forests off limits to logging, mining and most development, former Cheney staff members said.

Cheney's pro-business drive to ease regulations, however, has often set the administration on a collision course with the judicial branch.

The administration, for example, is appealing the order of a federal judge who reinstated the forest protections after she ruled that officials didn't adequately study the environmental consequences of giving states more development authority.

And in April, the Supreme Court rejected two other policies closely associated with Cheney. It rebuffed the effort, ongoing since Whitman's resignation, to loosen some rules under the Clean Air Act. The court also rebuked the administration for not regulating greenhouse gases associated with global warming, issuing its ruling less than two months after Cheney declared that "conflicting viewpoints" remain about the extent of the human contribution to the problem.

In the latter case, Cheney made his environmental views clear in public. But with some notable exceptions, he generally has preferred to operate with stealth, aided by loyalists who owe him for their careers.

When the vice president got wind of a petition to list the cutthroat trout in Yellowstone National Park as a protected species, his office turned to one of his former congressional aides.

The aide, Paul Hoffman, landed his job as deputy assistant interior secretary for fish and wildlife after Cheney recommended him. In an interview, Hoffman said the vice president knew that listing the cutthroat trout would harm the recreational fishing industry in his home state of Wyoming and that he "followed the issue closely." In 2001 and again in 2006, Hoffman's agency declined to list the trout as threatened.

Hoffman also was well positioned to help his former boss with what Cheney aides said was one of the vice president's pet peeves: the Clinton-era ban on snowmobiling in national parks. "He impressed upon us that so many people enjoyed snowmobiling in the Tetons," former Cheney aide Ron Christie said.

With Cheney's encouragement, the administration lifted the ban in 2002, and Hoffman followed up in 2005 by writing a proposal to fundamentally change the way national parks are managed. That plan, which would have emphasized recreational use over conservation, attracted so much opposition from park managers and the public that the Interior Department withdrew it. Still, the Bush administration continues to press for expanded snowmobile access, despite numerous studies showing that the vehicles harm the parks' environment and polls showing majority support for the ban.

Hoffman, now in another job at the Interior Department, said Cheney never told him what to do on either issue — he didn't have to.

"His genius," Hoffman said, is that "he builds networks and puts the right people in the right places, and then trusts them to make well-informed decisions that comport with his overall vision."

_____

### 'Political Ramifications'

Robert F. Smith had grown desperate by the time he turned to the vice president for help.

The former Republican congressman from Oregon represented farmers in the Klamath basin who had relied on a government-operated complex of dams and canals built almost a century ago along the Oregon-California border to irrigate nearly a quarter-million acres of arid land.

In April 2001, with the region gripped by the worst drought in memory, the spigot was shut off.

Studies by the federal government's scientists concluded unequivocally that diverting water would harm two federally protected species of fish, violating the Endangered Species Act of 1973. The Bureau of Reclamation was forced to declare that farmers must go without in order to maintain higher water levels so that two types of suckerfish in Upper Klamath Lake and the coho salmon that spawn in the Klamath River could survive the dry spell.

Farmers and their families, furious and fearing for their livelihoods, formed a symbolic 10,000-person bucket brigade. Then they took saws and blowtorches to dam gates, clashing with U.S. marshals as water streamed into the canals that fed their withering fields, before the government stopped the flow again.

What they didn't know was that the vice president was already on the case.

Smith had served with Cheney on the House Interior Committee in the 1980s, and the former congressman said he turned to the vice president because he knew him as a man of the West who didn't take kindly to federal bureaucrats meddling with private use of public land. "He saw, as every other person did, what a ridiculous disaster shutting off the water was," Smith said.

Cheney recognized, even before the shut-off and long before others at the White House, that what "at first blush didn't seem like a big deal" had "a lot of political ramifications," said Dylan Glenn, a former aide to President Bush.

Bush and Cheney couldn't afford to anger thousands of solidly Republican farmers and ranchers during the midterm elections and beyond. The case also was rapidly becoming a test for conservatives nationwide of the administration's commitment to fixing what they saw as an imbalance between conservation and economics.

"What does the law say?" Christie, the former aide, recalled the vice president asking. "Isn't there some way around it?"

# Maintaining Connections

*Vice President Cheney has brought many of his former allies with him to the White House, placed them in important roles, or kept strong bonds.*

## MET IN CONGRESS



Cheney served as **Wyoming's sole congressman, 1978-1989**



**David S. Addington**
Followed Cheney from the Iran-contra committee in the House to the Pentagon, then to the Bush White House, where he was the vice president's counsel and became one of the dominant lawyers in the Bush administration.



**Paul Hoffman**
Once an aide to Cheney in Congress, he got two jobs in the Interior Department (including deputy assistant secretary for fish and wildlife) that helped him eliminate one of Cheney's pet peeves (a snowmobile ban in national parks) and "de-list" some species from the endangered list.



**Rep. Bill Thomas (R-Calif.)**
An old friend from Cheney's House days. Thomas introduced a tax bill with ideas that Cheney promoted.

**RECENT CONNECTION**  ·  White House  ·  Interior Department  ·  Congress

## MET AT THE DEFENSE DEPARTMENT



Cheney was **secretary of defense, 1989-1993**



**John R. Bolton**
Got to know Cheney as an assistant secretary of state in the first Bush administration, where he became an ally. Bolton helped run the legal battle over the Florida recount, and later Cheney asked a reluctant Colin L. Powell to make Bolton undersecretary of state. There he openly defied Powell and Richard L. Armitage, promoting an agenda he shared with Cheney.



**Susan J. Crawford**
Cheney gave her her first four federal government jobs at the Pentagon. When it came time for Bush to choose the person who would run military commissions for suspected terrorists, she got the job.



**Nancy Dorn**
She impressed Cheney in two mid-level jobs at the Pentagon. In the Bush administration, she was Cheney's top lobbyist on the Hill, then became No. 2 at the Office of Management and Budget — a key position allocating money and setting federal government policy on legislation.

State Department  ·  Defense Department  ·  White House

3 of 7



ANGLER
THE CHENEY VICE PRESIDENCY

# 'We Had to Match the Science'

Next, Cheney called Wooldridge, who was then deputy chief of staff to Interior Secretary Gale A. Norton and the woman handling the Klamath situation.

Aides praise Cheney's habit of reaching down to officials who are best informed on a subject he is tackling. But the effect of his calls often leads those mid-level officials scrambling to do what they presume to be his bidding.

That's what happened when a mortified Wooldridge finally returned the vice president's call, after receiving a tart follow-up inquiry from one of his aides. Cheney, she said, "was coming from the perspective that the farmers had to be able to farm — that was his concern. The fact that the vice president was interested meant that everyone paid attention."

Cheney made sure that attention did not wander. He had Wooldridge brief his staff weekly and, Smith said, he also called the interior secretary directly.

"For months and months, at almost every briefing it was 'Sir, here's where we stand on the Klamath basin,'" recalled Christie, who is now a lobbyist. "His hands-on involvement, it's safe to say, elevated the issue."

## 'Let the Water Flow'

There was, as it happened, an established exemption to the Endangered Species Act.

A rarely invoked panel of seven Cabinet officials, known informally as the "God Squad," is empowered by the statute to determine that economic hardship outweighs the benefit of protecting threatened wildlife. But after discussing the option with Smith, Cheney rejected that course. He had another idea, one that would not put the administration on record as advocating the extinction of endangered or threatened species.

The thing to do, Cheney told Smith, was to get science on the side of the farmers. And the way to do that was to ask the National Academy of Sciences to scrutinize the work of the federal biologists who wanted to protect the fish.

Smith said he told Cheney that he thought that was a roll of the dice. Academy panels are independently appointed, receive no payment and must reach a conclusion that can withstand peer review.

"It worried me that these are individuals who are unreachable," Smith said of the academy members. But Cheney was firm, expressing no such concerns about the result. "He felt we had to match the science."

Smith also wasn't sure that the Klamath case — "a small place in a small corner of the country" — would meet the science academy's rigorous internal process for deciding what to study. Cheney took care of that. "He called them and said, 'Please look at this, it's important,'" Smith said. "Everyone just went flying at it."

William Kearney, a spokesman for the National Academies, said he was unaware of any direct contact from Cheney on the matter. The official request came from the Interior Department, he said.

It was Norton who announced the review, and it was Bush and his political adviser Karl Rove who traveled to Oregon in February 2002 to assure farmers that they had the administration's support. A month later, Cheney got what he wanted when the science academy delivered a preliminary report finding "no substantial scientific foundation" to justify withholding water from the farmers.

There was not enough clear evidence that proposed higher lake levels would benefit suckerfish, the report found. And it hypothesized that the practice of releasing warm lake water into the river during spawning season might do more harm than good to the coho, which thrive in lower temperatures.

Norton flew to Klamath Falls in March to open the head gate as farmers chanted "Let the water flow!" And seizing on the report's draft findings, the Bureau of Reclamation immediately submitted a new decade-long plan to give the farmers their full share of water.

See CHENEY, A10, Col. 1



BY RON WINN — KLAMATH FALLS HERALD AND NEWS VIA ASSOCIATED PRESS

An estimated 77,000 salmon washed up on the banks of the Klamath River. Last year, the government declared a "commercial fishery failure" on the West Coast.

4 of 7

THE WHITE HOUSE



**Stephen J. Hadley**
Was an assistant secretary of defense under Cheney and serves as the president's national security adviser.



**William J. Haynes II**
Worked in Cheney's Pentagon as the Army's top lawyer and is an old friend of Addington, a key ally of the vice president on the broad changes in the law on the detention, treatment and trial of suspected terrorists. He is now general counsel at the Defense Department.



**Zalmay Khalilzad**
Worked in Cheney's Pentagon policy shop, made a big impression on Wolfowitz and Libby, and coordinated Iraq and Afghanistan policy at various times for the Bush administration.



**I. Lewis "Scooter" Libby**
A Wolfowitz student at Yale, Libby became his principal deputy in the Pentagon years. He was a key player when Cheney almost ran for president and became an unprecedented triple titleholder under Bush — vice president's chief of staff, national security adviser and assistant to the president.



**Sean O'Keefe**
Cheney made him the Pentagon's comptroller and secretary of the Navy in the early 1990s, and in the Bush administration Cheney helped place him as the No. 2 at the Office of Management and Budget and then as the head of NASA.



**Paul D. Wolfowitz**
Ran policy for Cheney at the Pentagon. He was a key hard-liner and ally on Iraq. Cheney pushed Donald H. Rumsfeld to make Wolfowitz his No. 2.




Cheney has been **vice president** since 2001



**Brian V. McCormack**
A young gofer to Cheney in the Bush-Cheney campaign, McCormack became Cheney's personal aide in the White House, then special assistant to L. Paul Bremer in Iraq and later a White House aide.

White House   White House   White House   White House   NASA   Defense Department   White House

5 of 7



ANGLER
THE CHENEY VICE PRESIDENCY

# 'The Decision Had Already Been Made'



BY DAVID HUME KENNERLY — GETTY IMAGES

Cheney's insistence on easing air pollution controls led Christine Todd Whitman, shown with Secretary of State Colin L. Powell, right, and I. Lewis "Scooter" Libby, Cheney's chief of staff, to resign as EPA administrator.

**CHENEY,** *From A9*

When the lead biologist for the National Marine Fisheries Service team critiqued the science academy's report in a draft opinion objecting to the plan, the critique, was edited out by superiors and his objections were overruled, he said. The biologist, Michael Kelly, who has since quit the federal agency, said in a whistle-blower claim that it was clear to him that "someone at a higher level" had ordered his agency to endorse the proposal regardless of the consequences to the fish.

Months later, the first of an estimated 77,000 dead salmon began washing up on the banks of the warm, slow-moving river. Not only were threatened coho dying — so were chinook salmon, the staple of commercial fishing in Oregon and Northern California. State and federal biologists soon concluded that the diversion of water to farms was at least partly responsible.

Fishermen filed lawsuits and courts ruled that the new irrigation plan violated the Endangered Species Act. Echoing Kelly's objections, the U.S. Court of Appeals for the 9th Circuit deserved that the 10-year plan wouldn't provide enough water for the fish until year nine. By then, the 2005 opinion said, "all the water in the world" could not save the fish, "for there will be none to protect." In March 2006, a federal judge prohibited the government from diverting water for agricultural use whenever water levels dropped beneath a certain point.

Last summer, the federal government declared a "commercial fishery failure" on the West Coast after several years of poor chinook returns virtually shut down the industry, opening the way for Congress to approve more than $60 million in disaster aid to help fishermen recover their losses. That came on top of the $15 million that the government has paid Klamath farmers since 2002 not to farm, in order to reduce demand.

The science academy panel, in its final report, acknowledged that its draft report was "controversial," but it stood by its conclusions. Instead of focusing on the irrigation spigot, it recommended broad and expensive changes to improve fish habitat.

"The farmers were grateful for our decision, but we made the decision based on the scientific

outcome," said the panel chairman, William Lewis, a biologist at the University of Colorado at Boulder. "It just so happened the outcome favored a biologist."

But J.B. Ruhl, another member of the panel and a Florida State University law professor who specializes in endangered species cases, said the Bureau of Reclamation went "too far," making judgments that were not backed up by the academy's draft report. "The approach they took was inviting criticism," Ruhl said, "and I didn't think it was supported by our recommendations."

### 'More Pro-Industry'

Whitman, then head of the EPA, was on vacation with her family in Colorado when her cellphone rang. The vice president was on the line, and he was clearly irked.

Why was the agency dragging its feet on easing pollution rules for aging power and oil refinery plants?, Cheney wanted to know. An industry that had contributed heavily to the Bush-Cheney campaign was clamoring for change, and the vice president told Whitman that she "hadn't moved it fast enough," she recalled.

Whitman protested, warning Cheney that the administration had to proceed cautiously. It was August 2001, just seven months into the first term. We need to "document this according to the books," she said she told him, "so we don't look like we are ramrodding something through. Because it's going to court."

But the vice president's main concern was getting it done fast, she said, and "doing it in a way that didn't hamper industry."

At issue was a provision of the Clean Air Act known as the New Source Review, which requires older plants that belch millions of tons of smog and soot each year to install modern pollution controls when they are refurbished in a way that increases emissions.

Industry officials complained to the White House that even when they had merely performed routine maintenance and repairs, the Clinton administration hit them with violations and multimil-

lion-dollar lawsuits. Cheney's energy task force ordered the EPA to reconsider the rule.

Whitman had already gone several rounds with the vice president over the issue.

She and Cheney first got to know each other in one of the Nixon administration's anti-poverty agencies, working under Donald H. Rumsfeld. When Cheney offered her the job in the Bush administration, the former New Jersey governor marveled at how far both had come. But as with Treasury Secretary Paul H. O'Neill, another longtime friend who owed his Cabinet post to Cheney, Whitman's differences with the vice president would lead to her departure.

Sitting through Cheney's task force meetings, Whitman had been stunned by what she viewed as an unquestioned belief that EPA's regulations were primarily to blame for keeping companies from building new power plants. "I was upset, mad, offended that there seemed to be so much head-nodding around the table," she said.

Whitman said she had to fight "tooth and nail" to prevent Cheney's task force from handing over the job of reforming the New Source Review to the Energy Department, a battle she said she won only after appealing to White House Chief of Staff Andrew H. Card Jr. This was an environmental issue with major implications for air quality and health, she believed, and it shouldn't be driven by a task force primarily concerned with increasing production.

Whitman agreed that the exception for routine maintenance and repair needed to be clarified, but not in a way that undercut the ongoing Clinton-era lawsuits — many of which had merit, she said.

Cheney listened to her arguments, and as usual didn't say much. Whitman said she also met with the president to "explain my concerns" and to offer an alternative.

She wanted to work a political trade with industry — eliminating the New Source Review in return for support of Bush's 2002 "Clear Skies" initiative, which outlined a market-based approach to reducing emissions over time. But Clear Skies went nowhere. "There was never any follow-up," Whitman said, and moreover, there was no reason for industry to embrace even a modest pollution control initiative when the vice president was pushing to change the rules for nothing.

She decided to go back to Bush one last time. It

was a crapshoot — the EPA administrator had already been rolled by Cheney when the president reversed himself on a campaign promise to limit carbon dioxide emissions linked to global warming — so she came armed with a political argument.

Whitman said she plunked down two sets of folders filled with news clips. This one, she said, pointing to a stack about 2½ inches thick, contained articles, mostly negative, about the administration's controversial proposal to suspend tough new standards governing arsenic in drinking water. And this one, she said as she pointed to a pile four or five times as thick, are the articles about the rules on aging power plants and refineries — and the administration hadn't even done anything yet.

"If you think arsenic was bad," she recalled telling Bush, "look at what has already been written about this."

But Whitman left the meeting with the feeling that "the decision had already been made." Cheney had a clear mandate from the president on all things energy-related, she said, and while she could take her case directly to Bush, "you leave and the vice president's still there. So together, they would then shape policy."

What happened next was "a perfect example" of that, she said.

The EPA sent rule revisions to White House officials. The read-back was that they weren't happy and "wanted something that would be more pro-industry," she said.

The end result, which she said was written at the direction of the White House and announced in August 2003, vastly broadened the definition of routine maintenance. It allowed some of the nation's dirtiest plants to make major modifications without installing costly new pollution controls.

By that time, Whitman had already announced her resignation, saying she wanted to spend more time with her family. But the real reason, she said, was the new rule.

"I just couldn't sign it," she said. "The president has a right to have an administrator who could defend it, and I just couldn't."

A federal appeals court has since found that the rule change violated the Clean Air Act. In their ruling, the judges said that the administration had redefined the law in a way that could be valid "only in a Humpty-Dumpty world."

*Staff researcher Julie Tate contributed to this report.*

# The Series, in Print and Online

**SUNDAY** | *Dick Cheney, code-named "Angler" by the Secret Service, is the most powerful vice president in U.S. history — a master of bureaucracy and detail who exerts most of his influence out of public view.*

**MONDAY** | *Convinced that the "war on terror" required "robust interrogations" to extract information from captured suspects, Cheney pressed the Bush administration to carve out exceptions to the Geneva Conventions and adopt a novel distinction between permitted "cruelty" and forbidden "torture."*

**TUESDAY** | *Working behind the scenes, Cheney has made himself the dominant voice on tax and spending policy, outmaneuvering rivals for the president's ear and becoming the formal arbiter of Cabinet budget appeals.*

**TODAY** | *Cheney has steered some of the Bush administration's most important environmental decisions: easing air pollution controls, opening public parks to snowmobiles and diverting river water to farmers — a move that caused the deaths of thousands of salmon.*

**washingtonpost.com** | For narrated photo galleries, internal documents, key players and more go to **www.washingtonpost.com/cheney.**

7 of 7

# VANITY FAIR

**THE ENVIRONMENT**



U.S. parks superintendent J. T. Reynolds in Death Valley National Park, which he manages. He is the only active superintendent to speak out against the radical changes to national-parks policy proposed by the Bush Interior Department. *Photograph by Jonas Karlsson.*

## Who's Ruining Our National Parks?

Inside the Department of the Interior, Paul Hoffman, a cowboy with a beef against land conservation, has a vision for our national parks—and it involves submitting them to the menace of snowmobiles, A.T.V.'s, and privatization. His attempts to radically alter the National Park Service mission, however, have provoked a public outcry among the parks' true stewards, including one man, in Death Valley, who's standing his ground.

**by MICHAEL SHNAYERSON   VF.COM   June 7, 2006**

Paul Hoffman doesn't ride a horse to work, but he might as well, from the way he swaggers into Washington's gloomy and cavernous Department of the Interior building with his cowboy hat cocked. He's no inside-the-Beltway type, no, sir. Cody, Wyoming, is the town he calls home, and out in the woods is where he likes to be. Yet something very curious has happened to the former head of Cody's chamber of commerce. He's now a deputy assistant secretary at the National Park Service. As one of Interior's top political appointees, he's made it his mission to open America's national parks to more of the fun that Hoffman thinks most visitors want to have. Snowmobiling is one of those kinds of fun. Jet Skiing is another. Hunting would be nice, too. With any luck, he'll get a lot of what he wants before the summer is out.

Almost no one outside of Interior had heard of Hoffman until last year, when he produced a startling document to further his kinds of fun: a revision of management policies for the 390 units of the U.S. National Park Service, one of the nine public-lands agencies under Interior's aegis. Like so many of the environmental changes wrought by the Bush administration, this sounded bland and unimportant. It wasn't. The management policies are the Park Service's bible. Changing them is like changing the Ten

Commandments—or, in the case of the Park Service, the fundamental commandment written in 1916, when the service was established. The Organic Act calls for the parks to be left "unimpaired for the enjoyment of future generations." In ways both subtle and profound, Hoffman's new language opened the parks to uses that do impair them—now and for the future.

The draft was reportedly Hoffman's own work, but it reflected the wishes of the multi-billion-dollar mechanized-recreation industry, which, perhaps not surprisingly, has contributed generously to the Bush administration. Three of its leading advocates have met with Hoffman and supported him in his labors. One is a lobbyist whose pet ideas, nursed from the early 1980s, resonate throughout Hoffman's draft.

The re-write, which was leaked last summer, caused such consternation that a new draft was written. This one, says Interior, is the work not of Hoffman but of 100 Park Service career employees. Some of the worst ideas are gone. Others remain, in softer but no less consequential terms. A final draft is now working through its last stages.

In oversight hearings, Democratic lawmakers have railed against the revisions. "This is about a set of political priorities that are going to shortchange our treasures," warns Senator Ron Wyden (Democrat, Oregon). Six Republican senators, including Lamar Alexander (Tennessee) and Olympia Snowe (Maine), agreed: they signed a strong letter of concern to then Interior Secretary Gale Norton. Alexander went so far as to write a strong follow-up letter of his own. "I am not convinced," he wrote to N.P.S. director Fran Mainella, "that the rewrite process is even necessary at this time." Yet there's nothing that he or other lawmakers can do to stop Interior from pushing it through. "It sure looks like they have a lot of administrative discretion to work their will," Wyden says. "The tragedy here is that, by the time you can get more responsible leadership, these guys will have done a lot of damage."

Hoffman would be worth scrutiny if he were merely a top political at Interior who happened to re-write those management policies. But he's more than that. He's the appointee who, critics say, carried out his superiors' wishes—the embodiment of what the Bush administration feels about national parks, and how it wants them changed. He's not as smart as his superiors, critics say, and not as subtle. But that just makes his story a more blatant version of theirs, its truths more glaring and egregious.

In the five years since a new political regime moved into the block-size limestone Interior headquarters, at 18th and C Streets, Interior's top politicals, starting with Secretary Norton, have made it clear: however else they regard the national parks, they also consider them to be irksome money pits. They've suggested privatizing thousands of Park Service jobs—what they term "outsourcing"—a way not only to save money but, in the eyes of many critics, to destroy the culture of an agency they view as not obedient enough to them. Some have even proposed having corporate sponsors share park costs in exchange for donor recognition. Despite a 2000 campaign pledge by President Bush to spend $4.9 billion addressing the parks' maintenance backlog, only a pittance in new moneys has been put to the cause. That hasn't stopped the administration from taking credit for "fixing" the maintenance backlog—by spending billions already committed by Congress—but the fact is that park buildings, roads, and bridges are crumbling.

Meanwhile, many parks' operating budgets, with inflation, can't cover their increased costs. Overall, the parks budget for 2007 has just been cut by $100.5 million, to $2.16 billion, despite a shortfall last year of $600 million. Some of that latest cut will come from the fund for acquiring new parklands—a fund already slashed in half in the Bush years, from $97,800,000 in 2000 to $44,000,769 in 2005. The last thing the administration wants, so it seems, is new parks.

In the hierarchy of public lands, national parks by law have been above the rest: America's most special places, where natural beauty and all its attendant pleasures—quiet waters, the scents of fir and balsam, the hoot of an owl, and the dark of a night sky unsullied by city lights—are sacrosanct. Historically, conservation has always been the top priority, trumping any suggested use that might degrade them. This administration has a different view. Through a willfully perverse reading of the Organic Act—and despite a thick stack of court rulings through the decades—the administration has declared conservation and recreation to be equivalent national-park priorities. As long as the recreation in question doesn't have an "unacceptable impact," as the new management policies put it, Interior's politicals are all for it. As one Park Service insider says, "They either don't get the difference between national-park-designated land and other public lands or they don't care. They think this is much ado about

nothing."

That critic insisted on anonymity, as did many at the Park Service and Interior who shared their concerns with *Vanity Fair*. One high-level Park Service person left four messages on this reporter's phone machine, concerned about what would happen if his superiors learned he'd talked: he felt sure he would be fired and deprived of his government pension.

This culture of intimidation, critics say, has settled over the Park Service like a shroud. Parks superintendents have learned that questioning Interior dictates is a good way to stall a career rise or induce an unwanted transfer. So the campaign against new management policies has been led by the Coalition of National Park Service Retirees—a group formed in May 2003, after Bush took office, now more than 500 members strong—while their working counterparts stay mum. One active superintendent, though, has spoken out, on the record: J. T. Reynolds, of Death Valley National Park.

On a clear blue day, Reynolds takes the wheel for a ruminative drive along Death Valley's salt flats. The desert air is crisp, the temperature a mere 65 degrees—a gorgeous respite from the summer highs of 120 degrees that gave this eerie land its name and make Death Valley one of the hottest places on earth. Even now, Reynolds passes only an occasional car. If any environment seems safe from the intrusions of man, this is surely it, for Death Valley is protected not merely by nature but by law: it's the biggest national park outside of Alaska, after the 1994 California Desert Protection Act nearly doubled its size to 5,000 square miles. And yet the prospect of off-road vehicles zipping across those salt flats is not as unlikely as it may seem.

"What concerns me," says Reynolds, "is the idea of changing the Organic Act.... It is the law that establishes the Park Service. It is the law that binds all the Park Service areas as units. Congressional intent tells us that 'preserve and protect for future generations' is paramount, and that if we're going to err on any side of protection versus use, we're going to err on the side of resource protection. That's part of one's indoctrination. There are training sessions where the Organic Act is taken apart element by element.

"This is the issue," he says, "that many of us are willing to fall on our swords for."

Reynolds, 59, has the broad shoulders and powerful arms of a football player, which is what he was a long time ago at Texas A&M. But he also has the careful diction and intellectual pride instilled in him by his mother, who overcame discrimination in Galveston, Texas, to graduate from the Tuskegee Institute, one of the South's first African-American universities, and go on to a career in education. Reynolds was an Eagle Scout who married his childhood sweetheart. He was a Vietnam-era veteran, then a Park Service career man who moved from one park to another as he rose in the ranks: Yosemite, Everglades, Gates of the Arctic, Grand Canyon.

Reynolds got to Death Valley in early 2001, just as the Bush administration took office. For a year, the job was just as he'd hoped: a last stint before retirement in a park as beautiful as it is extreme. Reynolds grew to love watching the sun rise and set from Telescope Peak. He and his wife would walk out on the salt flats on a moonless night and feel overwhelmed—scared, really—by the utter darkness and quiet. Then, in early 2002, Paul Hoffman paid them a visit.

Reynolds knew that Hoffman was one of his new political overseers. He didn't know more than that, because Hoffman had no prior experience in the federal government. He'd come straight from Cody, Wyoming's chamber of commerce. How had he ascended to such a political perch? Perhaps because in the 1980s he'd served as Wyoming state director to then congressman Dick Cheney. Hoffman was a crony: Mike Brown in a cowboy hat.

According to Reynolds, the visit was billed as routine, a chance for Hoffman to see one of the crown jewels of his new dominion. At the time, the Death Valley superintendent had no idea that, back in Washington, Hoffman had already begun re-writing the Park Service management policies.

On the drive along the salt flats, Reynolds says, Hoffman asked him what he thought of the Surprise Canyon situation. Reynolds knew it well. Surprise Canyon lies on the western side of the Panamint Mountains, which rise starkly from the flats like

mountains of the moon. Over the years, extreme-four-wheel-vehicle enthusiasts had made a sport of driving up the canyon's vertical spring-fed waterfalls. The vehicles were super-modified Jeeps called "rock crawlers." The drivers had to drill holes in the canyon wall, stick in metal bars, then winch their way up. Often, the rock crawlers flipped or fell, spilling antifreeze and motor oil into the stream. As a result, the canyon's ground cover was destroyed.

U ntil the 1994 California Desert Protection Act, all of Surprise Canyon had been under the Bureau of Land Management, subject to less stringent use standards than parklands. Still, an environmental group had sued the B.L.M. and forced it to close the canyon off to rock crawlers. Five years later, the enthusiasts had come back to the B.L.M. to demand they be let in again. Since part of the canyon now lay within Death Valley Park's expanded borders, they'd apparently made their case to those in Hoffman's circle as well.

From Hoffman's questions, Reynolds concluded that the deputy assistant secretary sympathized with the extreme-vehicle group. Reynolds was baffled. He explained that the restored canyon was inappropriate for rock crawlers. Then, Reynolds says, Hoffman asked where off-road vehicles were allowed in Death Valley. Reynolds explained they were allowed in one area called Dumont Dunes, but nowhere else.

"Why not?" Hoffman asked.

"Well, number one, we have some threatened endangered species, and we wouldn't want them impacted," Reynolds said.

Hoffman seemed unconvinced, Reynolds recalls. An Interior spokesperson says Paul Hoffman does not even know what a rock crawler is and does not recall having any conversations about them.

L ast summer, three years after that visit, Hoffman's draft of the new management policies leaked out to the press. Reynolds, it so happened, was the one active superintendent who criticized them publicly. Two regional directors happened to be in Washington the week an article appeared in the *Los Angeles Times*. Hoffman poked his head into an office they were using at Interior. "What are you guys going to do about Reynolds?" Hoffman reportedly asked. An Interior spokesperson says that Paul Hoffman never asked this.

Since then, Death Valley National Park has been the subject of at least three investigative reviews. Those are the first such assessments the park has received since Reynolds arrived in early 2001.

The reviews appear to have found nothing significant amiss. Still, Reynolds's supporters are doing what they can to protect him if Hoffman tries anything. Last December, the Death Valley superintendent was given the Stephen T. Mather Award, named after the founding director of the Park Service, who helped write the Organic Act. The award was bestowed by the National Parks Conservation Association, a nonpartisan group with a number of Republicans on its national council, including Mather's grandson, Stephen Mather McPherson. Reynolds was honored for his "leadership" and "dedication to the long-term protection of the national parks." But everyone at the event knew the honor had an additional purpose: to help inoculate Reynolds against retribution.

O n that same trip in early 2002, Hoffman drove from Death Valley to Mojave National Preserve. Another local group had called his attention to a use issue. Mojave had become a preserve only with the 1994 Desert Protection Act, and a lot of Californians, particularly hunters, were still upset about that. Hunting was allowed at Mojave—that was part of the deal that had brought its 1.6 million acres into the parks system, and why it was called a preserve, not a park. But some hunters felt that Mojave's superintendent, Mary Martin, hadn't done enough to support them. They were furious that she hadn't agreed to maintain the area's "guzzlers." These were artificial watering sources—pipe-fed tanks and troughs—abandoned by ranchers who'd happily sold their lands at a premium to the federal government to create the preserve in the first place. The hunters felt the game populations would suffer without guzzlers. That would give them fewer animals to shoot.

"This is a hunting park," the deputy assistant secretary reportedly declared. (An Interior spokesman points out that hunting in

Who's Ruining Our National Parks?: Politics & Power: vanityfair.com                 Page 5 of 11

the preserve is authorized by law. Counters Mojave's chief of resource management Larry Whalon: "It was a big effort in what he wanted to portray [the park] as.") Martin, an effervescent woman who'd won an award for diplomacy with local residents, reportedly tried gently to explain that, while hunting in the preserve was allowed, it was limited by, among other things, the Organic Act.

Months later, Hoffman returned. This time he was accompanied by some three dozen hunters who belonged to a national group called the Safari Club. At a contentious meeting, lawyers and lobbyists for the organization also weighed in, both in person and by speakerphone. Martin stood staunch against them all. "It was a circus," recalls Martin's assistant superintendent, Larry Whalon. "We had individuals ranting—quail hunters, bighorn-sheep and deer hunters.... Our lead ranger finally said, 'This is a national park, not a zoo!'"

For more than two years after that, Martin avoided putting in new guzzlers. Memos from Hoffman's office accumulated in her regional director's office, until the pile was inches thick. Memos came, too, from the office of Republican Congressman Richard Pombo, head of the House Resources Committee. Pombo has become notorious as having one of the worst environmental records in both houses of Congress. Last fall, his staff proposed that 15 national parks with low visitation rights be sold as a cost-saving measure. Pombo's staffers worked in concert with Hoffman to pressure Martin. (Rob Howarth, a staff director on Pombo's committee, acknowledges that he "had a number of meetings with Mary Martin," but he says his relationship with her was "very good." He adds: "What happened between her and deputy secretary Paul Hoffman, that's not my business.")

Martin was able to fend off this broadside until the 2004 election. But with Bush's victory, according to two Mojave staffers, Hoffman demanded new guzzlers be put in. Interior says that Paul Hoffman did not order Mary Martin to install guzzlers but did ask her to consider them. Interior also says Hoffman, along with the Park Service, believed that guzzlers did not require a NEPA study, but more than one Mojave staffer made it clear to Hoffman that a NEPA study would have to be done on the guzzlers before they were installed. Any government decision that might have environmental effects must, by law, be strictly reviewed in accordance with the National Environmental Policy Act.

Martin complied. Immediately, an environmental group sued the Park Service for ignoring NEPA. Last year, a judge ordered the requisite NEPA review. By then, Martin had left to become superintendent of Lassen Volcanic National Park, in northeastern California. She chose a park of no interest to hunters or off-road-vehicle enthusiasts. This spring, her ex-colleagues back at Mojave will have to decide, based on the NEPA review and Interior's wishes, whether or not to put in the guzzlers. "The fun is just beginning," sighs a Mojave parks administrator. "Because no matter what choice we pursue, someone will be mad and very likely that group will sue us."

P aul David Hoffman's résumé features a headshot with cowboy hat and a "personal mission statement" that begins: "I believe that my gifts come from God and that I am called to use those gifts to serve people by helping them improve their physical, emotional, and economic well being by listening to hear their needs ... " His experiences include summers spent working as a ranch hand and hunting guide in Wyoming. In the mid-1980s, the résumé states, Hoffman was a loan officer at Cody's First Wyoming Bank, before becoming state director for then congressman Dick Cheney from 1985 to 1989. Cheney's appointment as secretary of defense, in 1989, in the first George Bush's administration, prompted a special election for his seat, which Craig Thomas, now the state's senior senator, won with some on-the-ground help from Hoffman as road manager. The onetime outfitter then slid over to work for Wyoming senator Alan Simpson.

That's as much as can be gleaned from Hoffman himself, since he declined to speak with *Vanity Fair*. From the way he spent the 1990s, however, he clearly wanted to expend his new political capital on Yellowstone National Park.

Like many of his neighbors in Cody, Hoffman had a complex relationship with Yellowstone. Cody is one of the park's surrounding "gateway" communities—the park has one on each side, with Cody to the east—and many local businesspeople rely on the park-bound traffic that flows through it. But to many the park's superintendents have always seemed too strict, banning or restricting uses that generate business or that keep locals from leisure pursuits that might be environmentally destructive. Everyone, it

seemed, had a Yellowstone story. But Hoffman's was more colorful than most.

His grandfather had been a hunter, Hoffman liked to recount. One day, a posse of U.S. cavalry, then the park's patrolling agents, surrounded him and the elk he'd just bagged. The cavalry accused him of poaching within park borders. Hoffman's grandfather declared he knew where the line was, and he was outside it. The exchange grew heated, and as Hoffman's grandfather told it, the sergeant hit him in the face with his Colt revolver. Hoffman's grandfather had already given over his gun, but now he grabbed it back and slammed the sergeant just as hard in the face. "He went down like a stuck pig," recalled Hoffman's grandfather in a family account, with one eye dangling from its socket. When the other soldiers reached for their guns, Hoffman's grandfather shot one in the shoulder, then made his escape. Days later he found his way to Canada, where he stayed for some time, sure that if he returned, he might be charged with murder. Eventually he drifted south of the border again, only to hear that the ranger had somehow managed to drag himself through deep wilderness to safety and recovery. This was Wyoming, so Hoffman's grandfather was merely brought before a judge to face the charge of poaching elk. His grandfather pleaded no contest.

Hoffman's own Yellowstone dust-up began in the mid-1990s. As head of Cody's chamber of commerce, he bridled as Yellowstone's new superintendent, Mike Finley, declared that parkland snowmobile use had gotten out of hand.

"I'm not afraid of conflict," says Finley, who's since retired to become head of Ted Turner's environmental foundation. "It didn't matter which party was in power. If someone came up with some brainchild that wasn't in the long-term interests of the park, then I'm sorry. Because I took my oath very seriously. When you tell me in statutory law that I am to provide for the use and enjoyment of these park areas to leave them unimpaired, then unimpairment is my standard.... My experience with Hoffman was that when he talked about 'use,' it always had a commercial connotation. Not a family staying in the park and having a good time. Always a commercial connection, in this case snowmobile renters."

Hoffman got nowhere with Finley. Instead, he had to watch as the Clinton administration, in response to Finley's concern, undertook a study of snowmobiles in Yellowstone and reached the obvious conclusion: banning the machines would be best for the park and its wildlife. Over three years, according to the Clinton-era mandate, snowmobiles would be phased out at Yellowstone, in favor of bus-like snow coaches. "Had Gore become president," observes Destry Jarvis, then a senior adviser at Interior, "that's where we'd be."

Instead, Bush took office and called for a new review, which ended up costing $2.4 million. No one had much doubt how it would turn out: the snowmobilers' local champion was, after all, Interior's new deputy assistant secretary of fish, wildlife, and parks.

To many of the new politicals at Interior, snowmobiles in Yellowstone was a rallying cry: the iconic issue that distinguished their stance on the use of public lands from that of the Clinton administration. To them, the right to snowmobile in Yellowstone might as well have been as fundamental as any enshrined in the Constitution.

It was, first, an issue of local economic interest—western interest. "The philosophy is: western guys are closer to the land—they know how to use national parks and forests better," observes Mike Finley. "They sort of forget about the 'national' part of that."

But the philosophy of former Interior secretary Gale Norton and her top politicals ran deeper and darker than that—to an extreme libertarianism. In certain spheres, national parks were considered federal deadweights, best cut loose and absorbed by a laissez-faire market, or at least funded by the private sector. Don Barry, assistant Interior secretary of fish, wildlife, and parks in the Clinton administration, now executive vice president of the Wilderness Society, describes what he calls a "starve the beast" mentality. "The ever smaller budgets work to starve the parks system and national wilderness areas deliberately," Barry suggests. "Then what happens? The parks are so desperate, they have to bring in local economic partners—to outsource vital services. The local economies profit from this, and the culture of the Park Service is destroyed, which is what this administration wants, too." Rob Arnberger, a 34-year veteran of the Park Service who retired as the regional director of the Alaska region, calls it a "perfect storm of ideology and special interests."

Hoffman was appointed in January 2002. In the year before, Norton had all the input she needed on snowmobiles in Yellowstone

Who's Ruining Our National Parks?: Politics & Power: vanityfair.com

from a genial Washington lawyer and lobbyist named Bill Horn. More than anyone who actually works at Interior, Horn seems to be the department's guru on the balance between conservation and recreation in the parks. Back in the Reagan years, he served as assistant secretary of Interior for fish, wildlife, and parks—the slot directly above the deputy post Hoffman would soon fill. Today, Horn represents the International Snowmobile Manufacturers Association, the largest of the organized motorized-recreation groups. Despite his return to private practice, Horn has close ties at Interior. "He's on our corridor all the time," confirmed one Interior insider.

At the same time, those ties haven't kept Horn from suing Interior on behalf of snowmobilers; however, this conflict caused no ill will since, according to critics, the department was rooting for the snowmobilers, too. Quickly enough, the government settled the suit and agreed to do a new environmental study. Yet this new review reached the same conclusion: the park was better off without snowmobiles. So the government, still unconvinced, has launched a third study which will bring the taxpayers' tab for examining the impact of snowmobiles in Yellowstone to a cumulative $6.9 million. The administration has decided that until this one is done, in 2007, as many as 720 snowmobiles a day will be allowed in Yellowstone, 140 in neighboring Grand Teton National Park. On average, far fewer snowmobiles have entered the parks since then, as ongoing news of the issue has dissuaded most visitors from using them. Yet the impact of just 250 to 300 snowmobiles a day—with new, quieter engines—has already exceeded Park Service standards.

Hoffman's draft was an end run on the snowmobile wars: a nifty way of establishing a precedent that would make their use hard to ban unless it was shown to have an "unacceptable impact." Horn says he weighed in with opinions when he could, and indeed many of his long-held ideas are echoed in the document. Most of those ideas seem to lessen the importance of conservation while promoting enjoyment—enjoyment on mechanized vehicles made by companies that happen to be Bill Horn's clients.

Certainly, in Hoffman, Horn had a willing pupil. According to colleagues, Hoffman hung a poster in his office that listed all the fun things prohibited in national parks. He hung a cross on his closet door, and a biblical quote beneath it. On his desk, he kept a book that explained how the Grand Canyon had been created 6,000 years ago. Hoffman is, according to one colleague, a Young Earth creationist. An Interior spokesperson says that Paul Hoffman's beliefs have no bearing on the conservation of natural resources today. When copies of that very book showed up in the Grand Canyon bookstore, Park Service geologists howled in protest. But there the book remains.

His new co-workers soon got used to seeing Hoffman walking the halls in his cowboy hat and boots. He had a cowboy's openness and affability, but also a cowboy's impatience with rules. One Interior insider recalls him telling colleagues, in effect, not to let science and philosophy get in the way of having fun. An Interior spokesperson denies this. One colleague recalls him intensely lobbying a room of agency lawyers to help him relax the rules on firearms possession in national parks. When he didn't prevail, says someone close to Hoffman at the time, Hoffman got ornery.

It was apparently for the cause of greater fun in parks that Hoffman put the 2001 management policies on his computer and started redlining away. Generally, the policies are revised every 10 or 12 years—typically by career Park Service employees. For Hoffman to take them on a mere year or two later was novel, to say the least. According to sources, the motive was clear: the new regime wanted new policies that reflected its philosophy. "There was a perception that because the management policies were published in January 2001 they were a Clinton thing and had to be bad," says one Interior insider.

One of the first passages Hoffman redlined out of the 2001 draft was the core mission of the Park Service. "Congress … has provided that when there is a conflict between conserving resources and values and providing for enjoyment of them, conservation is to be predominant." With one keystroke, it was gone, replaced by "The Service must balance the sometimes competing obligations of conservation and enjoyment in managing the parks."

With a legal legerdemain quite impressive for a former chamber-of-commerce head, Hoffman declared that superintendents must now prove that a given activity on national-park property would have an "unacceptable impact" before disallowing it. Critics charge they'd have a hard time showing that until the impact became unacceptable. So with two words the parks would be open

to almost any use anyone proposed. When a use did impair a park, according to Hoffman's proposed framework, the superintendent should work to "mitigate" it rather than rule it out altogether. Before, superintendents had been charged with "protecting" or "preserving" their parks. Now these words were declared synonymous with "conserve." But as retired superintendent Jerry Rogers observes, "If that's the case, why not use the same word throughout? No two words mean exactly the same thing, after all. If they did, there would be only one word, not two." "Conserve," to many superintendents, set a looser standard than "protect."

One of Horn's favorite notions is echoed in Hoffman's draft. Horn has said he feels that the Organic Act calls for conservation only of tangible park resources: trees, rocks, water, and so forth. The stillness of a canyon, clarity of a view, or sounds of wildlife are intangible values, Horn argues, and are thus unprotected. Besides, he says, one visitor's idea of soothing park sounds may be different from another's. That the drone from a single Jet Ski ruins the park experience of everyone else within earshot is not, to Horn's mind, a problem. Parks, he likes to say, should not be "biospheres under glass."

Perhaps not by coincidence, one of the passages Hoffman redlined was this one: "In addition to their natural values, natural sounds, such as waves breaking on the shore, the roar of a river, and the call of a loon, form a valued part of the visitor experience." It too was gone, replaced by this phrase: "There are many forms of motorized equipment, and mechanized modes of travel, and improved technology has increased the frequency of their use. In some areas and under certain conditions, the use of mechanized equipment and mechanized modes of travel may be determined to be an appropriate use."

A long with Horn, other recreation advocates weighed in with comments to Hoffman. One was Ed Klim, a jovial midwesterner who, as head of the International Snowmobile Manufacturers Association, represents the four major snowmobile companies. He's pleased that the re-write calls for conservation and visitor enjoyment to be given equal weight. Klim, as befits his job, is a snowmobile enthusiast. He even argues that snowmobiles are a great way to answer the president's call for more physical fitness in America. "You ride a snowmobile, it's refreshing, you get outside.... It's stimulating, kind of wakes your mind up. In your arms and shoulders, you get exercise. You're kind of standing up, and when the vehicle goes over little bumps and stuff, and when you turn, it's surprising, you do burn calories.

"Sometimes," he adds, "you get your snowmobile stuck in snow and you have to pull it out: you get exercise that way."

Another player, according to Horn, is Derek Crandall, head of the powerful American Recreation Coalition. ARC calls itself the voice of a $250 billion industry, from snowmobilers to Jet Skiers, mountain bikers to equestrians. Top Interior politicals, including Gale Norton and Assistant Secretary Lynn Scarlett, regularly attend ARC's annual meetings to receive awards and give talks about opening up the parks. Crandall thinks the new polices help frame the parks for future needs. "How does the parks system stay as important to us in 20 years as it is now?" he muses. "How does a nation that changes, that now has cable TV and iPods, how do we stay relevant to that?"

Klim sits on Crandall's board, and both are close to a third player: Rob Howarth, staff director for Representative Pombo. Howarth is a young, fast-talking policy wonk with a passing resemblance to actor Rick Moranis. He says that the management policies were like a pendulum that had swung too far toward conservation in the 2001 draft and needed to swing back. Howarth readily acknowledges that 95 percent of America's 300 million parks visitors last year had very good experiences without snowmobiles and Jet Skis. He knows that the Yellowstone snowmobile controversy drew 500,000 public comments, more than any other issue in the history of the parks, and that the overwhelming majority of those comments called for conserving the park by banning the vehicles. "I'm familiar with those studies," he says. Yet he and Klim, Crandall, and Horn, and the special interests they represent, cheered when Hoffman's draft took shape just the way they wanted.

L ast July, when Hoffman's draft leaked, even some of his colleagues at Interior were appalled. "When I read his draft," says one, "I thought, How arrogant this guy is! He has no idea how he's turning on his head core concepts of the Park Service. He would have been much more effective eliciting help. But he was too much of a yahoo to do that. There isn't anyone in the department who wouldn't say Hoffman's draft was a mistake." To the superintendents, the sheer surprise of the plan was as

distressing as what it said. "We didn't even get a chance to comment," says Death Valley's J. T. Reynolds.

In previous administrations, alarmed superintendents might have turned to their directors for help. The director's first duty is to protect the service and its values from the politicals. But, according to several sources, they knew better than to expect support of any kind from Fran Mainella.

A former state-park director in Florida, Mainella has established a reputation for never standing up for her staff. Instead, she kowtows to the other top political appointees. "Some people are generous with her leadership, saying she's outmaneuvered," says Rob Arnberger, the former Alaska regional director. "I have a different view. I think the leadership of the Park Service was intentionally selected to allow this agenda to be pushed through." The worst part, suggests one retired senior-level person, is that Mainella's toadying is viewed with private scorn by the top politicals. "They don't particularly like her—I don't think she's terribly bright—but they manipulate her." An Interior spokesperson says these accusations are unfounded and untrue.

A self-described "team player" with her superiors, Mainella has been harsh with her staffers. "She has a total disdain for long-term professionals," says one retired Park Service employee. "I can think of example after example of people being completely devalued: run off, stuck in corners, transferred against their wishes, or hounded into retirement." According to an Interior spokesperson, Director Mainella values the contributions and advice of career employees and relies on them constantly.

One superintendent was actually fired—an almost unprecedented occurrence in the Park Service. Theresa Chambers, hired with much fanfare in the early days of the Bush administration as the first woman chief of the National Park Service police, says she thinks she may have been fired because a reporter asked her if it was true that, after 9/11, many Park Service police were hired as air marshals, depleting the ranks. Chambers said it was. Without explanation, Chambers says, Mainella canceled a meeting the two were scheduled to have. Later that week, Chambers says, she was asked into Assistant Secretary Don Murphy's office and told to surrender her gun and badge. "Can you please tell me what I'm alleged to have done wrong?" Chambers asked.

"Well, we're investigating that," she says Murphy replied.

Larry Belli, superintendent of Cape Hatteras National Seashore, in North Carolina, says he was called into a superior's office and fired just as abruptly, about a year ago, with no explanation. Not long before, he'd had to decide what to do about beach-buggy enthusiasts who wanted to race up and down the park oceanfront. Belli says his superiors urged him to accommodate them, even though endangered piping plovers nested on the beaches. As soon as one of the vehicles ran over a plover nest, environmentalists sued. Belli got the ax. A sympathetic colleague says Belli didn't understand how to deal with Mainella and her team. "When they say they want me to do something," says this superintendent, "my response is always 'Put it in writing.'" Shortly before Belli's case was to be heard by the Merit Systems Protection Board, a settlement was reached with Interior. The record of Belli's sudden termination was expunged, and Belli was declared to have retired, as an Interior spokesperson says, "after a long and successful career." The spokesperson adds that all details of the settlement agreement are confidential.

One of Mainella's two goals, as she has reportedly told colleagues, is to be the longest-serving parks director ever. The other is to visit every one of the 390 parks in the system. Neither, observes one retired superintendent, has anything to do with defending her staff members or their deeply held values. An Interior spokesman says this claim is absurd, and that Ms. Mainella's management goals are clearly spelled out in a document titled, "NPS Legacy Goals and Four Year Plan."

When Hoffman's draft was leaked, Mainella sanctioned a senior-level retreat in Santa Fe to review it, reportedly because even top politicals felt he'd gone too far. At the same time, Mainella imposed a de facto loyalty oath—the first such mandatory vow in Park Service history. Henceforth, all applicants for managerial jobs at the Park Service would have to be vetted by the politicals at Interior. They would have to come to Washington and demonstrate their allegiance to the secretary's four C's—Norton's tedious and meaningless mantra of "communication, consultation, and cooperation, all in the service of conservation." More chilling, they would have to show their enthusiasm for "the president's management agenda." The service had always been apolitical; Mainella's blandly worded memo proposed to change all that. (The memo has since been retracted.)

Case 1:07-cv-02112-EGS    Document 28-15    Filed 04/11/2008    Page 10 of 11
Page 10 of 11

By October of 2005, Hoffman's colleagues had finished overhauling his draft. Dubbed "Hoffman Lite," it was released to less surprise but no less consternation.

At the computer in his office at Death Valley, Reynolds scrolls down to some of the problems that leap out at him. "Those changes to the wording of the Organic Act are still there," he says, changes that make visitor enjoyment as important as conservation. Also, he says, "there are still areas throughout the document where words have been changed ... from 'protection' to 'conserve' or from 'must' to 'could' or 'should'—changed to what I consider real wussy words, real mealymouthed explanations."

Many of Hoffman's early cuts have survived. Gone are the references to "intangible values": protecting peace and quiet, wilderness sounds and smells and views. All wilderness parks are threatened by that little deletion. But, according to critics, for Grand Canyon National Park the threat is especially direct and dire. For years, Grand Canyon has struggled to balance the desire of visitors for natural quiet with the droning of planes that carry airborne tourists. When tensions—and lawsuits—persisted, a Grand Canyon Working Group of air-tour operators, conservation groups, backcountry users, and the Federal Aviation Administration came to the table to hash out new rules agreeable to all. Recently, they decided that, by April 2008, half of the park will have to remain quiet 75 to 100 percent of the time. But if the "soundscape" is devalued by the new management policies, that agreement will fall apart. "The air industry is a huge, multi-million-dollar industry," says Roxane George, of the local Sierra Club. "They're only at the table because the courts and Congress have said they have to be there."

Since its dubious reception, Hoffman Lite has been put out for public comment and pored over in Senate and House hearings. In those sessions, lawmakers from both parties have expressed keen skepticism about it, but not to Fran Mainella. There in her stead has been Steve Martin, her assistant director, a former superintendent at Grand Teton National Park, who now has the thankless task of producing a final draft that pleases his career colleagues and his political overseers.

Martin's capacious corner office in the Interior building seems at odds, somehow, with his Park Service uniform: he resembles a ranger sitting in for an executive V.P. Visibly uncomfortable, he also looks like he'd rather be back at Grand Teton than here in the hot seat, flanked by three department flacks. He stresses that Hoffman Lite is undergoing more review, not just from the public but from many on his staff. When it's done, he says, it may actually do more than the 2001 version to protect parks.

But will conservation and visitor enjoyment now have equal weight?

Martin hesitates. "Conservation has to trump enjoyment," he says. "If there's a conflict, if use could cause degradation, you have to err on the side of the resource."

Why, then, does the standard of "unacceptable impact" reappear in Hoffman Lite?

Again, Martin hesitates. "It's not something that we would find appropriate to how we manage the resources of the parks system." Yet Hoffman Lite is still riddled with the phrase.

Martin insists that the concept of intangible resources will be restored in words of some kind. But, he adds, "we manage Langston Golf Course ... and we manage Gates of the Arctic.... These policies have to work for both."

Would it be fair, Martin is asked, to say Hoffman's draft was a huge misstep?

Martin hesitates again, then says firmly, "Yes."

That's a gutsy reply, given that Hoffman is still one of Martin's bosses. For now, Martin seems to have the authority to shape the re-write as he sees fit. Whether he can get the politicals to sign off on it is another matter.

"Steve is fairly new to the D.C. game," says Don Barry, the former assistant secretary of fish, wildlife, and parks under Clinton. "I've spent 19 years at Interior ... and I know how these things operate. The National Park Service won't stay in control of this

thing. The sixth floor will call all the shots."

A week later, in mid-February, Martin appears before the House subcommittee on parks to make his pitch that all will be well. Representative Donna M. Christensen (Democrat, Virgin Islands) notes with dismay Fran Mainella's absence from the hearings. "I'm having difficulty understanding why the director is not here," she says.

"You said the final version would be vetted," Christensen says. "Who specifically at Interior will vet it?"

"The director is the signatory on the document," Martin says. "But the assistant secretary, the deputy secretary, or secretary, if she wants, will have a chance to review it."

Mark Udall (Democrat, Colorado) follows up on this. "You said before that political appointees will no longer be involved in the process," he says. "That's not the case, though, is it, if career people write it and politicals oversee it, right?"

Martin, the man in the middle, struggles again to answer in a way that pleases all. "The director of the Park Service is a political appointee," he responds, "and the assistant secretary and deputy secretary are political appointees. But having a surprise endgame ... I don't feel like that's going to be the outcome of the process."

Soon enough, he'll know if he's right.

**Michael Shnayerson** is a *Vanity Fair* contributing editor.

digg thisadd to del.icio.usadd to reddit





For Immediate Release
Office of the Vice President
September 28, 2004

## Vice President and Mrs. Cheney's Remarks and Q&A at a Town Hall Meeting in Dubuque, Iowa

Grand River Center
Dubuque, Iowa

12:50 P.M. CDT

MRS. CHENEY: Well, hey, that's pretty nice. Thank you for that warm welcome. Could it be a more beautiful day in Dubuque? We are so pleased to be here. Thank you for your warmth and your enthusiasm. (Applause.)

As I travel across the country, I always like to think of -- what an important part different states have played in my life. And as we were driving over here today, Dick and I were talking about two of my great, great grandmothers who spent some time in Iowa, and in whose lives Council Bluffs played a very important role. Council Bluffs was a jumping off place for people who were going to take the Mormon Trail west. So one summer, in the 1850s, I had two great grandmothers in Council Bluffs getting ready to go west. One had had a sad story. She'd come here all the way from Wales and lost her husband on the way, and her baby. But she was a woman of determined spirit, and she stayed in Council Bluffs a while, and got on a wagon train and went west.

The other story is one I love so much, I put it in the last children's book I wrote. It's about a little girl named Fannie Peck, who was only seven years old. But she was in Council Bluffs that same summer, getting ready to go with her folks out west. And when they started, she took off her shoes and decided that she would go barefoot because the wagon train stopped on Sunday to worship, and Fannie wanted to have her shoes so that she could look her very best on Sunday. However, the first time they stopped, she figured out that having walked barefoot so far, she couldn't get her shoes on. So it didn't work out too well. But I love stories like that. And I love thinking that Iowa has played an important part in my life.

My family ended up in the West, which is where I met Dick. And I've known him for quite a long time. That's how come I get to introduce him. He was 14 years old when I first met him -- a pretty good looking 14-year-old. I can share that with you. (Laughter.) And he had a summer job that year, a summer job and after school job, which was sweeping out the Ben Franklin store in Casper, Wyoming, which is our hometown. And I've known him through many jobs since. I've known him since he was at the Ben Franklin store. I've known him since he was digging ditches at the Central Wyoming Fair and Rodeo Grounds, just outside our hometown. I've known him since he was loading bentonite --hundred-pound sacks of bentonite onto railroad cars. I've known him since he was building power line all across the West to help pay his way through school. And I like to talk about those stories because I think when you grow up working hard, you learn some pretty important lessons. And one of those lessons is how important it is for the hard working men and women of this country to get to keep as much of their paychecks as possible. (Applause.)

So it's lovely to be here on this -- this beautiful day. As we travel across the country, I think how much we have to be proud of as Americans. And if I were to make a list of all the things we have to be proud of, right at the top of it, I would put our Commander-in-Chief, George W. Bush. (Applause.) He has really been a magnificent leader over these past four years. And if you'll permit me to say so, the Vice President is no slouch either. (Applause.) So it gives me great pride to introduce to you my husband, Dick Cheney, the Vice President of the United States. (Applause.)

THE VICE PRESIDENT: Thank you, very much. And thank you, Lynne.

MRS. CHENEY: You're welcome.

THE VICE PRESIDENT: She wouldn't go out with me until I was 17. (Laughter.) I like to tell people that we got married because Dwight Eisenhower got elected President of the United States. In 1952, I was a youngster living in Lincoln, Nebraska with my folks. Dad worked for the Soil Conservation Service. Eisenhower got elected, reorganized the government, Dad got transferred to Casper, Wyoming, and that's where I met Lynn. And we grew up together, went to high school together, and a couple of weeks ago celebrated our 40th wedding anniversary. (Applause.) I explained to a group the other night that if it hadn't been for Eisenhower's election victory, Lynne would have married somebody else. (Laughter.) And she said, right, and now he'd be Vice President of the United States. (Laughter and applause.) And there's no doubt in my mind. (Laughter.)

Vice President and Mrs. Cheney's Remarks and Q&A at a Town Hall Meeting in Dubuque, Iowa        Page 2 of 9

But we are delighted to be here today. Iowa is an extraordinarily important state, as you can tell by all the attention you're getting this year. I think I counted up coming in this morning, just in the last couple of months we've been here, I think, eight times, now, different places around the state. (Applause.) And it was a close election in Iowa last time. We didn't quite pull it off, but come November 2nd, Iowa is going to be part of a winning coalition of the Bush-Cheney ticket. (Applause.)

What we do at these town meetings -- we've done a few of them now, and enjoy them very much. It's an opportunity to hear from you, as well as for me to make a speech or pontificate a bit. I've got some thoughts I'd like to share with you this morning. And then we'll open it up to questions and give you an opportunity to offer comments or ask questions and have a chance for a good exchange back and forth. And I encourage, also, to fire some shots at Lynne. There's no reason why she should sit up here without having to answer some of the questions, as well, too. (Laughter.)

I wanted, this morning, to take a little bit of time and talk about what I think is the most important decision we're going to make on November 2nd, why it's so important. There are times in our history where we come to, sort of, a watershed, where a series of events or circumstances or such that we have to fundamentally rethink our national security strategy, for example, how we're organized to defend ourselves.

Certainly, that happened right after World War II, when we were suddenly faced, after victory in World War II over the Nazis and the Japanese, all of a sudden faced with the prospect of the Cold War, the threat the Soviets represented, and had to completely build a new national security strategy that then was in place for the next 40 years, supported by Republican and Democratic administration alike, and ultimately successful in terms of deterring the Soviet attack against the United States, created North Atlantic Treaty Organization, created the Department of Defense, the Central Intelligence Agency, et cetera.

And I think we're at a similar point now, a break point, if you will, where as a result of the threats that we've had to deal with that we now face a similar set of circumstances where we're having debates and a major national dialogue and deciding what kind of a national security strategy we're going to follow in the years ahead. And I really believe, as I've often said, that this election could not come at a more crucial time in our history. The enemy we face now is ever bit as intent on destroying us, as were the Axis powers in World War II.

In the words of the 9/11 Commission report of a few weeks ago, "The enemy is sophisticated, patient, disciplined, and lethal." "What the enemy wants," as the 9/11 Commission reported, "is to do away with democracy, to end all rights for women, and to impose their way of life on the rest of us." As we saw on the morning of 9/11, this enemy is perfectly prepared to slaughter anyone -- man, woman, or child -- who stands in their way.

This is not an enemy we can negotiate with or appease or reason with. This is, to put it quite simply, an enemy that we must destroy. And with George W. Bush as our Commander-in-Chief, that is exactly what we're about. (Applause.)

It's important for us to remember, this is a global conflict. This isn't just about what happened here on 9/11 in Washington, or New York, or Pennsylvania. Since 9/11, terrorists have struck in Madrid, Casablanca, Riyadh, Mombassa, Istanbul, Bali, Jakarta, Baghdad, most recently in Beslan, in Russia, where they killed some 350 people, mostly school kids.

To meet the danger we face, the President has developed a clear, steady, and I believe, appropriate strategy. He's transformed our government to focus on protecting the American people. Under his leadership, we've also gone on offense in this war, seeking out the terrorists wherever they train or hide, and making clear to governments who harbor or sponsor terror, that they will be held as guilty as the terrorists themselves of the actions that are committed, and will be treated accordingly. In other words, we're taking the fight to America's enemies, confronting them with our military so that we do not have to fight them with the armies of policemen, firemen, and medical personnel on the streets of our own cities.

Our strategy is working. In Afghanistan, we've ended the Taliban regime. In Iraq, Saddam Hussein, of course, is in jail. We've broken up terror cells around the world and captured or killed thousands of terrorists. We're helping the peoples of Afghanistan and Iraq now to build democratic governments because we know that free nations will not be breeding grounds for terror. These are not easy tasks, but despite the worst predictions of the pessimists, we are succeeding. Afghanistan's first democratic election will be held October 9th, and Iraq will have elections next January. (Applause.)

Now, wars always carry a cost, and the highest cost of all is born by our servicemen and women and by their families. Many of our service members have been far from home for a long time. Some have returned with severe injuries. Nearly 1,200 men and women on duty in Afghanistan and Iraq have made the ultimate sacrifice. We grieve at the loss of every single life, and we will never forget these brave men and women. We will honor them, and honor their memory by completing the mission. (Applause.)

If we revert back to the pre-9/11 mind set where we treated terrorist attacks simply as a law enforcement problem, that is simply not an option. If we fail to aggressively prosecute the war on terror, confronting terrorists where we find them and confronting governments that sponsor terror, the danger will only increase. The terrorists will escalate their attacks, both here at home and overseas, and the likelihood will increase that they will eventually acquire weapons of mass destruction to use against us.

If we think back to that period before 9/11, the terrorists had learned two lessons, unfortunately. First of all, they came to believe they could strike us with impunity, because they had repeatedly -- in the World Trade Center bombing, in 1993; Khobar Towers, in 1996; the simultaneous bombing of two -- two of our embassies in East Africa, in 1998; the attack on the USS Cole, in 2000. If you think back to those events, there never was a very effective response from the United States against those who launched the attack. We fired off a few cruise missiles once, but they came to believe they could strike us with impunity.

Secondly, during that same period of time, the training camps were operating in Afghanistan where some 20,000 people were turned out -- terrorist trained, including those who struck us on 9/11. And of course, the terrorists also came to believe that if they struck us hard enough, they could change our policy, because they had. It happened in 1983 after we lost 241 Marines in Beirut -- within a matter of months, we were out of Lebanon. In 1993, of course, we had the situation in Mogadishu. We lost 19 soldiers during a battle in Mogadishu, and within weeks, we pulled all of our troops out of Somalia. So those two lessons, they could strike us with impunity and they could strike us to change our policy, is what they came to believe.

Now, it's my view that those attacks were not occasioned by the exercise of U.S. military strength. They were encouraged by the perception of weakness. (Applause.)

As high as the cost of the war is now, it will be much higher if we do not confront this danger now. And as high as the cost of this war is, it is the price we must pay if we want a safer and a more secure world for our children and grandchildren. (Applause.)

And this brings us to what I believe is the most important decision in the election of 2004. I believe it is absolutely essential that we have a Commander-in-Chief who is steadfast, who has clear conviction, and who meets his obligations without regard to his own political fortune. (Applause.) That's the kind of leadership that George W. Bush has provided in this war, and that is the kind of leadership that will bring victory in the war on terror. (Applause.)

In his 20 years in the Senate and two years on the presidential campaign trail, Senator Kerry has given every indication that he lacks the conviction necessary to prevail in the war on terror. (Applause.) During the 1980s, Senator Kerry opposed Ronald Reagan's major defense initiatives that brought victory in the Cold War. In 1991, when Saddam Hussein occupied Kuwait and stood poised to dominate the Persian Gulf, Senator Kerry voted against Operation Desert Storm. After the first bombing of the World Trade Center in 1993, Senator Kerry proposed to cut the intelligence budget by $6 billion, a move so radical that even Ted Kennedy wouldn't support it. (Laughter.)

In the present conflict, he has shown endless vacillation and indecision. He makes repeated changes in direction, which seem to be in response to his own standing in the polls or his most recent campaign advisors. His endless back and forth on Iraq sends a message of confusion and shows that he is not ready for the responsibilities of Commander-in-Chief. (Applause.)

Let me be specific. Two years ago, Senator Kerry voted to use force against Saddam Hussein. Since then, he's taken at least 10 different and distinct positions on the war. The low point came during one of his anti-war phases, when he stood on the Senate floor and voted to deny funding to the troops on the ground in Iraq and Afghanistan. Now, with 35 days left in the campaign, and just in time for the debates, Senator Kerry says he has a plan for Iraq. Yet, the plan he announced is not a plan; it's an echo of the strategy that President Bush laid out many months ago. (Applause.)

And it's a strategy that Senator Kerry has alternately supported and opposed, depending on his assessment of the political advantage. Senator Kerry claims he'll be better at building alliances around the world, yet he has repeatedly insulted fellow democracies and allies of the United States. Last week, the Prime Minister of Iraq visited the United States and appeared before a joint session of Congress. Ayad Allawi, the Iraqi Prime Minister, is a very brave man. Saddam Hussein sent assassins after him with axes. They tried to hack him to death in his bed, late at night. But he survived; now he's leading his country, and he came to the Congress to report on progress in Iraq. He thanked America for ending Saddam Hussein's regime, and reported that Iraqi security forces are being trained and the country is moving steadily toward free elections. (Applause.)

I was in the chamber last Thursday when Prime Minister Allawi spoke. Most senators and congressmen were there -- not Senator Kerry. He did, however, manage to rush before the television cameras to speak with disrespect and condescension about the Prime Minister. I understand the Prime Minister's message is not what Senator Kerry wanted to hear, but I was nonetheless amazed that he would insult this courageous man, who is one of our most important allies in the war on terror. (Applause.)

Vice President and Mrs. Cheney's Remarks and Q&A at a Town Hall Meeting in Dubuque, Iowa    Page 4 of 9

President Bush has said now is the time and Iraq is the place in which the enemies of the civilized world are testing the will of the civilized world; we must not waver. Senator Kerry's continued wavering in this campaign -- opposing the war, but claiming the President's plan as his own, calling himself an alliance-builder, then belittling America's closest friends -- shows an agenda, not of conviction, but of political opportunism. And his record establishes that he is not prepared to lead America in the war on terror. (Applause.)

How we respond to the danger we face, and whether that response is effective depends very much on who is Commander-in-Chief. In his years in Washington, John Kerry has been one of a hundred votes in the United States Senate. And fortunately on matters of national security, his views rarely prevailed. But the presidency is an entirely different proposition. A senator can be wrong, a senator can be confused, a senator can be indecisive for 20 years without consequence to the nation. But a President always casts the deciding vote, and in this time of challenge, America needs, and America has a President we can count on to get it right. (Applause.)

George W. Bush is a leader with firm convictions who speaks his mind and keeps his word. He acts with patience and calm and moral seriousness. He's made our world better and our nation safer, and he will lead this nation to victory in the war on terror. (Applause.)

And with that, I'll stop and we'd be happy to open it up to questions, and I don't want to by any means, by focusing on this particular issue, to limit the discussion. I'm just have, really, my own deep, personal conviction that that is at the heart of what this campaign is all about. There are other important issues, as well, too -- certainly, the economy and health care and education, and we're addressing all those issues as well, too. But in the final analysis, we're picking a Commander-in-Chief for the next four years and I think setting the course for this nation's national security strategy for maybe 30 or 40 years, and it's very important we get it right. (Applause.)

Now, if you'll look around the room, you'll see these folks in these attractive orange T-shirts with microphones. And if you want to make a comment or ask a question, just get their attention and they'll come around, and grab a mike and show you. Number one.

Q Thank you for coming today. My name is Charlie and my sister is an undecided voter. She lives in Janesville, Wisconsin. I recently went to the Department of Labor website and got the Bureau of Labor Statistics that shows that you and President Bush, a partnership that has created over 5 million jobs since 2001, but we don't hear you talk about that. According to the statistics, there were 135 million people working in 2001, and there are over 140 million now. Does that mean we've had a net increase in jobs?

THE VICE PRESIDENT: Yes. I think probably what you were looking at was the household survey. There are two surveys by which we measure employment. The one that you see reported monthly is the so-called "establishment survey," this is where the Bureau of Labor Statistics goes out and interviews, asks questions, does a survey of companies and asks "how many people do you have employed?" and that gives you one number. But it doesn't -- that particular survey doesn't cover all employment. If you're self-employed, for example, you're not likely to get picked up in that particular survey.

The other survey that is collected is the so-called "household survey," and that's where they go to individual households and say "how many people in this house are employed, have jobs?" And that gives you the higher number. Usually, the first one tracks over time the household survey. But the household survey does show there's been a significant increase in employment over that period of time. We, of course, had a recession to begin with. Then we were struck by the terrorists on 9/11; that cost us over a million jobs within a matter of weeks after 9/11. So without question, we've been through a recession and we've been gaining now, by anybody's standards. We've had over 12 months of consecutive real growth. We've added 1.7 million new jobs in the last year, according to the establishment survey. And I believe it's about 2.4 million according to the household survey over the course of the last 12 or 13 months.

So the economy is headed in the right direction. Without question, we're making progress. But we won't be happy until everybody who wants to work can find a job. And going forward we need to do everything we can to make certain that the United States is the best place in the world to do business. So we encourage new jobs, we encourage companies to expand and people to take risks and support the entrepreneurial spirit. And as Lynne said in her opening remarks, make certain we keep the tax burden as low as possible, because the American people will spend that money far more wisely than would the federal government. (Applause.)

Number five.

Q Vice President Cheney and Mrs. Cheney, thank you so much for coming to Dubuque. We're so glad to see you. And my

question is, I understand from a number of sources that I read that approximately 70,000 troops are going to be moved from old Europe and Korea. And I'd like to know if any of those troops will be guarding our borders in this country?

THE VICE PRESIDENT: I think there are two separate issues there. First of all, I think what you're referring to, with respect to the redeployment of troops -- if you look back at the way we deployed our forces during the Cold War, we had -- when I became Secretary of Defense, 1989, we had about 330,000 troops in Europe, because at that point we still had the Soviet threat. As the Soviet threat ended, we drew down that force to about 100,000, but we still have two heavy divisions, basically, in Germany. And, of course, we've maintained since the end of the Korean War another division on the ground in South Korea. We've got a lot of bases out around the world that were deployed and built and used at the time of the Cold War.

All of that's changed now, the world circumstances have changed. I mentioned in my opening remarks we need a different strategy, and that includes forces, where they're deployed, how mobile they are now that we've moved into having to confront the war on terror. So Secretary Rumsfeld and the Joint Chiefs have been working for the last couple of years on plans for the redeployment of forces worldwide.

A lot of that will end up on bringing some of them home and having them here in the United States, on the theory that we can deploy overseas more rapidly if we need to. A place like Germany, for example, you'll end up not with two heavy divisions there now, but with maybe a brigade, and those kinds of changes are being made on a global basis so that we're configured in a better way and have the forces we need to deal with those problems in the future.

None of those forces will be deployed specifically to the border question, in terms of the immigration problem. I would argue, as a former Secretary of Defense, that's an extremely important problem, but we need to handle that through the Border Patrol, through the Department of Homeland Security that now has control over the Border Patrol and Customs and so forth. And that ought to be handled primarily by civilians, on the civilian side, rather than troops that we have to deploy someplace overseas to undertake a military mission.

I think they're two different missions. I think they're both very important. I think it's very important that we do everything we can to secure our borders -- and we have significantly improved our capabilities in that regard, but we haven't solved all those problems. We still have -- still have porous borders, simply because of the sheer size of them, and also because the United States is a huge magnet, economic magnet. We've got a lot folks overseas that would love to come live and work in the United States. And we need to make certain that that flow is regularized, that legal immigration is allowed, but that illegal immigration isn't. And, as I say, I think we're making progress there. They beefed-up the Border Patrol, added people, added a lot of new technologies, but there's still more work to be done. (Applause.)

Number two.

Q Senator Kerry has said that you and President Bush have a secret plan to reinstitute the draft. Is that true? (Laughter.)

THE VICE PRESIDENT: As far as I know, he's the only one with secret plans. (Laughter and applause.)

I don't know anybody in a position of responsibility who would advocate going back to the draft. We keep it there, it's on the books, the statute is there in the eventuality of some totally unforeseen set of circumstances that nobody can contemplate today. But those of us who have been involved, as I was as Secretary of Defense, for example, back from '89 to '93, I'm sure our military -- if we have any retired military here today, our officers, Joint Chiefs, people who study the subject -- are enormously pleased with our all-volunteer force.

One of the things that came out of Vietnam and that experience was that back in the '70s we moved to an all-volunteer force, so that everybody today wearing the uniform voluntarily signed up for that mission. And we -- obviously, we owe them an enormous debt of gratitude for their willingness to take on that responsibility. But the all-volunteer force works extraordinarily well. I think the quality and caliber of people serving today, and the professionalism, is as good as we've ever had in the history of the republic.

One of the reasons I'm such a big fan of the all-volunteer force is because it forces the military to make major changes in terms of the way we operate. As long as the services could count on a drafted force, people who were required and compelled to serve, they didn't have to spend as much time and energy worrying about their ability to be able to really attract people who wanted to serve. The manpower sort of became a free good, if you will, and we didn't spend nearly as much on salaries, on housing for families and so forth. Today we've got much more stability in the force, a much larger percentage of the force is married. That means we've got to provide housing for the families and adequate medical care for dependents and so forth. But it's made the services, I think, higher-quality institutions than they were when they didn't have to worry about attracting people to come serve.

Vice President and Mrs. Cheney's Remarks and Q&A at a Town Hall Meeting in Dubuque, Iowa

And I say, I just think, when you think about what we've been able to do with the all-volunteer force, the successes we've had, going back to Desert Storm, I think, and our current assignments, what we did in Afghanistan earlier this year, with a handful -- not earlier this year, but two years ago, three years ago now, almost -- with a relative handful of troops, to be able to go in and perform that mission as effectively as we did, in Afghanistan in particular, but also later on in Iraq, is a measure of the quality of the force that we deploy today. And that's directly attributable to the fact that we have an all-volunteer force and that the people who are serving are -- volunteered to serve, that they are -- their service is respected and honored. And I'm just a huge believer.

And the suggestion that somehow there's a plan out there for a secret draft is -- I'd call it -- you could call it either an urban legend or a nasty political rumor, but it's not true. (Applause.)

Over here.

Q My question is for Lynne Cheney.

THE VICE PRESIDENT: Good. (Laughter.)

Q The No Child Left Behind program seems to be a common sense program to improve the education of our children. But there are complaints about enforced testing. Do you think there is too much reliance on the testing to measure the progress?

MRS. CHENEY: Well, I've been a great fan of accountability for as long as I can remember. Now, here in Iowa, you all have the advantage of great schools. I mean, I've looked at the data long enough to know that when they ranked the states, there's Iowa, right up there at the top. So you have good reason to be confident in your schools. What happened though -- and I think one of the reasons that our schools all around the country haven't always been as good as they should, is parents sometimes had that confidence they had a good school, but it wasn't the fact.

There was this wonderful doctor in West Virginia who used to talk about patients coming in to him -- he was a pediatrician and the little kids would come in, and their parents would always say, my child is above average. Well, he started thinking about it after a while, and he realized not everybody can be above average, despite what -- what is it -- Garrison Keillor says, where all the men are strong, all the women are handsome, and all the kids are above average. It can't be.

The problem is people didn't know how their schools were performing. And that's what testing does, is it gives parents and policymakers a real way to know. And what too often happens -- not here in Iowa, because you do have great schools. I think I read 93 percent of your schools are making annual -- yearly progress. It's quite astonishing. But we were shuffling kids through. So you would end up with 6th, 7th, 8th graders, sometimes high school graduates who couldn't read. And that is just something that we can't have happen in this country. We can't do that to kids.

The President is so committed to the idea that no child will be left behind, that we'll know how kids are doing so that we can meet their needs early. One of the advantages of testing, of course, is diagnostics. If you've got a little kid who can't read, you got a little kid who can't do math, you find out so you can fix the problem.

So I got to tell you that I -- I've heard the complaints about testing, and I'm sure you could test too much. But, boy, is it important for letting parents know what's going on, and for being sure that no little kid does get left behind. (Applause.)

THE VICE PRESIDENT: In the back.

Q Mr. Vice President, as consumers, I think almost everyone in this room has likely had the experience of going into some store, any store, looking for some merchandise and discovering that about 90 percent of it or better was of foreign manufacturing. In addition to the current tax cuts, what can be done to ensure our independence from foreign imports, and also you referred to our financial competitiveness in the manufacturing sectors of the world markets?

THE VICE PRESIDENT: Well, I think -- I don't think there's any one silver bullet. I think what it takes is a series of policies that need to be pursued. I say, you come back -- and at heart of it, the guiding principle ought to be to make America the best place in the world to do business. What do we mean by that? Well, you mentioned tax policy. We put in place a series of changes over the course of the last three years, for example, allowing small businesses to quadruple the amount they could expend in terms of purchasing new equipment. Small businesses create 7 out of 10 new jobs in this country. It's very important we be sensitive to what their needs and requirements are.

We need to deal not only with the taxation problems, for example,

when we cut the top rates on income taxes, when we reduced all the rates across the board, but even the top rate, our opponents will say, well, that's just to help the wealthy. No, an awful lot of your small businesses, especially a lot of your more successful ones, pay taxes based on that top rate. And when you cut it, it makes them more competitive and lets them keep more of what they earn so they can save and invest and create more jobs.

We also need to address, I think, the litigation question. One of the real problems we have -- I think it's a disadvantage relative to some of our competitors overseas -- is just the number of lawsuits, what I would call lawsuit abuse, which I think has gotten to be a real problem in this country and we need to do something about it. And we can do that through tort reform and reform of the legal system.

We've gotten a lot of that legislation through the House of Representatives. We haven't been able to get it through the Senate yet. Senators Kerry and Edwards have opposed it, I might mention.

We also need to be careful with respect to regulations. We've so burdened down private companies with red tape and bureaucratic forms they've got to fill out and send into Washington, nobody ever reads, but that, too, is an added cost. If you look at the tax system itself, one estimate is that its complexities today require about six billion man-hours of effort to just comply with the tax code every year. So one of the things the President talked about the other night in his acceptance speech in New York was that in his second term he wants to put together a bipartisan group to simplify and reform the tax code. It's long overdue, badly needs to be done. (Applause.)

The whole area of health care is one that badly needs to be addressed, too. When we talk about the uninsured, people who lack health insurance in the U.S., it turns about 60 percent of them work for small businesses, or are small business owners themselves. So one of the things we've spent a lot of time on is looking for ways that we can reduce the cost of health care, or make it more affordable, so we've done things. For example, when we passed the Medicare reform package last fall that Chuck Grassley was an architect of, your Senator here. Chuck, as chairman of the finance committee, did a superb job. (Applause.) Not only did we provide prescription drug benefits for seniors, and the Medicare drug discount card, but we also set up health savings accounts that allow people to save tax-free in order to finance health costs.

And part of the -- one of the proposals that's kicking around out there now is to allow small business owners to get a tax credit for contributions they make to their employees' health savings accounts to make it possible for them to be able to afford health care. Providing those kinds of basic benefits to employees is an important part of the cost of doing business.

We think medical liability reform is very important in that regard, too. We estimate -- one estimate is that there's over a hundred billion dollars a year added in cost because of our medical liability system in terms of the way it functions in this country. It's a crisis in a lot of parts of the nation. I know in my home state of Wyoming, where we've driven up malpractice insurance costs so high, that doctors are going out of business. We can't attract new doctors coming into the state. The company that provided the insurance is gone from the business. That's another area that adds cost to everything we do that needs to be addressed at the same time, too.

And finally, education. With respect to our ability to be able to field a work force that can out-compete anybody else on the planet, we've got to have people who've got the skills necessary to be able to take those jobs when we create them. And we've always had in this country a great public school system. Lynne and I are the products of public schools. I would guess most of the people in this room are. And it's very, very important the schools -- that when people come out of that process, when they finish with 12 years of high school and go on for advanced degrees, if they do, or go on to college, that they've got the necessary skills to take on the ever more sophisticated jobs that are involved in our economy, especially in the manufacturing area.

So I think we have to do all those things to be able to ensure that we maintain a good strong manufacturing base in this country. Partly what has happened, manufacturing as a percentage of our economy has continued to be very strong, and grown steadily over the years. But as the productivity has increased, the actual employment in manufacturing has been in a long-term decline. And we need to reverse that. And one way to do that is to make certain that we've got the kind of work force and opportunity, and do as much as we can to reduce the cost of business so that it pays companies to locate here, to stay here, to expand here, and to create more jobs and opportunities here. (Applause.)

MRS. NUSSLE: Mr. Vice President, I have the dubious honor of trying to keep you on schedule today. So I'm told that we only have time for one more question. Let me, on behalf of Jim and myself, and the folks here in Dubuque and northeast Iowa, thank you again for coming today. We very much appreciate it. (Applause.)

Vice President and Mrs. Cheney's Remarks and Q&A at a Town Hall Meeting in Dubuque, Iowa

MRS. CHENEY: Did we have a chance to say what a great congressman Jim Nussle is? (Applause.)

THE VICE PRESIDENT: I spent some time last week with Jim because I attend periodically the House Republican Leadership meetings. Of course, he's a part of the House Republican Leadership and does a superb job for all of us. And he would be here today, except he's back there doing important work. So, Karen, thank you for hosting all of us today.

We'll do one more question back here. Number one.

Q Mr. Vice President and Mrs. Cheney, it's indeed an honor for me to speak with you today. Thank you. And I know after you and the President are reelected, I know that you're a duck hunter, please feel free to come back. We will have -- (Laughter.)

MRS. CHENEY: Can he bring Nino Scalia?

Q Absolutely. (Applause.) I would be more than happy to host you. We would just have the time of our lives, I'm sure.

THE VICE PRESIDENT: Be sure and get that man's name, will you? (Laughter.)

Q You hear an awful lot from the other party about the doom and gloom and woe is the United States, and it just gets a little tiring. I'm glad I'm the last question. Could you leave us with your positive message?

THE VICE PRESIDENT: Well, I think -- of course, there are a lot of ways to look at what we're doing now. Lynne and I have had just an enormous privilege to be able to do what we do over the course of the last nearly 40 years now. We literally grew up in a small town in Wyoming, went to public schools, come from modest circumstances. My grandfather was a cook in the Union Pacific Railroad, never went to high school.

And I mentioned the other night in New York, in my acceptance speech, that the day I was born he sent a letter to my parents saying, since I was born the same day as Franklin Delano Roosevelt was, that it was the President's birthday, and of course, he was then the President in 1941, that my folks should send him a letter and announce my arrival to the President of the United States. (Laughter.) And the intriguing thing about that was that he didn't think that there was any reason why -- even though he was somebody with less than a high school education who had come from very modest circumstances -- any reason in the world why his grandson couldn't do anything he wanted to do, couldn't rise to whatever fate might have in store for him, and hard work and obviously, the help and assistance of others might take you.

And it's that sense of possibility that anything is possible in the United States, that sense of -- that feeling of hope and optimism and opportunity. And, yes, we have tough times. And, yes, lots of times we've got major challenges that we have to meet, but we do it consistently. And we have all these years. And I hear our opponents talking about two Americas in this campaign. And I don't think of it in those terms. There's no question but what there are barriers and problems and challenges out there to overcome, and we have not achieved our ideal in terms of everybody having exactly the same opportunity in this country, but the history of the United States of America is the history of overcoming those obstacles and getting rid of artificial barriers to advancement, and setting aside the past bigotries with respect to race or ethnicity or religious conviction or country of origin.

And when you travel the country as Lynne and I have this last election cycle -- gee, we've been in 48 states -- we've had the opportunity to meet with and talk with people from every walk of life. We meet grandmothers, and school teachers, and veterans returned from Iraq, and farmers, and business people, and doctors, and people that are -- just represent that enormous broad sweep of our society, and you just have to feel awful good about the United States of America. We're very privileged to live here, very privileged to have the opportunity to participate in this process which unfortunately too many people take for granted. But if you think about how rare it is in the history of the world for people to live as we do, with the freedom we do, and with the opportunity that we have, and with the responsibility to elect our leadership and then hold them accountable, it's very, very rare and very special. So you can't -- a lot of grief connected with these campaigns. A lot stuff lying around all the time out there. But you set that aside because what is really important at the bottom is, we're Americans and enormously privileged to carry that title.

Thank you. (Applause.)

END 1:40 P.M. CDT

**Return to this article at:**
http://www.whitehouse.gov/news/releases/2004/09/20040928-6.html

 

nytimes.com

February 17, 2005

# A 3-Day Yellowstone Tour in Support of Snowmobiles

### By FELICITY BARRINGER

YELLOWSTONE NATIONAL PARK, Wyo., Feb. 16 - With a jaunty orange pennant waving from the back of her black snowmobile, Interior Secretary Gale A. Norton tootled through a snowscape of hills, steaming rivers and indifferent bison this week, giving an unusual personal endorsement to the machines that some consider a blight and others a blessing.

The secretary's three-day show of solidarity with snowmobiles was unambiguous as she gave one mini news conference after another in the subzero temperatures, the last of them on Wednesday.

Ms. Norton gave only faint praise to the snowmobile's competition. Emerging from a short ride in a vanlike snow coach, the mode of transport that is becoming an increasingly robust rival for snowmobile outfitters at the edges of the park, she said, "This is a much more ordinary kind of experience," adding, "It's not as special as a snowmobile."

In the wake of an election in which President Bush's campaign reached out to snowmobile enthusiasts and in the midst of dueling legal challenges to two conflicting National Park Service decisions on whether to permit snowmobiles in the park, Ms. Norton's drawn-out photo opportunity and snowmobile seminar underscored the similar interests of the multibillion-dollar outdoor recreation industry and the current Interior Department.

During the course of her 150 miles of snowmobile travel in Yellowstone, Ms. Norton was able to score some points on behalf of the latest generation of snowmobiles, which are universally acclaimed as quieter and cleaner than their whining, exhaust-belching predecessors.

The herds of bison she encountered showed no discernible reaction to the passing cavalcade of squat, sleek machines. The monitors at the West Yellowstone entrance this year are registering a decrease of 90 percent in choking carbon monoxide, said the park's outdoor recreation planner, Kevin Schneider.

Snowmobile noise, while still locking the driver inside a bubble of impenetrable sound, is much reduced for passers-by listening for the pffft of belching hot mud or the cascading rhythm of a waterfall. And the number of tickets issued to wayward snowmobilers who were caught for offenses like going faster than the posted 35 miles per hour or leaving the groomed road system that is their only approved location declined by 75 percent from 2003 to 2004. Park officials credit the new requirement for snowmobiles to be part of guided tours for much of the improvement.

The issue of snowmobiling here has become a touchstone of people's attitudes toward recreation and toward the Bush administration's decision to overturn a Clinton administration regulation phasing out the vehicles in this park, where rangers at the west entrance a few years ago asked for respirators because of the acrid blue smoke emitted from the tailpipes of waiting vehicles.

For many westerners, particularly those in the Rocky Mountain states, the sport appeals to the urge for unfettered - and fast - exploration of large swaths of terrain. But environmentalists say the snowmobile's continued presence here represents the triumph of commercial interests over conservation.

Representatives of both camps were standing within 50 feet of each other on Tuesday afternoon as Old Faithful spewed velvety veils of water into the cold, sunny air. O'Neal Browder, 63, an accountant from Birmingham, Ala., who has snowmobiled into the park half a dozen times in the past 25 years, called those who would ban the machines "a bunch of elitists." Nearby, Norman Ashcraft, a former Manhattanite now living in Connecticut, rested on his ski poles. Told that Ms. Norton was nearby, he grimaced and said, "She's the enemy."

He added, "We'd like Americans to do what Europeans do and get out into the country quietly." But his wife, Janine Palmer, conceded that "it isn't as bad as it used to be."

At the moment, park regulations allow a maximum of 720 machines daily, always in small groups led by a commercial guide. That ceiling has not been reached this year - there were 311 snowmobiles on the busiest day - and it will remain in force for two more years, assuming that neither of the two district courts considering the issue intervene. In that period, the

park service will conduct a new $3 million environmental review, the third in a decade, on the effect of the machines on the park. During her visit, Ms. Norton indicated that the requirement to move in groups with guides, which snowmobile operators believe discourages freewheeling customers, might be modified. Individuals who pass some kind of test qualifying them as guides might go on "self guided" tours, she said, adding that this option would be studied as part of the assessment.

Asked why she made a point of spending such a protracted time with her right hand squeezing the accelerator of a snowmobile, Ms. Norton said she was trying to change what she called "preconceived notions." "Snowmobiles have been controversial and snow coaches are more widely accepted," she said.

Still, the buzzing low-slung snowmobiles are hardly the underdog in the contest with the coach, but their market share is slipping. This winter, through Feb. 7, snow coach ridership was up 7 percent over the same period in 2004, with 4,279 people paying the $100 cost of a seat in a coach.

The number of snowmobile riders, who pay a total of about $200 a day, was nearly double that - 8,165 - but it has declined 7 percent in the past year, Suzanne Lewis, the park's superintendent, said. And even though the winter tourism industry was plagued this year by a lack of snow, the winter of 2003-2004, with a last-minute federal court decision reducing the number of snowmobiles permitted, was hardly a banner year for snowmobiling.

Snowmobile sales declined to $711.6 million last year, from $779 million in 2003. In 1997, total sales were $1 billion, according to the International Snowmobile Manufacturers Association.

Ms. Norton's restrained appreciation for snow coaches was a source of disappointment for their operators in West Yellowstone. One of them, Randy Roberson, said, "The reason people are here is to visit Yellowstone," not necessarily to ride snowmobiles.

He noted that tourists had far more leeway to ask a snow coach driver to stop so they could gaze at a bald eagle than if they were on a guided snowmobile tour.

There is also the trade-off of choosing comfort over thrills. Ms. Norton's husband, John Hughes, wore earplugs during his ride Wednesday. And Ms. Lewis, the park superintendent, was thrown from her machine and bruised trying to avoid a crash Monday.

But as the secretary rode along Yellowstone's roads Tuesday and Wednesday, she spoke of the park's wonders and the machine's virtues with equal enthusiasm. "We, I think, have a better understanding of what the experience is here and why people are so excited about the opportunity to snowmobile here," she said.

Copyright 2005 The New York Times Company | Home | Privacy Policy | Search | Corrections | RSS | Help | Back to Top

2 of 2



HOME | LOG IN

# Former Park Service Director Mainella: Interior Department Called Yellowstone Snowmobile Decisions

Posted November 29th, 2007 by Kurt Repanshek



*Yellowstone Superintendent Suzanne Lewis (left) and former National Park Service Director Fran Mainella (right) review snowmobiles in this J. Sullivan photo illustration.*



Former National Park Service Director Fran Mainella says her bosses in the Interior Department, in effect, tied her hands on the question of recreational snowmobiling in Yellowstone National

Park. And now she says science should have the final say in whether snowmobiling continues to be allowed in the park.

In a short but telling interview with *National Parks Traveler*, Ms. Mainella also indicated that she had opposed Paul Hoffman's infamous rewrite of the Park Service's Management Policies as well as efforts to outsource jobs across the national park system.

Threaded through the interview, which ranged just shy of 17 minutes, the former Park Service director created an image of a National Park Service not following the letter of the agency's overriding directive to conserve the park system and its resources for the enjoyment of future generations but rather one that kowtowed to political appointees in the Interior Department.

Ms. Mainella, currently a visiting scholar at Clemson University, granted the interview after it became known that she wanted to join seven other former Park Service directors in urging Interior Secretary Dirk Kempthorne to let science guide the decision on whether snowmobiles should be phased out of Yellowstone.

Those seven --George B. Hartzog, Jr. (1964-1972), Ronald H. Walker (1973-1975), Gary Everhardt (1975-1977), Russell E. Dickenson (1980-1985), James M. Ridenour (1989-1993), Roger G. Kennedy (1993-1997) and Robert Stanton (1997-2001) -- co-signed a letter to Secretary Kempthorne last Spring opposing an increase in snowmobile usage in the park and endorsing snow coaches as the most environmentally sensitive mode of motorized winter recreational travel in Yellowstone.

The only living Park Service director whose signature was absent from that letter was Ms. Mainella. That changed on November 19 when, in a brief letter to former Director Hartzog, she noted that ethics rules had prohibited her from publicly addressing any Park Service matters for one year after she left the directorship.

With that timespan having lapsed, she added, "I now am able to let you know that I would have joined with you and the other former NPS directors by signing your letter. In fact, through this letter, please consider me an official signatory effective immediately."

Of course, Ms. Mainella's letter begs the question of why she didn't hold that position during her tenure as director, when two Environmental Impact Statements and an Environmental

Assessment on the snowmobiling question stated that snow coaches were the environmentally preferred alternative when it came to motorized winter recreation in the park.

Reached Thursday evening at her Clemson University office, Ms. Mainella explained that she did not hold the final decision on snowmobiling in Yellowstone.

"All I can say is that those decisions, I chose to have my discussions in the 'house' of the Department of Interior, so whether I agreed or disagreed was reflected in those meetings," she told the *Traveler*. "Once a decision was made by the Department of Interior, I did come out and speak on behalf (of it) because I felt that was my responsibility in the position (as Park Service director)."

Pressed a bit later on whether she supported the science of those environmental studies, as she now says the Park Service and Interior Department should do in the latest chapter of the saga, Ms. Mainella said:

"We helped develop the new snow coaches to further enhance the improvement of snow-coach use in the national parks. Those were some of the things that we were able to do," she said. "But again, all I can tell you is that those decisions were decided at a level beyond our office. A pay grade higher than mine."

While Ms. Mainella now wants to add her name to her colleagues' letter to Secretary Kempthorne, though, she does not have a specific position on snowmobiling in the park. Indeed, she says she hasn't reviewed the latest Record of Decision or the science that went into it.

"I certainly promote the snow coaches, but to completely, going to full elimination of snowmobiles, I can't speak to that right now," she said. " And when I signed onto the letter my intention wasn't necessary to say whether it was to be zero snowmobiles. ... I'm not specifying a limit of snowmobiles, I'm just saying that the limit should be what the science says it is."

On other matters, the former Park Service director alluded to both the attempt by Mr. Hoffman, at the time a deputy assistant Interior Secretary, to drastically rewrite the Park Service's Management Policies and efforts to outsource Park Service jobs as endeavors she opposed.

"I was happy that both under the Management Policies, because I got it back to where it belonged, and then competitive sourcing is the other issue that I felt like I was able, during my time as director ... particularly once I created the preliminary planning concept, you had no jobs being put out to bid during my time, from basically '02 or '03 onward until I left," said Ms. Mainella. "So those are things I was able to, by staying and working from inside, was able to get those back in my position."

*in* *Grand Teton National Park*    *Yellowstone National Park*    *Plight of the Parks*    *Snowmobiles*

# Comments

## Frank

On November 29th, 2007

> the former Park Service director created an image of a National Park Service not following the letter of the agency's overriding directive to conserve the park system and its resources for the enjoyment of future generations but rather **one that kowtowed to political appointees** in the Interior Department.

Yet Ms. Mainella and many other national park advocates want to keep park management in a political system. Does this make sense to anyone else? Ms. Mainella opposes outsourcing NPS jobs, but perhaps it's time we outsource-- no, eliminate!--all political appointees (isn't the director a political appointee?) and most management.

reply

## MRC (not verified)

On December 1st, 2007

Come on, the parks are funded by tax money. And decision and oversight on the use of tax money is the first and foremost task of politics. So unless you find a different form of finance for the park, they will always be and have to be a part of the political game. Stop whining over political

influence and get your voice heard in a constructive way in the political debates. Frankly, I'm fed up with your style of contributions here.

reply

## Beamis

On December 1st, 2007

I agree with MRC! Frank get with the program and recognize that Dick Cheney's pals in the Wyoming snowmobile industry have the juice to get the NPS to do it the way they want it done in Yellowstone. That's the way the ball bounces in the real world my friend because *"oversight on the use of tax money is the first and foremost task of politics."*

Those with power and influence generally get their way and the poor suckers who point this out are just sniveling whiners. MRC is fed up with your style of contributions Frank, so I suggest henceforward that you just pay your taxes and stop your pathetic *"whining over political influence"*. It is indeed unbecoming of you.

At least we're clear about the so called objective professionalism and science focused decision-making that is a supposed hallmark of the NPS. We now clearly understand that these vital matters of resource protection *"will always be and have to be a part of the political game."* Fran Mainiella has now said it out loud (we sorta knew all along didn't we Frank?) and it has been amplified by MRC.

I'm certainly glad that was cleared up for all of us. Now can we all move on to more civilized matters like Christmas ornaments?

reply

## Frank

On December 1st, 2007

Beamis,

You are so right. From now on I will stop asking questions,

stop pointing out how politics are ruining our national parks, and just accept the political game to which the NPS will *always* be subject. I apologize most sincerely to those who have become perturbed over my whining about how politics are ruining our national parks.

Those are some fine ornaments, though! I particularly liked the cave ornament. Such a classy design!

So not to perturb anyone, let me discuss my wonderful winter solstice tree! I drove to the national forest and cut down a noble spruce planted in a clear cut by the Boy Scouts in 1983. For a 25-year-old tree, this one was pathetic! A real Charlie Brown tree! Thanks, Boy Scouts! Anyway, my ornaments aren't imported from China. They're real Sequoia cones (the same cones on the NPS belt, although many rangers think they're merely pine cones--ha!) gathered from one of the 6000 sequoias planted around Portland. I've painted them silver and gold.

Happy solstice! :)

reply

## Lone Hiker

On December 2nd, 2007

We should all aspire to a time when, as would make not only Frank but so many of the citizenry of our nation terrbily pleased, the NPS and other managers of national lands are turned back into the public stewardship organizations that they were meant to be, and not politically laden private interest groups who are subservient to no other than those signing their checks. Acceptance of the current regime and their mindset is not an option.

True, the park system is indeed financed by tax monies, but not directly. There is no specific tax muiltiplier in the national tax code designed to divert a fixed portion of federal taxed to the NPS. Their budget is at the whims of the afore mentioned special interest groups who control the Senate and House votes, who along with the President, are bought and sold every election. For the proper long-term sustained

operation of the park system, the need for a separate taxing body has never been more evident. Akin to the school district on your local property tax bill, this body would levy a tax based proportionally on the national budget of the system, and be responsible for the infrastructure, maintenance, land aquisitions, marketing, scientific budget, and unfortunately, environmental issues that the current managers have absolutely no control over, as the current state of the operating budget is a fluctuating, random, arbitrary figure at best. The only way to effectively resolve this dilemma is to sequester the park budget from the controls exerted by the Washington cesspool.

An initial tax offering based less on percentages and more on population (family members per household) could easily be factored. A simple $10/person rate would initially bring a revenue stream of approximately 30 billion dollars. Reduction to a flat rate of $3/person generates an annual budget of around 1 billion. The vast majority of Americans wouldn't even notice the difference in their annual incomes. I'd even offer to submit a proposal from taxing foreign nationals to assist in alleviating the burden on the consumer. This would also serve to help eliminate the alleged need for corporate sponsopship and the related issues that are generated by their involvement in the system, as they (corporations) serve no real purpose other than to disturb the equilibrium and quality of the system as a whole.

We are all forced regularly to "shut up and pay up". When this pertains to something of which we are all supposedly co-owners, I see no justification for the mentality of silence and ignorance. Speak loudly and proudly to those who can institute changes, or the future of the system as a whole is bleak. Our national lands are too precious a resource for us to allow them to be mismanaged, pillaged and otherwise destroyed. We enjoy a deserved reputation from travellers throughout the world as the home of some of the most unique landscapes on the planet. What nature has taken untold eons to create, once lost, cannot be replaced. Let's collectively demonstrate some pride of ownership and vision for the future.

While this doesn't qualify with Bart's "Simple Proposal"

# Management
# Policies
# 2006





U.S. Department of the Interior | National Park Service

1 of 4

# Table of Contents



| | | |
|---|---|---|
| **Management Policies** | | 1 |
| The Guide to Managing the | | |
| National Park System | | 1 |
| Underlying Principles | | 2 |
| **Introduction** | | 3 |
| Law, Policy, and Other Guidance | | 3 |
| Hierarchy of Authorities | | 4 |
| Policy Development | | 4 |
| Compliance, Accountability, | | |
| and Enforceability | | 4 |
| The Directives System | | 4 |
| Other Sources of Guidance | | 5 |
| NPS Program Policies | | 5 |
| **1  The Foundation** | | **7** |
| 1.1 | The National Park Idea | 8 |
| 1.2 | The National Park System | 8 |
| 1.3 | Criteria for Inclusion | 8 |
| 1.3.1 | National Significance | 8 |
| 1.3.2 | Suitability | 9 |
| 1.3.3 | Feasibility | 9 |
| 1.3.4 | Direct NPS Management | 9 |
| 1.4 | Park Management | 10 |
| 1.4.1 | The Laws Generally Governing | |
| | Park Management | 10 |
| 1.4.2 | "Impairment" and "Derogation": | |
| | One Standard | 10 |
| 1.4.3 | The NPS Obligation to Conserve | |
| | and Provide for Enjoyment of | |
| | Park Resources and Values | 10 |
| 1.4.3.1 | Park Purposes and Legislatively | |
| | Authorized Uses | 11 |
| 1.4.4 | The Prohibition on Impairment | |
| | of Park Resources and Values | 11 |
| 1.4.5 | What Constitutes Impairment | |
| | of Park Resources and Values | 11 |
| 1.4.6 | What Constitutes Park | |
| | Resources and Values | 11 |
| 1.4.7 | Decision-making Requirements to | |
| | Identify and Avoid Impairments | 12 |
| 1.4.7.1 | Unacceptable Impacts | 12 |
| 1.4.7.2 | Improving Resource Conditions | |
| | within the Parks | 12 |
| 1.5 | Appropriate Use of the Parks | 13 |
| 1.6 | Cooperative Conservation | |
| | Beyond Park Boundaries | 13 |
| 1.7 | Civic Engagement | 14 |
| 1.8 | Environmental Leadership | 14 |
| 1.9 | Management Excellence | 14 |
| 1.9.1 | Human Resources | 15 |
| 1.9.1.1 | Career Development, Training, | |
| | and Management | 15 |
| 1.9.1.2 | Succession Planning | 15 |
| 1.9.1.3 | Workforce Planning | 15 |
| 1.9.1.4 | Employee Safety and Health | 15 |
| 1.9.1.5 | Workforce Diversity | 15 |
| 1.9.1.6 | Volunteers in the Parks | 15 |
| 1.9.2 | Managing Information | 16 |
| 1.9.2.1 | Information Sharing | 16 |
| 1.9.2.2 | Proprietary Information | 16 |
| 1.9.2.3 | Information Confidentiality | 16 |
| 1.9.3 | Accessibility for Persons with Disabilities | |
| | | 17 |
| 1.9.4 | Public Information and Media Relations | 17 |
| 1.9.5 | Management Accountability | 17 |
| 1.9.5.1 | Financial Sustainability | 17 |
| 1.9.5.2 | Facilities | 18 |
| 1.9.5.3 | Budget Performance and | |
| | Accountability Programs | 18 |
| 1.10 | Partnerships | 18 |
| 1.11 | Relationship with | |
| | American Indian Tribes | 19 |
| 1.11.1 | Government-to-Government | |
| | Relationship | 19 |
| 1.11.2 | Consultation | 19 |
| 1.11.3 | Trust Resources | 19 |
| 1.12 | Native Hawaiians, Pacific Islanders, | |
| | and Caribbean Islanders | 20 |
| 1.13 | An Enduring Message | 20 |
| **2  Park System Planning** | | **21** |
| 2.1 | General Principles | 22 |
| 2.1.1 | Decision-making | 22 |
| 2.1.2 | Scientific, Technical, | |
| | and Scholarly Analysis | 22 |
| 2.1.3 | Public Participation | 22 |
| 2.1.4 | Goal Orientation | 22 |
| 2.2 | Major Elements of Park Planning | |
| | and Decision-making | 22 |
| 2.3 | Levels of Park Planning | 23 |
| 2.3.1 | General Management Planning | 23 |
| 2.3.1.1 | Statutory Requirements | 24 |
| 2.3.1.2 | Management Zoning | 24 |
| 2.3.1.3 | Planning Team | 24 |
| 2.3.1.4 | Science and Scholarship | 24 |
| 2.3.1.5 | Public Involvement | 24 |
| 2.3.1.6 | Alternative Futures | 25 |
| 2.3.1.7 | Environmental Analysis | 25 |
| 2.3.1.8 | Cooperative Planning | 25 |
| 2.3.1.9 | Wild and Scenic Rivers | 25 |
| 2.3.1.10 | Wilderness | 25 |
| 2.3.1.11 | Alaska Park Units | 26 |
| 2.3.1.12 | Periodic Review of | |
| | General Management Plans | 26 |
| 2.3.2 | Program Management Planning | 26 |
| 2.3.3 | Strategic Planning | 26 |
| 2.3.3.1 | Relationship between the Strategic Plan | |
| | and the General Management Plan | 27 |
| 2.3.4 | Implementation Planning | 27 |
| 2.3.4.1 | Environmental Analysis | 27 |
| 2.3.5 | Park Annual Performance | 27 |
| | Planning and Reporting | 27 |
| **3  Land Protection** | | **29** |
| 3.1 | General | 30 |
| 3.2 | Land Protection Methods | 30 |
| 3.3 | Land Protection Plans | 30 |

conservation, recreation, education, and continued use through partnerships among public and private entities at the local or regional level. Either of these two alternatives (and others as well) would recognize an area's importance to the nation without requiring or implying management by the National Park Service.

*(See National Significance 1.3.1; Suitability 1.3.2)*

## 1.4    Park Management

### 1.4.1    The Laws Generally Governing Park Management

The most important statutory directive for the National Park Service is provided by interrelated provisions of the NPS Organic Act of 1916 and the NPS General Authorities Act of 1970, including amendments to the latter law enacted in 1978.

The key management-related provision of the Organic Act is as follows:

> [The National Park Service] shall promote and regulate the use of the Federal areas known as national parks, monuments, and reservations hereinafter specified… by such means and measures as to conform to the fundamental purpose of the said parks, monuments, and reservations, which purpose is to conserve the scenery and the natural and historic objects and the wild life therein and to provide for the enjoyment of the same in such manner and by such means as will leave them unimpaired for the enjoyment of future generations. (16 USC 1)

Congress supplemented and clarified these provisions through enactment of the General Authorities Act in 1970, and again through enactment of a 1978 amendment to that act (the "Redwood amendment," contained in a bill expanding Redwood National Park), which added the last two sentences in the following provision. The key part of that act, as amended, is as follows:

> Congress declares that the national park system, which began with establishment of Yellowstone National Park in 1872, has since grown to include superlative natural, historic, and recreation areas in every major region of the United States, its territories and island possessions; that these areas, though distinct in character, are united through their inter-related purposes and resources into one national park system as cumulative expressions of a single national heritage; that, individually and collectively, these areas derive increased national dignity and recognition of their superlative environmental quality through their inclusion jointly with each other in one national park system preserved and managed for the benefit and inspiration of all the people of the United States; and that it is the purpose of this Act to include all such areas in the System and to clarify the authorities applicable to the system. Congress further reaffirms, declares, and directs that the promotion and regulation of the various areas of the National Park System, as defined in section 1c of this title, shall be consistent with and

founded in the purpose established by section 1 of this title [the Organic Act provision quoted above], to the common benefit of all the people of the United States. The authorization of activities shall be construed and the protection, management, and administration of these areas shall be conducted in light of the high public value and integrity of the National Park System and shall not be exercised in derogation of the values and purposes for which these various areas have been established, except as may have been or shall be directly and specifically provided by Congress. (16 USC 1a-1)

This section 1.4 of *Management Policies* represents the agency's interpretation of these key statutory provisions.

### 1.4.2    "Impairment" and "Derogation": One Standard

Congress intended the language of the Redwood amendment to the General Authorities Act to reiterate the provisions of the Organic Act, not create a substantively different management standard. The House committee report described the Redwood amendment as a "declaration by Congress" that the promotion and regulation of the national park system is to be consistent with the Organic Act. The Senate committee report stated that under the Redwood amendment, "The Secretary has an absolute duty, which is not to be compromised, to fulfill the mandate of the 1916 Act to take whatever actions and seek whatever relief as will safeguard the units of the national park system." So, although the Organic Act and the General Authorities Act, as amended by the Redwood amendment, use different wording ("unimpaired" and "derogation") to describe what the National Park Service must avoid, they define a single standard for the management of the national park system— not two different standards. For simplicity, *Management Policies* uses "impairment" (or a variation thereof), not both statutory phrases, to refer to that single standard.

### 1.4.3    The NPS Obligation to Conserve and Provide for Enjoyment of Park Resources and Values

The fundamental purpose of the national park system, established by the Organic Act and reaffirmed by the General Authorities Act, as amended, begins with a mandate to conserve park resources and values. This mandate is independent of the separate prohibition on impairment and applies all the time with respect to all park resources and values, even when there is no risk that any park resources or values may be impaired. NPS managers must always seek ways to avoid, or to minimize to the greatest extent practicable, adverse impacts on park resources and values. However, the laws do give the Service the management discretion to allow impacts to park resources and values when necessary and appropriate to fulfill the purposes of a park, so long as the impact does not constitute impairment of the affected resources and values.

The fundamental purpose of all parks also includes providing for the enjoyment of park resources and values by the people of the United States. The enjoyment that is contemplated by the statute is broad; it is the enjoyment of all the people of the United States and includes enjoyment both by people who visit parks and by those who appreciate

them from afar. It also includes deriving benefit (including scientific knowledge) and inspiration from parks, as well as other forms of enjoyment and inspiration. Congress, recognizing that the enjoyment by future generations of the national parks can be ensured only if the superb quality of park resources and values is left unimpaired, has provided that when there is a conflict between conserving resources and values and providing for enjoyment of them, conservation is to be predominant. This is how courts have consistently interpreted the Organic Act.

### 1.4.3.1 Park Purposes and Legislatively Authorized Uses

Park purposes are found in the general laws pertaining to the national park system, as well as the enabling legislation or proclamation establishing each unit. In addition to park purposes, in many cases the enabling legislation or proclamation for a park unit may also identify uses that are either mandated or authorized. In the administration of mandated uses, park managers must allow the use; however, they do have the authority to and must manage and regulate the use to ensure, to the extent possible, that impacts on park resources from that use are acceptable. In the administration of authorized uses, park managers have the discretionary authority to allow and manage the use, provided that the use will not cause impairment or unacceptable impacts. In determining whether or how to allow the use, park managers must consider the congressional or presidential interest, as expressed in the enabling legislation or proclamation, that the use or uses continue. Where there is strong public interest in a particular use, opportunities for civic engagement and cooperative conservation should be factored into the decision-making process.

*(See Unacceptable Impacts 1.4.7.1; Civic Engagement 1.7; Major Elements of NPS Park Planning and Decision-making 2.2; General 8.1)*

### 1.4.4 The Prohibition on Impairment of Park Resources and Values

While Congress has given the Service the management discretion to allow impacts within parks, that discretion is limited by the statutory requirement (generally enforceable by the federal courts) that the Park Service must leave park resources and values unimpaired unless a particular law directly and specifically provides otherwise. This, the cornerstone of the Organic Act, establishes the primary responsibility of the National Park Service. It ensures that park resources and values will continue to exist in a condition that will allow the American people to have present and future opportunities for enjoyment of them.

The impairment of park resources and values may not be allowed by the Service unless directly and specifically provided for by legislation or by the proclamation establishing the park. The relevant legislation or proclamation must provide explicitly (not by implication or inference) for the activity, in terms that keep the Service from having the authority to manage the activity so as to avoid the impairment.

### 1.4.5 What Constitutes Impairment of Park Resources and Values

The impairment that is prohibited by the Organic Act and the General Authorities Act is an impact that, in the professional judgment of the responsible NPS manager, would harm the integrity of park resources or values, including the opportunities that otherwise would be present for the enjoyment of those resources or values. Whether an impact meets this definition depends on the particular resources and values that would be affected; the severity, duration, and timing of the impact; the direct and indirect effects of the impact; and the cumulative effects of the impact in question and other impacts.

An impact to any park resource or value may, but does not necessarily, constitute an impairment. An impact would be more likely to constitute impairment to the extent that it affects a resource or value whose conservation is

◆ necessary to fulfill specific purposes identified in the establishing legislation or proclamation of the park, or

◆ key to the natural or cultural integrity of the park or to opportunities for enjoyment of the park, or

◆ identified in the park's general management plan or other relevant NPS planning documents as being of significance.

An impact would be less likely to constitute an impairment if it is an unavoidable result of an action necessary to preserve or restore the integrity of park resources or values and it cannot be further mitigated.

An impact that may, but would not necessarily, lead to impairment may result from visitor activities; NPS administrative activities; or activities undertaken by concessioners, contractors, and others operating in the park. Impairment may also result from sources or activities outside the park. This will be addressed consistent with sections 1.6 and 1.7 on Cooperative Conservation and Civic Engagement.

*(See Unacceptable Impacts 1.4.7.1)*

### 1.4.6 What Constitutes Park Resources and Values

The "park resources and values" that are subject to the no-impairment standard include

◆ the park's scenery, natural and historic objects, and wildlife, and the processes and conditions that sustain them, including, to the extent present in the park: the ecological, biological, and physical processes that created the park and continue to act upon it; scenic features; natural visibility, both in daytime and at night; natural landscapes; natural soundscapes and smells; water and air resources; soils; geological resources; paleontological resources; archeological resources; cultural landscapes; ethnographic resources; historic and prehistoric sites, structures, and objects; museum collections; and native plants and animals;

◆ appropriate opportunities to experience enjoyment of the above resources, to the extent that can be done without impairing them;

# Winter Use Plans
# Final Environmental Impact Statement

**Yellowstone and Grand Teton National Parks**
**John D. Rockefeller, Jr. Memorial Parkway**



**National Park Service**

Volume 1

2007

WINTER USE PLANS FINAL ENVIRONMENTAL IMPACT STATEMENT
Yellowstone and Grand Teton National Parks and the John D. Rockefeller, Jr. Memorial Parkway

Table 3-1:  Economic Output and Employment Levels for the Greater Yellowstone Area, 2003

| Geographic Area | Total 2003 Output [a] | Total 2003 Employment [b] |
|---|---|---|
| Three-State | $166,318,000,000 | 1,750,137 |
| Five-County | $9,547,000,000 | 115,822 |
| Cody, WY | $917,000,000 | 10,705 |
| Jackson, WY | $1,860,000,000 | 20,302 |
| West Yellowstone, MT | $167,000,000 | 2,333 |
| Wapiti, WY | $10,300,000 | 112 |
| [a] Includes direct, indirect, and induced output | | |
| [b] All jobs, both full and part time. The analysis area at the community level is by zip code, thus the area may not correspond with city limits. | | |

### 3.3.3.2 Recent Trends in Park Visitation

This analysis estimates changes in total visits to the three park units in the GYA by people who are from outside the area. The estimated regional economic impacts discussed in Chapter IV consider impacts to the GYA that are associated with the different winter management alternatives considered, including limits to the use of snowmobiles and snowcoaches within the parks.

Previous estimates of changes in GYA visitation in response to changes in winter use policies relied primarily on visitor surveys to predict future policy impacts (Duffield and Neher 2000; RTI International 2004). The current analysis, however, benefits from several years of data collected during periods of varying winter use visitation levels. These sources of observed data allow the current analysis to incorporate trends in winter economic activity to supplement predictions based on visitor survey responses. Visitation data for the parks is presented in Section 3.8.5 in this chapter.

### 3.3.3.3 Recent Trends in the Greater Yellowstone Area Economy

Analyses for previous winter use planning efforts in the parks have predicted that restrictions on some types of winter use (snowmobiles primarily) would be at least partially offset by winter visitors still recreating in the GYA but utilizing other recreational opportunities outside of the parks. As a general example, it was predicted that restricting access to the parks for some uses, such as snowmobiling, could lead to offsetting increases in use of other GYA recreational opportunities, such as snowmobiling in the national forests.

As shown in Section 3.8.5, however, there have been noteworthy declines in both snowmobile visits and total winter visitation to YNP in the past four years. An examination of key tourism-targeted tax collections in the GYA counties bordering the parks provides information on the degree to which the economies of these counties and communities are economically dependent on park winter visitation.

Table 3-2 and Figure 3-1 present winter lodging collections for Fremont County, Idaho. In general, during the period of time when winter visitation to YNP was decreasing (2002-2003 through 2005-2006), winter lodging tax collections in Fremont County trended upwards—opposite of YNP visitation trends. Fremont County winter lodging tax collections in 2005-2006 were over double the level seen in the four years prior to 2002 (and the management changes that began in 2003). Winter lodging taxes in Fremont County seem to more closely match the statewide 16.7% growth in lodging tax that occurred during the same period (Otter 2007).

2 of 12

WINTER USE PLANS FINAL ENVIRONMENTAL IMPACT STATEMENT
Yellowstone and Grand Teton National Parks and the John D. Rockefeller, Jr. Memorial Parkway

Table 3-2: Fremont County, Idaho, Winter Lodging Tax Collections Compared with Yellowstone National Park Winter Visitation, 1996-1997 through 2005-2006 (Idaho State Tax Commission 2006).

| Winter Season | Total Lodging Sales | | | | | YNP Winter Visitation (OSV and wheeled) |
|---|---|---|---|---|---|---|
| | Dec | Jan | Feb | Mar | Total for Winter | |
| 1996-97 | $42,442 | $44,183 | $83,866 | $143,806 | $314,297 | 116,882 |
| 1997-98 | $204,652 | $34,754 | $114,365 | $71,945 | $425,716 | 123,225 |
| 1998-99 | $93,591 | $55,816 | $180,620 | $59,299 | $389,326 | 128,057 |
| 1999-00 | $76,263 | $70,473 | $112,822 | $96,865 | $356,423 | 134,326 |
| 2000-01 | $80,688 | $58,952 | $101,676 | $71,411 | $312,727 | 139,880 |
| 2001-02 | $123,261 | $76,855 | $144,869 | $155,416 | $500,401 | 146,425 |
| 2002-03 | $61,374 | $131,383 | $239,068 | $204,393 | $636,218 | 115,304 |
| 2003-04 | $246,769 | $107,345 | $406,135 | $92,864 | $853,113 | 89,626 |
| 2004-05 | $116,323 | $4,661 | $335,441 | $112,605 | $569,031 | 85,224 |
| 2005-06 | $221,627 | $261,024 | $236,964 | $111,201 | $830,816 | 94,206 |



Figure 3-1: Comparison of Fremont County, Idaho, Winter Lodging Collections and Yellowstone National Park Winter Visitation, 1996-1997 through 2005-2006
Note: Original figure is in color; printing costs precluded use of color. The reader may obtain the color version at http://www.nps.gov/yell/parkmgmt/winterusetechnicaldocuments.htm.

Table 3-3 and Figure 3-2 present similar winter lodging tax collection information for Park County, Wyoming, on the east side of YNP. The main community in Park County is Cody. However, Park County includes the northern portion of YNP, including the Mammoth Hot Springs Hotel, which is open during the winter (Snow Lodge, at Old Faithful, is in Teton

WINTER USE PLANS FINAL ENVIRONMENTAL IMPACT STATEMENT
Yellowstone and Grand Teton National Parks and the John D. Rockefeller, Jr. Memorial Parkway

County, Wyoming). This table shows both total OSV visitation levels for YNP and total winter lodging tax collections for the county. As is the case in Fremont County, winter lodging tax collections did not follow the decrease in YNP OSV visitation during 2002-2006. The Mammoth Hot Springs Hotel accounts for 41% of the Park County lodging tax in the winter.

Table 3-3: Park County, Wyoming, Winter Lodging Tax Collections, in Tax Year Dollars, Compared with Yellowstone National Park Oversnow Visitation, 1997-1998 through 2005-2006*

| Winter Season | Dec | Jan | Feb | Mar | Total for Winter | YNP OSV Visitation |
|---|---|---|---|---|---|---|
| 1997-98 | $33,155 | $8,498 | $13,458 | $12,965 | $68,075 | 82,731 |
| 1998-99 | $24,258 | $9,523 | $12,509 | $29,218 | $75,509 | 87,050 |
| 1999-00 | $59,379 | $14,971 | $10,617 | $18,184 | $103,151 | 88,270 |
| 2000-01 | $20,467 | $9,384 | $16,200 | $13,955 | $60,006 | 96,156 |
| 2001-02 | $26,971 | $9,477 | $12,352 | $13,072 | $61,872 | 98,038 |
| 2002-03 | $27,486 | $14,217 | $10,417 | $14,256 | $66,376 | 72,560 |
| 2003-04 | $28,765 | $12,527 | $9,455 | $18,090 | $68,837 | 45,535 |
| 2004-05 | $27,841 | $13,210 | $13,313 | $13,556 | $67,919 | 41,291 |
| 2005-06 | $20,520 | $21,382 | $20,532 | $13,244 | $75,679 | 48,689 |

*The report, "Economic Trends in the Winter Season for Park County, Wyoming" by David T. Taylor (Taylor 2007) presents different winter lodging tax information (excluding December and lagged 2-months) for 5 of the 9 years presented above. However, the general lodging tax trends (without regard to inflation – see text below) are the same in both reports.



Figure 3-2: Comparison of Park County, Wyoming, Winter Lodging Tax Collections, and Yellowstone National Park Oversnow Visitation, 1997-1998 through 2005-2006

The recent lodging and tax data for Fremont and Park counties (the only lodging tax data provided to the NPS by the cooperating agencies) indicate that declines in snowmobile entries into YNP in particular, and in winter visitation in the park in general, have not

WINTER USE PLANS FINAL ENVIRONMENTAL IMPACT STATEMENT
Yellowstone and Grand Teton National Parks and the John D. Rockefeller, Jr. Memorial Parkway

detectably impacted the overall winter tourist economy in the counties as measured by monthly lodging tax collections. This is despite the fact that the economies of these counties are relatively small. Two other adjoining counties, Gallatin County in Montana (including Bozeman) and Teton County in Wyoming (including Jackson) have relatively large economies where even substantial changes in YNP and GTNP winter visitation would not be detectable. For example, the observed change in visitation at the south entrance in response to the Temporary Winter Use Plan might have an expenditure impact on the order of $4 million per year. By comparison, the five county GYA economy (largely driven by Gallatin and Teton counties) was on the order of $6 billion in 1999 and in 2003 (the most recent IMPLAN data available) had grown to about $9 billion. Similarly, impacts from changes in the parks' winter visitation levels for the three-state economy would not be detectable.

However, the relative size of the county economies does mask likely individual changes which have occurred. Some individual businesses have indicated a considerable reduction in their winter operations. Other employment patterns have changed (all-year work for some employees is no longer available) as a result of changing visitation patterns (Ecosystem Research Group 2006).

Parenthetically, for the north entrance gateway of Gardiner, Montana (Park County), almost all winter use is wheeled vehicle entries and the Temporary Winter Use Plan (NPS 2004b) has not had a noticeable effect on visitation through this entrance. Visitors there are destined for Mammoth Hot Springs and sites such as the Lamar Valley in the park's northern range (which are both in Park County, Wyoming) or other YNP locations or to recreate in and around Cooke City, Montana (which is in Park County, Montana).

Another indicator and change in the winter economy is wildlife viewing in Yellowstone. A 2004-2006 year-round survey looked at the economic effects of wolf watching and wolf presence to Yellowstone visitors. Winter visitors, which constitute about 3.1% of the annual visitation to Yellowstone, contribute about $1.3 million to the 17-county economy just related to wolf presence in Yellowstone. This is about 5.8% of the total annual $22.5 million direct spending impact of wolf watching to the 17-county economy (Duffield, Neher, and Patterson 2006).

The lodging tax information at the county level in tables 3-2 and 3-3 is as reported by the respective states and does not include an inflation factor. That is, lodging costs typically increase as a result of inflation, thus lodging tax revenue (which is a percent of the cost of lodging) will also increase. When inflation is included, the inflation-adjusted tax revenue may be lower, even though the tax dollars stay the same or increase (Taylor 2007). A variety of inflation estimates exist (such as the national consumer price index (CPI), the core consumer price index (which excludes food and energy), the consumer price index for all urban consumers in the west (CPI-U), the consumer price index for urban wage earners and clerical earners in the west (CPI-W), and Monthly Average Daily Room Rates (Department of Labor 2007, Taylor 2007). The NPS chooses to present lodging tax information without an inflation adjustment since there are a variety of possible indices, but notes through the reference to Taylor 2007 that such adjustments can be made. Also, another similar report looking at tourism in Wyoming (Dean Runyan Associates 2006) and cited by Taylor 2007 does not (except for one table in a 71-page report) take into account inflation.

The remaining major gateway community for YNP and GTNP is West Yellowstone, at the west entrance to YNP. Table 3-4 provides time series data for this entrance, shown graphically in Figure 3-3. Included in the table are winter resort tax collections for the town of West Yellowstone, winter entries through the west entrance to YNP, and winter snowmobile visits to the Hebgen Lake District of the Gallatin National Forest, which abuts the town to the west. Unlike the cases of Park and Fremont Counties, discussed above, it is

5 of 12

WINTER USE PLANS FINAL ENVIRONMENTAL IMPACT STATEMENT
Yellowstone and Grand Teton National Parks and the John D. Rockefeller, Jr. Memorial Parkway

clear that in response to reductions in winter park visits through the west entrance in 2002-2003 through 2005-2006 and in response to reduced forest visits, resort tax collections also fell. It should be noted that the decline was not in proportion to the decrease in west entrance visits. Specifically, comparing average levels for the four years immediately before and after management changes (2002-2003 through 2005-2006) to the four years immediately preceding this period shows that while park visitation fell 48.5% on average, winter tax collections only fell 19.7%. However, Montana's statewide lodging tax grew 17% during the same time period. The nearly 20% reduction in tax revenue is more striking in light of the statewide increase and perhaps a better indicator of the relative impact of the recent decrease in winter park visitation on West Yellowstone (Otter 2007).

Table 3-4: West Yellowstone Winter Resort Tax Collections, Hebgen Lake District Snowmobile Use, and Yellowstone West Entrance Winter Visits, 1989-1990 through 2005-2006

| Winter Season | West Yellowstone Winter Resort Tax Collections | Gallatin National Forest Hebgen Lake District Snowmobile Use | Yellowstone National Park West Entrance Winter Visits |
|---|---|---|---|
| 1996-97 | $455,035 | 226,555 | 56,212 |
| 1997-98 | $476,508 | 209,420 | 54,859 |
| 1998-99 | $500,473 | 203,759 | 59,928 |
| 1999-00 | $520,566 | 223,726 | 58,154 |
| 2000-01 | $549,182 | 167,512 | 66,302 |
| 2001-02 | $536,996 | 197,190 | 70,371 |
| 2002-03 | $476,037 | 191,847 | 49,703 |
| 2003-04 | $401,664 | 139,991 | 28,880 |
| 2004-05 | $388,222 | 133,858 | 24,510 |
| 2005-06 | $425,933 | 146,128 | 28,243 |

WINTER USE PLANS FINAL ENVIRONMENTAL IMPACT STATEMENT
Yellowstone and Grand Teton National Parks and the John D. Rockefeller, Jr. Memorial Parkway

*Mitigation of Effects*

In general, mitigation of effects upon park operations is a routine and required part of NPS management of park resources. In the case of closed roads, park employees will find alternate routes and adjust their schedules as needed to arrive at necessary destinations.

*Cumulative Effects*

Past, present, and foreseeable actions occurring within and around the parks which could affect park operations are the same as those for alternative 1. Cumulative effects to park operations under this alternative would be similar to those stated for alternative 1.

*Conclusions*

Alternative 7 would result in minor, beneficial, direct, and long-term impacts upon park operations in Yellowstone, primarily because avalanche control operations on Sylvan Pass would no longer be necessary. Experimental closures of the Gibbon Canyon or other road segments would make this alternative's effects minor, adverse, direct, and long-term impacts upon park operations in YNP. For Grand Teton and the Parkway, selection of alternative 7 would result in minor, beneficial, direct, and long-term impacts.

In terms of cumulative effects, the long-term, minor, beneficial and adverse impacts resulting from direct and indirect actions described in this alternative would contribute a minor, beneficial to adverse, long-term impact to past, present, and foreseeable actions and impacts on park operations.

## 4.2.2 Effects on the Socioeconomic Environment

### Assumptions and Methods

This section analyzes how winter use management alternatives would likely impact recreational use in the Greater Yellowstone Area (GYA) and how impacts to such use would impact economic activity (expenditures and employment) within the area. The economy of the GYA and the estimated socioeconomic impacts associated with the winter use management alternatives are described in an analysis prepared for the National Park Service (NPS) by Duffield and Neher (2006 and 2007). This section summarizes the methodology and data used in the analyses. Readers are encouraged to refer to those documents for technical details.

Duffield and Neher (2006 and 2007) describe the economy of the GYA at three different levels: a state level (Idaho, Montana, and Wyoming), a county level (Fremont County in Idaho, Gallatin and Park Counties in Montana, and Park and Teton Counties in Wyoming), and a community level (Cody, Jackson, and Wapiti, Wyoming, and West Yellowstone, Montana). Recreational use and visitor expenditure levels were estimated for each of the management alternatives considered. Then, the economic impacts associated with each alternative were estimated at the three levels described above.

The economic impacts of each action alternative are estimated relative to the no-action alternative, which is no motorized oversnow access, which would prohibit recreational snowmobile and snowcoach use in the parks and would not allow plowing of interior roads (i.e. the road from Gardiner to Mammoth to Cooke City and U.S. 191 would still be plowed).

Three estimates of socioeconomic impacts are presented in this analysis for each management alternative. The first is a lower bound estimate that is based primarily on the observed changes in visitation resulting from the current winter use management plan. This lower bound estimate describes the impacts that can be expected in the near-term. The next

7 of 12

WINTER USE PLANS FINAL ENVIRONMENTAL IMPACT STATEMENT
Yellowstone and Grand Teton National Parks and the John D. Rockefeller, Jr. Memorial Parkway

and employment were calculated to reflect various assumptions of how visitation to the GYA might respond. The primary results of that analysis are summarized below.

In the 3-state, 5-county, Cody and Jackson, Wyoming areas, all estimated socioeconomic impacts were negligible under each of the action alternatives considered. These results reflect the size and diversity of the economies in those areas.

Moderate adverse socioeconomic impacts were estimated for the West Yellowstone, Montana area under two alternatives. Under alternative 2 (snowcoaches only), estimated impacts ranged from moderate adverse (when compared to historical conditions) to moderate beneficial (when compared to the no action alternative of no motorized oversnow access). Under alternative 3A (Most Road Grooming Eliminated), estimated impacts ranged from major adverse (when compared to historical conditions) to negligible beneficial (when compared to the no action alternative of no motorized oversnow access). Estimated impacts were moderate adverse when compared to the current conditions in one analysis scenario.

No significant adverse socioeconomic impacts were estimated for the West Yellowstone, Montana area under four alternatives. Under alternative 1 (Continued Temporary Plan), estimated impacts ranged from negligible adverse (when compared to historical conditions) to major beneficial (when compared to the no action alternative of no motorized oversnow access). Under alternative 4 (Expanded Recreational Use), estimated impacts ranged from negligible adverse (when compared to historical conditions) to major beneficial (when compared to the snowcoaches only, current conditions, and no action (no motorized oversnow access)). Under alternative 5 (New Management Tools and Improved BAT), estimated impacts ranged from negligible adverse (when compared to historical conditions) to major beneficial (when compared to the no action alternative of no motorized oversnow access). Under alternative 6 (mixed use), estimated impacts ranged from negligible adverse (when compared to historical conditions) to major beneficial (when compared to the snowcoaches only, current conditions, and no action (no motorized oversnow access)). Under alternative 7 (Revised Preferred Alternative), estimated impacts ranged from negligible adverse (when compared to 1997-1998 and 2001-2002 historical conditions to moderate beneficial when compared to no action (no motorized oversnow access).

It should be noted that where negligible adverse impacts are indicated, impacts to specific sectors or individual businesses may be substantially larger. The conclusions drawn regarding the general level of impact apply to the area of analysis. Within each of those geographic areas, the actual changes affecting individual businesses, their employees, and their families are anything but negligible when the changes are felt at that level. As noted in Ecosystem Research Group 2006, the changes that have occurred in recent years in winter visitation have adversely affected local businesses and individuals, especially those who depended on snowmobile access to Yellowstone. The discussion in the previous section on Cumulative Effects is an acknowledgement of the adverse effects that have occurred to businesses around the parks due to the recent decline in visitation. The income and employment numbers in the above tables are a reflection of, and an indication of, the changes that might occur to businesses and employees in the communities and region if an alternative is implemented.

### 4.2.3 Effects on Air Quality and Air Quality-Related Values

#### Assumptions and Methods

Impacts for each alternative were assessed with respect to the NAAQS and relative to current and historical conditions (Air Resource Specialists, Inc. 2006, 2007—these two reports are the basis for most of the discussion in section 4.2.3). For Wyoming, Montana, and Idaho, the

8 of 12

WINTER USE PLANS FINAL ENVIRONMENTAL IMPACT STATEMENT
Yellowstone and Grand Teton National Parks and the John D. Rockefeller, Jr. Memorial Parkway

Impairment of park resources would not occur; the level of air pollution under alternative 6 would not harm the integrity of park resources and values.

In terms of cumulative effects, the moderate, long-term, and adverse impacts resulting from direct and indirect actions described in this alternative would contribute a moderate, adverse, long-term impact to past, present, and foreseeable actions and impacts on air quality.

## Alternative 7

Emissions in this alternative would be a moderate, adverse, long-term (but occurring only in winter), direct, park-wide impact, more adverse compared to current use levels, and greatly beneficial compared to historic conditions. No perceptible visibility impacts would be likely. If the Madison-Norris road is closed for bison-road research or the East Entrance remains open, impacts would be the same (moderate, adverse, long-term, direct, and park-wide). Impairment of park resources would not occur; the level of air pollution under alternative 7 would not harm the integrity of park resources and values.

In terms of cumulative effects, the moderate, long-term, and adverse impacts resulting from direct and indirect actions described in this alternative would contribute a moderate, adverse, long-term impact to past, present, and foreseeable actions and impacts on air quality.

Table 4-45 Air Quality Impacts Conclusions

| Alternative | Level of Adverse Impact[1] | | Relative Comparison to Current Conditions | Relative Comparison to Historic Condition | Impairment |
|---|---|---|---|---|---|
| | Emissions | Visibility | (%)[2] | (%)[3] | |
| 1 | Moderate | Negligible | Adverse    (157%) | Beneficial    (6%) | No |
| 2 | Negligible | Negligible | Beneficial (33%) | Beneficial (1.2%) | No |
| 3A[4] | None to Minor | Negligible | Beneficial    (50%) | Beneficial (1.9%) | No |
| 4 | Major | Negligible | Adverse    (234%) | Beneficial (8.9%) | No |
| 5 | Negligible to Minor | Negligible | Beneficial    (44%) | Beneficial (1.6%) | No |
| 6 | Moderate | Moderate | Beneficial (91%) | Beneficial (3.4%) | No |
| 7 | Moderate | Negligible | Adverse (117%) | Beneficial (4.4%) | No |

[1] See Table 4-28 for definitions
[2] Alternative's CO emissions as a percent of the current annual CO emissions -  from actual use levels (114 tons per year)
[3] Alternative's CO emissions as a percent of the annual CO emissions produced historically (3,045 tons per year)
[4] 3B, the "No Action" option, would produce no emissions so there would be no impacts.

## 4.2.4 Effects on Public and Employee Health and Safety

### Assumptions and Methods

The area of analysis is the parks. To assess the level of impact to employee and public health and safety for each alternative, the following types of information were used:

- Safety policies and guidelines (see section 3.5.1)
- Results of air monitoring near the West Entrance in YNP
- Results of personal exposure and sound monitoring
- Results of air quality and sound modeling
- Reports from employees and commercial guides

9 of 12

WINTER USE PLANS FINAL ENVIRONMENTAL IMPACT STATEMENT
Yellowstone and Grand Teton National Parks and the John D. Rockefeller, Jr. Memorial Parkway

- Past and current avalanche analyses.

Table 4-46 defines overall impacts to health and safety, including impacts for avalanche control in the Sylvan Pass area of YNP. Note that while personal and occupational exposure to air quality and noise contaminants has been monitored in Yellowstone (as described in Section 3.5.3), it was not modeled for the various alternatives and is therefore compared qualitatively, using monitored data (See Jensen and Meyer, 2006; Spear et al., 2006).

Table 4-46: Definition of Impacts to Employee and Public Health and Safety

| Impact Category | Definition |
| --- | --- |
| Negligible | No noticeable or perceptible impact; no mitigation needed. 8-hour average noise exposure levels (Leq) are below 55 dBA; peak sound pressure levels (SPL) are below 75 dBA. |
| Minor | Measurable or perceptible impact if ATSDR Minimum Risk Levels (MRLs)* or other established limits are rarely exceeded. If mitigation were needed, it would be relatively simple and would likely be successful. 8-hour time-weighted noise exposure levels are below 60 dBA; peak noise levels are below 75 dBA. |
| Moderate | Impact could cause a permanent change; ATSDR MRLs or other established limits are exceeded daily. Mitigation measures would probably be necessary and would likely be successful. 8-hour time-weighted noise exposure levels are below 70 dBA; peak noise levels are below 80 dBA. |
| Major | Substantial impact to employee or public health and safety; ATSDR MRLs or other established limits are exceeded more than once per day. Extensive mitigation measures would be needed, and their success would not be guaranteed. High potential exists for serious accidents or hazards. 8-hour time-weighted noise exposure levels exceed 85 dBA; peak noise levels routinely exceed 90 dBA. Maximum one second Leq levels exceed 130 dBA. |
| *From the Agency for Toxic Substances & Disease Registry at http://www.atsdr.cdc.gov/mrls/index.html | |

## Effects by Alternative

This section analyzes the effects of personal and occupational exposure to air and noise contaminants and avalanche control operations in comparison to the no-action alternative and current and historic conditions.

## Alternative 1

As with the Temporary Plan, all snowmobiles in the parks would meet BAT requirements and all would be commercially guided. Continuation of these guiding and BAT requirements, and extension of BAT requirements to snowcoaches, would contribute to a park environment characterized by orderly, clean and quiet conditions, similar to current conditions for snowmobiling and snowcoach operations. Current conditions include occupational exposure to air contaminants and noise that is well below established limits, with average entrance station noise exposure levels well below 80 dBA. Although the number of snowmobiles could increase above current levels under this alternative, it is unlikely that toxic pollutant emissions or noise levels would increase significantly, particularly given the fact that peak days have seen between 400 and 500 snowmobiles in the last three years.

Minimal impacts to employee and public health and safety would be generated by the potential closure of Gibbon Canyon (Madison to Norris Junctions) for management experiments investigating the bison-groomed road relationship. Travel between Mammoth Hot Springs and Old Faithful or West Yellowstone, and between Canyon and West Yellowstone, would become substantially more difficult (with greater exposure to rough roads), as visitors and employees would then need to travel around the Lower Loop or via wheeled vehicle through Livingston and Bozeman, Montana. Implementation of the closure

10 of 12

WINTER USE PLANS FINAL ENVIRONMENTAL IMPACT STATEMENT
Yellowstone and Grand Teton National Parks and the John D. Rockefeller, Jr. Memorial Parkway

would probably also result in a reduced number of such trips, due to the increased time necessary for them.

Seasonal avalanche control operations for spring opening would pose minor, short-term, direct adverse effects to employee safety.

Under this alternative, Sylvan Pass would be closed to OSV travel but remain open to non-motorized travel. Further,

- No avalanche control operations would occur at the pass, other than those necessary for search and rescue operations and spring opening procedures.
- The howitzer platform would be dismantled. Howitzers, ammunition and associated equipment would be removed from the park.
- Homeland security issues currently associated with the howitzer operation would not exist once the equipment is removed from the park.

Under this alternative, the NPS would continue to construct and maintain the CDST alongside of and partially upon the plowed roadway between the east park boundary of Grand Teton and Flagg Ranch. The presence of this snowmobile route and its configuration relative to the road would result in minor to moderate, direct and long-term adverse impacts to public health and safety.

Under this alternative, impacts to employee and public health and safety in the parks would be moderate, direct, short-term, and adverse as a result of this action.

*Comparison to current conditions, historic conditions, and the No Action Alternative*

Even though the use levels set by this alternative were in effect for the Temporary Plan, they were not reached under current conditions, so this alternative could see increased OSV traffic as compared to current conditions. Therefore, its safety impacts, relative to the current conditions, could increase. Regarding the avalanche hazards, selection of this alternative would have major beneficial effects upon visitor and employee health and safety.

Historically, all snowmobiles were two-stroke machines, which produced objectionable levels of noise and air emissions. Because this alternative would continue the temporary plan's restriction to BAT machines and would limit the number of such machines in the park, and because it would implement BAT requirements for snowcoaches, this alternative would result in beneficial effects upon visitor and employee health and safety. Furthermore, the closure of Sylvan Pass, with its substantial avalanche hazards, would have significant beneficial effects upon the exposure to avalanche hazards for visitors and employees.

The no-action alternative disallows recreational OSV use in the parks; minimal administrative travel could continue. Compared to this restricted use, this alternative would incur adverse effects upon visitor and employee health and safety. Both alternatives would close Sylvan Pass to OSV travel, so the exposures to avalanche hazards would be similar.

*Mitigation of Effects*

Current mitigation measures such as the wearing of appropriate winter clothing, helmets and earplugs would continue as needed. Other personal protective equipment would be made available for employee use as appropriate.

Guiding is an effective mitigation for visitor and employee health and safety because guides are effective at enforcing proper touring behaviors, such as staying within speed limits and on the groomed road surfaces. Requirements for BAT on both snowcoaches and snowmobiles would mitigate exposure to both air toxics and noise. Snowcoach size and numerical limits will mitigate the effects of large vehicles upon the road surfaces. The use of hearing

11 of 12

WINTER USE PLANS FINAL ENVIRONMENTAL IMPACT STATEMENT
Yellowstone and Grand Teton National Parks and the John D. Rockefeller, Jr. Memorial Parkway

protection, recommended by the NPS for all OSV users, is an effective mitigation against
excessive noise levels.

*Cumulative Effects*

The area of concern is the parks. Few if any actions or trends from outside the parks would
influence public and employee health and safety in the parks. For example, the trend toward
increasing guide and outfitter activity extends to the parks, but the NPS strictly regulates the
provision of guided services within the parks. As well, while changing demographics means
an increasing interest in outdoor activities, all snowmobiling in Yellowstone is guided,
reducing the occurrence of unsafe snowmobile behaviors.

For employees exposed to air toxics, noise, and rough roads, health effects may accumulate
over the course of a season. Additionally, there is the potential for synergistic effects.
However, under this alternative, the provisions for BAT, limited entries, and guided groups
substantially mitigate these effects. A variety of other hazards associated with winter travel
may also be experienced while traveling in the parks during the winter, all of which are
common to winter travel in the intermountain west. These hazards may include avalanches,
rock fall, hypothermia, blowing snow, traffic accidents and poor driving conditions. To some
extent these hazards are mitigated by management action such as the cold weather advisory
system and temporary road closures.

*Conclusion*

Because Sylvan Pass would be closed to OSV travel under this alternative, because BAT and
guiding requirements would be in effect, and because snowcoach BAT requirements would
be implemented, the effects of this alternative upon visitor and employee health and safety
would be minor to moderate, direct, short-term, and adverse.

In terms of cumulative effects, the minor to moderate, short-term, and adverse impacts
resulting from direct and indirect actions described in this alternative would contribute a
minor to moderate, adverse, short-term impact to past, present, and foreseeable actions and
impacts on employee health and safety.

## Alternative 2

Under this alternative, a BAT requirement would be implemented for snowcoaches,
snowmobiles would be banned, and Sylvan Pass would be closed to OSV travel. These
policies would contribute to an orderly, cleaner and quieter environment in the park.
Occupational exposure to air contaminants and noise would likely be well below established
limits because all snowcoaches would meet BAT requirements.

Seasonal avalanche control operations for spring opening would pose minor, short-term,
direct, adverse effects to employee safety.

Under this alternative, Sylvan Pass would be closed to OSV travel but remain open to non-
motorized travel. Further,

- No avalanche control operations would occur at the pass, other than those necessary
  for search and rescue operations and spring opening procedures.
- The howitzer platform would be dismantled. Howitzers, ammunition and associated
  equipment would be removed from the park.
- Homeland security issues currently associated with the howitzer operation would
  not exist once the equipment is removed from the park.

12 of 12

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| GREATER YELLOWSTONE COALITION, et al., | ) ) ) | |
| Plaintiffs, | ) | |
| | ) | Case No. 07-cv-2111 (EGS) |
| v. | ) ) | [Hearing on Motions for Summary |
| DIRK KEMPTHORNE, et al., | ) | Judgment on August 27, 2008] |
| | ) | |
| Defendants. | ) ) | |

|  |  |  |
|---|---|---|
| NATIONAL PARKS CONSERVATION ASSOCIATION, | ) ) ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 07-cv-2112 (EGS) |
| v. | ) | |
| | ) | [Hearing on Motions for Summary |
| UNITED STATES DEPARTMENT OF THE INTERIOR; NATIONAL PARK SERVICE, | ) ) | Judgment on August 27, 2008] |
| | ) | |
| Defendants. | ) | |
| | ) | |

## DECLARATION OF ROBERT D. ROSENBAUM

Robert D. Rosenbaum hereby declares under penalty of perjury pursuant to 28 U.S.C. § 1746 as follows:

1.    I am the attorney at Arnold & Porter LLP primarily responsible for our representation of the National Parks Conservation Association in this litigation.

2.    Attached as Exhibit S are the following documents (relating to newspaper coverage and commentary on the snowmobile controversy) that were copied from the Administrative Record provided by the Federal Defendants, identified by Bates numbers:

119220 (with pages of attachments having no Bates numbers); 118424; 118427; 118378-79; 118476-77.

3.     Attached as Exhibit T are the following Record documents (showing a nexus between the Yellowstone controversy and the District of Columbia): 119737; 113523-24; 114773; 113508.

4.     Attached as Exhibit U is a Record document bearing Bates number 114900 and six unnumbered pages that follow it.

5.     Attached as Exhibit V ia a letter dated April 8, 2007 which I received from Luther L. Hajek, counsel to the Federal Defendants.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on April 11, 2008.

Robert D. Rosenbaum

119220



**L J Miller**
07/03/2007 01:03 PM
MDT

To: Suzanne Lewis/YELL/NPS@NPS
cc: Al Nash/YELL/NPS@NPS, John Sacklin/YELL/NPS@NPS, Mike
    Yochim/YELL/NPS@NPS, Denice Swanke/YELL/NPS@NPS, Janice
    Laye/YELL/NPS@NPS
Subject: Update of DEIS Editorial chart

Suzanne,

Attached is the most recent update.  It includes additions from the Toledo Blade and Albuquerque Tribune.

The chart is now in alpha order by paper name as opposed to dates of articles.
Some other changes/addtional text have been made/added as well.



2007 DEIS Editorials Chart-07-03-07.doc

Linda J. Miller
Public Affairs Office
Yellowstone National Park, WY
307-344-2013
L_J_Miller@NPS.GOV

## DEIS EDITORIAL OPINIONS
### Updated 7/3/07

| Paper Date Headline | General position | Limits | Guides | Sylvan Closure | Air / Sound Quality | Snowmobiles/ Snowcoaches |
|---|---|---|---|---|---|---|
| Albuquerque Tribune 06-19-07 Bill Wade Commentary: The Cold Path of Promises | NPS decision to continue allowing snowmobiles goes against Kempthorne's vow to put conservation first in all decisions, and also overwhelming scientific evidence that it will degrade the park's environment | Plan will allow significantly more snowmobiles than current average. Administration is pushing snowmobile use at a level 3 times higher than the park has seen since 2003 | | | NEPA policies instruct NPS to "perpetuate the best possible air quality in parks," use the "least impacting" vehicles and transp systems & protect natural sounds & quiet "to the greatest extent possible" – current proposal would violate them all | 80% of public comment urges replacing snowmobiles with snowcoaches (cheaper & more environmentally friendly) 4 studies have cost over $40 million – every study has produced same conclusion – snowmobiles aren't the answer, snowcoaches are |
| Billings Gazette 05-13-07 Winter Plan Fails to Balance Conservation & Recreation | Wisely, DEIS makes clear that nothing will change next winter – this buys everyone time to operate smoothly for the season Effects of people on the park in winter must be regulated so that visitors' enthusiasm for YNP doesn't damage the landscape that they've come to enjoy | If temp rules become permanent, "the number of snowmo-biles going into YNP daily could more than double to 720" Permanent rules ought to limit snowmobile traffic to the numbers that have been documented as improving air & sound quality | Trained guides have greatly reduced number of infractions | Sylvan Pass closure should be removed from EIS and reassessed again after park rules on snowmobiles and snowcoaches have been in place for a few yrs in order to give E Entrance a chance to stabilize and rebound | Perception that more machines will be allowed also means AQ would deteriorate – NPS documented improved conditions are only because of far fewer machines. 4-strokes are still noisier than most vehicles | Snowcoaches are cleaner & quieter and can comfortably transport larger groups w/one engine Having fewer snowmobiles & more snowcoaches has changed YNP for the better |
| Bozeman Chronicle 03-30-07 YNP Winter Travel Plan Will Give Businesses Predictability | New draft is reasonable compromise Gives businesses in gateway communities a modicum of certainty about their futures...businesses can comfortably plan for their winter seasons... We should all appreciate the predictability it provides | Makes only minor changes from the status quo | | | | |

Page 1 of 5

| Paper Date Headline | General position | Limits | Guides | Sylvan closure/E Entrance | Air / Sound Quality | Snowmobiles/ Snowcoaches |
|---|---|---|---|---|---|---|
| Casper Star Tribune 05-16-07 NPS Must be Open to Options for Sylvan Pass | NPS has attitude that it's not going to be intimidated by any gateway community that wants to change the plan. sabotaging efforts to bring winter visitors to park If NPS doesn't explain inconsistencies in avalanche control and explore options, mtg is nothing more than charade. | | | Lots of public opposition/ NPS appears intent on closing pass Opportunities for public to have input on options to keep pass open too little, too late NPS has dramatically changed its position on avalanche risks – downgrading some (Talus Slope) and escalating perceived danger on Sylvan | | |
| Casper Star Tribune 03-29-07 Keep Yellowstone's East Gate Open in Winter | New document plows little new ground | 720 limit seems reasonable – may be some room for compromise on numbers since actual use has been far less | Against – should be provision that allows people to receive trng to enter w/o guide Current requirement essentially makes YNP a privately licensed wildlife preserve instead of nat'l park open to the public. | NPS has ignored Park Co complaints; will create havoc among businesses Change in avalanche control doesn't make sense | | |

Page 2 of 5

| Paper Date Headline | General position | Limits | Guides | Sylvan closure/E Entrance | Air / Sound Quality | Snowmobiles/ Snowcoaches |
|---|---|---|---|---|---|---|
| **Cody Enterprise** 06-04-07 Shut Out Group Made Winter Debate Honest (McCormack) | Federal officials have waged a disingenuous, pre-determined, and less than objective and fair-minded effort to close East Entrance. Shut Out has shown how hard NPS staffers have worked to make a reality of their longtime goal of closing this route in winter. A thoroughly dishonest effort. Have promoted every possible angle to close the gate & ignored every opportunity to keep it open. | | | NPS original contention that keeping Sylvan open was financially impossible – Shut Out turned focus to avalanche control Embarrassing, if not devastating when Shut Out discovered and publicized inconsistent avalanche mgmt (Talus Slope) | | |
| **Cody Enterprise** 05-21-07 (Reeder) | Lewis' 3rd trip to Cody re East Entrance closure – give her credit for showing up and discussing even though her stance isn't popular | | | Safety hazard claims ring hollow | | |
| **Cody Enterprise** 04-11-07 Alt 4 Best for Future of East Gate Access (McCormack) | Strong preference for Alternative 4 Their reporting providing more revelations about NPS actions that undermine the credibility of YNP officials Pre-ordained, prejudiced, subjective and set conclusion of NPS has badly compromised their efforts | | | | | |

④

Page 3 of 5

| Paper Date Headline | General position | Limits | Guides | Sylvan closure/E Entrance | Air / Sound Quality | Snowmobiles/ Snowcoaches |
|---|---|---|---|---|---|---|
| **Cody Enterprise** 03-26-07 NPS Sheds No Light on Gate Closure Logic (McCormack) ⑤ | Uncommunicative, uninspired and less than informative presentation of the Park Service's thinking & position Lewis often failed to respond because she knows the NPS answers are so lacking Cody well prepared- NPS non-responsive. Rep Coe delivered "devastating litany of NPS mgmt failures" DEIS starting to border on a waste of time | | | Why didn't NPS approach Cody with "how can we make this work?" instead of "we're closing the east gate" | | |
| **Columbus Dispatch** 04-03-07 Not Again-Administration should Quit Pushing to Boost Snowmobiles in YNP | Targets Bush Administration | Temporary revised mgmt policies reduced the # of snowmobiles to 250 daily despite all studies, administration is pushing a proposal that would allow up to 720 s/m's per day | | | Snowmobile impacts on air and sound quality are unacceptable | Anti snowmobile; pro snowcoach |
| **Denver Post** 06-02-07 Snowmobile Fight Revs Up | Park's most contentious issue Appreciate park's dilemma, but... | 720 limit is too high, better to go to 250 (average for last 3 winters); total ban is better | | | Snowmobiles unquestionably create noise and air pollution and disrupt wildlife | Public comments have strongly supported banning snowmobiles. Total ban is best |

Page 4 of 5

| Paper Date Headline | General position | Limits | Guides | Sylvan closure/E Entrance | Air / Sound Quality | Snowmobiles/ Snowcoaches |
|---|---|---|---|---|---|---|
| Hartford (CT) Courant 04-15-07 Yellowstone and Snowmobiles | Restrictions since 2004 have meant cleaner air, better protected wildlife, a lot less noise. | YNP officials "apparently blinded by the snowmobile industry" are proposing allowing 720 of the noisy, polluting s/m's a day – almost a 3-fold increase | | | Snowmobile impacts on air and sound quality are unacceptable, especially with "increased" number. | Very anti snowmobiles; pro snowcoach |
| New York Times 06-06-07 Keeping a Watch on Winter ⑥ | Yellowstone is glaring exception to mgmt by valued principles that should apply in national parks, and explicitly to Kempthorne's goals that "stewardship & science will guide decisions" Now another chance to get it right | Plan would raise number of snowmobiles allowed from 250 to 720/day. | | | | Kempthorne should put an end to snowmobiles in YNP Scientific results have been consistent – best alternative is to do away with snowmobiles Over 700,000 public comments – also against snowmobiles |
| Toledo Blade 06-15-07 Editorial: No Yield on Yellowstone | Bush Administration caving to pressure from recreational industry – ignoring public & scientific opinion to act unilaterally to implement snowmobile policies – propensity to say one thing and do another Kempthorne's pledge too good to be true – has been "morphed into a business plan to keep tourist dollars flowing…" Years of public, scientific, & environmental opposition apparently don't count Gov't has spent $10 million to produce nearly 100,000 pgs saying the same thing over & over again | Proposing to "open the gates at YNP to nearly 3-fold increase in snowmobile use" | | | Studies yield same conclusions- snowmobiles erode AQ & adversely affect health of visitors, employees & wildlife. Noise levels unacceptably high Americans do not want "noisy, polluting snowmobiles mucking up cherished national treasures like Yellowstone" | Snowmobiles should be banned |

118424

SAN FRANCISCO CHRONICLE
March 22, 2006

**EDITORIAL**

# GUARDIAN OF THE WEST

INTERIOR secretaries invariably came from the wide-open West, where the federal government is the biggest landlord. But, as recent history has shown, Western origins don't necessarily translate into due respect for public land and our natural resources.

President Bush's pick as interior secretary, Idaho Gov. Dirk Kempthorne, could be an upgrade from Gale Norton, who spent five years gutting outdoors protections, pushing for oil drilling in Alaska and aiding Bush's plans to hack down forests in the name of fire safety. Her tenure is further tarred by high-up staff links to disgraced lobbyist Jack Abramoff.

To his credit, Kempthorne has stood up to Washington on the nuclear waste dispute, expanded his state's small parks budget and drawn praise from Democrats for his knowledge and open manner.

It's hardly the resume of a dig-and-cut industry emissary, though environmental groups are suspicious of his past efforts to weaken the Endangered Species Act and allow roads in wilderness areas, a timber industry special cause. "Gale Norton in pants," scoffed National Resources Defense Council analyst Chuck Clusen.

Running a department that controls almost 20 percent of the U.S. map and 68 percent of the oil and gas reserves will present tough choices. The job juggles public lands preservation with cattle grazing, mining, logging and oil drilling on the rest of this turf.

The Bush White House makes no secret which way it leans in this balancing act. Kempthorne can't be expected to challenge this outlook, but during upcoming nomination hearings he should be asked about how far he is willing to go.

A few topics to consider: Arctic and offshore-oil drilling, wholesale changes to the Endangered Species Act, public land sell-offs, a multibillion-dollar backlog of parks repairs and even snowmobiles screaming through Yellowstone National Park in winter. His answers should give the country an idea where the White House is headed on environmental policy for the balance of Bush's term.

URL: http://sfgate.com/cgi-bin/article.cgi?file=/chronicle/archive/2006/03/22/EDGU9GJFPT1.DTL

118427

WASHINGTON POST
March 24, 2006

# Yellowstone Winter Visits Up Despite Debate

By BECKY BOHRER
The Associated Press

BILLINGS, Mont. -- The number of people touring Yellowstone National Park by snowmobile and snowcoach rose this winter as the snow _ and the debate over regulating the modes of travel _ deepened.

Traffic never approached the daily parkwide limit of 720 snowmobiles, and conservationists say that points to the growing popularity of mass-transit snowcoaches _ an option they call more environmentally friendly than snowmobiles.

The National Park Service is studying what should be allowed on the winter roads of Yellowstone and Grand Teton national parks, as well as the parkway connecting the two. A draft proposal is expected this fall.

Officials are looking at a wide range of options, from an all-out ban on snowmobiles in Yellowstone in favor of snowcoaches _ which run on tracks and can carry several people _ to allowing more snowmobiles, which generally carry one to two.

Public opinion is also varied.

"We have informed consumers, and they're choosing to take the mode of transportation that is not only the most enjoyable to them but also the most protective of park resources," said snowcoach proponent Amy McNamara of the Greater Yellowstone Coalition.

But Kent Swanson, who runs a snowmobile business near Yellowstone, said he believes there's room for both types of machines in the park. He worries about the park becoming "exclusive," leaving out snowmobilers who have their own sleds.

Currently, snowmobiles in Yellowstone must be part of commercially guided trips and meet park standards as being cleaner and quieter than the once-popular two-stroke machines. Temporary rules expected to be in place for one more winter put no restrictions on snowcoaches.

Those rules took effect last winter and were meant to provide business owners and tourists a measure of certainty while the long-term plan was developed. Confusion arising from court battles over winter use shrouded the winter of 2003-04 and, business owners say, kept tourists away.

But this winter, park figures show that 21,932 snowmobiles were in Yellowstone from Dec. 21 to March 12. Last winter, when poor snow conditions also curtailed the season, there were 18,364 snowmobiles.

There were 2,491 snowcoaches in the park this winter, with 20,152 visitors, the figures show. Last season, there were 2,201 snowcoaches and 17,218 riders.

Swanson said the park service couldn't improve much on the current rules, which have made snowmobile excursions more enjoyable and educational.

Yellowstone spokesman Al Nash said visitor statistics would be among the factors planners look at as officials develop the long-term plan. Data collected under the temporary rules would also factor in, he said.

Snowcoach operator Arden Bailey said he considers the current rules workable.

"Personally, I think we ought to offer a range of opportunities in the park."

On the Net:   Yellowstone National Park: http://www.nps.gov/yell/

http://www.washingtonpost.com/wp-dyn/content/article/2006/03/24/AR2006032402072_pf.html

118378



**Mike Yochim**
02/28/2006 01:14 PM
MST

To: Al Nash/YELL/NPS@NPS, John Sacklin/YELL/NPS@NPS, Denice
Swanke/YELL/NPS@NPS, Deborah VanDePolder/YELL/NPS@NPS
cc:
Subject: Fw: NY Times editorial

Michael J. Yochim, Ph.D.
National Park Service
P.O. Box 168
Yellowstone National Park, WY 82190
307-344-2703 (o)
406-848-9137 (fax)
----- Forwarded by Mike Yochim/YELL/NPS on 02/28/2006 01:14 PM -----

**Lee Whittlesey**
02/28/2006 09:19 AM
MST

To: Marlymerr@aol.com
cc: (bcc: Mike Yochim/YELL/NPS)
Subject: Re: NY Times editorial

Marly----Thanks much for sending this. I've forwarded it to relevant folks. Hope we can talk soon.

Lee

Marlymerr@aol.com



**Marlymerr@aol.com**
02/27/2006 11:59 PM
EST

To: lee_whittlesey@nps.gov
cc:
Subject: NY Times editorial

Hi Lee: In case you haven't seen this, here's the NY Time editorial for today (Feb. 27). Marly
    Published: February 27, 2006

"The Interior Department has extended the period in which the public may comment on the National Park Service's
controversial plan to rewrite the management policies for the national parks.
But the extension was unnecessary, just as the rewrite itself is unnecessary. The public has already spoken and so
have its elected representatives. Their central message is that the administration's proposed revisions will serve no
one, least of all the parks, and that the Interior Department would be well advised to abandon the effort.
The main problem with the proposed revisions is that, taken together, they shift the management focus from the park
service's central, historic mission — preserving natural resources for the enjoyment of future generations — to
commercial and recreational use of the park for today's generation. As many members of the House and Senate have
pointed out in letters to Interior Secretary Gale Norton, air quality and wilderness are especially at risk since the
policy appears to invite greater use of snowmobiles and other off-road vehicles.
We hope that Congress can dissuade Ms. Norton and her parks director, Fran Mainella, from proceeding with these
unnecessary changes. But even if it does, it will still have one more battle to fight. And that is to provide the money
the National Park Service needs to operate the parks properly and to repair their deteriorating infrastructure.
President Bush's new budget calls for a $100 million cut in park appropriations. Viewed cynically, deliberately
underfinancing the parks could create the necessary cover for opening the parks to more commercial activity — the
last thing the parks need. It also makes a mockery of one of the few campaign promises George W. Bush ever made
about the environment: his promise in 2000 to end the maintenance backlog in the national parks. The sharpest cuts
— some $84.6 million — would come from money for construction and major maintenance, the very area Mr. Bush
promised to address.
If there is a ray of hope here, it is that the administration is losing the battle where it matters most — on the ground.
Despite efforts to cram snowmobiles down the public's throat, snowmobile use in Yellowstone has dropped this year,

118379

falling well below the 720 machines that are allowed into the park each day. Visitors — including former snowmobilers — are increasingly choosing to use snow coaches, the specially equipped buses that are vastly cleaner than even the cleanest snowmobiles. And Yellowstone is seeing a greater variety of visitors in winter than it used to see when snowmobilers dominated the park.

This battle — as well as the larger battle over the parks' true purpose —isn't likely to end soon. Off-road vehicle groups are doing their best to pressure an already pliable park service leadership in Yellowstone and Washington into increasing access. But if the public and a broad array of its elected representatives — not to mention the men and women who have devoted their careers to the park service — want to see the parks carefully preserved and kept quiet and clean and safe, on whose behalf is the Bush administration really fighting?"

 **Al Nash**
05/30/2006 08:42 AM
MDT

To: YELL Division Chiefs@NPS
cc: Stacy Vallie/YELL/NPS@NPS, Karen McEneaney/YELL/NPS, L J
    Miller/YELL/NPS
Subject: (Asheville Citizen-Times) Opinion: Interior Department turned over to
         corporate puppets

—— Forwarded by Al Nash/YELL/NPS on 05/30/2006 08:40 AM ——

 **David_Barna@nps.gov**
Sent by:
owner-infozone@webma
il.itc.nps.gov

05/28/2006 06:40 PM
AST

To: "INFOZONE " <infozone@webmail.itc.nps.gov>
cc: (bcc: Al Nash/YELL/NPS)
Subject: Interior Department turned over to corporate puppets


Asheville (NC) Citizen-Times
Sunday, May 28, 2006

Interior Department turned over to corporate puppets
by Art Allen

Whenever an administration comes to power that possesses a philosophy
totally at odds with an agency's purpose, mission, and traditions, you can
expect fireworks. Since January 2001, the Interior Department has been
transformed from a department of professionals concerned about the
long-term
preservation and sustained use of our nation's resources to a cadre of
politically-driven corporate puppets whose mission is to turn over
America's
resources to the private business interests and the "wreckreation"
movement.

Across the spectrum of government, we have seen the dramatic effect of this
not-so-subtle transition from good stewardship to destructive policies
affecting the environment. The administration has gutted the Clean Water
Act, has crippled laws that were designed to reduce air pollution, and is
moving rapidly toward dire changes in the Endangered Species Act that
destroy its effectiveness. The administration is pushing current efforts to
open up the wilderness Arctic Refuge to oil interests. Why? You ask? It's
really simple. In all these moves, private business interests benefit; the
public suffers.

In the case of the National Park Service, it was clearly evident that the
parks were under siege shortly after the Bush administration took office.
Appointments were made to positions having responsibility to guard the
people's resources and health with candidates having a belief that private
industry should exploit the nation's resources. This is only another form
of
"trickle-down" economic theory that simply does not work. Economists,
political science majors, lobbyists, and spokespersons from the mining and
oil industry, and organizations supporting privatization were filling
important resource positions in the Department of Interior and the National
Park Service. Formerly, resource-based individuals filled these positions.

Need convincing? Here are some examples:

. NPS sets policy reducing ability to have air pollution controls in

National Parks.

. NPS overrides two decades of scientific study to allow the reintroduction of snowmobiles in Yellowstone National Park.

. NPS proposed policy that would permit advertising in National Parks.

. NPS began outsourcing of public protection jobs (lifeguards) at seashores.

. NPS rewrote policies and directives that once put protection of resources first, so that protection and use would be equal. This paved the way for more "wreckreational'' use by motorized vehicles.

The administration's leadership introduced legislation to sell off 10 national park areas.

As a result of this enormous change in park administration and the obvious threats to the continued welfare of the National Park Service, a new organization was born: The Coalition of National Park Service Retirees.

Numbering over 500 retired park employees, including Directors, Regional Directors, Park Superintendents, and other supervisors, this group has proven to be the watchdogs for responsible park stewardship. The Coalition has created the fireworks. Every time the administration has put forward a foul policy that endangers the cultural or natural resources of the parks, this group has quickly responded through letters to the media, to the legislators, and to the NPS officials. Simply bringing the administration's flawed policies to the public's attention has resulted in substantial victories for protection of our natural and cultural resources.

So there you have it, the gauntlet has been laid down.

Which side are you on?

I have always looked upon the National Parks as the American equivalent to Europe's ancient cathedrals and magnificent castles.

Europeans have always accepted the burden of preserving and protecting their
timeworn icons.

For over 90 years the people who govern have supported the National Parks by
adequate funding and philosophical support. Now the parks are in dire straits; they need your support.

Speak out to your legislators, write letters to the editors, and join conservation groups.

Whatever you do, just remember these are your parks and your resources, let'
s help insure they will still be around for your descendants.

Art Allen served as a park ranger on the Blue Ridge Parkway, a naturalist at
Big Bend National Park and as Supervisory Ranger at Canyonlands National Park. He also worked as a park planner in Washington, D.C. and became Chief Curator for the National Park Service in 1970, a post he held for 12 years. In 1983, Allen became assistant superintendent of Blue Ridge Parkway before retirement in 1990. He lives in Asheville.



**Suzanne Lewis**    To:  John Sacklin/YELL/NPS@NPS    119737
12/09/2005 01:25 PM    cc:
MST    Subject:  WU Information

John;

While on the phone with Paul Hoffman this morning on other park issues he brought up to me discussions he had in Cody over the T-day weekend with Cody folks about their desire , actually he said "need" for a "resident guide" system as part of the new Winter Use decision. I just wanted to give you this FYI as you continue your contact with the state of WY and communities. I am not sure how we would articulate the resident guide concept with our current alternative conceptual structure...but wanted you to have the information.

On related notes: where are we on the adjusted schedule for staying on target for the EIS ? I thought a newsletter was going out in November. I ask that you schedule an appointment with me BEFORE the holidays to discuss your schedule. Having a strategic schedule agreed to by you and I is a priority for me and you, and the reason why things like the Concessioner Winter Meeting and the winter interior trip as well as court dates on snowplanes and trips to ISMA are issues for me.

Suzanne Lewis
Superintendent
Yellowstone National Park

**Winter Use Planning**
**Schedule for EIS and Final Rule – March to November 2007**
Draft of March 28, 2007

113523

| EIS | | | Rulemaking | | |
|---|---|---|---|---|---|
| Open for Winter Season December 19, 2007 | | | | | |
| November 13 | Sign ROD | | November 16 | Publish Final Rule in Federal Register | |
| November 5 – 9 | Brief Congress Staff on ROD | | November 13 | Transmit rule to Federal Register | |
| | | | November 7 | - Final Surnaming of Rule Begins - Travel to Washington for surnaming | |
| | | | November 6 | Final Comments received from OMB | |
| | | | October 22-25 | Meet with OMB in Washington to get discuss comments | |
| October 5 | Publish EPA Notice of Availability of FEIS | | October 1 | Final Rule to OMB | |
| October 1 | Publish NPS Notice of Availability of FEIS | | September 30 | Conditional surnaming final rule for approval to provide to OMB | |
| September 24 | Letters to EPA announcing availability | | | | |
| September 21 | - Clear NPS NOA in Department - Printed Copies of document available - Obtain Control Number | | September 17 – 21 | - Complete Final Rule in Washington - Begin surnaming process | |
| September 17 – 21 | - To WASO to obtain clearances - Brief Congress Staff on FEIS | | September 15 | Receive final economic / reg. flex analysis | |
| September 17 | FEIS to printer | | | | |
| September 10 | NOA to Regional Director for signature | | September 11 | Comment Analysis Report on Rule Making Received | |
| August 24 | FEIS completes Cooperating Agency and OMB and CEQ Reviews | | | | |
| August 22 or 23 | - Cooperating Agency Meeting on FEIS - Meet with OMB on comments | | | | |
| August 6 | Cooperating Agency and OMB and CEQ Reviews begins | | August 1 | Initiate final economic and reg flex analysis | |
| July 25-27 | Brief Congressional Staff on FEIS | | | | |
| July 20 | - Internal Review Complete - Public Comment Analysis Report Received | | | | |
| July 19 – 20 | Internal Review Meeting (Region, Solicitor, Justice) (Washington) | | | | |

**Winter Use Planning**
**Schedule for EIS and Final Rule – March to November 2007**
Draft of March 28, 2007

113524

| July 10-12 | Progress Review with Region / WASO / Department (Washington) | | | |
| July 9 | Internal Review starts | | June 27 | Comment period on Proposed Rule ends |
| June 11 | Modeling Analysis complete | | | |
| June 6 | Comment period closes on DEIS | | | |
| May 17 | Public Open House in West Yellowstone | | | |
| May 16 | Public Open House in Cody | | | |
| May 4 | Cooperating Agency Meeting – Idaho Falls | | | |
| April 13 | - Modeling Analysis initiated<br>- Begin response to comments | | April 27 | Proposed Rule Published in Federal Register |
| April 11 | Regional Director Briefing | | | |
| April 9 | Team meeting on public involvement | | | |
| April 6 | EPA Notice of Availability of DEIS published – begins 60-day comment period | | | |
| April 3 | NPS NOA published | | | |
| March 27 | DEIS released to public | | | |

114773



Suzanne Lewis
01/21/2007 09:17 PM
EST

To: "John Sacklin" <John_Sacklin@nps.gov>
cc:
Subject: Fw: Lynn & EPA & Winter Use

FYI per our conversation
Suzanne Lewis
307 344-2002

    Sue Masica

    **From:** Sue Masica
    **Sent:** 01/21/2007 08:42 PM
    **To:** Suzanne Lewis
    **Subject:** Lynn & EPA & Winter Use


Remind me to tell you, if you haven't already heard, of Lynn Scarlett's intervention with EPA region in Denver to get them to re-write their cooperating agency comments so as not to provide EPA's interpretation of NPS management policies.  She called Mary early one AM (have lost track of which one) to inform her of this.  Mary wanted me to make sure you were aware and I forgot to call and tell you (might have had something to do with the time of day!).

Wish us well with Senator Thomas tomorrow.  Liked your letter to Bob Coe ... Very restrained!

See you soon.  Wanna have dinner Weds PM?  Or do you have more white shirts to shop for?!?!  :)

Sue
------------------------
Sue Masica
(202) 208-3264

113508

<u>Conversation with Suzanne Lewis on April 4, 2007</u>

We initially discussed the schedule and the time constraints that we are working under, especially in light of the fact that our proposed rule is bogged down in the surname process at Interior.

That led to a conversation about going forward with a delay rule. Suzanne thinks that there are two basic options:

1. Be ready to go with a delay rule, but keep it in our back pocket until we really need it. Kind of a last minute thing. Most likely, this would not sit well with a lot of people.

2. Move forward strategically with a delay rule in the fairly near future. One scenario would be to present the delay rule as being necessary due to the time involved in dealing with the voluminous number of comments that we are going to receive. The other would be to use the delay rule in order to postpone making a decision until *after* the bison experiment has been conducted.

Under the first scenario, we would seek only to delay by one season, giving us time to finish our NEPA and rulemaking. Under the second, we would seek a delay for three winter seasons. The first two seasons (2007-2008 and 2008-2009) would be used to actually conduct the experiment, presumably closing the road segment between Mammoth and Madison. Since the researchers would likely need at least 4-6 months to prepare a final report, we would not be able to finish our NEPA and rulemaking in time for the 2009-2010 season; hence a third season of delay.

Lots of issues with this.

- We currently have a DEIS out for public review and comment. This process would continue and we would do our comment analysis. Once that was complete, however, we would likely put the rest of the NEPA process into "suspended animation" and focus on the bison experiment.

- While the process was suspended, it might be possible for GTNP to move forward on our issues alone, essentially using the analysis in the DEIS to serve as the foundation for an EA and FONSI.

- The three-season delay rule may be a tough sell for the Department because it would put off any final decisions until this Administration had left office. It's

113509

possible that some in the Department (but not all) would view this as simply an effort to wait them out and work with what might be considered a more environmentally-friendly Administration.

- The logic to a 3-season delay would be that it makes way more sense to actually do the bison experiment before making a final decision. We would maintain the status quo in terms of park operations (except for the road closure) and would gather two seasons of data. Once that was complete, we could move forward with either an FEIS, or more likely a second DEIS or supplemental DEIS.

  Judge Sullivan might question why we did not do the experiment during the three years of the temporary plan. The reality is that we had to do the Cormack Gates study, workshops, and other things that did not allow sufficient time to design and implement an experiment, especially one that would go for two seasons.

- The Fund for Animals is, arguably, our biggest litigation risk. They would be unlikely to oppose a delay rule if we committed to doing the experiment. Suzanne thinks we might even want to talk to them about this. Questionable whether any of the environmental groups would oppose strongly enough to litigate; Blue Ribbon and Wyoming might just keep their powder dry, too.

- East entrance would remain open, and hopefully we could encourage or facilitate efforts to plow the plug during that time. There would be a lot of grumbling about helicopter-based avalanche control, but nothing we couldn't live with.

- Politically, House Resources may be our biggest problem, more at the member level than with staff. We could probably expect if not support, then at least not outright opposition, on a bipartisan basis on both sides of the Hill, except for some members of House Resources. This would apply equally to legislation as it would to rulemaking.

Also brought up a discussion that began with my suggesting an option that might lead to a sustainable decision. Basically, I suggested that we limit snowmobiles to 325 per day in Yellowstone (all BAT) and allow 105-110 snowcoaches (also all BAT). East Entrance would close. We would allow 50-75 unguided (BAT) snowmobiles. The bison experiment would be conducted. Not stated in our discussion was that the alternative would allow for 30-40 EPA compliant snowmobiles on Jackson Lake, 25 per day on

Grassy Lake Road (originating at Flagg; snowmobiles entering from Targhee do not count against limit; no restrictions on make, model, or year), and closure of CDST.

My thought with this is that it might be viewed as giving both sides something about which they could declare victory, although more likely that snowmobile interests would not be happy about the numbers. Possible that 325 is low enough that the environmental groups would declare victory. Wyoming and Blue Ribbon would probably litigate. Possible that we would only be litigated by one side though, and in one court.

I stated that my view is that at this point it is better to be litigated by only the snowmobile interests. The Department might be convinced to accept our proposal for lower numbers because they desperately need a win on something. Since the vast majority of the public comments will oppose any amount of snowmobile use that is higher than the last few winters, and the media is all over the Administration on this, they might look good to put forward such a plan. Retirees will probably still oppose us, but questionable whether they would litigate; have to remember the Finley factor.

If we are fairly certain that the snowmobile interests are going to file a lawsuit, almost irregardless of what we propose, then we may as well stick with the lower numbers but maintain 100% guided. That might be a hard sell in the Department.

Suzanne thinks that both sides will file lawsuits, irregardless, if only to preserve their options.

We need to run all of this past Mike. Specifically, we need to let him know the issues with the schedule and the implications of not being able to get a rule in place prior to mid-November. Need to talk over with him the delay rule concepts, potential other alternatives (including the one discussed above), our sense of the Department and their level of engagement

114900

# MEMORANDUM OF UNDERSTANDING

### Between the National Park Service
### and
### U.S. Forest Service; Environmental Protection Agency; State of Idaho; State of Montana; State of Wyoming; Fremont County, Idaho; Gallatin County, Montana; Park County, Montana; Park County, Wyoming; and Teton County, Wyoming

## I. CONTEXT

Winter use in Yellowstone and Grand Teton National Parks and the John D. Rockefeller, Jr., Memorial Parkway is now governed by a temporary plan in effect for three winter seasons (2004-2007). Because this temporary plan is only in effect for three winter seasons, the National Park Service (NPS) is preparing a long-term Winter Use Plan and Environmental Impact Statement (EIS) for these parks. The long-term plan is intended to guide winter use management beginning in December 2007.

Cooperating agency participation is intended to enable effective communication among government entities and provide relevant information to be used in the forthcoming NPS decision.

## II. PURPOSE

As established in the Council on Environmental Quality (CEQ) regulations, 40 C.F.R. Part 1501, Executive Order 13352 on cooperative conservation, and the Department of Interior Departmental Manual on NEPA (516 DM 2.5), Interior bureaus will cooperate with all cooperating agencies that have jurisdiction by law or special expertise to the "fullest extent practicable." As the chair of CEQ emphasizes, "cooperating agency status is a major component of agency stakeholder involvement that neither enlarges nor diminishes authority of any agency involved in the NEPA process" and "determinations about whether to invite, accept, or end cooperating agency status should be made on a case by case basis" (January 30, 2002, memorandum from CEQ).

Accordingly, the purpose of this MOU is to establish the following governmental entities as cooperating agencies in the process of preparing the Winter Use Plan EIS: the states of Idaho, Montana, and Wyoming; the counties of Fremont, Idaho; Gallatin, Montana; and Park and Teton, Wyoming; the Environmental Protection Agency; and the U.S. Forest Service. The cooperating agencies agree and commit to engage as cooperators in the specific ways listed in Section VI "Roles and Assignment of Issues."

As the lead agency, the NPS has sole and ultimate decision-making authority for the Record of Decision (ROD) and for NEPA compliance and preparation of the Winter Use Plan EIS. NPS will fully consider the views of the other parties to this MOU in developing its ROD.

All parties recognize this MOU is to define the working relationships between the parties. It does not infer any contractual relationship, nor assumption of liability for any action of the other parties.

## III. STATEMENT OF MUTUAL UNDERSTANDING OF COOPERATING AGENCY WORK

All parties recognize the purpose of cooperating agency status is to provide the decision-maker with the information necessary to make informed and timely decisions.

All parties recognize NPS is the decision-maker and lead agency and recognize this EIS is not an agreement-seeking or shared decision-making process.

All parties report they want to communicate candidly about the relevant substantive and procedural aspects of the forthcoming EIS work and keep the door open for future problem solving and dialogue.

All parties recognize that governmental decisions by each cooperating agency affect the overall situation in each community and in the region -- across the parks, national forests, communities, counties and states.

All parties recognize a shared interest in routine and regular communication of relevant and timely information.

All parties recognize a shared interest in long-term, more stable and predictable solutions for visitation to the parks in the winter.

All parties acknowledge a mutual interest in minimizing travel and meeting time while maximizing awareness and give and take among NPS and cooperators about when and how to contribute their special expertise.

All parties recognize their mutual needs to hear back from NPS specifically about how their data or special expertise was understood and used, or not used, in the EIS process.

## IV. JURISDICTION & AUTHORITIES

It is understood that each party continues to exercise its respective jurisdictional authorities and that the cooperation extended to other parties to this MOU does not transfer any jurisdictional roles or responsibilities. It is mutually understood by all parties that, for this case, no cooperator has jurisdiction by law (e.g., authority to grant permits for implementing actions). The NPS, as lead agency, is the only agency with jurisdiction by law over management of winter recreational use of the parks.

This MOU is based on and consistent with the authorities provided in the following:
- National Environmental Policy Act of 1969, as amended, 42 U.S.C. § 4321 et seq.
- NPS Organic Act, 16 U.S.C. § 1 et seq.
- General Authorities Act, 16 U.S.C. § 1a-1 et seq.
- The Yellowstone National Park Act, 16 U.S.C. § 21 et seq.
- The Grand Teton National Park Act, 16 U.S.C. § 406d-1 et seq.
- The John D. Rockefeller, Jr. Memorial Parkway Act, PL 92-404

## V.  RELEVANT GUIDANCE FROM COUNCIL ON ENVIRONMENTAL QUALITY AND THE DEPARTMENT OF INTERIOR

The establishment of this MOU is consistent with the following guidance provided by the Council on Environmental Quality:

- Council on Environmental Quality (CEQ) regulations, 40 C.F.R. Part 1501
- Executive Order 13352 on cooperative conservation
- Department of Interior Departmental Manual on NEPA

## VI. RESPECTIVE ROLES AND ASSIGNMENT OF ISSUES

Each cooperator has unique roles in this process related to its own agency's special expertise.

### NPS Lead Agency Roles and Assignment of Issues
The National Park Service will:

1. Prepare the draft and final EIS and be responsible for the quality and content of these documents. The NPS will be solely responsible for selecting the preferred alternative during the EIS process.

2. Exercise sole decision making authority on the Record of Decision.

3. Seek meaningful input from cooperating agencies, non-governmental stakeholder groups, and the general public primarily at key moments in the EIS process, including: during scoping, when issues and alternatives to be addressed in the EIS are identified; during the development of the range of alternatives that will be analyzed; during review of the draft EIS; on environmental baseline conditions, and on particular monitoring assumptions and inputs.

4. Keep all parties -- primarily via telephone, individual visits, and the NPS website -- informed about the timeframes for public scoping, public comments and alternatives under consideration.

5. Hold joint cooperating agency meetings as deemed necessary by the National Park Service and the cooperating agencies as appropriate.

6. Let cooperating agencies know specifically how and where cooperating agency data, information, or input was incorporated into, or considered in, the EIS, and how it may have influenced NPS decisions.

7. Inform the public and decision makers of the potential direct, indirect, and cumulative impacts of the proposed action and a reasonable range of alternatives as well as potential means to mitigate those impacts.

8. In the EIS, identify the cooperating agencies and acknowledge the roles and responsibilities of each cooperating agency and its specific responsibilities in participating as a cooperating agency.

9. Allow the appropriate cooperating agencies to review analysis relevant to the information provided by that cooperating agency, and give meaningful consideration to comments submitted by the involved cooperating agencies on a timely basis.

10. Share substantive public comments pertinent to cooperating agencies' areas of expertise, as requested by the cooperating agencies.

11. Provide cooperators a preliminary draft EIS and allow for a reasonable amount of time for cooperating agency comments.

**EPA Region 8 Roles and Assignment of Issues:**
1. EPA will provide expertise in air quality monitoring and assessment, vehicle emissions, NEPA implementation, and other areas under the expertise of the agency as necessary. EPA will participate in meetings and review of documents on these topics, and on any other topics of interest to the cooperating agencies as resources allow.

2. Nothing in this cooperating agency agreement shall preclude or abridge the obligation of EPA to independently comment on the adequacy of the EIS or the effects upon the environment of the proposed action and its reasonable alternatives pursuant to EPA's obligations under Section 309 of the Clean Air Act.

3. EPA staff will participate in technical team analyses, reviews, and meetings to the maximum extent allowed by agency resource and budgetary constraints, and other program commitments.

**U.S. Forest Service Role and Assignment of Issues:**
1. Represent the six national forests and the ecosystem.
2. Provide the NPS data on winter visitor use trends and displacement collected by the Forests since the last EIS in time to be included in the Draft EIS.
3. Understand there are no, or minimal travel or meeting expectations connected to this process.

**State of Idaho, Montana and Wyoming Roles and Assignment of Issues**
**The states will, at their discretion:**

1. Provide technical assistance and advice in those areas for which the cooperating agency has identified expertise applicable to the winter visitor use plan.
2. Provide information on visitor use trends at public and private sites or areas in the Yellowstone-Teton region.
3. Provide socioeconomic data (including multi-year trends) for the Yellowstone-Teton Region, as well as statewide.
4. Provide technical review of air quality, soundscape, socioeconomic, and wildlife monitoring reports.
5. Provide technical review of draft modeling assumptions and inputs, as well as analysis related to air quality, soundscape, socioeconomics, and wildlife, as appropriate.

**County Role and Assignment of Issues**
1. Provide local political perspectives to give the NPS team the broadest possible context for the NEPA work.
2. Provide context regarding "mutual dependencies" between gateway communities and the parks especially related to infrastructure and services.
3. Provide county level socioeconomic data, as possible and practical.

**VII. EFFECTIVE DATES AND TERMINATION**

This MOU will be effective from the date of the last signature and will continue until the Record of Decision is signed.

NPS may exercise its right to end the participation of any cooperating agency if NPS deems the situation warrants such action. *(e.g., see Memorandum for Heads of Federal Agencies, "Cooperating Agencies in Implementing the Procedural Requirements of the National Environmental Policy Act" with Attachment 1: "Factors for Determining Whether to Invite, Decline, or End Cooperating Agency Status," January 30, 2002)*

Any party may terminate their participation in this MOU when that party provides thirty (30) days written notice of such termination to the other parties.

## VIII. AMENDMENTS AND UNDERSTANDINGS ABOUT CONFLICT RESOLUTION

Any party to this MOU may identify a need for an amendment to the MOU and/or a need to schedule further communications with the respective parties at any time. The MOU may be modified by mutual written consent of all parties at any time.

If an issue arises that cannot be resolved at the primary contact level identified later in this MOU, a neutral facilitator will be available to convene the parties to seek voluntary resolution. If no mutually acceptable resolution can be found, the superintendents of the Yellowstone and Grand Teton National Parks will decide the issue and inform the primary contacts and the cooperating agency heads (Governors, Commission Chairs, Regional Foresters, and EPA Region 8 Administrator) of their resolution.

## IX. PRIMARY CONTACTS FOR THIS MOU
**State Representatives**
Idaho: Carl Wilgus, Commerce and Labor
Montana: Pat Flowers, Montana Fish Wildlife and Parks
Wyoming: Temple Stevenson, Office of the Governor

**County Representatives**
Fremont County, Idaho: Tamra Cikaitoga, Parks and Recreation Department
Gallatin County, Montana: Bill Murdock, County Commissioner
Park County, Montana: Larry Lahren, County Commissioner
Park County, Wyoming: Tim French, County Commissioner
Teton County, Wyoming: Larry Jorgenson, County Commissioner

**Federal Agencies**
U.S. Forest Service: Becki Heath, Gallatin Forest Supervisor
U.S. Environmental Protection Agency: Phil Strobel, NEPA Review Coordinator
National Park Service: John Sacklin, Yellowstone National Park Superintendent's Office

## X. STANDARD CONDITIONS:

      A. **AUTHORITIES.** Nothing in this MOU shall be construed to extend the jurisdiction or decision-making authority of any party to this MOU beyond that which exists

under current laws and regulations. Nothing in this MOU shall be construed as limiting or affecting the authority or legal responsibility of any party, or as binding any party to perform beyond the respective authority of each, or to require any party to assume or expend any specific sum of money. The provisions of this MOU are subject to the laws and regulations of the states of Idaho, Montana, and Wyoming; the laws of the United States; and the regulations of the Department of the Interior, as they may be applicable. Nothing in this MOU shall be construed as affecting the decision-making requirements of any party or impairing the independent judgment of each party regarding policy decisions.

**B.**    **LEGAL RIGHTS AND REMEDIES.** Nothing in this MOU shall be construed to alter the legal rights and remedies that each party would otherwise have. No party waives any legal rights or defenses by entering into this MOU or participating in the process contemplated hereby.

**C.**    **SOVEREIGN IMMUNITY.** The States of Idaho, Montana and Wyoming, political subdivisions, and the agencies of the federal government do not waive their sovereign immunity by entering into this MOU, and each fully retains all immunities and defenses provided by law with respect to any action based on or occurring as a result of this MOU.

**D.**    **SEVERABILITY.** Should any portion of this MOU be judicially determined to be illegal or unenforceable, the remainder of the MOU shall continue in full force and effect, and any party may renegotiate the terms affected by the severance.

**E.**    **THIRD PARTY BENEFICIARY RIGHTS.** The parties do not intend to create in any other individual or entity the status of third party beneficiary, and this MOU shall not be construed so as to create such status. The rights, duties and obligations contained in this MOU shall operate only among the parties to this MOU, and shall inure solely to the benefit of the parties to this MOU. The provisions of this MOU are intended only to assist the parties in determining and performing their obligations under this MOU.

**F.**    **NON-FUND OBLIGATION DOCUMENT.** This MOU is neither a fiscal nor a funds obligation document. Any endeavor or transfer of anything of value involving reimbursement or contribution of funds between the parties to this instrument will be handled in accordance with applicable laws, regulations, and procedures including those for Government procurement and printing. Such endeavors will be outlined in separate agreements that shall be made in writing by representatives of the parties and shall be independently authorized by appropriate rules, policies, and statutory authority. This MOU does not provide such authority. Specifically, this MOU does not establish authority for noncompetitive award to the cooperator of any contract or other agreement. Nothing herein constitutes a binding commitment to fund any of the proceedings encompassed by the MOU. Any specific cost sharing or funding shall be executed separately through other funding mechanisms, as deemed necessary and appropriate by each of the signatories.

**G.**    **PARTICIPATION IN SIMILAR ACTIVITIES WITH OTHER ENTITIES.** This MOU in no way restricts any of the parties from participating in similar activities with other public or private agencies, organizations, and individuals.

## XI. APPROVALS

_____          _____
For the U.S. Environmental Protection Agency          Date


_____          _____
For the U.S. Forest Service          Date


_____          _____
For the State of Idaho          Date


_____          _____
For the State of Montana          Date


_____          _____
For the State of Wyoming          Date


_____          _____
For Fremont County, Idaho          Date


_____          _____
For Gallatin County, Montana          Date


_____          _____
For Park County, Montana          Date


_____          _____
For Park County, Wyoming          Date


_____          _____
For Teton County, Wyoming          Date


_____          _____
For Yellowstone National Park          Date


_____          _____
For Grand Teton National Park and the          Date
John D. Rockefeller, Jr., Memorial Parkway



**U.S. Department of Justice**

Environment and Natural Resources Division

90-1-4-12005

*Natural Resources Section*
*P.O. Box 663*
*Washington, DC  20044-0663*

*Telephone (202) 305-0492*
*Facsimile (202) 305-0274*

April 8, 2007

*Via E-mail*

Douglas L. Honnold
Sean M. Helle
EarthJustice
209 South Willson Avenue
Bozeman, MT 59715

Robert D. Rosenbaum
Meetu Kaul
Arnold & Porter LLP
555 Twelfth Street, NW
Washington, DC 20004

Re:    Greater Yellowstone Coalition v. Kempthorne, 07-cv-2111 (EGS)
       National Parks Conservation Ass'n v. U.S. Dept of the Interior, 07-cv-2112
(EGS)

Dear Counselors:

    As indicated in the Certification of the Index for the Administrative Record filed with the Court on April 4 in the above-captioned cases, the Administrative Record does not include certain documents because they are deliberative material and/or privileged documents reflecting agency deliberations.  Such documents, which reflect internal, pre-decisional agency deliberations on legal or policy matters, were excluded from the administrative record.

    The majority of the deliberative materials are communications between officials at the National Park Service, Department of the Interior, and officials at the Office of Management and Budget, and other Executive Branch officials regarding NPS's winter use plan for Yellowstone National Park, Grand Teton National Park, and the John D. Rockefeller, Jr. Memorial Parkway ("the Parks").  Among these documents are internal briefings, draft documents, and comments regarding NPS's proposed rule for winter use of the Parks, the record of decision, and the final rule, which issued on December 13, 2007.

    Please do not hesitate to contact me at (202) 305-0492 if you have any questions.

Sincerely,

/s/ *Luther L. Hajek*

Luther L. Hajek
Trial Attorney
Department of Justice
Environment and Natural Resources Division

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                                      )
GREATER YELLOWSTONE                 )
COALITION, et al.,                              )
                                                      )
                     Plaintiffs,                   )
                                                      )        Case No. 07-cv-2111 (EGS)
          v.                                          )
                                                      )
DIRK KEMPTHORNE, et al.,              )
                                                      )
                     Defendants.                 )
_____)

_____
                                                      )
NATIONAL PARKS CONSERVATION   )
ASSOCIATION,                                   )
                                                      )
                     Plaintiff,                     )
                                                      )        Case No. 07-cv-2112 (EGS)
          v.                                          )
                                                      )
UNITED STATES DEPARTMENT OF THE  )
INTERIOR and the NATIONAL PARK SERVICE, )
                                                      )
                     Defendants.                 )
_____)


**[PROPOSED] ORDER**

      Having considered the Defendants' March 25, 2008 combined motion to transfer and

Plaintiffs' oppositions thereto, it is hereby ORDERED that the motion is DENIED.

      SO ORDERED.


                                        _____
                                        EMMET G. SULLIVAN
                                        United States District Judge

Dated:  April __, 2008