IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

———————————————————— )
GREATER YELLOWSTONE COALITION,          )
et al.,                                 )
                                        )
                    Plaintiffs,         )
                                        )     Case No. 07-cv-2111 (EGS)
          v.                            )
                                        )     [Hearing on Motions for Summary
DIRK KEMPTHORNE, et al.,                )     Judgment on August 27, 2008]
                                        )
                    Defendants.         )
———————————————————— )


———————————————————— )
NATIONAL PARKS CONSERVATION             )
ASSOCIATION,                            )
                                        )
                    Plaintiff,          )
                                        )     Case No. 07-cv-2112 (EGS)
          v.                            )
                                        )     [Hearing on Motions for Summary
UNITED STATES DEPARTMENT OF THE         )     Judgment on August 27, 2008]
INTERIOR; NATIONAL PARK SERVICE         )
                                        )
                    Defendants.         )
———————————————————— )


**FEDERAL DEFENDANTS' REPLY BRIEF IN SUPPORT OF**
**MOTION TO TRANSFER CASE NO. 07-CV-2111 (EGS)**

I.    **INTRODUCTION**

Federal Defendants hereby submit this memorandum in reply to the Greater Yellowstone

Coalition, The Wilderness Society, the Natural Resources Defense Council, the Winter

Wildlands Alliance, and the Sierra Club (collectively "GYC") memorandum in opposition to the

Federal Defendants' March 25, 2008 Motion to Transfer.

As explained in the opening brief, previous winter use litigation before this Court and the

U.S. District Court for the District of Wyoming ("Wyoming Court") produced conflicting orders

and ultimately led this Court to order Federal Defendants to show cause why they should not be

held in contempt of court.  The current set of winter use cases presents an even greater risk of

inconsistent judgments because, unlike the previous litigation, the current cases challenge

exactly the same federal documents and decisions on the same administrative record.  Therefore,

both the interests of judicial economy and the orderly administration of justice strongly favor

consolidating the four winter use cases – which are currently pending before this Court and the

Wyoming Court – in a single district so that they may be heard and decided by a single court.

Moreover, while Federal Defendants have not expressed a preference for either district,

and have instead appealed to the collective wisdom of both courts through their contingent

motions to transfer, Defendants nonetheless demonstrated in their opening brief that a transfer of

the above-captioned cases to the Wyoming District is merited because the cases will most

acutely impact the residents of Wyoming and adjacent states.

In its response, GYC does not dispute that judicial economy would be served by a

consolidation of the cases in a single district, nor does GYC advance any serious arguments in

response to the Defendants' concern with the risk of inconsistent judgments.  GYC instead

advances two main arguments in opposition to Federal Defendants' transfer motion.  First, GYC

argues that, under the "first-filed" principle, Defendants "should have first sought transfer of the two cases pending in the District of Wyoming to this Court . . . ." GYC Opp. at 22. This argument fails, however, because it was the Wyoming Court, and not this Court, that first received a valid challenge to a discrete and final agency action, *viz.*, the 2007 Final Rule. Thus, in fashioning relief to address the need to consolidate all four winter use cases, this Court should not be swayed by GYC's assertions that it reached the Court first.

Second, GYC urges that several public and private interests would be served by having this Court adjudicate the above-captioned cases. This argument also lacks merit. While Defendants recognize this Court's interest in ensuring compliance with its Orders, GYC fails to show that the Wyoming Court is incapable of enforcing the bedrock administrative law principles articulated in those orders. Similarly, GYC's assertion that the winter use litigation is of "national character" does not explain why the litigation must be held in this District, when it could be equally addressed in a District where the events giving rise to the claims before this Court occurred, and where the citizens most likely to be affected reside.

At bottom, GYC's opposition offers no serious rebuttal to Defendants' arguments that the interest of justice weighs heavily in favor of transferring the above-captioned cases to the Wyoming Court, and GYC does not even attempt to show that it would be inconvenienced by such a transfer. As the Defendants have shown, the remaining factors that this Court must consider in deciding the transfer motion are either neutral or weigh in favor of the Defendants. Accordingly, Federal Defendants' motion to transfer the above captioned cases should be granted.

## II.  ARGUMENT

### A.  GYC's Attempts To Play Down The Likelihood of Inconsistent Judgements Are Unpersuasive

In its opposition, GYC makes the rather remarkable assertion that the likelihood of conflicting orders between this Court and the Wyoming court is "overstated."  Specifically, GYC argues that the possibility of inconsistent judgments is mitigated because the plaintiffs in both districts are pursuing "distinct claims."  This contention lacks merit.  Their fundamental motivations and requested remedies may differ, but the plaintiff groups in both districts have challenged exactly the same federal documents and decision under the same federal statutes, and in cases that will rely on the same administrative record.  Accordingly, the claims are identical. See Black's Law Dictionary 264 (8th ed. 2004) (defining "claim" as "[t]he aggregate of operative facts giving rise to a right enforceable by a court").

GYC also posits that the two courts might be able to tailor any eventual remedies so as to avoid the issuance of conflicting orders.  However, GYC's sanguine attempt to reassure the Court that it may avoid conflicting orders by "tailoring" its remedy is not credible, especially where, as here, the relief GYC seeks in this Court is diametrically opposed to the relief sought in the Wyoming Court.  The Wyoming Plaintiffs allege that the 2007 EIS, ROD, and Final Rule violate the APA, Yellowstone National Park Act, and Park Service Organic Act by reducing the ceiling for daily snowmobile entries into Yellowstone National Park from 720 to 540.  See Ex. K, ¶ 2(e)-(f).[1]  Those plaintiffs request that the Wyoming Court set aside and vacate the portions

---

[1]     Citations to "Ex. ___" refer to exhibits to the Declaration of Guillermo A. Montero, filed concurrently with Federal Defendants' March 25, 2008 Motion to Transfer (Dkt. # 25-2). Citations to "Supp. Ex. ___" refer to exhibits to the Supplemental Declaration of Guillermo A. Montero, filed concurrently herewith.  Citations to "GYC Ex. ___" refer to exhibits to the Declaration of Sean M. Helle (Dkt. # 32-3).

of the challenged documents that impose the daily limit of 540 on snowmobile use, <u>see id.</u> at 2,
¶2, and will presumably seek an order barring the Service's implementation of that daily limit.
Indeed, the International Snowmobile Manufacturer's Association, Inc. ("ISMA"), which has
been granted intervention in the Wyoming cases, specifically seeks an order "that the previous
720-snowmobile limit remain in effect until such time" as a new rule can be promulgated.  <u>See</u>
Ex. M ¶19(c).  In sharp contrast, GYC alleges that the Service's authorization of up to 540
snowmobiles per day is an "expansion" of recreational snowmobiling which violates the above-
referenced statutes.  <u>See</u> Ex. H, ¶¶ 41, 44.  Consistent with that allegation, GYC seeks an order
enjoining implementation of the ROD and Final Rule, <u>id.</u> at 23, ¶2, which would presumably
include an injunction barring snowmobile use or at least reducing it to below the levels
authorized in the ROD and Final Rule.  <u>See</u> <u>Fund for Animals v. Norton</u>, 294 F. Supp.2d 92, 98
(D.D.C. 2003) (illustrating that, in previous winter use litigation, GYC has sought a phase-out of
snowmobile use).  Thus, the likelihood of conflicting orders between this Court and the
Wyoming Court is substantial, not "overstated."

 Finally, GYC asks this Court to ignore the risk of inconsistent judgments based on
speculation that the Wyoming Court would transfer the winter use cases before it to this District,
or that Defendants would prevail in both districts.  <u>See</u> GYC Opp. at 22-23.  These arguments
are specious.  The Court's judgment should be guided by the history of winter use litigation
before both courts in past years, as well as the starkly conflicting relief sought by the Wyoming
and D.C. plaintiffs – not by GYC's speculation.

 Federal Defendants, however, agree with GYC that a transfer of the Wyoming cases to
this Court would eliminate the risk of inconsistent judgments, and fully support that outcome as
evidenced by Defendants' filing of a contingent transfer motion in the Wyoming Court.  <u>See</u>

GYC Opp. at 22 ("The risk of such conflict is mitigated by the prospect that the District of Wyoming may transfer its cases to this district.").  Contrary to GYC's assertions, however, the transfer motion before this Court should not be denied based on mere speculation that the Wyoming Court would grant the contingent motion.  As various courts have recognized, it would create not only a hardship for the Defendants but also a disservice to the public interest in the orderly administration of justice if this litigation were to proceed in both fora.  See Feller v. Block, 802 F.2d 722, 727 (4th Cir. 1986); Washington Metropolitan Area Transit Authority v. Ragonese, 617 F.2d 828, 830 (D.C. Cir. 1980); Hooker v. Burson, 960 F. Supp. 1283, 1292 (M.D. Tenn. 1996).

### B.     GYC's Reliance on The First To File Rule Carries No Weight Here

GYC does not dispute that judicial economy would be served by a consolidation of the winter use cases in a single district and, as discussed immediately above, does not offer any serious rebuttal to Federal Defendants' showing that allowing the cases to proceed in two districts presents the risk of conflicting judgments.  Rather, GYC opposes the transfer on grounds that the cases should be consolidated in *this* Court because GYC's November 20, 2007 complaint affords its case "first-filed" status.  This argument is severely flawed.  GYC's case is not entitled to precedence as a first-filed action because the November 20, 2007 complaint was filed prematurely, before the final agency action affecting winter use in the Parks – the 2007 Final Rule – had occurred.  As such, GYC's claims as they stood on November 20, 2007 were barred by the United States' sovereign immunity.

The Administrative Procedure Act ("APA") waives sovereign immunity and grants a private right of action to plaintiffs "suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute. . ."  5 U.S.C.

§702.  In cases such as this one, however, where "review is sought not pursuant to specific authorization in the substantive statute, but only under the general review provisions of the APA, the 'agency action' in question must be '<u>final</u> agency action.'"  <u>Lujan v. Nat'l Wildlife Fed'n</u>, 497 U.S. 871, 882 (1990) (<u>emphasis added</u>); 5 U.S.C. § 704.  The requirement that an agency action be final before it may be challenged is an express condition of the United States sovereign immunity and, therefore, is deemed jurisdictional in nature.  <u>United States v. Mottaz</u>, 476 U.S. 834, 841 (1986) ("When the United States consents to be sued, the terms of its waiver of sovereign immunity define the extent of the court's jurisdiction"); <u>DRG Funding Corp. v. Sec'y of Housing & Urban Dev.</u>, 76 F.3d 1212 (D.C.Cir.1996) ("[t]he requirement of a final agency action has been considered jurisdictional. If the agency action is not final, the court therefore cannot reach the merits of the dispute.") (internal citations omitted).

This requirement is fatal to the Plaintiffs' November 20, 2007 complaint because the complaint challenged only the 2007 Environmental Impact Statement ("2007 EIS") and Record of Decision ("2007 ROD"), neither of which constitutes a final agency action within the meaning of APA § 704.

> As a general matter, two conditions must be satisfied for agency action to be 'final': First, the action must mark the 'consummation' of the agency's decisionmaking process – it must not be of a merely tentative or interlocutory nature.  And second, the action must be one by which 'rights or obligations have been determined,' or from which 'legal consequences will flow[.]'

<u>Bennett v. Spear</u>, 520 U.S. 154, 177-178 (1997) (internal citations omitted); <u>see also</u> <u>Nat'l Ass'n of Homebuilders v. Norton</u>, 298 F. Supp.2d 68, 79 (D.D.C. 2003).  As is clear from the face of the 2007 ROD, the EIS and ROD neither marked the consummation of the Service's decision-making process nor established rights, obligations, or other legal consequences.  They were instead a procedural prerequisite to the December 13, 2007 Final Rule, and it is that Final

Rule that for the first time implemented the elements of the Service's decision at issue in this

case.  See Ex. T at 4 ("This Record of Decision is not the final agency action for those elements

of the plans that require promulgation of regulations to be effective.").[2]  Accordingly, GYC's

November 20, 2007 complaint – on which GYC relies to establish its "first-filed" status – was

barred by the United States' sovereign immunity.

Defendants do not seek dismissal of the action on finality grounds because this defect

was subsequently cured by GYC's amended and supplemental complaint, which was filed on

January 11, 2008.  By that time, however, the State of Wyoming had already filed its petition for

review.  See Ex. C, Dkt. #1 (indicating that the State of Wyoming filed its petition for review in

Case No. 07-cv-319-CAB on December 13, 2007).  Accordingly, it is the Wyoming case, and not

the instant case, that takes precedence here.  See e.g., Associated Gas Distributors v. F.E.R.C.,

738 F.2d 1388 (D.C. Cir. 1984) (refusing to give precedence to a prematurely filed suit for

purposes of transfer analysis); Public Service Co. of N.M. v. FERC, 716 F.2d 778, 780 (10th Cir.

1983) (same).  Consistent with the arguments in GYC's own briefs, therefore, this Court should

transfer the above-captioned cases to the Wyoming Court.  See GYC Opp. at 21 (arguing that

"when related cases are pending in separate fora, the cases should generally be consolidated in

that Court in which the first of the cases was filed").

### C.    This Court's Interest In Ensuring Compliance With Its Orders Will Be Fully Served Regardless of the Forum

Contrary to GYC's assertions, Federal Defendants do not ignore this Court's interest in

ensuring compliance with its own Orders.  As GYC notes in its opposition, this Court's

---

[2]     This is not to say that non-final agency actions such as the 2007 EIS and ROD can never be judicially reviewed.  The APA provides that such "preliminary, procedural, or intermediate agency action," while "not directly reviewable" under the APA, is nonetheless "subject to review on the review of the final agency action."  5 U.S.C. § 704.

December 16, 2003 Order vacated the 2003 Final Rule on grounds that the Park Service had failed to explain adequately its reversal of an earlier rule which had contemplated an eventual phase-out of snowmobile use in Yellowstone Park (hereinafter the "2001 Phase-Out Rule").  See GYC Opp. at 13-14.  In the present case, GYC in effect argues that only this Court is suited to adjudicate its new claims because they once again challenge the Park Services' alleged "failure to explain its departure from the . . . prior determination that all recreational snowmobiling must be eliminated."  GYC Opp. at 14.  GYC is mistaken for several reasons.

First, contrary to GYC's insinuation, this is not an action to enforce an order in earlier litigation; this is a new lawsuit seeking judicial review of a new agency action.  Second, the federal court in Wyoming is fully competent to enforce the bedrock administrative law principles that underlie this Court's earlier orders.  Federal agencies are afforded wide latitude to change their policies through rulemaking, subject only to the requirement that they "provide[] a reasoned analysis for doing so."  See DIRECTV, Inc. v. F.C.C., 110 F.3d 816, 826 (D.C. Cir. 1997).  When an agency is challenged on grounds of an unexplained departure from a prior position, courts in this Circuit examine"whether the decision was based on a consideration of the relevant factors and whether there has been a clear error in judgment."  Id.; see also Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 42 (1983) ("[T]he direction in which an agency chooses to move does not alter the standard of judicial review established by law.").  Similarly in the Tenth Circuit, courts reviewing an agency's departure from a prior position require that the agency clearly articulate the basis for its change in addition to providing a rational connection between the facts before the agency and the rule-making choice made.  See Humana of Aurora, Inc. v. Heckler, 753 F.2d 1579, 1582 (10th Cir. 1985).

By moving to transfer this case to the Wyoming Court – an Article III court of concurrent jurisdiction – Defendants ensure that this standard of review, which is black letter administrative law, will be competently applied.  See In re Korean Air Lines Disaster of Sept. 1, 1983, 829 F.2d 1171, 1175 (D.C. Cir. 1987) (In cases where federal claims are transferred from one district to another, the D.C. Circuit adheres to "the principle that the transferee federal court is competent to decide federal issues correctly"); cf. Hawksbill Sea Turtle v. Federal Emergency Management Agency, 939 F. Supp. 1, 5 (D.D.C. 1996) ("When federal judges take their oath of office they swear to impartially administer justice and uphold the Constitution of the United States. In difficult cases like this one, that oath is particularly compelling, and no evidence has been presented to establish that it will not be carried out in the finest tradition of the federal bench."). The Wyoming Court is thus presumed capable of ensuring that the Park Service will be required to explain its departure from the positions represented in the 2001 Phase-Out Rule, and GYC has presented no evidence to rebut this presumption.  Accordingly, this Court's interest in ensuring that its Order be enforced would in no way be jeopardized by the requested transfer.

**D.    The Winter Use Cases Should Be Resolved Within View of the Citizens Who Will Be Most Affected By Their Outcome**

As Federal Defendants explained in their opening brief, the interests of justice are promoted when a controversy is resolved in the region where its impacts will be felt the most. See Mot. at 15.  Here, those impacts are felt most in Wyoming and Montana.  While Defendants do not deny that a generalized interest in the recreational use, conservation, and management of the national parks is shared equally by the citizens of all fifty states, the livelihoods and local businesses potentially affected by the winter use cases lie in those two states.  Accordingly, the citizens of that region have a uniquely compelling interest in having the winter use cases resolved within "their view and reach rather than in remote parts of the country where they can

learn of it by report only." Gulf Oil Corp. v. Gilbert, 330 U.S. 501, 509 (1947). The more

generalized concerns that residents of the District of Columbia share with the rest of the Nation

simply do not outweigh the more compelling local interests that would be served by transferring

the above-captioned cases to the Wyoming Court. See Nat'l Wildlife Fed'n v. Harvey, 437 F.

Supp.2d 42, 47 (D.D.C. 2006) (plaintiffs' failure to provide evidence of impacts to the District of

Columbia "other than the District's broad concern for endangered species" merited transfer in

light of "the impact of the case on Florida's local interests") (emphasis added).

      GYC arguments to the contrary simply miss the mark. The fact that public comments on

the EIS and Final Rule were submitted from throughout the United States merely confirms that

there is a nation-wide interest in the recreational use, conservation and management of the

national park system – a fact which Defendants do not dispute. A closer examination of the

comment report, however, confirms the uniquely compelling nature of the State of Wyoming's

interests in the winter use litigation. As GYC points out, 3,497 of the 122,190 comment letters

received on the draft EIS (or 2.9%), originated in Wyoming. GYC Opp. at 17; GYC Ex. H at 5.

While GYC's characterizes this figure as a "tiny fraction," it is in fact an impressive sum

considering that Wyoming residents make less than 0.2% of the United States' total population.

See Supp. Ex. AA (U.S. Census Bureau Report estimating 2006 population at 515,004 in

Wyoming and 299,398,484 in the entire United States). By contrast, only 214 of the 122,190

comment letters on the EIS originated in the District of Columbia, despite a significantly larger

population. See GYC Ex. H at 5 (indicating that D.C. residents submitted only 214 comment

letters on the draft EIS); Supp. Ex. BB (U.S. Census Bureau Report estimating 2006 population

at 581,530 in the District of Columbia). Thus, insofar as the public comment reports reflect the

relative interests of the two districts, those reports weigh heavily in favor of a transfer to the

Wyoming Court.

GYC's asserted concern with the gateway communities in Montana, see GYC Opp. at 18,

also weighs in favor of having the winter use cases decided in Wyoming.  While no single

district encompasses both states, it cannot be disputed that the District of Wyoming is more

convenient than the District of Columbia for those citizens of Montana who wish to view the

proceedings.  See Hawksbill Sea Turtle, 939 F. Supp. at 3 n.5 ("The Court . . . notes the

importance of allowing local citizens to attend and observe the proceedings of this case.  That

would obviously be impossible (or at least prohibitively expensive) if a trial were held in the

District of Columbia.").  This Court, though fully capable of fairly considering both local and

national interests, see Fund for Animals v. Norton, 352 F. Supp.2d 1, 2 (D.D.C. 2005), is a much

less convenient forum for those with the most compelling right to witness the proceedings – the

citizens of the Wyoming and Montana.

Finally, GYC misplaces its heavy reliance on the broad language contained in the Park

Service Organic Act, the General Authorities Act, and the Yellowstone National Park Act.  See

GYC Opp. at 15-16.  GYC offers selected quotations from those statutes which characterize

Yellowstone and other national parks as resources to be "preserved and managed for the benefit

and inspiration of all the people of the United States."  16 U.S.C. § 1a-1; see also 16 U.S.C. § 21

(dedicating and setting apart Yellowstone "for the benefit and enjoyment of the people").  Those

provisions, of course, confirm the undisputed fact that the Nation as a whole shares a generalized

interest in the recreational use, conservation, and management of the National Park System.

Those provisions, however, lend no support to GYC's argument that its choice of venue should

be prioritized over the District of Wyoming – where the operative facts giving rise to the winter

use cases took place and where the impacts of the litigation will be felt the most.

Indeed, this very argument has been rejected time and again by this District in the context

of the Endangered Species Act.  Similar to the statutory provisions quoted above and in GYC's

opposition brief, see Opp. at 15-16, Congress has declared that endangered species have unique

value to the Nation as a whole.  16 U.S.C. § 1531(a) ("[V]arious species of fish, wildlife, and

plants . . . are of esthetic, ecological, educational, historical, recreational, and scientific value to

the Nation and its people) (emphasis added).  It clearly does not follow, however, that the

District of Columbia should hear every case involving an endangered species.  Despite

Congress' characterization of endangered species as "national" resources, this District has

recognized the importance of allowing ESA claims to be heard in the districts most affected by

their outcome.  See Hawksbill Sea Turtle, 939 F.Supp. at 3 n.5 (recognizing "the importance of

allowing local citizens to attend and observe the proceedings" of a case involving an endangered

sea turtle); see also Harvey, 437 F. Supp.2d at 47 (rejecting claim that case had "national

significance" merely because its outcome could affect the fate of the endangered snail kite

species); Sierra Club v. Flowers, 276 F. Supp.2d 62, 68 (D.D.C. 2003) ("[T]he plaintiffs' choice

of forum does not warrant deference simply because the plaintiffs bring an ESA claim involving

the nationally known Everglades ecosystem.").  Similarly here, this Court should recognize the

compelling interests served by allowing the winter use litigation to be decided in the District of

Wyoming.

**E.    There is no "Substantial Nexus" Here That Requires Special Deference to NPCA's Choice of Venue**

While it is true that the Court "must afford <u>some</u> deference to the plaintiff's choice of forum," <u>Trout Unlimited v. U.S. Dep't of Agriculture</u>, 944 F. Supp. 13, 17 (D.D.C. 1995), the degree of deference owed to GYC is very small under the circumstances.  As an initial matter, GYC overstates the significance that should be attributed to NPCA's and The Wilderness Society's residence in the District of Columbia.  <u>See</u> GYC Opp. at 19-20.  As this District has previously held, "the fact that the parties . . . have offices in the District of Columbia is not dispositive of the question of deference."  <u>Sierra Club v. Flowers</u>, 276 F. Supp.2d 62, 67 (D.D.C. 2003); <u>see also</u> <u>Kafack v. Primerica Life Ins. Co.</u>, 934 F. Supp. 3, 7 (D.D.C. 1996) ("Cases decided under Section 1404(a) . . . have laid much less emphasis on this residence factor") (citations and internal quotations omitted).  Much more significant in this context is the fact that the specific offices within the two organizations that are devoted to advocating against snowmobile use in Yellowstone National Park are located in Montana.  <u>See</u> Exs. U, V (indicating that NPCA's campaign to phase out snowmobile use is run out of the Yellowstone Field Office in Montana, and not its headquarters in the District of Columbia); Ex. W and Supp. Ex. CC (establishing the Northern Rockies Regional Office, located in Montana, as point of contact for The Wilderness Society's campaign against snowmobile use).

GYC's choice of venue is also rendered less significant because, contrary to GYC's assertions, a "substantial nexus" between the District of Columbia and the winter use plans is not created simply by the supervisory involvement of officials residing in the District.  <u>Cf.</u> <u>Envtl. Def. v. U.S. Dep't of Transp.</u>, Civil Action No. 06-2176 (GK), 2007 WL 1490478 at *7 (D.D.C. May 18, 2007) ("The fact that the actual decisions themselves occurred within the confines of the District of Columbia is not sufficient to overcome the roots of [] this case in Maryland.").

While GYC's Exhibits J through N show the exercise of supervisory authority by officials in this District, they do not belie the facts here: the decision adopting the winter use plans challenged in the above-captioned cases was signed on November 20, 2007 by Yellowstone National Park Superintendent Suzanne Lewis and Intermountain (Denver) Regional Director Michael D. Snyder, see Ex. T at 1; the environmental impact statement on which that decision was based was prepared locally and primarily by Park staff, requiring the investment of countless hours over the course of three years; the vast majority (45 out of 50) of the cooperating agency meetings or telephone calls that formed part of the NEPA process occurred in Wyoming, Montana, and Idaho, see Supp. Ex. DD at 392; and of the four public meetings held during the comment period on the draft EIS, one occurred in Wyoming, one in West Yellowstone, Montana, one in Colorado, and one in Minnesota. Id. at 393. None of the meetings occurred in or near the District of Columbia. See Envtl. Def. v. U.S. Dep't of Transp., 2007 WL 1490478, at *7 (rejecting plaintiffs' reliance on fact that federal decisions and approvals relating to a Maryland highway project were made in the District of Columbia, and instead giving weight to, inter alia, where the "object of the decisions and approvals" was located, and where the community meetings on the draft EIS were held).

Given these facts, GYC's observation that the 2007 Final Rule was signed by the Assistant Secretary for Fish and Wildlife and Parks, see GYC Opp. at 20, does not constitute substantial involvement in the decision-making process. Indeed, to find a "substantial nexus" with the District of Columbia on this basis would prove too much because it is standard practice at the Department of the Interior for all regulations to be signed by Assistant Secretaries in Washington, D.C. See Supp. Ex. EE at 3 (excerpt from Department of the Interior Manual requiring that rulemaking documents be signed by a Secretarial Officer).

Finally, as discussed above, the Park lands at issue lie primarily in the District of
Wyoming, and decisions concerning their management will be felt most acutely by the citizens
of that State and adjacent states.  Thus, what nexus may exist between this District and the
winter use plans is outweighed by the winter use plans' much more substantial nexus with the
District of Wyoming.  See Harvey, 437 F. Supp.2d at 46 ("In the present action, the nexus
between Plaintiffs' choice of forum, the District of Columbia, and the facts of the controversy, is
attenuated compared to the Southern District of Florida's connection with the case.") (emphasis
added).  Therefore, GYC's choice of venue is entitled to little deference, if any, and cannot
outweigh the substantial public interests that would be served by transferring this case to the
District of Wyoming.

> **F.     No Showing With Respect to Convenience is Necessary Where, As Here, The
> Interest of Justice Weighs Heavily In Favor of Transfer**

In its opposition, GYC characterizes the Federal Defendants' arguments as "offer[ing]
little" in support of their transfer motion, and "dwelling instead on the inefficiency and risk of
inconsistent judgments that would arise" if the four cases currently challenging the same agency
actions are allowed to proceed in different districts.  GYC Opp. at 12.  Presumably, the concern
underlying GYC's comment is that the Defendants did not assert, in addition to the above
arguments, that Wyoming would prove a more convenient forum.  See GYC Opp. at 12 n.5.
This is immaterial.

While this Court is required to consider both "public" and "private" interests when
deciding motions to transfer, see Mot. at 10-11, there is no authority supporting GYC's apparent
belief that the lack of a showing with respect to private interests (which reflect considerations of
convenience) requires denial of a transfer motion.  Rather, "it is well established that the interest
of justice is a factor to be considered on its own and an important one, and that the interest of

justice may be decisive in ruling on a transfer motion." 15 Charles A. Wright, et al., Federal

Practice and Procedure § 3859 at 439 (2d ed. 1986). "Indeed, a number of federal courts have

considered this factor decisive – outweighing the other statutory factors – in ruling on a change

of venue motion even though the convenience of the parties and witnesses pointed in a different

direction." 15 Charles A. Wright, Arthur R. Miller & E. Cooper, Federal Practice and Procedure

§ 3854 at 291 (3d Ed.2007) (emphasis added). In this case, Federal Defendants have shown that

the interest of justice weighs heavily in favor of a transfer of the above-captioned cases to the

Wyoming Court. GYC has made no effort to show that it would be prejudiced by that transfer,

nor could it in light of each of the plaintiff organizations' close ties to the immediate vicinity of

the Parks. Defendants have therefore carried their burden, and are entitled to the requested

relief. See Nw. Forest Resource Council v. Babbitt, No. 93-1579 JHG, 1994 WL 908586, *2-3

(D.D.C. April 13, 1994) (granting transfer based primarily on interest of justice factors and

without significant analysis of the parties' respective conveniences).

## III.    CONCLUSION

For the foregoing reasons, Federal Defendants respectfully request that the above-

captioned cases be transferred to the District of Wyoming so that they may be consolidated with

the ongoing winter use litigation in that district.

Respectfully submitted this 16th day of April, 2008.

RONALD J. TENPAS
Assistant Attorney General

 /s/ Guillermo A. Montero
GUILLERMO A. MONTERO
BARRY A. WEINER
LUTHER L. HAJEK
United States Department of Justice
Environment and Natural Resources Division
Post Office Box 663

- 16 -

Washington, D.C. 20044-0663
Telephone: (202) 305-0469 / Fax: (202) 305-0274
Email: Barry.Weiner@usdoj.gov
       Luke.Hajek@usdoj.gov
       Guillermo.Montero@usdoj.gov

OF COUNSEL:                  Attorneys for the Defendants

JASON WAANDERS
U.S. Department of the Interior
Office of the Solicitor
Division of Parks and Wildlife
1849 C St., N.W., MS-3230
Washington, D.C.  20240
Tel: (202) 208-7957

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

---

| | | |
|---|---|---|
| GREATER YELLOWSTONE COALITION, et al., | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Case No. 07-cv-2111 (EGS) |
| DIRK KEMPTHORNE, et al., | ) ) | [Hearing on Motions for Summary Judgment on August 27, 2008] |
| Defendants. | ) ) ) | |

---

| | | |
|---|---|---|
| NATIONAL PARKS CONSERVATION ASSOCIATION, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No. 07-cv-2112 (EGS) |
| UNITED STATES DEPARTMENT OF THE INTERIOR; NATIONAL PARK SERVICE | ) ) ) | [Hearing on Motions for Summary Judgment on August 27, 2008] |
| Defendants. | ) ) ) | |

---

**SUPPLEMENTAL DECLARATION OF GUILLERMO A. MONTERO
IN SUPPORT OF FEDERAL DEFENDANTS' MOTION TO TRANSFER
CASE NO. 07-CV-2111 (EGS)**

I, Guillermo A. Montero, declare as follows pursuant to 28 U.S.C. §1746:

1.      I am an attorney in good standing of the bar of Massachusetts, and I am employed as a trial attorney with the United States Department of Justice, Environment and Natural Resources Division, Natural Resources Section.  I am one of the attorneys of record assigned to represent the Federal Defendants in this action.  I have personal knowledge of the facts stated herein and, if called upon to testify, I would testify that the facts set forth below are true and correct.

2.      Attached as **Exhibit AA** is a true and correct copy of the portion of the U.S. Census Bureau website which provides population estimates for the State of Wyoming as of 2006.

3.      Attached as **Exhibit BB** is a true and correct copy of the portion of the U.S. Census Bureau web page which provides population estimates for the District of Columbia as of 2006.

4.      Attached as **Exhibit CC** is a true and correct copy of the portion of The Wilderness Society's ("Society") web page which identifies the Society's Northern Rockies Regional Office as point of contact for the Society's campaign against snowmobile use.

5.      Attached as **Exhibit DD** is a true and correct excerpted copy of the Winter Use Plans Final Environmental Impact Statement.

6.      Attached as **Exhibit EE** is a true and correct excerpted copy of the Department Manual for the U.S. Department of the Interior.


Executed this 16th day of April, 2008 in Washington, D.C.


                              /s/ Guillermo A. Montero
                             Guillermo A. Montero

- 1 -

**U.S. Census Bureau**

State & County QuickFacts

# Wyoming

| People QuickFacts | Wyoming | USA |
|---|---:|---:|
| Population, 2006 estimate | 515,004 | 299,398,484 |
| Population, percent change, April 1, 2000 to July 1, 2006 | 4.3% | 6.4% |
| Population, 2000 | 493,782 | 281,421,906 |
| Persons under 5 years old, percent, 2006 | 6.5% | 6.8% |
| Persons under 18 years old, percent, 2006 | 23.6% | 24.6% |
| Persons 65 years old and over, percent, 2006 | 12.2% | 12.4% |
| Female persons, percent, 2006 | 49.3% | 50.7% |
| White persons, percent, 2006 (a) | 94.5% | 80.1% |
| Black persons, percent, 2006 (a) | 0.9% | 12.8% |
| American Indian and Alaska Native persons, percent, 2006 (a) | 2.5% | 1.0% |
| Asian persons, percent, 2006 (a) | 0.7% | 4.4% |
| Native Hawaiian and Other Pacific Islander, percent, 2006 (a) | 0.1% | 0.2% |
| Persons reporting two or more races, percent, 2006 | 1.4% | 1.6% |
| Persons of Hispanic or Latino origin, percent, 2006 (b) | 6.9% | 14.8% |
| White persons not Hispanic, percent, 2006 | 88.1% | 66.4% |
| Living in same house in 1995 and 2000, pct 5 yrs old & over | 51.3% | 54.1% |
| Foreign born persons, percent, 2000 | 2.3% | 11.1% |
| Language other than English spoken at home, pct age 5+, 2000 | 6.4% | 17.9% |
| High school graduates, percent of persons age 25+, 2000 | 87.9% | 80.4% |
| Bachelor's degree or higher, pct of persons age 25+, 2000 | 21.9% | 24.4% |
| Persons with a disability, age 5+, 2000 | 77,143 | 49,746,248 |
| Mean travel time to work (minutes), workers age 16+, 2000 | 17.8 | 25.5 |
| Housing units, 2006 | 239,178 | 126,316,181 |
| Homeownership rate, 2000 | 70.0% | 66.2% |
| Housing units in multi-unit structures, percent, 2000 | 15.2% | 26.4% |
| Median value of owner-occupied housing units, 2000 | $96,600 | $119,600 |
| Households, 2000 | 193,608 | 105,480,101 |
| Persons per household, 2000 | 2.48 | 2.59 |
| Median household income, 2004 | $43,785 | $44,334 |
| Per capita money income, 1999 | $19,134 | $21,587 |
| Persons below poverty, percent, 2004 | 10.3% | 12.7% |

| Business QuickFacts | Wyoming | USA |
|---|---:|---:|
| Private nonfarm establishments, 2005 | 19,736[1] | 7,499,702 |
| Private nonfarm employment, 2005 | 191,934[1] | 116,317,003 |
| Private nonfarm employment, percent change 2000-2005 | 9.9%[1] | 2.0% |

EXHIBIT AA

| | | |
|---|---:|---:|
| Nonemployer establishments, 2005 | 41,861 | 20,392,068 |
| Total number of firms, 2002 | 53,103 | 22,974,655 |
| Black-owned firms, percent, 2002 | 0.3% | 5.2% |
| American Indian and Alaska Native owned firms, percent, 2002 | 1.1% | 0.9% |
| Asian-owned firms, percent, 2002 | 0.8% | 4.8% |
| Native Hawaiian and Other Pacific Islander owned firms, percent, 2002 | 0.0% | 0.1% |
| Hispanic-owned firms, percent, 2002 | 2.5% | 6.8% |
| Women-owned firms, percent, 2002 | 24.4% | 28.2% |
| Manufacturers shipments, 2002 ($1000) | 4,061,516 | 3,916,136,712 |
| Wholesale trade sales, 2002 ($1000) | 3,331,043 | 4,634,755,112 |
| Retail sales, 2002 ($1000) | 5,783,756 | 3,056,421,997 |
| Retail sales per capita, 2002 | $11,586 | $10,615 |
| Accommodation and foodservices sales, 2002 ($1000) | 984,684 | 449,498,718 |
| Building permits, 2006 | 3,537 | 1,838,903 |
| Federal spending, 2004 ($1000) | 4,393,308[1] | 2,143,781,727[2] |

| Geography QuickFacts | Wyoming | USA |
|---|---:|---:|
| Land area, 2000 (square miles) | 97,100.40 | 3,537,438.44 |
| Persons per square mile, 2000 | 5.1 | 79.6 |
| FIPS Code | 56 | |

1: Includes data not distributed by county.
2: Includes data not distributed by state.

(a) Includes persons reporting only one race.
(b) Hispanics may be of any race, so also are included in applicable race categories.

D: Suppressed to avoid disclosure of confidential information
F: Fewer than 100 firms
FN: Footnote on this item for this area in place of data
NA: Not available
S: Suppressed; does not meet publication standards
X: Not applicable
Z: Value greater than zero but less than half unit of measure shown

Source U.S. Census Bureau: State and County QuickFacts. Data derived from Population Estimates, Census of Population and Housing, Small Area Income and Poverty Estimates, State and County Housing Unit Estimates, County Business Patterns, Nonemployer Statistics, Economic Census, Survey of Business Owners, Building Permits, Consolidated Federal Funds Report
Last Revised: Wednesday, 02-Jan-2008 15:10:26 EST

EXHIBIT AA

**U.S. Census Bureau**

State & County QuickFacts

# District of Columbia

| People QuickFacts | District of Columbia | USA |
|---|---|---|
| Population, 2006 estimate | 581,530 | 299,398,484 |
| Population, percent change, April 1, 2000 to July 1, 2006 | 1.7% | 6.4% |
| Population, 2000 | 572,059 | 281,421,906 |
| Persons under 5 years old, percent, 2006 | 6.0% | 6.8% |
| Persons under 18 years old, percent, 2006 | 19.8% | 24.6% |
| Persons 65 years old and over, percent, 2006 | 12.3% | 12.4% |
| Female persons, percent, 2006 | 53.1% | 50.7% |
| White persons, percent, 2006 (a) | 38.4% | 80.1% |
| Black persons, percent, 2006 (a) | 56.5% | 12.8% |
| American Indian and Alaska Native persons, percent, 2006 (a) | 0.4% | 1.0% |
| Asian persons, percent, 2006 (a) | 3.2% | 4.4% |
| Native Hawaiian and Other Pacific Islander, percent, 2006 (a) | 0.1% | 0.2% |
| Persons reporting two or more races, percent, 2006 | 1.4% | 1.6% |
| Persons of Hispanic or Latino origin, percent, 2006 (b) | 8.2% | 14.8% |
| White persons not Hispanic, percent, 2006 | 31.7% | 66.4% |
| Living in same house in 1995 and 2000, pct 5 yrs old & over | 49.9% | 54.1% |
| Foreign born persons, percent, 2000 | 12.9% | 11.1% |
| Language other than English spoken at home, pct age 5+, 2000 | 16.8% | 17.9% |
| High school graduates, percent of persons age 25+, 2000 | 77.8% | 80.4% |
| Bachelor's degree or higher, pct of persons age 25+, 2000 | 39.1% | 24.4% |
| Persons with a disability, age 5+, 2000 | 115,980 | 49,746,248 |
| Mean travel time to work (minutes), workers age 16+, 2000 | 29.7 | 25.5 |
| Housing units, 2006 | 282,894 | 126,316,181 |
| Homeownership rate, 2000 | 40.8% | 66.2% |
| Housing units in multi-unit structures, percent, 2000 | 60.2% | 26.4% |
| Median value of owner-occupied housing units, 2000 | $157,200 | $119,600 |
| Households, 2000 | 248,338 | 105,480,101 |
| Persons per household, 2000 | 2.16 | 2.59 |
| Median household income, 2004 | $46,211 | $44,334 |
| Per capita money income, 1999 | $28,659 | $21,587 |
| Persons below poverty, percent, 2004 | 18.3% | 12.7% |

| Business QuickFacts | District of Columbia | USA |
|---|---|---|
| Private nonfarm establishments, 2005 | 20,481 | 7,499,702 |
| Private nonfarm employment, 2005 | 439,610 | 116,317,003 |
| Private nonfarm employment, percent change 2000-2005 | 5.9% | 2.0% |
| Nonemployer establishments, 2005 | 39,470 | 20,392,068 |

EXHIBIT BB

| | | |
|---|---|---|
| Total number of firms, 2002 | 47,172 | 22,974,655 |
| Black-owned firms, percent, 2002 | 25.9% | 5.2% |
| American Indian and Alaska Native owned firms, percent, 2002 | 0.5% | 0.9% |
| Asian-owned firms, percent, 2002 | 5.1% | 4.8% |
| Native Hawaiian and Other Pacific Islander owned firms, percent, 2002 | S | 0.1% |
| Hispanic-owned firms, percent, 2002 | 4.6% | 6.8% |
| Women-owned firms, percent, 2002 | 33.2% | 28.2% |
| Manufacturers shipments, 2002 ($1000) | 246,237 | 3,916,136,712 |
| Wholesale trade sales, 2002 ($1000) | 2,971,507 | 4,634,755,112 |
| Retail sales, 2002 ($1000) | 3,061,401 | 3,056,421,997 |
| Retail sales per capita, 2002 | $5,422 | $10,615 |
| Accommodation and foodservices sales, 2002 ($1000) | 2,943,078 | 449,498,718 |
| Building permits, 2006 | 2,105 | 1,838,903 |
| Federal spending, 2004 ($1000) | 37,629,655 | 2,143,781,727[1] |

| Geography QuickFacts | District of Columbia | USA |
|---|---|---|
| Land area, 2000 (square miles) | 61.40 | 3,537,438.44 |
| Persons per square mile, 2000 | 9,378.0 | 79.6 |
| FIPS Code | 11 | |

1: Includes data not distributed by state.


(a) Includes persons reporting only one race.
(b) Hispanics may be of any race, so also are included in applicable race categories.

D: Suppressed to avoid disclosure of confidential information
F: Fewer than 100 firms
FN: Footnote on this item for this area in place of data
NA: Not available
S: Suppressed; does not meet publication standards
X: Not applicable
Z: Value greater than zero but less than half unit of measure shown


Source U.S. Census Bureau: State and County QuickFacts. Data derived from Population Estimates, Census of Population and Housing, Small Area Income and Poverty Estimates, State and County Housing Unit Estimates, County Business Patterns, Nonemployer Statistics, Economic Census, Survey of Business Owners, Building Permits, Consolidated Federal Funds Report
Last Revised: Wednesday, 02-Jan-2008 15:10:22 EST

EXHIBIT BB




Search [GO]

About Us | Join and Donate | News Room | Library | Our Issues | Where We Work | Ta

## Where We Wo

- ▶ **Wyoming Home**
- ▶ **Snowmobiles in Yellowstone**
- ▶ **Upper Green River**
- ▶ **Yellowstone to Yukon**
- ▶ **Bridger-Teton/Wyoming Range**
- ▶ **Wyoming Wilderness**
- ▶ **Red Desert**

............................................

Subscribe to WildAlerts

Enter email address [GO]

............................................

Support Our Work



............................................

# Snowmobile Damage in Yellowstone & Grand Teton Will Continue

 Email Page         Print Page

Yellowstone National Park in summer is a masterwork. Yellowstone in winter is a miracle. Snow drapes lodgepole pines and capes bison as they forage in the vapor from thermal pools. That familiar Yellowstone image is a winter photographic staple. But it is giving way to another: rangers, also barely visible but obscured in snowmobile exhaust, not water vapor, and wearing gas masks as they tend entrance stations. And bison are as apt to be seen fleeing from snowmobiles as going about their serious winter business of husbanding the energy to make it to spring. That is America's greatest national park today.

**"... a national treasure"**
*"Americans have a national treasure in the Yellowstone Park and they should guard it jealously. Nature has made her wildest patterns here, has brought the boiling waters from her greatest depths to the peaks which bear eternal snow, and set her masterpiece with pools like jewels."*
- Frederick Remington, after visiting Yellowstone in 1893

The National Park Service tells us snowmobiles cause problems in Yellowstone: blue haze lingers over Old Faithful; Park Service rangers don respirators, but only to breathe; bison and other wildlife flee snowmobiles. Unfortunately, and despite the indictment, snowmobile use will continue in both Yellowstone and Grand Teton National Parks this winter.

**A Full Complement of Species**
For 130 years, we have protected Yellowstone National Park, first in what is now a whole system of natural spectacles that has been called the "best idea America ever had." We've protected its geysers, its magnificent views and its natural

**Latest News [**S
- Conservationist
year roadless for
anniversary

**Facts & Publica**
- Priority BLM La
& Alaska [pdf]

**Take Action [**Sh
- Keep Oil and G
America's Specia

EXHIBIT CC

sounds. And we've protected its wildlife: Yellowstone is the only place in the lower 48 states where all the native animals present before European settlement still survive. Wolves, bison, bears, elk, bald eagles and other important species thrive alongside remarkable geothermal features, majestic mountains, pure lakes and rivers.

Yellowstone has about 250 active geysers and 10,000 thermal features within its 2.2 million acres. It is a global one-of-a-kind. Throughout its history, though, it has confronted threats. The Congress has intervened to protect Yellowstone from plans to dam the Yellowstone River and to build a railroad through the park. The Wilderness Society will ask it to intervene again to combat the latest threat to this greatest of American National Parks: recreational snowmobile use. It is a threat that continues, and seems likely to grow, despite a decade of scientific study that documents damage from snowmobiles.

### Banning Science, Not Snowmobiles

The National Park Service in 2000 approved a phaseout of snowmobile use that would have reduced the numbers in the winter of 2002-2003 by half and eliminated the machines entirely by the winter of 2003-2004. But park rangers will be reaching for their gas masks yet again this winter, for the Bush Administration has proposed a plan that could actually increase snowmobile use in our first national park.

The snowmobile count for this winter is expected to be around 65,000, as usual, because of pressure the snowmobile industry applied on the Administration. In the latest development, the Administration has agreed to settle an industry lawsuit against the phaseout with a draft plan that will allow snowmachines to continue indefinitely in both Yellowstone and Grand Teton National Parks. Worse, it could actually increase their numbers. The public can expect to see the final plan in early 2003.

Before it unveiled its new snowmobile management proposal in November 2002, the National Park Service studied, once again, areas of particular concern. They included air quality, visibility, soundscapes, health and safety, impacts on wildlife and visitor experience. The study found that in virtually all areas, snowmobile use damages the park. The agency says that visibility will be impaired around Old Faithful, visitors will hear more noise, and "employees and visitors who are susceptible to respiratory problems would likely be affected." Science implicates human health, of both visitors and park employees, in another way: snowmobile use spreads

EXHIBIT CC

poisons, benzene and carbon monoxide among them, through both Yellowstone and Grand Teton National Parks. The list goes on; so will the damage it catalogs.

The Administration's new plan simply dismisses the science that so clearly demonstrates that snowmobiles disrupt wildlife, drown out natural sounds and create tunnels of blue haze that obscures visitors' views of Yellowstone's stark winter beauty.

## Deferring to Snowmobile Industry

In deference to the industry, it will risk not only a matchless national park but the health of its own employees as they staff entrance stations surrounded by idling snow machines, with more stretched out into the distance waiting to get in. The Environmental Protection Agency has told the National Park Service the only way to protect human health, air quality and water quality is to eliminate snowmobile use in Yellowstone and Grand Teton.

The verdict of science clearly supports phasing out snowmobiles in these parks; the public overwhelmingly demands it. With each public comment opportunity on snowmobile management, opposition to snowmobiles has risen. During the last such comment opportunity, over 350,000 Americans responded. Eighty percent supported the phaseout in Yellowstone and Grand Teton.

## Our Efforts

The Wilderness Society and its conservation partners have worked hard to protect Yellowstone and Grand Teton National Parks from damage by snowmobiles. The culmination of that effort was the agency's decision in 2000 to phase out snowmobiles in favor of less damaging snow coaches. The latest study supports the earlier decision: snow coaches are the best way to protect these parks and still afford the greatest number of Americans to enjoy their winter beauty. We continue to educate the public, to encourage public involvement in the issue and to ask the Congress to reinstate the original decision.

## For More Information

- Email The Wilderness Society's Northern Rockies Regional Office
- Greater Yellowstone Coalition
- National Parks Conservation Association
- Natural Trails and Waters Coalition

EXHIBIT CC

The Yellowstone Protection Act

Our Privacy Policy

1615 M St, NW    Washington, DC 20036    1.800.THE.WILD

EXHIBIT CC

WINTER USE PLANS FINAL ENVIRONMENTAL IMPACT STATEMENT
Yellowstone and Grand Teton National Parks and the John D. Rockefeller, Jr. Memorial Parkway

# CHAPTER V: CONSULTATION AND COORDINATION

## 5.1 Introduction

This section describes the consultation and coordination that has occurred leading up to the Notice of Availability for this FEIS.

This chapter, as well as Appendix I (Comment Analysis) and information on the winter use website (See 5.2.3 below) and provided to the Cooperating Agencies and others demonstrates how public and agency participation shaped this process. In summary, the substantive, procedural, and relational effects of agency and public participation are visible:

- in the particular mix of *elements and expectations* contained in the analysis;

- in the sometimes fragile but consistent efforts by all parties to *keep talking and working with one another* even while the litigation and legislative context has a tendency to mirror or reproduce adversarial modes of communication;

- in the commitment of NPS to *adaptive management*, and the agency's willingness to keep explaining what that commitment is as they move ahead with winter use management in the parks.

Winter use in Yellowstone and Grand Teton National Parks and the John D. Rockefeller, Jr. Memorial Parkway has the interest and involvement of all three branches of government (executive, legislative and judicial), the media, citizens, and interest groups.

To be meaningful, effective consultation needs to show how participation affected the NPS proposed decision.

The passage of time will be the surest way to show how participation has affected the decision – seeing what happens on the ground. In the meantime, written and verbal feedback from participants on the participation process itself – gathered during larger meetings and in each periodic participation assessment -- have indicated that the NPS accuracy and honesty regarding the various roles of governmental and non-governmental participants (i.e., not shared decision making) is part of what has, perhaps ironically, made the participation process more meaningful. Whether that appreciation holds even when elements of the decision are not satisfying to participants with a stake in the outcomes remains to be seen.

Table 5-1 indicates some key steps of the planning process. A Public and Agency Participation Plan[1] and the Cooperating Agency Memorandum of Understanding were developed and implemented with involvement from governmental and non-governmental stakeholders.

The NPS sustained its commitment to open information sharing throughout the process toward a winter use management decision that can be publicly understood and supported to the maximum extent possible.

---

[1] Available at http://www.nps.gov/yell/planyourvisit/upload/participationplan10-13-05.pdf.


EXHIBIT DD

WINTER USE PLANS FINAL ENVIRONMENTAL IMPACT STATEMENT
Yellowstone and Grand Teton National Parks and the John D. Rockefeller, Jr. Memorial Parkway

Table 5-1: Overall Planning Process

| Planning Step | Methods | Timeframe |
|---|---|---|
| Pre-scoping assessment | Assistance from the U.S. Institute for Environmental Conflict Resolution to help discern possibilities for agreement-seeking process such as negotiated rulemaking, or a focus on public participation programs geared to informing, consulting or involving. | January-March 2005 |
| Pre-scoping and beginning of scoping | Interviews with 60+ governmental and non-governmental interested parties | May-July 2005 |
| Scoping—gather ideas and concerns, confirm purpose, need, and significance | *Federal Register* notice, PEPC*, newsletter, web site, stakeholder assessments. | June-September, 2005 |
| Finalize Public Participation Plan | Plan conforms to the emphases stakeholders suggested: maximize information sharing, minimize expectations for large group meetings, recognize that other possibilities for engagement could emerge later. | October 2005 |
| Analyze scoping comments, review history and legal proceedings | Planning team research, scoping report. | Fall 2005 |
| Cooperating Agency MOU text concluded and signed | The Memorandum of Understanding (MOU) describes how agencies share information, with tailored roles for each agency. | January 2006 (began in June 2005) |
| Modeling scenarios | Discuss issues with and present scenarios to cooperating agencies and other stakeholders | Fall 2005 |
| Confirm issues, goals and opportunities; develop general alternative concepts | PEPC, newsletter, web site, stakeholder dialog, roving team meetings. Two large open house meetings in Montana and Wyoming. | Winter 2005/2006 |
| Analyze resources, identify impacts | Planning team research, stakeholder dialog. | Spring/Summer 2006 |
| Refine alternatives | Cooperating Agency meeting in Idaho to discuss preliminary alternatives. | April 2006 |
| Cooperating Agency review of preliminary and Draft EIS | Cooperating agency meetings in Wyoming and Idaho. Meetings open to other stakeholders as well. | December 2006 and May 2007 |
| Public review of Draft EIS; Publish Proposed Rule | *Federal Register* notice, PEPC, newsletter, web site, stakeholder dialog, information fair in Wyoming; public comment meetings | November 2006 through June 2007 |
| Analyze comments, make changes as appropriate, prepare Final EIS | Planning team refined elements of the document with attention to results of agency and public participation – verbal and written comments and ongoing work regarding discrete elements of the analyses. | June 2007 through September 2007 |
| Availability of Final EIS (30-day waiting period) | *Federal Register* notice, PEPC, newsletter, and web site | September-October 2007 |
| Prepare and publish Record of Decision | Planning team, with recommendation by park superintendents and approved by NPS regional director; *Federal Register* notice | October-November 2007 |
| Publish Final Rule | *Federal Register* notice | November 2007 |

* PEPC is the National Park Service's "Planning, Environment, and Public Comment" website, the Internet site at which members of the public offer comments on NPS planning projects.

EXHIBIT DD

WINTER USE PLANS FINAL ENVIRONMENTAL IMPACT STATEMENT
Yellowstone and Grand Teton National Parks and the John D. Rockefeller, Jr. Memorial Parkway

## 5.2 Public and Agency Participation

### 5.2.1 Participation Plan and Assistance

The winter use team turned to the U.S. Institute for Environmental Conflict Resolution's roster of facilitators and mediators for assistance in late April 2005. The NPS then utilized the Rocky Mountain Cooperative Ecosystems Study Unit (RM-CESU) to implement an agreement between itself, the Montana State University Department of Political Science, and Cadence, Inc. This agreement allows for impartial assessment services, meeting facilitation with cooperating agencies and other stakeholders, and continual assistance on the public and agency involvement elements of the EIS and rulemaking processes.

### 5.2.2 NEPA, Rulemaking, and Assessment[2] Context

Over the past few decades, litigation steered many NEPA decisions through long, confrontational, narrowly-defined debates. This has proven to be true at times for winter use in the two parks over the past decade. In some other national and regional cases, litigation sometimes seems to be the only available tool to secure adequate environmental protection and appropriate agency action. Despite its utility, the use of this power has also, at times, led to an unintended consequence of stalled (or slowed) decision outcomes and polarized political climates (Chandler et al. 2000).

This is the sixth NEPA process on winter use in the three parks. The rulemaking process has also been necessary to get a regulation in place to implement prior NEPA decisions.

In light of the long NEPA and litigation history of this issue and the procedural fatigue many of the most involved participants expressed, public and agency involvement was tailored to be responsive and flexible.

What this meant in practice is that continual assessment[3] was needed to keep checking on the fit and effectiveness of winter use participation work. That turned out to be key: to have a flexible participation plan that was responsive to how stakeholders told NPS they wanted to be engaged, but to also stay open to adjusting the participation strategies as indicated by stakeholders as the project progressed.

There were five main participation assessments between winter of 2004-2005 and spring of 2007, ranging from very informal and brief, to more intense and deliberate, as described below. From July 2005 forward, these assessments and brief thematic summaries were prepared by Cadence, broadly shared with the full stakeholder contact list, and then used by NPS to guide next steps for public and agency participation.

### Assessment 1: Winter 2004-2005

The pre-planning process began in winter of 2004-2005 when NPS asked for assistance from the U.S. Institute for Environmental Conflict Resolution, a federal agency created by Congress to assist parties in resolving environmental, natural resource, and public lands conflicts. Yellowstone management and staff asked for assistance to help them make an

---

[2] "Assessment" as currently practiced is not formulaic or standardized, nor should it be. A comprehensive but flexible conceptual framework for assessment work is preferable, one that *asks participants to examine and probe the appropriateness of various tools, techniques, and desired outcomes* (Bean et al. 2007, emphasis added).
[3] Assessment is defined as an impartial analysis that helps prepare the path for a conflict-resolution or agreement-seeking process. This analysis can include a determination that such a process is not timely or appropriate (Bean et al. 2007).


EXHIBIT DD

informed decision about how to proceed toward meaningful public and agency involvement in the forthcoming (this) NEPA process.

The consultation between the U.S. Institute and NPS was a verbal exploration to discern the level of interest in and support for mediation. How might a negotiated rulemaking or mediation be structured? What topics could reasonably be addressed? Are key parties interested, and if so, under what conditions? Under what circumstances would a mediated process and potential result be the best option for stakeholders? What technical resources should be brought to the table and in what manner?

The conclusion at the time was that conditions were not ripe for an agreement-seeking process.

### Assessment 2:  Spring/Summer 2005

In May 2005, approximately one month before the Park Service published the Notice of Intent that launched scoping, the winter use team invited cooperating agencies to work with the facilitation team to jointly negotiate the terms of the Memorandum of Understanding that would guide their involvement during this EIS. The NPS also asked the Cadence team to conduct an informal situation assessment for public and agency participation, this time with both the opportunities and the limits of the NPS participation "promise" firmly in view (promise is a term of art coined by the International Association for Public Participation). For this process, "the NPS promise to governmental and non-governmental stakeholders is to open information sharing. We will actively listen to and acknowledge concerns. We will let you know where timely agency and public input was incorporated in the EIS, and how it did/did not influence NPS decisions."  This promise is located between the "consult" and "involve" vectors of the International Association for Public Participation spectrum.

EXHIBIT DD

WINTER USE PLANS FINAL ENVIRONMENTAL IMPACT STATEMENT
Yellowstone and Grand Teton National Parks and the John D. Rockefeller, Jr. Memorial Parkway

# IAP2 Public Participation Spectrum

Developed by the International Association for Public Participation

## INCREASING LEVEL OF PUBLIC IMPACT

| INFORM | CONSULT | INVOLVE | COLLABORATE | EMPOWER |
|---|---|---|---|---|
| **Public Participation Goal:** | **Public Participation Goal:** | **Public Participation Goal:** | **Public Participation Goal:** | **Public Participation Goal:** |
| To provide the public with balanced and objective information to assist them in understanding the problem, alternatives, opportunities and/or solutions. | To obtain public feedback on analysis, alternatives and/or decisions. | To work directly with the public throughout the process to ensure that public concerns and aspirations are consistently understood and considered. | To partner with the public in each aspect of the decision including the development of alternatives and the identification of the preferred solution. | To place final decision-making in the hands of the public. |
| **Promise to the Public:** | **Promise to the Public:** | **Promise to the Public:** | **Promise to the Public:** | **Promise to the Public:** |
| We will keep you informed. | We will keep you informed, listen to and acknowledge concerns and aspirations, and provide feedback on how public input influenced the decision. | We will work with you to ensure that your concerns and aspirations are directly reflected in the alternatives developed and provide feedback on how public input influenced the decision. | We will look to you for direct advice and innovation in formulating solutions and incorporate your advice and recommendations into the decisions to the maximum extent possible. | We will implement what you decide. |
| **Example Techniques to Consider:** | **Example Techniques to Consider:** | **Example Techniques to Consider:** | **Example Techniques to Consider:** | **Example Techniques to Consider:** |
| • Fact sheets<br>• Web sites<br>• Open houses | • Public comment<br>• Focus groups<br>• Surveys<br>• Public meetings | • Workshops<br>• Deliberate polling | • Citizen Advisory Committees<br>• Consensus-building<br>• Participatory decision-making | • Citizen juries<br>• Ballots<br>• Delegated decisions |

**Figure 5-1:** International Association for Public Participation spectrum **(IAPP 2007).**

In June, the Cadence team made a series of approximately 60 individual and small group phone calls and visits to ask governmental and non-governmental interested parties their view of the situation and how they wanted to be engaged in the new NEPA process. The Cadence team wrote a draft assessment document of the situation's possibilities for participation and how those fit with the promise (which communicates both the limits and opportunities the agency and stakeholders had identified for the process).

The July 2005 assessment document, with a series of unattributed thematic notes about participation, was delivered simultaneously to NPS and all stakeholders (no party pre-reviewed or edited the themes) and then received an accuracy check by the 60 interviewees via electronic mail.

The six main participation themes affirmed from that independent assessment included:



EXHIBIT DD

WINTER USE PLANS FINAL ENVIRONMENTAL IMPACT STATEMENT
Yellowstone and Grand Teton National Parks and the John D. Rockefeller, Jr. Memorial Parkway

- a low level of trust about the process;
- fatigue in the process;
- confusion about how past winter use analyses are connected to current winter use analyses and the current EIS work;
- concern about ongoing or expected litigation that could confound participation efforts;
- uncertainty regarding some of the science and ecology aspects, monitoring results, and their use or disuse by the agency and others; and
- tension over how NPS was hearing and using local/regional/national interests in winter use planning for these parks.

Many of the interested parties themselves acknowledged what the NPS had concluded in the previous winter with assistance from the U.S. Institute for Environmental Conflict Resolution: conditions were not ripe for mediation or shared decision making. That is, the necessary preliminary agreements and organizational structures simply were not present under the circumstances at that time.

NPS embarked on a public and agency outreach and participation effort with the explicit goal of investing in disclosure and exchange of information and rebuilding trust in working relationships for the long term, and to lay possible groundwork so that collaboration, mediation and/or a negotiated settlement might be possible in the future. The related goal was to improve the overall potential for a durable winter use management scheme in the two parks. NPS made this commitment in spite of the continuing litigation context and the confining aspects of that situation that tend to mirror/reproduce, the adversarial relationships onto every aspect of the EIS, and onto the working relationships between and among those with a stake in the outcomes.

## Assessment 3: Winter/Spring 2006

Cadence used email and telephone communication to conduct the least structured of all five assessments immediately following a complaint by interested parties in Wyoming that the open meeting to describe the preliminary scenarios for the EIS was scheduled only for Bozeman, Mont. After checking with a sampling of interested groups and individuals most likely to attend and engage, the NPS scheduled a second and identical open meeting in Jackson, Wyoming for the same week as the Bozeman meeting (March 2006). The Cadence team asked stakeholders their preferences for how to structure the meetings, especially since one of the key themes from the previous summer had been to avoid large group meetings as general principal (primarily because of difficult memories of past large group meetings associated with previous winter use planning). Process evaluations by participants were positive about the chance to talk with NPS staff and each other and learn of the scenarios.

## Assessment 4: Fall 2006

The Cadence team posed the following three questions via email to about 100 governmental and non-governmental interested parties and received responses back from a mix of people (nine governmental cooperators/agencies, seven nongovernmental groups, and two unaffiliated individuals). The questions were intended to help identify the salient themes of opinions about the public participation process held by participants, not to provide a statistical analysis of the predominance of any particular opinions:

- How well did the public and agency engagement methods used in the last year suit your needs?


EXHIBIT DD

WINTER USE PLANS FINAL ENVIRONMENTAL IMPACT STATEMENT
Yellowstone and Grand Teton National Parks and the John D. Rockefeller, Jr. Memorial Parkway

• Do last year's themes from participants (such as process fatigue and steering away from large meetings) still ring true? Are there new themes that ought to be acknowledged and responded to in the participation methods?

• What changes do you believe would improve the public and agency engagement process in the next year when the NPS expects to publish the Draft EIS and conduct the corresponding public comment period?

The resultant themes about winter use participation were:

*NPS Management Policies of great interest* – the Secretary of the Interior's clarification in summer 2006 of the NPS's approach to its dual goals by was perceived by many as directly applicable to the winter use plan. Specifically, the outcome of this Winter Use Planning process was anticipated as a "first example" of the NPS's implementation of this clarified policy.

*Trust and distrust of the NPS* – although some parties expressed a high opinion of the integrity of the NPS, chronic distrust of the agency continued to be a strong theme. There was, however, some acknowledgement that the NPS has handled the process in this past year better than in earlier Winter Use processes. Rebuilding trust was recognized as slow work especially in the midst of a process and expected litigation that could be expected to strain some parties' confidence in the integrity of others.

*Format for public meetings* – whereas most public participation processes are intended to introduce to the public a topic that may be relatively unfamiliar to them, the question of winter use is now generally well understood. The type of information sought by participating stakeholders is, therefore, quite advanced, so that, for example, open house meetings may require more technical personnel to enable participants to get the information that they seek. Much of the interested public has formed well-developed opinions on the outcome that they desire from this process. So there was limited benefit to providing public meetings as a forum for the public airing of perspectives or for debate. Also, there was concern that large meetings can be intimidating for participants who fear being shamed, discredited, or shouted at. There was even a fear of violence expressed. Despite this concern, others accept "venting" at meetings as an unavoidable, necessary part of the process.

*Winter use management by administration or by litigation* – the theme of "Process Fatigue" that was so strong in the summer of 2005 was now more clearly expressed as a perception that the administrative process will probably be followed by a litigated process. Emphasis on public and agency participation within the administrative process provides opportunities for NPS to sustain the relationships that it needs for the adaptive management of the Park. These relationships will inevitably be strained by litigation.

*Format for meetings of cooperating agencies* – some respondents preferred meetings at which all Cooperating Agencies (CAs) meet together with the opportunity to understand each others' interests. Others prefer that one agency at a time meet with NPS. Still others are confined by travel restrictions (small or no travel budgets).

*Availability of data* – there was interest in knowing what the NPS is learning from its studies as soon as it has the information and in hearing how the NPS is interpreting the information. The provision of this information as it becomes available is reassuring, because it indicates the NPS's interest in staying engaged with stakeholder groups. It was noted that the frequent delivery of information as it becomes available has reduced opportunities for newsworthy issues to develop.

*General communication* – there was great interest in knowing about alternatives and what the preferred alternative would be. Several stakeholders noted Congressional delegations need



EXHIBIT DD

WINTER USE PLANS FINAL ENVIRONMENTAL IMPACT STATEMENT
Yellowstone and Grand Teton National Parks and the John D. Rockefeller, Jr. Memorial Parkway

to be encouraged to participate within the agency and public participation process rather than on its periphery or outside of it. Related to this is the realization that as all three branches of government are involved in decision making in three separate, but connected, arenas (administrative, political, and judicial), this often makes it all the more confounding to an individual or group seeking to shape the outcomes of winter use in the parks.

## Assessment 5: Spring 2007

Coinciding with the release of the Draft EIS for formal public comment, the Cadence team made another round of phone calls to about a dozen governmental and non-governmental people, local to national, with a stake in the outcomes of the winter use decision making. They asked for additional thoughts/perspectives on what meeting format(s) could be most useful and helpful, in their view, during the formal public comment period.

The Cadence team distilled three main messages from that set of informal calls and distributed them via email to continue the principal of conducting all work with full transparency:

- During this formal public comment period, go national – (e.g., it is important to be congruent with local and national interest in these National Parks and public meetings should occur locally and in out-of-area places).
- Communicate what is likely to happen next winter season. (e.g., there is much uncertainty, especially in gateway communities, about what is going to happen next winter season, and it is critically important to help people see what is most likely to occur).
- Explain (especially to Cody and Wyoming-based interests) what it would take for NPS to keep Sylvan Pass open to motorized oversnow traffic. (e.g., there was/is much grassroots involvement about the current NPS preferred alternative to close Sylvan Pass to motorized oversnow traffic in the winter. Even those outside the Cody area mentioned how important it will be to help people know how and/or where they can or cannot work with NPS to shape that aspect of the current NPS preferred alternative).

### 5.2.3 Participation Plan Elements

The full text of the Public and Agency Information/Participation Plan, which NPS adopted in late 2005 pursuant to the first assessment, may be found at http://www.nps.gov/yell/planyourvisit/upload/participationplan10-13-05.pdf . The document provides more background, explanation of participation themes, descriptions of these elements, excerpts from the NPS Director's Order #75A on Civic Engagement and Public Involvement, CEQ guidance regarding cooperating agency involvement, and other references.

The main participation strategies of this plan were:

- Documents and noticing in the Federal Register (EIS, Rule, ROD)
- Customized cooperating agency work (one-on-one calls, written communication, meetings, and three full group meetings)
- Roving team meetings (see Table 5-2). These were a valuable tool for sharing information and receiving input to the planning process. Early meetings were held to discuss the history and background of winter use planning and the need for a new planning effort; beginning in November 2005 a range of modeling scenarios were introduced. In April 2006, draft alternatives were presented. In December 2006, a Cooperating Agency Review Draft EIS was presented. Many meeting summaries are available on the winter use planning web site.
- Media communication (news releases, news advisories and interviews)


EXHIBIT DD

WINTER USE PLANS FINAL ENVIRONMENTAL IMPACT STATEMENT
Yellowstone and Grand Teton National Parks and the John D. Rockefeller, Jr. Memorial Parkway

- Outreach to Congressional delegation staff
- Project newsletters sent to full stakeholder contact list via surface mail
- Rounds of phone calls and/or emails to various stakeholders (from NPS and also via the Cadence team as part of their periodic assessments of the participation work)
- Translation task (NPS did ongoing tracking of how the agency used/did not use what stakeholders said)
- Web archive and PEPC updates. The winter use website http://www.nps.gov/yell/planyourvisit/winteruse.htm, has been a project library/archive and a useful tool for disseminating information about the status of the plan to the public throughout the process. The NPS Planning, Environment and Public Comment website at http://parkplanning.nps.gov was used throughout the process to notify stakeholders of meetings and to receive written comments.
- Public meetings. In addition to the three full cooperating agency meetings (which were always open public meetings), NPS convened two large open meetings in the spring of 2006, a December 2006 technical information fair coinciding with the release of the preliminary DEIS for cooperating agency review (November 2006), and four public comment meetings during the formal public comment period in the spring of 2007 in Montana, Wyoming, Minnesota, and Colorado (See Table 5-2).
- Project contact lists. Participants were continually asked whether they would like to be added to the NPS contact list at face to face meetings and the Cadence team built and used an email contact list as the project developed through the initial interviews in the summer of 2005 and by asking, "who else do you think would appreciate being contacted?"
- Invitations to review and comment (technical review by cooperating agencies and stakeholders with relevant expertise) on the following documents:
  o Soundscapes Modeling Plan and Draft Report
  o Soundscapes Monitoring Reports
  o Air Quality Modeling Plan and Draft Report
  o Air Quality Monitoring Reports
  o Wildlife Monitoring Reports
  o Economics Modeling Plan
  o Economic Analysis Memorandum and Draft Modeling Report
  o The research proposal "Evaluating key uncertainties regarding road grooming and bison movements"
  o Operational Risk Management Assessment for Avalanche Hazard Mitigation at Sylvan Pass and Talus Slope



EXHIBIT DD
September 2007

WINTER USE PLANS FINAL ENVIRONMENTAL IMPACT STATEMENT
Yellowstone and Grand Teton National Parks and the John D. Rockefeller, Jr. Memorial Parkway

**Table 5-2: Meetings held during winter planning process**

| Stakeholder | Meeting location | Date |
|---|---|---|
| State of Wyoming | Cheyenne, WY | July 2005 |
| Park County, WY | Cody, WY | September 2005 |
| State of Montana | Helena, MT | September 2005 |
| Park County, MT | Livingston, MT | October 2005 |
| Fremont County, ID | West Yellowstone, MT | November 2005 |
| State of Idaho | Boise, ID | November 2005 |
| EPA | Denver, CO | November 2005 |
| State of Wyoming | Cheyenne, WY | November 2005 |
| Greater Yellowstone Coordinating Committee | Cody, WY | November 2005 |
| Gallatin County, MT | Bozeman, MT | November 2005 |
| Park County, WY; Park County, MT | Telephone | November 2005 |
| State of Wyoming | Telephone | November 2005 |
| NPS and Xanterra Staff | Mammoth, WY | December 2005 |
| Winter Guides & Outfitters | Old Faithful, WY | December 2005 |
| State of Montana: Conservation Interests | Bozeman, MT | December 2005 |
| ISMA, BRP, Yamaha, Polaris, Arctic Cat | Houghton, MI | January 2006 |
| USFS; OMB staff | Telephone | January 2006 |
| BRC and local businesses | West Yellowstone, MT | January 2006 |
| BRC, ACSA and local businesses | Jackson, WY | January 2006 |
| Conservation Interests: Teton County, WY | Jackson, WY | February 2006 |
| Local congressional staff | Telephone | March 2006 |
| Open house | Bozeman, MT | March 2006 |
| Open house | Jackson, WY | March 2006 |
| Cooperating Agencies, GYC, BRC | Idaho Falls, ID | April 2006 |
| New NPS Employees | Gardiner, MT | June 2006 |
| Island Park Area Chamber of Commerce | Island Park, ID | August 2006 |
| Yellowstone Concessioners | Bozeman, MT | October 2006 |
| Eastern Idaho's Yellowstone Teton Territory group | Rexburg, ID | October 2006 |
| Montana State Snowmobile Association | Bozeman, MT | October 2006 |
| Local congressional staff | Telephone | November 2006 |
| NPS Employees, at multiple duty locations | Yellowstone NP | November 2006 |
| Cooperating Agencies, other stakeholders | Cody, WY | December 2006 |
| State of Montana | Helena, MT | December 2006 |
| Winter Guides & Outfitters | Old Faithful, WY | December 2006 |
| Winter Operators | Jackson, WY | December 2006 |
| Winter Operators | West Yellowstone, MT | December 2006 |
| Parks subcommittee, Cody Chamber | Cody, WY | January 2007 |
| State of WY staff, Senators and Representatives, Park County Commissioners | Billings, MT | January 2007 |
| Wyoming Governor Freudenthal and staff | Old Faithful, WY | February 2007 |
| Wyoming Senators and Representatives | Cheyenne, WY | February 2007 |
| State of Wyoming, Governor's staff | Cheyenne, WY | March 2007 |
| Park County, WY Commissioners | Cody, WY | March 2007 |
| "Shut Out of Yellowstone" Forum | Cody, WY | March 2007 |
| Delegation and Local Congressional Staff | Telephone | March 2007 |
| Cooperating Agencies, other stakeholders | Idaho Falls, ID | May 2007 |
| Public Meetings and Guide and Outfitter meetings (6 total) | Jackson; Cody; West Yellowstone (2); St. Paul; Lakewood | May – June 2007 |
| NPS Employees, at multiple duty locations | Yellowstone NP | June 2007 |



EXHIBIT DD

WINTER USE PLANS FINAL ENVIRONMENTAL IMPACT STATEMENT
Yellowstone and Grand Teton National Parks and the John D. Rockefeller, Jr. Memorial Parkway

### 5.2.4 Cooperating Agencies

Table 5-3: List of Cooperating Agency Representatives

| Name | Agency |
|------|--------|
| Tamra Cikaitoga | Fremont County, Idaho |
| Pat Flowers | State of Montana, Department of Fish, Wildlife and Parks |
| Tim French | Park County, Wyoming |
| Becki Heath | Gallatin National Forest |
| Larry Lahren | Park County, Montana |
| Bill Murdock | Gallatin County, Montana |
| Bill Paddleford | Teton County, Wyoming |
| Tom Puchlerz | Gallatin County, Montana |
| Temple Stevenson | State of Wyoming, Office of the Governor |
| Phil Strobel | U.S. EPA Region 8 |
| Mark Toft | State of Wyoming, Office of the Governor |
| Carl Wilgus | State of Idaho, Department of Commerce and Labor |

### 5.2.5 Public Scoping Comments and Public Input on DEIS

The public scoping period for this EIS was June 24 – September 1, 2005. The NPS received 33,365 documents commenting on the scope of the EIS. Of these, about 90% were form letters of various kinds and about 1% contained unique or substantive comments rather than, or in addition to, opinion statements. Comments were received from persons in all U.S. states and territories and from other countries.

Although the public scoping period was intended to garner comments about the scope of this EIS, many people simply expressed their opinions regarding winter use management in the parks. A detailed report of the public scoping comments is available for public review on the NPS website: http://www.nps.gov/yell/parkmgmt/winterusetechnicaldocuments.htm. Chapter V of the FEIS contains a summary of public involvement during this process.

The Draft EIS was on public review from March 27 – June 5, 2007. The NPS received approximately 120,000 documents commenting on the DEIS. A summary of comments and responses is found in Appendix I of the FEIS. Four public meetings were held during the EIS comments period:  Cody, Wyoming; West Yellowstone, Montana; St. Paul, Minnesota; and Lakewood, Colorado. A detailed report is available at the above web site.

# 5.3 List of Preparers and Contributors

Table 5-4: List of preparers

| Name | Title or Role | Agency or Affiliation |
|------|---------------|------------------------|
| **Project management and coordination** | | |
| Gary Pollock | Management Assistant | Grand Teton National Park |
| John Sacklin | Management Assistant | Yellowstone National Park |
| Denice Swanke | Outdoor Recreation Planner | Yellowstone National Park |
| Mike Yochim | Outdoor Recreation Planner | Yellowstone National Park |
| **Technical expertise** | | |
| Shan Burson | Ecologist | Grand Teton National Park |
| Troy Davis | Wildlife Biologist | Yellowstone National Park |



EXHIBIT DD

WINTER USE PLANS FINAL ENVIRONMENTAL IMPACT STATEMENT
Yellowstone and Grand Teton National Parks and the John D. Rockefeller, Jr. Memorial Parkway

| | | |
|---|---|---|
| Laurie Domler | NEPA Specialist | National Park Service |
| Kevin Franken | Planning Assistant | Administrative Record and Support |
| Bruce Peacock | Economist | National Park Service |
| John D. Ray | Atmospheric Chemist | National Park Service |
| Robert Rossman | DEIS Contractor | Rossman Services |
| Barry Roth | Deputy Associate Solicitor | U.S. Department of the Interior |
| Christine Turk | Environmental Quality Coordinator | National Park Service |
| Deborah Van De Polder | Planning Assistant | Administrative Record and Support |
| Jason Waanders | Attorney-Advisor | U.S. Department of the Interior |
| Aaron Worstell | Air Resource Specialist | National Park Service |
| **Consultants** | | |
| Martha Bean | Public Engagement and Facilitation | Cadence, Inc. |
| Nedra Chandler | Public Engagement and Facilitation | Cadence, Inc. |
| Carol Cole | Public Comment Analysis | Northwind Environmental |
| Nicolas Dewar | Public Engagement and Facilitation | Cadence, Inc. |
| John Duffield | Economic Analysis | University of Montana |
| Aaron Hastings | Soundscapes Analysis | DOT, Volpe Center |
| Chris Neher | Economic Analysis | University of Montana |
| James Wu | Air Quality Analysis | Air Resource Specialists |
| **Management Support** | | |
| Jim Bellamy | Deputy Superintendent (retired) | Grand Teton National Park |
| Colin Campbell | Deputy Superintendent | Yellowstone National Park |
| Chris Lehnertz | Deputy Superintendent | Yellowstone National Park |
| Suzanne Lewis | Superintendent | Yellowstone National Park |
| Al Nash | Chief of Public Affairs | Yellowstone National Park |
| Mary Gibson Scott | Superintendent | Grand Teton National Park |
| Michael Snyder | Intermountain Regional Director | National Park Service |
| Bob Vogel | Deputy Superintendent | Grand Teton National Park |
| Franklin Walker | Deputy Superintendent (retired) | Yellowstone National Park |

EXHIBIT DD

**Department of the Interior**

# Departmental Manual

**Effective Date**: 5/14/98

**Series**: Administrative Procedure

**Part 318**: Federal Register Documents

**Chapter 6**: Clearance Procedures

**Originating Office**: Executive Secretariat and Office of Regulatory Affairs

**318 DM 6**

6.1 **What does this chapter do?** This chapter tells you how to get the approvals you need before you can publish your Federal Register document.

6.2 **What approvals must I get before a document is signed?** Except as provided in 6.10, the following reviewers must approve before signature each rulemaking document prepared for signature by a Secretarial Officer:

A. Office of the Solicitor; (We recommend that you begin consulting informally with SOL early in the rulemaking process.)

B. ORA;

C. PPA when economic or benefit-cost analyses are involved; (We recommend that you begin consulting with PPA early in the rulemaking process and reach a general understanding on analytical requirements and approaches.)

D. Bureau Information Collection Clearance Officer; and

E. Other bureaus/offices that have been involved in the planning and development of the document.

6.3 **When must I obtain ORA approval?** You must submit your rule to ORA for approval at the same time as you submit it to other offices external to your bureau for review and surnaming. You must also submit your ROC (see Chapter 3) to PPA at that time.

6.4 **Does ORA have to review all rulemaking documents?** Yes. You must submit all ANPRMs, proposed and final rules, and other policy making documents to ORA.

6.5 **How much time should I allow for ORA review?** We will complete review of each rule within 10 working days of receipt. After you have obtained all necessary surnames and your rule has been signed, you must return the rule and a copy of the surnames you have obtained to ORA, where we will complete our final administrative review within 2 working days.

6.6 **How can I get ORA review in less than 10 working days?** If you need Departmental review in

EXHIBIT EE

less than 10 working days, notify us and explain why you need expedited review (e.g., if there is a statutory or judicial deadline). We will honor your request if workload permits.

6.7 **Should I send the original document to ORA?** No. Send us a copy of your document. If OMB will review the rule, send us the original E.O. 12866 Submission Form (see Illustration 1 to this Chapter). Keep the original rule and internal file copies until the rule is approved for publication.

6.8 **How can I expedite the approval process?** You may ask us for assistance in expediting any part of the approval process after a document leaves your bureau. You may also ask us to obtain external surnames for you. In addition, you may contact PPA on analytical and economic issues in sufficient time to reduce any delays on that score.

6.9 **What additional approval is required if a document affects small businesses?** If the rule will have a significant economic effect on a substantial number of small entities, you must get the approval of the Office of Small and Disadvantaged Business Utilization as well as the offices listed in section 6.3.

6.10 **Are there any exceptions to the requirements of section 6.2?** Yes. The following documents are the only exceptions to the clearance procedures contained in section 6.2:

A. Public Land Orders. Send these documents to the following offices for review:

(1) Field office (including the Field or Regional Solicitor);

(2) Bureau of Land Management review;

(3) BLM Regulatory contact;

(4) Director, BLM;

(5) Other affected bureaus; and

(6) Assistant Secretary - Land and Minerals Management.

B. Environmental Impact Statement (EIS) Notices of Availability. Send these documents for review in accordance with the table below.

| If the decision authority for the EIS is assigned... | the notice must be cleared and signed by... |
|---|---|
| to the bureau | the bureau head. |
| to the program Assistant Secretary | the program Assistant Secretary. |
| above the Assistant Secretary level | the Office of Environmental Policy and Compliance (clearance), the Assistant Secretary - Policy, Management and Budget or his/her designee (signature). |
| to more than one program Assistant Secretary | the Office of Environmental Policy and Compliance (clearance), the Assistant Secretary - Policy, Management and Budget or his/her designee (signature). |

EXHIBIT EE

C. <u>State and Tribal Program Amendments under Titles IV and V of the Surface Mining Control and Reclamation Act of 1977</u>. Actions by the Office of Surface Mining Reclamation and Enforcement to approve, disapprove, or supersede amendments to State and tribal programs under Titles IV and V of the Surface Mining Control and Reclamation Act of 1977 are reviewed in the field by the Office of the Solicitor and then signed by an OSM official prior to publication in the Federal Register.

6.11 **Who signs rules?** A Secretarial Officer (the Secretary, the Deputy Secretary, the Solicitor, and the Assistant Secretaries) signs rulemaking documents under the conditions in their delegation chapters (the 200 Series of the Departmental Manual). In addition, officials in the Office of Surface Mining Reclamation and Enforcement have been delegated authority to sign rules approving, disapproving, or superseding amendments to State and tribal programs under Titles IV and V of the Surface Mining Control and Reclamation Act of 1977.

6.12 **What additional documentation do I need for a significant rule?** For each significant rule (under E.O. 12866), you must send us:

A. A copy of the rule;

B. A description of the need for the rule and an explanation of how the rule fulfills that need;

C. A cost-benefit analysis;

D. An explanation of how the rule is consistent with a statutory mandate; and

E. A statement of how the rule promotes the President's priorities and avoids undue interference with State, local, or tribal governments.

6.13 **What additional material must I send to ORA for an economically significant (under E.O. 12866) rule?** If your rule has an annual effect on the economy of $100 million or more, or adversely affects the economy, the environment, public health or safety, or other levels of government, you must send us:

A. An analysis and quantification of the costs and benefits of both the rule and any reasonably feasible alternatives to the rule; and

B. An explanation of why the alternative you selected is preferable to other alternatives.

6.14 **What other information must I submit when a rule affects a substantial number of small entities?** When a rule has a significant economic impact on a substantial number of small entities, you must send us a copy of any initial or final regulatory flexibility analysis as well as a description of steps taken to minimize that impact. See Appendix 3 to Chapter 3.

6.15 **Can I get extra time to work on my small entity flexibility analysis?**

A. The Secretary may delay or waive publication of the initial regulatory flexibility analysis. He/she may delay, but not waive, the final regulatory flexibility analysis. To do this, he/she must publish a notice in the Federal Register.

(1) The notice must state that the rule is being published to respond to an emergency that makes timely completion of a small entity flexibility analysis impractical.

EXHIBIT EE

(2) The finding must be published no later than the final rule and must include the reasons for the finding.

(3) The finding may be subject to judicial review under §611 of the Regulatory Flexibility Act.

B. If you delay preparing an analysis under paragraph A, you must publish a final regulatory flexibility analysis within 180 days of publishing the final rule. If you do not, the rule will lapse and have no effect. In this case, you cannot republish the rule until you publish a final small entity flexibility analysis.

C. See guidance in Appendix 3 to Chapter 3.

6.16 **Do I need a memorandum for reviewers?** No. The preamble and the rule should be self-explanatory.

6.17 **When will a press release accompany a rule?** Your bureau public affairs office should coordinate with the Office of Communications on whether a press release is necessary. If a press release is prepared, you must circulate it with the rule, and you must send the Office of Communications a file copy of the rule.

6.18 **What must I include when I send a rule to the Office of Management and Budget for review?** You must complete an OMB Form 83-R and attach it to your rule. An ORA official must sign the OMB Form in addition to the Program Official and Authorized Regulatory Contact. Send OMB three copies of the same material that you send us under sections 6.12-6.14. However, if your rule is economically significant as defined by E.O. 12866 section 3(f)(1) or imposes an "unfunded mandate" as defined by 2 U.S.C. 1532, you must send four copies of the rule and supporting material.

6.19 **How long will OMB take to review a rule?** If OMB must review your rule, OMB has the following time frames to complete the review under E.O. 12866:

| For a ... | OMB may take no longer than... |
|---|---|
| notice of intent, advance notice of proposed rulemaking, or other preliminary action | 10 working days |
| regulatory action that OMB has not previously reviewed | 90 calendar days |
| regulatory action that OMB has previously reviewed and that you have not changed materially | 45 calendar days |

6.20 **Will OMB expedite review of a rule in an emergency?** You must schedule development of each rule to allow enough time for OMB review. If, due to unforeseen circumstances, you need OMB approval before the deadlines in section 6.19, call your bureau regulatory contact as soon as possible.

6.21 **How does OMB approval of collections of information under the Paperwork Reduction Act affect approval of a rule?** OMB must approve each proposed rule containing a collection of information. An OMB form 83-I and supporting statement must be completed and submitted to OMB when the NPRM is published. The 83-I and supporting statement must be approved by the Department (PPA) before it may be sent to OMB. You may not submit to OMB a final rule containing a collection of information until OMB has approved the collection. See 381 DM 11 and 12 and Attachment 2 ("Collections of Information from the Public: Interim Guidelines") of the Interim Guidelines issued by PPA (dated March 20, 1997) for guidance in preparing the supporting statement, and consult with your

EXHIBIT EE

bureau information collection officer.

6.22 **What is the last step before I send a rule to be published?** You must send us a copy of each rule for a final review after signature. Keep the original signed rule and internal file copies until the rule is approved for publication. You may not send a rule to the Federal Register until we have completed our final review. We will complete this review within 48 hours of receipt of each rule.

6.23 **What other copies of final rules must I distribute?** To comply with the Small Business Regulatory Enforcement Fairness Act (5 U.S.C. 801), you must distribute copies of each final rule and related material as indicated in the table below. You must deliver these copies before the final rule can take effect.

| You must send to... | the following material... |
|---|---|
| The Speaker of the House of Representatives | - A transmittal memo in the format contained in Appendix 1 to this Chapter<br><br>- A copy of the rule |
| The President of the Senate | - A transmittal memo in the format contained in Appendix 1 to this Chapter<br><br>- A copy of the rule |
| The General Counsel of the General Accounting Office | - A transmittal memo in the format contained in Appendix 1 to this Chapter<br><br>- A copy of the rule<br><br>- A copy of any cost/benefit analysis prepared for the rule<br><br>- A copy of any regulatory flexibility analysis prepared for the rule<br><br>- A copy of any unfunded mandates analysis prepared for the rule |

6.24 **When will a final rule become effective?** You must specify an effective date in the preamble of the final rule. The effective date for a non-major (under SBREFA) rule generally must be at least 30 days after transmittal to Congress. For a major rule, the effective date must be 60 days after transmittal to Congress (see 5 U.S.C. 808 for certain limited exceptions). The rule will become effective on this date unless Congress disapproves it under 5 U.S.C. 802.

6.25 **Can a final rule ever become effective less than 30 days after publication?** Yes. For a rule to become effective sooner than 30 days after publication, you must explain in the preamble that you have established an earlier effective date because the rule meets one of these conditions:

A. The rule grants an exception or relieves a restriction;

B. The rule is an interpretation or policy statement; or

EXHIBIT EE

C. You have a good cause for the rule to become effective earlier.

6.26 **How do I incorporate material by reference?** Incorporation by reference allows you to refer to materials, such as technical standards, that are already published elsewhere. The Director of the Federal Register must approve each incorporation by reference. See the Document Drafting Handbook and 1 CFR 51 for instructions on how to incorporate material by reference.

6.27 **What Department clearances do I need for a Federal Register notice?** The approval requirements for notices depend upon the level at which they are signed. Notices should generally be signed at the lowest appropriate level. If you have questions about what approvals are required for a notice or at what level it should be signed, call your bureau regulatory contact or ORA.

-------------------------------------------------------------------------------------------------------

**Appendix 1 to Chapter 6**

[Date]

Honorable Newt Gingrich

Speaker of the House of

Representatives

The Capitol, Room H-209

Washington, D.C. 20515

<u>BY HAND</u>

Dear Mr. Speaker:

Attached please find a final rule submitted for your review in accordance with the requirements of Public Law 104-121.

A concise general statement relating to the rule, in conformity with the public law, may be found on the first page of the rule. Please refer any questions about the rule to the contact person named in the rule's preamble.

Sincerely,

Assistant Secretary

Attachment: [Give title of rule]

-------------------------------------------------------------------------------------------------------

[Date]

Honorable Al Gore

**EXHIBIT EE**

President of the Senate

The Capitol, Room S-212

Washington, D.C. 20510

BY HAND

Dear Mr. President:

Attached please find a final rule submitted for Congressional review in accordance with the requirements of Public Law 104-121.

A concise general statement relating to the rule, in conformity with the public law, may be found on the first page of the rule. Please refer any questions about the rule to the contact person named in the rule's preamble.

Sincerely,

Assistant Secretary

Attachment: [Give title of rule]

-------------------------------------------------------------------------------------------------------------------

[Date]

Mr. Robert P. Murphy

General Counsel

U.S. General Accounting Office

441 G Street NW

Washington, D.C. 20548

BY HAND

Dear Mr. Murphy:

Attached please find a final rule submitted for your review in accordance with the requirements of Public Law 104-121.

A concise general statement relating to the rule, in conformity with the public law, may be found on the first page of the rule. Please refer any questions about the rule to the contact person named in the rule's preamble.

Sincerely,

**EXHIBIT EE**

Assistant Secretary

Attachment: [Give title of rule]

-----------------------------------------------------------------------------------------------------------

Department of the Interior

Transmittal and Receipt for Rulemaking Document

(Pursuant to 5 U.S.C. §801)

| To: | ___ Senate | Major rule: | ___ Yes |
|-----|------------|-------------|---------|
| | ___ House | | ___ No |
| | ___ General Accounting Office | | |

| Title of rule: |
|----------------|
| Bureau: |
| RIN: |
| Proposed effective date: |

For submissions to the Comptroller General only, in accordance with the statute, the following, if applicable, are included in the preamble to the rulemaking document or as separate documents, as indicated below. (These documents are also available to both Houses of Congress upon request.)

| Item | In preamble | Separate document |
|------|-------------|-------------------|
| Cost/benefit analysis | . | . |
| Actions relating to 5 U.S.C. §§ 603, 604, 605, 607, and 609 (Regulatory Flexibility Act) | . | . |
| Actions relevant to 2 U.S.C. §§ 1532, 1533, 1534, and 1535 (Unfunded Mandates Reform Act) | . | . |
| Other relevant information under another Act or Executive Order | . | . |

Document received by: _____

Date received: _____

5/14/98 #3210

Replaces 12/26/85 #2663

Click here to download in WordPerfect format

EXHIBIT EE