IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| GREATER YELLOWSTONE COALITION, et al., | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Case No. 07-cv-2111 (EGS) |
| DIRK KEMPTHORNE, et al., | ) ) | [Hearing on Motions for Summary Judgment on August 27, 2008] |
| Defendants. | ) ) ) | |

| | | |
|---|---|---|
| NATIONAL PARKS CONSERVATION ASSOCIATION, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No. 07-cv-2112 (EGS) |
| UNITED STATES DEPARTMENT OF THE INTERIOR; NATIONAL PARK SERVICE | ) ) ) | [Hearing on Motions for Summary Judgment on August 27, 2008] |
| Defendants. | ) ) ) | |

**FEDERAL DEFENDANTS' REPLY BRIEF IN SUPPORT OF
MOTION TO TRANSFER CASE NO. 07-CV-2112 (EGS)**

## INTRODUCTION

Federal Defendants hereby submit this memorandum in reply to the National Parks Conservation Association ("NPCA") memorandum in opposition to the Federal Defendants' March 25, 2008 Motion to Transfer.

As explained in the opening brief, previous winter use litigation before this Court and the U.S. District Court for the District of Wyoming ("Wyoming Court") produced conflicting orders and ultimately led this Court to order Federal Defendants to show cause why they should not be held in contempt of court. The current set of winter use cases presents an even greater risk of inconsistent judgments because, unlike the previous litigation, the current cases challenge exactly the same federal documents and decisions on the same administrative record. Therefore, both the interests of judicial economy and the orderly administration of justice strongly favor consolidating the four winter use cases – which are currently pending before this Court and the Wyoming Court – in a single district so that they may be heard and decided by a single court.

Moreover, while Federal Defendants have not expressed a preference for either district, and have instead appealed to the collective wisdom of both courts through their contingent motions to transfer, Defendants nonetheless demonstrated in their opening brief that a transfer of the above-captioned cases to the Wyoming District is merited because the cases will most acutely impact the residents of Wyoming and adjacent states.

In its response, NPCA does not dispute that judicial economy would be served by a consolidation of the cases in a single district. Instead NPCA argues that the interest of justice does not favor the requested transfer because Federal Defendants have overstated the risk of inconsistent judgments. This argument fails however, because it is premised on the dismissal of the cases before the U.S. District Court for the District of Wyoming, which is purely speculative.

NPCA's argument that its case is entitled to precedence under the "first-filed" doctrine is also incorrect, because it was the Wyoming Court, and not this Court, that first received a valid challenge to a discrete and final agency action, *viz.*, the 2007 Final Rule. Thus, in fashioning relief to address the need to consolidate all four winter use cases, this Court should not be swayed by GYC's assertions that the Wyoming cases "might" be dismissed or that NPCA reached the Court first.

NPCA also argues that private interest considerations weigh against transfer, but this contention is equally flawed. At bottom, NPCA offers no serious rebuttal to Defendants' arguments that the interest of justice weighs heavily in favor of transferring the above-captioned cases to the Wyoming Court. Accordingly, Defendants' motion to transfer should be granted.

## ARGUMENT

**I.      THE PUBLIC INTEREST FACTORS WEIGH HEAVILY IN SUPPORT OF GRANTING THE MOTION TO TRANSFER**

### A.      NPCA's Attempts To Play Down The Likelihood of Inconsistent Judgements Are Unpersuasive

As Federal Defendants demonstrated in their opening brief, the fact that the winter use cases are proceeding in two district courts presents a high risk that the Defendants will once again be subjected to inconsistent judgments. Mot. at 12-14. In response, NPCA attempts to downplay this risk by arguing that the Wyoming cases should be dismissed given the asserted "dubiousness" of the State of Wyoming and Park County's standing. This argument is severely flawed on many levels.

First, while NPCA notes that neither the State of Wyoming nor Park County alleged any facts in their petitions for review to support their standing to sue, see NPCA Opp. at 13, this omission is a product of the Tenth Circuit's procedures for review of agency actions under

Olenhouse v. Commodity Credit Corp., 42 F.3d 1560, 1580 (10th Cir. 1994), which directs

district courts to process petitions for review of agency actions "as appeals."  Thus, under the

Local Rules of the United States District Court for the District of Wyoming, a party seeking

review of an agency action must file a  "petition for review" which identifies only the action to

be reviewed, the petitioner and respondent, and the statute by which jurisdiction is claimed.  See

U.S.D.C.L.R. 83.7.2 (submitted herewith as Supp. Ex. HH at 97).[1]  Of particular relevance here,

Rule 83.7.2 instructs that "[t]he petition or notice shall not contain factual allegations in the

nature of a complaint. Factual allegations in the petition or notice shall be stricken."  The fact

that no such allegations exist in the Wyoming parties' petitions for review is therefore hardly

remarkable.

Second, the Court need not entertain NPCA's theory that the Wyoming plaintiffs' claims

might be barred by the doctrine of *parens patriae* (which bars suit by a sovereign on behalf of its

citizens).  See NPCA Opp. at 13-14.  At the very least, NPCA concedes that the State of

Wyoming has pressed a colorable claim to seek vindication of its alleged consultation rights

under NEPA.  Id. at 15.  The fact that NPCA may question the *merits* of such a claim is

irrelevant to an Article III standing analysis.  See Competitive Enter. Inst. v. Nat'l Highway

Traffic Safety Admin., 901 F.2d 107, 113 (D.C. Cir. 1990) ("We note at the outset that the

standing determination must not be confused with our assessment of whether the party could

succeed on the merits."); Women's Equity Action League v. Cavazos, 879 F.2d 880, 886 (D.C.

Cir. 1989) ("It bears repetition . . . that a ruling for plaintiffs on standing in no way depends on

---

[1]      Citations to "Ex. ___" refer to exhibits to the Declaration of Guillermo A. Montero, filed
concurrently with Federal Defendants' March 25, 2008 Motion to Transfer (Dkt. # 25-2).
Citations to "Supp. Ex. ___" refer to exhibits to the Supplemental Declaration of Guillermo A.
Montero, filed concurrently herewith.  Citations to "Jewett Ex. ___" refer to exhibits to the
Declaration of Tony Jewett (Dkt. #33-2).

the merits of their claims.") (internal quotations omitted).  It is also irrelevant that NPCA

questions whether the asserted injury to Wyoming's alleged consultation rights would be

redressed by a favorable decision.  See NPCA Opp. at 16 ("It is by no means clear that the relief

requested would in any way address the injuries claims by Wyoming.").  NPCA's analysis in this

regard is wholly superficial, and fails to even acknowledge the different standard that applies to

parties alleging a procedural injury.  See Lujan v. Defenders of Wildlife, 504 U.S. 555, 573

(1992).

        Third, even if NPCA were correct in its assumption that all of Wyoming's claims other

than its "consultation" claim lack standing, this would in no way reduce the risk of conflicting

judgments.  NPCA ignores that the International Snowmobile Manufacturer's Association, Inc.

("ISMA"), whose standing is not questioned here, asserts claims that are virtually identical to the

State of Wyoming's.  Compare Ex. K ¶2(a)-2(g) with Ex. M ¶¶ 15-18.  Accordingly, NPCA's

speculation about the State of Wyoming's standing is of no relevance to this motion.[2/]

        NPCA's second line of argument, is even more deeply flawed.  As an alternative to its

standing arguments, NPCA makes the remarkable assertion that the risk of Federal Defendants

---

[2/]     NPCA chides Federal Defendants throughout its brief for not taking what it apparently
believes are more appropriate steps than the instant transfer motion to reduce the risk of
inconsistent judgments.  See, e.g., NPCA Opp. at 12 (arguing that "the Government's concern
for inconsistent judgments cannot be taken seriously" because Defendants filed the instant
transfer motion "rather than moving to dismiss the Wyoming cases . . . ."); id. at 18 ("The
Government's claim that it risks inconsistent judgments is not entitled to much weight in light of
the fact that it has taken no steps to obtain the dismissal or at least substantial narrowing of the
Wyoming litigation.").  These accusations are unfounded.  The United States has no intention of
waiving any defenses it may have, on jurisdictional or substantive grounds, in the Wyoming
litigation.  As explained above, however, we note that NPCA's theory for dismissal of the
Wyoming cases on standing grounds is based on pure speculation and a superficial treatment of
Article III jurisprudence.  Moreover, NPCA's theory for dismissal fails to address the extent to
which ISMA's claims could remain before the Wyoming Court, notwithstanding any potential
jurisdictional infirmities in the State of Wyoming's case.

being subjected to conflicting orders, is "slim and highly theoretical."  NPCA Opp. at 19.  This is

incorrect.  Defendants' concern with conflicting judgments is guided by the history of winter use

litigation before both courts in past years, as well as the starkly conflicting relief sought by the

Wyoming and D.C. plaintiffs.  The Wyoming plaintiffs allege that the 2007 EIS, ROD, and Final

Rule violate the APA, Yellowstone National Park Act, and Park Service Organic Act by

reducing the ceiling for daily snowmobile entries into Yellowstone National Park from 720 to

540.  See Ex. K ¶ 2(e)-(f); Ex. L ¶2(a)-(h); Ex. M ¶¶ 15-18.  Those plaintiffs request that the

Wyoming Court set aside and vacate the portions of the challenged documents that impose the

daily limit of 540 on snowmobile use, see Ex. K at 2, ¶2, and will presumably all seek an order

barring the Service's implementation of that daily limit.  Indeed, ISMA specifically seeks an

order "that the previous 720-snowmobile limit remain in effect until such time" as a new rule can

be promulgated.  See Ex. M ¶19(c).

   In sharp contrast, NPCA alleges that the Service's authorization of up to 540

snowmobiles per day is an "expansion" of recreational snowmobiling (from actual use seen in

the 2004-2007 winter seasons) which violates the above-referenced statutes.  See, e.g., Ex. J, ¶¶

38-39, 46, 56(a)-(e).  Consistent with that allegation, NPCA seeks an order setting aside the

ROD and Final Rule, see Ex. J at 26, ¶1, and will presumably also seek an injunction barring

snowmobile use or at least reducing it to below the levels authorized in the ROD and Final Rule.

Thus, the D.C. plaintiffs arguments and the relief they seek is diametrically opposed to the

arguments made and relief sought by the Wyoming plaintiffs.  Compare Ex. M ¶¶ 15-16

(ISMA's allegations that the decision *to reduce* the ceiling for daily snowmobile entries to 540 is

contrary to record evidence and not supported by reasoned analysis) with Ex. J ¶¶ 56(a)-(e)

(NPCA's allegations that setting a ceiling for daily snowmobile entries *as high as* 540 is contrary

to record evidence and not supported by reasoned analysis). Under these circumstances, NPCA's characterization of the likelihood of conflicting orders as "slim" or "theoretical" cannot be taken seriously.

   **B.     The Winter Use Cases Should Be Resolved Within View of the Citizens Who Will Be Most Affected By Their Outcome**

   As Federal Defendants explained in their opening brief, the interests of justice are promoted when a controversy is resolved in the region where its impacts will be felt the most. <u>See</u> Mot. at 15.  Here, those impacts are felt most in the Northern Rockies.  While Defendants do not deny that a generalized interest in the recreational use, conservation, and management of the national parks is shared equally by the citizens of all fifty states, the livelihoods and local businesses potentially affected by the winter use cases lie in Wyoming, Montana, and Idaho. Accordingly, the citizens of that region have a uniquely compelling interest in having the winter use cases resolved within "their view and reach rather than in remote parts of the country where they can learn of it by report only."  <u>Gulf Oil Corp. v. Gilbert</u>, 330 U.S. 501, 509 (1947).  The generalized concerns that residents of the District of Columbia share with the rest of the Nation simply do not outweigh the more compelling local interests that would be served by transferring the above-captioned cases to the Wyoming Court.  <u>See</u> <u>Nat'l Wildlife Fed'n v. Harvey</u>, 437 F. Supp.2d 42, 47 (D.D.C. 2006) (plaintiffs' failure to provide evidence of impacts to the District of Columbia "<u>other than the District's broad concern for endangered species</u>" merited transfer in light of "the impact of the case on <u>Florida's local interests</u>") (emphasis added).

   Notwithstanding this, NPCA labors to characterize the winter use cases as presenting issues of "national interest" – a characterization which is not disputed – as if the label possessed a talismanic quality that requires claims matching its description to be heard in the District of

Columbia.  See NPCA Opp. at 10-12.  This is clearly not the case and, in any case, NPCA's arguments in this context do not support its position.

NPCA misplaces its heavy reliance on the broad language contained in the Park Service Organic Act and the General Authorities Act.[3/]  See NPCA Opp. at 11 (citing 16 U.S.C. §§ 1, 1a-1).  NPCA offers selected quotations from those statutes which characterize Yellowstone and other national parks as resources to be "preserved and managed for the benefit and inspiration of all the people of the United States."  Id.  Those provisions, of course, confirm the undisputed fact that the Nation as a whole shares a generalized interest in the recreational use, conservation, and management of the National Park System.  Those provisions, however, lend no support to NPCA's argument that its choice of venue should be prioritized over the District of Wyoming – where the operative facts giving rise to the winter use cases took place and where the impacts of the litigation will be felt the most.

Indeed, this very argument has been rejected time and again by this Court in the context of the Endangered Species Act ("ESA").  Similar to the statutory provisions quoted above and in NPCA's opposition brief, see Opp. at 15-16, Congress has declared that endangered species have unique value to the Nation as a whole.  16 U.S.C. § 1531(a) ("[V]arious species of fish, wildlife, and plants . . . are of esthetic, ecological, educational, historical, recreational, and scientific value to the Nation and its people") (emphasis added).  It clearly does not follow, however, that the District of Columbia should hear every case involving an endangered species.  Despite

---

[3/]     NPCA also misstates this Court's December 16, 2003 Order and Opinion in Fund for Animals v. Norton, No. CIV.A. 02-2367 (EGS).  Citing to 294 F. Supp.2d 92, 102-103 (D.D.C. 2003), NPCA states that "[t]he first case challenging the winter use plan for the Parks was litigated in this District precisely because conserving the scenery, natural object[s] and wildlife of that park is a matter of great national importance." (emphasis added).  However, the cause-and-effect relationship that NPCA reads into those pages appears nowhere in the Court's Opinion, nor does that Opinion even deal with the issue of transfer or venue.

Congress' characterization of endangered species as "national" resources, this District has recognized the importance of allowing ESA claims to be heard in the districts most affected by their outcome.  See Hawksbill Sea Turtle v. Fed. Emergency Mgmt. Agency, 939 F.Supp. 1, 3 n.5 (D.D.C. 1996) (recognizing "the importance of allowing local citizens to attend and observe the proceedings" of a case involving an endangered sea turtle); see also Harvey, 437 F. Supp.2d at 47 (rejecting claim that case had "national significance" merely because its outcome could affect the fate of the endangered snail kite species); Sierra Club v. Flowers, 276 F. Supp.2d 62, 68 (D.D.C. 2003) ("[T]he plaintiffs' choice of forum does not warrant deference simply because the plaintiffs bring an ESA claim involving the nationally known Everglades ecosystem.").

NPCA's description of visitor statistics and the public comment process also fails to support its assertion that the winter use cases should remain in this District, and in fact undermines that assertion.  For example, in an attempt to dilute the local effects of the winter use controversy, NPCA points out that "[m]ore than 70% of the visitors to Yellowstone and Grand Teton National Parks were from states other than Wyoming, Montana and Idaho, the States in which those Parks are located . . . ."  NPCA Opp. at 11.  What is apparently lost on NPCA is that Wyoming, Montana, and Idaho supply almost 30% of the visitors to those Parks, despite containing less than 1% of the total United States population.  See Supp. Exs. AA, GG, FF. Moreover, the very report on which NPCA relies states that the majority of the visitors to the Parks live west of the Mississippi River, which obviously does not favor NPCA's selection of the District of Columbia as a venue for its claims.  See Jewett Ex. A at 5-4.

NPCA's reliance on the public comment reports for the challenged action is similarly myopic.  A closer examination of the comment report confirms the uniquely compelling nature of the State of Wyoming's interests in the winter use litigation.  While only 3,497 of the 122,190

comment letters received on the draft EIS (or 2.9%), originated in Wyoming, that sum is in fact impressive considering that Wyoming residents make up less than 0.2% of the United States' total population.  <u>See</u> Supp. Ex. AA (U.S. Census Bureau Report estimating 2006 population at 515,004 in Wyoming and 299,398,484 in the entire United States).  By contrast, only 214 of the 122,190 comment letters on the EIS originated in the District of Columbia, despite a significantly larger population.  <u>See</u> Jewett Ex. B at 5 (indicating that D.C. residents submitted only 214 comment letters on the draft EIS); Supp. Ex. BB (U.S. Census Bureau Report estimating 2006 population at 581,530 in the District of Columbia).  Thus, insofar as the public comment reports reflect the relative interests of the two districts, those reports weigh heavily in favor of a transfer to the Wyoming Court.

As this Court has recognized in the past, it is important to allow citizens to observe the proceedings that will determine the fate of their interests.  <u>See</u> <u>Hawksbill Sea Turtle</u>, 939 F. Supp. at 3 n.5 ("The Court . . . notes the importance of allowing local citizens to attend and observe the proceedings of this case.  That would obviously be impossible (or at least prohibitively expensive) if a trial were held in the District of Columbia.").  That result is most effectively accomplished in the District of Wyoming because that District provides a convenient forum for the citizens of Wyoming, Montana and Idaho – the people who by all accounts have the largest stake in the matters currently before this Court.  By contrast, this Court, though fully capable of fairly considering both local and national interests, <u>see</u> <u>Fund for Animals v. Norton</u>, 352 F. Supp.2d 1, 2 (D.D.C. 2005), is a much less convenient forum for those with the most compelling right to witness the proceedings.

Finally, NPCA's heavy references to newspaper articles and a Congressional comment letter should have no bearing here.  Defendants do not dispute that the winter use plans (and the

various plaintiff groups' campaigns to phase out snowmobile use in the Parks) have been the

subject of some national newspapers as well as editorials appearing outside of the Northern

Rockies.  These articles, however, pale in comparison to the volume of coverage devoted to this

same issue by media sources within the Northern Rockies.  Compare NPCA Opp. at 11-12

(describing national media coverage) with Supp. Ex. JJ (collecting sample articles from local

newspapers in the Northern Rockies).  NPCA's reliance on a "letter of objection" signed by 86

members of Congress is even less significant.  See NPCA Opp. at 12 (citing Jewett Exs. F, G).

Members of Congress, more than any other individual, have the ability to make their voice heard

through the legislative powers and other official channels granted to them by Article I of the

United States Constitution.[4]  Thus, congressional members' interests in these proceedings do not

displace the interest of the Wyoming communities in having access to a local forum.  Cf.

Consumer Energy Council of Am. v. FERC, 673 F.2d 425, 465-466 (D.C. Cir. 1982) (holding

that any congressional action purporting to exercise the legislative power must meet the

requirements of bicameralism and presentment.), aff'd Process Gas Consumers Group v.

Consumer Energy Council of Am., 463 U.S. 1216 (1983); id. at 464 ("The overriding objective

of bicameralism . . . is to constrain the exercise of the federal legislative power by making sure

that the Legislature can act only where representatives of two different constituencies are in

agreement.").  None of NPCA's arguments change the simple fact that the most convenient

---

[4]     In addition, the comment letter provides no useful insight into the requirements of the
statutes at issue in this case or the proper interpretation of the 2006 National Park Service
Management Policies.  See Thomas Jefferson Univ. v. Shalala, 512 U.S. 504, 512 (1994) (courts
owe "substantial deference to the agency's interpretation of its own regulations, which . . . must
be given controlling weight unless it is plainly erroneous or inconsistent with the regulation.")
(emphasis added) (internal quotations omitted); see also Pension Ben. Guar. Corp v. LTV Corp.,
496 U.S. 633, 650 (1990) ("[S]ubsequent legislative history is a hazardous basis for inferring the
intent of an earlier Congress.") (internal quotations omitted).

district to the largest number of citizens most likely to be affected by the outcome of the winter use litigation is the District of Wyoming. Thus, this Court should recognize the compelling interests that would be served by allowing the winter use litigation to be decided in the District of Wyoming.

### C. NPCA's Reliance on The 'First To File' Rule is Misplaced

In addition to opposing Defendants' request that the above-captioned cases be transferred to the Wyoming Court, NPCA implies that the cases should instead be consolidated in *this* Court because NPCA's November 21, 2007 complaint affords its case "first-filed" status. As NPCA explains, "courts in this jurisdiction have found that the 'interest of justice' can weigh in favor of giving priority to earlier filed litigation" even where the "related litigation does not involve the same parties or identical legal claims." NPCA Opp. at 21 (citing Martin-Trigona v. Meister, 668 F. Supp. 1, 3 (D.D.C. 1987); Smiths Indus. Med. Sys., Inc. v. Ballard Med. Prods., 728 F. Supp. 6, 6 (D.D.C. 1989)). NPCA also observes that "[t]his Court has transferred an action to a district with earlier-filed litigation – even where the earlier-filed litigation involved different legal claims – on the grounds that litigation has a common 'factual underpinning.'" NPCA Mot. at 21 (citing Comptroller v. Calhoun First Nat'l Bank, 626 F. Supp. 137, 141 (D.D.C. 1985).

While Defendants agree with NPCA's presentation of the relevant case law, the referenced authorities in no way support its request that the above-captioned cases remain before this Court. NPCA's case is not entitled to precedence as a first-filed action because the November 21, 2007 petition for review of agency action ("Petition") was filed prematurely, before the final agency action affecting winter use in the Parks – the 2007 Final Rule – had occurred. As such, NPCA's claims as they stood on November 21, 2007 were barred by the United States' sovereign immunity.

The Administrative Procedure Act ("APA") waives sovereign immunity and grants a private right of action to plaintiffs "suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute. . ." 5 U.S.C. §702. In cases such as this one, however, where "review is sought not pursuant to specific authorization in the substantive statute, but only under the general review provisions of the APA, the 'agency action' in question must be 'final agency action.'" Lujan v. Nat'l Wildlife Fed'n, 497 U.S. 871, 882 (1990) (emphasis added); 5 U.S.C. § 704. The requirement that an agency action be final before it may be challenged is an express condition of the United States sovereign immunity and, therefore, is deemed jurisdictional in nature. United States v. Mottaz, 476 U.S. 834, 841 (1986) ("When the United States consents to be sued, the terms of its waiver of sovereign immunity define the extent of the court's jurisdiction"); DRG Funding Corp. v. Sec'y of Housing & Urban Dev., 76 F.3d 1212 (D.C. Cir.1996) ("[t]he requirement of a final agency action has been considered jurisdictional. If the agency action is not final, the court therefore cannot reach the merits of the dispute.").

This requirement is fatal to the Plaintiffs' November 21, 2007 Petition because the complaint challenged only the 2007 Environmental Impact Statement ("2007 EIS") and Record of Decision ("2007 ROD"), see Ex. I at 24, ¶1, neither of which constitutes a final agency action within the meaning of APA §704.

> As a general matter, two conditions must be satisfied for agency action to be 'final': First, the action must mark the 'consummation' of the agency's decisionmaking process – it must not be of a merely tentative or interlocutory nature. And second, the action must be one by which 'rights or obligations have been determined,' or from which 'legal consequences will flow[.]'

Bennett v. Spear, 520 U.S. 154, 177-178 (1997); see also Nat'l Ass'n of Homebuilders v. Norton, 298 F. Supp.2d 68, 79 (D.D.C. 2003). As is clear from the face of the 2007 ROD, the

EIS and ROD neither marked the consummation of the Service's decision-making process nor established rights, obligations, or other legal consequences. They were instead a procedural prerequisite to the December 13, 2007 Final Rule, and it is that Final Rule that for the first time implemented the elements of the Service's decision at issue in this case. See Ex. T at 4 ("This Record of Decision is not the final agency action for those elements of the plans that require promulgation of regulations to be effective.").[5] Accordingly, NPCA's November 21, 2007 Petition – on which NPCA relies to establish its "first-filed" status – was barred by the United States' sovereign immunity.

Defendants do not seek dismissal of the action on finality grounds because this defect was subsequently cured by NPCA's amended petition for review of agency action, which was filed on January 11, 2008. By that time, however, the State of Wyoming had already filed its petition for review in the Wyoming Court. See Ex. C, Dkt. #1 (indicating that the State of Wyoming filed its petition for review in Case No. 07-cv-319-CAB on December 13, 2007). Accordingly, it is the Wyoming case, and not the instant case, that takes precedence here. See e.g., Associated Gas Distrib. v. FERC, 738 F.2d 1388 (D.C. Cir. 1984) (refusing to give precedence to a prematurely filed suit for purposes of transfer analysis); Public Service Co. v. FERC, 716 F.2d 778 (10th Cir. 1983) (same). Consistent with the arguments in NPCA's own briefs, therefore, this Court should transfer the above-captioned cases to the Wyoming Court. See NPCA Opp. at 20-21 (arguing that when related cases are pending in separate fora, the cases should be consolidated in that Court in which the first of the cases was filed).

---

[5]     This is not to say that non-final agency actions such as the 2007 EIS and ROD can never be judicially reviewed. The APA provides that such "preliminary, procedural, or intermediate agency action," while "not directly reviewable" under the APA, is nonetheless "subject to review on the review of the final agency action." 5 U.S.C. § 704.

II.    **NEITHER THE DEFERENCE AFFORDED TO PLAINTIFFS' CHOICE OF FORUM NOR THE OTHER PRIVATE INTEREST FACTORS OUTWEIGH THE SUBSTANTIAL PUBLIC INTEREST SERVED BY TRANSFER**

A.    **There is no "Substantial Nexus" Here That Requires Special Deference to NPCA's Choice of Venue**

While it is true that the Court "must afford some deference to the plaintiff's choice of forum," Trout Unlimited v. U.S. Dep't of Agric., 944 F. Supp. 13, 17 (D.D.C. 1995), NPCA's choice of venue is rendered less significant here because, contrary to NPCA's assertions, a "substantial nexus" between the District of Columbia and the winter use plans is not created simply by virtue of the supervisory involvement of officials residing in the District.  Cf. Envtl. Def. v. U.S. Dep't of Transp., Civil Action No. 06-2176 (GK), 2007 WL 1490478 at *7 (D.D.C. May 18, 2007) ("The fact that the actual decisions themselves occurred within the confines of the District of Columbia is not sufficient to overcome the roots of [] this case in Maryland.").

The decision adopting the winter use plans challenged in the above-captioned cases was signed on November 20, 2007 by Yellowstone National Park Superintendent Suzanne Lewis and Intermountain (Denver) Regional Director Michael D. Snyder.  See Ex. T at 1.  Notwithstanding this fact, NPCA asserts that "the snowmobile policy in Yellowstone was not developed at the level of the superintendents of Yellowstone or of the other affected parks."  NPCA Opp. at 5-6. To the contrary, the environmental impact statement on which that decision was based was prepared locally and primarily by Park staff, requiring the investment of countless hours over the course of three years; the vast majority (45 out of 50) of the cooperating agency meetings or telephone calls that formed part of the NEPA process occurred in Wyoming, Montana, and Idaho, see Supp. Ex. DD at 392; and of the four public meetings held during the comment period on the draft EIS, one occurred in Wyoming, one in West Yellowstone, Montana, one in

Colorado, and one in Minnesota.  Id. at 393.  None of the meetings occurred in or near the District of Columbia.

Given these facts, NPCA's observation that the 2007 Final Rule was signed by the Assistant Secretary of the Interior for Fish and Wildlife and Parks, rather than by the Park superintendents, is insufficient to outweigh the winter use planning initiative's substantial roots in and around Wyoming.  See Envtl. Def., 2007 WL 1490478 at *7 (rejecting plaintiffs' reliance on fact that federal decisions and approvals relating to a Maryland highway project were made in the District of Columbia, and instead giving weight to, inter alia, where the "object of the decisions and approvals" was located, and where the community meetings on the draft EIS were held).  Indeed, to find a "substantial nexus" to the District of Columbia under these circumstances would prove too much since it is the standard practice at the Department of the Interior for all regulations to be signed by Assistant Secretaries in Washington, D.C.  See Supp. Ex. EE at 3 (excerpt from Department of the Interior Manual requiring that rulemaking documents be signed by a Secretarial Officer).

NPCA's heavy reliance on newspaper articles and press releases reflecting the historical interest of certain officials within the current Administration in the winter use management of the Parks similarly fails to establish the requisite "substantial" nexus.  For example, Jewett Exhibits L, M, O and P bear no relation to the decision-making process at issue in the above-captioned cases, viz., the 2007 ROD and Final Rule.  Similarly, the intended "Jewett Exhibit N," a corrected copy of which is provided herewith,[g] does not support NPCA's assertions of involvement by D.C. Officials.  As is clear from NPCA's block quote as well as the larger

---

[g]     Jewett Exhibit N is wholly irrelevant, and was apparently submitted by inadvertence.  For the Court's convenience, Federal Defendants provide herewith the referenced September 29, 2004 press release, see Supp. Ex. II.

document, Vice President Cheney's comments merely acknowledge that winter use in the Parks presents a resource management question, and that citizens can participate in the management process by working with their representatives in the legislative and executive branches.  See NPCA Opp. at 7; Supp. Ex. II at 12.

As discussed above, the Park lands at issue lie primarily in the District of Wyoming, and decisions concerning their management will be felt most acutely by the citizens of that State and adjacent states.  Thus, what nexus may exist between this District and the winter use plans is outweighed by the winter use plans' much more substantial nexus with the District of Wyoming. See Harvey, 437 F. Supp.2d at 46 ("In the present action, the nexus between Plaintiffs' choice of forum, the District of Columbia, and the facts of the controversy, is attenuated compared to the Southern District of Florida's connection with the case.") (emphasis added).  Therefore, NPCA's choice of venue is entitled to little deference, if any, and cannot outweigh the substantial public interests that would be served by transferring this case to the District of Wyoming.

**B.     The Remaining Private Interest Factors Do Not Weigh Against Transfer**

NPCA's assertion that the remaining private interest factors "all . . . weigh against transfer" is not only incorrect, but also internally contradictory.  See NPCA Opp. at 4.  As NPCA concedes on the very next page of its brief, the convenience of potential witnesses is not at issue because NPCA's petition for review of administrative action will be reviewed on the record.  In addition, the administrative record, which constitutes the only source of proof in the instant case, is equally available in both this Court and the Wyoming Court.  Accordingly, these private interest factors are neutral; contrary to NPCA's initial assertion, they do not weigh against transfer.

NPCA's arguments concerning the convenience of counsel are similarly unavailing. Although NPCA's General Counsel and outside counsel are located in the District of Columbia, this District has repeatedly stated that the location of counsel is given little weight in a motion to transfer venue.  See, e.g., Armco Steel Co. v. CSX Corp., 790 F. Supp. 311, 324 (D.D.C. 1991) ("The location of counsel carries little, if any, weight in an analysis under Section 1404(a)."); Anderson v. Thompson, 634 F. Supp. 1201, 1204 & n.2 (D. Mont. 1986) ("The court . . . does not consider the convenience of counsel in determining the propriety of a discretionary transfer."); Lopez-Perez v. Hufstedler, 505 F. Supp. 39, 41 (D.D.C. 1980) (inconvenience to plaintiffs' counsel is of no consequence).  Similarly, "the fact that Defendant[s'] counsel is located in the District of Columbia does not justify denying transfer because 'any inconvenience to [Defendant's counsel] is offset by the fact that they represent the party requesting the transfer.'" Harvey, 437 F. Supp.2d at 48 (quoting Nw. Forest Res. Council v. Babbitt, Civil Action No. 93-1579 (JHG), 1994 WL 908586, at *3 (D.D.C. April 13, 1994)).

Finally, NPCA misplaces its reliance on the fact that its headquarters is located in the District of Columbia.  In this District, "[c]ases decided under Section 1404(a) . . . have laid much less emphasis on this residence factor."  Kafack v. Primerica Life Ins. Co., 934 F. Supp. 3, 7 (D.D.C. 1996) (citations and internal quotations omitted).  Moreover, any convenience for NPCA's headquarters in the District of Columbia is counterbalanced by the fact that NPCA's campaign to phase-out snowmobile use in the Parks is run by NPCA's Yellowstone Field Office in Montana.  See Exs. U, V.  Accordingly, these private interest considerations are at most neutral.  Federal Defendants have shown that the interest of justice weighs heavily in favor of a transfer to the Wyoming Court, and this showing fully satisfies the Defendants burden.  See Nw. Forest Res. Council v. Babbitt, 1994 WL 908586, at *2-3 (granting transfer based primarily on

interest of justice factors and without significant analysis of the parties' respective conveniences); 15 Charles A. Wright, et al., Federal Practice and Procedure § 3859 at 439 (2d ed. 1986) ("[I]t is well established that the interest of justice is a factor to be considered on its own and an important one, and that the interest of justice may be decisive in ruling on a transfer motion."); 15 Charles A. Wright, Arthur R. Miller & E. Cooper, Federal Practice and Procedure § 3854 at 291 (3d Ed.2007) ("Indeed, a number of federal courts have considered this factor decisive – outweighing the other statutory factors – in ruling on a change of venue motion <u>even though the convenience of the parties and witnesses pointed in a different direction</u>.") (emphasis added).

## CONCLUSION

For the foregoing reasons, Federal Defendants respectfully request that the above-captioned cases be transferred to the District of Wyoming so that they may be consolidated with the ongoing winter use litigation in that district.


Respectfully submitted this 16th day of April, 2008.

RONALD J. TENPAS
Assistant Attorney General

 /s/ Guillermo A. Montero
GUILLERMO A. MONTERO
BARRY A. WEINER
LUTHER L. HAJEK
United States Department of Justice
Environment and Natural Resources Division
Post Office Box 663
Washington, D.C. 20044-0663
Telephone: (202) 305-0469 / Fax: (202) 305-0274
Email: Barry.Weiner@usdoj.gov
        Luke.Hajek@usdoj.gov
        Guillermo.Montero@usdoj.gov

OF COUNSEL:                              Attorneys for the Defendants

JASON WAANDERS
U.S. Department of the Interior
Office of the Solicitor
Division of Parks and Wildlife
1849 C St., N.W., MS-3230
Washington, D.C.  20240
Tel: (202) 208-7957

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

---

| | |
|---|---|
| GREATER YELLOWSTONE COALITION, et al., | ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) |
| DIRK KEMPTHORNE, et al., | ) ) ) |
| Defendants. | ) ) |

Case No. 07-cv-2111 (EGS)

[Hearing on Motions for Summary Judgment on August 27, 2008]

---

| | |
|---|---|
| NATIONAL PARKS CONSERVATION ASSOCIATION, | ) ) ) ) |
| Plaintiff, | ) ) |
| v. | ) ) |
| UNITED STATES DEPARTMENT OF THE INTERIOR; NATIONAL PARK SERVICE | ) ) ) |
| Defendants. | ) ) |

Case No. 07-cv-2112 (EGS)

[Hearing on Motions for Summary Judgment on August 27, 2008]

---

**SUPPLEMENTAL DECLARATION OF GUILLERMO A. MONTERO
IN SUPPORT OF FEDERAL DEFENDANTS' MOTION TO TRANSFER
CASE NO. 07-CV-2112 (EGS)**

I, Guillermo A. Montero, declare as follows pursuant to 28 U.S.C. §1746:

1.      I am an attorney in good standing of the bar of Massachusetts, and I am employed as a trial attorney with the United States Department of Justice, Environment and Natural Resources Division, Natural Resources Section.  I am one of the attorneys of record assigned to represent the Federal Defendants in this action.  I have personal knowledge of the facts stated herein and, if called upon to testify, I would testify that the facts set forth below are true and correct.

2.      Attached as **Exhibit AA** is a true and correct copy of the portion of the U.S. Census Bureau website which provides population estimates for the State of Wyoming as of 2006.

3.      Attached as **Exhibit BB** is a true and correct copy of the portion of the U.S. Census Bureau web page which provides population estimates for the District of Columbia as of 2006.

4.      Attached as **Exhibit CC** is a true and correct copy of the portion of The Wilderness Society's ("Society") web page which identifies the Society's Northern Rockies Regional Office as point of contact for the Society's campaign against snowmobile use.

5.      Attached as **Exhibit DD** is a true and correct excerpted copy of the Winter Use Plans Final Environmental Impact Statement.

6.      Attached as **Exhibit EE** is a true and correct excerpted copy of the Department Manual for the U.S. Department of the Interior.

7.      Attached as **Exhibit FF** is a true and correct copy of the portion of the U.S. Census Bureau website which provides population estimates for the State of Montana as of 2006.

8.      Attached as **Exhibit GG** is a true and correct copy of the portion of the U.S. Census Bureau web page which provides population estimates for the State of Idaho as of 2006.

9.      Attached as **Exhibit HH** is a true and correct excerpted copy of the Local Rules of the United States District Court for the District of Wyoming.

10.     Attached as **Exhibit II** is a true and correct copy of a Press Release, White House, Vice President and Mr. Cheney Remarks and Q&A at a Town Hall Meeting in Duluth, Minnesota (Sept 29, 2004), as obtained from the White House website.  This exhibit is submitted as a replacement for Exhibit N to the declaration of Tony Jewett, which Defendants believe NPCA submitted by inadvertence.

11.     Attached as **Exhibit JJ** are true and correct copies of the following news articles and editorials, all of which have been published by media outlets within Wyoming and Montana:

-      Penny Preston, *East Gate Talks*, KURL 8 NEWS, March 25, 2008.

-      *Closed Talks Continue Over The Future of Sylvan Pass*, Wyoming Tribune-Eagle, March 31, 2008.

-      *Park Sled Use Stays Steady*, Trib.com, March 19, 2008 (available at: http://www.trib.com/articles/2008/03/19/news/wyoming/6eaf5ceb4507164087257 41000808d83.txt).

-      *Angry Perspective Alienates Others*, Trib.com, February 17, 2008 (available at: http://www.trib.com/articles/2008/02/17/editorial/letters/d5442b15de5a45998725 73f100803d67.txt).

-      *No Right Way to do The Wrong Thing*, Trib.com, January 26, 2008 (http://www.trib.com/articles/2008/01/26/editorial/forum/d817d34a1d781486872 573db0066742c.txt).

-      Brodie Farquhar, *Officials Plan Sylvan Pass Talks*, Trib.com, January 21, 2008 (http://www.trib.com/articles/2008/01/21/news/wyoming/384c1b6b4f4952bf8725 73d600267825.txt).

- Star Tribune Editorial Board, *NPS Uses Science, Politics to Make Sled Decisions*, Trib.com, December 17, 2007 (http://www.trib.com/articles/2007/12/17/editorial/editorial/4dc34e581135b458872573b300268b09.txt).

- Mike Stark, *Discussion of Sylvan Pass' Future Starts Today*, Billings Gazette, January 1, 2008.

- *Gazette Opinion: New Year, Old Yellowstone Dispute Back In Court*, Billings Gazette, January 6, 2008.

- Ruffin Provost, *County Joins Petition Against Winter Use Plan*, Billings Gazette, January 5, 2008.

- Cory Hatch, *Winter Park Visits Steady*, Jackson Hole News & Guide, March 18, 2008.


Executed this 16th day of April, 2008 in Washington, D.C.


                                          /s/ Guillermo A. Montero
                                          Guillermo A. Montero

## U.S. Census Bureau

State & County QuickFacts

# Wyoming

| People QuickFacts | Wyoming | USA |
|---|---|---|
| Population, 2006 estimate | 515,004 | 299,398,484 |
| Population, percent change, April 1, 2000 to July 1, 2006 | 4.3% | 6.4% |
| Population, 2000 | 493,782 | 281,421,906 |
| Persons under 5 years old, percent, 2006 | 6.5% | 6.8% |
| Persons under 18 years old, percent, 2006 | 23.6% | 24.6% |
| Persons 65 years old and over, percent, 2006 | 12.2% | 12.4% |
| Female persons, percent, 2006 | 49.3% | 50.7% |
| White persons, percent, 2006 (a) | 94.5% | 80.1% |
| Black persons, percent, 2006 (a) | 0.9% | 12.8% |
| American Indian and Alaska Native persons, percent, 2006 (a) | 2.5% | 1.0% |
| Asian persons, percent, 2006 (a) | 0.7% | 4.4% |
| Native Hawaiian and Other Pacific Islander, percent, 2006 (a) | 0.1% | 0.2% |
| Persons reporting two or more races, percent, 2006 | 1.4% | 1.6% |
| Persons of Hispanic or Latino origin, percent, 2006 (b) | 6.9% | 14.8% |
| White persons not Hispanic, percent, 2006 | 88.1% | 66.4% |
| Living in same house in 1995 and 2000, pct 5 yrs old & over | 51.3% | 54.1% |
| Foreign born persons, percent, 2000 | 2.3% | 11.1% |
| Language other than English spoken at home, pct age 5+, 2000 | 6.4% | 17.9% |
| High school graduates, percent of persons age 25+, 2000 | 87.9% | 80.4% |
| Bachelor's degree or higher, pct of persons age 25+, 2000 | 21.9% | 24.4% |
| Persons with a disability, age 5+, 2000 | 77,143 | 49,746,248 |
| Mean travel time to work (minutes), workers age 16+, 2000 | 17.8 | 25.5 |
| Housing units, 2006 | 239,178 | 126,316,181 |
| Homeownership rate, 2000 | 70.0% | 66.2% |
| Housing units in multi-unit structures, percent, 2000 | 15.2% | 26.4% |
| Median value of owner-occupied housing units, 2000 | $96,600 | $119,600 |
| Households, 2000 | 193,608 | 105,480,101 |
| Persons per household, 2000 | 2.48 | 2.59 |
| Median household income, 2004 | $43,785 | $44,334 |
| Per capita money income, 1999 | $19,134 | $21,587 |
| Persons below poverty, percent, 2004 | 10.3% | 12.7% |

| Business QuickFacts | Wyoming | USA |
|---|---|---|
| Private nonfarm establishments, 2005 | 19,736[1] | 7,499,702 |
| Private nonfarm employment, 2005 | 191,934[1] | 116,317,003 |
| Private nonfarm employment, percent change 2000-2005 | 9.9%[1] | 2.0% |

EXHIBIT AA

| | | |
|---|---:|---:|
| Nonemployer establishments, 2005 | 41,861 | 20,392,068 |
| Total number of firms, 2002 | 53,103 | 22,974,655 |
| Black-owned firms, percent, 2002 | 0.3% | 5.2% |
| American Indian and Alaska Native owned firms, percent, 2002 | 1.1% | 0.9% |
| Asian-owned firms, percent, 2002 | 0.8% | 4.8% |
| Native Hawaiian and Other Pacific Islander owned firms, percent, 2002 | 0.0% | 0.1% |
| Hispanic-owned firms, percent, 2002 | 2.5% | 6.8% |
| Women-owned firms, percent, 2002 | 24.4% | 28.2% |
| Manufacturers shipments, 2002 ($1000) | 4,061,516 | 3,916,136,712 |
| Wholesale trade sales, 2002 ($1000) | 3,331,043 | 4,634,755,112 |
| Retail sales, 2002 ($1000) | 5,783,756 | 3,056,421,997 |
| Retail sales per capita, 2002 | $11,586 | $10,615 |
| Accommodation and foodservices sales, 2002 ($1000) | 984,684 | 449,498,718 |
| Building permits, 2006 | 3,537 | 1,838,903 |
| Federal spending, 2004 ($1000) | 4,393,308[1] | 2,143,781,727[2] |

| Geography QuickFacts | Wyoming | USA |
|---|---:|---:|
| Land area, 2000 (square miles) | 97,100.40 | 3,537,438.44 |
| Persons per square mile, 2000 | 5.1 | 79.6 |
| FIPS Code | 56 | |

1: Includes data not distributed by county.
2: Includes data not distributed by state.

(a) Includes persons reporting only one race.
(b) Hispanics may be of any race, so also are included in applicable race categories.

D: Suppressed to avoid disclosure of confidential information
F: Fewer than 100 firms
FN: Footnote on this item for this area in place of data
NA: Not available
S: Suppressed; does not meet publication standards
X: Not applicable
Z: Value greater than zero but less than half unit of measure shown

Source U.S. Census Bureau: State and County QuickFacts. Data derived from Population Estimates, Census of Population and Housing, Small Area Income and Poverty Estimates, State and County Housing Unit Estimates, County Business Patterns, Nonemployer Statistics, Economic Census, Survey of Business Owners, Building Permits, Consolidated Federal Funds Report
Last Revised: Wednesday, 02-Jan-2008 15:10:26 EST

EXHIBIT AA

**U.S. Census Bureau**

State & County QuickFacts

# District of Columbia

| People QuickFacts | District of Columbia | USA |
|---|---|---|
| Population, 2006 estimate | 581,530 | 299,398,484 |
| Population, percent change, April 1, 2000 to July 1, 2006 | 1.7% | 6.4% |
| Population, 2000 | 572,059 | 281,421,906 |
| Persons under 5 years old, percent, 2006 | 6.0% | 6.8% |
| Persons under 18 years old, percent, 2006 | 19.8% | 24.6% |
| Persons 65 years old and over, percent, 2006 | 12.3% | 12.4% |
| Female persons, percent, 2006 | 53.1% | 50.7% |
| White persons, percent, 2006 (a) | 38.4% | 80.1% |
| Black persons, percent, 2006 (a) | 56.5% | 12.8% |
| American Indian and Alaska Native persons, percent, 2006 (a) | 0.4% | 1.0% |
| Asian persons, percent, 2006 (a) | 3.2% | 4.4% |
| Native Hawaiian and Other Pacific Islander, percent, 2006 (a) | 0.1% | 0.2% |
| Persons reporting two or more races, percent, 2006 | 1.4% | 1.6% |
| Persons of Hispanic or Latino origin, percent, 2006 (b) | 8.2% | 14.8% |
| White persons not Hispanic, percent, 2006 | 31.7% | 66.4% |
| Living in same house in 1995 and 2000, pct 5 yrs old & over | 49.9% | 54.1% |
| Foreign born persons, percent, 2000 | 12.9% | 11.1% |
| Language other than English spoken at home, pct age 5+, 2000 | 16.8% | 17.9% |
| High school graduates, percent of persons age 25+, 2000 | 77.8% | 80.4% |
| Bachelor's degree or higher, pct of persons age 25+, 2000 | 39.1% | 24.4% |
| Persons with a disability, age 5+, 2000 | 115,980 | 49,746,248 |
| Mean travel time to work (minutes), workers age 16+, 2000 | 29.7 | 25.5 |
| Housing units, 2006 | 282,894 | 126,316,181 |
| Homeownership rate, 2000 | 40.8% | 66.2% |
| Housing units in multi-unit structures, percent, 2000 | 60.2% | 26.4% |
| Median value of owner-occupied housing units, 2000 | $157,200 | $119,600 |
| Households, 2000 | 248,338 | 105,480,101 |
| Persons per household, 2000 | 2.16 | 2.59 |
| Median household income, 2004 | $46,211 | $44,334 |
| Per capita money income, 1999 | $28,659 | $21,587 |
| Persons below poverty, percent, 2004 | 18.3% | 12.7% |

| Business QuickFacts | District of Columbia | USA |
|---|---|---|
| Private nonfarm establishments, 2005 | 20,481 | 7,499,702 |
| Private nonfarm employment, 2005 | 439,610 | 116,317,003 |
| Private nonfarm employment, percent change 2000-2005 | 5.9% | 2.0% |
| Nonemployer establishments, 2005 | 39,470 | 20,392,068 |

EXHIBIT BB

| | | |
|---|---:|---:|
| Total number of firms, 2002 | 47,172 | 22,974,655 |
| Black-owned firms, percent, 2002 | 25.9% | 5.2% |
| American Indian and Alaska Native owned firms, percent, 2002 | 0.5% | 0.9% |
| Asian-owned firms, percent, 2002 | 5.1% | 4.8% |
| Native Hawaiian and Other Pacific Islander owned firms, percent, 2002 | S | 0.1% |
| Hispanic-owned firms, percent, 2002 | 4.6% | 6.8% |
| Women-owned firms, percent, 2002 | 33.2% | 28.2% |
| Manufacturers shipments, 2002 ($1000) | 246,237 | 3,916,136,712 |
| Wholesale trade sales, 2002 ($1000) | 2,971,507 | 4,634,755,112 |
| Retail sales, 2002 ($1000) | 3,061,401 | 3,056,421,997 |
| Retail sales per capita, 2002 | $5,422 | $10,615 |
| Accommodation and foodservices sales, 2002 ($1000) | 2,943,078 | 449,498,718 |
| Building permits, 2006 | 2,105 | 1,838,903 |
| Federal spending, 2004 ($1000) | 37,629,655 | 2,143,781,727[1] |

| Geography QuickFacts | District of Columbia | USA |
|---|---:|---:|
| Land area, 2000 (square miles) | 61.40 | 3,537,438.44 |
| Persons per square mile, 2000 | 9,378.0 | 79.6 |
| FIPS Code | 11 | |

1: Includes data not distributed by state.


(a) Includes persons reporting only one race.
(b) Hispanics may be of any race, so also are included in applicable race categories.

D: Suppressed to avoid disclosure of confidential information
F: Fewer than 100 firms
FN: Footnote on this item for this area in place of data
NA: Not available
S: Suppressed; does not meet publication standards
X: Not applicable
Z: Value greater than zero but less than half unit of measure shown


Source U.S. Census Bureau: State and County QuickFacts. Data derived from Population Estimates, Census of Population and Housing, Small Area Income and Poverty Estimates, State and County Housing Unit Estimates, County Business Patterns, Nonemployer Statistics, Economic Census, Survey of Business Owners, Building Permits, Consolidated Federal Funds Report
Last Revised: Wednesday, 02-Jan-2008 15:10:22 EST

EXHIBIT BB





Home    Contact Us    Site Map

Search    GO

About Us    Join and Donate    News Room    Library    Our Issues    Where We Work    Ta



Where We Wo

- Wyoming Home
- Snowmobiles in Yellowstone
- Upper Green River
- Yellowstone to Yukon
- Bridger-Teton/Wyoming Range
- Wyoming Wilderness
- Red Desert

Subscribe to WildAlerts

Enter email address   GO

Support Our Work



# Snowmobile Damage in Yellowstone & Grand Teton Will Continue

 Email Page      Print Page

**Latest News [S**
- Conservationist
year roadless for
anniversary

**Facts & Publica**
- Priority BLM Lar
& Alaska [pdf]

**Take Action [Sh**
- Keep Oil and Ga
America's Specia

Yellowstone National Park in summer is a masterwork. Yellowstone in winter is a miracle. Snow drapes lodgepole pines and capes bison as they forage in the vapor from thermal pools. That familiar Yellowstone image is a winter photographic staple. But it is giving way to another: rangers, also barely visible but obscured in snowmobile exhaust, not water vapor, and wearing gas masks as they tend entrance stations. And bison are as apt to be seen fleeing from snowmobiles as going about their serious winter business of husbanding the energy to make it to spring. That is America's greatest national park today.

**"... a national treasure"**
*"Americans have a national treasure in the Yellowstone Park and they should guard it jealously. Nature has made her wildest patterns here, has brought the boiling waters from her greatest depths to the peaks which bear eternal snow, and set her masterpiece with pools like jewels."*
- Frederick Remington, after visiting Yellowstone in 1893

The National Park Service tells us snowmobiles cause problems in Yellowstone: blue haze lingers over Old Faithful; Park Service rangers don respirators, but only to breathe; bison and other wildlife flee snowmobiles. Unfortunately, and despite the indictment, snowmobile use will continue in both Yellowstone and Grand Teton National Parks this winter.

**A Full Complement of Species**
For 130 years, we have protected Yellowstone National Park, first in what is now a whole system of natural spectacles that has been called the "best idea America ever had."  We've protected its geysers, its magnificent views and its natural



EXHIBIT CC

sounds. And we've protected its wildlife: Yellowstone is the only place in the lower 48 states where all the native animals present before European settlement still survive. Wolves, bison, bears, elk, bald eagles and other important species thrive alongside remarkable geothermal features, majestic mountains, pure lakes and rivers.

Yellowstone has about 250 active geysers and 10,000 thermal features within its 2.2 million acres. It is a global one-of-a-kind. Throughout its history, though, it has confronted threats. The Congress has intervened to protect Yellowstone from plans to dam the Yellowstone River and to build a railroad through the park. The Wilderness Society will ask it to intervene again to combat the latest threat to this greatest of American National Parks: recreational snowmobile use. It is a threat that continues, and seems likely to grow, despite a decade of scientific study that documents damage from snowmobiles.

### Banning Science, Not Snowmobiles

The National Park Service in 2000 approved a phaseout of snowmobile use that would have reduced the numbers in the winter of 2002-2003 by half and eliminated the machines entirely by the winter of 2003-2004. But park rangers will be reaching for their gas masks yet again this winter, for the Bush Administration has proposed a plan that could actually increase snowmobile use in our first national park.

The snowmobile count for this winter is expected to be around 65,000, as usual, because of pressure the snowmobile industry applied on the Administration. In the latest development, the Administration has agreed to settle an industry lawsuit against the phaseout with a draft plan that will allow snowmachines to continue indefinitely in both Yellowstone and Grand Teton National Parks. Worse, it could actually increase their numbers. The public can expect to see the final plan in early 2003.

Before it unveiled its new snowmobile management proposal in November 2002, the National Park Service studied, once again, areas of particular concern. They included air quality, visibility, soundscapes, health and safety, impacts on wildlife and visitor experience. The study found that in virtually all areas, snowmobile use damages the park. The agency says that visibility will be impaired around Old Faithful, visitors will hear more noise, and "employees and visitors who are susceptible to respiratory problems would likely be affected." Science implicates human health, of both visitors and park employees, in another way: snowmobile use spreads

EXHIBIT CC

poisons, benzene and carbon monoxide among them, through both Yellowstone and Grand Teton National Parks. The list goes on; so will the damage it catalogs.

The Administration's new plan simply dismisses the science that so clearly demonstrates that snowmobiles disrupt wildlife, drown out natural sounds and create tunnels of blue haze that obscures visitors' views of Yellowstone's stark winter beauty.

### Deferring to Snowmobile Industry

In deference to the industry, it will risk not only a matchless national park but the health of its own employees as they staff entrance stations surrounded by idling snow machines, with more stretched out into the distance waiting to get in. The Environmental Protection Agency has told the National Park Service the only way to protect human health, air quality and water quality is to eliminate snowmobile use in Yellowstone and Grand Teton.

The verdict of science clearly supports phasing out snowmobiles in these parks; the public overwhelmingly demands it. With each public comment opportunity on snowmobile management, opposition to snowmobiles has risen. During the last such comment opportunity, over 350,000 Americans responded. Eighty percent supported the phaseout in Yellowstone and Grand Teton.

### Our Efforts

The Wilderness Society and its conservation partners have worked hard to protect Yellowstone and Grand Teton National Parks from damage by snowmobiles. The culmination of that effort was the agency's decision in 2000 to phase out snowmobiles in favor of less damaging snow coaches. The latest study supports the earlier decision: snow coaches are the best way to protect these parks and still afford the greatest number of Americans to enjoy their winter beauty. We continue to educate the public, to encourage public involvement in the issue and to ask the Congress to reinstate the original decision.

### For More Information

- Email The Wilderness Society's Northern Rockies Regional Office
- Greater Yellowstone Coalition
- National Parks Conservation Association
- Natural Trails and Waters Coalition

EXHIBIT CC

The Yellowstone Protection Act

Our Privacy Policy

1615 M St, NW     Washington, DC 20036     1.800.THE.WILD

EXHIBIT CC

WINTER USE PLANS FINAL ENVIRONMENTAL IMPACT STATEMENT
Yellowstone and Grand Teton National Parks and the John D. Rockefeller, Jr. Memorial Parkway

# CHAPTER V: CONSULTATION AND COORDINATION

## 5.1 Introduction

This section describes the consultation and coordination that has occurred leading up to the Notice of Availability for this FEIS.

This chapter, as well as Appendix I (Comment Analysis) and information on the winter use website (See 5.2.3 below) and provided to the Cooperating Agencies and others demonstrates how public and agency participation shaped this process. In summary, the substantive, procedural, and relational effects of agency and public participation are visible:

- in the particular mix of *elements and expectations* contained in the analysis;
- in the sometimes fragile but consistent efforts by all parties to *keep talking and working with one another* even while the litigation and legislative context has a tendency to mirror or reproduce adversarial modes of communication;
- in the commitment of NPS to *adaptive management*, and the agency's willingness to keep explaining what that commitment is as they move ahead with winter use management in the parks.

Winter use in Yellowstone and Grand Teton National Parks and the John D. Rockefeller, Jr. Memorial Parkway has the interest and involvement of all three branches of government (executive, legislative and judicial), the media, citizens, and interest groups.

To be meaningful, effective consultation needs to show how participation affected the NPS proposed decision.

The passage of time will be the surest way to show how participation has affected the decision – seeing what happens on the ground. In the meantime, written and verbal feedback from participants on the participation process itself – gathered during larger meetings and in each periodic participation assessment -- have indicated that the NPS accuracy and honesty regarding the various roles of governmental and non-governmental participants (i.e., not shared decision making) is part of what has, perhaps ironically, made the participation process more meaningful. Whether that appreciation holds even when elements of the decision are not satisfying to participants with a stake in the outcomes remains to be seen.

Table 5-1 indicates some key steps of the planning process. A Public and Agency Participation Plan[1] and the Cooperating Agency Memorandum of Understanding were developed and implemented with involvement from governmental and non-governmental stakeholders.

The NPS sustained its commitment to open information sharing throughout the process toward a winter use management decision that can be publicly understood and supported to the maximum extent possible.

---

[1] Available at http://www.nps.gov/yell/planyourvisit/upload/participationplan10-13-05.pdf.


EXHIBIT DD

WINTER USE PLANS FINAL ENVIRONMENTAL IMPACT STATEMENT
Yellowstone and Grand Teton National Parks and the John D. Rockefeller, Jr. Memorial Parkway

Table 5-1: Overall Planning Process

| Planning Step | Methods | Timeframe |
|---|---|---|
| Pre-scoping assessment | Assistance from the U.S. Institute for Environmental Conflict Resolution to help discern possibilities for agreement-seeking process such as negotiated rulemaking, or a focus on public participation programs geared to informing, consulting or involving. | January-March 2005 |
| Pre-scoping and beginning of scoping | Interviews with 60+ governmental and non-governmental interested parties | May-July 2005 |
| Scoping—gather ideas and concerns, confirm purpose, need, and significance | *Federal Register* notice, PEPC*, newsletter, web site, stakeholder assessments. | June-September, 2005 |
| Finalize Public Participation Plan | Plan conforms to the emphases stakeholders suggested: maximize information sharing, minimize expectations for large group meetings, recognize that other possibilities for engagement could emerge later. | October 2005 |
| Analyze scoping comments, review history and legal proceedings | Planning team research, scoping report. | Fall 2005 |
| Cooperating Agency MOU text concluded and signed | The Memorandum of Understanding (MOU) describes how agencies share information, with tailored roles for each agency. | January 2006 (began in June 2005) |
| Modeling scenarios | Discuss issues with and present scenarios to cooperating agencies and other stakeholders | Fall 2005 |
| Confirm issues, goals and opportunities; develop general alternative concepts | PEPC, newsletter, web site, stakeholder dialog, roving team meetings. Two large open house meetings in Montana and Wyoming. | Winter 2005/2006 |
| Analyze resources, identify impacts | Planning team research, stakeholder dialog. | Spring/Summer 2006 |
| Refine alternatives | Cooperating Agency meeting in Idaho to discuss preliminary alternatives. | April 2006 |
| Cooperating Agency review of preliminary and Draft EIS | Cooperating agency meetings in Wyoming and Idaho. Meetings open to other stakeholders as well. | December 2006 and May 2007 |
| Public review of Draft EIS; Publish Proposed Rule | *Federal Register* notice, PEPC, newsletter, web site, stakeholder dialog, information fair in Wyoming; public comment meetings | November 2006 through June 2007 |
| Analyze comments, make changes as appropriate, prepare Final EIS | Planning team refined elements of the document with attention to results of agency and public participation – verbal and written comments and ongoing work regarding discrete elements of the analyses. | June 2007 through September 2007 |
| Availability of Final EIS (30-day waiting period) | *Federal Register* notice, PEPC, newsletter, and web site | September-October 2007 |
| Prepare and publish Record of Decision | Planning team, with recommendation by park superintendents and approved by NPS regional director; *Federal Register* notice | October-November 2007 |
| Publish Final Rule | *Federal Register* notice | November 2007 |

* PEPC is the National Park Service's "Planning, Environment, and Public Comment" website, the Internet site at which members of the public offer comments on NPS planning projects.

EXHIBIT DD

WINTER USE PLANS FINAL ENVIRONMENTAL IMPACT STATEMENT
Yellowstone and Grand Teton National Parks and the John D. Rockefeller, Jr. Memorial Parkway

## 5.2 Public and Agency Participation

### 5.2.1 Participation Plan and Assistance

The winter use team turned to the U.S. Institute for Environmental Conflict Resolution's roster of facilitators and mediators for assistance in late April 2005. The NPS then utilized the Rocky Mountain Cooperative Ecosystems Study Unit (RM-CESU) to implement an agreement between itself, the Montana State University Department of Political Science, and Cadence, Inc. This agreement allows for impartial assessment services, meeting facilitation with cooperating agencies and other stakeholders, and continual assistance on the public and agency involvement elements of the EIS and rulemaking processes.

### 5.2.2 NEPA, Rulemaking, and Assessment[2] Context

Over the past few decades, litigation steered many NEPA decisions through long, confrontational, narrowly-defined debates. This has proven to be true at times for winter use in the two parks over the past decade. In some other national and regional cases, litigation sometimes seems to be the only available tool to secure adequate environmental protection and appropriate agency action. Despite its utility, the use of this power has also, at times, led to an unintended consequence of stalled (or slowed) decision outcomes and polarized political climates (Chandler et al. 2000).

This is the sixth NEPA process on winter use in the three parks. The rulemaking process has also been necessary to get a regulation in place to implement prior NEPA decisions.

In light of the long NEPA and litigation history of this issue and the procedural fatigue many of the most involved participants expressed, public and agency involvement was tailored to be responsive and flexible.

What this meant in practice is that continual assessment[3] was needed to keep checking on the fit and effectiveness of winter use participation work. That turned out to be key: to have a flexible participation plan that was responsive to how stakeholders told NPS they wanted to be engaged, but to also stay open to adjusting the participation strategies as indicated by stakeholders as the project progressed.

There were five main participation assessments between winter of 2004-2005 and spring of 2007, ranging from very informal and brief, to more intense and deliberate, as described below. From July 2005 forward, these assessments and brief thematic summaries were prepared by Cadence, broadly shared with the full stakeholder contact list, and then used by NPS to guide next steps for public and agency participation.

### Assessment 1: Winter 2004-2005

The pre-planning process began in winter of 2004-2005 when NPS asked for assistance from the U.S. Institute for Environmental Conflict Resolution, a federal agency created by Congress to assist parties in resolving environmental, natural resource, and public lands conflicts. Yellowstone management and staff asked for assistance to help them make an

---

[2] "Assessment" as currently practiced is not formulaic or standardized, nor should it be. A comprehensive but flexible conceptual framework for assessment work is preferable, one that *asks participants to examine and probe the appropriateness of various tools, techniques, and desired outcomes* (Bean et al. 2007, emphasis added).
[3] Assessment is defined as an impartial analysis that helps prepare the path for a conflict-resolution or agreement-seeking process. This analysis can include a determination that such a process is not timely or appropriate (Bean et al. 2007).


EXHIBIT DD
September 2007

WINTER USE PLANS FINAL ENVIRONMENTAL IMPACT STATEMENT
Yellowstone and Grand Teton National Parks and the John D. Rockefeller, Jr. Memorial Parkway

informed decision about how to proceed toward meaningful public and agency involvement in the forthcoming (this) NEPA process.

The consultation between the U.S. Institute and NPS was a verbal exploration to discern the level of interest in and support for mediation. How might a negotiated rulemaking or mediation be structured? What topics could reasonably be addressed? Are key parties interested, and if so, under what conditions? Under what circumstances would a mediated process and potential result be the best option for stakeholders? What technical resources should be brought to the table and in what manner?

The conclusion at the time was that conditions were not ripe for an agreement-seeking process.

## Assessment 2:  Spring/Summer 2005

In May 2005, approximately one month before the Park Service published the Notice of Intent that launched scoping, the winter use team invited cooperating agencies to work with the facilitation team to jointly negotiate the terms of the Memorandum of Understanding that would guide their involvement during this EIS. The NPS also asked the Cadence team to conduct an informal situation assessment for public and agency participation, this time with both the opportunities and the limits of the NPS participation "promise" firmly in view (promise is a term of art coined by the International Association for Public Participation). For this process, "the NPS promise to governmental and non-governmental stakeholders is to open information sharing. We will actively listen to and acknowledge concerns. We will let you know where timely agency and public input was incorporated in the EIS, and how it did/did not influence NPS decisions."  This promise is located between the "consult" and "involve" vectors of the International Association for Public Participation spectrum.

EXHIBIT DD

WINTER USE PLANS FINAL ENVIRONMENTAL IMPACT STATEMENT
Yellowstone and Grand Teton National Parks and the John D. Rockefeller, Jr. Memorial Parkway

## IAP2 Public Participation Spectrum
Developed by the International Association for Public Participation

### INCREASING LEVEL OF PUBLIC IMPACT

| INFORM | CONSULT | INVOLVE | COLLABORATE | EMPOWER |
|---|---|---|---|---|
| **Public Participation Goal:** | **Public Participation Goal:** | **Public Participation Goal:** | **Public Participation Goal:** | **Public Participation Goal:** |
| To provide the public with balanced and objective information to assist them in understanding the problem, alternatives, opportunities and/or solutions. | To obtain public feedback on analysis, alternatives and/or decisions. | To work directly with the public throughout the process to ensure that public concerns and aspirations are consistently understood and considered. | To partner with the public in each aspect of the decision including the development of alternatives and the identification of the preferred solution. | To place final decision-making in the hands of the public. |
| **Promise to the Public:** | **Promise to the Public:** | **Promise to the Public:** | **Promise to the Public:** | **Promise to the Public:** |
| We will keep you informed. | We will keep you informed, listen to and acknowledge concerns and aspirations, and provide feedback on how public input influenced the decision. | We will work with you to ensure that your concerns and aspirations are directly reflected in the alternatives developed and provide feedback on how public input influenced the decision. | We will look to you for direct advice and innovation in formulating solutions and incorporate your advice and recommendations into the decisions to the maximum extent possible. | We will implement what you decide. |
| **Example Techniques to Consider:** | **Example Techniques to Consider:** | **Example Techniques to Consider:** | **Example Techniques to Consider:** | **Example Techniques to Consider:** |
| • Fact sheets<br>• Web sites<br>• Open houses | • Public comment<br>• Focus groups<br>• Surveys<br>• Public meetings | • Workshops<br>• Deliberate polling | • Citizen Advisory Committees<br>• Consensus-building<br>• Participatory decision-making | • Citizen juries<br>• Ballots<br>• Delegated decisions |

**Figure 5-1:** International Association for Public Participation spectrum (**IAPP 2007**).

In June, the Cadence team made a series of approximately 60 individual and small group phone calls and visits to ask governmental and non-governmental interested parties their view of the situation and how they wanted to be engaged in the new NEPA process. The Cadence team wrote a draft assessment document of the situation's possibilities for participation and how those fit with the promise (which communicates both the limits and opportunities the agency and stakeholders had identified for the process).

The July 2005 assessment document, with a series of unattributed thematic notes about participation, was delivered simultaneously to NPS and all stakeholders (no party pre-reviewed or edited the themes) and then received an accuracy check by the 60 interviewees via electronic mail.

The six main participation themes affirmed from that independent assessment included:



WINTER USE PLANS FINAL ENVIRONMENTAL IMPACT STATEMENT
Yellowstone and Grand Teton National Parks and the John D. Rockefeller, Jr. Memorial Parkway

- a low level of trust about the process;
- fatigue in the process;
- confusion about how past winter use analyses are connected to current winter use analyses and the current EIS work;
- concern about ongoing or expected litigation that could confound participation efforts;
- uncertainty regarding some of the science and ecology aspects, monitoring results, and their use or disuse by the agency and others; and
- tension over how NPS was hearing and using local/regional/national interests in winter use planning for these parks.

Many of the interested parties themselves acknowledged what the NPS had concluded in the previous winter with assistance from the U.S. Institute for Environmental Conflict Resolution: conditions were not ripe for mediation or shared decision making. That is, the necessary preliminary agreements and organizational structures simply were not present under the circumstances at that time.

NPS embarked on a public and agency outreach and participation effort with the explicit goal of investing in disclosure and exchange of information and rebuilding trust in working relationships for the long term, and to lay possible groundwork so that collaboration, mediation and/or a negotiated settlement might be possible in the future. The related goal was to improve the overall potential for a durable winter use management scheme in the two parks. NPS made this commitment in spite of the continuing litigation context and the confining aspects of that situation that tend to mirror/reproduce, the adversarial relationships onto every aspect of the EIS, and onto the working relationships between and among those with a stake in the outcomes.

## Assessment 3: Winter/Spring 2006

Cadence used email and telephone communication to conduct the least structured of all five assessments immediately following a complaint by interested parties in Wyoming that the open meeting to describe the preliminary scenarios for the EIS was scheduled only for Bozeman, Mont. After checking with a sampling of interested groups and individuals most likely to attend and engage, the NPS scheduled a second and identical open meeting in Jackson, Wyoming for the same week as the Bozeman meeting (March 2006). The Cadence team asked stakeholders their preferences for how to structure the meetings, especially since one of the key themes from the previous summer had been to avoid large group meetings as general principal (primarily because of difficult memories of past large group meetings associated with previous winter use planning). Process evaluations by participants were positive about the chance to talk with NPS staff and each other and learn of the scenarios.

## Assessment 4: Fall 2006

The Cadence team posed the following three questions via email to about 100 governmental and non-governmental interested parties and received responses back from a mix of people (nine governmental cooperators/agencies, seven nongovernmental groups, and two unaffiliated individuals). The questions were intended to help identify the salient themes of opinions about the public participation process held by participants, not to provide a statistical analysis of the predominance of any particular opinions:

- How well did the public and agency engagement methods used in the last year suit your needs?


EXHIBIT DD

WINTER USE PLANS FINAL ENVIRONMENTAL IMPACT STATEMENT
Yellowstone and Grand Teton National Parks and the John D. Rockefeller, Jr. Memorial Parkway

- Do last year's themes from participants (such as process fatigue and steering away from large meetings) still ring true? Are there new themes that ought to be acknowledged and responded to in the participation methods?
- What changes do you believe would improve the public and agency engagement process in the next year when the NPS expects to publish the Draft EIS and conduct the corresponding public comment period?

The resultant themes about winter use participation were:

*NPS Management Policies of great interest* – the Secretary of the Interior's clarification in summer 2006 of the NPS's approach to its dual goals by was perceived by many as directly applicable to the winter use plan. Specifically, the outcome of this Winter Use Planning process was anticipated as a "first example" of the NPS's implementation of this clarified policy.

*Trust and distrust of the NPS* – although some parties expressed a high opinion of the integrity of the NPS, chronic distrust of the agency continued to be a strong theme. There was, however, some acknowledgement that the NPS has handled the process in this past year better than in earlier Winter Use processes. Rebuilding trust was recognized as slow work especially in the midst of a process and expected litigation that could be expected to strain some parties' confidence in the integrity of others.

*Format for public meetings* – whereas most public participation processes are intended to introduce to the public a topic that may be relatively unfamiliar to them, the question of winter use is now generally well understood. The type of information sought by participating stakeholders is, therefore, quite advanced, so that, for example, open house meetings may require more technical personnel to enable participants to get the information that they seek. Much of the interested public has formed well-developed opinions on the outcome that they desire from this process. So there was limited benefit to providing public meetings as a forum for the public airing of perspectives or for debate. Also, there was concern that large meetings can be intimidating for participants who fear being shamed, discredited, or shouted at. There was even a fear of violence expressed. Despite this concern, others accept "venting" at meetings as an unavoidable, necessary part of the process.

*Winter use management by administration or by litigation* – the theme of "Process Fatigue" that was so strong in the summer of 2005 was now more clearly expressed as a perception that the administrative process will probably be followed by a litigated process. Emphasis on public and agency participation within the administrative process provides opportunities for NPS to sustain the relationships that it needs for the adaptive management of the Park. These relationships will inevitably be strained by litigation.

*Format for meetings of cooperating agencies* – some respondents preferred meetings at which all Cooperating Agencies (CAs) meet together with the opportunity to understand each others' interests. Others prefer that one agency at a time meet with NPS. Still others are confined by travel restrictions (small or no travel budgets).

*Availability of data* – there was interest in knowing what the NPS is learning from its studies as soon as it has the information and in hearing how the NPS is interpreting the information. The provision of this information as it becomes available is reassuring, because it indicates the NPS's interest in staying engaged with stakeholder groups. It was noted that the frequent delivery of information as it becomes available has reduced opportunities for newsworthy issues to develop.

*General communication* – there was great interest in knowing about alternatives and what the preferred alternative would be. Several stakeholders noted Congressional delegations need


EXHIBIT DD
September 2007

WINTER USE PLANS FINAL ENVIRONMENTAL IMPACT STATEMENT
Yellowstone and Grand Teton National Parks and the John D. Rockefeller, Jr. Memorial Parkway

to be encouraged to participate within the agency and public participation process rather than on its periphery or outside of it. Related to this is the realization that as all three branches of government are involved in decision making in three separate, but connected, arenas (administrative, political, and judicial), this often makes it all the more confounding to an individual or group seeking to shape the outcomes of winter use in the parks.

## Assessment 5:  Spring 2007

Coinciding with the release of the Draft EIS for formal public comment, the Cadence team made another round of phone calls to about a dozen governmental and non-governmental people, local to national, with a stake in the outcomes of the winter use decision making. They asked for additional thoughts/perspectives on what meeting format(s) could be most useful and helpful, in their view, during the formal public comment period.

The Cadence team distilled three main messages from that set of informal calls and distributed them via email to continue the principal of conducting all work with full transparency:

• During this formal public comment period, go national – (e.g., it is important to be congruent with local and national interest in these National Parks and public meetings should occur locally and in out-of-area places).

• Communicate what is likely to happen next winter season. (e.g., there is much uncertainty, especially in gateway communities, about what is going to happen next winter season, and it is critically important to help people see what is most likely to occur).

• Explain (especially to Cody and Wyoming-based interests) what it would take for NPS to keep Sylvan Pass open to motorized oversnow traffic. (e.g., there was/is much grassroots involvement about the current NPS preferred alternative to close Sylvan Pass to motorized oversnow traffic in the winter. Even those outside the Cody area mentioned how important it will be to help people know how and/or where they can or cannot work with NPS to shape that aspect of the current NPS preferred alternative).

### 5.2.3 Participation Plan Elements

The full text of the Public and Agency Information/Participation Plan, which NPS adopted in late 2005 pursuant to the first assessment, may be found at http://www.nps.gov/yell/planyourvisit/upload/participationplan10-13-05.pdf . The document provides more background, explanation of participation themes, descriptions of these elements, excerpts from the NPS Director's Order #75A on Civic Engagement and Public Involvement, CEQ guidance regarding cooperating agency involvement, and other references.

The main participation strategies of this plan were:

• Documents and noticing in the Federal Register (EIS, Rule, ROD)

• Customized cooperating agency work (one-on-one calls, written communication, meetings, and three full group meetings)

• Roving team meetings (see Table 5-2). These were a valuable tool for sharing information and receiving input to the planning process. Early meetings were held to discuss the history and background of winter use planning and the need for a new planning effort; beginning in November 2005 a range of modeling scenarios were introduced. In April 2006, draft alternatives were presented. In December 2006, a Cooperating Agency Review Draft EIS was presented. Many meeting summaries are available on the winter use planning web site.

• Media communication (news releases, news advisories and interviews)



EXHIBIT DD

WINTER USE PLANS FINAL ENVIRONMENTAL IMPACT STATEMENT
Yellowstone and Grand Teton National Parks and the John D. Rockefeller, Jr. Memorial Parkway

- Outreach to Congressional delegation staff
- Project newsletters sent to full stakeholder contact list via surface mail
- Rounds of phone calls and/or emails to various stakeholders (from NPS and also via the Cadence team as part of their periodic assessments of the participation work)
- Translation task (NPS did ongoing tracking of how the agency used/did not use what stakeholders said)
- Web archive and PEPC updates. The winter use website http://www.nps.gov/yell/planyourvisit/winteruse.htm, has been a project library/archive and a useful tool for disseminating information about the status of the plan to the public throughout the process. The NPS Planning, Environment and Public Comment website at http://parkplanning.nps.gov was used throughout the process to notify stakeholders of meetings and to receive written comments.
- Public meetings. In addition to the three full cooperating agency meetings (which were always open public meetings), NPS convened two large open meetings in the spring of 2006, a December 2006 technical information fair coinciding with the release of the preliminary DEIS for cooperating agency review (November 2006), and four public comment meetings during the formal public comment period in the spring of 2007 in Montana, Wyoming, Minnesota, and Colorado (See Table 5-2).
- Project contact lists. Participants were continually asked whether they would like to be added to the NPS contact list at face to face meetings and the Cadence team built and used an email contact list as the project developed through the initial interviews in the summer of 2005 and by asking, "who else do you think would appreciate being contacted?"
- Invitations to review and comment (technical review by cooperating agencies and stakeholders with relevant expertise) on the following documents:
  o Soundscapes Modeling Plan and Draft Report
  o Soundscapes Monitoring Reports
  o Air Quality Modeling Plan and Draft Report
  o Air Quality Monitoring Reports
  o Wildlife Monitoring Reports
  o Economics Modeling Plan
  o Economic Analysis Memorandum and Draft Modeling Report
  o The research proposal "Evaluating key uncertainties regarding road grooming and bison movements"
  o Operational Risk Management Assessment for Avalanche Hazard Mitigation at Sylvan Pass and Talus Slope


EXHIBIT DD
September 2007

**WINTER USE PLANS FINAL ENVIRONMENTAL IMPACT STATEMENT**
Yellowstone and Grand Teton National Parks and the John D. Rockefeller, Jr. Memorial Parkway

**Table 5-2: Meetings held during winter planning process**

| Stakeholder | Meeting location | Date |
|---|---|---|
| State of Wyoming | Cheyenne, WY | July 2005 |
| Park County, WY | Cody, WY | September 2005 |
| State of Montana | Helena, MT | September 2005 |
| Park County, MT | Livingston, MT | October 2005 |
| Fremont County, ID | West Yellowstone, MT | November 2005 |
| State of Idaho | Boise, ID | November 2005 |
| EPA | Denver, CO | November 2005 |
| State of Wyoming | Cheyenne, WY | November 2005 |
| Greater Yellowstone Coordinating Committee | Cody, WY | November 2005 |
| Gallatin County, MT | Bozeman, MT | November 2005 |
| Park County, WY; Park County, MT | Telephone | November 2005 |
| State of Wyoming | Telephone | November 2005 |
| NPS and Xanterra Staff | Mammoth, WY | December 2005 |
| Winter Guides & Outfitters | Old Faithful, WY | December 2005 |
| State of Montana: Conservation Interests | Bozeman, MT | December 2005 |
| ISMA, BRP, Yamaha, Polaris, Arctic Cat | Houghton, MI | January 2006 |
| USFS; OMB staff | Telephone | January 2006 |
| BRC and local businesses | West Yellowstone, MT | January 2006 |
| BRC, ACSA and local businesses | Jackson, WY | January 2006 |
| Conservation Interests: Teton County, WY | Jackson, WY | February 2006 |
| Local congressional staff | Telephone | March 2006 |
| Open house | Bozeman, MT | March 2006 |
| Open house | Jackson, WY | March 2006 |
| Cooperating Agencies, GYC, BRC | Idaho Falls, ID | April 2006 |
| New NPS Employees | Gardiner, MT | June 2006 |
| Island Park Area Chamber of Commerce | Island Park, ID | August 2006 |
| Yellowstone Concessioners | Bozeman, MT | October 2006 |
| Eastern Idaho's Yellowstone Teton Territory group | Rexburg, ID | October 2006 |
| Montana State Snowmobile Association | Bozeman, MT | October 2006 |
| Local congressional staff | Telephone | November 2006 |
| NPS Employees, at multiple duty locations | Yellowstone NP | November 2006 |
| Cooperating Agencies, other stakeholders | Cody, WY | December 2006 |
| State of Montana | Helena, MT | December 2006 |
| Winter Guides & Outfitters | Old Faithful, WY | December 2006 |
| Winter Operators | Jackson, WY | December 2006 |
| Winter Operators | West Yellowstone, MT | December 2006 |
| Parks subcommittee, Cody Chamber | Cody, WY | January 2007 |
| State of WY staff, Senators and Representatives, Park County Commissioners | Billings, MT | January 2007 |
| Wyoming Governor Freudenthal and staff | Old Faithful, WY | February 2007 |
| Wyoming Senators and Representatives | Cheyenne, WY | February 2007 |
| State of Wyoming, Governor's staff | Cheyenne, WY | March 2007 |
| Park County, WY Commissioners | Cody, WY | March 2007 |
| "Shut Out of Yellowstone" Forum | Cody, WY | March 2007 |
| Delegation and Local Congressional Staff | Telephone | March 2007 |
| Cooperating Agencies, other stakeholders | Idaho Falls, ID | May 2007 |
| Public Meetings and Guide and Outfitter meetings (6 total) | Jackson; Cody; West Yellowstone (2); St. Paul; Lakewood | May – June 2007 |
| NPS Employees, at multiple duty locations | Yellowstone NP | June 2007 |



EXHIBIT DD

WINTER USE PLANS FINAL ENVIRONMENTAL IMPACT STATEMENT
Yellowstone and Grand Teton National Parks and the John D. Rockefeller, Jr. Memorial Parkway

### 5.2.4 Cooperating Agencies

Table 5-3: List of Cooperating Agency Representatives

| Name | Agency |
|------|--------|
| Tamra Cikaitoga | Fremont County, Idaho |
| Pat Flowers | State of Montana, Department of Fish, Wildlife and Parks |
| Tim French | Park County, Wyoming |
| Becki Heath | Gallatin National Forest |
| Larry Lahren | Park County, Montana |
| Bill Murdock | Gallatin County, Montana |
| Bill Paddleford | Teton County, Wyoming |
| Tom Puchlerz | Gallatin County, Montana |
| Temple Stevenson | State of Wyoming, Office of the Governor |
| Phil Strobel | U.S. EPA Region 8 |
| Mark Toft | State of Wyoming, Office of the Governor |
| Carl Wilgus | State of Idaho, Department of Commerce and Labor |

### 5.2.5 Public Scoping Comments and Public Input on DEIS

The public scoping period for this EIS was June 24 – September 1, 2005. The NPS received 33,365 documents commenting on the scope of the EIS. Of these, about 90% were form letters of various kinds and about 1% contained unique or substantive comments rather than, or in addition to, opinion statements. Comments were received from persons in all U.S. states and territories and from other countries.

Although the public scoping period was intended to garner comments about the scope of this EIS, many people simply expressed their opinions regarding winter use management in the parks. A detailed report of the public scoping comments is available for public review on the NPS website: http://www.nps.gov/yell/parkmgmt/winterusetechnicaldocuments.htm. Chapter V of the FEIS contains a summary of public involvement during this process.

The Draft EIS was on public review from March 27 – June 5, 2007. The NPS received approximately 120,000 documents commenting on the DEIS. A summary of comments and responses is found in Appendix I of the FEIS. Four public meetings were held during the EIS comments period:  Cody, Wyoming; West Yellowstone, Montana; St. Paul, Minnesota; and Lakewood, Colorado. A detailed report is available at the above web site.

# 5.3 List of Preparers and Contributors

Table 5-4: List of preparers

| Name | Title or Role | Agency or Affiliation |
|------|---------------|----------------------|
| **Project management and coordination** | | |
| Gary Pollock | Management Assistant | Grand Teton National Park |
| John Sacklin | Management Assistant | Yellowstone National Park |
| Denice Swanke | Outdoor Recreation Planner | Yellowstone National Park |
| Mike Yochim | Outdoor Recreation Planner | Yellowstone National Park |
| **Technical expertise** | | |
| Shan Burson | Ecologist | Grand Teton National Park |
| Troy Davis | Wildlife Biologist | Yellowstone National Park |


EXHIBIT DD

### WINTER USE PLANS FINAL ENVIRONMENTAL IMPACT STATEMENT
#### Yellowstone and Grand Teton National Parks and the John D. Rockefeller, Jr. Memorial Parkway

| | | |
|---|---|---|
| Laurie Domler | NEPA Specialist | National Park Service |
| Kevin Franken | Planning Assistant | Administrative Record and Support |
| Bruce Peacock | Economist | National Park Service |
| John D. Ray | Atmospheric Chemist | National Park Service |
| Robert Rossman | DEIS Contractor | Rossman Services |
| Barry Roth | Deputy Associate Solicitor | U.S. Department of the Interior |
| Christine Turk | Environmental Quality Coordinator | National Park Service |
| Deborah Van De Polder | Planning Assistant | Administrative Record and Support |
| Jason Waanders | Attorney-Advisor | U.S. Department of the Interior |
| Aaron Worstell | Air Resource Specialist | National Park Service |
| **Consultants** | | |
| Martha Bean | Public Engagement and Facilitation | Cadence, Inc. |
| Nedra Chandler | Public Engagement and Facilitation | Cadence, Inc. |
| Carol Cole | Public Comment Analysis | Northwind Environmental |
| Nicolas Dewar | Public Engagement and Facilitation | Cadence, Inc. |
| John Duffield | Economic Analysis | University of Montana |
| Aaron Hastings | Soundscapes Analysis | DOT, Volpe Center |
| Chris Neher | Economic Analysis | University of Montana |
| James Wu | Air Quality Analysis | Air Resource Specialists |
| **Management Support** | | |
| Jim Bellamy | Deputy Superintendent (retired) | Grand Teton National Park |
| Colin Campbell | Deputy Superintendent | Yellowstone National Park |
| Chris Lehnertz | Deputy Superintendent | Yellowstone National Park |
| Suzanne Lewis | Superintendent | Yellowstone National Park |
| Al Nash | Chief of Public Affairs | Yellowstone National Park |
| Mary Gibson Scott | Superintendent | Grand Teton National Park |
| Michael Snyder | Intermountain Regional Director | National Park Service |
| Bob Vogel | Deputy Superintendent | Grand Teton National Park |
| Franklin Walker | Deputy Superintendent (retired) | Yellowstone National Park |

EXHIBIT DD

**Department of the Interior**

# Departmental Manual

**Effective Date**: 5/14/98

**Series**: Administrative Procedure

**Part 318**: Federal Register Documents

**Chapter 6**: Clearance Procedures

**Originating Office**: Executive Secretariat and Office of Regulatory Affairs

**318 DM 6**

6.1 **What does this chapter do?** This chapter tells you how to get the approvals you need before you can publish your Federal Register document.

6.2 **What approvals must I get before a document is signed?** Except as provided in 6.10, the following reviewers must approve before signature each rulemaking document prepared for signature by a Secretarial Officer:

A. Office of the Solicitor; (We recommend that you begin consulting informally with SOL early in the rulemaking process.)

B. ORA;

C. PPA when economic or benefit-cost analyses are involved; (We recommend that you begin consulting with PPA early in the rulemaking process and reach a general understanding on analytical requirements and approaches.)

D. Bureau Information Collection Clearance Officer; and

E. Other bureaus/offices that have been involved in the planning and development of the document.

6.3 **When must I obtain ORA approval?** You must submit your rule to ORA for approval at the same time as you submit it to other offices external to your bureau for review and surnaming. You must also submit your ROC (see Chapter 3) to PPA at that time.

6.4 **Does ORA have to review all rulemaking documents?** Yes. You must submit all ANPRMs, proposed and final rules, and other policy making documents to ORA.

6.5 **How much time should I allow for ORA review?** We will complete review of each rule within 10 working days of receipt. After you have obtained all necessary surnames and your rule has been signed, you must return the rule and a copy of the surnames you have obtained to ORA, where we will complete our final administrative review within 2 working days.

6.6 **How can I get ORA review in less than 10 working days?** If you need Departmental review in

## EXHIBIT EE

less than 10 working days, notify us and explain why you need expedited review (e.g., if there is a statutory or judicial deadline). We will honor your request if workload permits.

6.7 **Should I send the original document to ORA?** No. Send us a copy of your document. If OMB will review the rule, send us the original E.O. 12866 Submission Form (see Illustration 1 to this Chapter). Keep the original rule and internal file copies until the rule is approved for publication.

6.8 **How can I expedite the approval process?** You may ask us for assistance in expediting any part of the approval process after a document leaves your bureau. You may also ask us to obtain external surnames for you. In addition, you may contact PPA on analytical and economic issues in sufficient time to reduce any delays on that score.

6.9 **What additional approval is required if a document affects small businesses?** If the rule will have a significant economic effect on a substantial number of small entities, you must get the approval of the Office of Small and Disadvantaged Business Utilization as well as the offices listed in section 6.3.

6.10 **Are there any exceptions to the requirements of section 6.2?** Yes. The following documents are the only exceptions to the clearance procedures contained in section 6.2:

A. Public Land Orders. Send these documents to the following offices for review:

(1) Field office (including the Field or Regional Solicitor);

(2) Bureau of Land Management review;

(3) BLM Regulatory contact;

(4) Director, BLM;

(5) Other affected bureaus; and

(6) Assistant Secretary - Land and Minerals Management.

B. Environmental Impact Statement (EIS) Notices of Availability. Send these documents for review in accordance with the table below.

| If the decision authority for the EIS is assigned... | the notice must be cleared and signed by... |
| --- | --- |
| to the bureau | the bureau head. |
| to the program Assistant Secretary | the program Assistant Secretary. |
| above the Assistant Secretary level | the Office of Environmental Policy and Compliance (clearance), the Assistant Secretary - Policy, Management and Budget or his/her designee (signature). |
| to more than one program Assistant Secretary | the Office of Environmental Policy and Compliance (clearance), the Assistant Secretary - Policy, Management and Budget or his/her designee (signature). |

EXHIBIT EE

C. <u>State and Tribal Program Amendments under Titles IV and V of the Surface Mining Control and Reclamation Act of 1977</u>. Actions by the Office of Surface Mining Reclamation and Enforcement to approve, disapprove, or supersede amendments to State and tribal programs under Titles IV and V of the Surface Mining Control and Reclamation Act of 1977 are reviewed in the field by the Office of the Solicitor and then signed by an OSM official prior to publication in the Federal Register.

6.11 **Who signs rules?** A Secretarial Officer (the Secretary, the Deputy Secretary, the Solicitor, and the Assistant Secretaries) signs rulemaking documents under the conditions in their delegation chapters (the 200 Series of the Departmental Manual). In addition, officials in the Office of Surface Mining Reclamation and Enforcement have been delegated authority to sign rules approving, disapproving, or superseding amendments to State and tribal programs under Titles IV and V of the Surface Mining Control and Reclamation Act of 1977.

6.12 **What additional documentation do I need for a significant rule?** For each significant rule (under E.O. 12866), you must send us:

A. A copy of the rule;

B. A description of the need for the rule and an explanation of how the rule fulfills that need;

C. A cost-benefit analysis;

D. An explanation of how the rule is consistent with a statutory mandate; and

E. A statement of how the rule promotes the President's priorities and avoids undue interference with State, local, or tribal governments.

6.13 **What additional material must I send to ORA for an economically significant (under E.O. 12866) rule?** If your rule has an annual effect on the economy of $100 million or more, or adversely affects the economy, the environment, public health or safety, or other levels of government, you must send us:

A. An analysis and quantification of the costs and benefits of both the rule and any reasonably feasible alternatives to the rule; and

B. An explanation of why the alternative you selected is preferable to other alternatives.

6.14 **What other information must I submit when a rule affects a substantial number of small entities?** When a rule has a significant economic impact on a substantial number of small entities, you must send us a copy of any initial or final regulatory flexibility analysis as well as a description of steps taken to minimize that impact. See Appendix 3 to Chapter 3.

6.15 **Can I get extra time to work on my small entity flexibility analysis?**

A. The Secretary may delay or waive publication of the initial regulatory flexibility analysis. He/she may delay, but not waive, the final regulatory flexibility analysis. To do this, he/she must publish a notice in the Federal Register.

(1) The notice must state that the rule is being published to respond to an emergency that makes timely completion of a small entity flexibility analysis impractical.

EXHIBIT EE

(2) The finding must be published no later than the final rule and must include the reasons for the finding.

(3) The finding may be subject to judicial review under §611 of the Regulatory Flexibility Act.

B. If you delay preparing an analysis under paragraph A, you must publish a final regulatory flexibility analysis within 180 days of publishing the final rule. If you do not, the rule will lapse and have no effect. In this case, you cannot republish the rule until you publish a final small entity flexibility analysis.

C. See guidance in Appendix 3 to Chapter 3.

6.16 **Do I need a memorandum for reviewers?** No. The preamble and the rule should be self-explanatory.

6.17 **When will a press release accompany a rule?** Your bureau public affairs office should coordinate with the Office of Communications on whether a press release is necessary. If a press release is prepared, you must circulate it with the rule, and you must send the Office of Communications a file copy of the rule.

6.18 **What must I include when I send a rule to the Office of Management and Budget for review?** You must complete an OMB Form 83-R and attach it to your rule. An ORA official must sign the OMB Form in addition to the Program Official and Authorized Regulatory Contact. Send OMB three copies of the same material that you send us under sections 6.12-6.14. However, if your rule is <u>economically</u> significant as defined by E.O. 12866 section 3(f)(1) or imposes an "unfunded mandate" as defined by 2 U.S.C. 1532, you must send <u>four</u> copies of the rule and supporting material.

6.19 **How long will OMB take to review a rule?** If OMB must review your rule, OMB has the following time frames to complete the review under E.O. 12866:

| For a ... | OMB may take no longer than... |
|---|---|
| notice of intent, advance notice of proposed rulemaking, or other preliminary action | 10 working days |
| regulatory action that OMB has not previously reviewed | 90 calendar days |
| regulatory action that OMB has previously reviewed and that you have not changed materially | 45 calendar days |

6.20 **Will OMB expedite review of a rule in an emergency?** You must schedule development of each rule to allow enough time for OMB review. If, due to unforeseen circumstances, you need OMB approval before the deadlines in section 6.19, call your bureau regulatory contact as soon as possible.

6.21 **How does OMB approval of collections of information under the Paperwork Reduction Act affect approval of a rule?** OMB must approve each proposed rule containing a collection of information. An OMB form 83-I and supporting statement must be completed and submitted to OMB when the NPRM is published. The 83-I and supporting statement must be approved by the Department (PPA) before it may be sent to OMB. You may not submit to OMB a final rule containing a collection of information until OMB has approved the collection. See 381 DM 11 and 12 and Attachment 2 ("Collections of Information from the Public: Interim Guidelines") of the Interim Guidelines issued by PPA (dated March 20, 1997) for guidance in preparing the supporting statement, and consult with your

EXHIBIT EE

bureau information collection officer.

6.22 **What is the last step before I send a rule to be published?** You must send us a copy of each rule for a final review after signature. Keep the original signed rule and internal file copies until the rule is approved for publication. You may not send a rule to the Federal Register until we have completed our final review. We will complete this review within 48 hours of receipt of each rule.

6.23 **What other copies of final rules must I distribute?** To comply with the Small Business Regulatory Enforcement Fairness Act (5 U.S.C. 801), you must distribute copies of each final rule and related material as indicated in the table below. You must deliver these copies before the final rule can take effect.

| You must send to... | the following material... |
|---|---|
| The Speaker of the House of Representatives | - A transmittal memo in the format contained in Appendix 1 to this Chapter<br><br>- A copy of the rule |
| The President of the Senate | - A transmittal memo in the format contained in Appendix 1 to this Chapter<br><br>- A copy of the rule |
| The General Counsel of the General Accounting Office | - A transmittal memo in the format contained in Appendix 1 to this Chapter<br><br>- A copy of the rule<br><br>- A copy of any cost/benefit analysis prepared for the rule<br><br>- A copy of any regulatory flexibility analysis prepared for the rule<br><br>- A copy of any unfunded mandates analysis prepared for the rule |

6.24 **When will a final rule become effective?** You must specify an effective date in the preamble of the final rule. The effective date for a non-major (under SBREFA) rule generally must be at least 30 days after transmittal to Congress. For a major rule, the effective date must be 60 days after transmittal to Congress (see 5 U.S.C. 808 for certain limited exceptions). The rule will become effective on this date unless Congress disapproves it under 5 U.S.C. 802.

6.25 **Can a final rule ever become effective less than 30 days after publication?** Yes. For a rule to become effective sooner than 30 days after publication, you must explain in the preamble that you have established an earlier effective date because the rule meets one of these conditions:

A. The rule grants an exception or relieves a restriction;

B. The rule is an interpretation or policy statement; or

EXHIBIT EE

C. You have a good cause for the rule to become effective earlier.

6.26 **How do I incorporate material by reference?** Incorporation by reference allows you to refer to materials, such as technical standards, that are already published elsewhere. The Director of the Federal Register must approve each incorporation by reference. See the Document Drafting Handbook and 1 CFR 51 for instructions on how to incorporate material by reference.

6.27 **What Department clearances do I need for a Federal Register <u>notice</u>?** The approval requirements for notices depend upon the level at which they are signed. Notices should generally be signed at the lowest appropriate level. If you have questions about what approvals are required for a notice or at what level it should be signed, call your bureau regulatory contact or ORA.

\------------------------------------------------------------------------------------------------------------

**Appendix 1 to Chapter 6**

[Date]

Honorable Newt Gingrich

Speaker of the House of

Representatives

The Capitol, Room H-209

Washington, D.C. 20515

<u>BY HAND</u>

Dear Mr. Speaker:

Attached please find a final rule submitted for your review in accordance with the requirements of Public Law 104-121.

A concise general statement relating to the rule, in conformity with the public law, may be found on the first page of the rule. Please refer any questions about the rule to the contact person named in the rule's preamble.

Sincerely,

Assistant Secretary

Attachment: [Give title of rule]

\------------------------------------------------------------------------------------------------------------

[Date]

Honorable Al Gore

EXHIBIT EE

President of the Senate

The Capitol, Room S-212

Washington, D.C. 20510

<u>BY HAND</u>

Dear Mr. President:

Attached please find a final rule submitted for Congressional review in accordance with the requirements of Public Law 104-121.

A concise general statement relating to the rule, in conformity with the public law, may be found on the first page of the rule. Please refer any questions about the rule to the contact person named in the rule's preamble.

Sincerely,

Assistant Secretary

Attachment: [Give title of rule]

------------------------------------------------------------------------------------------------------------------

[Date]

Mr. Robert P. Murphy

General Counsel

U.S. General Accounting Office

441 G Street NW

Washington, D.C. 20548

<u>BY HAND</u>

Dear Mr. Murphy:

Attached please find a final rule submitted for your review in accordance with the requirements of Public Law 104-121.

A concise general statement relating to the rule, in conformity with the public law, may be found on the first page of the rule. Please refer any questions about the rule to the contact person named in the rule's preamble.

Sincerely,

**EXHIBIT EE**

Assistant Secretary

Attachment: [Give title of rule]

-------------------------------------------------------------------------------------------------------------

Department of the Interior

Transmittal and Receipt for Rulemaking Document

(Pursuant to 5 U.S.C. §801)

| To: | ___ Senate | Major rule: | ___ Yes |
|-----|------------|-------------|---------|
| | ___ House | | ___ No |
| | ___ General Accounting Office | | |

| Title of rule: |
|----------------|
| Bureau: |
| RIN: |
| Proposed effective date: |

For submissions to the Comptroller General only, in accordance with the statute, the following, if applicable, are included in the preamble to the rulemaking document or as separate documents, as indicated below. (These documents are also available to both Houses of Congress upon request.)

| Item | In preamble | Separate document |
|------|-------------|-------------------|
| Cost/benefit analysis | . | . |
| Actions relating to 5 U.S.C. §§ 603, 604, 605, 607, and 609 (Regulatory Flexibility Act) | . | . |
| Actions relevant to 2 U.S.C. §§ 1532, 1533, 1534, and 1535 (Unfunded Mandates Reform Act) | . | . |
| Other relevant information under another Act or Executive Order | . | . |

Document received by: _____

Date received: _____

5/14/98 #3210

Replaces 12/26/85 #2663

Click here to download in WordPerfect format

EXHIBIT EE

## U.S. Census Bureau

State & County QuickFacts

# Montana

| People QuickFacts | Montana | USA |
|---|---|---|
| Population, 2006 estimate | 944,632 | 299,398,484 |
| Population, percent change, April 1, 2000 to July 1, 2006 | 4.7% | 6.4% |
| Population, 2000 | 902,195 | 281,421,906 |
| Persons under 5 years old, percent, 2006 | 6.1% | 6.8% |
| Persons under 18 years old, percent, 2006 | 23.1% | 24.6% |
| Persons 65 years old and over, percent, 2006 | 13.8% | 12.4% |
| Female persons, percent, 2006 | 50.0% | 50.7% |
| White persons, percent, 2006 (a) | 90.8% | 80.1% |
| Black persons, percent, 2006 (a) | 0.4% | 12.8% |
| American Indian and Alaska Native persons, percent, 2006 (a) | 6.4% | 1.0% |
| Asian persons, percent, 2006 (a) | 0.6% | 4.4% |
| Native Hawaiian and Other Pacific Islander, percent, 2006 (a) | 0.1% | 0.2% |
| Persons reporting two or more races, percent, 2006 | 1.6% | 1.6% |
| Persons of Hispanic or Latino origin, percent, 2006 (b) | 2.5% | 14.8% |
| White persons not Hispanic, percent, 2006 | 88.7% | 66.4% |
| Living in same house in 1995 and 2000, pct 5 yrs old & over | 53.6% | 54.1% |
| Foreign born persons, percent, 2000 | 1.8% | 11.1% |
| Language other than English spoken at home, pct age 5+, 2000 | 5.2% | 17.9% |
| High school graduates, percent of persons age 25+, 2000 | 87.2% | 80.4% |
| Bachelor's degree or higher, pct of persons age 25+, 2000 | 24.4% | 24.4% |
| Persons with a disability, age 5+, 2000 | 145,732 | 49,746,248 |
| Mean travel time to work (minutes), workers age 16+, 2000 | 17.7 | 25.5 |
| Housing units, 2006 | 432,023 | 126,316,181 |
| Homeownership rate, 2000 | 69.1% | 66.2% |
| Housing units in multi-unit structures, percent, 2000 | 15.7% | 26.4% |
| Median value of owner-occupied housing units, 2000 | $99,500 | $119,600 |
| Households, 2000 | 358,667 | 105,480,101 |
| Persons per household, 2000 | 2.45 | 2.59 |
| Median household income, 2004 | $35,574 | $44,334 |
| Per capita money income, 1999 | $17,151 | $21,587 |
| Persons below poverty, percent, 2004 | 13.6% | 12.7% |

| Business QuickFacts | Montana | USA |
|---|---|---|
| Private nonfarm establishments, 2005 | 35,736[1] | 7,499,702 |
| Private nonfarm employment, 2005 | 326,887[1] | 116,317,003 |
| Private nonfarm employment, percent change 2000-2005 | 10.4%[1] | 2.0% |

EXHIBIT FF

| Nonemployer establishments, 2005 | 80,851 | 20,392,068 |
| Total number of firms, 2002 | 100,402 | 22,974,655 |
| Black-owned firms, percent, 2002 | 0.2% | 5.2% |
| American Indian and Alaska Native owned firms, percent, 2002 | 2.0% | 0.9% |
| Asian-owned firms, percent, 2002 | 0.5% | 4.8% |
| Native Hawaiian and Other Pacific Islander owned firms, percent, 2002 | 0.0% | 0.1% |
| Hispanic-owned firms, percent, 2002 | 1.0% | 6.8% |
| Women-owned firms, percent, 2002 | 24.4% | 28.2% |
| Manufacturers shipments, 2002 ($1000) | 4,987,577 | 3,916,136,712 |
| Wholesale trade sales, 2002 ($1000) | 7,223,420 | 4,634,755,112 |
| Retail sales, 2002 ($1000) | 10,122,625 | 3,056,421,997 |
| Retail sales per capita, 2002 | $11,116 | $10,615 |
| Accommodation and foodservices sales, 2002 ($1000) | 1,537,986 | 449,498,718 |
| Building permits, 2006 | 4,542 | 1,838,903 |
| Federal spending, 2004 ($1000) | 7,493,567[1] | 2,143,781,727[2] |

| Geography QuickFacts | Montana | USA |
| --- | --- | --- |
| Land area, 2000 (square miles) | 145,552.43 | 3,537,438.44 |
| Persons per square mile, 2000 | 6.2 | 79.6 |
| FIPS Code | 30 | |

1: Includes data not distributed by county.
2: Includes data not distributed by state.


(a) Includes persons reporting only one race.
(b) Hispanics may be of any race, so also are included in applicable race categories.

D: Suppressed to avoid disclosure of confidential information
F: Fewer than 100 firms
FN: Footnote on this item for this area in place of data
NA: Not available
S: Suppressed; does not meet publication standards
X: Not applicable
Z: Value greater than zero but less than half unit of measure shown


Source U.S. Census Bureau: State and County QuickFacts. Data derived from Population Estimates, Census of Population and Housing, Small Area Income and Poverty Estimates, State and County Housing Unit Estimates, County Business Patterns, Nonemployer Statistics, Economic Census, Survey of Business Owners, Building Permits, Consolidated Federal Funds Report
Last Revised: Wednesday, 02-Jan-2008 15:09:17 EST


EXHIBIT FF

## U.S. Census Bureau

State & County QuickFacts

# Idaho

| People QuickFacts | Idaho | USA |
|---|---|---|
| Population, 2006 estimate | 1,466,465 | 299,398,484 |
| Population, percent change, April 1, 2000 to July 1, 2006 | 13.3% | 6.4% |
| Population, 2000 | 1,293,953 | 281,421,906 |
| Persons under 5 years old, percent, 2006 | 7.7% | 6.8% |
| Persons under 18 years old, percent, 2006 | 26.9% | 24.6% |
| Persons 65 years old and over, percent, 2006 | 11.5% | 12.4% |
| Female persons, percent, 2006 | 49.6% | 50.7% |
| White persons, percent, 2006 (a) | 95.2% | 80.1% |
| Black persons, percent, 2006 (a) | 0.7% | 12.8% |
| American Indian and Alaska Native persons, percent, 2006 (a) | 1.4% | 1.0% |
| Asian persons, percent, 2006 (a) | 1.1% | 4.4% |
| Native Hawaiian and Other Pacific Islander, percent, 2006 (a) | 0.1% | 0.2% |
| Persons reporting two or more races, percent, 2006 | 1.5% | 1.6% |
| Persons of Hispanic or Latino origin, percent, 2006 (b) | 9.5% | 14.8% |
| White persons not Hispanic, percent, 2006 | 86.3% | 66.4% |
| Living in same house in 1995 and 2000, pct 5 yrs old & over | 49.6% | 54.1% |
| Foreign born persons, percent, 2000 | 5.0% | 11.1% |
| Language other than English spoken at home, pct age 5+, 2000 | 9.3% | 17.9% |
| High school graduates, percent of persons age 25+, 2000 | 84.7% | 80.4% |
| Bachelor's degree or higher, pct of persons age 25+, 2000 | 21.7% | 24.4% |
| Persons with a disability, age 5+, 2000 | 200,498 | 49,746,248 |
| Mean travel time to work (minutes), workers age 16+, 2000 | 20.0 | 25.5 |
| Housing units, 2006 | 615,624 | 126,316,181 |
| Homeownership rate, 2000 | 72.4% | 66.2% |
| Housing units in multi-unit structures, percent, 2000 | 14.4% | 26.4% |
| Median value of owner-occupied housing units, 2000 | $106,300 | $119,600 |
| Households, 2000 | 469,645 | 105,480,101 |
| Persons per household, 2000 | 2.69 | 2.59 |
| Median household income, 2004 | $40,509 | $44,334 |
| Per capita money income, 1999 | $17,841 | $21,587 |
| Persons below poverty, percent, 2004 | 11.5% | 12.7% |

| Business QuickFacts | Idaho | USA |
|---|---|---|
| Private nonfarm establishments, 2005 | 43,346[1] | 7,499,702 |
| Private nonfarm employment, 2005 | 519,319[1] | 116,317,003 |
| Private nonfarm employment, percent change 2000-2005 | 15.2%[1] | 2.0% |

EXHIBIT GG

| | | |
|---|---|---|
| Nonemployer establishments, 2005 | 106,257 | 20,392,068 |
| Total number of firms, 2002 | 121,560 | 22,974,655 |
| Black-owned firms, percent, 2002 | 0.3% | 5.2% |
| American Indian and Alaska Native owned firms, percent, 2002 | 0.9% | 0.9% |
| Asian-owned firms, percent, 2002 | 0.9% | 4.8% |
| Native Hawaiian and Other Pacific Islander owned firms, percent, 2002 | 0.1% | 0.1% |
| Hispanic-owned firms, percent, 2002 | 2.3% | 6.8% |
| Women-owned firms, percent, 2002 | 23.7% | 28.2% |
| Manufacturers shipments, 2002 ($1000) | 15,174,196 | 3,916,136,712 |
| Wholesale trade sales, 2002 ($1000) | 11,458,012 | 4,634,755,112 |
| Retail sales, 2002 ($1000) | 13,540,952 | 3,056,421,997 |
| Retail sales per capita, 2002 | $10,081 | $10,615 |
| Accommodation and foodservices sales, 2002 ($1000) | 1,653,671 | 449,498,718 |
| Building permits, 2006 | 17,075 | 1,838,903 |
| Federal spending, 2004 ($1000) | 8,968,204[1] | 2,143,781,727[2] |

| Geography QuickFacts | Idaho | USA |
|---|---|---|
| Land area, 2000 (square miles) | 82,747.21 | 3,537,438.44 |
| Persons per square mile, 2000 | 15.6 | 79.6 |
| FIPS Code | 16 | |

1: Includes data not distributed by county.
2: Includes data not distributed by state.

(a) Includes persons reporting only one race.
(b) Hispanics may be of any race, so also are included in applicable race categories.

D: Suppressed to avoid disclosure of confidential information
F: Fewer than 100 firms
FN: Footnote on this item for this area in place of data
NA: Not available
S: Suppressed; does not meet publication standards
X: Not applicable
Z: Value greater than zero but less than half unit of measure shown

Source U.S. Census Bureau: State and County QuickFacts. Data derived from Population Estimates, Census of Population and Housing, Small Area Income and Poverty Estimates, State and County Housing Unit Estimates, County Business Patterns, Nonemployer Statistics, Economic Census, Survey of Business Owners, Building Permits, Consolidated Federal Funds Report
Last Revised: Wednesday, 02-Jan-2008 15:10:10 EST

EXHIBIT GG



UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF WYOMING

# LOCAL CIVIL RULES

Current Revision: March 1, 2005

EXHIBIT HH

Rule 83.7.2    REVIEW OF ACTION OF ADMINISTRATIVE AGENCIES, BOARDS, COMMISSIONS, AND OFFICERS (INCLUDING SOCIAL SECURITY APPEALS)

(a)    Review of Agency Action--How obtained.

(1)    Petition for review of agency action.  Review of action of an administrative agency, board, commission, or officer must be obtained by filing a petition for review or, if specified by the applicable statute, a notice of appeal.  (As used in this rule, the term "agency" includes any federal agency, board, commission, or officer--including the Commissioner of Social Security under Title 42 of the United States Code.) The caption of the petition or notice must name each party seeking review.  The petition or notice must name the petitioner(s) and the respondent(s), and identify the action, order, or part thereof, to be reviewed.  The petition or notice shall also contain a citation of the statute by which jurisdiction is claimed.  (Form 3 in the Appendix to the Federal Rules of Appellate Procedure is a suggested form of petition or notice.) The petition or notice shall not contain factual allegations in the nature of a complaint.  Factual allegations in the petition or notice shall be stricken.  The respondent is not required to file a response to the petition or notice unless required by statute.  If two or more persons are entitled to seek judicial review of the same action and their interests are such as to make joinder proper, they may file a joint petition or notice.

(2)    Service of process.  Service of process shall be in the manner provided by Fed. R. Civ. P. 4, unless a different manner of service is prescribed by an applicable statute.

(b)    The record on review.

(1)    Composition of the record.  The written action or order sought to be reviewed, the findings or report on which it is based, and the pleadings, evidence and proceedings before the agency shall constitute the record on review in proceedings to review agency action, unless otherwise provided by the applicable statute.

(2)    Supplementation of the record.  Any party may seek leave of court to supplement the record or may oppose a party's request for such supplementation.  Local Rule 7.1(b), which pertains to briefing of non-dispositive motions, shall apply.

(c)    Filing of the record.  In review proceedings, the agency shall file the record with the clerk within sixty days of proper service of the petition or notice unless a different time is provided by statute, or as otherwise ordered by the court.

(d)    Filing and service of briefs.  The court, in its discretion and upon its own initiative, shall schedule a briefing conference.  At the briefing conference, the court will set a briefing schedule.  The time for filing and serving briefs may be extended or

EXHIBIT HH

shortened by order of the court.  Parties shall not file motions to affirm, motions for summary judgment, or affidavits in support thereof.  The length of briefs shall be governed by the applicable Federal Rules of Appellate Procedure of the Tenth Circuit Court of Appeals.

(e)    Applicability of other rules.  The parties to any proceedings governed by this rule shall give the same notice of the filing of pleadings, records and other documents as is required by Fed. R. Civ. P. 5.

EXHIBIT HH



THE WHITE HOUSE
PRESIDENT GEORGE W. BUSH

Home > News & Policies > September 2004

For Immediate Release
Office of the Vice President
September 29, 2004

### Vice President and Mrs. Cheney's Remarks and Q&A at a Town Hall Meeting in Duluth, Minnesota

Cirrus Design Corporation
Duluth, Minnesota

10:55 A.M. CDT

MRS. CHENEY: Well, thank you so much that great welcome. It is a beautiful day here in Duluth, and we are so happy to be here.

It has been a privilege for Dick and me to travel all across this wonderful country. And I can't tell you how many times when we're going through the many, many beautiful places that America has, we say to ourselves how lucky we are to be American. And when I try to make a list of all the things that I feel fortunate about, all the things that I feel proud about -- proud about, especially, -- right at the top of that list is our President, George W. Bush. (Applause.)

He has been a magnificent leader over these past four years. And if you don't mind my saying so, the Vice President is no slouch either. (Laughter and applause.)

Well, I get the job of introducing Dick because I have known him for so long. I have known him since he was 14 years old, and his job that summer, that school year when I first knew him, his job was sweeping out the Ben Franklin store in Casper, Wyoming, our hometown. And I have known him through many jobs since. I've known him since he was digging ditches at the Central Wyoming Fair and Rodeo Grounds, outside our hometown of Casper. And I've known him since he was loading bentonite - -hundred-pound sacks of bentonite into railroad cars. And I've known him since he was building power line all across the West to help pay his way through school. And I mention all those things because I think that when you grow up working hard, you learn some really important lessons. And one of those lessons is how important it is for the hard working men and women of this country to get to keep as much of their paychecks as possible. (Applause.)

So it has been a great honor and privilege for us to be involved in this presidential campaign, a distinguishing mark of our civilization, our country is getting to choose our leaders. And it is a great source of pride and honor to me to get to introduce to you my husband, Dick Cheney, the Vice President of the United States. (Applause.)

THE VICE PRESIDENT: Thank you. Thank you all very much. And, Lynne, thank you for the fine introduction. She wouldn't go out with me until I was 17. (Laughter.)

But I often tell people we have a marriage that came about because Dwight Eisenhower got elected President of the United States. Because in 1952, when Eisenhower ran for President, I was a youngster

EXHIBIT II

living in Lincoln, Nebraska with my folks. Dad worked for the Soil Conservation Service. Eisenhower got elected, reorganized the government, Dad got transferred to Casper, Wyoming, which is where I met Lynn. And we grew up together, went to high school together, and a few of weeks ago celebrated our 40th wedding anniversary. (Applause.) I explained to a group the other night that if it hadn't been for Eisenhower's election victory, Lynne would have married somebody else. (Laughter.) And she said, right, and now he'd be Vice President of the United States. (Laughter and applause.)

Well, we're delighted to be here today in Duluth. I want to thank the Klapmeiers for allowing us to come here and spend some time at Cirrus. This is a great company. They've got a great track record and have done some superb work building quality products. One of the great American success stories that you find as you travel all across the country. And we're delighted to be here today. And I want to thank all of you at Cirrus for allowing us to come by and for being part of the effort here this morning.

We're obviously embarked upon the final weeks of the campaign. And we're doing a number of these events across the country. Of course, the President is getting ready for his debate tomorrow night. And mine will be next Tuesday with my opponent, John Edwards.

John, of course -- Senator Edwards -- I shouldn't call him John. I don't know him that well. But Senator Edwards, of course, it is alleged got his job because he's charming, sexy, good looking and has great hair. I said, how do you think I got the job? (Laughter.) Why do they laugh?

But this is an important campaign this year. And you need to have a sense of humor in this business, so we need to have a few laughs along the way. But it's also very serious business. The decision we're going to make on November 2nd is one of great significance for the nation, and may indeed be the most important election at least that I can recall in my lifetime in terms of the decisions we're going to make about absolutely vital issues and the course we're going to set for this nation in the years ahead.

And what I'd like to do this morning is take a few minutes, share some thoughts with you about a part of that decision that we're going to make on November 2nd, why I think it's so important. And then we'll throw it open to questions and allow you to ask questions or make comments, have a bit of an exchange or dialogue. These sessions are a lot better if you don't have to just listen to me ramble on endlessly, but rather get a chance for a good exchange. So we'll do that this morning.

But I want to begin, first of all, by talking about what I think is at the heart of the election, the significance of this election this year, and that's the basic fundamental question about what the national security strategy and policy will be for the United States in the years ahead. The most significant set of developments I think that the President had I have had to deal with since we were sworn in, that were not anticipated when we were elected four years ago, of course, are all of those events that began with 9/11 and all that that's entailed for the country. So that's what I really want to focus on this morning.

If you think about it, there have been times in our history when we come to sort of watershed moments. Something happens that constitutes a new threat to the United States, or a fundamentally altered international situation and we have to think new thoughts about our strategy, about how we conduct ourselves in the world, what kind of military forces we need, what the threats are, and I think we've gone through one of those periods.

I think back to the time right after World War II, for example, after we'd won the war against Germany and Japan, our troops came home. And then within a matter of a few years, all of a sudden we were faced with the Cold War, a Soviet Union that had occupied half of Europe, that was acquiring nuclear weapons, and we had to put together an entirely new national security strategy for the United States, a

EXHIBIT II

policy of deterrence to deter the Soviets from launching an attack against the U.S., of containment -- established NATO, a series of alliances around the world to protect us against the Soviet threat, created the Department of Defense, in 1947 -- the Central Intelligence Agency, reconfigured our military forces and so forth. Those policies we put in place then lasted for about the next 40 years, and were supported by Republican and Democratic administrations alike -- the basic, fundamental foundation of national security for the United States really until the Soviet Union collapsed and the Cold War ended in the 1989-90 time frame.

And I think we're again at one of those moments, in connection with the war on terror, the nature of the threat we face today, and what has emerged if you will for us since 9/11 that we now have to deal with

And of course, 9/11 was significant because it brought home, I think, to everybody the fact that there was, indeed, an organization out there -- in this case, we called them the al Qaeda -- that had designs on the United States, that had managed to organize an attack against us that killed 3,000 of our people in less than two hours on the morning of 9/11, more folks than we lost at Pearl Harbor, the worst attack ever on American soil by a foreign power.

And when that occurred, of course, we had to come to grips with that threat and to recognize that the biggest threat we face today would be a group of terrorists in the middle of one of our own cities with a weapon of mass destruction, with a biological or a chemical agent, or conceivably, even a nuclear weapon, and that that kind of threat, if it were to occur could conceivably result in the death of hundreds of thousands of Americans in a few hours, not just 3,000. And so the scale of the threat is very different than what we've dealt with before, and the nature of the defenses we need to mount against it, obviously, are fundamentally altered, too.

In response to 9/11, we did several things. The President, of course, insisted on doing everything we could to harden the target here at home, to make the U.S. a tougher target for our adversaries, created the Department of Homeland Security, passed the Patriot Act that gave law enforcement the tools they need to be able to prosecute terrorists, strengthened our intelligence agencies, got a better mechanism in place to coordinate between the CIA and the FBI, beefed up our Border Patrol, passed Project BioShield, which provides funds and authority to research and develop defenses against biological weapons and so forth.

All of that is very good. But the President also made a decision that I think is absolutely essential, and that is that there's no such thing as a perfect defense, that if we're successful 99 percent of the time against our adversaries, the 1 percent that gets through given the nature of the threat could be devastating. So you cannot accept a situation where even a 1 percent possibility of success on the part of our adversaries. And therefore, it was essential that we also go on offense. And that has been the biggest departure, if you will, from the past in terms of what George Bush and those of us who work for him have done since 9/11. By go on offense, we mean that we would use our military force as well as our intelligence services and so forth to aggressively go after the terrorists wherever they reside, wherever they train, wherever we find them. And secondly, that we would confront those who support terror -- those states that sponsor terror, who've provided safe harbor and sanctuary for terrorists, who conceivably have provided financial assistance or arms, or could eventually share that deadly technology with the terrorists also become a target of our interest.

And based on that fundamental strategic decision, we then clearly went into Afghanistan, took down the Taliban regime, captured and killed hundreds of al Qaeda, closed the training camps in Afghanistan where the terrorists had trained to kill Americans on 9/11, and where some 20,000 terrorists were trained in the late 1990s. And in the aftermath of that, then, we also took one additional step, and that is to establish a democratically elected government in Afghanistan. It's not enough for us to go and simply

EXHIBIT II

kill terrorists, or to topple governments that have supported terror and thereby threaten the United States, you also have to put something in its place. You can't simply do the first two steps and walk away and leave a failed state behind where it will revert back to what it was before, a breeding ground for terror, or conceivably become a dictatorship of some kind.

And so what we've done in Afghanistan, we've stood up an interim government. They've written a constitution. They've registered 10 million voters, first time in history, over 40 percent of them, women. And on October 9th, there will be free elections in Afghanistan. And by the end of the year, there will be a democratically elected government in Afghanistan where they used to train terrorists. (Applause.)

On Iraq, slightly different situation -- but in Iraq, we had in Saddam Hussein a man who had started two wars, who had traditionally been a state sponsor of terror, always carried by our State Department as a sponsor of terror, the home to the Abu Nidal organization, the Palestinian Islamic Jihad, a man who paid $25,000 to the families of suicide bombers who would kill Israelis, had a relationship with al Qaeda, a man who had previously produced and used weapons of mass destruction against his own people and against the Iranians, and who had defied the international community for 12 years. We went in and took down the regime of Saddam Hussein. Today, he's in jail -- which is exactly where he belongs. (Applause.) And we're now actively and aggressively working to stand up a new democratic government in Iraq.

This is hard work. This is not an easy task. You're going to find people who say, oh, my gosh, you can't do it. It's too hard. There will be a civil war, et cetera, et cetera, et cetera. You can always find somebody who can argue against what needs to be done here. But it needs to be done. And having -- (Applause.) And having gone this far, it can be done. And again, think about where we are in Iraq. We've got an interim government stood up composed of Iraqis, headed up by a man named Ayad Allawi. He is the Prime Minister. He has now appointed a Cabinet. The Iraqis control all the government ministries now, have since the end of June. They've been in business 90 days -- probably a little soon to make a final judgment about how they're going to do. They're just getting started. We've got a lot of people out there who want say, oh, it's a failure. They don't have any idea whether it's a failure or not. These folks have just barely gotten started, gotten their feet on the ground and they're doing a good job.

Allawi is a very tough man. He fled Iraq many, many years ago during Saddam's rule, went to London and was living in London. And one night when he was in bed, in London, woke up to find assassins in his room sent by Saddam Hussein armed with axes. They tried to hack him to death -- he and his wife. He survived, but he spent nearly a year in the hospital recovering from his wounds. And his wife never really recovered psychologically from the event. She died a few years later. Very tough customer, Ayad Allawi -- he's willing to go back to Iraq, and knows he's the target of the terrorists and the former regime elements who'd like nothing better than to do him in. And he's back there putting his life on the line to create a democracy in Iraq and to give the people of Iraq a chance to live in freedom under a democratic form of government.

Now, it is in our interest that that happen. We don't want to see Iraq revert back to what it was before. And the Iraqis have got a good start. They've not -- we were told we couldn't stand up an interim government, that they couldn't. Well, they've done that. We were told, you'll never transfer power to them on June 30th. Well, we've done that. We were told, you can't hold a national assembly of Iraq. Well, they've done that. They will have elections in January. That group that is elected then will write a constitution, and by the end of next year, they'll have new elections under an Iraqi-drafted constitution, and you'll have a democratically elected government in place in Iraq. (Applause.)

Now, the challenge for us going forward here is to make certain we get it right. We have to continue to do whatever is necessary for as long as necessary to get these people back on their feet. And there are

EXHIBIT II

two major tasks they have to accomplish. They've got to take on responsibility for their own governance. And they've got to take on responsibility for their own security. So both in Afghanistan and Iraq, we're spending a lot of time and effort, standing up and training Afghan and Iraqi security forces that can take over basic fundamental responsibilities for their security. And that's a major task for us. We want to get it done just as quickly as we can. We don't want to stay a day long than we have to, but we want to stay as long as necessary. You'll find some people -- I heard John Kerry this morning on Good Morning America for example, say his objective is to get the American troops home. We clearly want them home, but that's not the way to state the objective. The objective is to finish the mission, to get the job done, to do it right. (Applause.)

Now, the biggest cost of all, the burden for this situation, prosecuting the war on terror and doing what needs to be done in Afghanistan and Iraq falls first and foremost on the armed services, on the men and women who wear the uniform of the United States military, and on their families. And we all owe them an enormous debt of gratitude for what they've done for all of us. (Applause.)

The -- some have suggested that we need to pursue a different policy. I think, frankly, there are still a lot of folks out there that have not made the transition to the post-9/11 perspective, if you will. They still have what I call a pre-9/11 mind set. They still think it's an option for us to pull back, sort of retreat behind our oceans, that we can live comfortably here at home. We don't have to be engaged out there around the world. We don't have to be prosecuting the war on terror in the far corners of the globe. I think they're wrong. I think that mind set, that attitude is flawed because all it does is postpone the ultimate day of reckoning. The United States of America cannot fail to be engaged in the world. We're the world's leading trading nation, the most powerful nation on Earth. We do business all over the world. Our ideas, our culture, our beliefs, our economic products and services and so forth, we are the dominant power on the face of the Earth today. And you can't allow a bunch of terrorists to force the United States to retreat behind its oceans and sit here and act as though we're safe and maybe they'll hit us last.

The fact is what we're engaged in here is a global conflict. Remember, since 9/11, since they hit New York and Washington, they hit Madrid, and Casablanca, and Mombassa, and Riyadh, and Jakarta, and Istanbul, and Bali, and Baghdad, and Beslan -- most recently -- in Russia, where they killed approximately 350 people one morning, most of them school children. That's the nature of the enemy and the adversary we face. The kinds of people who will go on television and make a tape of themselves beheading an individual and then broadcast it because they want to -- through fear and intimidation -- they want force us to change our policies and withdraw, if you will, from the outside world and retreat, in effect, behind our own boundaries.

That won't work. And as I say, all it will do is increase the ultimate cost of coming to grips with this problem because sooner or later you do have to face it. And it's better for us to face it today and to deal with it today when we've got friends and allies all over the world out there who are willing to work with us on it than it would be to postpone action and to wait.

And the other thing, obviously, that's at stake here is to understand that if we don't take them on over there, we may well end up having to fight with them here in the streets of our own cities, as we did on 9/11. And that's not an acceptable outcome. Ultimately, of course, what is at risk here, what is at stake are the safety and security of our kids and grandkids for generations to come. And the United States can win this battle. There is no doubt in my mind. It's absolutely the right thing to do, and we're on the right course. And that's the course we need to stay on.

Now, when we make a decision on November 2nd, we'll be choosing between that policy and that strategy that I believe is working, that the President laid out for us in the aftermath of 9/11, or we're going to shift gears and pick somebody else as our Commander-in-Chief.

EXHIBIT II

Now, I've looked carefully at John Kerry's record and let me say today, as I've said -- I said it in my speech at the convention in New York a few weeks ago -- that we respect John Kerry's military service, as we do for all of our veterans, appreciate very much his service in Vietnam. Nobody in connection with this campaign has ever challenged his patriotism or his service to the nation. What we challenge is his judgment and what he operated, did, votes he cast, how he functioned for the 20 years he was in the United States Senate, where he had an opportunity time after time to vote on issues that deal directly with national security -- on weapons systems, on strategy, on the commitment of forces, on when the United States ought to be aggressively involved and so forth. And if you look at that record, what it shows is during those years in the Senate, back in the '80s, most of the time, he opposed the major weapons systems and programs that Ronald Reagan recommended and put forth that were instrumental to our being able to succeed in the Cold War. Many of those systems that we're using today he opposed when we were starting up.

In 1991, when Saddam Hussein invaded Kuwait and the question before the Congress was whether or not we would use military force to liberate Kuwait and send Saddam packing, Desert Storm, John Kerry voted no. In the two years that he's been campaigning for President, I think everybody knows he's been all over the lot in terms of whether or not he's for or against what we've been doing in the war on terror. He voted to authorize the use of force, and then later on announced he was an anti-war candidate, and then voted against funding for the troops once we committed them to combat, and then when asked knowing everything he knows now, would he have voted the way he did then, and he said yes. And this morning, Diane Sawyer interviewed him on Good Morning America and asked him the same question, knowing everything you know now, would you have voted that way, and he said, no. (Laughter.) He's changed his mind on many occasion. I think what's required in a President is the ability to make a decision, to take a position, and to convey to the American people and to the troops who are the ones who have to put their lives on the line to carry out the policy, and to our adversaries what the position of the United States is. That's exactly what we've got in George Bush, a man who means what he says and says what he means. (Applause.)

I don't see those same qualities in John Kerry. And I think when it comes time to pick a Commander-in-Chief for the next four years, who's going to basically set strategy and a policy that may, in fact, be the key to defending the nation for the next 30 or 40 or 50 years, that we've got a pretty clear choice on November 2nd. In my mind, given my priorities, what I worry about, that is an absolutely crucial part of the decision that we, as Americans, are going to make.

I think it's very, very important that we get it right. I think we will. I feel very good about the state of the race. I tell people that things look good. As Lynne and I travel the country -- we've been in some 48 states now, in this campaign -- and things look very good not only here in Minnesota, but even in Massachusetts. (Laughter and applause.)

There was this news account a few weeks ago, as the Democratic Convention ended in Boston, as the delegates were leaving the hall, they stopped a Boston policeman and asked for directions. And he said, "Leave here and go vote Republican." (Laughter and applause.) True story. (Applause.) So we're eager to have the support of that policeman, as well as Republicans, Democrats and independents from all across America.

But it is an important decision that we get to make. We're enormously privileged to be Americans, to live in the country we do and to have the opportunity and the responsibility to participate in this process. Don't let anybody tell you what a handful of people does doesn't matter -- remember the last election? Five hundred and thirty-seven votes in Florida determined the outcome of who was going to be President of the United States for the next four years. Every hour of volunteer time, every dollar contributed, every vote, everything matters. And it's our privilege to live in a country where we can

EXHIBIT II

exercise that responsibility. It's a gift from the generations that have gone before, and it's one we need to exercise and nurture if we're going to make certain that it's in as good of shape for our kids and grandkids as it's been for us.

So with that, let me stop and we'll go to a Q&A session. We've got proctors in the audience with microphones -- you'll note they're the people in the orange shirts.

MRS. CHENEY: Dick, what do those orange shirts remind you of? (Laughter.) I'll say it. (Laughter.) How about John Kerry's suntan? (Laughter and applause.)

THE VICE PRESIDENT: Oh, I may have to disassociate myself from -- (laughter.) We're trying to bring her along -- she's doing good, that was a good line; it was a good line.

But what we'll do, if you've got a question, I'm going to ask just grab the attention of a proctor and I'll call on you and we'll get a chance to do some questions. Yes.

Q Vice President Cheney and Mrs. Cheney, welcome to Duluth, God's country -- a fact, not an opinion. (Laughter.) Mrs. Cheney, what is the status of the women in Afghanistan now?

MRS. CHENEY: Well, as Dick mentioned, and it's just so thrilling to hear those numbers, that 40 percent of the 10 million people registered are women. And, you know, they've done this with great bravery. There was one incident where women were pulled off a bus and killed because they were trying to register to vote.

But the status of women in Afghanistan, what the United States and our allies have done has really transformed their lives. Little girls are going to school now. I mean, for years they weren't. Women under the Taliban were stopped on the street, they were whipped if their ankles were showing; there were accounts of their fingers being amputated if they were wearing nail polish. I mean, it is impossible to imagine the brutality and repression of life under the Taliban. And to see women re-entering their professions -- doctors, teachers, engineers -- to see those little girls going to school, I have to tell you, just makes my heart glad. We've done a very good thing there. (Applause.)

Q Mr. Vice President, the national news media is always concentrating on the less than productive relationships that we have with certain Arab and Muslim nations around the world. Would you comment on the positive relationship that we have with Arab and Muslim nations and just exactly what they're doing to help us fight the war on terror?

THE VICE PRESIDENT: Sure. I guess the way I would describe it is our relationships have improved significantly since 9/11. When you look at the reality of what's happening in various places out there, that part of it was the exercise of firm leadership and the demonstration of the President's determination and the ability of the American military to do what we said we were going to do. And then let me give you a couple of examples.

If you think about Libya, for example. We went into Afghanistan and then we went into Iraq, took down those regimes. Moammar Ghadafi had for years invested millions in trying to acquire nuclear weapons capability. He had acquired the centrifuges to enrich uranium. He had the uranium feed stock. And he had a design for a weapon that he had acquired from a black market network that was providing these materials not only to him, but also to North Korea and Iran.

The day that we launched into Iraq, he contacted President Bush and Prime Minister Blair -- he didn't

**EXHIBIT II**

contact Kofi Annan and the United Nations -- and he basically said he wanted to enter into negotiations about ending his program. Then some nine months later -- we went into the negotiations, some nine months later, five days after Saddam was dug out of his hole in Northern Iraq, Colonel Ghadafi went public and said he was going to give up all of his WMD materials. He has. We've rounded all that up. And all that nuclear material that was being developed for weapons now resides under lock and key down at Oak Ridge, in Tennessee.

A classic example of how the behavior of a government in the region saw what the United States did, saw we meant business and fundamentally altered the course of action. And relationships are improving now between the U.S. and Libya.

Other examples. Pakistan, President Musharraf has been one of our key allies in this effort. We have captured and killed hundreds of al Qaeda -- a lot of them in Pakistan. We captured, in Pakistan, Khalid Shaykh Muhammad, the man who was the mastermind of the 9/11 attack. He's now in custody because of the help and cooperation we got from President Musharraf. Musharraf is -- now recognizes that he's on the target list for al Qaeda, too, there have been two or three assassination attempts on him in the last year.

Saudi Arabia, after they got hit in Riyadh, back in May of '03, they've been allies in the past, but they work very closely with us now, a coordinated effort because they, too, are targets for the al Qaeda organization.

So we have made progress. We've got a closer working relationship with many intelligence services and law enforcement agencies in that part of the globe. And many of the nations out there have provided basing, access and so forth for the United States, for our operation. So I would say overall the degree of cooperation we're getting from governments out there has, for the most part, improved over the course of the last three-plus years now, since 9/11.

Q Vice President and Mrs. Cheney, thank you for your service and welcome to Duluth. Being a military father -- I have two sons in the military -- I'd like to hear your comment about how we sustain perhaps four or five -- who knows how many years -- of the kind of pace that we're keeping currently with active duty military, without jeopardizing troop strength. And I'd also like to hear Mrs. Cheney comment -- for the benefit of my wife and the other moms -- what will this administration do to assure that we continue to support the troops that are going to be there for, undoubtedly, some period of time?

THE VICE PRESIDENT: Well, I -- without question, the level of activity has been pretty intense in the last three years, since 9/11. I've spent a fair amount of time with the troops; I've been out into the region and visited with various unites that are there; I've talked with folks back, who've been deployed; I've recently been at Camp Pendleton with Marines; a couple of weeks ago down at Fort Benning, Georgia, with the 3rd Battalion of the Ranger Regiment, the 75th Ranger Regiment, who've been deployed repeatedly over the course of that three year period of time; I meet with National Guard units, I got off the airplane yesterday in -- I guess it was in Minneapolis -- and visited the commanders of the Air Guard wing down there, they've been deployed regularly, too.

So the pace, the ops tempo has been higher than normal, without question. That places an extra burden on us, in terms of making sure that they've got all the support they need, that we take care of their families back here at home, that we provide as much information as quickly as possible about the kinds of demands that are placed on various units -- especially those that are Reserve and Guard units that are called up -- so

**EXHIBIT II**

that they can plan their own lives and we can work around that.

There's also a major effort underway, especially, for example, in the Army, to restructure the entire Army, to create a lot more deployable force out of the total end strength that we have today. Pete Schoomaker, who is the Army Chief of Staff, has got a superb plan he's working on to take the same end strength and increase, I think it's from 33 brigades up to 48 brigades, to be deployable.

We're also in the midst of a major transformation of our forces worldwide. For example, we've had two heavy divisions deployed in Europe now, since the end of the Cold War. Now we'll be bringing them one and there will be only one brigade left in Europe to replace them. But that means we'll have more of our troops based here at home on a permanent basis; they'll deploy periodically overseas; it'll be a lighter, more mobile force; we'll be able to have more basing arrangements at various places around the world that we have to get into quickly, but it will be a different kind of force structure than we've had previously. We're doing the same thing in Korea, where we're cutting back a brigade there, as well, too.

So I think when you get through this whole period of time you'll see that on the one hand we're doing everything we can to support the troops that are deployed out there now; secondly, to restructure the entire force so we can better sustain these kinds of operations, recognizing that what we have to do in the global war on terror and the way we have to operate is fundamentally different than what we did during the Cold War, when the basic idea was to keep a lot of heavy divisions forward deployed overseas to be able to take on the Soviets, for example, in a conventional armored warfare, the kind of thing that you'd have if there had ever been a major conflict in Europe.

So all of that should help relieve the turmoil, if you will, and the turnover in the force. The Secretary -- also talking about longer assignments, instead of rotating somebody in and out of a unit every two years, that once you signed on for a unit, you'd stay for a longer period of time. That means fewer moves for the family, more consistency and stability over time.

We're very sensitive to the need to maintain the quality of life for the force, because it's an all-volunteer force, everybody who is wearing the uniform today voluntarily put it on. That places a special obligation on all of us to make certain that we manage that process in the best way possible, to take into account their needs, too. A lot of the soldiers today are married, they've got families, they need good schools for their kids, decent health care, housing, and so forth, and we have to tend to all of that at the same time.

I'm confident we can do it. I served as Secretary of Defense for four years, myself. I can't say enough things about the caliber of people we have serving today and about the value of the all-volunteer force, they do a superb job for us. And we're watching very carefully all those indicators to make certain that we do, in fact, do whatever is necessary to maintain that force as strong and as healthy and as vibrant as it is today.

MRS. CHENEY: I'll just add one thing, which is, you know, what Dick and I are doing traveling all across the country is sometimes you wake up in the morning and you feel like, oh, my gosh, this a is pretty exhausting thing we're doing. There is nothing that energizes either of us -- and I think it's probably -- I'm speaking for Dick, but I've done that before. Meeting with the young men and women who are serving, and meeting with military families, there is such strength there, such focus, such conviction, and it does seem to me that one of the things that we can do to repay that is to elect a Commander-in-Chief who has that same focus and strength and conviction, and who understands that the way you honor the men and women who are serving is by completing this mission. (Applause.)

Q Vice President Cheney and Mrs. Cheney, I have been hearing the opposition saying things like, if

EXHIBIT II

you're re-elected that we're going to be -- you're going to institute the draft. And I know it isn't true, but I want you to let other people know it, too.

THE VICE PRESIDENT: All right. This is an urban legend. (Laughter.) Or a nasty political rumor, I'm not sure which. Nobody has any intention -- nobody in a position of responsibility -- any intention of trying to reinstitute the draft. It makes no sense at all. As I say, and those of us who have been associated with the military in the past -- and as I say, I had the privilege of serving as Secretary of Defense for four years, from '89 to '93, through Desert Storm and Just Cause in Panama and so forth. The thing you come away from that with is just enormous respect for the caliber of people we have serving today.

The other thing that I would say, in addition to the fact that everybody is there because they want to be there, just affects their quality and caliber of the whole operation. But, also, it has forced the services to be much better than they used to be about how they tend to their people. You know, when you had an arrangement where manpower was basically a free good -- you didn't have to pay for it, you could compel people to serve, you got your monthly quota and put them through basic and trained them up and away we went -- it worked under certain circumstances and during World War II made sense.

But once we went to the all volunteer force after Vietnam, it forced the services to think about: Well, how do I attract good people? How do I retain them? What do I have to pay them? What kind of benefits do we provide? What kind of leadership? Do we give them enough responsibility so that they're willing to sign on and be proud of their service? Do we take care of their families? Is there adequate base housing? All of those things you have to do if you're running a business to be able to attract good people that want to work for you and to have a really first-class organization, the military has to do now. And it's changed -- I can't measure all the ways in which it's changed, the way the Army and the Navy and the Air Force and so forth, think about the kind of organization they want to be and how they attract their folks.

And it has just -- it's paid enormous dividends. As I say, in all the years that I've been involved, one way or another -- as a member of Congress, SECDEF, the Vice President now -- I have yet to encounter anybody in the uniformed military or in a position of responsibility who thinks we ought to go back to the old days, where we operated based on a draft, instead of an all-volunteer force. It works. It works extraordinarily well. It's the best military I think the world has ever seen. And I don't know anybody in their right mind who would want to go back and do that. And the notion that somebody is peddling out there, that there's a secret plan to reinstate the draft -- hogwash, not true. (Applause.)

MODERATOR: Excuse me, Mr. Vice President, we're out of time.

THE VICE PRESIDENT: Well, we do -- we've got time for a couple more questions here -- unless you guys all got to go back to work. (Laughter.) Yes, sir.

Q I just wanted to say to you that slightly chubby, balding hairline just like yours --

THE VICE PRESIDENT: I don't know anybody like that. (Laughter.)

Q (Inaudible.)

THE VICE PRESIDENT: All right.

Q I stand squarely behind you, 100 percent. It seems that perception right now in the political process is

**EXHIBIT II**

more important than reality. The reality that we have right now as a border state, it appears to me that with millions upon millions of illegal aliens in the United States, will it take another 9/11 before the Congress, which really has the power, if you will, will do something about our borders?

THE VICE PRESIDENT: Well, it's -- it is a continuing problem. It's one that Tom Ridge, who is the Secretary now of Homeland Security, spends a lot of time on. We've beefed-up our border patrol capabilities, completely reorganized that part of the government so you've got Customs and Border Patrol, and so forth, now all under one agency. We've hired a lot more people. We've deployed more technology to be able to monitor the borders.

But you've still got a situation both at the border with Canada and the border with Mexico are huge, thousands and thousands of miles; a tradition of good, friendly relations with our neighbors, so these are not hostile borders, by any means, with armed guards on them -- we probably haven't got enough people to put armed guards, you know, every step of the way. So we've got to find ways to work with them to help try to control the flow of people and to regularlize it and have knowledge over who's here, when they come, what they're doing when they're here, and when they leave. It's a problem, too, also, from our ports and air transportation coming in and so forth, but a special problem at the borders.

We're doing better. We're not doing good enough, yet. And it's an area that the President continues to emphasize. He's got good, strong understanding of because of his years as the governor of Texas, and trying to deal with the problem down there, which has been significant. And we just have to keep working at it. But we do need to find ways to make certain we know who's here and what they're doing, and to protect it.

Q We're behind you in that.

THE VICE PRESIDENT: All right. Thank you. (Applause.)

Q I have just a little different opinion on men with hair. (Laughter.) Just teasing you.

My name is Peter Wood, I'm a third generation logger from the Duluth area here, and my family has homesteaded where I live for the last, almost hundred years.

The forest industry is about the second industry in Minnesota. We employ roughly around 60,000 people. What is your own take on the President's healthy initiative on forests?

THE VICE PRESIDENT: Well, we think the Healthy Forest Initiative is very important, especially out our way -- I mean, we're from Wyoming. The problem we've had out there, with respect to wildfires, is that it's been devastating. We've had about a five year drought and we've lost vast stretches of forest. And the policies the President has put in place to allow us to control that, to go in and harvest some of that timber and put it to good use -- and partly as a preventive measure, to make it more easy for us to control and prevent fires in the far West is extraordinarily important. We've had to continue to fight to get it through. We've got environmental groups oftentimes on our case trying to block it, or stop it in various places. But I think it's absolutely the right thing to do. And as I say, my years in Wyoming, I used to serve on the public lands subcommittee and the interior committee for 10 years in the House where we wrestled with these kinds of issues. And I think the Healthy Forest Initiative is a very good, a very positive step forward. (Applause.)

Q (Inaudible.)

EXHIBIT II

THE VICE PRESIDENT: Well, those are tough management decisions that you've got to make, and obviously, in part the federal government gets involved because a lot of those are federal resources. Again, in Wyoming, we've got a slightly different situation because we're a public land state. We came into the union under different circumstances. Half the surface of Wyoming is owned by the federal government. So we get into situations there where we get a real crunch between the federal interest, the fact that to do anything in Wyoming, whether it's resource development or farming and ranching, or recreation, you've got to have access to the public lands. And that immediately sets up a conflict between the various groups involved. So we're continually trying to manage that process. I'm not familiar with the details of the issues you've got around the Boundary Waters Area. I know it's a beautiful area, very important resource. Right now, the battle in Wyoming is over snowmobiles in Yellowstone. And those of us who live in Wyoming -- I've got to be careful how I say this now -- (laughter) -- when you're from a public land state, or a state like Wyoming, we love it. It's a fantastic place to live. And it is in great shape relative to, say, New York or San Francisco, in terms of the natural beauty of the place, but we get a lot of advice from New York and San Francisco about how to do our business. (Laughter and applause.) And for years, we've used snowmobiles in Yellowstone. And I'm sure you got snowmobilers here in northern Minnesota. And it's something we've done. We do it responsibly in the park. When you go in the park, you stay on the road. You don't go off-road at all. But there's been a battle raging now for several years, and the Clinton administration tried basically to shut down all snowmobiles in Yellowstone National Park. That doesn't make any sense at all. Reasonable regulations and requirements and so forth, be sensitive to other uses -- so there is this battle, that the only way I know about it is to go into the normal process, the political process, participate and get actively involved, work with your members of Congress, work with the administration.

One of the things we inherited when we came in, in the closing days of the Clinton administration, shortly before he left office, Bill Clinton designated huge areas in the West as roadless, permanently roadless, off-limits. You couldn't do anything with them. Well, we've been through that process now. The courts basically threw that decision out. We've now gone to a situation where what we've said is we want to work with the governors, and the governor of each state can come in with recommendations for how the lands ought to be managed in that state, and we'll try to work with them to put together an intelligence, coherent plan that respects and reflects the views of the people that live there, and who've got to make a living as to how we ought to proceed. So as I say, these are age-old issues for those of us who live in places like Minnesota and Wyoming. I think we're doing a better job now than was true in the past, with respect to managing that. And you're always looking to balance out, if you will, the public interest in protecting and preserving a lot of those areas, as well as the need for folks that live in the area to be able to make a decent living and to use those resources, but use them intelligently and in a wise fashion.

So thank you. You bet. One last question.

Q Mr. Vice President, I think I'm going to have to throw one on the social side. A lot of people, especially the elderly that I've been around, they get really mad because Mr. Bush is going to -- President Bush is going to take away their Social Security. That's one of the issues. The other one --

THE VICE PRESIDENT: It's not an issue. It's not going to happen. (Laughter.)

Q Believe me it is when you're downtown waiting for a bus and they've read about it -- that he's taking away my Social Security. And the Medicare, and Medicaid -- these are things that I hear a lot about in the different groups I belong to, and the education -- like my daughter moving from one school to the other because they brought in -- everybody has to be educated, so we'll take them from a bad school and put them in a good school. And the good school turns bad because of the students. There's no doubt about it. These are social factors the average mom and dad coming home, and maybe they've got two

EXHIBIT II

hours before everybody has to get to bed, and at least my grandson knows the President is Mr. Bush. And the thing of it is, this is the argument -- what is the President going to do for me?

THE VICE PRESIDENT: Well, let me give you a quick response to a couple of those. Social Security -- the Social Security program is safe. We have no intention on taking away anybody's Social Security benefits. Don't let anybody tell you otherwise. For those who are currently in the program, receiving benefits, the program is secure. For those who are about to retire, getting close to retirement age, they're going to be fine.

The problem we're going to have in Social Security is down the road 30 years or so, and today's younger worker in their 20s and 30s can look at it and legitimately say, well, is there going to be anything there when I'm ready to retire? And there are going to be long-term problems with the program if we don't find ways to keep it solvent and make it solvent. One of the things the President has talked about, I think and this applies to the younger generation. It would not apply to anybody who is already receiving benefits, or expecting soon to receive benefits, but it would a program that would allow the younger worker voluntarily -- they don't have to, but that they could take part of their payroll tax and invest it in a personal retirement account, earn a higher rate of return and be able to have greater confidence when they reached retirement age that they would, in fact, have the cushion they need for their retirement when that time comes. It's a concept. It's an idea. There are a lot of ideas floating around about exactly how you would do it. But those are some of the things we're looking at. But anybody -- tell anybody, any of your friends today, their Social Security check is going to continue to arrive just like clockwork. And I don't know anybody who isn't committed to that course of action.

With respect to Medicare, the President did something I think is very important -- it's the most important change in Medicare in my lifetime since the program was set up back in the '60s. This year, when we passed legislation -- this past year, he signed it last December, I guess, when we passed legislation to provide prescription drug benefits to Medicare recipients -- 40 million Americans. And the Medicare program, of course, when it was set up -- part B of the program would provide hospitalization coverage, but in effect, the way it was working was you could get -- if you were enrolled in Medicare, you could get covered for a heart bypass operation, but you couldn't get covered for the prescription drug that might keep you from needing a bypass operation because it didn't cover prescription drugs. And in the 40 years, or 50 years since -- 40 years, I guess, since Medicare was set up, medicine had changed a great deal, and a whole lot more is available now, possible now through prescription drugs. They're a much more important part of our continuing care for everybody, and so the President wanted to change that.

His opposition -- the Democrats, frankly, campaigned year after year after year on the basis that they were going to do this, and they never did. George Bush got elected, and we did it. We got it done. It's now the law of the land. (Applause.)

So there -- we have I think moved in the right direction with respect to Medicare. I think that's a major plus. A lot more work to do in the whole health care area. It's one of the single most important issues that we face. It affects everybody. It affects businesses, the cost of doing business, the care and quality of life of everybody. We've got a lot of folks out there that are not insured still at this point -- a lot of them working for small businesses. So the President has got a plan to address a lot of these issues. We've already started and it will be priority for us clearly in a second term.

Let me stop at that point. I've gone on long enough, and I've gone over my limit according to Joanne. So I'll simply want to thank you again for being here today. As I say, it's a enormous privilege for all of us to be able to participate in the presidential selection process. Lynne and I feel uniquely blessed to get to campaign all across this country and meet so many tremendous people in fantastic communities, and great companies, and organizations doing great work. And you really do come away from this

EXHIBIT II

experience just with this enormous enthusiasm and excitement and emotional feeling about the greatness of America. So we're proud to be here today. We hope all of you will take advantage of our citizenship, participate on November 2nd. And we hope you remember us.

Thank you very much. (Applause.)

END 11:53 A.M. CDT

EXHIBIT II





Powered by Clickability

# East Gate Talks

### By Penny Preston

Story Published: Mar 25, 2008 at 7:07 PM MDT

Story Updated: Mar 25, 2008 at 7:07 PM MDT

### Multimedia

- Watch The Video

CODY, WYOMING - Cody area government leaders are hopeful that they might hammer out an agreement with Yellowstone officials soon, to keep the Park's East Gate open in the winter.

Pahasaka resort, just outside Yellowstone's East gate, used to send dozens of snowmobilers into the park daily. In 2004, a snowcoach operation started taking people in the East Gate. But, next year, under the parks new winter use plan, snowmobiles will go in only when there is no avalanche danger. The park will not use the old howitzer to bring down the slides. Under that scenario, the snowcoach probably wouldn't run at all.

Buffalo Bill Historical Center CEO Bruce Eldredge took a trip into the park on the last day of the season. He says the operator said, "He at the time of our trip did not think that he would run again without a gate that he could count on being open." Eldredge may have taken the last snowcoach ever through the East Gate. He said, "The scenery was just gorgeous. Miles and miles of undisturbed snow."

Cody area government officials have been meeting with Yellowstone Park officials since December. They hope to persuade the park to keep clearing the avalanche danger on Sylvan Pass in the winter. State Representative Colin Simpson told KULR 8, "I think there's a good chance we can come to an agreement by April 24th, or late April."

Cody's Mayor Roger Sedam said, "We agreed that we needed to listen to each other." Sedam says they understand now avalanche mitigation is more complicated than it used to be. He and Simpson hope to find out more about the costs of full forecasting, to be used in the new winter use plan. Simpson described it, "Which is the use of the weather station, traveling to Sylvan Pass every day to assess the situation, and not using explosives." Simpson thinks the numbers may show the cost of adding the howitzer, and helicopter may be relatively small. "From my best estimate it may be only $75,000 to go beyond full forecasting."

Neither Simpson, nor Sedam could say whether Wyoming, or Cody would be willing to pay

EXHIBIT JJ

part of that cost. KULR 8 attempted to reach Yellowstone officials for comment on the meetings. They were not available for comment. The next meeting is in Billings in April.

**Find this article at:**
http://www.kulr8.com/news/wyoming/17001551.html

☐ Check the box to include the list of links referenced in the article.

©2007 KULR-TV. All Rights Reserved.

**EXHIBIT JJ**

# WyomingNews<sup>Tribune-Eagle</sup>.com

[ Print Page ]

Last modified: Monday, March 31, 2008 11:23 AM MDT

## Closed talks continue over the future of Sylvan Pass

CHEYENNE (AP) -- The National Park Service and the state of Wyoming said they will meet next month to try to resolve a dispute over the federal agency's decision to stop maintaining a pass frequently used by snowmobilers to enter the eastern side of Yellowstone National Park.

Following an environmental analysis last year, Park Service Regional Director Mike Snyder in Denver ruled that his agency would stop using howitzers and other means to trigger avalanches to make Sylvan Pass safe after the winter of 2007-2008.

The decision would make snowmobilers and snow coaches dependent on natural conditions to cross the pass starting next winter. However, Snyder said the Park Service would continue to work with state and local officials until June to try to find alternatives that would allow continued motorized use of the pass.

The Park Service's environmental study drew thousands of comments from around the country, with the majority favoring closing the park to snowmobile use entirely. But the state of Wyoming and many area residents have pushed the Park Service to keep Sylvan Pass open. They say closing the pass would reduce recreational opportunities and hurt tourism.

Meetings scheduled for April 24-25 in Billings, Mont., will focus on the cost of keeping the pass open during the past several winters, said Carl Moore, a facilitator retained by the Park Service. He said the meeting on the 24th will be open to the public, while the next day's session will be closed.

Park Service officials have referred comment on Sylvan Pass to Moore. However, Moore said it would be up to the agency officials to determine whether they want to keep the pass open in the future.

Moore said the meetings so far have turned up information that much of the work necessary to keep Sylvan Pass open for snowmobile use would have to be done even if snowmobiles weren't allowed.

"The point is that there's some costs associated just to live with it, even if you don't want to keep it open," Moore said.

Gov. Dave Freudenthal said Wednesday that he's cautiously optimistic that an agreement can be reached to keep the pass open. He said the Park Service should incorporate the cost of keeping the pass open into the recurring federal budget so the issue can be laid to rest.

State Rep. Colin Simpson, R-Cody, has been attending the meetings with the Park Service and has been a vocal proponent of keeping the pass open.

"I don't want to get too optimistic, but I am optimistic at this point that there appears to be recognition that keeping it open is important to the state, and the county and the town (of Cody) economically and

EXHIBIT JJ

culturally," Simpson said.

Simpson said state officials have assumed that the cost of keeping the pass open would be the responsibility of the Park Service.

"The Park Service has suggested that they simply don't want to be obligated to an open-ended responsibility into the future, and they're looking for some limitations, as they call them, to their obligation," he said.

Franz Camenzind, executive director of the Jackson Hole Conservation Alliance, said he's concerned about the closed process of reaching a decision on the Sylvan Pass. He said his group hasn't been involved in the issue.

"I really don't have any firsthand knowledge, but I'll say that I'm always very concerned when decisions on public resources use are made in private," Camenzind said. "It casts a cloud of skepticism over the process, and I don't think that's good for good decisions, and it's not good for community buy-in, they don't feel that they had a chair at the table."

Camenzind said he believes the pressure the Park Service is under pressure from the state of Wyoming to keep the pass open.

"I think this is indicative about what's been happening about the entire winter use study in the Yellowstone and Grand Teton area," Camenzind said. "There have been numerous studies completed that have all shown that snowmobile use should be completely phased out. But there have been just as many political pushes to have those decisions modified, or overturned, so that snowmobile use would continue. And I think that's clear indication that politics trumps good resource-management recommendations."

EXHIBIT JJ

Case 1:07-cv-02112-EGS    Document 30-12    Filed 04/16/2008    Page 5 of 18



**Wyoming's news source**

[ Print Page ]

**WEDNESDAY APRIL 16, 2008** :: Last modified: Wednesday, March 19, 2008 7:49 AM MDT

## Park sled use stays steady

JACKSON (AP) -- The number of snowmobilers
visiting Yellowstone National Park remained
steady this winter while the use of snowcoaches
there rose slightly.

The number of park visitors on snowmobiles
dropped less than 1 percent, to 30,756,
compared with last winter. Snowcoach visits
rose about 7 percent to 21,794.

The total number of visitors to the park from
December to February increased 7 percent,
from 75,450 in 2006-07 to 80,828 in 2007-08.

Yellowstone spokesman Al Nash said visitor
numbers for March aren't yet available. All the
visitor numbers are preliminary, he said.

Two Bombardier snowcoaches carry winter visitors
along a road near Old Faithful in Yellowstone National
Park earlier this winter. Snowcoach visits in the park
rose about 7 percent this winter to 21,794. Photo by
MARK GOCKE, Star-Tribune correspondent.

Yellowstone next winter will operate under new
winter travel rules that reduce the number of
snowmobiles allowed in the park each day from 720 to 540. The new rules also lower the daily limit
on snowmobiles at each entrance and at other areas.

Nash said the number of snowmobiles entering the park surpassed 540 just one day this winter, on
Dec. 28. More than 500 snowmobiles entered the park on Dec. 27, 28 and 29.

**EXHIBIT JJ**


**Wyoming's news source**

Print Page

**WEDNESDAY APRIL 16, 2008** :: Last modified: Sunday, February 17, 2008 2:05 AM MST

---

## Angry perspective alienates others

Editor:

Re: the guest column that appeared in the Jan. 26 Casper Star-Tribune Forum headlined, "No right way to do the wrong thing," by George Wuerthner.

George Wuerthner, a licensed guide in Yellowstone Park, must have been having a bad day when he wrote about "thrillcrafters," or at least I hope that was the cause of such negativity. His definition of a "thrillcraft" is: "ATV's, dirt bikes, dune buggies, swamp buggies, jet skis, snowmobiles and other associated toys used by immature adults." It's too bad that our society is becoming so intolerant.

In Yellowstone Park, winter use by snowmobiles has been cut in a severe manner. It has gone from no limits on the number of snowmobiles allowed to travel through the park in one day, to 750, and now 500 a day are allowed to pass through the gates and then only with a guide, a provision that is ludicrous.

During summer months, automobiles have unlimited access to all paved roads, except for construction areas, while snowmobiles have approximately 180 miles of groomed roads in which to ride. They cannot leave the groomed trails and no one would disagree with this rule, but each year it becomes more difficult to use "our land," as Mr. Wuerthner calls it. This could be viewed as discrimination and what is right about that?

Like it or not, there are abuses of every sort from every segment of society, including guides. The number of good "thrillcraft" riders just like the numbers of any other part of society, including guides, far outnumber the ones who aren't so good. Mr. Wuerthner's message suggests it's "our land" only if we agree with him about how exactly it should be used.

I wonder if he would like to see the "thrillcrafters" and other spin-off businesses that go along with them, go out of business?

Comparing people who enjoy motorized recreation with wife beaters and those who would destroy truly sacred ground such as Arlington Cemetery goes too far! It shows not only dysfunction and disrespect from people such as Mr. Wuerthner and radical environmentalists (sometimes referred to as green terrorists) who are slowly but surely taking away the use of public lands to all but non-motorized use, but points out once again their base selfishness. If we can't learn tolerance of each other, we could all be in danger of losing much more than our toys.

STAN and JANE WOSTENBERG, Worland

**EXHIBIT JJ**



**Wyoming's news source**

[ Print Page ]

**WEDNESDAY APRIL 16, 2008** :: Last modified: Saturday, January 26, 2008 2:05 AM MST

## No right way to do the wrong thing

GEORGE WUERTHNER
Perspective

Right now various National Forests and BLM districts are beginning to put together travel management plans. Most of these plans are focused on corralling the growing abuse of our public lands by thrillcraft -- ATVs, dirt bikes, dune buggies, swamp buggies, jet skis, snowmobiles, and other associated toys used by immature adults. The underlying assumption of all these travel management plans is that some level of abuse and vandalism of our public domain by thrillcraft owners is inevitable.

I do not accept the premise that abuse of our lands is something that we must tolerate as inevitable. It is our land. It is our children's land, and their children's land. We have a responsibility to pass these lands on to the next generation in better condition than we found them. And we have a collective responsibility to protect our national heritage against the thrillcraft menace.

The real problem isn't the machines. It's not even the people. Many otherwise decent people ride thrillcraft, but when they straddle one of these machines they become participants in a dysfunctional culture. It is a culture that sees our public land as nothing more than a giant sandbox. Thrillcraft culture represents a lack of respect for other people's property and the quality of their outdoor experience. What people do on their own property is not my concern, but when they ride their machines on public lands it becomes a societal issue. Our public lands are as close as our society has to shared "sacred" ground.

The operation of any thrillcraft has a disproportional impact upon the landscape, wildlife and other people. Thrillcraft pollute the air and water. They compact soils. They damage wetlands and riparian areas. They spread weeds. They displace wildlife. The noise, speed, and general disregard for other people by thrillcraft owners displace other non-motorized users of our public lands. Increasingly they threaten archeological treasures. How can any of this be considered "responsible" use?

You hear a lot about "responsible" ORV use and "a few bad apples" from thrillcraft promoters themselves, as well as some government bureaucrats. What is responsible about tearing up the land? It's like suggesting we ought to promote "responsible wife abuse" or "responsible child abuse." There is no level of abuse that is acceptable. Working with agencies to create designated routes or play areas is just helping to legalize public vandalism.

Most people would never allow thrillcraft to run across their lawns.

They would not tolerate such noise in their neighborhoods. Would we allow thrillcraft to do wheelies in the Arlington National Cemetery, or crawl up the Lincoln Memorial? I think not. And I see no reason to permit similar antics on the rest of our public lands.

EXHIBIT JJ

To those who think we have to accept thrillcraft because they are "traditional" activities, I remind them that the same arguments were once made about segregation, beating up your wife, about smoking in public places, and many other behaviors and cultural "traditions" that were once commonplace. Society now views these things as wrong, and has outlawed them.

There is no right way to do the wrong thing. Running thrillcraft on our public lands is wrong. It's not good for the land. It's not good for the air and water. It's not good for wildlife. It's not good for other people. It's not even good for the people doing it. It's time to ban these machines, not legitimize the continued destruction of our sacred public commons.

*George Wuerthner is a licensed guide in Yellowstone National Park and the author/editor of 34 books, including "Yellowstone -- A Visitor's Companion." His most recent book is "Thrillcraft -- the environmental consequences of motorized recreation."*

EXHIBIT JJ



**Wyoming's news source**

Print Page

**WEDNESDAY APRIL 16, 2008** :: Last modified: Monday, January 21, 2008 2:05 AM MST

## Officials plan Sylvan Pass talks

By BRODIE FARQUHAR
Star-Tribune correspondent

A closed-door meeting in Montana later this month could determine the future of winter access to Yellowstone National Park from its east entrance near Cody.

Officials from Yellowstone, the Wyoming Legislature and governor's office, Park County, the city of Cody and observers from the Wyoming, Montana and Idaho congressional delegations will meet Jan. 28-30 in a Billings airport conference room.

The purpose of the meeting is to negotiate a consensus agreement on access to the park and avalanche hazard mitigation of Sylvan Pass for the 2008-09 winter. The group must come up with a viable plan by June 1, or the National Park Service will close Yellowstone's east entrance during the winter, citing avalanche hazards.

Some of those expected to attend include Yellowstone Superintendent Suzanne Lewis and management assistant John Sacklin; Cody Mayor Roger Sedam; Park County Commission Chairman Tim French; state Rep. Colin Simpson, R-Cody, and state Sen. Pat Childers, R-Cody; and Ryan Lance and Mark Toft from Gov. Dave Freudenthal's office.

Facilitator Carl Moore has been hired by the Park Service to conduct the meetings.

While the press and public are barred from attending the negotiations, they can attend "informational" segments of the meetings. At the close of each meeting, participants will decide what information can be shared with the public, which will be conveyed via a press release written by Moore.

Al Nash, spokesman for the park, said the privacy of the meeting was to encourage "frank discussions."

Dan Neal, director of the Equality State Policy Center, countered that "candor is often used to justify secrecy." He noted that the Sylvan Pass meeting isn't about security or personnel or property, the most common reasons for holding government meetings behind closed doors.

"What is it that they don't want the public to know?" he asked. Neal said his group's position is that government decision-making should be as open as possible.

Cara Eastwood, press secretary to the governor, said the closed meeting was requested by the Park Service, and that the governor is "willing to have it be open to the public."

Simpson said he hopes to persuade the Park Service to keep the pass open, which would help revive

EXHIBIT JJ

winter tourism that has declined during the Yellowstone snowmobile controversy. The Sleeping Giant ski area is going to reopen, he said, and an open Sylvan Pass is key to reviving the winter economy.

As for holding the meeting behind closed doors, "I'm an open meeting type, but if confidential discussions will help resolve the issue, I'll live with it," he said.

Tim Stevens, Yellowstone program manager for the National Parks Conservation Association, said having a closed meeting is "totally wrong" and runs counter to the public having trust and understanding of how public officials reach decisions.

Stevens said Yellowstone is exploiting an exemption in the Federal Advisory Committee Act, enacted in 1972, to avoid an open process.

Stevens said his group believes the Park Service has demonstrated in three studies that the risk of keeping the pass open is unacceptable and cannot be justified with just a handful of winter recreationists seeking to go through the pass each day.

EXHIBIT JJ



Story available at http://billingsgazette.net/articles/2008/01/28/news/wyoming/26-sylvan.txt

Published on Monday, January 28, 2008.
Last modified on 1/28/2008 at 12:56 am

# Discussion of Sylvan Pass' future starts today

**By MIKE STARK**
**Of The Gazette Staff**

The future wintertime use of Yellowstone National Park's Sylvan Pass will be the focus of a two-day meeting in Billings starting today.

Sylvan Pass, west of Cody, Wyo., and Yellowstone's East Entrance, has been at the center of controversy since the National Park Service in 2006 proposed closing it during the winter because of safety concerns for crews trying to keep the high-elevation road free of avalanche danger.

The Park Service pulled back from that proposal in November, announcing that it will negotiate with officials from the state of Wyoming, Park County, Wyo., and the City of Cody to look for ways to control avalanches on the pass.

**Deadline looming**

If an agreement isn't reached by June 1, the Park Service will no longer use explosives for avalanche control and instead will only open the pass for snowmobiles and snowcoaches when it's deemed safe. That could mean the pass could be closed for days or weeks at a time, depending on the weather.

The first round of negotiations starts at 1 p.m. today at Crowne Plaza Hotel.

The two-day meeting is expected to include at least three sessions where the public and press will be barred. The first "executive session" is expected at 1 p.m. today. The others are scheduled for 8 a.m. and 4 p.m. Tuesday.

The Park Service for years used a 105 mm howitzer to artificially trigger avalanches on the pass in order to keep the pass safe for winter travelers.

**OSHA concerns**

In 2001, the Occupational Safety and Health Administration issued a report outlining eight concerns with the park's avalanche program, including that crews had to pass through active avalanche zones to get to the howitzer.

Park officials, calling the risk to employees "extreme" in using the howitzer, began contracting with a private helicopter crew in 2004 to hand-drop explosives onto Sylvan Pass.

EXHIBIT JJ

Case 1:07-cv-02112-EGS    Document 30-12    Filed 04/16/2008    Page 12 of 18

The howitzer and a helicopter are still being used this year to control avalanches on the pass.

Plans to close Sylvan Pass in November 2006 angered residents and officials in Wyoming, especially Cody, out of concern that the closure would mean substantial economic losses from winter tourism.

"Revenue from winter visitor spending may be critical to the survival of many businesses in the area," said a report last year by a University of Wyoming economist.

Park Service officials reopened the possibility of allowing winter traffic over Sylvan Pass last fall in announcing the new, long-term proposal for snowmobiles in Yellowstone, which is scheduled to take effect next winter.

If Sylvan Pass does remain open, up to 30 snowmobiles each day would be allowed through the East Entrance each day.

Today's negotiating session is expected to include discussions about Yellowstone's effect on Cody's economy, the city's efforts to enhance tourism, the cost and methods of avalanche forecasting in Yellowstone and possible alternatives to the helicopter or howitzer.

Tuesday's session is scheduled to include a history of the current avalanche control system, the current costs, and the potential costs and benefits of alternative avalanche control methods.

*Contact Mike Stark at mstark@billingsgazette.com or 657-1232.*

Copyright © The Billings Gazette, a division of Lee Enterprises.

EXHIBIT JJ


# billingsgazette.com

Story available at http://billingsgazette.net/articles/2008/01/06/opinion/gazette/20-winter-plan_x.txt

Published on Sunday, January 06, 2008.
Last modified on 1/6/2008 at 1:34 am

# Gazette Opinion: New year, old Yellowstone dispute back in court

"This final rule ... will ensure that visitors have an appropriate range of winter recreation opportunities that are appropriate to the national park setting, and that these activities do not impair park resources and values."

Everything in that "final" statement from the National Park Service remains controversial.

After 10 years and the expenditure of around $10 million in public money to study winter use in Yellowstone and Grand Teton national parks, the National Park Service rule on use of motorized over-the-snow vehicles satisfies neither snowmobiling advocates nor environmental proponents.

There's a strong sense of deja vu as the winter use dispute heads to the courts once again in 2008. Two days after the latest NPS decision was announced, six conservation organizations challenged it in two lawsuits filed in U.S. District Court in Washington, D.C. A few weeks later, the state of Wyoming challenged the final winter use rule with a lawsuit in U.S. District Court in Cheyenne.

### 3 lawsuits, 2 courts

The winter debate has been here before. It's likely that both of the same judges in Washington and Cheyenne will handle these Yellowstone lawsuits as they did in dueling 2003 lawsuits. That December, conflicting rulings from the courts on the eve of the parks' winter season created such confusion for the parks, the public and local tourist businesses that visitation plummeted.

A three-season temporary rule, extended this winter for a fourth season, has allowed tourism to rebound. The past four seasons have seen significant growth in snowcoach travel that now includes vans and buses. Although the rule allowed up to 720 snowmobiles a day to enter the parks, the actual use was around 250, all of which were on commercially guided tours. Additional scientific studies of noise, air pollution and wildlife were conducted with the much reduced number of snowmobiles using the parks. Even with as few as 250 snowmobiles running through the gates in a day, noise monitors indicated that the roar of snowmobiles was heard at Old Faithful geyser and other popular winter travel sites most of the day.

A degree of peace has reigned temporarily, but the underlying issues aren't resolved, as evidenced by the latest round of lawsuits. National Parks Conservation Association, filing separately, and the other groups, led by Greater Yellowstone Coalition and Wilderness Society, challenge the NPS decision to allow up to 540 snowmobiles a day into the parks.

EXHIBIT JJ

They say NPS ignored federal laws, its own scientists, research and standards in authorizing continued snowmobile travel that will be detrimental to the parks' natural resources.

**Wyoming weighs in**

The environmental groups and the state of Wyoming cite the same laws, but reach diametrically opposed conclusions. Wyoming Attorney General Bruce Salzburg says that the rule allows fewer snowmobiles than it should. Salzburg's petition says NPS failed "to take a 'hard look' " at allowing some snowmobilers in the park with noncommercial guides, and he challenges the plan to stop avalanche control operations on Sylvan Pass near the park's east entrance after this season.

Sylvan Pass appears to be less an environmental issue and more a matter of funding the cost of safely keeping this eastern access open for a relatively small number of visitors. The obvious political solution is an appropriation specifically for safe avalanche control. Wyoming's state leaders and congressional delegation can work on the question of who will pay.

The winter use rules are debated as scientific and legal questions. However, the long history of this dispute has shown that NPS action will be influenced strongly by political philosophy. To settle a 1997 lawsuit, President Bill Clinton's administration issued a decision that would have banned all snowmobiles in Yellowstone by 2003-2004. To settle a 2001 lawsuit, President George W. Bush's administration has issued decisions that allow snowmobiles.

What will the future policy be? The answer will depend largely on whom voters send to the White House a year from now.

Copyright © The Billings Gazette, a division of <u>Lee Enterprises</u>.

EXHIBIT JJ



Story available at http://billingsgazette.net/articles/2008/01/05/news/wyoming/26-petition.txt

Published on Saturday, January 05, 2008.
Last modified on 1/5/2008 at 1:10 am

# County joins petition against winter use plan

**By RUFFIN PREVOST**
**Gazette Wyoming Bureau**

CODY - Park County has joined the state in filing a petition in federal court seeking a review of the winter use plan for Yellowstone National Park.

The petition was filed this week in U.S. District Court in Cheyenne by Park County Attorney Bryan Skoric on behalf of the five-member Board of County Commissioners. It largely mirrors one filed Dec. 13 by the Wyoming Attorney General's Office.

The petition claims that the Park Service failed to provide sufficient analysis for Sylvan Pass management; that the plan "arbitrarily and capriciously reduces the number of snowmobile entries"; and that the requirement for a commercial guide for snowmobile riders amounts to a "de facto tax or unauthorized fee."

The petition comes as the county, state and city of Cody are negotiating with the Park Service to develop a safe, affordable avalanche management plan to reliably keep Sylvan Pass open.

The petition states that the county "recognizes a need to preserve this issue despite continuing efforts between the parties to negotiate aspects of future use."

Commissioner Tim French said he didn't expect the filing to complicate those efforts or cause hard feelings at the negotiating table.

"The bulk of it is on other issues besides Sylvan Pass. It's about snowmobile numbers, the commercial-guide requirement and how the record of decision, through full forecasting, effectively shuts the pass down to winter use," French said.

"The petition just preserves our right to go after these other issues, too.

"I don't think they will take it personally. It's just part of the process," he said.

### 'Alongside' state

"We're right alongside this with the state of Wyoming," Skoric said.

"Park County wasn't in a position to wait until June based on only one issue," he said.

"I don't think it chills any of the discussion at all," said state Rep. Colin Simpson, who has been

EXHIBIT JJ

negotiating the Sylvan Pass issue with the Park Service.

"I believe federal land managers are used to being sued by all sides on these kinds of issues," he said, adding that he had not heard any mention during negotiations of the state petition filed last month.

"We all are pretty much unified as a board on this," said Commissioner Bucky Hall.

"It also goes to the issue of public access to all our parks, period, all across the country," he said.

Hall said it was important to oppose what he said appeared to be an "informal philosophy" by the Park Service in light of stretched budgets and growing demands to "restrict access and charge more for it."

A tight Park Service budget was a legitimate reason to consider closing Sylvan Pass, said Tim Stevens, Yellowstone program manager for the National Parks Conservation Association in Livingston.

Park managers have made a good case that "the $200,000 a year being expended to allow a mere trickle of visitors in the wintertime is not justified given that the Park Service has such a huge annual deficit to begin with," he said.

The NPCA in November filed a petition seeking a review of the same winter use decision, arguing that the Park Service's studies have found that snow coaches offer the best option for preserving the park for future generations, and that snowmobiles should be banned.

Stevens said negotiations between the Park Service and local and state officials over Sylvan Pass amounted to a closed process that will influence the park's winter use without the chance for public input or review.

"It's not a surprise to us that some parties have chosen to raise questions regarding our final decision in the courts," said Al Nash, spokesman for Yellowstone Park.

The Park Service will submit Park County's petition to the U.S. Department of Justice, as it has with previous petitions filed by other parties, he said.

The court must find potential merit in the petition's claims for the review to be considered.

No response to the state or Park County petitions has been filed by the National Park Service or U.S. Bureau of the Interior, and no date is set for consideration of the petition.

*Contact Ruffin Prevost at rprevost@billingsgazette.com or 307-527-7250.*

Copyright © The Billings Gazette, a division of Lee Enterprises.

EXHIBIT JJ

# Jackson Hole News&Guide

Print This Page >

## Winter park visits steady

*By Cory Hatch Jackson Hole, Wyoming*
*Date: March 18, 2008*

Yellowstone National Park officials say preliminary counts of snowmobiles stayed steady while snow coach use rose slightly this past winter.

Compared with last winter, snowmobile numbers this season dropped less than 1 percent, falling to 30,756, while snow coach visits rose roughly 7 percent to 21,794.

Overall visitation numbers from December to February increased 7 percent, from 75,450 in 2006-07 to 80,828 in 2007-08. Officials said overall numbers for March are not yet available. All of the data are preliminary, Yellowstone spokesman Al Nash said.

Nash said the biggest increase came from people who entered the park's North Entrance in automobiles. Through February, about 35,900 people visited Mammoth, Lamar Valley or traveled to Cooke City, Mont., located on the park's northeast boundary, for an 8 percent increase compared with last winter.

"Even though there is only limited wheeled access, it is still very significant and important," Nash said. "Lamar Valley sees people looking for wolves year round."

Next winter, Yellowstone will operate under new winter travel rules that reduce the number of snowmobiles allowed in the park each day from 720 to 540. The new rules also lower the daily limit on snowmobiles at each entrance and at other areas.

Nash said the number of snowmobiles entering the park surpassed 540 just one day this winter, on Dec. 28. More than 500 snowmobiles entered the park on Dec. 27, 28 and 29.

Daily limits would have also passed next winter's allocation for the West Entrance, the South Entrance and Old Faithful right after Christmas.
Snow coach totals would have passed the maximum limit at the South Entrance on several days at the end of December and at the East Entrance one day in March.

Nash said the fact that snowmobile use passed next winter's maximum limit on only a few days this winter shows that opportunities will continue for snowmobile and snow coach operators outside the park.

"We felt that these levels would allow us to provide for visitor use, protection of resources and some economic growth for the gateway communities," he said. "It's no surprise which days have the highest visitation during our brief winter season."

Further, Nash said the new plan leaves managers some leeway to adjust the numbers.

"Part of the final rule does call for an adaptive management component," he said. "We're going to continue to monitor the number of snowmobiles and snow coaches allowed and watch how they impact conditions. We have the flexibility to do that."

Nash said that could mean an increase or a decrease in snowmobile or snow coach numbers, depending on the results of continuous air, noise and wildlife monitoring.

EXHIBIT JJ

Case 1:07-cv-02112-EGS    Document 30-12    Filed 04/16/2008    Page 18 of 18

www.jhnewsandguide.com
307-733-2047
© 2008 Jackson Hole News&Guide
All Rights Reserved

**EXHIBIT JJ**