IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

GREATER YELLOWSTONE COALITION, )
et al., )
                 Plaintiffs, )
                        )
       v. )
                        )
DIRK KEMPTHORNE, et al., )
                        )
             Defendants. )

**Case No. 07-cv-2111 (EGS)**

[Hearing on Motions for Summary
Judgment on August 27, 2008]

NATIONAL PARKS CONSERVATION )
ASSOCIATION, )
                        )
             Plaintiff, )
                        )
       v. )
                        )
UNITED STATES DEPARTMENT OF THE )
INTERIOR; NATIONAL PARK SERVICE, )
                        )
             Defendants. )

**Case No. 07-cv-2112 (EGS)**

[Hearing on Motions for Summary
Judgment on August 27, 2008]

## PLAINTIFF NATIONAL PARKS CONSERVATION ASSOCIATION'S
## MOTION FOR SUMMARY JUDGMENT

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, the National Parks

Conservation Association hereby moves for summary judgment.  For the reasons set forth in the

accompanying Memorandum, there are no genuine issues of material fact in dispute, and the

Plaintiff is entitled to judgment as a matter of law.  In support of this Motion, Plaintiff submits

the accompanying Memorandum of Law, a Proposed Order, a Statement of Material Facts as to

Which There Is No Genuine Issue, and an Appendix containing items not found in the

Administrative Record but relevant for background purposes.

Respectfully submitted,

Robert D. Rosenbaum (D.C. Bar No. 090498)
Ingo W. Sprie
Francis A. Franze-Nakamura (D.C. Bar No. 497985)
Meetu Kaul (D.C. Bar No. 468146)
ARNOLD & PORTER LLP
555 Twelfth Street, NW
Washington, DC  20004
Phone:    (202) 942-5862
Fax:        (202) 942-5999

Attorneys for Plaintiff National Parks Conservation
Association

Dated:  May 9, 2008

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| GREATER YELLOWSTONE COALITION, et al.,<br><br>　　　　　　Plaintiffs,<br><br>　　v.<br><br>DIRK KEMPTHORNE, et al.,<br><br>　　　　　　Defendants. | Case No. 07-cv-2111 (EGS)<br><br>[Hearing on Motions for Summary Judgment on August 27, 2008] |
| NATIONAL PARKS CONSERVATION ASSOCIATION,<br><br>　　　　　　Plaintiff,<br><br>　　v.<br><br>UNITED STATES DEPARTMENT OF THE INTERIOR; NATIONAL PARK SERVICE,<br><br>　　　　　　Defendants. | Case No. 07-cv-2112 (EGS)<br><br>[Hearing on Motions for Summary Judgment on August 27, 2008] |

**PLAINTIFF NATIONAL PARKS CONSERVATION ASSOCIATION'S
MEMORANDUM IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

TABLE OF CONTENTS..................................................................................................i

GLOSSARY OF ABBREVIATIONS ...................................................................... iii

TABLE OF AUTHORITIES ..................................................................................... iv

INTRODUCTION AND SUMMARY .........................................................................1

I.    FACTUAL BACKGROUND .............................................................................3

    A.    A Brief History of This Dispute Up to the 2004 Temporary Rule ..........3

    B.    The 2004 Rule, the Two-Third's Reduction in the Number of
        Snowmobiles and the Improved Conditions...........................................4

    C.    The Bush Administration Continues to Favor Snowmobiles at
        Yellowstone ............................................................................................5

    D.    The 2005-2006 Bush Administration Effort to Change the NPS's Mission
        to Elevate the Significance of Recreation in the National Parks ..............6

    E.    The 2007 EIS ..........................................................................................8

    F.    The ROD and Final Rule .......................................................................10

II.   NPS'S STUDIES, FINDINGS AND CONCLUSIONS CONCERNING ADVERSE
    SNOWMOBILE IMPACTS .............................................................................11

    A.    Impacts on the Natural Soundscape:  The Studies, the FEIS and the ROD..........11

        (1)    The Four Years of Monitoring Studies Demonstrate the Significant
            Impact on Soundscapes.........................................................12

        (2)    The NPS's Contrived Impact Definitions...................................14

        (3)    The NPS's Modeling Studies Based on the "Total Park Area"
            Approach................................................................................16

        (4)    The NPS's Findings ..............................................................18

    B.    Impacts on Wildlife:  The Studies, the FEIS and the ROD ...................22

        (1)    The NPS's Studies Demonstrate That Snowmobiles Disturb
            Wildlife..................................................................................22

(2)    The NPS Avoided the Results of Its Own Scientific Studies by
Defining Impacts Based on Population-Level Effects.................................24

(3)    The NPS Found Population-Level Impacts to Wildlife Acceptable
Despite Adverse Impacts to Individuals ...................................................25

C.    Impacts on Air Quality:  The Studies, the FEIS and the ROD ............................26

(1)    The FEIS Sets an Inappropriate "Desired Condition" by Seeking
Merely a Reduction from Historical Pollution and Visibility
Conditions..................................................................................................27

(2)    Carbon Monoxide and Particulate Matter Would Increase
Dramatically Under Winter Use Plan from Current Conditions,
Even Based on the NPS's Modeling...........................................................28

(3)    The NPS's Findings ...................................................................................30

III.    ARGUMENT ...............................................................................................................31

A.    The Standard of Review...............................................................................................31

B.    It Is Now Clear That the Winter Use Plan Is Prohibited Under the
Governing Statutes and Regulations and Should Be Vacated as Contrary to
Law ..............................................................................................................................31

(1)    The Winter Use Plan Violates the Yellowstone Enabling Act .................32

(2)    The Winter Use Plan Violates the NPS Organic Act and Redwood
Amendment................................................................................................34

(3)    The Winter Use Plan Violates Executive Orders 11644 and 11989
and 36 C.F.R. § 2.18(c).............................................................................37

C.    The FEIS, ROD and Rule Should Be Vacated as Arbitrary, Capricious and
an Abuse of Discretion.................................................................................................39

(1)    The Parameters Set for the NPS's Analysis Did Not Reflect the
Applicable Legal Restraints on Its Action ................................................39

(2)    The NPS Has Manipulated Its Analysis to Justify Its Desired
Result .........................................................................................................41

IV.    CONCLUSION............................................................................................................44

# GLOSSARY OF ABBREVIATIONS

For ease of reference, Plaintiff National Parks Conservation Association will refer to the following items using the abbreviations described below.

AR    The Administrative Record produced in this action.  We will cite to items by the form, for example, "AR 123456."

- Because the individual pages of many items in the Record as produced are not separately Bates-numbered, we will refer to those items by the Bates number of the first page of the item.  If the complete document is paginated, we will use the document's own pagination for jump cites.  If the document is not paginated, but handwritten page numbers were written on the document as produced, we will use those handwritten page numbers as jump cites.

DEIS    Draft Environmental Impact Statement, March 27, 2007, AR 117061 *et seq.*

FEIS    Final Environmental Impact Statement, September 24, 2007, AR 117160 *et seq.*

ROD    Record of Decision, November 20, 2007, AR 126499 *et seq.*

Rule    Amendment to 36 C.F.R. §§ 7.13, 7.21 and 7.22, as published at 72 FED. REG. 70781 *et seq.* (Dec. 13, 2007), AR 126681 *et seq.*

2000 ROD    Record of Decision, Winter Use Plans for the Yellowstone and Grand Teton National Parks and John D. Rockefeller, Jr. Memorial Parkway (November 22, 2000).

2001 Rule    Amendment to 36 C.F.R. §§ 7.13, 7.21 and 7.22, as published at 66 FED. REG. 7260 *et seq.* (Jan. 22, 2001).

2003 SEIS    Final Supplemental Environmental Impact Statement, Winter Use Plans, Yellowstone and Grand Teton National Parks and the John D. Rockefeller, Jr. Memorial Parkway, February 2003.  *See* excerpt in Appendix, Tab 5.

2003 ROD    Record of Decision,, Winter Use Plans for Yellowstone and Grand Teton National Parks and the John D. Rockefeller, Jr. Memorial Parkway, March 25, 2003.

2003 Rule    Amendments to 36 C.F.R. §§ 7.13, 7.21 and 7.22, as published at 68 FED. REG. 69268 *et seq.* (Dec. 11, 2003).

2004 Rule    Amendments to 36 C.F.R. §§ 7.13, 7.21 and 7.22, as published at 69 FED. REG. 65348 *et seq.* (Nov. 10, 2004).

## TABLE OF AUTHORITIES

**Cases**

*Bicycle Trails Council of Marin v. Babbitt,* 82 F.3d 1445 (9th Cir. 1996)...................................... 34

*Burlington Truck Lines Inc. v. U.S.*, 371 U.S. 156 (1962)............................................................... 42

*Bush-Quayle '92 Primary Committee, Inc. v. Federal Election Com'n,* 104 F.3d
    448 (D.C. Cir. 1997) ................................................................................................................ 39

*Chamber of Commerce v. SEC*, 443 F.3d 890 (D.C. Cir. 2006)....................................................... 31

*Citizens Against Burlington, Inc. v. Busey*, 938 F.2d 190 (D.C. Cir. 1991) ..................... 40, 41, 42

*Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402 (1971)................................................. 31

*City of Carmel-by-the-Sea v. U.S. Dept. of Transp.*, 123 F.3d 1142 (9th Cir. 1997) ............. 39, 41

*Edmunds Institute v. Babbitt*, 42 F. Supp. 2d 1 (D.D.C. 1986) ...................................................... 34

*Environmental Defense v. U.S. Army Corps of Engineers*, 515 F. Supp. 2d 69
    (D.D.C. 2007) ................................................................................................................... 41, 43

*Friends of the Earth v. Hall*, 693 F. Supp. 904 (W.D. Wash. 1998) .............................................. 43

*Fund for Animals v. Norton*, 294 F. Supp. 2d 92 (D.D.C. 2003)............................................. passim

*Fund for Animals v. Norton*, 323 F. Supp. 2d 7 (D.D.C. 2004)........................................................ 4

*Int'l Snowmobile Mfrs. Ass'n v. Norton*, 304 F. Supp. 2d 1278 (D. Wyo. 2004)............................ 4

*Int'l Snowmobile Mfs. Ass'n v. Norton*, 340 F. Supp. 2d 1249 (D. Wyo. 2004) ............................ 4

*Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29
    (1983)................................................................................................................... 39, 43, 44

*National Parks Conservation Association v. FAA*, 988 F.2d 1523 (10th Cir. 1993).................... 42

*Pacific Coast Federation of Fisherman's Ass'ns v. Nat'l Marine Fisheries Servs.*,
    482 F. Supp. 2d 1248 (W.D. Wash. 2007)................................................................................. 43

*Seattle Audubon Soc'y v. Moseley*, 798 F. Supp. 1473 (W.D. Wash. 1992) ................................ 43

*Sierra Club v. Costle*, 657 F.2d 298 (D.C. Cir. 1981) .................................................................. 43

*Sierra Club v. Mainella*, 459 F. Supp. 2d 76 (D.D.C. 2006) ........................................................ 44

*Tripoli Rocketry Ass'n, Inc. v. Bureau of Alcohol, Tobacco, Firearms and Explosives*, 437 F.3d 75 (D.C. Cir. 2006) ............................................................ 44

## Statutes

"An act to set apart a certain Tract of Land," ch. 34, 17 Stat. 32, 42 Cong. 2d Sess. (Act of Congress of March 1, 1872) ............................................................ 32

16 U.S.C. § 1 ............................................................................................ 2, 32, 34

16 U.S.C. § 1a-1 ............................................................................................ 31, 34

16 U.S.C. § 21 ............................................................................................ 35

16 U.S.C. § 22 ............................................................................................ 2, 31, 33, 38

16 U.S.C. § 26 ............................................................................................ 2, 32, 38

16 U.S.C. § 3 ............................................................................................ 33

## Regulations

36 C.F.R. § 2.18(c) ............................................................................................ 2, 31, 38, 41

36 C.F.R. §§ 7.13, 7.21 and 7.22 ............................................................ iii

40 C.F.R. § 1502.13 ............................................................................................ 39

## Other Authorities

37 FED. REG. 2877 (Feb. 8, 1972) ............................................................ 37

39 FED. REG. 11882 (Apr. 1, 1974) ............................................................ 37

66 FED. REG. 7260 (Jan. 22, 2001) ............................................................ iii

68 FED. REG. 69268 (Dec. 11, 2003) ............................................................ iii

69 FED. REG. 65348 (Nov. 10, 2004) ............................................................ iii, 4

72 FED. REG. 70781 (Dec. 13, 2007) ............................................................ iii, 10

Executive Order 11644 ............................................................................................ 31, 37

Executive Order 11989 ............................................................................................ 31

Hearing Before the Subcommittee on National Parks of the Senate Committee on
Energy and Natural Resources, "The National Park Service's Revised Draft
Management Policies," June 20, 2006 .................................................................................. 7

Horace Marden Albright, *The Birth of the National Park System: The Founding
Years, 1913-33* (1985). ......................................................................................................... 33

*Webster's New Universal Unabridged Dictionary* (2d ed. 1983) ............................................... 38

## INTRODUCTION AND SUMMARY

The Federal Defendants' 2007 regulation establishing a winter use plan for Yellowstone National Park, Grand Teton National Park and the connecting parkway (the "Winter Use Plan") is the latest in a series of efforts by the Bush Administration to reverse the conclusions reached in 2000 by its predecessor administration to phase out snowmobiles in these parks because of the substantial damage they cause to the parks' resources and values.  We need not tell this Court that Yellowstone is one of America's greatest natural treasures.  Nor need we remind this Court of the extensive litigation concerning this issue.  But this action should be the last case, because the extensive studies performed by the Government since the last prior rulemaking have now made clear that recreational snowmobiling in Yellowstone and these other parks is inconsistent with the governing statutes and rules.

During the last several winter seasons, and despite the fact that the regulation then in effect would have permitted 720 snowmobiles per day at Yellowstone, there have only been an average of about 250 per day in the park, for various reasons.  This fact has given the National Park Service's ("NPS") scientists and other experts the opportunity to monitor actual conditions and assess the impact of snowmobiles and snowcoaches (together, "oversnow vehicles," or "OSVs") on Yellowstone's natural soundscapes, wildlife and air quality.  Those scientists have concluded that, even with such a reduced number of recreational snowmobiles, and even considering the requirements that "best available technology" and commercial guides must be used by all snowmobilers, there was nevertheless substantial adverse impacts on those key resources.

The statute which established Yellowstone as a national park required the Federal Defendants to adopt regulations to provide for the preservation of the natural wonders in the park

and their retention in their natural condition, as well as to prevent animals and birds in the park

from being frightened. 16 U.S.C. §§ 22, 26. That Act also prohibits other regulations which are

inconsistent with these requirements. 16 U.S.C. § 22. Moreover, the NPS's own regulation

prohibits the designation of routes for snowmobiles when their use is not consistent with the

park's natural, cultural, scenic or aesthetic values, or when snowmobiles would disturb wildlife

or damage park resources. 36 C.F.R. § 2.18(c). And the more generally applicable NPS Organic

Act, 16 U.S.C. § 1, provides that conservation of the resources of the National Park System is the

principal and predominant mission of the NPS, as it acknowledged and reinforced by its adoption

of the 2006 Management Policies. Yet the Winter Use Plan flies in the face of all these legal

requirements.

        In order to permit a conclusion that their Winter Use Plan would not violate these legal

strictures, to the extent their existence was acknowledged at all, the Federal Defendants

constructed hypothetical models which were based on factors having no rational connection to

the issues at stake or to the ultimate conclusions reached. With respect to adverse impacts on

natural soundscapes, the Defendants relied on a model in which one of the operative factors was

the percentage of the total park area in which noise could be heard. Regardless of how loud the

noise was or what part of the day it could be heard, a noise was not considered to have a major

impact on natural soundscapes unless it could be heard over 20% of the entire park area.

Yellowstone, however, covers an immense area, equivalent to the combined areas of the States

of Delaware and Rhode Island. Ten times the number of snowmobiles permitted in the Winter

Use Plan, even twenty times that number, would not likely be considered as having a "major"

impact under that test. Similarly, adverse impacts to wildlife were judged on a scale in which the

impact was considered significant only if it impacted on the total population of the species. As

long as there were plenty of other bison, impacts on bison would not be considered significant even if large numbers of them were killed or otherwise disturbed. But the governing statutes and rules do not permit recreational impacts to wildlife merely because the impacts have no population-wide effects. Even if the Court does not find that the Winter Use Plan violates the governing legal strictures, there can be no doubt that this rulemaking process and its resulting Winter Use Plan constituted arbitrary and capricious government actions, an abuse of the NPS's discretion and a violation of NEPA.

## I.    FACTUAL BACKGROUND

### A.    A Brief History of This Dispute Up to the 2004 Temporary Rule

The early history of this dispute is set forth in this Court's 2003 decision. *See Fund for Animals v. Norton*, 294 F. Supp. 2d 92, 98-102 (D.D.C. 2003) (the "2003 Decision"). In 2000, the NPS concluded that snowmobile use at the current levels in Yellowstone and the other parks at issue here causes "overall adverse impacts" on wildlife, air quality and natural soundscapes and so constitutes an impairment of resources and values. *Id.* at 106. After President George W. Bush took office, the NPS adopted a new rule (the "2003 Rule") permitting up to 950 snowmobiles per day in Yellowstone. In December 2003, this Court vacated the 2003 Rule. The Court held that "the NPS was charged with fully explaining the need for, and identifying the record evidence supporting" its abrupt departure from its previous impairment finding and decision to eliminate snowmobile use. 294 F. Supp. 2d at 105. The Court found the NPS's own 2001 Management Policies particularly relevant to the reversal of the 2001 Rule because those Policies interpreted the statutory mandate as requiring the NPS (1) to place conservation of park resources before public enjoyment, and (2) to "always seek to avoid, or minimize to the greatest

degree practicable, adverse impacts on park resources and values." *Id.* at 103, 105-06.[1]

### B.    The 2004 Rule, the Two-Third's Reduction in the Number of Snowmobiles and the Improved Conditions

The NPS subsequently adopted a temporary rule applicable for three winter seasons ("2004 Rule"). The Rule permitted 720 snowmobiles per day in Yellowstone, required all snowmobile users to be accompanied by a commercial guide and required recreational snowmobiles to use "best available technology" ("BAT"). 69 FED. REG. 65348 (Nov. 10, 2004).

The actual number of snowmobiles entering Yellowstone during the period in which the 2004 Rule was in effect, however, was substantially less than that permitted. Under historic conditions, an average of 795 snowmobiles per day and 15 snowcoaches had entered Yellowstone. AR 126499 (2007 ROD), at 30-31. While the 2004 Rule permitted 720 snowmobiles per day, the average daily number of snowmobiles in that park during the winter 2005-06 was only 260. AR 117160 (2007 FEIS), at 76. In addition, there were an average of 29 snowcoaches per day in that park. *Id.* During the winter of 2006-2007, the average increased somewhat to 290 snowmobiles per day. AR 126499 (2007 ROD), at 20.

Conditions substantially improved during these several seasons (referred to as "current conditions"), although the NPS has overstated the improvement and downplayed the role of the 2/3 reduction in the number of snowmobiles from historic conditions. *See id.,* at 19 ("Many of the historical issues related to past numbers and types of snowmobiles have been successfully addressed [during the last 4 winter seasons].").

---

[1]    Further background can be found at, *inter alia, Int'l Snowmobile Mfrs. Ass'n v. Norton,* 304 F. Supp. 2d 1278, 1294 (D. Wyo. 2004) (preliminarily enjoining 2001 Rule); *Int'l Snowmobile Mfs. Ass'n v. Norton,* 340 F. Supp. 2d 1249, 1266 (D. Wyo. 2004) (final injunction); *Fund for Animals v. Norton,* 323 F. Supp. 2d 7, 10 (D.D.C. 2004) (modifying earlier order but emphasizing NPS's obligation to comply with 2003 order).

### C.     The Bush Administration Continues to Favor Snowmobiles at Yellowstone

The policy of the Bush Administration has been to open the national parks to more recreational activities, such as snowmobiling and jet skiing. The Secretary of the Interior until 2006, Gale A. Norton, supported recreational snowmobiling in Yellowstone, as did the then Deputy Assistant Secretary of the Interior for Fish and Wildlife and Parks, Paul Hoffman. Mr. Hoffman had been a congressional aide to Vice President Cheney when he was a member of Congress.[2] In late 2004, Vice President Cheney stated his opposition to the 2001 Rule: "those of us who live in Wyoming … for years, we've used snowmobiles in Yellowstone."[3] And then-Secretary of the Interior Norton made a well-publicized snowmobile tour through Yellowstone in February 2005.[4]

The professionals within the NPS clearly recognized what one email referred to as "the political reality" of the result-driven environmental impact statement on which work began at about that time. *See* AR 116985. While the acoustic analysis could be improved "with a better and more comprehensive tool box aimed at better protecting park resources, values and visitor use," "[g]iven the political reality however, we will not be spending much time on this …." *Id.* Another NPS professional suggested "that we limit snowmobiles to 325 per day" and "allow 105-110 snowcoaches." AR 113508, at 113509. But he recognized "[t]hat might be a hard sell in the Department." *Id.,* at 113510. The focus of the effort, quite obviously, was not on complying with the legal requirements applicable to this process, but instead on meeting political demands.

---

[2]     *See* Plaintiff National Parks Conservation Association's Opposition to the Government's Motion to Transfer [28], at 5-9 and Jewett and Rosenbaum Declarations and exhibits there cited, all of which are incorporated by reference herein.

[3]     Jewett Decl., Ex. N, at 9.

[4]     *See* Jewett Decl., Ex. O.

**D.    The 2005-2006 Bush Administration Effort to Change the NPS's Mission to Elevate the Significance of Recreation in the National Parks**

In early 2005, Mr. Hoffman began an effort to change the NPS's 2001 Management Policies in a manner that would have eliminated the provisions relied on by the Court in its 2003 Decision and that would have elevated recreation to an equal position with preservation in the NPS's mission statement. On October 19, 2005, the NPS published those proposed amendments for public comment. AR 120651-52. Those amendments would have given the NPS greatly enhanced discretionary authority to balance recreation and preservation. In fact, one of the stated purposes of the revision was to reflect "the NPS's commitment to tourism and public enjoyment." AR 120651.

For example, the proposed amendments would have deleted the statement in Section 1.4.3, on which this Court relied in its 2003 Decision (*see* 294 F. Supp. 2d at 103, 105) that the fundamental purpose of the National Park System "begins with a mandate to conserve park resources and values." *See* accompanying Appendix, Tab 1, at 16-17 (NPS version showing proposed amendments). The amendments would also have deleted the sentence, quoted there by this Court, stating that "this mandate is independent of the separate prohibition on impairment, and so applies all the time, with respect to all park resources and values, even when there is no risk that any park resources or values may be impaired." *Id.* The only limiting factor on permissible uses under the proposed amended Policies would be "impairment," which would have been redefined in a manner more difficult to establish. *Id.,* at 19-20.

A national outcry ensued. Tens of thousands of comments poured in. Critics pointed out — as this Court had found, 294 F. Supp. 2d at 105 — that the federal courts over the years had consistently interpreted the NPS Organic Act as providing an overarching and dominant purpose of the National Park System as that of preserving, conserving and protecting its resources and

values. *See, e.g.*, November 30, 2005 letter from The Coalition of National Park Service Retirees, at Appendix, Tab 2. On June 19, 2006, the Secretary of the Interior announced that the NPS was abandoning its proposed radical revision of its mission and of the purpose of the National Park System. Accordingly, when the 2006 Management Policies were finalized in August 2006, they retained the critical language on which this Court relied in its 2003 Decision. *See* AR 120645, at 11 (2006 Management Policies § 1.4.3).

On June 20, 2006, the Deputy Director of the NPS, Stephen P. Martin, told the Subcommittee on National Parks of the Senate Committee on Energy and Natural Resources that "we would like to unequivocally confirm to the American people that the fundamental purpose and mission of the National Park Service as stated in the 1916 Organic Act will be upheld ...." Appendix, Tab 3, at 5. According to his prepared statement on behalf of the Department of the Interior and the NPS, "[w]e heard that our mission to protect parks was of paramount importance." *Id.,* at 6. His statement also confirmed that the new policies "assure that conservation will be predominant when there is a conflict between protection of resources and their use." *Id.* And it stated that "the revised draft policies further recognize the importance of clean air and water as well as soundscapes and lightscapes. These resources help make each park unique and special in today's more crowded world." *Id.,* at 7.

That same day, one of Yellowstone's experts referred to the new Policies and stated that they "are a pretty significant reversal of the changes Paul Hoffman suggested awhile back. The Soundscapes section, for example, is no longer gutted ...." AR 124170. Nevertheless, it soon became apparent to those working on the Yellowstone snowmobile project that the Administration's claim that it had seen the light was not to have an impact on the snowmobile project. *See* AR 116985 (recognizing "political reality").

### E.     The 2007 EIS

In March 2007, the NPS issued for public comment a draft environmental impact statement (the "DEIS") relating to a permanent winter use plan. AR 117061. The DEIS evaluated six alternative approaches to allowing oversnow vehicles in Yellowstone and the other Parks. *Id.,* at 36-56. The NPS identified as its preferred alternative one under which 720 snowmobiles per day and 78 snowcoaches would be allowed in Yellowstone. *Id.,* at 36-37.

The NPS received comments on the DEIS from more than 122,000 commentors, including individuals, organizations, government agencies, political representatives and businesses. About 89,000 of these commentors — in excess of 70% — urged the NPS to eliminate recreational snowmobiling in Yellowstone. AR 12130, at 4. More than 115,000 of the commentors, more than 94%, stated that snowmobiles in the parks destroy Yellowstone's natural winter soundscape. *Id.,* at 10. More than 96,000 objected to snowmobiles' negative impacts more generally. *Id.,* at 9.

Eleven former Directors of the NPS — all of the living former Directors except the person who had retired in 2006 — wrote to "express our alarm over a proposal in Yellowstone National Park that would radically contravene both the spirit and letter of the 2006 Management Policies." AR 120940. They continued, "[i]n each of four separate studies since 1998, costing a cumulative $10 million, the National Park Service has verified conclusively that greater volumes of traffic required by an emphasis upon snowmobiling add dramatically to air and noise pollution and disturbance of Yellowstone's wildlife." AR 120941.

The U.S. Environmental Protection Agency ("EPA") also commented in opposition to the proposal. The EPA stated, among other things, that the NPS's preferred alternative produces "significantly increased air quality impacts … compared to current conditions." AR 116355, at 5.

In September 2007, the NPS issued a Final Environmental Impact Statement (the "FEIS") totaling 416 pages in length plus 10 appendices. The FEIS stated that, rather than permitting 720 snowmobiles and 78 snowcoaches per day in Yellowstone, the NPS now preferred a revised alternative permitting 540 snowmobiles and 83 snowcoaches per day there, with commercial guiding and snowmobile BAT required. AR 117160, at 60-61. The FEIS acknowledged that eliminating snowmobile use was the "environmentally preferred alternative" which best "promotes the national environmental policy as expressed by ... the National Environmental Policy Act." *Id.,* at 65. The NPS acknowledged that eliminating snowmobiles would provide a "clear benefit to the natural environment, relative to all other alternatives" and would "best preserve[] the unique historic, cultural, and natural resources in the parks." *Id.,* at 65, 66. The NPS recognized that allowing 540 snowmobiles per day at Yellowstone would "increase[] impacts to air quality, natural soundscapes, and wildlife as compared to [the no-snowmobile alternative]." *Id.,* at 67. But the NPS chose the 540 snowmobile alternative because it "<u>achieves a balance of resources use and sharing life's amenities.</u>" *Id.,* at 67 (emphasis added).

On October 29, 2007, 86 members of Congress wrote "to convey our deepening concern" regarding the Yellowstone snowmobile issue. "Your decision," they stated, "will either demonstrate a commitment to the 2006 National Park Service Management Policies based on the best science available or a disregard for them." AR 116581. They pointed out that even the reduced proposal to permit 540 snowmobiles per day "is still more than double the average daily snowmobile use of the last four winters." *Id.* "We urge you not to accept this new proposal." *Id.,* at 116582.

On November 9, 2007, the EPA commented that "the Final EIS is not entirely responsive to EPA's concerns regarding adaptive management, desired conditions, the effects of air quality

and noise on visitor experience, available mitigation for natural soundscapes, and unsupportive statements on snowcoach impacts." AR 114913.

### F.    The ROD and Final Rule

On November 20, 2007, the NPS finalized its Record of Decision. AR 126499. The NPS there found that the FEIS's preferred alternative would not impair the park's resources or values, violate the NPS Organic Act or create "unacceptable impacts." *Id.,* at 39. The NPS Regional Director signing the document stated that "I further find that this decision represents an appropriate balance of the various potential uses of the parks in the winter, and is in accord with the discretion provided to the National Park Service in managing the National Park System." *Id.*

The ROD claims that, while "the fundamental purpose of the NPS … begins with a mandate to conserve park resources and values," *id.,* at 28, the NPS nevertheless has the discretion to permit impacts to those park resources and values so long as the impact does not constitute impairment. *Id.* The ROD there claims that "Congress has given the NPS the management discretion to allow impacts within parks, although that discretion is limited by the statutory requirement … that the Park Service must leave park resources and values unimpaired …." *Id.* The NPS had flatly rejected this interpretation of the Organic Act by adopting the 2006 Management Policies.

On December 13, 2007, the Rule was published in the Federal Register. AR 126681; 72 FED. REG. 70781 *et seq.* In summary, the Rule permits operating a snowmobile in Yellowstone, subject to a daily limit of 540 snowmobiles, a requirement that recreational snowmobiles be accompanied by a commercial guide in groups of no more than 11 snowmobiles, a requirement that the snowmobiles meet NPS air and sound emission requirements, and several other requirements. *Id.,* at 70797-99. Up to 83 snowcoaches may be operated in Yellowstone each

day, and those snowcoaches must meet NPS air emission requirements and sound emission requirements beginning in the 2011-2012 season. *Id.*

## II. NPS'S STUDIES, FINDINGS AND CONCLUSIONS CONCERNING ADVERSE SNOWMOBILE IMPACTS

Over the last several years, the NPS conducted studies of the impacts of snowmobiling in Yellowstone which demonstrate that, even at the reduced level of 250-300 snowmobiles per day during the last several winters, natural soundscapes were overwhelmed with noise, wildlife was disturbed and air quality was adversely affected.

### A.    Impacts on the Natural Soundscape: The Studies, the FEIS and the ROD

The FEIS recognizes that the Organic Act "was written and enacted in an environment in which it was clear that the American people wanted places to go that were undisturbed and natural and which offered a retreat from the rigors and stresses of everyday life." AR 117160, at 137. The FEIS accordingly recognizes (at S-5) that natural soundscapes are a "key resource," just as did both the 2001 and the 2006 Management Policies, *see e.g.*, AR 117160 (FEIS), at A-10 (the NPS "will preserve, to the greatest extent possible, the natural soundscapes of parks;" the NPS "will take action to prevent or minimize all noise that through frequency, magnitude, or duration adversely affects the natural soundscape or other park resources or values"). Moreover, "the environment of sound that exists in the absence of human-caused noise" is considered to be the "baseline condition" from which to gauge the impacts of human use. *Id.*, at 137.

Four years of monitoring studies were conducted by the NPS at Yellowstone, demonstrating significant snowmobile impact to natural soundscapes even with only about 260 snowmobiles and 29 snowcoaches per day. The FEIS instead, however, relied almost entirely on hypothetical modeling studies, studies based on factors having little rational connection to the

laws, regulations and policies claimed to "underpin" the management of these parks.

### (1)    The Four Years of Monitoring Studies Demonstrate the Significant Impact on Soundscapes

The NPS's Shan Burson conducted a monitoring study at Yellowstone during each of the winters from 2002-2003 through 2006-2007. *See* AR 125050 (2005-2006); 125255 (2006-2007). The monitoring sites that were selected were along travel corridors and at developed areas such as near Old Faithful Geyser, one of the most popular sites in Yellowstone. A map showing these and other locations of relevance to the Winter Use Plan may be found in the Appendix at Tab 4.

The monitoring studies took into account two factors: (1) the percentage of time during daylight hours during which a noise may be heard and (2) the maximum sound level of the noise. Mr. Burson characterized an impact as an "adverse major effect" when a sound of greater than 70 decibels was audible more than 75% of the time in a developed area or when such a sound level was audible more than 50% of the time in a travel corridor. AR 125050, at 12. The study defined such an adverse major effect as "an action with an easily recognizable adverse effect on the natural soundscape and potential for its enjoyment." *Id*. Mr. Burson characterized an impact as an "adverse minor effect" when a sound of less than 60 decibels was audible more than 25% but less than 45% of the time in a developed area or when such a sound level was audible more than 15% but less than 25% of the time in a travel corridor. *Id*. The study defined an adverse minor effect as "an action that may effect the natural soundscape or potential for its enjoyment." *Id*.

Decibels — abbreviated as "dB" or "dBA" — is a commonly used measurement for sound. AR 125255, at 54. For a better understanding of the significance of a sound at particular decibel levels, the report included the decibel levels of commonly known sounds. *Id.,* at 50. Seventy decibels are perceived to be "noisy" and is the equivalent of listening to a vacuum

-12-

cleaner inside a room. *Id.  See also* AR 117160 (FEIS), at 140 (describing 70 decibels as having an "intrusive" effect, interfering with telephone conversations). The Burson study described 50 decibels as perceived to be "moderate" and as the equivalent of the noise made in an office environment. AR 125050, at 50.

The monitoring studies showed that oversnow vehicles were audible in the Old Faithful Geyser developed area an average of about 67% of the day between 8:00 a.m. and 4:00 p.m. *Id.,* at 2; AR 125255, at 2. Moreover, at Old Faithful, "oversnow vehicles were audible over the threshold of 75% for developed area for 9 of 35 days (26%) analyzed." AR 125255, at 2. At another location, 2.3 miles from Madison Junction, an intersection of two significant access roads, oversnow vehicles were audible for 59% of the day, exceeding the travel corridor threshold average of 50%. *Id.* The scientist observed that the percent-of-time audible found by use of instrumentation "likely represents a <u>minimum assessment</u> of time audible" because humans "in the field can and do turn toward faint sounds and thus can hear those sounds better than when we cannot turn to face the sound, as in an office playback." *Id.,* at 9-10 (emphasis added).

The monitoring studies found that the maximum sound levels for oversnow vehicles "exceeded 70 dBA" at Old Faithful, along the groomed travel corridor between Madison Junction and the West Yellowstone entrance (*i.e.,* 2.3 miles from Madison Junction) and between West Thumb and Old Faithful. *Id.,* at 2. *See* AR 117160 (FEIS), at 140 (70 db is "intrusive").

Mr. Burson made recommendations as a result of these four years of monitoring. The first recommendation started from the proposition that "although substantial improvements have been made by the switch from 2-stroke to 4-stroke snowmobiles and by the guiding requirement, … sound levels and audibility thresholds are being exceeded at developed areas and travel

corridors." AR 125255, at 47. He also recommended that the NPS reduce "the total number and reduc[e] single and small groups of OSVs operating on [Yellowstone] roads." *Id.*

### (2)    The NPS's Contrived Impact Definitions

The FEIS pays scant attention to those four years of monitoring studies and ignores those recommendations. The FEIS instead sets forth a different formula for evaluating soundscape impacts. The heart of the FEIS's treatment of impacts on natural soundscapes is found in a table defining those impacts as falling into one of four categories: "negligible," "minor," "moderate" or "major." AR 117160 (FEIS), at 304. The standards for measuring impacts apply three variables. Two of those variables are the same as used in the NPS monitoring studies: (1) the percentage of time during daylight hours during which the noise may be heard and (2) the maximum sound level of the noise. Those two variables are reflected in the NPS's impact definition table as "audibility % time" and "maximum sound level" expressed in decibels. *Id.*

However, a third variable is introduced in the NPS impact definition not found in the monitoring studies, namely "Percent of Total Park in Which OSV Sound Is Audible." The FEIS acknowledges that this is a change from prior methods of analysis. *Id.*, at 303. Under this new approach, an impact would be considered "minor," regardless of how loud it is, if it would be audible in 10% or less of the total park area. *Id.*, at 304. An impact would be considered "moderate" if the sound is audible over between 10 and 20% of the total park area. *Id.* To be considered a "major" impact, a sound would have to be audible over more than 20% of the total park area. *Id.*

Yellowstone National Park, however, occupies 2,219,789 acres. AR 125352, at 5. That park is larger in total area than the States of Rhode Island and Delaware combined. *Id.* Ten percent of the total park area comprises approximately 220,000 acres, and twenty percent

-14-

comprises approximately 440,000 acres.  By comparison, the District of Columbia is

approximately 39,296 acres in size;[5] 10% of the total park area of Yellowstone is therefore

equivalent to more than 5.5 times the size of the District of Columbia.  Under the test employed

by the NPS, even 20 times — probably even 50 times — the number of snowmobiles permitted

by the Winter Use Plan, creating constantly audible noise in the park's most visited areas, would

likely be considered as having only a "minor" impact.

    The ROD states, based on the modeling report, that oversnow vehicles, or "OSV" (*i.e.*,

both snowmobiles and snowcoaches) could be heard in only about 13.8% of Yellowstone on an

average a day.  AR 126499, at 33.  That figure creates the appearance that there is plenty of park

left for wildlife and non-motorized visitors to enjoy without audible OSV noise.  But in fact,

"although sounds from OSV are audible within a relatively small portion of the parks' total

acreage, they are concentrated to a large degree around travel corridors and park attractions and

affect the areas most accessible by the vast majority of park visitors.  Most areas used by winter

visitors seeking solitude and quiet are within two miles of travel corridors."  AR 117160 (FEIS),

at 139-40.  Moreover, those same travel corridors are heavily traveled by bison and other wildlife

during the winter months.

    As one of the NPS's own expert on natural sounds, Kurt Fristrup, pointed out in his

comments on a July 2007 draft of the FEIS:

> The percent of the park in which OSV sounds are audible seems to
> miss an important point.  This metric relates to visitor experience,
> not resource protection.  Accordingly, it is not the entire area of the
> park that is relevant, but the area of the park weighted by the
> amount of visitor use.  As mentioned elsewhere in the document,
> most nonmotorized visitor use takes place near the proposed OSV

---

[5]    U.S. Census Bureau, Census 2000 State and County Quick Facts,
http://quickfacts.census.gov/qfd/states/11000.html.

travel corridors. <u>Using the entire park area as the denominator in this indicator causes a substantial underestimation of the impact within visitor use zones.</u>

AR 125262, at 4 (emphasis added).

> ### (3)     The NPS's Modeling Studies Based on the "Total Park Area" Approach

Despite the fact that the NPS monitored actual conditions in Yellowstone during four winter seasons, the FEIS relied on a hypothetical model which is supposed to reflect the impact of oversnow vehicles on natural soundscapes under varying assumptions. *See* AR 117160 (FEIS), at 304, Table 4-48, n.5. That modeling study, referred to as the "Volpe" study, was performed by the Department of Transportation under contract to the NPS. Work on designing this modeling study apparently began in July 2005, a few months after then-Secretary of the Interior Norton had conducted her snowmobile tour of Yellowstone. *See* AR 124700. The NPS may of course properly utilize a well-constructed model to assist in assessing the impacts of various alternatives, but the Volpe study had significant limitations as a devise for assessing natural soundscape intrusions.

The most basic limitation of the Volpe study is that it is primarily designed to show the <u>total park area</u> in which oversnow vehicles would be audible under various alternatives. *See* AR 125352 at xxviii ("The modeling alternatives, as well as current and historical conditions, were rank ordered <u>based on park area</u> associated with the Integrated Noise Model's calculated percent time audible contours."). When the study had been completed, one NPS official expressed a concern that "perhaps we ... did not ask the right questions." AR 124927. The report provides information on "what percentage of the park is impacted," he stated, "[b]ut it seems that there is still a lot of information that is missing." He also stated: "[i]t seems like all other things being equal, <u>the more OSVs in operation at any point in time, the higher the decibel</u>

level. I didn't see that clearly described in the report." *Id.* (emphasis added).

In 2006 and 2007, several of the NPS's soundscape experts repeatedly commented on other deficiencies of the modeling. One stated that "the model didn't realistically calculate OSV travel in the area …. This is why the modeled results are so far from the reality." AR 125317 (emphasis added). Another stated that "one major shortcoming to be aware of is that the impact analysis is all based on modeling and the model used (INM) does not account for atmospheric temperature inversions…. Consequently, the analysis underestimates the amount of noise during thermal inversions which I understand are not at all uncommon there." AR 125248. A third commented that the Volpe study "appear biased" in discussing characteristics of Yellowstone which would absorb sound. He suggested, to provide a more balanced presentation, that the Volpe report add: "Many visitors visit areas near travel routes of OSVs and thus are exposed to very loud sound levels of OSVs." AR 124928 (emphasis added).

The FEIS does state that "a simple comparison of the Volpe modeling and NPS monitoring data at 12 sites in Yellowstone and Grand Teton was undertaken to better understand the similarities and differences in the results of both techniques. The model underestimated the sound level of OSVs at eight of twelve sites compared to the field measurements; it never overestimated the sound level. The model underestimated the percent time audible at seven of the twelve sites, and overestimated audibility at one site." AR 117160, at 302 (emphasis added). "Overall, it appears that the model underestimated, sometimes substantially, the sound level and the percent time audible of OSVs in the parks as compared to data derived from field measurement." *Id.,* at 302-03.

The NPS's soundscape experts repeatedly expressed concern that decision-making was apparently being based only on that model. *See, e.g.*, AR 125248. The finding that the model

-17-

sometimes substantially underestimated noise impacts, said another NPS expert, "does not invalidate the use of modeling to compare different alternatives, but it does <u>strongly caution against a literal interpretation of any modeled outcome as representing the impacts that will obtain</u>." AR 125262, at 3-4 (emphasis added). He reflected again in a written confirmation of a telephone conversation about "<u>the problem of treating modeled areas as literal</u> ... when on p294, pp2, last sentence, the document noted the systematic underestimation of exposed areas by INM. The modeled results provide a useful basis for comparison among alternatives, but when the affected area is related to some form of impact determination <u>there must be explicit recognition that the modeled values represent an underestimate, a lower bound</u>." AR 125263 (emphasis added).

Similarly, another soundscape expert suggested that the FEIS state as follows the "cumulative effects" of what became the Winter Use Plan ("Alternative 7"): "Along travel corridors, backcountry areas, and in developed areas, the natural soundscape is affected. <u>There are areas in the parks where the total cumulative effect from OSV activities and facilities (building, utilities, etc.) is such that it masks the natural soundscape for most of a winter day</u>." AR 125317 (emphasis added). No such statement was added, however.

The professionals essentially threw up their hands. As one stated in an email, "[g]iven the political reality, however, we will not be spending much time on [developing] a better and more comprehensive toolbox aimed at better protecting park resources, values and visitor use." AR 116985.

### (4) The NPS's Findings

Notwithstanding the conceded deficiencies in the Volpe study, and notwithstanding the concerns voiced by the NPS experts, the FEIS essentially relies on Volpe to the exclusion of the

monitoring studies. Based on the Volpe modeling, the FEIS concludes and the ROD finds that

the adverse impact of the Winter Use Plan on natural soundscapes would only be "moderate" and

short-term and would be "acceptable." AR 117160 (FEIS), at 342, 374; AR 126499 (ROD), at

13-15. The FEIS reaches essentially the same result concerning the impact on natural

soundscapes across all alternatives considered, except that permitting snowcoaches only. *See*

AR 117160, at S-13 (same result as to Yellowstone natural soundscapes for all 7 alternatives

except alternative 3A/B). Given Yellowstone's immense size and the total-park-area test, this is

not surprising. But that fact demonstrates that the total-park-area test is designed to permit the

NPS to allow any number of snowmobiles it might choose to allow as a matter of management

decision, without regard to real world impacts on the natural soundscape.

Indeed, the FEIS concludes that the impact of the Winter Use Plan "is modeled as less

than the impact modeled for current conditions," *id.,* at 338 (emphasis added), despite the fact

that the Winter Use Plan would double the number of snowmobiles and almost triple the number

of snowcoaches from current conditions. This is said to be so because modeled results under

current conditions OSVs are audible over 14.4% of the total park area, compared to 13.8% of the

total park area under Winter Use Plan. *Id.,* at 342, Table 4-66; *see also id.,* at 307, 334. But,

again, percentages of total-park-area impacted are essentially meaningless in reflecting the

natural soundscape impacts in those locations where most visitors are attempting to enjoy the

sounds of the natural environment.

When the Volpe modeling study considered percentage-of-time audible at 13 specific

sites in Yellowstone, it reached a very difficult result than under the "total-park-area" analysis.

AR 117160 (FEIS), at 336-37. Under the Winter Use Plan, OSVs would be audible 100% of the

time at Madison Junction and West Thumb, 80% of the time at Old Faithful developed area and

50-60% of the time in travel corridors. *Id.*[6] Similarly, the NPS's monitoring report established that oversnow vehicles were audible almost 100% of the day at Old Faithful during prime hours on popular weekends. AR 125050, at 25 (weekend of January 19, 2005) and 29 (weekend of February 14, 2003). These figures are comparable to those previously found to constitute impairment. *See* AR 126449 (ROD), at 31. Not surprisingly, therefore, the FEIS concedes that the adverse impacts due to percent-time-audible would be "major" at the selected Yellowstone sites. AR 117160 (FEIS), at 339.

The FEIS finds, however, that "impacts due to maximum sound levels would be minor" at these sites. *Id.* That conclusion is apparently reached by comparing the highest <u>modeled</u> sound level reflected in Table 4-64, *id.*, at 337 (<45-50dB in travel corridors, <35dB in developed areas) and applying the definitions of impact levels found in Table 4-48, *id.*, at 304. But the NPS's own monitoring reports tell a very different story. As discussed above, the NPS's own monitoring studies found that the maximum sound levels for oversnow vehicles "exceeded 70 dBa" at Old Faithful, along the groomed travel corridor between Madison Junction and the West Yellowstone Entrance and between West Thumb and Old Faithful. AR 125255, at 2. Burson states that 70 dB is "noisy" and is the equivalent of hearing a "vacuum cleaner" in an indoor room. AR 125050, at 50. The FEIS calls that sound level "intrusive." AR 117160, at 140. And, again, the Winter Use Plan would <u>double</u> the number of snowmobiles and almost <u>triple</u> the number of snowcoaches as compared with the numbers experienced during the period in which those monitoring studies were performed.

---

[6]    *See* map of Yellowstone at Tab 4 of the NPCA's Appendix. Note that these sites were analyzed based on traffic levels at 9:00 to 10:00 a.m. That hour is not the busiest time at Old Faithful or other internal areas of Yellowstone National Park. Elsewhere, the FEIS states that 65.8% of snowmobiles <u>enter</u> the park during that hour and that the peak hour at Old Faithful is 11:30 a.m. to 12:30 p.m. AR 117160 (FEIS), at 219-20.

The FEIS and the ROD place substantial weight, in finding that the Winter Use Plan will have only "acceptable" adverse impacts on the natural soundscapes, on the fact that snowmobiles will be required to use BAT  *See* AR 117160 (FEIS), at 374; 126499 (ROD), at 13-15.  But the 2004 Rule required BAT in all snowmobiles, so the monitoring results of current conditions already reflected BAT snowmobile use and showed they were still extremely noisy.  And the FEIS makes clear that snowmobiles using BAT will continue to be extremely noisy.  BAT snowmobiles operate at around 73 dB, AR 117160 (FEIS), at 374.  That sound level is somewhere between an indoor vacuum cleaner (at 70 dB) and a diesel truck going 50 miles per hour (at 80 dB).  *See* AR 125050, at 50.[7]

The ROD concedes that BAT has only "<u>somewhat</u> reduced noise emissions."  AR 126499, at 19 (emphasis added).  And the ROD, unlike the FEIS, considers the monitoring studies, acknowledging that the "[m]onitoring data also indicates that, at the lower level of use experienced over the past three years, oversnow vehicles could be heard <u>more than expected</u>."  *Id.,* at 20 (emphasis added).  The ROD attributes that fact primarily to snowcoaches and to road grooming equipment, *id.,* at 20-21.  By imposing a BAT requirement for snowcoaches, states the ROD, their noise impacts will be reduced.  But there is no support in the FEIS or, based on our search, elsewhere in the Administrative Record, for the claim that the excess noise found by the monitoring reports was primarily attributable to snowcoaches and road grooming equipment.

To the contrary, the monitoring reports concluded that, taking into account both the fact that snowmobiles were audible for more time than snowcoaches and the fact that individual snowcoaches have higher levels of sound, nevertheless

---

[7]    Because each 10 dB represents a <u>doubling</u> of the "loudness" of a sound, AR 125050, at 50, 73 dB is <u>one-third</u> louder than an indoor vacuum cleaner.

> the sound level and the percent time oversnow vehicles were
> audible remained substantially lower [during the 2005-2006
> season] than during the 2002-2003 winter use season. The reduced
> sound and audibility levels were largely explained by <u>fewer
> snowmobiles</u>, the change from 2- to 4-stroke engine technology,
> and the guided group requirements.

AR 125050, at 2 (emphasis added); *see also* AR 125255, at 2 (same). Accordingly, the

monitoring studies in fact showed that the number of snowmobiles was a significant factor in the

"overall impact on the natural soundscape from oversnow vehicles." AR 125255, at 2.

**B.     Impacts on Wildlife: The Studies, the FEIS and the ROD**

The FEIS acknowledges that "wildlife and wildlife habitats are highly valued park

resources," AR 117160, at 111. The NPS's Management Policies, as summarized in the FEIS,

require the NPS to "maintain (as parts of natural ecosystems of parks) all plants and animals

native to those ecosystems and ... minimize human impacts on animals, populations,

communities, ecosystems, and processes that sustain them." *Id.* Yellowstone is rich in wildlife.

Yellowstone is one of the last refuges in the United States for bison and elk and is also the home

of wolves, coyote, lynx, wolverines, trumpeter swans, bald eagles and other wildlife. *See id.*, at

119-136.

**(1)     The NPS's Studies Demonstrate That Snowmobiles Disturb Wildlife**

In the last several years, new studies have investigated the interrelationship between

wildlife and winter recreationists in Yellowstone. *Id.*, at 111-15. As stated in a report prepared

by four NPS scientists and two from Montana State University, "Yellowstone National Park ...

protects some of our nation's most important natural resources that, in turn, attract millions of

visitors annually for recreational activities.... Recreation may disrupt ecological processes by

disturbing wildlife and resulting in altered distributions, increased energetic costs, changes in

behavior and fitness, and avoidance of otherwise suitable habitat .... Thus, management policies must address the effects of recreation on wildlife and other resources to ensure that the integrity of the resources, and ecosystem processes on which they depend, are not harmed." AR 125701 ("White"), at 2.

Survival in the bitter winters at Yellowstone is a challenge for wildlife. The FEIS acknowledged that wildlife monitoring in the past several winters has been gathered "over a series of relatively mild to moderate winters." AR 117160, at 249. "The NPS acknowledges the potential for fitness costs such as decrease survival and reproduction to develop as winter severity becomes more severe or prolonged. ... [s]evere winters are known to increase energetic costs and chronic under-nutrition in most wildlife species ...." *Id.*

The White study considered the response of different species to perceived threats from oversnow vehicles. Any response uses energy which wildlife must diligently conserve during the winter months. That study found that OSVs "induce behavioral and stress responses." AR 125701, at 20. "Thus, it is unrealistic to expect winter recreation or administrative travel by park staff to be totally benign, regardless of whether the activity is skiing, snowshooing, snowmobiling, or driving an automobile ...." *Id.,* at 20. The study found that "[b]ald eagles, bison, coyotes, elk, and trumpeter swans in Yellowstone behaviorally responded to OSVs and associated human activities with increased vigilance (*i.e.*, look/respond, alert/attention), travel (*i.e.*, walking away) and, occasionally, flight or defense." *Id.*, at 15-16; *see also* AR 117160 (FEIS), at 114. The percentages of responses of any type were "83.3% for bald eagles, 60.5% for coyote, 52.4% for elk, 42.5% for swans, and only 19.6% for bison." *Id.*, at 114. The percentages of active responses were 7% for bison, 7% for elk, 10% for swans, 10% for bald eagles and 24% for coyote. *Id.,* at 115, Table 3-18. Active responses are recorded when the

animal walked or ran away or charged the human or vehicle.  AR 126499 (ROD), at 22.  But

these scientists found no evidence that OSV traffic had impacted "population dynamics."

AR 125701 (White), at 20.

The scientists tactfully acknowledged the political and policy issues faced by the NPS:

the decision about what degree of wildlife disturbance to tolerate was not theirs to make.  *Id.*, at

20.  Nevertheless, they stated that "park managers must seek ways to minimize, to the greatest

degree practicable, adverse effects to park resources and values."  *Id.*  They linked the impact on

wildlife to the level of OSV use.  Regulations restricting the levels and travel routes of OSVs

during the last several years, they stated, "were effective at reducing disturbances to wildlife

below a level that would cause measurable fitness effects.  We acknowledge the potential for

fitness effects to develop if OSVs or other stressors become more severe or prolonged.  Thus, we

recommend park managers consider maintaining OSV traffic levels at or below those observed

during our monitoring."  *Id.* (emphasis added).  The use levels observed during those studies

were approximately 260 snowmobiles and 29 snowcoaches per day.  The same conclusion is

reached in Borkowski, *et al.  See* AR 117160 (FEIS), at 112.

### (2)    The NPS Avoided the Results of Its Own Scientific Studies by Defining Impacts Based on Population-Level Effects

The FEIS defines wildlife impact levels based on the effect on the total population of

each species.  For example, an effect on an individual — regardless of the extent of the effect,

even death — is considered "negligible" so long as the effect "would not be of any measurable

or perceptible consequence to the population."  AR 117160, at 257 (emphasis added).  Similarly,

at the other end of the scale, an effect on an individual could be considered a "major effect" only

if it "will be measurable and have a substantial and possible permanent consequence to the

population."  *Id.* (emphasis added).

These definitions permitted the NPS to conclude that its Winter Use Plan would have acceptable impacts on wildlife. For example, the FEIS states that, "[w]hile the possibility of individual bison and elk being killed by OSVs exists under this alternative, the overall number of each species is expected to be small." *Id.*, at 269. The requirement that impacts effect the "total population" of a species also permit the NPS to brush aside the <u>number</u> of OSVs as a significant factor in the analysis. One of the NPS scientists, Troy Davis, observed, "[a]lternatives which <u>lower OSV traffic</u> are believed to have wildlife impacts lesser than those alternatives with <u>higher levels of traffic</u>." AR 125617 (emphasis added). Accordingly, a draft summary of wildlife impacts from each of the alternatives on which Mr. Davis was commenting was made expressly dependent on whether each alternative would <u>increase</u> or <u>decrease</u> OSV travel. *See* AR 125619. When that summary appeared in the FEIS, however, the summary no longer included as a factor whether each alternative would increase or decrease OSV traffic — that fact was no longer part of the analysis. *See* AR 117160 (FEIS), at S-11; compare AR 125619.

The NPS failed in its 2007 documents to explain how its total-population tests were supposedly consistent with governing statutes and rules such as the Yellowstone Enabling Act and the NPS snowmobile regulation. The 2003 SEIS acknowledged, by contrast, that "park policies, regulations and EOs clearly state that disturbance to wildlife, <u>regardless of population-level effects</u>, is unacceptable in the national parks." 2003 SEIS, at 206 (emphasis added), *see* Appendix, Tab 5.

### (3)     The NPS Found Population-Level Impacts to Wildlife Acceptable Despite Adverse Impacts to Individuals

The FEIS acknowledges "that increases in winter traffic levels and associated human recreational activity cause increases in vehicle-caused mortality, wildlife displacement, behavior- or physiology-related energy costs, and the potential for adverse demographic impacts."

-25-

AR 117160, at 270 (emphasis added).  Remarkably, however, the Winter Use Plan is said to have

a "negligible to moderate, adverse, short-term, and direct" effect on wildlife based on the total-

population-level-effects analysis.  *See* bison and elk (270); wolves (279), lynx and wolverines

(288-89), coyotes and ravens (291), bald eagles and swans (300-01).  The ROD states that

"[m]onitoring shows that winter use did not contribute to wildlife effects <u>at the population level</u>

under a wide range of snowmobile numbers (between 324 and 1,400 per day at the West

Entrance)."  AR 126499, at 22 (emphasis added).

The ROD acknowledged "a strong perception or concern … that snowmobiles are hurting

wildlife," but states that those concerns ignore "scientific evidence to the contrary."  *Id.*  That

statement is simply not a true reflection of the studies and the FEIS, however, if one considers

impacts on <u>individual</u> animals, rather than on the <u>population</u> of a species as a whole.  The ROD

acknowledges, for example, that 7% of the time bison actively responded to OSV.  *Id.*, at 22.

Yet the ROD fails to acknowledge or discuss the impact of such disturbances.  Indeed, by opting

for an analysis of impact only at the level of the total population of a species, the NPS has side-

stepped the recommendations of its own internal professionals and outside scientists that link

wildlife impact to the number of OSVs permitted.  *See* AR 125701, at 20; AR 125617.

### C.    Impacts on Air Quality:  The Studies, the FEIS and the ROD

The FEIS states that "air quality is a key resource in itself as well as a highly prized (and

expected) element of the park visitor experience."  AR 117160, at S-5 (Table S-2).  The 2006

Management Policies state that the NPS "has a responsibility to protect air quality" under the

Clean Air Act and that, accordingly, the NPS "will seek to perpetuate the best possible air quality

in parks…. In case of doubt as to the impacts of existing or potential air pollution on park

resources, the Service will err on the side of protecting air quality and related values for future

generations." AR 117160 (FEIS), at A-8-9.

Carbon monoxide ("CO") is a "colorless, odorless, and poisonous gas produced by incomplete burning of carbon in fuels. When CO enters the bloodstream, it reduces the delivery of oxygen to the body's organs and tissues. Health effects may include impairment of visual perception, manual dexterity, learning ability, and performance of complete tasks; headaches and fatigue; or respiratory failure and death.... [Particular matter ("PM")] includes dust, dirt, soot, smoke, and liquid droplets from sources such as ... vehicles,... Health effects from PM emissions include reduced lung function, long-term risk of increased cancer rates, and the development or aggravation of respiratory problems." *Id.*, at 92. As relevant here, particulate matter is referred to by the size of the particles, such as "PM10" for large particles and "PM2.5" for fine particles.

**(1)      The FEIS Sets an Inappropriate "Desired Condition" by Seeking Merely a Reduction from Historical Pollution and Visibility Conditions**

The FEIS' statement of desired conditions as they relate to air quality is inconsistent with the NPS's statutory and other legal obligations to avoid injuring the park's resources, of which air quality is admittedly a key element. The NPS justified its adoption of the Winter Use Plan because it would supposedly be an improvement over <u>historical</u> conditions which no longer exist, despite the fact that the Plan will have a significantly adverse impact on air quality compared with <u>current</u> conditions.

In establishing the "desired conditions," with respect to air quality, however, the FEIS states as the desired condition "[r]educed ... emission levels protect air quality" in comparison to historic conditions. AR 117160, at 5 (Table 1-1). The FEIS then repeatedly trumpets the fact that, under Winter Use Plan, emissions would be considerably less than under historic

conditions. *See, e.g., Id.,* at S-11 (Table S-4). The NPS found emissions levels in 1999 to

constitute violations of numerous requirements. Since the volume of snowmobile use has been

greatly reduced in recent years, however, there has been a major improvement in air quality. *See*

*id.,* at 94. Compared to <u>current</u> conditions, the NPS acknowledges that emissions impact would

be more adverse. AR 126499 (ROD), at 33. As the EPA commented, the then preferred

alternative of 720 snowmobiles per day would produce "significantly increased air quality

impacts ... compared to <u>current conditions</u>." AR 116355, at 5 (emphasis added). Even after the

FEIS changed the preferred alternative to 540 snowmobiles per day, the EPA commented that

the FEIS "is not entirely responsive to EPA's concerns regarding ... desired conditions ...."

AR 114913.

    Improvement over historical conditions is certainly necessary, but that alone cannot be

sufficient to justify the new Winter Use Plan.

        **(2)    Carbon Monoxide and Particulate Matter Would Increase**
                **Dramatically Under Winter Use Plan from Current Conditions, Even**
                **Based on the NPS's Modeling**

    The NPS relied on modeling reports to assess the impact of each alternative on air

quality. AR 117160 (FEIS), at 215-16. Based on that modeling, the Winter Use Plan would

increase the amount of carbon monoxide by 50% above current conditions at West Yellowstone

and Old Faithful and by 100% at Flagg Ranch. *See id.,* at 225, Table 4-35 (Alt. 7 predicted 8-

hour CO concentration is 150% of current conditions at West Entrance, 149% at Old Faithful and

209% at Flagg Ranch). In addition, the Winter Use Plan would increase the amount of fine

particulate matter ("PM2.5") at the West Entrance by almost 50%. *Id.,* at 226, Table 4-38 (Alt. 7

predicted 24-hour PM2.5 is 140% of current conditions at West Entrance).

    The FEIS acknowledges that its models underestimate actual effect of snowmobiles on

air quality. Table 4-30 of the FEIS demonstrates that, at Old Faithful, monitored actual conditions reflected almost 2-1/2 times more particulate matter than predicted under the model. *Id.*, at 221 (2.5 modeled, 6.0 monitored).

One factor not accounted for in the modeling is the often extreme winter conditions at Yellowstone. The FEIS admits that "snowmobile laboratory test data utilized below may not reflect actual operating conditions in Yellowstone, Grand Teton and the Parkway, as high altitude and low winter temperatures in the parks are likely to decrease overall snowmobile engine performance and <u>increase relative emissions</u>." *Id.,* at 217 (emphasis added).

In addition, the modeling is based on assumptions that the emissions from BAT-certified snowmobiles will actually meet the NPS's emissions requirements. *See* AR 111552, at 12 (Option Z: "YNP: all BAT"). But there is reason to believe that would not be true. The NPS's own atmospheric chemist advised the Winter Use Plan team that "our emissions data don't seem to support that 4-stroke snowmobiles are as clean as they are supposed to be. Likewise the ambient monitoring data that shows reductions in CO and PM can mostly be accounted for by fewer numbers of snowmobiles." AR 110545.

Indeed, one NPS study completed in early 2007 establishes that emissions are likely to be higher than those assumed for purposes of the air quality modeling. *See* AR 111471 ("2007 Emissions Report"). That study found that one model of snowmobile available for rent called the "Ski Doo Legend GT" produced higher carbon monoxide ("CO") emissions during acceleration in speed (which were referred to as "transient emissions"). "[T]he more transient the operation of the Ski Doo snowmobile the higher the CO emissions will be as it will spend more operation time at the higher levels." *Id.*, at 33. However, that study pointed out that "these transient emissions are not included in the current BAT certification process since that engine

dynamometer test is a steady state test...." *Id.,* at 33-34. In fact, while current BAT

requirements are 35.1 grams per mile ("g/mi") at 15 miles per hour, the 2007 Emissions Report

found that the Ski Doo snowmobile had emissions of 53 g/mi. *Id.,* at 31. Another BAT-

approved snowmobile, the "Arctic Cat T660," was also tested for the 2007 report. The Arctic

Cat exhibited much higher emissions when idling than when at low or cruise speeds. *Id.,* at 31.

Snowmobiles touring through the park will undoubtedly idle frequently to take in the scenery or

pause for a photo.

 The modeling analysis set forth in the FEIS therefore undoubtedly understates the impact

of snowmobile emissions on air quality.

### (3) The NPS's Findings

 The FEIS concludes that adverse air quality impacts from emissions under the Winter

Use Plan would be "moderate" and that those impacts would contribute to a moderate adverse

long-term impact on air quality. AR 117160, at 236 and Table 4-45. As defined in the FEIS,

such an impact on air quality would be "measurable and perceptible, possibly throughout the

parks," although it "could be reversed and generally localized." *Id.,* at 222 (Table 4-31).

 The ROD, however, concludes that these adverse impacts "will not harm the integrity of

park resources and values and not constitute unacceptable impacts or impairment." AR 126499,

at 33. But these conclusions are based on the results of hypothetical models which admittedly

underestimate the level of pollution that would result from the Winter Use Plan. And the NPS

makes no attempt to explain the fact that its findings appear inconsistent with the 2007

Emissions Report.

## III.    ARGUMENT

### A.    The Standard of Review

This Court explained in its 2003 Decision the general standard of review in a challenge to

APA rulemaking:

> In reviewing an agency's action, the court must engage in a
> "thorough, probing, in-depth review" to determine "whether the
> decision was based on a consideration of the relevant factors and
> whether there has been a clear error of judgment." *Citizens to
> Preserve Overton Park v. Volpe*, 401 U.S. 402, 415-16, 91 S.Ct.
> 814, 28 L.Ed.2d 136 (1971).  However, while the Court's inquiry
> must be "searching and careful," the standard of review is also a
> highly deferential one;....

294 F. Supp. 2d at 104.  However, the D.C. Circuit has explained that "more exacting review

may be required when the presumption of regularity is rebutted, as may occur when the agency

has arrived at an identical result on remand under circumstances that throw into question the

regularity of its proceedings." *Chamber of Commerce v. SEC*, 443 F.3d 890, 899 (D.C. Cir.

2006).  While the 2007 decision is not "identical" to the 2003 decision vacated by this Court, the

circumstances presented here rebut the presumption of regularity.

Regardless of the level of deference given here, however, the Winter Use Plan fails.

### B.    It Is Now Clear That the Winter Use Plan Is Prohibited Under the Governing
    Statutes and Regulations and Should Be Vacated as Contrary to Law

The studies conducted by the NPS in the last several years demonstrate that the Winter

Use Plan is prohibited by any one of the legal prohibitions found in the Yellowstone National

Park Enabling Act, 16 U.S.C. § 22; the National Park System Organic Act, 16 U.S.C. §§ 1, 1a-1;

the NPS regulation governing the authorization of snowmobile use in the National Park System,

36 C.F.R. § 2.18(c); and Executive Orders 11644 and 11989.

The entire 2007 Winter Use Plan project is based on a flawed understanding of the

governing laws.  The NPS claims to have management discretion to balance recreation against

adverse impacts to resources and values, so long as the impacts do not create impairment.

Applying this discretion, the NPS concludes the Winter Use Plan would not cause impairment,

and that the NPS is therefore free to permit recreational snowmobiling in Yellowstone in order to

provide visitors with a recreational opportunity.  But that premise and that conclusion fail on a

number of levels.

### (1)    The Winter Use Plan Violates the Yellowstone Enabling Act

Yellowstone National Park was established pursuant to an Act of Congress of March 1,

1872.  "An act to set apart a certain Tract of Land," ch. 34, 17 Stat. 32, 42 Cong. 2d Sess.  The

Secretary of the Interior was given control of the park and was directed to promulgate rules and

regulations "for the care and management of the same." *Id.* at 33.  Congress instructed the

Secretary: "Such regulations shall provide for the preservation, from injury or spoliation, of all

timber, mineral deposits, natural curiosities, or wonders within said park and their retention in

their natural condition." *Id.*

In 1894, Congress added what is now 16 U.S.C. § 26, requiring the Secretary of the

Interior to adopt regulations "especially for the preservation from injury or spoliation of ...

natural curiosities, or wonderful objects within said park; and for the protection of the animals

and birds in the park, from capture or destruction, or to prevent their being frightened or driven

from the park ...." 16 U.S.C. § 26 (May 7, 1894).

In 1916, Congress established the National Park System and entrusted Yellowstone

National Park and other parks that had been or might thereafter be established to the care of the

director of the NPS.  16 U.S.C. § 1.  The Secretary of the Interior was authorized in Section 3 of

that Title to adopt regulations "for the use and management of the parks ... under the jurisdiction

of the National Park Service." 16 U.S.C. § 3.  But in 1926, when the next codification of federal

statutes was adopted, Congress made clear that, as to Yellowstone at least, the Organic Act grant

of authority was subject to the very specific and detailed preservation mandate established in

1872.  Congress amended the sentence setting regulatory parameters to read, as it does now, as

follows:

> In addition to the powers and duties enumerated in section 3 of this
> Title not inconsistent with this section, he shall make regulations
> providing for the preservation, from injury or spoliation, of all
> timber, mineral deposits, natural curiosities, or wonders, within the
> park, and their retention in their natural condition.

See 16 U.S.C. § 22 (originally enacted as 44 Stat. cdii (1925-1927)).  While we could find no

specific legislative history of this amendment, it is likely that the then recent celebration of

Yellowstone's 50th anniversary was a factor in Congress' making the Enabling Act dominant

over the Organic Act.  That anniversary was celebrated at Yellowstone in 1922 and 1923,

attended by the President, the Secretary of the Interior, the Director of the NPS and numerous

senators and congressmen.[8]

  The Winter Use Plan is a blatant violation of the Yellowstone Enabling Act.  The NPS's

own studies and findings establish that, even under the reduced numbers of oversnow vehicles

experienced during the last several seasons, individual wildlife were harmed, natural

soundscapes were overwhelmed and air quality was adversely impacted as against natural

conditions.  Despite this uncontested data, the Winter Use Plan would double the number of

snowmobiles and almost triple the number of snowcoaches from those experienced during those

recent winter seasons.

---

[8] Horace Marden Albright, *The Birth of the National Park System:  The Founding Years,
1913-33*, 126-27, 133, 149-52, 155 (1985).

(2)     **The Winter Use Plan Violates the NPS Organic Act and Redwood
Amendment**

In the 1916 Organic Act, Congress established as the purpose of the National Park

System to "conserve the scenery and natural and historic objects and the wild life therein and to

provide for the enjoyment of the same in such manner and by such means as will leave them

unimpaired for the enjoyment of future generations." 16 U.S.C. § 1.  In 1978, Congress added

what is known as the Redwood Amendment, providing:

> The authorization of activities [in the National Park System] shall
> be construed, and the protection, management and administration
> of these areas shall be conducted in light of the high public value
> and integrity of the National Park System and shall not be
> exercised in derogation of the values and purposes for which these
> various areas have been established.

16 U.S.C. § 1a-1 (emphasis added).

This and numerous other courts have recognized that the NPS's overarching mandate

under these statutes is one of preservation of the natural wonders of the National Park System.

*See, e.g.*, this Court's 2003 Decision, 294 F. Supp. 2d at 105, 113; *Bicycle Trails Council of

Marin v. Babbitt*, 82 F.3d 1445, 1453 (9th Cir. 1996); *Edmunds Institute v. Babbitt*, 42 F. Supp.

2d 1, 16 (D.D.C. 1986) (citing other cases).

(a)     **The Winter Use Plan Violates the NPS's Conservation
Mandate, Which Does Not Permit the Balancing of Recreation
and Conservation Reflected Here**

The NPS's claim to have management discretion to permit the type of adverse impacts

that the agency concedes occur under this Winter Use Plan merely in order to provide an

additional form of recreation cannot be squared with the NPS's statutory conservation mandate,

regardless of whether those impacts create impairment.  The NPS attempted in 2005 and 2006 to

convince the American people and the Congress that the NPS's governing statutes gave it such

discretion.  But that effort failed, and the NPS was forced to concede that the 2001 Management

Policies correctly interpreted the Organic Act and Redwood Amendment. In this Court's 2003 decision, the Court referred to the NPS's Management Policies, as then in effect, as "offer[ing] the best interpretation of [the NPS's statutory] mandate. 294 F. Supp. 2d at 105. As the NPS reaffirmed in its 2006 Management Policies, its mission begins with a mandate to conserve resources and values. Specifically, § 1.4.3 continues to interpret the Organic Act as embodying both a non-impairment requirement and a broader conservation mandate. Whenever there is a conflict between conserving resources and values and providing for enjoyment of them, the revised Policies continue to state, conservation is to be predominant. AR 120645, at 11.

We recognize the caveat in the Management Policies that "the laws do give the Park Service the management discretion to allow impacts to park resources and values when necessary and appropriate to fulfill the purposes of a park, as long as the impact does not constitute impairment." *Id.* But the key words in that sentence are "necessary and appropriate." Nowhere in the FEIS, the ROD or the release accompanying the adoption of the Winter Use Plan does the MPS attempt to explain why the Winter Use Plan is "necessary" to fulfill the purposes of Yellowstone. While the Yellowstone Enabling Act states that Yellowstone is set aside "as a public park or pleasuring ground for the benefit and enjoyment of the people," 16 U.S.C. § 21, the type of benefit and enjoyment to be derived by the people is made clear in Section 22, providing for the retention of the natural wonders of Yellowstone in their natural condition. It is no wonder, therefore, that the NPS does not even attempt to explain how the Winter Use Plan is somehow "necessary" to fulfilling Congress' purpose in establishing Yellowstone.

### (b)    The Winter Use Plan Would Cause Impairment

In 2003, this Court ordered the NPS to justify its departure from the 2000 ROD's conclusion that historic conditions caused impairment. The NPS's attempt to do so now does not stand up to reasoned analysis. The FEIS relies primarily on three changes from historic

conditions in concluding that the Winter Use Plan would not create impairment: (1) the numerical limit to 540 snowmobiles and 83 snowcoaches per day, (2) the mandatory use of commercial guides, and (3) the mandatory use of BAT. Monitoring and "adaptive management" are also relied on.

Reduction in the number of snowmobiles from historic conditions: The FEIS and the studies on which it is based concede that, even with some 260 snowmobiles and 29 snowcoaches per day experienced over the last several seasons, Yellowstone's wildlife has been disturbed, its natural soundscapes have been overwhelmed and its air quality has been adversely impacted. Yet, the Winter Use Plan would permit the number of snowmobiles to double and the number of snowcoaches to almost triple over that experienced during those recent seasons. See AR 125701 (White), at 20 (linking wildlife impact to the number of OSVs); 125617 (same); 125050, at 16 (more OSVs would generally make more sound and would be heard a greater proportion of the day).

Commercial guiding: The commercial guiding requirement was in effect during the last several seasons, during which adverse impacts were found to occur. The FEIS argues, however, that there might be some mitigating impact because snowmobiles will have to travel in commercially guided groups, creating intervals in which there will be no snowmobiles or snowcoaches. But there will still be a substantial number of snowmobile groups and snowcoaches. There is no requirement that snowmobilers travel in groups larger than two, namely the guide and the client. See AR 126681, at 70798 ("All recreational snowmobile operators must be accompanied by a commercial guide. ...Snowmobile parties must travel in a group of no more than 11 snowmobiles, including that of the guide.") (emphasis added). But with 540 snowmobiles per day, divided into groups of between 2 and 11, there would be between

-36-

50 and 270 snowmobile groups per day permitted in the park. Including the 83 snowcoaches, there would be between 133 and 353 snowmobile groups and snowcoaches per day. Given the short period of daylight in winter, it is far more likely that snowmobile groups and snowcoaches will be heard constantly in daylight hours than that there will be intervals of natural quiet between groups. *See* 294 F. Supp. 2d at 107 (rejecting guiding requirement as a "significantly flawed" justification for permitting snowmobiles).

BAT: As discussed at pages 21 and 29-30 above, snowmobiles are still extremely noisy and still emit substantial pollution, even with BAT.

### (3)    The Winter Use Plan Violates Executive Orders 11644 and 11989 and 36 C.F.R. § 2.18(c)

In 1972, President Nixon signed Executive Order 11644 to "establish policies and provide for procedures that will ensure that the use of off-road vehicles on public lands will be controlled and directed <u>so as to protect the resources of those lands</u>, to promote the safety of all users of those lands, and to minimize conflicts among the various uses of those lands." Exec. Order 11644, § 1, 37 Fed. Reg. 2877 (Feb. 8, 1972) (emphasis added). Among other things, that Executive Order provided:

> Areas and trails shall be located in areas of the National Park System ... <u>only</u> if the respective agency head <u>determines</u> that off-road vehicle use in such locations <u>will not adversely affect their natural, aesthetic, or scenic values</u>.

Exec. Order 11644, § 3(a)(4) (emphasis added).[9] In order to comply with Executive Order 11644, the NPS adopted a regulation relating to the use of snowmobiles in the National Park System. *See* 39 Fed. Reg. 11882-83 (Apr. 1, 1974). The current version of that regulation is found at 36 C.F.R. § 2.18 (c), which provides as follows:

---

[9]    That Executive Order was strengthened subsequently by Executive Order 11989.

> The use of snowmobiles is prohibited, except on designated routes and water surfaces that are used by motor vehicles or motor boats during other seasons.  Routes and water surfaces designated for snowmobile use shall be promulgated as special regulations. Snowmobiles are prohibited except where designated and only when their use is consistent with the park's natural, cultural, scenic and aesthetic values, safety considerations, park management objectives, and will not disturb wildlife or damage park resources.

There is no better place to look for Yellowstone's "natural, cultural, scenic and aesthetic values" than in 16 U.S.C. § 22, which provides for the protection and preservation of the natural wonders of that park and "their retention in their natural condition."  16 U.S.C. § 22; see also 16 U.S.C. § 26 (wildlife not to be frightened).  Moreover, while the NPS regulations do not define "disturb" as used in the regulation, its standard dictionary definition is "to stir; to move; …to excite from a state of rest or tranquility; to make uneasy or anxious; to agitate the mind of …."[10] If the Winter Use Plan would permit snowmobiles to create anxiety or unease among wildlife, to agitate them, or to cause them to move or change from a state of rest or tranquility, that plan is prohibited by the NPS's own snowmobile regulation.

The Winter Use Plan would concededly "disturb" wildlife, would concededly damage park resources such as natural soundscapes and air quality and would certainly be inconsistent with Yellowstone's natural, scenic and aesthetic values, as found in 16 U.S.C. § 22.  That Plan therefore violates 36 C.F.R. § 2.18(c) and the Executive Orders on which it is founded.

*        *        *

Accordingly, the Winter Use Plan is contrary to law, based on any one of the foregoing provisions.

---

[10]   *Webster's New Universal Unabridged Dictionary* 535 (2d ed. 1983).

C.     **The FEIS, ROD and Rule Should Be Vacated as Arbitrary, Capricious and an Abuse of Discretion**

The entire Winter Use Plan process was in any event fundamentally flawed. The process was manipulated to permit the Government to reach the conclusion for which the Bush Administration has been striving since it entered office, namely to permit large numbers of recreational snowmobiles in Yellowstone. An agency rule "would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43 (1983). Additionally, "in order to withstand judicial scrutiny the agency record must demonstrate that 'prior precedents and standards are being deliberately changed, not casually ignored.'" *Norton,* 294 F. Supp. 2d at 104 (quoting *Bush-Quayle '92 Primary Committee, Inc. v. Federal Election Com'n,* 104 F.3d 448, 453 (D.C. Cir. 1997)).

(1)     **The Parameters Set for the NPS's Analysis Did Not Reflect the Applicable Legal Restraints on Its Action**

An EIS is required to state the purpose and need to which the agency is responding in its proposed action. 40 C.F.R. § 1502.13. The purpose and need statement "necessarily 'dictates the range of reasonable alternatives.'" *City of Carmel-by-the-Sea v. U.S. Dept. of Transp.,* 123 F.3d 1142, 1155 (9th Cir. 1997). In setting the purpose and need for the proposed action in an EIS, the D.C. Circuit has stressed that,

> an agency should always consider the views of Congress,
> expressed, to the extent that the agency can determine them, in the
> agency's statutory authorization to act, as well as in other
> congressional directives.

*Citizens Against Burlington, Inc. v. Busey*, 938 F.2d 190, 196 (D.C. Cir. 1991). The NPS here

paid lip service to the applicable legal restrictions discussed above, but its statement of "purpose

and need," its statement of the "desired conditions" and its definition of impact levels all reveal

that the NPS established an analytic process which essentially ignored those restrictions and

requirements.

According to the FEIS, "the decision [to be made] requires optimizing between recreation

activities and protection of resources and values, in accordance with NPS policies." AR 117160,

at S-4 (emphasis added). The FEIS explained that "the purpose of this project or planning effort

is to ensure park visitors have a range of winter recreation opportunities that are appropriate to

the national park setting, and that these activities do not impair or irreparably harm park

resources or values." *Id.*, at i (emphasis added). Similarly, the FEIS explains that the chosen

alternative of 540 snowmobiles and 83 snowcoaches per day at Yellowstone "achieves a balance

of resources use and sharing life's amenities." *Id.*, at 67.

The NPS's "desired conditions" with respect to "park resources and values" are

cryptically stated only as follows: "Park resources and values are protected from impairment by

preventing unacceptable impacts. Reduced oversnow vehicle sound and emissions levels protect

air quality, natural soundscapes, and other resources that are dependent on those qualities.

Impacts to wildlife are mitigated, and effective wildlife habitat is protected." AR 126499

(ROD), at 5 (Table 1); 117160 (FEIS), at S-4 (Table 5-1) (emphasis added).

But these statements, as well as the NPS's impact definitions discussed above, are

premised on a misapprehension of the mandate imposed by the Organic Act, which extends

beyond simply avoiding impairment. Moreover, these parameters for the NPS's analysis failed

to take into account the strong protections imposed by the Yellowstone Enabling Act and of the

NPS's own regulation, 36 C.F.R. § 2.18(c). The FEIS was therefore fatally flawed. The NPS is not permitted to "optimize" or balance between recreation and preservation in the manner reflected in this Winter Use Plan. The NPS may not, merely to provide another form of recreation, permit the extent of adverse impacts demonstrated by the NPS's own studies here.

### (2)    The NPS Has Manipulated Its Analysis to Justify Its Desired Result

In numerous ways, the Federal Defendants have employed an analysis unreasonably designed to justify the result they wished to achieve. The manipulation employed here "gives new meaning to the phrase 'result-oriented decision-making.'" *Environmental Defense v. U.S. Army Corps of Engineers*, 515 F. Supp. 2d 69, 85 (D.D.C. 2007). This Circuit has made clear that an agency may not set the parameters of its action "in terms so unreasonably narrow that only one alternative" would be acceptable; otherwise, "the EIS would become a foreordained formality." *Citizens Against Burlington,* 938 F.2d at 196; *see also City of Carmel-by-the-Sea*, 123 F.3d at 1155 (same). But the opposite is also obviously true — if an agency sets the parameters for its action in terms so broad as to permit a decision without regard to its environmental impacts, the entire NEPA process would similarly lose any purpose or meaning.

Here, as in *Environmental Defense*, the NPS has "obviously worked backwards" from the agency's desired result "so as to make the project appear" to meet the required standards. 515 F. Supp. 2d at 85. Moreover, as in *Environmental Defense*, the NPS "has demonstrated its willingness to do whatever it takes to proceed" with its objective of permitting snowmobiles in Yellowstone — "change definitions, abandon core assumptions — even if it means ignoring serious environmental impacts." *Id.* It is apparent that, after this Court vacated and remanded the NPS's 2003 Rule, the NPS established a process that would permit 90% of the historical number of snowmobiles (720 out of 795). In fact, that process permitted the NPS to conclude —

as it did in the FEIS — that even 720 snowmobiles would not create impairment or other legal violations. And that process would have permitted even 1,400 snowmobiles per day, far more than the historic number. *See, e.g.*, AR 126499 (ROD), at 22 (impact on wildlife).

It is well-established that an agency must articulate a rational basis for its conclusions and decision. *See, e.g.*, *Burlington Truck Lines Inc. v. U.S.*, 371 U.S. 156, 168 (1962); *Nuclear Energy Institute, Inc. v. EPA*, 373 F.3d 1251, 1289 (D.C. Cir. 2004). There is nothing rational, however, about a definition of soundscape impacts that ignores intrusions into the natural soundscape of loud and continuous noise in the very areas in which visitors and wildlife congregate. There is nothing rational about an analytical approach that ignores the <u>number</u> of OSVs as a highly significant, perhaps the most significant, factor in evaluating resource impacts, as observed by NPS experts. *See, e.g.*, AR 125617. There is nothing rational about the NPS's reliance on BAT to justify a conclusion that large numbers of snowmobiles will not cause undue pollution when the studies, other than the NPS's models, demonstrate that even BAT snowmobiles cause significant pollution. And there is nothing rational about pointing to snowcoaches — with no evidentiary support — as the supposed reason why modeling produced irrational conclusions (*e.g.*, 720 snowmobiles and 78 snowcoaches using BAT would have less adverse impact to natural soundscapes than current conditions with 260 BAT snowmobiles and 29 snowcoaches not necessarily using BAT). *See National Parks Conservation Association v. FAA*, 988 F.2d 1523, 1533 (10th Cir. 1993) (agency's conclusion that aircraft noise would have no significant impact was irrational because agency provided no empirical evidence to support that conclusion).

Moreover, an agency must be able to defend as reasonable its choice of scientific method. *Citizens Against Burlington*, 938 F.2d at 201; *Sierra Club v. Costle*, 657 F.2d 298, 333 (D.C. Cir.

1981). Under NEPA, agencies contemplating major action must prepare an environmental impact statement, and agencies are under an affirmative mandate to "'insure the professional integrity, including scientific integrity, of the discussions and analyses in environmental impact statements.'" *Environmental Defense*, 515 F. Supp. 2d at 78 (quoting 40 C.F.R. § 1502.24). But the NPS failed to offer any explanation of its choice of modeling over monitoring as a scientific method. While acknowledging the defects and limitations in its modeling studies, the NPS articulated no defense of its reliance on those models to the exclusion of the monitoring results. And the NPS cannot ignore the scientific studies it has commissioned — such as the 2007 Emissions Report — without any reasoned explanation for its doing so and without any reasoned response to those studies. *Seattle Audubon Soc'y v. Moseley*, 798 F. Supp. 1473 (W.D. Wash. 1992).

The NPS also rejected without any explanation or reasoning the recommendations of its own scientists that, because of impacts on wildlife and soundscapes, the then-current use level — 260 snowmobiles and 29 snowcoaches per day — be maintained or reduced. AR 125701 (White), at 20; 125255, at 47. *See Pacific Coast Federation of Fisherman's Ass'ns v. Nat'l Marine Fisheries Servs.*, 482 F. Supp. 2d 1248, 1255 (W.D. Wash. 2007) ("'Where the agency fails to acknowledge the opinions held by well-respected scientists concerning the hazards of the proposed action, the EIS is fatally deficient.'") (quoting *Friends of the Earth v. Hall*, 693 F. Supp. 904, 934 (W.D. Wash. 1998)). As this Court held in its 2003 Decision, when experts differ, the agency may decide to credit some experts over others. "However, when making such a decision, the agency 'must cogently explain *why* it has exercised its discretion in a given manner.'" 294 F. Supp. 2d at 110 (quoting *State Farm*, 463 U.S. at 52).

The FEIS and ROD are also defective because they are based on impact definitions that

leave identifying the intensity of the impact entirely up to the decision-makers. Impact definitions, however, must provide an objective standard for determining what kind of differential makes one impact more or less significant than another. *Tripoli Rocketry Ass'n, Inc. v. Bureau of Alcohol, Tobacco, Firearms and Explosives*, 437 F.3d 75, 81 (D.C. Cir. 2006); *Sierra Club v. Mainella*, 459 F. Supp. 2d 76, 101 (D.D.C. 2006). In *Sierra Club v. Mainella*, the court found unacceptable NPS impact definitions which merely stated that an impact on air quality, lightscape or water resources was "detectable," "small and of little consequence" and "short term and localized," and similar phrases. The court found that these definitions left entirely up to the agency the identification of the intensity of the impact. 459 F. Supp. 2d at 101-02. Similarly, the NPS here used impact definitions such as "measurable," "perceptible," "generally localized," in its definition of impacts on air quality. AR 117160 (FEIS), at 222. The definition of impacts to wildlife relied on terms such as "measurable or perceptible," "small," "substantial consequence to the population." *Id.*, at 257. These conclusory definitions provide no basis for this Court to conduct a review. *See Sierra Club v. Mainella*, 459 F. Supp. 2d at 103.

Accordingly, for these and other reasons the NPS findings "run[] counter to the evidence before the agency [and are] so implausible that [they cannot] be ascribed to a difference in view or the product of agency expertise." *State Farm*, 463 U.S. at 43.

## IV.    CONCLUSION

The NPCA accordingly requests that the Court enter summary judgment in its favor, finding that the Winter Use Plan is contrary to law and/or, alternatively, that the process followed by the Federal Defendants in adopting that Plan was arbitrary, capricious and an abuse of discretion.

Respectfully submitted,

Robert D. Rosenbaum (D.C. Bar No. 090498)
Ingo W. Sprie
Francis A. Franze-Nakamura (D.C. Bar No. 497985)
Meetu Kaul (D.C. Bar No. 468146)
ARNOLD & PORTER LLP
555 Twelfth Street, NW
Washington, DC  20004
Phone:    (202) 942-5862
Fax:        (202) 942-5999

Attorneys for Plaintiff National Parks Conservation
Association

Dated:  May 9, 2008

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| GREATER YELLOWSTONE COALITION, et al., ) | |
| Plaintiffs, ) | Case No. 07-cv-2111 (EGS) |
| v. ) | [Hearing on Motions for Summary |
| DIRK KEMPTHORNE, et al., ) | Judgment on August 27, 2008] |
| Defendants. ) | |

| | |
|---|---|
| NATIONAL PARKS CONSERVATION ASSOCIATION, ) | |
| Plaintiff, ) | Case No. 07-cv-2112 (EGS) |
| v. ) | [Hearing on Motions for Summary |
| UNITED STATES DEPARTMENT OF THE INTERIOR; NATIONAL PARK SERVICE, ) | Judgment on August 27, 2008] |
| Defendants. ) | |

**APPENDIX TO
PLAINTIFF NATIONAL PARKS CONSERVATION ASSOCIATION'S
MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

Tab No.

Excerpts from National Park Service Comparison of Proposed Amendments to
2001 Management Policies ............................................................................................1.

November 30, 2005 Letter from The Coalition of National Park Service Retirees
to Director of National Park Service Concerning Proposed Revisions to 2001
Management Policies ....................................................................................................2.

Excerpts from Hearing Before the Subcommittee on National Parks of the Senate
Committee on Energy and Natural Resources, "The National Park Service's
Revised Draft Management Policies," June 20, 2006 ...................................................3.

Map of Yellowstone National Park Relevant to Winter Use Plan, Page 8 from
Final Environmental Impact Statement ........................................................................4.

Excerpts from Final Supplemental Environmental Impact Statement,
February 2003 ...............................................................................................................5.



National Park Service
U.S. Department of the Interior
2006

Comparison edition of the

# *Draft*

# **Management Policies**

To Guide the Management of the National Park System

---

*Comments on this draft should be submitted to the NPS Office of Policy by no later than February 18, 2006, via*
- *the parkplanning Internet link below,*
- *e-mail to <u>waso_policy@nps.gov</u>*
- *fax to Bernard Fagan at 202-219-8835*
- *delivery to Room 7252, Main Interior Building, Washington, D.C.*

---

This edition of the draft Management Policies compares
the draft 2006 edition with the 2001 edition.  New text is shown with an
<u>underline</u> while deleted text is shown with a ~~strikeout~~.

**To submit comments on this document, <u>*Click Here*</u>**

This document is also available via the Internet at:
http://parkplanning.nps.gov/waso

Draft 2006 NPS Management Policies

| | |
|---|---|
| 1 | Congress declares that the national park system, which began with establishment |
| 2 | of Yellowstone National Park in 1872, has since grown to include superlative |
| 3 | natural, historic, and recreation areas in every major region of the United States, |
| 4 | its territories and island possessions; that these areas, though distinct in character, |
| 5 | are united through their inter–related purposes and resources into one national |
| 6 | park system as cumulative expressions of a single national heritage; that, |
| 7 | individually and collectively, these areas derive increased national dignity and |
| 8 | recognition of their superlative environ-mental quality through their inclusion |
| 9 | jointly with each other in one national park system preserved and managed for |
| 10 | the benefit and inspiration of all the people of the United States; and that it is the |
| 11 | purpose of this Act to include all such areas in the System and to clarify the |
| 12 | authorities applicable to the system. Congress further reaffirms, declares, and |
| 13 | directs that the promotion and regulation of the various areas of the National Park |
| 14 | System, as defined in section 1c of this title, shall be consistent with and founded |
| 15 | in the purpose established by section 1 of this title [the Organic Act provision |
| 16 | quoted above], to the common benefit of all the people of the United States. The |
| 17 | authorization of activities shall be construed and the protection, management, |
| 18 | and administration of these areas shall be conducted in light of the high public |
| 19 | value and integrity of the National Park System and shall not be exercised in |
| 20 | derogation of the values and purposes for which these various areas have been |
| 21 | established, except as may have been or shall be directly and specifically |
| 22 | provided by Congress. (16 USC 1a–1) |

23   This section 1.4 of *Management Policies* represents the agency's interpretation of these key
24   statutory provisions.

25   **1.4.2 _"Impairment" and "Derogation": One Standard**

26   Congress intended the language of the Redwood amendment to the General Authorities Act
27   to reiterate the provisions of the Organic Act, not create a substantively different
28   management standard. The House committee report described the Redwood amendment as a
29   "declaration by Congress" that the promotion and regulation of the national park system is to
30   be consistent with the Organic Act. The Senate committee report stated that under the
31   Redwood amendment, "The Secretary has an absolute duty, which is not to be compromised,
32   to fulfill the mandate of the 1916 Act to take whatever actions and seek whatever relief as
33   will safeguard the units of the national park system." So, although the Organic Act and the
34   General Authorities Act, as amended by the Redwood amendment, use different wording ("
35   unimpaired" and "derogation") to describe what the National Park Service must avoid, they
36   define a single standard for the management of the national park system——not two different
37   standards. For simplicity, *Management Policies* uses "impairment,"" (or a variation thereof),
38   not both statutory phrases, to refer to that single standard.

39   **1.4.3 _The NPS ~~Obligation~~Obligations to Conserve and Provide for Enjoyment of Park**
40   **Resources and Values**

16

Draft 2006 NPS Management Policies

1   The "fundamental purpose" of the national park system, established by the Organic Act and
2   reaffirmed by the General Authorities Act, as amended, ~~begins with a mandate to conserve~~
3   ~~park resources and values. This mandate is independent of the separate prohibition on~~
4   ~~impairment, and so applies all the time, with respect to all park resources and values, even~~
5   ~~when there is no risk that any park resources or values may be impaired.~~is "to conserve the
6   scenery and the natural and historic objects and the wild life therein and to provide for the
7   enjoyment of the same in such manner and by such means as will leave them unimpaired for
8   the enjoyment of future generations." Through this mandate, Congress established the
9   overarching mission for national parks, which is to protect park resources and values to
10  ensure that these resources and values are maintained in as good, or better, condition for the
11  enjoyment of present and future generations. NPS managers must always seek ways to avoid,
12  or to minimize to the greatest ~~degree~~extent practicable, ~~adverse~~unacceptable impacts on park
13  resources and values. However, the laws do give the Service the management discretion to
14  allow impacts to park resources and values when necessary and appropriate to fulfill the
15  purposes of a park, so long as the impact does not ~~constitute impairment of the affected~~
16  ~~resources and values.~~ rise to the level of impairment or diminish visitor experience over time.

17  ~~The fundamental purpose of all parks also includes providing for~~As noted, the "enjoyment"
18  of park resources and values ~~by~~is part of the ~~people of the United States.~~fundamental
19  purpose of all parks. The "enjoyment" that is contemplated by the statute is broad; it is the
20  enjoyment of all the people of the United States, ~~not just those who visit parks,~~ and so
21  includes enjoyment both by people who ~~directly experience~~visit parks and by those who
22  appreciate them from afar. It also includes deriving benefit (including scientific knowledge)
23  and inspiration from parks, as well as other ~~forms of enjoyment. Congress, recognizing that~~
24  ~~the enjoyment by future generations of the national parks can be ensured only if the superb~~
25  ~~quality of park resources and values is left unimpaired, has provided that when there is a~~
26  ~~conflict between conserving resources and values and providing for enjoyment of them,~~
27  ~~conservation is to be predominant. This is how courts have consistently interpreted the~~
28  ~~Organic Act, in decisions that variously describe it as making "resource protection the~~
29  ~~primary goal" or "resource protection the overarching concern," or as establishing a "primary~~
30  ~~mission of resource conservation," a "conservation mandate," "an overriding preservation~~
31  ~~mandate," "an overarching goal of resource protection," or "but a single purpose, namely,~~
32  ~~conservation."~~uses. The Park Service recognizes that activities in which park visitors engage
33  can cause impacts to park resources and values, and the Service must balance the sometimes
34  competing obligations of conservation and enjoyment in managing the parks. The courts
35  have recognized that the Service has broad discretion in determining how best to fulfill the
36  Organic Act's mandate. Because the enjoyment of park resources and values by present and
37  future generations is dependent on their preservation, when there are concerns as to whether
38  an activity or action will cause an impairment, the Service will protect the resources while
39  taking appropriate steps, including scientific study and public involvement, to resolve the
40  concerns.

> **Comment:** When there is uncertainty, the NPS will protect the resources.

41  ~~1.4.4 The Prohibition on Impairment of Park Resources and Values~~

42  ~~While Congress has given the Service the management discretion to allow certain impacts~~
43  **1.4.3.1  Appropriate Use**          **Comment:** The text below stresses the importance of appropriate use.

> **Comment:** NPS restoration activities make resource conditions better.

Draft 2006 NPS Management Policies

1  In each case where a form of enjoyment or other use is under consideration, the responsible
2  NPS manager must determine whether the use is "appropriate" in a particular park.
3  Appropriate uses are those uses that, in the professional judgment of the responsible NPS
4  manager, will not

> **Comment:** See Glossary for stringent new standard that has been set for "professional judgment."

5  • cause an unacceptable impact,
6  • be inconsistent with the park purposes or values,
7  • unreasonably interfere with park programs or activities,
8  • disrupt the operations of park concessions or contractors,
9  • create an unsafe or unhealthful environment for visitors or employees,
10 • result in significant conflict with other appropriate uses, or
11 • diminish opportunities for current or future generations to enjoy park resources or
12   values.

13 Subject to the above criteria, appropriate uses may include

14 • uses that have occurred historically in a park and when the type and/or the level of
15   impact has not increased significantly,
16 • uses that may represent new technology, or
17 • uses whose impacts can be successfully mitigated or eliminated through

> **Comment:** "Managing" these activities may make them appropriate, but they are still subject to the overarching criteria for "appropriate use."

18   o visitor education,
19   o temporal, spatial, or numerical limitations on the use,
20   o the application of best available technology, or
21   o the application of adaptive management techniques.

22 **1.4.3.2  Unacceptable Impacts**

> **Comment:** This draft sets tough criteria for unacceptable impacts so that impacts do not come close to causing impairment. Criteria for protection are at least as strong as the 2001 edition

23 In evaluating the appropriateness of an activity, standard NPS planning and decision-making
24 procedures will be employed to engage the public and to utilize the best scientific
25 information available. These procedures will also be used to determine whether there would
26 be an unacceptable impact. An unacceptable impact is an impact that would

27 • be inconsistent with the park's purposes or values,
28 • degrade resource conditions so as to preclude future generations from enjoying the
29   resource in as good, or better, condition,
30 • create an unsafe or unhealthful environment for other visitors or employees, or
31 • unreasonably interfere with

32   o existing appropriate park uses,
33   o NPS interpretive, visitor service, administrative, or other activities,
34   o NPS concessioner or contractor operations or services, or
35   o the attainment of a park's desired conditions, as identified through the park's
36     planning process.

> **Comment:** This criterion places increased importance on the park planning process, which would identify, for example, locations where desired conditions such as quiet, tranquility, and natural sounds are especially important.

Draft 2006 NPS Management Policies

1

2    **1.4.3.3  Park Purposes and Legislatively Authorized Uses**

3    Park purposes are found in the general laws pertaining to the national park system, as well as
4    the enabling legislation or proclamation establishing each unit. In addition to park purposes,
5    in many cases, the enabling legislation or proclamation for a park may also identify uses that
6    are either mandated or authorized.

7    In the administration of mandated uses, park managers must allow the use; however, they do
8    have the authority to and must manage and regulate the use to minimize impacts on park
9    resources, values, and visitor enjoyment. In the administration of authorized uses, park
10   managers have the discretionary authority to allow and manage the use, provided that the use
11   will not cause impairment or unacceptable impacts. In considering whether to allow the use,
12   park managers must respect and be responsive to the desire, as reflected in the enabling
13   legislation or proclamation, that the use or uses continue.

14   *(See Major Elements of NPS Park Planning and Decision-making 2.2; General 8.1)*

15   **1.4.4  The Prohibition on Impairment of Park Resources and Values**

16   Although Congress has given the Service the management discretion to allow impacts from
17   activities within parks, that discretion is limited by the statutory requirement (generally
18   enforceable by the federal courts) that the Park Service must leave park resources and values
19   unimpaired, unless a particular law directly and specifically provides otherwise. This, the
20   cornerstone of the Organic Act, establishes the primary responsibility of the National Park
21   Service. It ensures that park resources and values will continue to exist in a condition that
22   will allow the American people to have present and future opportunities for enjoyment of
23   them.

24   The impairment of park resources and values may not be allowed by the Service unless
25   directly and specifically provided for by legislation or by the proclamation establishing the
26   park. The relevant legislation or proclamation must provide explicitly (not by implication or
27   inference) for the activity, in terms that keep the Service from having the authority to manage
28   the activity so as to avoid the impairment.

29   **1.4.5 _What Constitutes Impairment of Park Resources and Values**

> Comment: More guidance is added below on what a manager must do when making decisions about impairment.

30   The impairment that is prohibited by the Organic Act and the General Authorities Act is ana
31   significant impact that, in the professional judgment of the responsible NPS manager, would
32   harm the integrity of park resources or values, including the opportunities that otherwise
33   would be present for the enjoyment of those resources or values. The responsible NPS
34   manager must have followed a process including civic engagement as well as the use of the
35   best available scientific, scholarly, and technical information, and be able to clearly articulate
36   the reasoning applied in reaching a finding of impairment or non-impairment. Whether an
37   impact meets this definition depends on the particular resources and values that would be

19

Draft 2006 NPS Management Policies

1  affected; the severity, duration, and timing of the impact; the direct and indirect effects of the
2  impact; and the cumulative effects of the impact in question and other impacts.

3  An impact to any park resource or value may, but does not necessarily, constitute an
4  impairment. An impact would be more likely to constitute an impairment to the extent that it
5  affects a resource or value whose conservation is:

6  • Necessarynecessary to fulfill specific purposes identified in the establishing
7    legislation or proclamation of the park; Key, or
8  • key to the natural or cultural integrity of the park or to opportunities for enjoyment of
9    the park;, or Identified as a goal
10 • identified in the park's general management plan or other relevant NPS planning
11   documents as being of special significance.

12 An impact would be less likely to constitute an impairment to the extent that it is an
13 unavoidable result, which cannot reasonably be further mitigated, of an action necessary to
14 preserve or restore the integrity of park resources or values.

15 Impairment An impact that may occurlead to impairment may result from visitor activities;
16 NPS administrative activities in the course of managing a park; or; activities undertaken by
17 concessioners, contractors, and others operating in the park.; or visitor activities.

18 **1.4.6 _What Constitutes Park Resources and Values**

19 The "park resources and values" that are subject to the no impairment standard include: the
20 following:  Comment: "Resources" are distinguished from "values," but they are protected equally. (See para below)

21 • The park's scenery, natural and historic objects, and wildlife, and the processes and
22   conditions that sustain them, including, to the extent present in the park: the
23   ecological, biological, and physical processes that created the park and continue to act
24   upon it; scenic features; natural visibility, both in daytime and at night; natural
25   landscapes; natural soundscapes and smells; water and air resources; soils; geological
26   resources; paleontological resources; archeological resources; cultural landscapes;
27   ethnographic resources; historic and prehistoric sites, structures, and objects; museum
28   collections; and native plants and animals;.

29 OpportunitiesThe "park values" that are subject to the no impairment standard include

30 • appropriate opportunities to experience enjoyment of the above resources, to the
31   extent that can be done without impairing any of them; the same,
32 • The the park's role in contributing to the national dignity, the high public value and
33   integrity, and the superlative environmental quality of the national park system, and
34   the benefit and inspiration provided to the American people by the national park
35   system;. and

20

Draft 2006 NPS Management Policies

1     • ~~Any~~ any additional attributes encompassed by the specific values and purposes for
2     which it was established.

3     *(See introduction to chapter 4)*

4     **1.4.7 _Decision–making Requirements to Avoid Impairments**

5     Before approving a proposed action that could lead to an impairment of park resources and
6     values, an NPS decision-maker must consider the impacts of the proposed action and
7     determine, in writing, that the activity will not lead to an impairment of park resources and
8     values. If there would be an impairment, the action may not be approved.

9     In making a determination of whether there would be an impairment, a National Park Service
10    decision–maker must use his or her professional judgment. The decision- maker must
11    consider any environmental assessments or environmental impact statements required by the
12    National Environmental Policy Act of 1969 (NEPA); relevant scientific studies, and other
13    sources of information; and public comments.

14    When an NPS decision- maker becomes aware that an ongoing activity might have led or
15    might be leading to an impairment of park resources or values, he or she must investigate and
16    determine if there is, or will be, ~~an~~ impairment. Whenever reasonable and practicable, such
17    an investigation and determination will be made as part of an appropriate park planning
18    process undertaken for other purposes. If it is determined that there is, or will be, such an
19    impairment, the ~~Director~~decision maker  must take appropriate action, to the extent possible
20    within the Service's authorities and available resources, to mitigate the impacts so as to
21    eliminate the impairment~~.~~, or reduce impacts as needed to eliminate the impairment. The
22    action must eliminate the impairment as soon as reasonably possible, taking into
23    consideration the nature, duration, magnitude, and other characteristics of the impacts to park
24    resources and values, as well as the requirements of NEPA, the Administrative Procedure
25    Act, and other applicable laws.

26    *(See Levels of Park Planning 2.3; Evaluating Environmental Impacts 4.1.3; Planning 5.2;*
27    *General 8.1; Visitor Use 8.2; General 9.1. Also see Director's Order #12: Conservation*
28    *Planning and Environmental Impact Analysis)*

29    ~~**1.5 External Threats and Opportunities**~~     | Comment: Cooperation is the best way to prevent threats to park resources and ensure their protection. |

30    ~~**Strategies and actions**~~**1.5   Cooperative Conservation Beyond Park Boundaries**

31    Cooperation beyond park boundaries ~~have~~ has become increasingly necessary as the National
32    Park Service strives to fulfill its mandate to ~~preserve~~conserve the natural and cultural
33    resources of parks unimpaired for future generations. Ecological processes cross park
34    boundaries, and park boundaries may not incorporate all of the natural resources, cultural
35    sites, and scenic vistas that relate to park resources or the quality of the visitor experience.
36    Therefore, activities proposed for adjacent lands may significantly affect park programs,
37    resources, and values. Conversely, Park Service activities may have impacts outside park

21




**THE COALITION OF NATIONAL PARK SERVICE RETIREES**

The Green Blood Still Runs Deep

Home

About Us

Coalition News

Press Releases

Letters

Affiliations

Join Us

To contact us:

**THE COALITION OF NPS RETIREES**
5625 North Wilmot
Tucson, AZ 85750

Phone: 520-615-9417
Fax: 520-615-9474
Email

# The Coalition of National Park Service Retirees

**Voices of Experience - Advocating the Protection of America's National Parks**

## Breaking News

NOTE: The "Join Us" page is not working correctly - the "Submit" button returns an error message. We are working on this problem. If you wish to join, simply provide the information called for on the page in an email message to bill_wade@npsretirees.org.

**\*\*\*\*\*\*\*\*\*\***

**December 6 , 2005**
The following letter was sent to NPS Director Fran Mainella on November 30, 2005 . In addition to expressing the views of the signatories, it provides a clear summary of CNPSR's views related to the proposed revisions of the NPS Management Policies.

**SENT VIA FAX AND EMAIL**

**November 30, 2005**

**Ms. Fran Mainella, Director**

**National Park Service**

**1849 C Street NW**

**Washington DC 20240**

**Dear Director Mainella:**

**Each of us was privileged to serve the National Park Service in an executive level leadership position during our careers. We understand the value and importance of management policies to assuring that the National Park System is managed in the way that the Congress and previous generations of Americans intended it to be managed.**

**Beginning in 1918, when Director Stephen Mather drafted NPS policy subsequently signed by Interior Secretary Lane (often referred to as the "Lane Letter"), policy has undergone periodic revision, while remaining consistent in its intent to implement**

the Organic Act and subsequent legislation to assure that parks are left unimpaired for future generations.

Now that the set of radical revisions of the 2001 Management Policies proposed by Mr. Hoffman are no longer on the table, the question arises: are the proposed revisions to those 2001 Management Policies sufficiently better to justify scrapping the 2001 Policies and replacing them in their entirety? We think not. They are a drastic and dangerous departure from a longstanding national consensus. The proposed changes are not driven by law, by any conservation need, or by any failure of practical application. Little has changed since the present policies became effective less than five years ago.

While many of us intend to comment, we believe the current process should be terminated. The National Park Service should set in motion a deliberate process that begins with public scoping that explains why sections of the 2001 version should be changed. The reasons cited for the draft changes have been confusing and after-the-fact. Indeed, some of those reasons are contradicted in the new draft. For example, guidance on "base jumping" has been removed (section 8.2.2.7, page 83, 2001 policies). Conversely the oft-mentioned need for a better policy on cell towers has not resulted in any change (section 8.6.4.3 in both documents, page 92, 2001 policies).

We are especially troubled by the omission from the opening sections of the Management Policies of their long-established emphasis upon the NPS's overriding responsibility to preserve resources on behalf of all Americans, including those yet unborn. However, we are also concerned with opening the parks' management decision-making processes to disproportionate influence by special interest groups and local and individual state entities. These are national, not local, parks.

We are heartened that you have stated that, "the policies clearly underscore that when there is a conflict between use and conservation, the protection of the resources will be predominant." And yet, that very statement, which was so clearly articulated in the 2001 Management Policies, has been deleted from Section 1.4.3 of the version currently under consideration and replaced by less compelling language. To make certain that your intention continues as a part of policy, this important language should go back where it belongs.

Any decision to modify NPS policy should be based on the following "principles:"

- Policy should not attempt to rewrite law or regulation. Law should inform policy, not vice-versa.
- The policies should not revise the fundamental interpretation of the Organic Act and its amendments, upheld by over 80 years of implementation and numerous legislative and court actions. The 2001 Management Policies interpret the NPS's responsibility unequivocally: "...the enjoyment by future generations of the national parks can be assured only if the superb quality of park resources and values is left unimpaired." Revisions implying a need for the NPS to "balance" conservation with enjoyment, or implying that they are on "an equal plane," would depart radically from this time-honored emphasis that future enjoyment of the national parks flows <u>from</u> their conservation and that the two are inextricably linked. Such a redirection of park management must not occur.
- Consistent with the above, the policies must adhere to the standard that the impairment of park resources and derogation of values may not be allowed by the Service unless directly and specifically provided for by legislation or by the proclamation establishing a park. Modifying the definition of impairment to something less than what the term means can do nothing but diminish the resources of the National Park System and confuse rather than clarify appropriate management actions by field superintendents on the ground.
- Clear skies and natural soundscapes should continue to be recognized as resource values, rather than "associated characteristics." These factors are not only important to humans, but also to other species.
- Impairment of visitor enjoyment should not be considered to be as significant as impairment of resources.
- The policies must recognize that there is an enormous difference between "conservation" and "preservation" especially when these terms are applied to cultural resources.
- The standard of "reasonable" should not be replaced by the standard of "demonstrated."
- The policies in no way should diminish the values and uses of scientific research and scholarly analysis.
- A legislatively authorized activity in a park should not, in and of itself, become a purpose of that park. Just because snowmobiling, grazing or rock climbing might be authorized should not make such activities purposes of the park.
- Advertising and prominent recognition of

contributions and support should be avoided if they have the effect of reducing the vital contrast between the park experience and the daily routines and experiences that many visitors seek to leave behind.

- Protection of resources must take priority over the scheduling of events, of any kind, that have entertainment as their primary purpose.

There are improvements that may be made to the 2001 Management Policies, and they can be made in the traditional, conventional way by amending the policies one by one – bottom up – not top down, and not radically.

Sincerely,

The following former executive level leaders of the National Park Service have agreed to have their names added as signatories to this letter:

Bill Briggle, Deputy Director, 1975-1977

Herb Cables, Deputy Director, 1989-1993

Denis P. Galvin, Deputy Director, 1985-1989; 1997-2002

Robert Arnberger, Regional Director, 2000-2003

Robert M. Baker, Regional Director, 1994-1997

Bob Barbee, Regional Director, 1994-2000

Glen Bean, Regional Director, 1977-1980

Jerry Belson, Regional Director, 1996-2003

Chet Brooks, Regional Director, 1971-1976

Don Castleberry, Regional Director, 1987-1994

Jim Coleman, Regional Director, 1981-1994

Jim L. Dunning, Regional Director, 1979-1983

Barbara J. Griffin, Regional Director, 1993-1995

Lorraine (Mintzmyer) Denning, Regional Director, 1979-1992

Jack Morehead, Regional Director, 1991-1994

Gerald D. Patten, Regional Director, 1989-1990

Joseph C. Rumburg, Jr., Regional Director, 1974-1976

Dave Thompson, Regional Director, 1970-1977

Karen Wade, Regional Director, 1999-2003

Maureen Finnerty, Associate Director, 1994-2000

Joe Gorrell, Associate Director, 1988-1995

Jerry Rogers, Associate Director, 1982-1994

Caleb G. Cooper, Center Director, 1991-1995

Gary Cummins, Center Director, 1997-2005

Marc Sagan, Center Director, 1974-1986

**December 1 , 2005**
CNPSR submits comments in response to proposed
revisions to NPS Director's Order #21 - Donations
and Fundraising (Note: to see imbedded comments,
place your cursor over the colored identifier - such as
[B10] - and the text will appear) - click here.

**November 16 , 2005**
CNPSR sends letter to several Senators thanking
them for expressing their concerns about the
proposed revision of NPS Management Policies to
Secretary Norton

- **To see CNPSR letter click here.**
- **To see letter from six Senators to Secretary Norton,
  click here [Note: this is a .pdf file].**

**November 1 , 2005**
Senate Committee on Energy and Natural Resources
conducts oversight hearing on NPS Management
Policies. CNPSR Executive Council member Don
Castleberry and CNPSR member Deny Galvin testify,
along with NPS Deputy Director Steve Martin and
William P. Horn.

- **To read Don Castleberry's testimony - click here**
- **To read Deny Galvin's testimony - click here**
- **To read Steve Martin's testimony - click here**
- **To read William Horn's testimony - click here**

S. Hrg. 109–313, Pt. 2

# THE NATIONAL PARK SERVICE'S REVISED DRAFT MANAGEMENT POLICIES

# HEARING

BEFORE THE

## SUBCOMMITTEE ON NATIONAL PARKS

OF THE

## COMMITTEE ON
## ENERGY AND NATURAL RESOURCES
## UNITED STATES SENATE

ONE HUNDRED NINTH CONGRESS

SECOND SESSION

TO

RECEIVE TESTIMONY ON THE NATIONAL PARK SERVICE'S REVISED
DRAFT MANAGEMENT POLICIES

JUNE 20, 2006



Printed for the use of the
Committee on Energy and Natural Resources

U.S. GOVERNMENT PRINTING OFFICE

30–087 PDF                     WASHINGTON : 2006

For sale by the Superintendent of Documents, U.S. Government Printing Office
Internet: bookstore.gpo.gov   Phone: toll free (866) 512–1800; DC area (202) 512–1800
Fax: (202) 512–2250   Mail: Stop SSOP, Washington, DC 20402–0001

4

is, that we stand firmly behind the Organic Act of 1916 and the concept and doctrine that has been followed for parks management to do no harm. So I appreciate all that you have done. I appreciate Senator Alexander's and Senator Thomas' leadership on this issue as well.

Senator ALEXANDER. Thank you, Senator Salazar. We also should acknowledge the work of Tom Lillie and David Brooks, staff members who've worked hard on this issue.

[The prepared statement of Senator Salazar follows:]

PREPARED STATEMENT OF HON. KEN SALAZAR, U.S. SENATOR FROM COLORADO

Thank you, Mr. Chairman and Ranking Member Akaka. I appreciate having another opportunity to discuss proposed changes to the National Park Service's management policies.

At the end of a very long and difficult process, I am happy to see that we have returned to a draft of the Management Policies that closely resembles the 2001 Policies.

Members of the public, Park Service employees, retirees, and park advocates have been overwhelming in their support for the bedrock principles of resource protection in the Parks. People want the air, sounds, and scenic views of their Parks protected.

They want uses carefully monitored to ensure they are not damaging Park resources. They want wilderness lands protected and preserved. And they want clear, consistent, and stable management of our Parks so that our children and grandchildren may enjoy the same wonders we experience today when we visit one of America's 58 National Parks.

While I am pleased that this process has ultimately restored and strengthened the management principles in the 2001 Policies, I still wonder why this process was necessary in the first place.

The Park Service has devoted a lot of time and taxpayer resources to the various drafts of these policies. In a budget climate that is forcing cuts to visitor services and neglect of park infrastructure, wouldn't taxpayer dollars have been better spent elsewhere? After all, after numerous revisions of the management policies, we have basically returned to the core principles in the 2001 Policies.

I do want to commend the Park Service for its willingness to consider public comments and make changes to previous drafts.

The steady guidance of people like Denny Galvin and Senator Alexander, along with organizations like the National Parks Conservation Association and the Coalition of National Park Service Retirees, helped expose the flaws of earlier drafts and restore the "do no harm principle." Thanks to their support of the Park Service and the Parks, we have made lemonade from the lemons of Paul Hoffman's draft last year.

I would ask that as you circulate this latest draft with career Park Service employees for their feedback, that you also make it available to the public for scrutiny and comment. The more public comment we gather on these policies, it seems, the more we affirm the Park Service's mandate to protect the parks' extraordinary resources.

Mr. Chairman, I thank you again for holding this hearing and I look forward to the testimony of the witnesses.

Thank you.

Senator ALEXANDER. Now, we're anxious to hear from Mr. Martin and Mr. Kiernan. Why don't we start with Mr. Martin. We have your testimony. If you would like to summarize it in 5 to 7 minutes, that would be fine. Then we'll ask questions and Chairman Thomas will be back after he votes and we'll continue the hearing. But we want to hear what you have to say, so welcome and we look forward to it.

**STATEMENT OF STEVE MARTIN, DEPUTY DIRECTOR, NATIONAL PARK SERVICE, DEPARTMENT OF THE INTERIOR**

Mr. MARTIN. Well, thank you and thank for the opportunity to appear before your subcommittee to discuss the revisions to the

5

National Park Service Management Policies. And like you brought up, I would like to just summarize my testimony and I will submit my full comments for the record.

Senator ALEXANDER. They will be included in the record.

Mr. MARTIN. On June 19, 2006, Director Fran Mainella of the National Park Service released a final review document of the management policies for all employees. We believe that the revised draft policies are a significant improvement over the draft released in 2005 and will improve upon the 2001 management policies. I want to thank you and this committee for the interest that you have shown in this issue and the support you have given for the positive resolution of this matter.

Since the last hearing before this subcommittee, we received nearly 50,000 comments on the proposed policy revisions. The public comment period ran for 127 days and the draft was reviewed by interested individuals and groups, park service employees, the Department, and Federal agencies, with a lot of support and interest from the Senate, from the House and from key groups like the National Parks Conservation Association and many others. We wanted to assure that the process of comment and evaluation was thorough. We assembled a group of National Park Service employees that included park superintendents, managers, program specialists, and the National Park Service Advisory Board, to incorporate the comments that would improve upon the 2001 policies. We believe it is very important for our employees to have a final opportunity to make sure that this document is as accurate and useful as possible. That is why it is out for an additional employee review. We anticipate making final changes in late July, and preparing the document for approval by the director in August sometime. We have also placed the draft on our website, where it can be obtained by any interested party.

It is also notable that Secretary of the Interior Kempthorne participated in the release of the final draft. His remarks included clear language on the overarching mission of the National Parks, including when there is a conflict between conserving resources unimpaired for future generations and the use of those resources, conservation will be predominant.

We would like to emphasize that the revisions were considered only if they met basic principles that were adopted by our career employees in the Park Service and other leadership. These principles are contained in the draft policies and include key points of how policies—these policies were revised and how future policies should be revised and those—all of those points can be found within the document itself.

But we would like to unequivocally confirm to the American people that the fundamental purpose and mission of the National Park Service as stated in the 1916 Organic Act will be upheld and we believe that the revised management policies will help the National Park Service fulfill its role as a leader of resource stewardship and in providing opportunities for visitor enjoyment and as a model for other nations in how to protect special places unimpaired for future generations.

That concludes my statement and I would look forward to answering any questions.

6

[The prepared statement of Mr. Martin follows:]

PREPARED STATEMENT OF STEPHEN P. MARTIN, DEPUTY DIRECTOR, NATIONAL PARK
SERVICE, DEPARTMENT OF THE INTERIOR

Mr. Chairman, thank you for the opportunity to appear before your subcommittee to discuss the revisions to the National Park Service (NPS) Management Policies. This is the third Congressional hearing held on these revisions, and we are pleased to report that significant progress has been made since our last hearing. On June 19, 2006, the Director of the National Park Service released a final review document to all employees. We believe that the revised draft policies are a significant improvement and will provide useful guidance to our park managers.

Since the last hearing before this subcommittee on November 1, 2005, we received nearly 50,000 comments on the proposed policy revisions. The public comment period ran for 127 days, and the draft was reviewed by interested individuals and groups, NPS employees, the Department, and other federal and state agencies.

The number and content of the comments reflected a strong public interest in our national parks and how they are managed. The comments repeatedly stressed the vitality and relevancy of the Organic Act and that the Act must be honored in the management of our National Parks. We heard that our mission to protect parks was of paramount importance. We received many good suggestions from the public, NPS employees, and others that helped clarify various portions of the document.

We want to assure you that the process of comment evaluation was thorough. Comments were consolidated by career policy specialists and a private firm which was retained to assist with the large volume of comments. We then assembled a group of NPS employees that included park superintendents, managers, and program specialists. This knowledgeable team reviewed, discussed, and incorporated the comments. The revised draft was then further reviewed by the NPS National Leadership Council. Following that approval, a special committee of the NPS Advisory Board met with key NPS staff to discuss the revised policies. On the recommendation of the special committee, the revised draft policies were endorsed by the full NPS Advisory Board on June 9, 2006.

The Director released the revised draft policies to all NPS employees for final comment on June 19, 2006. We also have placed a courtesy copy on our web site for viewing by any interested party. Although the employee review will take an additional three weeks, we believe it is very important for our employees to have a final opportunity to double check the review process and make sure that this document is as accurate and useful as possible. We anticipate final approval by the Director in August.

As the Deputy Director, I am very pleased with this document. We believe that the revised draft is an improvement in content, tone, and clarity over the 2001 and the earlier 2005 draft. We would like to emphasize that revisions were considered only if they met basic principals that were adopted by our career employees. We believe that these principals are so fundamental that they should guide any future management policy changes.

The policies must—

- Comply with current laws, regulations, and Executive Orders,
- Prevent impairment of park resources and values,
- Assure that conservation will be predominant when there is a conflict between protection of resources and their use,
- Maintain NPS responsibility for making decisions and for exercising key authorities,
- Emphasize consultation and cooperation with local, state, Tribal, and federal entities,
- Support pursuit of the best contemporary business practices and sustainability,
- Encourage consistency across the system—"one" National Park System,
- Reflect NPS goals and a commitment to cooperative conservation and civic engagement,
- Employ a tone that leaves no room for misunderstanding the NPS's commitment to the public's appropriate use and enjoyment, including education and interpretation, of park resources, while preventing unacceptable impacts,
- Pass onto future generations natural, cultural, and physical resources that meet desired conditions better than they do today, along with improved opportunities for enjoyment.

I would like to illustrate several key areas where the revised draft provides greater emphasis and clarity from the 2001 policy document.

7

We unequivocally confirm to the American people that the fundamental purpose and mission of the NPS as stated in the 1916 Organic Act is to ". . . promote and regulate the use of the Federal areas known as national parks, monuments, and reservations hereinafter specified by such means and measures as conform to the fundamental purposes of the said parks, monuments, and reservations, which purpose is to conserve the scenery and the natural and historic objects and the wildlife therein and to provide for the enjoyment of the same in such manner and by such means as will leave them unimpaired for the enjoyment of future generations." Since passage of the Act, the NPS has established itself as a world leader in protected area management. We believe that these revised draft policies inspire and guide managers to follow that tradition.

The revised draft policies are committed to civic engagement and cooperative conservation at all levels of park management. This revised draft emphasizes to our managers that decisions based on sound public input are better for parks and more supportive of surrounding communities.

The management of parks is recognized as a serious business enterprise that must be continually improved by professional management. This ensures that the American taxpayer is well-served by managers using the best business practices. These revised draft policies make a strong commitment to workforce and business practices improvement.

The revised draft policies provide additional guidance on the important relationships between parks and Native Americans. The revised draft is respectful of tribal sovereignty and more explicitly expresses our commitment to a positive government-to-government relationship between parks and tribes.

The revised draft policies further recognize the importance of clean air and water as well as soundscapes and lightscapes. These resources help make each park unique and special in today's more crowded world. The revised draft policies allow for managers to review the variety of possible park resources and values, account for each park's specific legislation, and encourage working with neighbors and other land management agencies.

The revised draft policies recognize that we must not allow uses or threats to park resources to even approach the level of impairment. The manager will use professional judgment and science to determine when a proposed or existing use may be leading to impairment and manage to a level far below that critical point. This level of management, referred to as unacceptable impact, is clarified in the revised draft.

The revised draft policies have strengthened commitment to appropriate use in parks. Managers have new guidance on determining what an appropriate or inappropriate use in a park is. These revised draft policies also acknowledge that what may be appropriate in one park may not be in another park.

Finally, the revised draft policies recognize in a new way how much National Parks and the National Park experience means to Americans. The role of the park ranger as educator and protector is emphasized. The document demonstrates our commitment to the relevancy of National Parks and to the inspiration that they provide for our citizens, both today and in the future.

In closing, I would like leave you with two quotations from distinguished Americans who cared deeply about our special places. The first is from President Theodore Roosevelt in 1912:

> The establishment of the National Park Service is justified by considerations of good administration, of the value of natural beauty as a National asset, and of the effectiveness of outdoor life and recreation in the production of good citizenship.

The other quotation is from the author Wallace Stegner. In 1983, he wrote:

> National parks are the best idea we ever had. Absolutely American, absolutely democratic, they reflect us at our best . . . .

We believe that the revised Management Policies will help the National Park Service to shine in its role as a leader of resource stewardship, as a leader in providing opportunities for visitor enjoyment, and as a model for other nations in how to protect special places unimpaired for the future.

Senator ALEXANDER. Thank you, Mr. Martin.
We've been joined by Senator Akaka.
Mr. Kiernan.

WINTER USE PLANS FINAL ENVIRONMENTAL IMPACT STATEMENT
Yellowstone and Grand Teton National Parks and the John D. Rockefeller, Jr. Memorial Parkway



Figure 1-1: Yellowstone National Park.

**WINTER USE PLANS**

**Final Supplemental Environmental Impact Statement**

# Volume 1



**February 2003**

---

**YELLOWSTONE AND GRAND TETON NATIONAL PARKS**

AND THE **JOHN D. ROCKEFELLER, JR., MEMORIAL PARKWAY**

as an inversion. However, BAT requirements and entry limits would mitigate this to some degree. Overall impacts would be minor on less heavily used road segments and minor to moderate on heavily used road segments and in staging areas. The highest levels would occur at times and places where large numbers of oversnow vehicles stage for entry into the parks (also see *Effects of Implementing the Alternatives on Air Quality*).

## THE EFFECTS OF IMPLEMENTING THE ALTERNATIVES ON WILDLIFE — ELK AND BISON

### Methods and Assumptions for SEIS

Analyses of impacts to wildlife are limited to alternative features that pertain to oversnow motorized access in the parks and groomed roads and trails for motorized use. The analysis is further limited to those wildlife species for which new information and analysis may alter the assessment of impacts as disclosed in the Final EIS, and for which impacts may vary by alternative (see *Impact Topics Addressed* in Chapter III). Based on the proposed actions, these species include bison and elk. The analysis of impacts to other species contained in the *Environmental Consequences* chapter of the Final EIS remains valid; see pages 237-262 of that document.

National Park Service regulations and policies for management of wildlife underlie the analysis determinations presented in the consequence discussions. A summary of this direction (including legislation and EOs) is presented in Appendix C of the Final EIS.

The following sources of information were used to assess the level of impact on wildlife:

- Scientific literature on species' life histories, distributions, habitat selection, and responses to human activities.
- Site-specific information on wildlife species in the parks, including complete and on-going studies (when available), and the professional judgment of park biologists familiar with the management concerns related to individual species. Park-specific information and scientific literature documented in the Final EIS on pages 143-158 and 237-262 is hereby incorporated by reference. Alternative 1a in the SEIS contains a review of pertinent, new information available since the publication of the Final EIS; subsequent alternative analyses compare and contrast effects relative to alternative 1a.
- A risk assessment, categorized by road segment, depicts the potential risk of impacts to bison and elk from snowmobiles and snowcoaches.

Effects are characterized according to their intensity and scale of impact on wildlife individuals and populations[31] (Table 73). Effects that remain essentially unchanged from those disclosed in the Final EIS are incorporated by reference. Variations in alternatives that mitigate the impacts of these actions are included and reflected in the statements of effects. See Chapter III *Wildlife*, for a list of definitions used when describing the effects of the alternative actions on wildlife.

---

[31] Definitions are loosely based on ESA impact criteria that differentiate between levels of effects based on their degree of measurability or detectability.

**Table 73. Definition of impacts to wildlife.**

| Impact Category | Definition |
|---|---|
| No Effect | An action that does not affect a species. |
| No Known Effect | An action that may affect a species elsewhere but for which there are no demonstrated impacts known to occur in the parks. |
| Adverse Negligible Effect | An action that may affect a population or individuals of a species, but the effect will be so small that it will not be of any measurable or perceptible consequence to the population. |
| Adverse Minor Effect | An action that may affect a population or individuals of a species, but the effect will be small; if it is measurable, it will be a small and localized consequence to the population. |
| Adverse Moderate Effect | An action that will affect a population or individuals of a species; the effect may be measurable and may have a sufficient consequence to the population but is more localized. |
| Adverse Major Effect | An action that will noticeably affect a population or individuals of a species; the effect will be measurable and will have a substantial and possible permanent consequence to the population. |

## Effects Common to All Alternatives

### Effects of Oversnow Motorized Sound

Animals may exhibit physiological and behavioral responses to human-caused noise. For a literature review of the effects of noise on wildlife see page 222 in the Final EIS. An analysis of these effects is implicit in the assessment of motorized use for each alternative. It can be inferred that as the level, location, and type of motorized use changes, so will the associated effects of motorized sound. An analysis of how the natural soundscape is impacted by alternative is included in this chapter.

### Effects of Oversnow Motorized Use

Alternatives 1a and 1b provide for the use of mass-transit snowcoaches; alternatives 2, 3, and 4, while retaining the use of snowcoaches, provide for the use of snowmobiles. Effects associated with oversnow motorized use include disturbance to wildlife from the sight, sound and smell of the machines, and the presence of groomed roads and trails to facilitate their use. Conclusions related to the effects of oversnow motorized use did not change from those presented in the Final EIS for alternatives that feature comparable numbers of oversnow motorized vehicles.

### General Effects

Winter recreation activities take place during the season when animals are stressed by climate and food shortages. Disturbance or harassment of wildlife during this sensitive time can have a negative effect on individual animals and, in some cases, populations as a whole (Moen et al. 1982). Human activities may provoke the following responses: elevation of heart rate and metabolism; elevated stress hormones (i.e., glucocorticoids); flight; displacement from habitats; reduced reproduction; increased susceptibility to predation; and diminished health as a result of increased energy costs (Creel et al. 2001; Hardy et al. 2001; Moen et al. 1982; Geist 1978; Cassier et al. 1992; Picton 1999; Aune 1981). Because many of these responses are difficult to detect, animals that may appear unaffected by human activities may nonetheless be suffering from adverse effects. In YNP's Madison, Firehole, and Gibbon River valleys, Aune (1981) reported that wildlife developed crepuscular patterns in response to winter recreation activity, were displaced from trailsides, and that their movements were inhibited by traffic

and snow berms created by plowing and grooming operations. Conversely, animals may be able to habituate over time to human activities, providing that such activities are conducted in a predicable and regular manner. Habituation has been defined as a waning of behavioral response to a repeated stimuli (Whittaker and Knight 1998). Habituation may occur when flight or displacement are not possible (e.g., in critical or limited winter range, during severe winters when the snowpack is deep, or when the weakened physical state of the animal precludes it). Although habituated ungulates may fail to exhibit overt behavioral responses, research has shown that physiological responses, including an increase in heart rates, may occur and can result in high energy expenditures (Canfield et al. 1999). Increases in energy expenditures during the stressful winter period are considered deleterious to the overall physical condition of the animal.

## The Effects of Implementing Alternative 1a on Wildlife

### Ungulates (Elk and Bison)

**Effects of oversnow motorized use.** The use of motorized oversnow vehicles can cause injury and death for wildlife, habitat displacement, behavioral changes and physiological stress responses. This alternative would restrict public oversnow access to snowcoaches. In YNP, all existing groomed routes would be available for snowcoach use, and in GTNP, snowcoaches would be allowed on the groomed surface of the road from Colter Bay to Flagg Ranch, north to YNP, and on the Grassy Lake Road. The winter use season would run from approximately late November to mid-March, and all groomed roads would be closed to public entry by March 15 (latest closing date).

Because the annual number of road-killed ungulates caused by oversnow vehicles was estimated at less than 1% of each species' total population (Gunther et al. 1998), impacts related to road kills are considered none to negligible and short term (see pages 239-241 in the Final EIS for a review of collision impacts). Despite the small number of road-killed ungulates relative to the size of their populations, NPS is concerned about impacts to individuals and seeks to minimize collisions caused by motorized vehicles of all kinds. Because snowmobiles are responsible for all oversnow-wildlife collisions to date (Gunther, pers. com.), eliminating their use would decrease the potential for collisions to nearly zero. Conversely, alternatives that increase oversnow traffic in wildlife winter range (where the majority of collisions occur) would likely increase the frequency of road-killed wildlife (Gunther et al. 1998).

Human activities that result in displacement of animals from parts of their home range may be considered a form of habitat fragmentation. In particular, increased access into elk winter range as provided by plowed and groomed roads may reduce the overall scale and effectiveness of elk habitat, and lead to increased harassment and energetic stress (Picton 1999). In YNP, Hardy et al. (2001) documented that elk may have been displaced from suitable roadside habitat along the busiest winter road in the park (West Yellowstone to Old Faithful) in part due to high volumes of oversnow motorized vehicles. Therefore it may be concluded that the greater the number of oversnow vehicles in wildlife winter range, the higher the risk of harassment and displacement. Consequently, because the alternatives vary in the number of allowable oversnow motorized vehicles on various road segments, risks to wildlife would be expected to vary by road segment as well. Robinson and Gehman (2002) confirmed, using video documentation, that these responses occur, and also noted that negative interactions due to oversnow motorized use with bison in YNP resulted in disruption of feeding and individuals becoming agitated or alarmed. In addition, Jaffe et al. documented negative responses by wildlife due to oversnow vehicles.

For each road segment, risk was predicated on the perceived number of wildlife conflicts reported and the projected average daily number of oversnow vehicles. To assess this level of risk among the alternatives, road segments in YNP were categorized as being of "High," "Medium," and "Low" risk for wildlife conflicts based on the YNP employee survey described in Chapter III *Wildlife*. Identified conflicts were associated with oversnow motorized use and included animals being herded down

roadways, animals being prevented from crossing roads, and animals fleeing from oversnow motorized activities. For each road segment, risk was predicated on the perceived number of wildlife conflicts reported along each road segment and the projected average daily number of oversnow vehicles.

"High" risk segments were those that were reported by the majority of respondents to have daily occurrences of conflicts between wildlife and oversnow motorized vehicles. "Medium" risk segments were those that had weekly conflicts, and "Low" risk segments were those that had monthly conflicts. Because the survey results represent current condition, alternatives presented in the SEIS that modify use numbers alter the assessment of risks relative to the current condition (Table 74). For each alternative, the number of estimated oversnow vehicles on each road segment was compared to the number and risk rating under the current condition. Where numbers approximated the current condition, the associated risk did not change. Conversely, where numbers were lower or higher than the current condition, the potential risk associated with that segment changed accordingly.

Alternative 1a prohibits the use of snowmobiles. Therefore the overall number of oversnow vehicles in YNP would be greatly reduced. Consequently, along road segments where risk was rated as "High" or "Medium" under the current condition, risk would decline. This was true of the segments from the West Entrance to Old Faithful, Canyon Village to Fishing Bridge, and Fishing Bridge to the East Entrance. The remaining segments were all currently rated as "Low"; further reduction of numbers on these segments would not be expected to change the potential risk. To summarize, the risk assessment for 1a indicates that for road segments that currently have a high risk for wildlife-oversnow motorized use conflicts, risks greatly decrease due to the elimination of snowmobiles specifically, and the overall reduction in traffic volumes generally.

In YNP, both Hardy et al. (2001) and Aune (1981) concluded that bison and elk habituated to snowmobiles to some degree as exposure to traffic increased throughout the winter recreation season. However both of these studies and Bjornlie (2000) reported that when behavioral responses were elicited, they most often resulted in the bison fleeing, with snowmobiles frequently herding them down the packed trails. To provide an index of physiological stress, Hardy et al. (2001) measured fecal glucocorticoid (FGC) levels and found them to be higher in bison and elk during wheeled vehicle travel as opposed to snowmobiles or snowcoaches. FGC levels in elk increased as traffic entering the West Yellowstone gate exceeded 7,500 cumulative vehicles subsequent to the opening of the spring season. When comparing elk responses to various levels of oversnow traffic, FGC levels were found to be greater in elk that occurred near the busiest oversnow road in the park (West Yellowstone to Old Faithful) than other less frequented roads. While acknowledging that elk FGC levels could potentially increase depending upon winter visitation levels and management scenarios, and despite documented effects, Hardy et al. (2001) concluded that overall, elk and bison were co-existing with winter recreation without declines in population levels.

In contrast, Creel et al. (2001) found that FGC levels in YNP elk were higher in response to snowmobiles as opposed to wheeled vehicles, and that day-to-day variation in FGC levels paralleled variation in the number of oversnow vehicles (of which snowcoaches constituted 2% of the total number). Although the two studies are not directly comparable due to differences in methodology, the Creel et al. study demonstrates that oversnow traffic may indeed be affecting individual elk in YNP, depending perhaps upon other variables (e.g., the year the data were collected there was an unusually heavy snowpack). Nonetheless, Creel et al. found no evidence that current snowmobile levels were affecting elk populations as a whole.

Table 74. Relative risks associated with each road segment as based on a YNP employee survey related to wildlife and oversnow motorized use conflicts.

| Road Segments | Current Condition | | | Alternatives 1a and 1b | | | Alternative 2 | | | Alternative 3 | | | Alternative 4 (Preferred Alternative) | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Risk[†] | SC[‡] | SM[‡] | Risk | SC | SM | Risk | SC | SM | Risk | SC | SM | Risk | SC | SM |
| West Entrance to Madison | High | 9 | 554 | Low | 88 | 0 | High | 10 | 640 | Med | 33 | 352 | High | 10 | 589 |
| Madison to Old Faithful | High | 10 | 489 | Low | 80 | 0 | High | 10 | 571 | High | 33 | 574 | High | 10 | 586 |
| Old Faithful to West Thumb | High | 4 | 209 | Low | 34 | 0 | High | 4 | 240 | High | 5 | 241 | High | 4 | 246 |
| Fishing Bridge to East Entrance | High | 0 | 36 | Low | 5 | 0 | High | 0 | 210 | High | 0 | 111 | High | 0 | 211 |
| Canyon Village to Fishing Bridge | Med | 3 | 148 | Low | 24 | 0 | Med | 3 | 173 | Med | 3 | 174 | Med | 3 | 178 |
| Madison to Norris | Low | 5 | 247 | Low | 40 | 0 | Low | 5 | 289 | Low | 12 | 290 | Low | 5 | 296 |
| Mammoth to Norris | Low | 3 | 31 | Low | 8 | 0 | Med | 3 | 50 | Med | 3 | 111 | Med | 3 | 99 |
| West Thumb to Flagg | Low | 4 | 176 | Low | 29 | 0 | Med | 2 | 316 | Med | 5 | 426 | Med | 2 | 353 |
| Fishing Bridge to West Thumb | Low | 3 | 125 | Low | 20 | 0 | Low | 2 | 146 | Low | 3 | 147 | Low | 2 | 150 |
| Norris to Canyon | Low | 4 | 185 | Low | 30 | 0 | Low | 4 | 214 | Low | 4 | 215 | Low | 4 | 219 |

[†]"High" indicates daily occurrences of conflicts between wildlife and oversnow motorized traffic; "Medium" indicates weekly conflicts; and "Low" indicates monthly conflicts.

[‡]SC = Snowcoach; SM = Snowmobile.

THE EFFECTS OF IMPLEMENTING THE ALTERNATIVES ON WILDLIFE — ELK AND BISON

Alternative 1a reduces the potential effects on ungulates by eliminating snowmobile use. A minor risk of collision and short-term stress-induced movement would continue with the use of snowcoaches. However, compared to current levels of snowmobile use, traffic levels would be reduced by a factor of eight or more and NPS policy would require that snowcoach drivers be trained to recognize potential wildlife conflicts and instructed to stop only in areas where wildlife would be unaffected. In all parks, collisions would further be mitigated by the prohibition on oversnow motorized use from 9 P.M. to 8 A.M.

The effects analysis in the Final EIS under alternative G remains valid: given an analysis of the available data, the level of effects related to oversnow motorized use on ungulates range from none to negligible (collisions) to minor and short term (harassment and displacement).

**Effects of groomed roads and trails for motorized use.** Packed trails may influence wildlife movements and distributions by facilitating travel into areas that would normally be inaccessible due to deep snow. Under alternative 1a, YNP would groom a total of 184 miles for motorized use, and GTNP and the Parkway would groom about 23 miles for motorized use. Adaptive management would be employed in all alternatives to evaluate the effects of winter recreation on wildlife and to formulate management alternatives if necessary. Preliminary thresholds for adaptive management under alternative 1a are based on park policies, regulations and EOs that state a "no disturbance" or "no adverse effects" criteria when assessing the impacts of park actions on wildlife.

The primary concern under this impact topic is the effect of groomed routes on bison (and to a lesser degree, elk) in YNP. Specifically, two issues remain speculative: 1) does bison use of groomed routes affect their population dynamics and distribution, and 2) is the energy saved by walking on these packed surfaces greater than that expended during responses to traffic encountered along these routes. Pages 238-239 in the Final EIS contain a review of these issues. Since the publication of the Final EIS, ongoing monitoring of the bison population continues to support the contention that bison use of groomed routes is relatively minor compared to their use of established game trails and other off-road travel corridors (Reinertson et al. 2001). The degree to which this use influences the bison population is disputable and under study.

Taper, Meagher, and Jerde (2000) note that road use by bison is likely to be important during stress-induced exploratory dispersal. Without a prior destination, exploratory travel is likely to occur on the energy-efficient, plowed or snow-packed roads. Meagher, Taper, and Jerde (in press) have also reported that groomed routes may have facilitated bison range expansion in YNP. If presented with a choice, bison will generally move preferentially to maintain a higher level of social aggregation (Meagher, Taper, and Jerde, in press). Over time, more bison have exited the park in an apparent effort to maintain social relationships. In doing so, bison have come into conflict with different land-use objectives outside the park, and some have been removed from the population under state legal authority (Meagher, Taper, and Jerde, in press). It remains unknown, however, to what extent groomed oversnow routes have facilitated this expansion.

Bjornlie and Garrott (2001) monitored bison over two winter and spring seasons and found that most bison winter travel occurred off roads, preferring to travel instead using geothermal features, social trails, and river and stream banks. In addition, bison use of roads was negatively correlated with grooming, with peak use occurring in April when roads were not being groomed, and lowest use when roads were groomed. They conclude that "grooming roads during winter does not have a major influence on bison ecology" (Bjornlie and Garrott 2001).

## Conclusion

Conclusions described in the Final EIS on page 422 remain valid. The potential for adverse impacts to elk and bison from oversnow motorized use under alternative 1a range from none to minor, and all would be considered short term. Specifically, there would be an expected reduction or elimination of road-killed large mammals due to the elimination of snowmobiles in the parks. In addition, the

replacement of individual snowmobiles with mass transit snowcoaches would serve to decrease potential risks associated with disturbance along particular road segments by greatly reducing traffic volume. Adaptive management would be employed to make adjustments in management if and when impacts to wildlife are determined. In summary, although impacts from winter recreation on individual animals would continue to occur and are adverse, most likely they would not result in long-term effects to the bison and elk population in the parks. Impacts to wildlife associated with alternative 1a would not be of sufficient magnitude to constitute impairment of park resources or values.

### Summary of Effects on Elk and Bison

Effects of motorized oversnow use of groomed and ungroomed roads and trails on:

- Mortality caused by collisions — adverse, none to negligible and short term
- Harassment and displacement from preferred habitats — adverse, negligible to minor and short term
- FGC levels — unknown to what extent stress may be affecting populations in the long term
- Effects of groomed roads and trails on animal movements — unknown if and to what extent beneficial effects outweigh negative effects
- Animal movements — potentially important during stress-induced exploratory dispersal; potentially facilitating range use/preference; however, unknown if and to what extent beneficial effects outweigh negative effects under normal conditions

## Effects of Implementing Alternative 1b on Wildlife

All effects described under alternative 1a remain unchanged. The principle difference between alternatives 1a and 1b is that under alternative 1b, implementation would be delayed one year. Consequently, snowmobiles would be phased out by 50% beginning 2004-2005, and beginning 2005-2006 access would be limited to snowcoaches only.

## The Effects of Implementing Alternative 2 on Wildlife

### Ungulates (Elk and Bison)

**Effects of motorized oversnow use.** The use of motorized oversnow vehicles can cause injury and death for wildlife, habitat displacement, behavioral changes and physiological stress responses. Under alternative 2, these effects are associated with about 184 miles of groomed road surface in YNP and about 35 miles of groomed surface for motorized use in GTNP and the Parkway, including Grassy Lake Road, and the CDST. In YNP, the speed limit would be lowered to 35 mph from the West Entrance to Madison and Old Faithful and oversnow travel would be prohibited from 8 P.M. to 7:30 A.M. Snowcoaches would be permitted in the park beginning mid-November; access to snowmobiles would occur from mid-December to mid-March dependent upon adequate snow conditions (see Chapter II *Actions for Yellowstone National Park*).

Because the use of snowmobiles would be allowed in the parks under alternative 2, overall associated effects would increase relative to alternatives 1a and 1b. To assess the potential level of risk along each road segment by alternative, road segments in YNP were categorized as being of "High," "Medium," and "Low" risk for wildlife conflicts based on the YNP employee survey described in Chapter III and described above under the wildlife analysis in alternative 1a. Identified conflicts were associated with oversnow motorized use and included animals being herded down roadways, animals being prevented from crossing roads, and animals fleeing from oversnow motorized activities. For each road segment, risk was predicated on the perceived number of wildlife conflicts reported along each road segment and the projected average daily number of oversnow vehicles. Robinson and Gehman (2002) confirmed, using video documentation, that these responses occur, and also noted that

negative interactions due to oversnow motorized use with bison in YNP resulted in disruption of feeding and individuals becoming agitated or alarmed. In addition, Jaffe et al. documented negative responses by wildlife due to oversnow vehicles.

For each road segment, risk was predicated on the perceived number of wildlife conflicts and the projected average daily number of oversnow vehicles. Relative to the current condition and alternatives 1a and 1b, risks to wildlife from oversnow motorized use in alternative 2 increase along most road segment due to the increase in traffic volumes (Table 74). Four of the ten segments were rated as "High" indicating that conflicts among wildlife and oversnow vehicles would be expected to occur daily. Three segments were rated as "Medium." On one of these segments, traffic volumes would increase over the current condition. "Medium" risk indicates that conflicts would be expected to occur weekly on these segments. The remaining three segments were rated as "low," with similar traffic volumes to the current condition.

Several alternative actions and implementation features of this alternative serve to mitigate the increase in traffic volume on wildlife. Specifically, lower speed limits are proposed from the West Entrance to Madison and Old Faithful, late night travel is prohibited, and increased visitor education and ranger patrols would occur. In addition, when snow depth warrants and at periodic intervals, routine plowing operations would include laying back roadside snowbanks that could be a barrier to wildlife exiting the road corridor (an action common to all alternatives).

Alternative 2 stipulates that years 2 and 3 of the daily entry limits at the West Entrance would not take effect unless a commensurate number of seats are available on new generation snowcoaches. This means that unless 225 seats on new generation snowcoaches are available in 2005-2006, then year 3 of the daily entry limits at the West Entrance would not be implemented, and 825 snowmobiles per day would be permitted to enter Yellowstone through the West Entrance indefinitely until the new generation snowcoach is implemented. This would increase the total number of snowmobiles in the parks by nearly 25%, and consequently, increase the impacts to wildlife. Although the modeling done for this alternative assumes that the entry limits will be fully implemented, it is possible that the new generation snowcoach will not be available by 2004-2005. Therefore, this analysis could significantly underestimate the impacts to wildlife for alternative 2.

**Effects of groomed roads and trails for motorized use.** Packed trails may influence wildlife movements and distributions by facilitating travel into areas that would normally be inaccessible due to deep snow. Under alternative 2, YNP would groom 184 miles of motorized routes and GTNP and the Parkway would groom 35 miles of motorized routes, including the Grassy Lake Road and the CDST. Adaptive management would be employed in all alternatives to evaluate the effects of winter recreation on wildlife and to formulate management alternatives if necessary. Preliminary thresholds for adaptive management under alternative 2 are based on a determination of significant adverse effects that are considered "greater than negligible" as determined by NPS biologists.

The effects of groomed routes would increase slightly from alternative 1a due to the addition of the CDST. However because the CDST does not pass through elk or bison winter range, effects related to these particular species would not change. As stated in alternative 1a, groomed routes may be important in stress-induced exploratory dispersal and range use/preference that has resulted in bison seeking habitat outside of the park boundaries; however whether or not this confers adverse impacts upon ungulate distributions and population dynamics is speculative and remains under investigation.

## Conclusion

Overall for alternative 2, effects increase relative to alternatives 1a and 1b because snowmobiles are allowed in the parks on all existing motorized routes except the Teton Park Road. Specifically, road kill mortality caused by oversnow vehicles would be greater (the occurrence is historically limited to snowmobiles only), risks associated with harassment and displacement would increase, and physiological stress responses would rise due to higher traffic volumes. Although winter recreation

within the park has not clearly demonstrated any long-term adverse consequences to populations, park policies, regulations, and EOs clearly state that disturbance to wildlife, regardless of population-level effects, is unacceptable in the national parks. Under alternative 2, potential impacts to wildlife would be mitigated by lowering the speed limit to 35 mph from the West Entrance to Madison to Old Faithful, increasing ranger patrols, prohibiting nighttime travel, and offering education programs on winter use to all users. Under alternative 2, if a new generation snowcoach is not available with at least 225 seats by 2005-2006, then the full implementation of the daily entry limits would not occur, resulting in greater impacts to wildlife. Relative to alternatives 3 and 4, effects increase because of a lack of any requirement in alternative 2 for guides. Thus, impacts to wildlife from snowmobiles would continue to occur. Therefore, impacts to wildlife associated with alternative 2 would constitute an impairment of park resources or values in YNP because there would not be sufficient mitigation (such as a requirement for guides and to travel in groups) to ensure that oversnow motorized vehicles do not impair wildlife.

### Summary of Effects on Elk and Bison

Effects of motorized oversnow use on:

- Mortality caused by collisions — adverse, negligible, and short term
- Harassment and displacement from preferred habitats — adverse, moderate, and short term
- FGC levels — unknown to what extent stress may be affecting populations in the long-term; Effects are greater than alternative 1a due to the addition of snowmobiles
- Effects of groomed roads and trails on animal movements — unknown if and to what extent beneficial effects outweigh negative effects
- Animal movements — potentially important during stress-induced exploratory dispersal; potentially facilitating range use/preference; however, unknown if and to what extent beneficial effects outweigh negative effects under normal conditions

## The Effects of Implementing Alternative 3 on Wildlife

### Ungulates (Elk and Bison)

**Effects of motorized oversnow use.** The use of motorized oversnow vehicles can cause injury and death for wildlife, habitat displacement, behavioral changes and physiological stress responses. Under alternative 3, these effects are associated with about 184 miles of groomed road surface in YNP and about 35 miles of groomed surfaces for motorized use in GTNP and the Parkway. Snowmobile access would only be permitted when accompanied by an NPS permitted guide. The winter use season would run from late November to mid-March, with early season travel limited to snowcoaches until sufficient snow has accumulated, and late season travel (following Presidents' Day weekend) limited to snowcoaches and nonmotorized travel only. Oversnow travel would be prohibited from 8 P.M. to 7:30 A.M., and in GTNP snowmobile use would not occur on the Teton Park road and the frozen surface of Jackson Lake.

Because the use of snowmobiles would be allowed in the parks under alternative 3, overall associated effects would be increased relative to alternatives 1a and 1b. To assess the potential level of risk among the road segments by alternative, road segments in YNP were categorized as being of "High," "Medium" and "Low" risk for wildlife conflicts based on the YNP employee survey described in Chapter III (Table 74) and described under the wildlife analysis in alternative 1a of this section. Identified conflicts were associated with oversnow motorized use and included animals being herded down roadways, animals being prevented from crossing roads, and animals fleeing from oversnow motorized activities. For each road segment, risk was predicated on the perceived number of wildlife conflicts reported along each road segment and the projected average daily number of oversnow

vehicles. Robinson and Gehman (2002) confirmed, using video documentation, that these responses occur, and also noted that negative interactions due to oversnow motorized use with bison in YNP resulted in disruption of feeding and individuals becoming agitated or alarmed. In addition, Jaffe et al. documented negative responses by wildlife due to oversnow vehicles.

For each road segment, risk was predicated on the perceived number of wildlife conflicts and the projected average daily number of oversnow vehicles. Relative to the four road segments currently rated as "High," all but one segment would remain "High" under alternative 3. "High" indicates that conflicts among wildlife and oversnow vehicles would be expected to continue to occur daily without mitigation. The exception is the segment from the West Entrance to Madison where the average number of vehicles would be reduced by 178 under this alternative. However the reduction in vehicles, and hence risk, along this segment may be made up for on other segments where the number of expected vehicles would rise due to redistributed use throughout the park. For example, risks increase from "Low" to "Medium" from Mammoth to Norris and West Thumb to Flagg as a result of increased traffic volume. For the remaining three segments currently rated as "Low," risk would remain "Low" in alternative 3 because traffic volumes would not be expected to significantly change.

Effects related to increased traffic volumes including disturbance and harassment would be mitigated by the stipulation that permitted guides accompany all snowmobilers in YNP. The use of guides would serve to minimize impacts by controlling where and when stops are made, and would prevent snowmobiles from becoming dispersed along the roadway. In addition, when snow depth warrants and at periodic intervals, routine plowing operations would include laying back roadside snowbanks that could be a barrier to wildlife exiting the road corridor (an action common to all alternatives).

**Effects of groomed roads and trails for motorized use.** Packed trails may influence wildlife movements and distributions by facilitating travel into areas that would normally be inaccessible due to deep snow. Under alternative 3, YNP would groom all existing routes (184 miles). GTNP and the Parkway would groom 35 miles of motorized routes, including the Grassy Lake Road and the CDST. Adaptive management would be employed in all alternatives to evaluate the effects of winter recreation on wildlife and to formulate management alternatives if necessary. Preliminary thresholds for adaptive management under alternative 3 are based on a determination of adverse effects that are considered "greater than negligible" as determined by NPS biologists.

Similar to alternative 2, the effects of groomed routes would increase slightly from alternatives 1a and 1b due to the addition of the CDST. However because the CDST does not pass through elk or bison winter range, effects related to these particular species would not change. As stated in alternative 1a, whether or not groomed routes confer adverse impacts upon ungulate distributions and population dynamics is speculative and remains under investigation. Groomed routes may be important in stress-induced exploratory dispersal and range use/preference that has resulted in bison seeking habitat outside of the park boundaries; however, whether this confers adverse impacts upon ungulate distributions and population dynamics is speculative and remains under investigation.

## Conclusion

Overall for alternative 3, effects increase relative to alternatives 1a and 1b because snowmobiles are allowed in the parks on all major existing motorized routes except the Teton Park Road and Jackson Lake. Specifically, road kill mortality caused by oversnow vehicles would be greater (the occurrence is historically related to snowmobile use only), risks associated with harassment and displacement would increase, and physiological stress responses would rise due to higher traffic volumes. Although winter recreation within the park has not clearly demonstrated any long-term adverse consequences to populations, park policies, regulations, and EOs clearly state that disturbance to wildlife, regardless of population-level effects, is unacceptable in the national parks. Under alternative 3, potential impacts to wildlife would be mitigated by permitting snowmobile access only when accompanied by an NPS permitted guide and prohibiting nighttime oversnow travel. These features, along with fewer snowmobiles, decrease effects relative to alternative 2. Because of these mitigation actions, impacts to

wildlife associated with alternative 3 would not be of sufficient magnitude to constitute impairment of park resources or values.

### Summary of Effects on Elk and Bison

Effects of motorized oversnow use on:

- Mortality caused by collisions – adverse, negligible, and short term
- Harassment and displacement from preferred habitats – adverse, moderate, short term
- FGC levels – unknown to what extent stress may be affecting populations in the long-term; Greater than alternative 1a
- Effects of groomed roads and trails on animal movements — unknown if and to what extent beneficial effects outweigh negative effects
- Animal movements — potentially important during stress-induced exploratory dispersal; potentially facilitating range use/preference; however unknown if and to what extent beneficial effects outweigh negative effects under normal conditions

## The Effects of Implementing Alternative 4 on Wildlife

**Effects of motorized oversnow use.** The use of motorized oversnow vehicles can cause injury and death for wildlife, habitat displacement, behavioral changes and physiological stress responses. Under the preferred alternative, these effects are associated with about 184 miles of groomed road surface in YNP and about 35 miles of groomed surfaces for motorized use in GTNP and the Parkway. Snowmobile access would only be permitted when accompanied by an NPS permitted guide. Eighty percent of the guides would be commercial, and 20% would be non-commercial guides. In order to be certified as a non-commercial guide, a person would have to complete a training course covering park rules, safety, and appropriate ways to avoid negative encounters with wildlife. The winter use season would run from late November to mid-March, with early season travel limited to rubber track vehicles only until sufficient snow has accumulated. Oversnow travel would be prohibited from 8 P.M. to 7:00 A.M., and in GTNP snowmobile use would not occur on the Teton Park road and the frozen surface of Jackson Lake.

Because the use of snowmobiles would be allowed in the parks under the preferred alternative, overall associated effects would be increased relative to alternatives 1a and 1b. To assess the potential level of risk among the road segments by alternative, road segments in YNP were categorized as being of "High," "Medium" and "Low" risk for wildlife conflicts based on the YNP employee survey described in Chapter III (Table 74) and described under the wildlife analysis in alternative 1a of this section. Identified conflicts were associated with oversnow motorized use and included animals being herded down roadways, animals being prevented from crossing roads, and animals fleeing from oversnow motorized activities. Robinson and Gehman (2002) confirmed, using video documentation, that these responses occur, and also noted that negative interactions due to oversnow motorized use with bison in YNP resulted in disruption of feeding and individuals becoming agitated or alarmed. In addition, Jaffe et al. documented negative responses by wildlife due to oversnow vehicles.

For each road segment, risk was predicated on the perceived number of wildlife conflicts reported along each road segment and the projected average daily number of oversnow vehicles. Relative to the four road segments currently rated as "High," all would remain "High" under the preferred alternative. "High" indicates that conflicts among wildlife and oversnow vehicles would be expected to occur daily without mitigation. Risks increase from "Low" to "Medium" from Mammoth to Norris and West Thumb to Flagg as a result of increased traffic volume. For the remaining three segments currently rated as "Low," risk would remain "Low" in the preferred alternative because traffic volumes would not be expected to significantly change.

THE EFFECTS OF IMPLEMENTING THE ALTERNATIVES ON WILDLIFE — ELK AND BISON

Effects related to traffic volumes including disturbance and harassment would be mitigated by the stipulation that permitted guides accompany all snowmobilers in YNP. The use of guides would serve to minimize impacts by controlling where and when stops are made, and would prevent snowmobiles from becoming dispersed along the roadway. In addition, when snow depth warrants and at periodic intervals, routine plowing operations would include laying back roadside snowbanks that could be a barrier to wildlife exiting the road corridor (an action common to all alternatives).

**Effects of groomed roads and trails for motorized use.** Packed trails may influence wildlife movements and distributions by facilitating travel into areas that would normally be inaccessible due to deep snow. Under the preferred alternative, YNP would groom all existing routes (184 miles). GTNP and the Parkway would groom 35 miles of motorized routes, including the Grassy Lake Road and the CDST. Adaptive management would be employed in all alternatives to evaluate the effects of winter recreation on wildlife and to formulate management alternatives if necessary. Preliminary thresholds for adaptive management under the preferred alternative are based on a determination of adverse effects that are considered "greater than negligible" as determined by NPS biologists.

Similar to alternative 3, the effects of groomed routes would increase slightly from alternatives 1a and 1b due to the addition of the CDST. However because the CDST does not pass through elk or bison winter range, effects related to these species would not change. As stated in alternative 1a, groomed routes may be important in stress-induced exploratory dispersal and range use/preference that has resulted in bison seeking habitat outside of the park boundaries; however, whether this confers adverse impacts upon ungulate distributions and population dynamics is speculative and remains under investigation.

### Conclusion

Overall for alternative 4, effects increase relative to alternatives 1a and 1b because snowmobiles are allowed in the parks on all major existing motorized routes except the Teton Park Road and Jackson Lake. Specifically, road kill mortality caused by oversnow vehicles would be greater (the occurrence is historically related to snowmobile use only), risks associated with harassment and displacement would increase, and physiological stress responses would rise due to higher traffic volumes. Although winter recreation within the park has not clearly demonstrated any long-term adverse consequences to populations, park policies, regulations, and EOs clearly state that disturbance to wildlife, regardless of population-level effects, is unacceptable in the national parks. Under the preferred alternative, alternative 4, potential impacts to wildlife would be mitigated by permitting snowmobile access only when accompanied by an NPS permitted guide, travel in groups, and prohibiting nighttime oversnow travel. These features decrease effects relative to alternative 2. Because of these mitigation actions, impacts to wildlife associated with alternative 4 would not be of sufficient magnitude to constitute impairment of park resources or values.

### Summary of Effects on Elk and Bison

Effects of motorized oversnow use of groomed and ungroomed roads and trails on:

- Mortality caused by collisions - adverse, negligible, and short term
- Harassment and displacement from preferred habitats - adverse, moderate, and short term
- FGC levels - unknown to what extent stress may be affecting populations in the long-term; Greater than alternative 1a
- Effects of groomed roads and trails on animal movements - unknown if and to what extent beneficial effects outweigh negative effects
- Animal movements - potentially important during stress-induced exploratory dispersal; potentially facilitating range use/preference; however unknown if and to what extent beneficial effects outweigh negative effects under normal conditions

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| GREATER YELLOWSTONE COALITION, et al., | ) ) ) | |
| Plaintiffs, | ) | |
| | ) | Case No. 07-cv-2111 (EGS) |
| v. | ) ) | [Hearing on Motions for Summary |
| DIRK KEMPTHORNE, et al., | ) | Judgment on August 27, 2008] |
| | ) | |
| Defendants. | ) | |

| | | |
|---|---|---|
| NATIONAL PARKS CONSERVATION ASSOCIATION, | ) ) ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 07-cv-2112 (EGS) |
| v. | ) ) | [Hearing on Motions for Summary |
| UNITED STATES DEPARTMENT OF THE INTERIOR; NATIONAL PARK SERVICE, | ) ) | Judgment on August 27, 2008] |
| | ) | |
| Defendants. | ) | |

**PLAINTIFF NATIONAL PARK CONSERVATION ASSOCIATION'S STATEMENT OF MATERIAL FACTS AS TO WHICH THERE IS NO GENUINE ISSUE**

Pursuant to Local Rules 7.1(h) and 56.1, Plaintiff National Parks Conservation Association ("NPCA") hereby submits the following statement of material facts as to which there is no genuine issue.

1. NPCA adopts by reference the procedural history of this dispute set forth in *Fund for Animals v. Norton*, 294 F. Supp. 2d 92, 98-102 (D.D.C. 2003).

2. In 2000, the National Park Service ("NPS") issued an Environmental Impact Statement ("2000 EIS") and a Record of Decision ("2000 ROD") concluding that snowmobile

-1-

use in Yellowstone National Park and the other parks at issue here should be phased out by the winter of 2003-2004 and that an NPS-managed mass-transit snowcoach system would be used to provide visitor access. The NPS found that the historical level of 795 snowmobiles per day in Yellowstone constituted an impairment of resources and values. On January 22, 2001, the NPS published a rule ("2001 Rule") implementing the conclusion of the 2000 EIS and ROD. Special Regulations, Areas of the National Park System, 66 FED. REG. 7260 (Jan. 22, 2001).

3.      After President George W. Bush took office, the 2001 Rule was stayed. In 2003, the NPS issued a supplemental environmental impact statement and a new rule ("2003 Rule") that permitted up to 950 snowmobiles per day in Yellowstone, subject to requirements that these snowmobiles use "best available technology" ("BAT") and that all snowmobilers be accompanied by a commercial guide. *See* Special Regulations, Areas of the National Park System, 68 FED. REG. 69268 (Dec. 11, 2003).

4.      In December 2003, this Court vacated the 2003 Rule because the NPS had failed to provide a reasoned analysis that explained the sudden reversal of the 2001 Rule. *See* 294 F. Supp. 2d at 108. The Court found that the 2003 Rule was inconsistent with the NPS's statutory mandate, the NPS's own interpretation of that mandate in its 2001 Management Policies, and other requirements. *Id*. at 105-06. The Court held that the NPS's statutory mandate – as the NPS acknowledged in its own Management Policies – required the NPS (1) to place conservation of park resources before public enjoyment, and (2) to "always seek to avoid, or minimize to the greatest degree practicable, adverse impacts on park resources and values." *Id* at 103, 105-06. The Court remanded the 2003 Rule for further proceedings consistent with the Court's opinion. *Id*. at 115-17. The Court observed that there was evidence in the record indicating that the

sudden departure from the 2001 Rule "was completely politically driven and result oriented." *Id.* n.11.

5.    Less than two months later, the U.S. District Court for the District of Wyoming issued a preliminary injunction against the 2001 Rule and required the NPS to promulgate temporary rules for the 2004 snowmobile season. *Int'l Snowmobile Mfrs. Ass'n v. Norton*, 304 F. Supp. 2d 1278, 1294 (D. Wyo. 2004).  The Wyoming Court subsequently vacated and remanded the 2001 Rule, the 2000 ROD, and the 2000 EIS. *Int'l Snowmobile Mfs. Ass'n v. Norton*, 340 F. Supp. 2d 1249, 1266 (D. Wyo. 2004).

6.    The Government then filed a motion with this Court seeking relief from the application of the part of this Court's 2003 Order requiring reinstatement of the 2001 Rule. *See Fund for Animals v. Norton*, 323 F. Supp. 2d 7, 10 n.3 (D.D.C. 2004).  Although the Court relieved the Government from its obligation to reinstate the 2001 Rule, the Court affirmed that the NPS was still obligated to promulgate a new rule for the 2004-2005 season that was consistent with the Court's December 16, 2003 Opinion. *Id.* at 10 ("lest there be any doubt by anyone, the Court sharply emphasizes that the remainder of the Court's December 16, 2003, Opinion and Order remains in full force and effect; Federal Defendants still have an obligation to conduct the new rule-making process in a manner consistent with, and addressing the concerns delineated in, the Court's December 2003 Opinion and Order").

7.    The NPS adopted a temporary rule applicable for three winter seasons ("2004 Rule") that permitted 720 snowmobiles per day in Yellowstone, required all snowmobile users to be accompanied by a commercial guide and required recreational snowmobiles to integrate "best available technology."  Special Regulations, Areas of the National Park System, 69 FED. REG. 65348 (Nov. 10, 2004).

8.    During the period in which the 2004 Rule was in effect, the actual number of snowmobiles entering Yellowstone was greatly reduced from historic levels for various reasons. Under historic conditions, an average of 795 snowmobiles per day and 15 snowcoaches had entered Yellowstone. AR 126499 (2007 ROD), at 30-31. While the 2004 Rule permitted 720 snowmobiles per day, the average daily number of snowmobiles in that park during the winter 2005-06 was only 260. AR 117160 (2007 FEIS), at 76. In addition, there were an average of 29 snowcoaches per day in that park. *Id.* During the winter of 2006-2007, the average increased somewhat to 290 snowmobiles per day. AR 126499 (2007 ROD), at 20.

9.    High-ranking members of the Bush administration expressed their support for snowmobile usage at Yellowstone. *See* Plaintiff National Parks Conservation Association's Opposition to the Government's Motion to Transfer [28], at 5-9 and Jewett and Rosenbaum Declarations and exhibits there cited, all of which are incorporated by reference herein.

a.    In late 2004, Vice President Cheney explained his view on the Yellowstone snowmobile dispute, as follows:

> Right now, the battle in Wyoming is over snowmobiles in Yellowstone. And those of us who live in Wyoming … for years, we've used snowmobiles in Yellowstone …. But there has been a battle raging now for several years, and the Clinton administration tried basically to shut down all snowmobiles in Yellowstone National Park. That doesn't make any sense at all. Reasonable regulations and requirements and so forth, be sensitive to other uses — so there is this battle, that the only way I know about it is to go into the normal process, the political process, participate and get actively involved, work with your members of Congress, work with the administration.

Press Release, White House, *Vice President and Mrs. Cheney Remarks and Q&A at a Town Hall Meeting in Duluth, Minnesota*, Sept. 29, 2004, at 9 (Jewett Decl., Ex. N).

-4-

b.      Gale A. Norton, Secretary of the Interior until 2006, also supported

recreational snowmobiling in Yellowstone. For example, in February 2005, Secretary Norton

showed her support for snowmobiling in Yellowstone by making a well-publicized snowmobile

trip through the park. *See* Felicity Barringer, *A 3-Day Yellowstone Tour in Support of*

*Snowmobiling*, NY TIMES, Feb. 17, 2005, at 1 (Jewett Decl., Ex. O).

10.     Paul Hoffman, Deputy Assistant Secretary of the Interior for Fish and Wildlife

and Parks and an aide to Vice President Cheney when he was a member of Congress, began an

effort to radically change the NPS's 2001 Management Policies so as to elevate recreation to an

equal level with preservation in the NPS's mission statement.

a.      On October 19, 2005, the NPS published proposed amendments to the

2001 NPS Management Policies that sought to give the NPS greatly enhanced discretionary

authority to balance the claimed "dual" purposes of the National Park System, enjoyment and

preservation. *See* AR 120651-52, Notice of Availability of Draft National Park Service

Management Policies,70 FED. REG. 60852 (Oct. 19, 2005). For example, the proposed

amendments would have deleted the statement in Section 1.4.3, to which this Court referred in

its 2003 decision (*see* 294 F. Supp. 2d at 103, 105), that the fundamental purpose of the National

Park System "begins with a mandate to conserve park resources and values." *See* accompanying

Appendix, Tab 1, at 16-17 (NPS version showing proposed amendments). The amendments

would also have deleted the sentence, quoted there by this Court, stating that this mandate is

independent of the separate prohibition on impairment, and so "applies all the time, with respect

to all park resources and values, even when there is no risk that any park resources or values

may be impaired." *Id.* The only limiting factor on permissible uses under the proposed

amended Policies would be "impairment," which would have been redefined in a manner more difficult to establish. *Id.,* at 19-20.

         b.     Tens of thousands of comments objected to the proposed amendments. Critics pointed out — as this Court had found, 294 F. Supp. 2d at 105 — that the federal courts had interpreted the NPS Organic Act as providing an overarching and dominant purpose of the National Park System of preserving, conserving and protecting its resources and values. *See, e.g.,* November 30, 2005 letter from The Coalition of National Park Service Retirees, at Appendix, Tab 2.

       11.     On June 19, 2006, the Secretary of the Interior announced that the NPS was abandoning its proposed radical revision of its mission and of the purpose of the National Park System.

         a.     When the 2006 Management Policies were finalized in August 2006, they retained the critical language on which this Court relied in its 2003 decision. *See* AR 120645, at 11 (2006 Management Policies § 1.4.3). Also retained was the statement that "NPS managers must also seek ways to avoid, or to minimize to the greatest extent practicable, adverse impacts on park resources and values." *Id.* The revised Policies affirm that:

> Congress, recognizing that the enjoyment by future generations of the national parks can be ensured only if the superb quality of park resources and values is left unimpaired, has provided that <u>when there is a conflict between conserving resources and values and providing for enjoyment of them, conservation is to be predominant.</u>

*Id.* (emphasis added).

         b.     The Deputy Director of the NPS, Stephen P. Martin, was called to testify about this issue before the Subcommittee on National Parks of the Senate Committee on Energy and Natural Resources on June 20, 2006. Mr. Martin stated that he "would like to unequivocally

-6-

confirm to the American people that the fundamental purpose and mission of the National Park

Service as stated in the 1916 Organic Act will be upheld …." *See* Appendix, Tab 3, at 5.  In his

prepared statement on behalf of the Department of the Interior and the NPS, Mr. Martin

confirmed that the NPS's "mission to protect parks was of paramount importance" and that the

revised 2006 Management Policies "assure that conservation will be predominant when there is

a conflict between protection of resources and their use." *Id*. at 6.  Mr. Martin also stated that

"the revised draft policies further recognize the importance of clean air and water as well as

soundscapes and lightscapes.  These resources help make each park unique and special in

today's more crowded world." *Id*. at 7.

   c. That same day, one of Yellowstone's experts described the new Policies

as "a pretty significant reversal of the changes Paul Hoffman suggested awhile back.  The

Soundscapes section, for example, is no longer gutted …." AR 124170.

  12. Nevertheless, in an email of February 21, 2007, soundscape experts within the

NPS stated that they had "recommendations that would have improved the analysis with a better

and more comprehensive toolbox aimed at better protecting park resources, values and visitor

use.  <u>Given the political reality</u>, however, we will not be spending much time on this …." AR

116985 (emphasis added).

  13. In March 2007, the NPS issued for public comment a draft environmental impact

statement (the "DEIS") relating to a permanent winter use plan for the Parks. AR 117061.

   a. The DEIS described a number of studies that the NPS had conducted

since adopting the 2004 Rule including modeling reports relating to snowmobile and snowcoach

emissions and relating to sound impacts, monitoring reports of natural soundscape impacts,

studies of winter air quality, a study on the behavioral responses of wildlife to snowmobiles and

snowcoaches, a review of implications for winter use of bison movements and distribution and other studies. *Id.*, at 6 (listing studies).

        b.     The DEIS also evaluated six alternative approaches to allowing oversnow vehicles in Yellowstone and the other Parks. *Id.*, at 36-56. The NPS identified as its preferred alternative one under which 720 snowmobiles per day and 78 snowcoaches would be allowed in Yellowstone. *Id.*, at 36-37.

     14.    The NPS received more than 122,000 comments on the DEIS. More than 89,000 of these comments — in excess of 70% — urged the NPS to eliminate recreational snowmobiling in Yellowstone. AR 12130, at 4. More than 115,000 of the comments stated that snowmobiles in the parks destroy Yellowstone's natural winter soundscape. *Id.*, at 10. And, more than 96,000 of the comments stated that snowmobiles have a negative impact on air quality. *Id.*, at 9.

        a.     Eleven former Directors of the NPS — <u>all</u> of the living former Directors except the person who had retired in 2006 — wrote to "express [their] alarm over a proposal in Yellowstone National Park that would radically contravene both the spirit and letter of the 2006 Management Policies." AR 120940. They continued, "in each of four separate studies since 1998, costing a cumulative $10 million, the National Park Service has verified conclusively that greater volumes of traffic required by an emphasis upon snowmobiling add dramatically to air and noise pollution and disturbance of Yellowstone's wildlife." AR 120941.

        b.     The U.S. Environmental Protection Agency ("EPA") also commented in opposition to the proposal. The EPA stated that the NPS's preferred alternative produces "significantly increased air quality impacts ... compared to current conditions." AR 116355, at 5. In addition, the EPA objected that the NPS's preferred alternative "would significantly

exceed the previously established threshold for soundscape protection and exceed the threshold for air quality." *Id.*, at 2.

15.    In September 2007, the NPS issued a Final Environmental Impact Statement (the "FEIS") indicating that, rather than permitting 720 snowmobiles and 78 snowcoaches per day in Yellowstone, the NPS now preferred a revised alternative permitting 540 snowmobiles and 83 snowcoaches per day there, with commercial guiding and snowmobile BAT required. AR 117160, at 60-61.

    a.    The FEIS acknowledged that eliminating snowmobile use was the "environmentally preferred alternative" which best "promotes the national environmental policy as expressed by ... the National Environmental Policy Act." *Id.*, at 65. The NPS acknowledged that eliminating snowmobiles would provide a "clear benefit to the natural environment, relative to all other alternatives" and would "best preserve[] the unique historic, cultural, and natural resources in the parks." *Id.,* at 65, 66.

    b.    The NPS recognized that allowing 540 snowmobiles per day at Yellowstone would "increase[] impacts to air quality, natural soundscapes, and wildlife as compared to [the no-snowmobile alternative]." *Id.*, at 67.

    c.    Nevertheless, the NPS chose the 540 snowmobile alternative because it "achieves a balance of resources use and <u>sharing life's amenities</u>." *Id.* (emphasis added).

16.    With respect to impact of snowmobile use on soundscapes, the FEIS essentially relies on a hypothetical model – referred to as the "Volpe" study – that was performed by the Department of Transportation under contract to the NPS. *See id.* at 304, Table 4-48, n.5.

a.      The Volpe modeling study is primarily designed to show the <u>total park</u>

<u>area</u> in which oversnow vehicles would be audible under various alternatives.  *See* AR 125352 at

xxviii.

(1)      Under this study, an impact would be considered "minor,"

regardless of how loud it is, if it would be audible in 10% or less of the total park area.

AR 117160 (FEIS), at 304.  An impact would be considered "moderate" if the sound is audible

over between 10 and 20% of the total park area.  *Id.*  To be considered a "major" impact, a sound

would have to be audible over more than 20% of the total park area.  *Id.*

(2)      Based on the Volpe study, the FEIS concludes that the adverse

impact of the Winter Use Plan on natural soundscapes would only be "moderate" and short-term

and would be "acceptable."  *Id.*, at 342, 374.  The FEIS reaches essentially the <u>same</u> result

concerning the impact on natural soundscapes <u>across all alternatives considered</u>, except that

permitting snowcoaches only.  *See id.*, at S-13.

(3)      However, as one of the NPS's own expert on natural sounds, Kurt

Fristrup, pointed out in his comments on a July 2007 draft of the FEIS:

> The percent of the park in which OSV sounds are audible seems to
> miss an important point.  This metric relates to visitor experience,
> not resource protection.  Accordingly, <u>it is not the entire area of the</u>
> <u>park that is relevant, but the area of the park weighted by the</u>
> <u>amount of visitor use.</u>  As mentioned elsewhere in the document,
> most nonmotorized visitor use takes place near the proposed OSV
> travel corridors.  <u>Using the entire park area as the denominator in</u>
> <u>this indicator causes a substantial underestimation of the impact</u>
> <u>within visitor use zones.</u>

AR 125262, at 4 (emphasis added).

b.      By relying on the Volpe modeling study, the FEIS virtually ignores the

NPS's own monitoring data.  Shan Burson, of the Division of Science and Resource

-10-

Management at Grand Teton National Park, conducted a monitoring study of sites along travel corridors in the park during each of the winters from 2002-2003 through 2006-2007 that measured the percentage of time during daylight hours during which a noise may be heard and the maximum sound level of the noise. The monitoring sites that were selected were along travel corridors and at developed areas such as near Old Faithful Geyser, one of the most popular sites in Yellowstone. *See* AR 125050 (2005-2006); 125255 (2006-2007). A map showing these and other locations of relevance to the Winter Use Plan may be found in the Appendix at Tab 4.

       (1)     The monitoring studies showed that oversnow vehicles were audible in the Old Faithful Geyser developed area an average of about 67% of the day between 8:00 a.m. and 4:00 p.m. *Id.,* at 2; AR 125255, at 2. Moreover, at Old Faithful, "oversnow vehicles were audible over the threshold of 75% for developed area for 9 of 35 days (26%) analyzed." AR 125255, at 2. At another location, 2.3 miles from Madison Junction, an intersection of two significant access roads oversnow vehicles were audible for 59% of the day, exceeding the travel corridor threshold average of 50%. *Id.*

       (2)     Mr. Burson observed that the percent-of-time audible found by use of instrumentation "likely represents a minimum assessment of time audible" because humans "in the field can and do turn toward faint sounds and thus can hear those sounds better than when we cannot turn to face the sound, as in an office playback." *Id.,* at 9-10 (emphasis added).

       (3)     The monitoring studies found that the maximum sound levels for oversnow vehicles "exceeded 70 dBA" at Old Faithful, along the groomed travel corridor between Madison Junction and the West Yellowstone entrance (*i.e.*, 2.3 miles from Madison Junction) and between West Thumb and Old Faithful. *Id.,* at 2. *See* AR 117160 (FEIS), at 140 (70 db is "intrusive").

(4)     Based on the results of his four year study, Burson recommended that NPS reduce the total number of oversnow vehicles at Yellowstone. AR 125255, at 47. By increasing rather than reducing the number of oversnow vehicles as Mr. Burson recommended, the Winter Use Plan would lead to even worse intrusion into soundscapes at Old Faithful and other popular locations and routes than under the current conditions studied in the monitoring reports.

c.     By relying on the Volpe modeling study so heavily in the FEIS, the NPS also ignored methodological deficiencies identified by several NPS soundscape experts.

(1)     One expert stated that "the model didn't realistically calculate OSV travel in the area, it just truncated all traffic at a point on the main road. This is why the modeled results are so far from the reality." AR 125317 (emphasis added).

(2)     Another stated that "one major shortcoming to be aware of is that the impact analysis is all based on modeling and the model used ("INM") does not account for atmospheric temperature inversions …. Consequently, the analysis underestimates the amount of noise during thermal inversions which I understand are not at all uncommon there." AR 125248.

(3)     A third expert stated that a draft of the Volpe study "appear[ed] biased" in discussing characteristics of Yellowstone which would absorb sound. To provide a more balanced presentation, the expert suggested that the Volpe report add: "Many visitors visit areas near travel routes of OSVs and thus are exposed to very loud sound levels of OSVs." AR 124928 (emphasis added).

21.     With respect to the impact of snowmobile use on wildlife, the FEIS defined wildlife impact levels based on the effect on the population of each species as a whole.

-12-

a.      According to the FEIS, an effect on an individual — regardless of the extent of the effect, even death — is considered "negligible" so long as the effect "would not be of any measurable or perceptible consequence to the population." AR 117160, at 257 (emphasis added). Similarly, at the other end of the scale, an effect on an individual could be considered a "major effect" only if it "will be measurable and have a substantial and possible permanent consequence to the population." *Id.* (emphasis added). This methodology minimizes the impact of the Winter Use Plan because of the large number of bison and elk and other animals in Yellowstone. *Id.*, at 269.

b.      The FEIS fails to consider adequately a number of scientific studies that have investigated the interrelationship between wildlife and winter recreation in Yellowstone. *Id.*, at 111-15. For example, a report prepared by four NPS scientists and two from Montana State University, found that OSVs "induce behavioral and stress responses." AR 125701 ("White"), at 20. The scientists observed that regulations restricting the levels and travel routes of OSVs during the last several years "were effective at reducing disturbances to wildlife below a level that would cause measurable fitness effects." *Id.* Accordingly, they recommended that "park managers consider maintaining OSV traffic levels at or below those observed during our monitoring." *Id.* (emphasis added). The same conclusion is reached in Borkowski, *et al. See* AR 117160 (FEIS), at 112.

c.      The total population methodology also permits the NPS to exclude the number of OSVs as a significant factor in the analysis. One of the NPS scientists, Troy Davis, observed, "[a]lternatives which lower OSV traffic are believed to have wildlife impacts lesser than those alternatives with higher levels of traffic." AR 125617 (emphasis added). Accordingly, a draft summary of wildlife impacts from each of the alternatives on which

-13-

Mr. Davis was commenting was made expressly dependent on whether each alternative would

increase or decrease OSV travel. *See* AR 125619. When that summary appeared in the FEIS,

however, the summary no longer included as a factor whether each alternative would increase or

decrease OSV traffic — that fact was no longer part of the analysis. *See* AR 117160 (FEIS), at

S-11; compare AR 125619.

     22.     With respect to the impact of snowmobile use on air quality, the FEIS defines the

"desired condition" as merely reduced emission levels in comparison to historic conditions.

AR 117160, at 5 (Table 1-1). The FEIS concedes that, since monitoring began in 1998,

"measured pollutant concentrations have steadily decreased consistent with the decrease in

number of snowmobile visits and the recent snowmobile technology emission requirements

under the temporary plan." *Id.*, at 94. Nevertheless, the FEIS concludes that adverse air quality

impacts from emissions under the Winter Use Plan would be "moderate" and that those impacts

would contribute to a moderate adverse long-term impact on air quality. *Id.*, at 236 and Table 4-

45. As defined in the FEIS, such an impact on air quality would be "measurable and perceptible,

possibly throughout the parks," although it "could be reversed and generally localized." *Id.*, at

222 (Table 4-31).

     a.     The NPS relied on modeling reports to assess the impact of each

alternative on air quality. *Id.*, at 215-16. Based on that modeling, the Winter Use Plan would

increase the amount of carbon monoxide by 50% above current conditions at West Yellowstone

and Old Faithful and by 100% at Flagg Ranch. *See id.* at 225, Table 4-35 (Alt. 7 predicted 8-

hour CO concentration is 150% of current conditions at West Entrance, 149% at Old Faithful and

209% at Flagg Ranch). In addition, the Winter Use Plan would increase the amount of fine

particulate matter ("PM2.5") at the West Entrance by almost 50%. *Id.* at 226, Table 4-38 (Alt. 7 predicted 24-hour PM2.5 is 140% of current conditions at West Entrance).

        b.     This modeling understates the impact of snowmobile emissions on air quality, in part because it is based on the assumption that the emissions from BAT-certified snowmobiles will actually meet the certification requirements. However, the NPS's own atmospheric chemist advised the Winter Use Plan team that "our emissions data don't seem to support that 4-stroke snowmobiles are as clean as they are supposed to be. Likewise the ambient monitoring data that shows reductions in CO and PM can mostly be accounted for by fewer numbers of snowmobiles." AR 110545.

        c.     Indeed, one NPS study completed in early 2007 establishes that emissions are likely to be higher than those assumed for purposes of the air quality modeling. *See* AR 111471 ("2007 Emissions Report"). That study found that one model of snowmobile available for rent called the "Ski Doo Legend GT" produced higher carbon monoxide ("CO") emissions during acceleration in speed (which were referred to as "transient emissions"). "[T]he more transient the operation of the Ski Doo snowmobile the higher the CO emissions will be as it will spend more operation time at the higher levels." *Id.*, at 33. However, that study pointed out that "these transient emissions are not included in the current BAT certification process since that engine dynamometer test is a steady state test ...." *Id.*, at 33-34. In fact, while current BAT requirements are 35.1 grams per mile ("g/mi") at 15 miles per hour, the 2007 Emissions Report found that the Ski Doo snowmobile had emissions of 53 g/mi. *Id.*, at 31. Another BAT-approved snowmobile, the "Arctic Cat T660," was also tested for the 2007 report. The Arctic Cat exhibited much higher emissions when idling than when at low or cruise speeds. *Id.*, at 31.

-15-

Snowmobiles touring through the park will undoubtedly idle frequently to take in the scenery or

pause for a photo.

      23.     The NPS received a number of comments on the FEIS:

      a.     On October 29, 2007, 86 members of Congress wrote "to convey [their]

deepening concern" regarding the Yellowstone snowmobile issue and to "urge [the NPS] not to

accept this new proposal." AR 116581. "Your decision," they stated, "will either demonstrate a

commitment to the 2006 National Park Service Management Policies based on the best science

available or a disregard for them." *Id.* They pointed out that even the reduced proposal to permit

540 snowmobiles per day "is still more than double the average daily snowmobile use of the last

four winters." *Id.*

      b.     On November 9, 2007, the EPA commented that "the Final EIS is not

entirely responsive to EPA's concerns regarding adaptive management, desired conditions, the

effects of air quality and noise on visitor experience, available mitigation for natural

soundscapes, and unsupportive statements on snowcoach impacts." AR 114913.

      24.     On November 20, 2007, the NPS issued its Record of Decision (the "2007 ROD")

finding that the FEIS's preferred alternative would not impair the park's resources or values,

violate the NPS Organic Act or create "unacceptable impacts." AR 126499, at 39. The NPS

Regional Director signing the document stated, "I further find that this decision represents an

appropriate balance of various potential uses of the parks in the winter, and is in accord with the

discretion provided to the National Park Service in managing the National Park System." *Id.*

      25.     Although the NPS had flatly rejected, by adopting the 2006 Management Policies,

the notion that the Organic Act permitted the balancing of supposedly "dual" purposes of

conservation and recreation, the 2007 ROD claimed the power to permit serious adverse impacts

in order to provide greater recreational opportunities. *Id.*, at 28. The ROD claims that "Congress has given the NPS the management discretion to allow impacts within parks, although that discretion is limited by the statutory requirement … that the Park Service must leave park resources and values unimpaired …." *Id.*

26.     On December 13, 2007, the NPS published its Final Rule in the Federal Register. AR 126681; 72 FED. REG. 70781 *et seq.* In summary, the Rule permits operating a snowmobile in Yellowstone, subject to a daily limit of 540 snowmobiles, a requirement that recreational snowmobiles be accompanied by a commercial guide in groups of no more than 11 snowmobiles, a requirement that the snowmobiles meet NPS air and sound emission requirements, and several other requirements. *Id.*, at 70797-99.

a.     The NPS claimed that — while the Final Rule would permit the number to double from current conditions — "this rule reduces the daily number of snowmobiles allowed to enter the Parks in order to better protect park soundscapes and other resources …" *Id.*, at 70782.

b.     The NPS further stated that "experience over the past several winters, during which a temporary plan has guided winter use management of the Parks, has shown that the combination of strict limits on the numbers of snowmobiles allowed to enter the Parks, the use of snowmobiles that meet NPS requirements for air and sound emissions …, the requirement that visitors touring Yellowstone on snowmobiles be accompanied by commercial guide, and the

availability of snowcoaches, allows for an appropriate range of visitor experiences while ensuring that the integrity of park resources and values is not harmed." *Id.*

Respectfully submitted,

Robert D. Rosenbaum (D.C. Bar No. 090498)
Ingo W. Sprie
Francis A. Franze-Nakamura (D.C. Bar No. 497985)
Meetu Kaul (D.C. Bar No. 468146)
ARNOLD & PORTER LLP
555 Twelfth Street, NW
Washington, DC  20004
Phone: (202) 942-5862
Fax:  (202) 942-5999

Attorneys for Plaintiff National Parks Conservation Association

Dated:  May 9, 2008

-18-

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                        )
GREATER YELLOWSTONE COALITION,          )
et al.,                                 )
                    Plaintiffs,         )
                                        )    Case No. 07-cv-2111 (EGS)
        v.                              )
                                        )    [Hearing on Motions for Summary
DIRK KEMPTHORNE, et al.,                )    Judgment on August 27, 2008]
                                        )
                    Defendants.         )
_____)

_____
                                        )
NATIONAL PARKS CONSERVATION             )
ASSOCIATION,                            )
                                        )
                    Plaintiff,          )
                                        )    Case No. 07-cv-2112 (EGS)
        v.                              )
                                        )    [Hearing on Motions for Summary
UNITED STATES DEPARTMENT OF THE         )    Judgment on August 27, 2008]
INTERIOR; NATIONAL PARK SERVICE,        )
                                        )
                    Defendants.         )
_____)


**FORM OF [PROPOSED] ORDER**

On consideration of the Plaintiff National Parks Conservation Association's Motion for

Summary Judgment, the opposition thereto, and the entire Record, it is hereby ORDERED that

the Motion is GRANTED; and the Court further

FINDS that the National Park Service adopted amendments to 36 C.F.R. §§ 7.13, 7.21

and 7.22 as published at 72 FED. REG. 70781 *et seq.* (Dec. 13, 2007) (the "Regulation") along

with the September 24, 2007 Final Environmental Impact Statement (the "FEIS") and

November 20, 2007 Record of Decision (the "ROD") contrary to law, arbitrarily and

capriciously and in an abuse of discretion.

ORDERS that the Rule, the FEIS and the ROD are hereby vacated and set aside.


_____

U.S. District Judge