William P. Horn (DC Bar No. 375666)
David E. Lampp (DC Bar No. 480215)
Birch Horton Bittner & Cherot, PC
1155 Connecticut Ave. NW, Suite 1200
Washington, DC  20036
Telephone:  (202) 659-5800
Facsimile:  (202) 659-1027

*Attorneys for Defendant Intervenors*
*International Snowmobile Manufacturer's Association,*
*American Council of Snowmobile Associations,*
*BlueRibbon Coalition, Inc., and Teri Manning*

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

|  |  |  |
|---|---|---|
| GREATER YELLOWSTONE COALITION, et al. | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 1:07-cv-02111 (EGS) |
| | ) | |
| KEMPTHORNE, et al. | ) | Hearing on Motions for Summary |
| | ) | Judgment to be Held on |
| Defendants, | ) | August 27, 2008 |
| | ) | |
| and | ) | |
| | ) | |
| THE INTERNATIONAL SNOWMOBILE | ) | |
| MANUFACTURER'S ASSOCIATION, | ) | |
|   et al. | ) | |
| | ) | |
| Defendant-Intervenors. | ) | |

---

|  |  |  |
|---|---|---|
| NATIONAL PARKS CONSERVATION | ) | |
|   ASSOCIATION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:07-cv-02112 (EGS) |
| | ) | |

G:/101238/12/00003073.DOC

| | | |
|---|---|---|
| UNITED STATES DEPARTMENT OF INTERIOR, et al. | ) ) ) | Hearing on Motions for Summary Judgment to be Held on August 27, 2008 |
| Defendants, | ) ) | |
| and | ) ) | |
| THE INTERNATIONAL SNOWMOBILE MANUFACTURER'S ASSOCIATION, et al. | ) ) ) | |
| Defendant-Intervenors. | ) ) ) | |

**DEFENDANT-INTERVENORS' MEMORANDUM IN OPPOSITION
TO PLAINTIFFS' MOTIONS FOR SUMMARY JUDGMENT**

2

# TABLE OF CONTENTS

I.     INTRODUCTION ........................................................................................1

II.    STATEMENT OF FACTS ........................................................................4

       A.     Yellowstone National Park ..........................................................4

              1.     Roadways and Surrounding Developed Areas ...........5
              2.     Backcountry .....................................................................6

       B.     Best Available Technology Snowmobiles ...............................6

       C.     Winter Use Planning and Rules – History of December 2007 Rule.......................7

              1.     History..............................................................................7
              2.     December 2007 Rule........................................................9

III.   STATUTORY AND REGULATORY FRAMEWORK ..........................10

       A.     The Yellowstone National Park Act .........................................10

       B.     The National Park Service Organic Act....................................10

       C.     NPS Regulations and Management Policies.............................11

       D.     The National Environmental Policy Act....................................12

IV.    STANDARD OF REVIEW ......................................................................12

       A.     Summary Judgment ....................................................................12

       B.     Administrative Procedure Act ("APA") ...................................13

V.     ARGUMENT ............................................................................................14

       A.     The Yellowstone Enabling Act and National Park Service Organic
              Act Require the Agency to Balance Conservation and Visitor Use
              and Enjoyment, Grant It Broad Discretion In Doing So and Grant it
              Broad Discretion in Making Determinations of Acceptable Uses
              and Non-Impairment....................................................................14

i

B.    The Agency's Decision to Continue Restricted Guided BAT Snowmobile Access to Portions of Yellowstone's Road System is Supported by the Administrative Record..................................................18

    1.    NPS's Conclusion That Continued Guided BAT Snowmobile Access In Limited Numbers Restricted To About Half of the Road System Would Not Have Unacceptable Impacts on Wildlife Is Reasonable and Supported by the Administrative Record....................................19

    2.    NPS's Assessment of Air Quality and Soundscape Effects on Yellowstone Park as a Whole Is Reasonable, Supported by the Record, and Entitled to Deference ...................................22

    3.    NPS's Conclusion That Continued BAT Snowmobile Access in Limited Numbers on Portions of The Road System Would Not Have Major Effects on Air Quality is Reasonable and Supported by The Administrative Record .....................24

    4.    NPS's Conclusion That Continued Guided BAT Snowmobile Access In Limited Numbers Restricted to About Half of Yellowstone's Historic Road System Would Not Have Major Adverse Impacts on Park Soundscapes Is Reasonable and Supported by the Administrative Record .......................26

C.    The Extensive and Far Reaching EIS Prepared by NPS, Building on Substantial Information and Evidence From a Previous EIS and SEIS, Fulfilled Its Procedural Duties Under NEPA ..............................28

VI.    CONCLUSION.................................................................................29

# TABLE OF AUTHORITIES

## FEDERAL CASES

<u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 255 (1986) ........................................................ 13

<u>Bicycle Trails Council of Marin v. Babbitt</u>, 83 F.3d 1445, 1454
    (9th Cir. 1996) ..................................................................................................................... 15, 17

<u>Cabinet Mountains Wilderness v. Peterson</u>, 685 F.2d 678, 684
    (D.C. Cir. 1982) .......................................................................................................................... 13

<u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 327 (1986) ...................................................................... 13

<u>Chevron USA, Inc. v. Natural Resources Defense Council, Inc.</u>,
    467 U.S. 837 (1984) ................................................................................................................... 17

<u>City of Olmstead Falls, Ohio v. Fed. Aviation Admin.</u>, 292 F.3d 261,
    269 (D.C. Cir. 2002) .................................................................................................................. 13

<u>Columbia Gas Transmission Corp. v. FERC</u>, 750 F.2d 105, 109
    (D.C. Cir. 1984) .......................................................................................................................... 14

<u>Daingerfield Island Protection Society v. Babbitt</u>, 40 F.3d 442, 446
    (D.C. Cir. 1994) ................................................................................................................ *passim*

<u>Edmonds Institute v. Babbitt</u>, 42 F. Supp. 2d 1 (D.D.C. 1999) ................................................... 17

<u>Int'l. Fabricare Inst. v. U.S. Envtl. Prot. Agency</u>, 972 F.2d 384, 389
    (D.C. Cir. 1992) .......................................................................................................................... 13

<u>International Snowmobile Manufacturers Association v. Norton</u>,
    340 F.Supp.2d 1249, 1266 (D. Wy. 2004) .............................................................................. 8

<u>Kleppe v. Sierra Club</u>, 427 U.S. 390, 412 (1976) ......................................................................... 13

<u>Motor Vehicle Mfrs. Assn. v. State Farm Mut. Ins. Co.</u>, 463 U.S. 29, 43
    (1983) .......................................................................................................................................... 13

<u>Natural Res. Def. Council, Inc. v. U.S. Envtl. Prot. Agency</u>,
    822 F.2d 104, 129 (D.C. Cir. 1987) ............................................................................ 12, 13, 28

G:/101238/12/00003073.DOC

National Wildlife Fed. v. National Park Service, 669 F. Supp. 384,
    391 (D. Wyo. 1987) ...................................................................15

Sierra Club v. Andrus, 487 F. Supp. 443, 448 (D.D.C. 1980) ......................................16

Sierra Club v. Watt, 659 F.2d 203 (D.C. Cir. 1981 ....................................................16

Southern Utah Wilderness Alliance v. Dabney, 222 F.3d 819,
    826-27 (10th Cir. 2000) ............................................10, 15, 19, 22, 23

Tennessee Gas Pipeline Company v. Federal Energy Regulatory
    Commission, 400 F.3d 23, 25 (D.C. Cir. 2005)........................................14, 18

Vermont Yankee Nuclear Power Corp. v. Natural Res. Def. Council,
    435 U.S. 519, 558 (1978)...........................................................12, 28

Wilkenson v. Department of Interior, 634 F. Supp. 1265, 1279
    (D. Colo. 1986) ....................................................................16

## STATUTES AND LEGISLATIVE MATERIALS

Administrative Procedure Act
    5 U.S.C. § 706.....................................................................13
    5 U.S.C. § 706 (2).................................................................13

National Environmental Policy Act
    42 U.S.C. § 4332(2)(c)............................................................12, 28

16 U.S.C. § 1 ...............................................................4, 10, 15, 17, 23
16 U.S.C. § 3.........................................................................16
16 U.S.C. § 21....................................................................4, 15, 16
16 U.S.C. § 22....................................................................10, 17

## REGULATIONS AND ADMINISTRATIVE MATERIALS

36 C.F.R. § 2.18(c).....................................................................11
36 C.F.R. § 7.13 ..............................................................1, 6, 7, 9, 11

66 Fed. Reg. 7260, et seq. (Jan. 22, 2001)...............................................8
67 Fed. Reg. 68242, et seq. (Nov. 8, 2002) ..............................................6
68 Fed. Reg. 69267, Dec. 11, 2003......................................................2
69 Fed. Reg. 65348, et seq. (Nov. 10, 2004) ...........................................4, 8
72 Fed. Reg. 14865, et seq. (March 29, 2007)...........................................21
72 Fed. Reg. 15720, et seq. (April 2, 2007)..............................................2, 9
72 Fed. Reg. 27499, et seq. (May 16, 2007).............................................9

iv

72 Fed. Reg. 54456 (Sept. 25, 2007) ...........................................................................9
72 Fed. Reg. 70781, et seq. (Dec. 13, 2007)................................................2, 6, 7, 8, 9
73 Fed. Reg. 10513, et seq. (Feb. 27, 2008) ..............................................................21

NPS Management Policies
    1.4.3...........................................................................................................................11
    8.1.1...........................................................................................................................11
    8.1.2...........................................................................................................................11
    8.2.............................................................................................................................11

G:/101238/12/00003073.DOC

Defendant Intervenors the International Snowmobile Manufacturer's Association, the

American Council of Snowmobile Associations, the BlueRibbon Coalition, Inc., and Teri

Manning (collectively, "Snowmobilers"), through counsel and pursuant to the Federal Rules of

Civil Procedure and Local Rules and Orders of this Court, hereby submit their Memorandum in

Opposition to the Motions for Summary Judgment filed by Plaintiffs Greater Yellowstone

Coalition ("GYC") and the National Parks Conservation Association ("NPCA") (collectively,

"Plaintiffs").

## I.    INTRODUCTION

The National Park Service ("NPS") December 2007 regulation[1] to permit no more than

540 cleaner and quieter Best Available Technology ("BAT") snowmobiles each day,

accompanied by trained and certified guides, onto 51 percent of Yellowstone National Park's

350 mile road system[2] during a 90 day winter use season is the most thoroughly studied,

documented, and considered recreational access action ever taken by that agency.  Yellowstone

winter use planning, culminating in the rulemaking now being challenged by the Plaintiffs,

commenced over a decade ago and has so far produced a four volume Environmental Impact

Statement ("EIS"), a two volume Supplemental EIS, and most recently another two volume 678

page EIS.  In addition, NPS has prepared and carefully considered dozens upon dozens of

extensive unprecedented studies and evaluations of (1) Yellowstone's wildlife and its migratory

patterns and the absence of adverse impacts on wildlife populations from winter road grooming

and regulated snowmobile use (i.e., the Gates Report et al.);[3] (2) wildlife response to human

recreationists indicating animals that stay along the Park's road system are habituated to vehicles

---

[1]   72 Fed. Reg. 70781 (Dec. 13, 2007), codified at 36 C.F.R. Part 7.13.
[2]   Winter Use Plans Final Environmental Impact Statement (National Park Service, Sept. 2007) ("FEIS") p. 8, Fig.
1- 1 (Administrative Record ("AR") 117160).
[3]   FEIS p. 115-119.

including snowmobiles;[4] (3) air quality and emissions studies demonstrating no violations of any applicable clean air standards arising from permitted BAT snowmobile use;[5] and (4) sounds and soundscapes providing empirical evidence that wintertime oversnow vehicle ("OSV") (i.e., snowmobiles and snowcoaches) sounds are limited to areas proximate to the historic road system and that such sounds are not audible in 86 percent of the 2.2 million acre Park.[6]

Litigation has been waged in two U.S. District Courts and two Circuit Courts of Appeals almost continuously since 1997.[7]  Congress has intervened three times enacting special provisions to ensure continuation of regulated snowmobile use in Yellowstone.[8]  Yet BAT snowmobile use in Yellowstone accounts for less than three percent of vehicular access in the Park, occurs during a short 90-day winter use season, and is restricted to half of the Park's road system.  Plaintiffs' attacks on this modest, heavily regulated snowmobile access have been unrelenting for over a decade, necessitating this enormous effort by the NPS and snowmobile enthusiasts to defend traditional use.

Plaintiffs' latest challenge ignores a crucial fact: Yellowstone is effectively "two" parks.[9] One is that area proximate to the historic 350 mile road system where the overwhelming majority of the Park's three million annual visitors find lodges, cabins, gas stations, restaurants, convenience stores, parking lots, visitor centers, employee housing and all of the Park's administrative infrastructure (sewer, water, electricity, maintenance yards, etc.).  The "second"

---

[4]  FEIS p. 128.
[5]  FEIS p. 233.
[6]  FEIS p. 306, Fig. 4-1.  For comparison purposes, Yellowstone is nearly 50 times larger than the District of Columbia (2.2 million acres v. 44,160 acres).  The 86% of the Park where snowcoaches and BAT snowmobiles cannot be heard equals nearly 1.9 million acres or an area 43 times larger than D.C.
[7]  Another challenge to the NPS December 2007 regulations is pending in U.S. District Court in Wyoming.  Case No. 2:07-cv-00319-CAB; Case No. 2:08-cv-0004-CAB.  Snowmobilers are Plaintiff-Intervenors in that proceeding and challenging only two features of the NPS rules:  (1) limiting BAT snowmobiles to 540 per day rather than 720 as outlined in the Agency's preferred alternative in the April 2007 Draft and (2) requiring all BAT snowmobile entries to be guided rather than the 80 percent guide requirement in previous winter use rules.  72 Fed. Reg. 15720, April 2, 2007; see also 68 Fed. Reg. 69267, Dec. 11, 2003.
[8]  72 Fed. Reg. at 70782.
[9]  FEIS pp. 31, Fig. 2-1; 309, Fig. 4-3.

Park is the vast wilderness backcountry which comprises 98 percent of Yellowstone, most of which is far removed from the sights and sounds of the road system and associated human development.

The heart of the Plaintiffs' objection is that guided BAT snowmobiles can be seen and heard and produce emissions along this road system (although they do not object to the much louder more polluting snowcoaches). They object to the loss of natural quiet and solitude. Snowmobilers submit that there has been no natural quiet or solitude along the Yellowstone road system since it was constructed by the Army in the late 1800's, opened to automobile traffic in 1916, had a series of hotels, restaurants, visitor facilities, and gas stations built along it nearly 100 years ago, opened to snowmobile and snowcoach use since 1963 and now hosts approximately 1.8 million autos, trucks, buses, SUVs, RVs and motorcycles per year. These facts represent the baseline of NPS winter use planning and action. For the few visitors seeking wilderness, solitude, and natural quiet in Yellowstone,[10] these values can be found in the vast backcountry by hiking away from the road system in the spring, summer or fall or cross country skiing or snowshoeing the same paths in winter rather than closing the road system to limited numbers of BAT snowmobiles (or other motorized vehicles in the spring, summer, and fall).

Since the beginning of this controversy over a decade ago, Snowmobilers have not been able to determine how it is an environmental "crime" and a violation of National Park law (as argued by Plaintiffs) for the NPS to allow a relative handful of guided BAT snowmobile visitors onto half of the Park road system in the winter,[11] yet the same laws and policies allow without restriction millions of other unguided non-BAT vehicles onto the same roads the remainder of

---

[10]   Snowmobile riders and snowcoach passengers make up approximately 98.5 percent of winter visitor entries at the West entrance. FEIS p. 91, Fig. 3-4.
[11]   Winter visitation under the NPS rules is expected to be between 88,718 and 160,246 yearly or 2.9 to 5.4 percent of total Yellowstone visitation. FEIS p. 184.

the year.  There appears to be no controversy (and there are certainly no legal challenges

pending) regarding the nearly two million autos, trucks, buses, SUVs, RVs and motorcycles

using all of Yellowstone's road system the other nine months of the year.  Snowmobilers are

committed to maintaining reasonable snowmobile access in Yellowstone but are similarly

committed to persuading this Court to interpret the law in manner that does not put other

traditional vehicular use of Yellowstone's road system (spring, summer, and fall) at future risk.

## II.    STATEMENT OF FACTS

### A.    Yellowstone National Park

Yellowstone National Park was created in 1872 and "dedicated and set apart as a public

park or pleasuring ground for the benefit and enjoyment of the people."  16 U.S.C. § 21.

Yellowstone is part of the National Park System and is governed by the National Park Service

Organic Act of 1916, which provides a singular "fundamental purpose" for all park units to

conserve resources therein and provide for public use and enjoyment.  16 U.S.C. § 1.

Snowmobiles have been permitted in Yellowstone since 1963.  Snowmobile use is

limited to 180 miles (i.e., 51 percent) of Yellowstone's 350 mile road system, which provides

vehicular access to numerous features of Yellowstone National Park. See 69 Fed. Reg. at 65350.

Approximately 1.8 million automobiles, buses, trucks, SUVs, RVs and motorcycles use this road

system in unrestricted numbers each year including 52 miles that are plowed and remain open to

cars, trucks, and buses during the winter months.[12]  Snowmobile use under present plans

constitutes less than three percent of total vehicular use within the Park.

---

[12]   Yellowstone's North entrance and 52 miles of road to the Northeast entrance and Cooke City are plowed in the winter and remain open to automobile and truck traffic.  Many winter visitors to this part of the park use autos to access wolf viewing areas along the Lamar Valley.  FEIS pp. 86, 91.

4

As the NPS's analysis correctly recognizes, Yellowstone essentially consists of two parks – the limited area including and immediately proximate to the historic road system, and the vast wilderness backcountry removed from the road system.[13]

### 1.    Roadways and Surrounding Developed Areas

The first of the "two parks" making up Yellowstone is the area immediately proximate to the road system, including hotels, cabins, stores, gas stations, visitor centers, living quarters for park and concessions staff, utility infrastructure, and other features necessary for park maintenance and visitor usage.[14]  Yellowstone's road system was constructed by the U.S. Army in the 19th Century, and opened to automotive traffic in 1916.  The area immediately surrounding the roads was developed beginning at that time, and currently makes up approximately two percent of the Park.  Since 1916 this developed portion of Yellowstone has been managed specifically for visitor access and use.  The type of solitude, sanctuary, and natural quiet that Plaintiffs crave is not, and has not been, available in this intensely developed portion of Yellowstone for over a century.

During spring, summer, and fall most of three million Park visitors and their vehicles (cars, trucks, SUVs, RVs, buses, motorcycles) use Yellowstone's entire road system to engage in statutorily-mandated visitor use and enjoyment.  For 90 days every year during the winter, half of the road system is kept open for use by limited numbers of guided BAT snowmobiles and snowcoaches.  The impacts of those snowmobiles and snowcoaches are minor (especially compared to the impacts of automotive traffic during all other seasons), restricted to the developed areas immediately proximate to the roads, and have little to no impact on the vast wilderness backcountry which offers the sanctuary and solitude Plaintiffs seek.

---

[13]   See FEIS p. 31, Fig. 2-1.
[14]   Developed areas with extensive visitor facilities include Mammoth, Tower, Roosevelt, Canyon, Norris, Old Faithful, Bridge Bay, Lake, Fishing Bridge, West Thumb, and Grant Village.

        2.      **Backcountry**

The other portion of Yellowstone, the "second park," consists of the vast wilderness

backcountry that makes up approximately 98 percent of Yellowstone National Park.  It is

undeveloped and remains in a natural state year-round.  The impacts alleged by Plaintiffs are

almost entirely restricted to areas proximate to the road system and are not felt throughout nearly

all of this vast backcountry.  This means that the overwhelming portion of Yellowstone National

Park provides year-round solitude, sanctuary and natural soundscapes regardless of the vehicles

traveling Yellowstone's historic road system including BAT snowmobiles and snowcoaches in

the winter.  At any time of year, visitors seeking solitude or sanctuary can find it by venturing

away from the road system and into the backcountry on foot, horseback, boat (for Yellowstone

and Lewis Lakes), snowshoes, or cross-country skis.

    B.      **Best Available Technology Snowmobiles**

Since the implementation of the 2004 temporary winter use rules[15] and under the

challenged December 2007 regulation, only cleaner and quieter BAT snowmobiles have been

permitted to enter Yellowstone for recreational purposes (NPS continues to use some 2-stroke

sleds for management and enforcement purposes).  NPS has defined BAT snowmobiles to be

those that achieve a 90 percent reduction in hydrocarbon (HC) emissions and a 70 percent

reduction in carbon monoxide (CO) emissions baseline.  36 C.F.R. § 7.13(l)(5), (6); 72 Fed. Reg.

at 70783; see also 67 Fed. Reg. 68242 (Nov. 8, 2002).  This standard assures "that snowmobiles

operating in the Parks represent the cleanest that are commercially available."  72 Fed. Reg. at

70784.

The BAT standards also require quieter snowmobiles.  Specifically, they dictate that

snowmobiles must operate at or below 73 dBA at full throttle as measured according to the

---

[15]  See 72 Fed. Reg. at 70782.

Society of Automotive Engineers J192 test procedures (revised 1985).  72 Fed. Reg. 70783; 36

C.F.R. § 7.13(l)(6)(C)(ii).  Full throttle operation is prohibited in Yellowstone by virtue of the

strictly enforced 35 mph and 25 mph speed limits and the guide requirement.  Id.; Sept. 20, 2007

Record of Decision ("ROD") p. 9 (AR 126499).  At these lower required speeds, BAT

snowmobiles "can be difficult to distinguish from wind or other indistinct sounds."  FEIS p. 303.

Limiting recreational use to the cleaner and quieter BAT snowmobiles has also produced

substantial reductions in air emissions within Yellowstone, FEIS p. 94, and limited sound

impacts to approximately 13 percent of the Park proximate to the road system.  FEIS p. 306, Fig.

4-1.  Furthermore, the mandated conversion to quieter snowmobiles means that the sources of the

loudest winter sounds in the Park are snowcoaches and road grooming equipment.  FEIS p.147.

### C.    Winter Use Planning and Rules – History of December 2007 Rule

#### 1.    History

In 1997, environmental interests challenged the NPS winter use plan which allowed

snowmobiling on Yellowstone's road system without regard to numerical limits, commercial

guide requirements, or BAT mandates.  The focus of the complaint was alleged adverse impacts

on the Park's bison population.  The case was eventually settled and the NPS agreed to prepare

an EIS to address snowmobile use and road grooming in Yellowstone.[16]

NPS released its Draft EIS in September 1999 which examined seven alternatives,

ranging from unrestricted snowmobile use to alternatives emphasizing use of newer cleaner and

quieter snowmobiles.  The NPS' preferred alternative provided for continued snowmobile

access.  In October 2000, after significant intervention by Interior political appointees, NPS

reversed course and released a Final EIS with a new preferred alternative banning recreational

---

[16]  Snowmobiles in Yellowstone have been restricted to groomed roads since long before the 1997 litigation.  As all permitted use is limited to roads, snowmobilers maintain that Executive Orders 11644 and 11989 governing offroad vehicle use are not applicable to this case.

snowmobiles from Yellowstone entirely.  See International Snowmobile Manufacturers Association v. Norton, 340 F.Supp.2d 1249, 1254 (D. Wy. 2004).

In January 2001 – on its last day in office – the Clinton Administration issued a final rule that prohibited traditional snowmobile use in Yellowstone and Grand Teton National Parks.  See 66 Fed. Reg. 7260 (Jan. 22, 2001).  Ultimately, on October 14, 2004, the 2001 Rule was vacated, the related 2000 EIS and ROD declared legally invalid, and the matter remanded to the NPS to prepare a wholly new Winter Use Plan for Yellowstone.  International Snowmobile Manufacturers Association, 340 F.Supp.2d at 1266.

In the period between 2001 and 2004, NPS prepared an extensive Supplemental EIS and promulgated new winter use rules in December 2003.  Those rules restricted Yellowstone to 950 BAT snowmobiles daily, continued to limit sleds to approximately half of the road system, and required 80 percent of entries to be accompanied by trained guides.  72 Fed. Reg. at 70781.  On December 16, 2003 this Court vacated and remanded those rules.

The first temporary rules were established shortly thereafter in February 2004, following an order by the U.S. District Court in Wyoming to promptly issue "fair and equitable" rules to assure continued snowmobile access.  These interim rules for the end of the 2003-2004 season allowed 780 BAT snowmobiles into Yellowstone accompanied by guides.  72 Fed. Reg. at 70782.

Recognizing that a comprehensive new EIS could not be completed before the 2004-2005 winter season, NPS proceeded to develop a revised temporary plan to govern winter use pending completion of the long-term winter use planning process (which resulted in the December 2007 regulation at issue here).  In November 2004, the NPS published a Final Temporary Rule to allow 720 BAT snowmobiles into Yellowstone each day and 140 into Grand Teton and the John D. Rockefeller, Jr. Memorial Parkway.  See 69 Fed. Reg. 65348, et seq. (Nov. 10, 2004).  The

8

Final Temporary Rule also required that all snowmobiles entering Yellowstone do so in small groups, with each group accompanied by a certified commercial guide.  72 Fed. Reg. at 70782.

Subsequently, Congress three times enacted special provisions mandating that NPS implement these temporary rules within Yellowstone for the winter use seasons of 2004-2005, 2005-2006 and 2006-2007.  Id.  Notwithstanding this express Congressional approval, parties in Wyoming and the District of Columbia sought to invalidate the Temporary Rule.  The U.S. District Court in Wyoming upheld the validity of the Temporary Rule in October 2005, and this Court, on September 24, 2007, dismissed challenges to the 2004 rule as moot.  Id.

### 2.    December 2007 Rule

The December 2007 rulemaking represents the culmination of over a decade of NPS planning and evaluation of appropriate winter use in Yellowstone.  This plan, which arises from extensive information and data gathered to prepare two EISs and a Supplemental EIS, has six primary features:

(1) approximately half of Yellowstone's road system (180 miles of 350 miles) will be groomed to facilitate use by OSV snowmobiles and snowcoaches; (2) only cleaner and quieter BAT snowmobiles may enter the Park and use the groomed roads only; (3) no more than 540 BAT snowmobiles may enter each day; (4) all BAT snowmobiles must travel in groups accompanied by trained guides; (5) speed limits are held low to minimize effects on wildlife along the roads; and (6) limited numbers of snowcoaches (83) may enter the part each day. 36 C.F.R. 7.13(l); see also 72 Fed. Reg. at 70781.

The current rule was published in draft form for public notice and review on May 16, 2007.  See 72 Fed. Reg. 27499 et seq. (May 16, 2007).  On a parallel track, the NPS prepared a draft EIS that was released for public review and comment on April 2, 2007 and made final on September 25, 2007.  72 Fed. Reg. 15720, April 2, 2007; 72 Fed. Reg. 54456, Sept. 25, 2007.

9

III.     STATUTORY AND REGULATORY FRAMEWORK

A.     The Yellowstone National Park Act

The Yellowstone National Park Act ("Yellowstone Act") withdrew and set aside the land

for Yellowstone National Park and dedicated it "as a public park or pleasuring ground for the

benefit and enjoyment of the people[.]"  16 U.S.C. § 21.

The Yellowstone Act also governs the NPS's administration of Yellowstone National

Park and directs the Agency to preserve "from injury or spoliation" the "wonders" of the Park

and to "provide against the wanton destruction of the fish and game found within the park, and

against their capture or destruction for the purposes of merchandise or profit."  16 U.S.C. § 22.

B.     The National Park Service Organic Act

The National Park Service Organic Act of 1916 ("NPS Act" or "NPS Organic Act")

created the NPS and conferred upon it the responsibility to regulate the parks according to its

fundamental purpose, which is to "conserve the scenery and the natural and historic objects and

wild life therein and to provide for the enjoyment of the same in such manner and by such means

as will leave them unimpaired for the enjoyment of future generations." 16 U.S.C. § 1.

The Secretary has broad discretion in determining whether a proposed activity impairs

park resources, and how best to balance the dual statutory purposes of conservation and visitor

use and enjoyment:

> Neither the word "unimpaired" nor the phrase "unimpaired for the enjoyment of
> future generations" is defined in the [NPS Organic] Act.  It is unclear from the
> statute itself what constitutes impairment, and how both the duration and severity
> of the impairment are to be evaluated or weighed against the other value of public
> use of the park. . . .   [W]e read the Act as permitting the NPS to balance the
> sometimes conflicting policies of resource conservation and visitor enjoyment in
> determining what activities should be permitted or prohibited.

Southern Utah Wilderness Alliance v. Dabney, 222 F.3d 819, 826-27 (10th Cir. 2000) (holding

that the Secretary's balancing of resource conservation and visitor enjoyment in promulgating

regulations under the NPS Organic Act is subject to deference).  The D.C. Circuit has also held

that the courts "must uphold the Park Service's exercise of [broad] discretion [under the

Organic Act] unless it is 'arbitrary, capricious, an abuse of discretion or not otherwise in

accordance with the law' and so long as it is 'based on a reasoned permissible construction of

the relevant statute.'"  Daingerfield Island Protection Society v. Babbitt, 40 F.3d 442, 446 (D.C.

Cir. 1994).

       C.       **NPS Regulations and Management Policies**

       NPS regulations provide that "snowmobiles are prohibited except where designated and

only when their use is consistent with the park's natural, cultural, scenic and aesthetic values,

safety considerations, and park management objectives, and will not disturb wildlife or damage

park resources."  36 C.F.R. § 2.18(c).  Special regulations allowing snowmobiling in

Yellowstone and Grand Teton are set forth in 36 C.F.R. § 7.13, including extensive limits and

rules designed to achieve an appropriate balance between conservation of park resources and

visitor use and enjoyment.

       NPS Management Policies published in 2006 ("Policies" or "Management Policies")

direct the NPS to "conserve park resources and values" pursuant to one of the fundamental

purposes set forth in the Organic Act.  Policies 1.4.3 at 1-4.  The Policies expressly recognize

that "in accordance with the Organic Act, the fundamental purpose of all parks also includes

providing for enjoyment of the park."  Id. at 8.1.1.  Further, the Policies stipulate that "enjoyment

of park resources and values by the people of the United States is part of the fundamental

purpose of all parks."  Id. at 8.2.  The Policies clarify that NPS has "discretion to allow impacts

to park resources and values when necessary and appropriate to fulfill the purposes of a park, so

long as the impact does not constitute impairment of the affected resources and values."  Id. at

1.4.3.  Consistent with this "fundamental" enjoyment purpose, the Policies outline a

comprehensive process by which the NPS assesses appropriate uses and effects of those uses, determines which effects are unacceptable and cannot be mitigated, and decides whether to permit a use.  Id. at 8.1.2.  Among the specific methods to be employed to protect against unacceptable impacts are "the application of best available technology" and "temporal, spatial or numerical limitations on the use."  Id.

The Policies are for internal management only and "not intended to, and do not create any right or benefit, substantive or procedural, enforceable at law or equity by a party against the United States."  Id. at Introduction, p. 4.

The agency applied its Policies and this process in promulgating the December 2007 rules.  ROD pp. 26-34.

### D.    The National Environmental Policy Act

NEPA requires federal agencies to consider the possible environmental impacts of all "major Federal actions significantly affecting the quality of the human environment."  42 U.S.C. § 4332(2)(c).  NEPA does not require that an agency reach a particular outcome as a result of such consideration.  See Natural Res. Def. Council, Inc. v. U.S. Envtl. Prot. Agency, 822 F.2d 104, 129 (D.C. Cir. 1987).  Rather "NEPA's mandate to the agencies is essentially procedural" and serves "to ensure a fully informed and well-considered decision[.]" Vermont Yankee Nuclear Power Corp. v. Natural Res. Def. Council, 435 U.S. 519, 558 (1978) ("Administrative decisions should be set aside.... only for substantial procedural or substantive reasons as mandated by statute.... not simply because the court is unhappy with the result reached").

## IV.    STANDARD OF REVIEW

### A.    Summary Judgment

Summary judgment is appropriate where the moving party demonstrates that there are no material facts in dispute and that the moving party is entitled to judgment as a matter of law.  See

Fed.R.Civ.P. 56(c); <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 327 (1986).  In determining whether

summary judgment is appropriate, all inferences are drawn in favor of the non-moving party.

<u>See</u> <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 255 (1986).  A fact is material if it "might

affect the outcome of the suit under the governing law."  <u>Id</u>. at 248.

      **B.**     **Administrative Procedure Act ("APA")**

      Plaintiffs' challenges to the 2007 Rule and the exercise of its broad discretion under the

NPS Organic Act are reviewed under the APA's "arbitrary and capricious" standard of review.

<u>See</u> 5 U.S.C. § 706;  <u>Daingerfield Island</u>, 40 F.3d at 446.  This standard also applies to Plaintiffs'

NEPA claims.  <u>See</u> <u>City of Olmstead Falls, Ohio v. Fed. Aviation Admin.</u>, 292 F.3d 261, 269

(D.C. Cir. 2002).

      Under the APA, a court is to set aside only that agency action that is "arbitrary,

capricious, an abuse of discretion, or otherwise not in accordance with law[.]"  5 U.S.C.

§ 706(2).  This standard of review is a "highly deferential standard" that "presumes agency

action to be valid."  <u>Int'l. Fabricare Inst. v. U.S. Envtl. Prot. Agency</u>, 972 F.2d 384, 389 (D.C.

Cir. 1992) (internal citations and quotations omitted); <u>Natural Res. Def. Council, Inc. v. U.S.</u>

<u>Envtl. Prot. Agency</u>, 822 F.2d 104, 111 (D.C. Cir. 1987) (citing <u>Motor Vehicle Mfrs. Assn. v.</u>

<u>State Farm Mut. Ins. Co.</u>, 463 U.S. 29, 43 (1983) ("A 'presumption of regularity' extends to

agency rulemakings")).  Under this standard of review, the court must uphold the agency's

decision unless it is arbitrary, capricious, an abuse of discretion or otherwise not in accordance

with law.  <u>Daingerfield Island</u>, 40 F.3d at 446.   A court may not substitute its judgment for that

of the agency.  <u>Cabinet Mountains Wilderness v. Peterson</u>, 685 F.2d 678, 684 (D.C. Cir. 1982)

(citing <u>Kleppe v. Sierra Club</u>, 427 U.S. 390, 412 (1976)).  Deference to an agency is particularly

strong where an agency is applying its technical and scientific expertise, <u>Int'l Fabricare Institute</u>,

972 F.2d at 389, and "the breadth of agency discretion is … at its zenith when the action assailed

13

relates primarily … to the fashioning of [its] policies." Tennessee Gas Pipeline Company v. Federal Energy Regulatory Commission, 400 F.3d 23, 25 (D.C. Cir. 2005) (quoting Columbia Gas Transmission Corp. v. FERC, 750 F.2d 105, 109 (D.C. Cir. 1984)).

## V.   ARGUMENT

Plaintiffs' challenges to the NPS 2007 Rule are reviewed under the highly deferential "arbitrary and capricious" standard of the APA and the broad discretion conferred on the NPS by the 1916 NPS Organic Act.  NPS's decision to allow limited numbers of guided BAT snowmobiles on portions of Yellowstone's historic road system easily passes muster under these standards.  Contrary to Plaintiffs' claims, NPS's decision to permit restricted snowmobile access is in accordance with relevant law, was conducted in full compliance with NEPA, and is adequately supported by the record.  Accordingly, Plaintiffs fall far short of carrying their burden to demonstrate that the 2007 Rule should be invalidated and remanded under these highly deferential standards.

### A.   The Yellowstone Enabling Act and National Park Service Organic Act Require the Agency to Balance Conservation and Visitor Use and Enjoyment, Grant it Broad Discretion In Doing So, and Grant it Broad Discretion in Making Determinations of Acceptable Uses and Non-Impairment

Plaintiffs argue, incorrectly, that the NPS Organic Act, the Yellowstone Act, agency regulations, and agency policies impose an overriding resource preservation mandate on NPS that trumps considerations of visitor use and enjoyment at Yellowstone.  Fundamentally, they argue that an activity that has any adverse effects on park resources, no matter how minor, must be barred by this purported standard.  In reality, governing law, regulations, and policies grant the NPS substantial discretion and latitude to balance its Organic Act duties to assure resource conservation and visitor use and enjoyment and make reasonable determinations that heavily restricted snowmobile use does not impair Park resources.

14

Contrary to Plaintiffs' arguments, the Yellowstone Act and the NPS Organic Act do not impose on the Agency an overriding resource preservation dictate mandating the prohibition of visitor use and enjoyment activities that would have any impacts on park resources.  <u>See</u> Greater Yellowstone Coalition Plaintiffs' Memorandum in Support of Summary Judgment (ECF Doc. No. 50-2) ("GYC SJ Brief") at 18-25; Plaintiff National Park Conservation Association's Memorandum in Support of Its Motion for Summary Judgment (ECF Doc. No. 48-2) ("NPCA SJ Brief") at 32-37.  Instead, these statutes establish Yellowstone National Park specifically "as a public park or pleasuring ground for the benefit and enjoyment of the people[,]" 16 U.S.C. § 21, and obligate NPS to assure resource conservation providing for visitor use and enjoyment.  16 U.S.C. § 1.  Indeed, the express statutory purpose of resource conservation is to assure that the park resources are available "for the *enjoyment* of future generations."  (Emphasis added)  <u>Id</u>. Furthermore, courts interpreting and applying the NPS Organic Act have overwhelmingly acknowledged that the Agency has broad discretion in performing this balancing and determining what does, and what does not, cause impairment of park resources. <u>See</u>, <u>e.g.</u>, <u>Daingerfield Island</u>, 40 F.3d at 446 ("Organic Act gives the Park Service broad, but not unlimited discretion in determining what actions are best calculated to protect Park resources."); <u>Southern Utah Wilderness Alliance v. Dabney</u>, 222 F.3d 819, 826 (10th Cir. 2000) ("[W]e read the Act as permitting the NPS to balance the sometimes conflicting policies of resource conservation and visitor enjoyment in determining what activities should be permitted or prohibited"); <u>National Wildlife Fed. v. National Park Service</u>, 669 F. Supp. 384, 391 (D. Wyo. 1987) ("[T]he Park Service has broad discretion in determining which avenues best achieve the Organic Act's mandate"); <u>Bicycle Trails Council of Marin v. Babbitt</u>, 83 F.3d 1445, 1454 (9th Cir. 1996) ("… this broad grant of discretion to the Secretary under the Organic Act").

15

The Agency also has broad discretion in promulgating regulations to manage national park units under the NPS Organic Act:

> The Secretary of the Interior shall make and publish such rules and regulations *as he may deem necessary or proper* for the use and management of the parks, monuments, and reservations under the jurisdiction of the National Park Service[.]

16 U.S.C. § 3 (emphasis added). <u>See</u> <u>Sierra Club v. Andrus</u>, 487 F. Supp. 443, 448 (D.D.C. 1980) ("The Court concludes that defendants have broad discretion in determining what actions are best calculated to protect Park resources"), <u>aff'd</u>, <u>Sierra Club v. Watt</u>, 659 F.2d 203 (D.C. Cir. 1981); <u>Wilkenson v. Department of Interior</u>, 634 F. Supp. 1265, 1279 (D. Colo. 1986) ("[T]he grant of authority to the Secretary [in 16 U.S.C. § 3] is very broad").

Plaintiffs argue that the 2007 Rule is a "blatant violation of the Yellowstone Enabling Act" because it purportedly allows negative impacts to soundscapes, air quality, and wildlife. NPCA SJ Brief at 33; <u>see</u> <u>also</u> GYC SJ Brief at 18, 25. However, Plaintiffs ignore the Agency's broad discretion to balance conservation with visitor use and enjoyment and decide how best to meet its statutory purpose under the NPS Organic Act. Nothing in the Yellowstone Act limits this discretion. Furthermore, as noted <u>infra</u>, numerous studies, scientific evaluations, empirical evidence and the final EIS demonstrate clearly that allowing limited numbers of recreational guided BAT snowmobiles on half of Yellowstone's road system will have no significant negative or unacceptable impacts on and cause no impairment to Park wildlife, air quality or soundscapes. As such, it was well within the Agency's discretion to determine that continued access for limited numbers of BAT snowmobiles accompanied by trained guides complies with its statutory duties and does not violates the Yellowstone Act and its "public park or pleasuring ground" purpose. 16 U.S.C. § 21.

Plaintiffs further argue that the 1916 NPS Organic Act imposes a paramount conservation duty and that a Winter Use visitor plan that has some effects on soundscapes, air quality, and

16

wildlife violates this duty.  See GYC SJ Brief at 18-19; NPCA SJ Brief at 34.  Neither Bicycle

Trails Council, 82 F.3d 1445, nor Edmonds Institute v. Babbitt, 42 F. Supp. 2d 1 (D.D.C. 1999)

– cited by Plaintiffs – stand for the proposition that the 1916 Act obligates the agency to bar

visitor activities that have any adverse impacts.  Bicycle Trails upheld the NPS authority to limit

mountain bikes to trails in the Golden Gate National Recreation Area much like the challenged

action here limits guided BAT snowmobiles to portions of the Yellowstone road system.  See

Bicycle Trails, 82 F.3d at 1454.  Edmonds Institute considered the Organic Act solely in the

context of whether or not it could give rise to a cause of action.  See Edmonds Institute, 72 F.

Supp. 2d at 15-16.  In that case, plaintiffs challenged a bioprospecting-royalty arrangement

approved by Secretary Babbitt.  The Agency argued that the Organic Act (and the Yellowstone

Park Act) did not provide the plaintiffs a cause of action to challenge the agreement.  The court

held that the 1916 Act and related regulations could be a basis for that suit.  Id. at 16.  Since no

one is seeking to dismiss Plaintiffs' present claims on such grounds, Edmonds Institute is

inapplicable.

        The law is also clear that the presence of "any" adverse impact does not mandate

prohibition of visitor activities that may produce such effects.  NPS has interpreted its statutory

duties in the regulations and its Management Policies and concluded that it can determine what

activities have "acceptable" effects and what do not.  Management Policies § 8.1.2.  Only

activities that would cause statutorily prescribed "impairment" (a term undefined by Congress)

are unacceptable.  Id.  These rules and policies are permissible interpretations of the statutorily

undefined terms "conserve," "unimpaired," and "injury or spoliation" (see 16 U.S.C. §§ 1, 22)

and are entitled to deference pursuant to Chevron USA, Inc. v. Natural Resources Defense

Council, Inc., 467 U.S. 837 (1984).

Consistent with this permissible interpretation of its statutory duties, NPS allows a wide variety of visitor use activities throughout the Park System that have acceptable adverse impacts on resource conservation.  Within Yellowstone, adverse impacts arise from the 350 mile road system, extensive visitor facilitates, associated utility infrastructure, and millions of visitors every year negatively impacting Yellowstone's natural resources, yet these activities are not being terminated or prohibited.  Moreover, the December 2007 rules are also consistent with the Agency's own Management Policies which provide expressly for a process of determining what level of adverse effects on resources and wildlife is acceptable to provide the other "fundamental" statutory purpose of visitor use and enjoyment.  This consistency is explained at length in the ROD at pp. 26-34.

The unreasonable, absolutist interpretation pushed by Plaintiffs (i.e., any visitor activity that causes any negative impact must be barred) would shut down the entire National Park System, including Yellowstone, to virtually all forms of visitor activity.  Here, the Agency reasonably concluded that regulated, guided BAT snowmobile use on half of Yellowstone's road system strikes an appropriate balance between these statutory purposes and does not impermissibly impair park resources.  This determination – reflected in the December 2007 rules – is within the Agency's broad discretion, is supported by the extensive record, and is entitled to deference.  Agency action on its own policies is at the "zenith" of agency discretion, Tennessee Gas Pipeline Co., 400 F.3d at 25, and the Court "must uphold" this exercise of NPS discretion since it is not arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law.  Daingerfield Island, 40 F.3d at 446.

> **B.     The Agency's Decision to Continue Restricted Guided BAT Snowmobile Access to Portions of Yellowstone's Road System is Supported by the Administrative Record**

18

NPS engaged in extensive research, monitoring, and evaluation of Yellowstone's wildlife, air quality and soundscapes and reached reasonable expert conclusions that continued access for limited numbers of guided BAT snowmobiles had very limited acceptable effects on these resources. These very limited acceptable effects coupled with the statutory obligation to provide for visitor use and enjoyment prompted NPS to exercise its broad discretion reasonably and rationally to adopt the December 2007 regulations. See Daingerfield Island, 40 F.3d at 446; Southern Utah, 222 F.3d at 826-27.

1. **NPS's Conclusion that Continued Guided BAT Snowmobile Access in Limited Numbers Restricted to About Half of the Road System Would Not Have Unacceptable Impacts on Wildlife is Reasonable and Supported by the Administrative Record**

NPS's extensive and unprecedented study and evaluation of the effects on Yellowstone's wildlife of continued guided BAT snowmobile access demonstrated conclusively that winter OSV use on groomed roads has no adverse effects on wildlife populations in the Park, and that most animals that stay along the road system are habituated to the presence of vehicles. These empirically based findings and the Agency's broad discretion under the Yellowstone Act and the NPS Organic Act to determine what effects are acceptable make it clear that NPS was well within its discretion to make these expert findings and use them as a basis for its December 2007 rulemaking.

Yellowstone's wildlife remains healthy and many important populations continue to increase. The Park's bison herd is presently estimated at 3900 animals, is healthy, and represents an increase over the last 40 years that has occurred simultaneously with the development of winter recreation use and snowmobile access. See FEIS p. 120. Nonetheless, NPS commissioned seven studies to evaluate a variety of bison-related issues including Borkowski et al. 2006, Bruggerman et al. 2006, Coughenor 2005; Fuller 2007; Wagner 2006; White et al. 2006

and Gates et al. 2005. Id. at pp. 112-115. These were in addition to numerous previous bison studies including Bjornlie and Garrott 2001; Cheville et al. 1998; Kurz et al. 2000, and Bjornlie 2000. Id. at 125-126. Concern that road grooming was changing in-Park bison movement patterns prompted this thorough review and yielded important expert conclusions including that "bison neither seek out nor avoid groomed roads" and that use of groomed roads "is less important to their population dynamics than other natural factors." Id. at p. 121. NPS has accepted this "best available evidence," Id. p. 126, and in so doing has acted reasonably, rationally and well within its broad discretion.

The Agency has also demonstrated caution by including in its Winter Use Plan an experiment involving winter closure of the Madison to Norris road segment to further test the effects, if any, on bison migrations. ROD at 15; FEIS pp. 111-112, 126. This study was first identified in the Gates Report and specifically outlined in a research proposal entitled "Evaluating Key Uncertainties Regarding Road Grooming and Bison Movements." Id. at 126; ROD at p. 15.

Yellowstone's elk herd remains healthy although the Park-wide population has dropped substantially with the likely causes being increased predation by increasing numbers of grizzly bears and successfully re-introduced wolves. FEIS p. 127. Snowmobile use has had no measurable effect on the elk herd and the herd reached its greatest numbers during the periods of greatest snowmobile use. Id. at pp. 127-128. NPS reasonably concluded that continued guided BAT snowmobile use would have only negligible to moderate and wholly acceptable effects on elk. Id. at p. 270.

Other species such as wolves and grizzly bears also currently thrive in Yellowstone although the Park is visited by three million people each year in nearly two million cars, SUVs, RVs, trucks, buses, and motorcycles, as well as limited numbers of BAT snowmobiles. Both

20

animal populations have rebounded to such a degree that both have been removed from the list of endangered and threatened species by the U.S. Fish and Wildlife Service. See 73 Fed. Reg. 10513 (Feb. 27, 2008); 72 Fed. Reg. 14865 (March 29, 2007). This is highly tangible evidence of the health of these two species within the Park and further empirical demonstration that previous snowmobile access has not adversely affected them and continued restricted access is unlikely to do so under the December 2007 rule. FEIS pp. 130-131.

Beyond appropriate Park-wide ecological evaluations of bison, elk, bears and wolves, NPS undertook new studies to evaluate the responses of individual animals to the presence of snowmobiles on the groomed roads. One study showed that 93 percent of bison are largely indifferent to recreationist presence and another showed a comparable 92 percent indifference rate. FEIS pp. 112, 114, 115. Elk exhibited comparable reactions. Id. When there was an "active response" it consisted of the animal moving away. Id. Indeed, anyone who has witnessed the bison roaming the Yellowstone roads causing "bison jams" or the elk grazing on the road shoulders and ignoring passing traffic knows that these habituated animals are not agitated or adversely impacted by on-road vehicles including BAT snowmobiles.

Plaintiffs disregard the compelling evidence of the health of the Park's wildlife populations and focus instead on alleged adverse reactions by individual animals. See GYC SJ Brief at 40-41; NPCA SJ Brief at 24-26. Contrary to these unsupported allegations, NPS studies show that such reactions are minimal and acceptable. More importantly, if NPS is compelled to adopt Plaintiffs' proposed standard for of wildlife resources (i.e., any adverse reactions by individual animals to vehicular presence mandates prohibitions of vehicles) it would be forced to ban not only snowmobiles (and snowcoaches) but also cars, SUVs, RVs, trucks, buses, motorcycles, and other motorized vehicles from Yellowstone's road systems. NPS reasonably concluded, based on its environmental impact analysis and the extensive materials in the record,

21

that limited snowmobile use on the road system has minimal negative impacts on wildlife at both a population level and an individual animal level. This conclusion is well within the Agency's broad discretion and is entitled to the Court's deference. Daingerfield Island, 40 F.3d at 446; Southern Utah, 222 F.3d at 826-27.

Finally, the breadth and weight of the record and NPS's environmental analysis support NPS's reasoned conclusion that allowing limited numbers of recreational BAT snowmobiles on portions of Yellowstone's historic road system would not cause impairment of Yellowstone's wildlife resources. GYC claims impairment by citing a single sentence from the previous Supplemental EIS performed in conjunction with a different Winter Use rule. See GYC SJ Brief at 40. However, that previous finding has been superseded, and refuted, by the extensive subsequent research and studies and no longer has any validity factually or legally. Similarly, NPCA recounts the statement of a single NPS scientist who observed that allowing fewer OSVs would be expected to have less affects on wildlife than alternatives allowing more OSVs. See NPCA SJ Brief at 25. That may be true but hardly demonstrates that the minimal wildlife effects associated with the present plan are unacceptable as a matter of law. Neither of these outdated, superseded and singular statements cited by Plaintiffs limit NPS's broad discretion or obligates it to ban BAT snowmobiles from Yellowstone, especially in light of the overwhelming weight of evidence in the administrative record supporting NPS's non-impairment finding pursuant to its statutory duties or Policies. See supra at 11-12, 18-19.

> **2.      NPS's Assessment of Air Quality and Soundscape Effects on Yellowstone Park as a Whole is Reasonable, Supported by the Record, and Entitled to Deference**

Plaintiffs argue that NPS impermissibly defined "major impacts" with regard to BAT snowmobile and snowcoach air quality and sounds as impacts measured throughout Yellowstone, both in the areas immediately adjacent to the road system and throughout the

22

undeveloped backcountry.  According to Plaintiffs, such "Park-wide" analysis disregards the fact that most winter visitors use the Park in or around Yellowstone's historic road system.  See GYC SJ Brief at 36-39; NPCA SJ Brief at 14, 16-18.  Snowmobilers maintain that a "Park-wide" analysis is appropriate and within the broad latitude conferred on NPS.  Daingerfield Island Protective Society, 40 F.3d at 446; Southern Utah, 222 F.3d at 826-27; supra at 7-8.

Snowmobilers appreciate Plaintiffs' recognition that there are "two parks" but disagree strongly that resources and values to be conserved in the wilderness/backcountry (e.g., natural soundscapes) can be preserved along a 350 mile road system subject to extensive vehicular traffic 12 months a year.  Imposition of backcountry standards along the half of the road system groomed for winter use and the resultant banning of snowmobiles and snowcoaches would create a standard that would likely compel the prohibition of autos in the summer, a plainly unreasonable result contrary to NPS's statutory duty in the NPS Organic Act to balance resource conservation with visitor use and enjoyment.  16 U.S.C. § 1.

Plaintiffs are correct that most winter visitors (and summer visitors as well) use and enjoy the Park on and near the historic road system.  FEIS p. 91, Fig. 3-4; GYC SJ Brief at 37; NPCA SJ Brief at 17.  Indeed, most winter visitors to Yellowstone are there for the purpose of riding BAT snowmobiles and are restricted to the portion of road system open to that use.  FEIS p. 91, Fig. 3-4.  However, that small minority of winter visitors seeking quiet and solitude or wishing to avoid vehicular traffic along the roads remains free to venture into the vast undeveloped backcountry (i.e., the "second park") year-round, away from the roads and associated human development.  Snowmobilers also submit that if NPS tried to judge backcountry activities on the basis of road system conditions (i.e., millions of visitors, extensive vehicle presence, numerous developed facilities, and associated emissions and sounds), Plaintiffs would object violently.  Given that the backcountry is open to winter visitors, just as the road system and surrounding

23

developed areas are open, it was entirely reasonable for the NPS to evaluate air quality and sound effects on a basis that takes into account both "parks" – the developed roadside areas and the undeveloped backcountry.

> **3.    NPS's Conclusion that Continued BAT Snowmobile Access in Limited Numbers on Portions of the Road System Would Not Have Major Adverse Effects on Air Quality is Reasonable and Supported by the Administrative Record**

Empirical data and information painstakingly assembled by the NPS through an extensive air monitoring program demonstrates that BAT snowmobile use under the limitations specified in the December 2007 rulemaking will assure that all applicable Clean Air Act National Ambient Air Quality Standards (NAAQS) and Prevention of Significant Deterioration (PSD) Standards will continue to be satisfied within the Park.[17]  The Agency acted within its broad discretion to rely upon the empirical data and information provided by the monitoring and evaluation programs and acted reasonably and within its discretion to adopt a Winter Use Plan likely to continue to satisfy these clean air standards as well as further to improve ambient air quality within the Park.

The federal Environmental Protection Agency (EPA) and the State of Wyoming set the NAAQS applicable to 90 percent of Yellowstone National Park and all of Grand Teton National Park.  The standard for Carbon Monoxide (CO) is 9 PPM for 8 hours.  From 1998 through 2007, this standard was never exceeded during the winter use season, even at the heavily used West Entrance (by the town of West Yellowstone), including during the periods when mostly older technology 2-stroke snowmobiles were used in much larger numbers than presently permitted. FEIS p. 95, Figure 3-5.  Monitoring produced comparable CO data for the Old Faithful developed area.  Id. at 96, Table 3-9.  The data do show that the switch to BAT snowmobiles has

---

[17]   Data also demonstrate that higher levels of BAT snowmobile use (e.g., 1025 daily) would satisfy Clean Air Act standards and no impairment of Park air resources.  FEIS p. 234.

dramatically reduced CO emissions by 91 percent at the West Entrance and 66 percent at Old Faithful during the most recent winter use seasons.  Id. at 94.  Overall, winter CO levels are now approximately 94 percent less than the applicable NAAQS.  Id.

Under the December 2007 rule, maximum predicted CO 8-hour concentrations are 1.9 PPM at the West Entrance, 0.4 PPM along the road to Madison Junction, and 0.4 PPM at Old Faithful.  Id. at 224, Table 4-33. All of these concentrations are substantially lower than the 9 PPM NAAQS. Moreover, all of these concentrations are significantly lower than 1999 historic conditions, meaning present and predicted air quality will be significantly improved under the December 2007 rule.  Id.

Monitoring and studies produced similar results for Particulate Matter (PM) – a source of reduced visibility. The NAAQS for PM has never been violated and, following the conversion to BAT snowmobiles, recent PM levels are 87 to 90 percent lower than the permitted level.  Id. at 96, Table 3-10.

NPS also examined and considered effects of its December 2007 action on the Prevention of Significant Deterioration (PSD) Clean Air Act standards.  Id. at 216.  The monitoring, data, and modeling indicate that PSD standards will be fully satisfied by the regulation demonstrating further improvement in air quality under the present Winter Use Plan.  Id. at 226-227.

In fact, the EPA-permitted PSD increment of 8 micrograms per cubic meter for the 24-hour averaging period will be approached, if at all, only at the West Entrance (6.2 micrograms per cubic meter predicted).  At other locations inside the Park, the predicted increment will be only 0.4 micrograms per cubic meter along the road to Madison Junction and 0.2 micrograms per cubic meter at Old Faithful – values that are a mere fraction of what the Clean Air Act allows.  Id. at 227, Table 4-39.

These uncontroverted facts persuaded the NPS to reasonably conclude that (1) its Winter Use Plan would "meet" applicable NAAQS (Id. at 234); (2) "Federal Class I air quality standards [PSD] would not be violated or even approached" (ROD at 21); (3) the Plan would greatly improve emissions and ambient air quality "to the point that some measures of air pollution are close to background levels (that is, those pollution levels that would exist without over snow vehicle traffic)" (Id. at 20); and (4) the Winter Use Plan would assure that Park resources would not be impaired or subjected to unacceptable impacts.  Id. at 31.  There is nothing arbitrary or capricious about these conclusions based on the facts and evidence assembled over a multiple year period and rigorously evaluated and considered by the NPS and Agency reliance on these conclusions is reasonable and within its broad discretion.  Daingerfield Island, 40 F.3d at 446.

> **4.      NPS's Conclusion that Continued Guided BAT Snowmobile Access in Limited Numbers Restricted to About Half of Yellowstone's Historic Road System Would Not Have Major Adverse Impacts on Park Soundscapes is Reasonable and Supported by the Administrative Record**

NPS properly concluded that continued snowmobile access for limited numbers of guided BAT snowmobiles on a portion of Yellowstone's historic road system would not have major adverse or unacceptable impacts on Park soundscapes.  As discussed supra, the Agency has substantial discretion to determine what type and degree of sound impacts represent an acceptable balance of resource conservation and visitor use.  This substantial discretion also extends to determinations of what does, and does not, constitute impairment.  See supra Part V.A and cases cited therein.  Furthermore, the record and NPS's FEIS demonstrate that the Agency considered all relevant impacts and reasonably concluded that continued recreational access for limited numbers of quieter BAT snowmobiles will not impair the Park's soundscapes.

Over the past six years, NPS conducted numerous studies of sound impacts related to BAT OSV use throughout Yellowstone and Grand Teton National Parks.  FEIS p. 137, 143.  As

26

common sense dictates, these studies demonstrated that vehicle sounds are "concentrated to a large degree around travel corridors and park attractions [i.e., the road system]." Id. at p. 139. On the other hand, vehicular sounds (from OSVs and road grooming machines) generally are not heard more than two miles from the road system. Id. Snowcoaches and snowgrooming equipment are the sources of the "loudest non-natural sounds." Id. at 147. NPS found, based on its studies, monitoring and modeling, that more than 86 percent of Yellowstone is unaffected by snowmobile or snowcoach sound under any alternative up to 1025 BAT snowmobiles per day. Id. at pp. 306, Fig. 4-1; 342, Table 4-66. The maps in Figures 4-10 and 4-16 in the FEIS illustrate clearly that OSV audibility is restricted to the road system and adjacent lands while the vast bulk of the Park retains a natural soundscape for those visitors seeking that amenity. Id. at pp. 323, 335. Empirical data further demonstrated that under the NPS alternative, OSVs will be audible in less than one percent of the Park 90 percent of the time. Id. at p. 307, Table 4-49. More importantly, extensive monitoring and evaluation demonstrated that "4 stroke BAT snowmobile sounds at lower sound levels can be difficult to distinguish from wind or other indistinct ambient sounds" and are much less audible than older 2-stroke snowmobiles. Id. at p. 303.

Even along the road system, limited use of BAT snowmobiles will not cause intrusive noise. At Madison Junction, the most affected area (where three roads join), maximum sound levels were found to approach only 45 to 50 dBA for a limited time period. Id. at p. 337, Table 4-64. Fifty to 60 dBA is the equivalent of conversation, a quiet office, or a croaking raven flying by. By comparison, average city traffic is approximately 80 dBA. Id.

Plaintiffs argue that NPS is required to promulgate a rule intended to establish "natural quiet" throughout Yellowstone, including its roadways. See GYC SJ Brief at 36-39; NPCA SJ Brief at 11-22. However, establishing "natural quiet" along the 350 mile road system (or the 180

27

miles used by BAT snowmobiles and snowcoaches) would set a standard requiring banning all motorized traffic year-round.  Based on its FEIS and the record, NPS was well within its discretion in determining that the minimal effects of a limited number of BAT snowmobiles restricted to portions of the road system do not impermissibly impair park values or resources throughout Yellowstone.

>    **C.    The Extensive and Far Reaching EIS Prepared by NPS, Building on Substantial Information and Evidence From a Previous EIS and SEIS, Fulfilled its Procedural Duties Under NEPA**

NEPA requires federal agencies to consider the possible environmental impacts of all "major Federal actions significantly affecting the quality of the human environment."  42 U.S.C. § 4332(2)(c).  NEPA does not require that an agency reach a particular outcome as a result of such consideration.  See Natural Res. Def. Council, Inc. v. U.S. Envtl. Prot. Agency, 822 F.2d 104, 129 (D.C. Cir. 1987).  Rather, "NEPA's mandate to the agencies is essentially procedural" and serves "to ensure a fully informed and well-considered decision[.]" Vermont Yankee Nuclear Power Corp. v. Natural Res. Def. Council, 435 U.S. 519, 558 (1978) ("Administrative decisions should be set aside ... only for substantial procedural or substantial reasons as mandated by statute ... not simply because the court is unhappy with the result reached").

Here, Plaintiffs are simply unhappy with the result of the Agency's extensive NEPA review.  The Agency's decision not to ban recreational BAT snowmobiles from Yellowstone National Park was made after appropriate review pursuant to NEPA, and is supported by extensive empirical data and substantial evidence in the record that has been thoroughly reviewed and considered.  The Court should, therefore, decline Plaintiffs' challenges to the 2007 Winter Use Rule.

## VI.    CONCLUSION

As demonstrated above, NPS appropriately issued the December 2007 Yellowstone and Grand Teton Winter Use Rule.  The Agency properly exercised its broad discretion to authorize the continued use of half of Yellowstone's road system by limited numbers of guided cleaner and quieter BAT snowmobiles.  NPS's extensive new wildlife studies, careful air and soundscape monitoring, and consideration of the empirical facts and evidence – reflected in its FEIS – led it to reasonably conclude that (1) the limited effects on the Park's healthy wildlife populations, (2) cleaner air and satisfaction of clean air standards, and (3) restrictions on sound impacts to that portion of the Park along the road system mean that the effects are acceptable and do not impair Park resources.  These facts ‒ based reasonable conclusions are entitled to deference and the resulting rulemaking must be upheld.  Therefore this Court should deny Plaintiffs' Motion for Summary Judgment.


DATED:   June 16, 2008

                                    Respectfully submitted,

                                     /s/ William P. Horn
                                    William P. Horn
                                    District of Columbia Bar No. 375666
                                    David E. Lampp
                                    District of Columbia Bar No. 480215
                                    1155 Connecticut Avenue, N.W.
                                    Washington, DC  20036
                                    Telephone: (202) 659-5800
                                    Facsimile: (202) 659-1027

                                    *Attorneys for Defendant Intervenors*
                                    *International Snowmobile Manufacturers*
                                    *Association, American Council of*
                                    *Snowmobile Associations, BlueRibbon*
                                    *Coalition, and Terri Manning*

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on the 16th day of June, 2008, I filed the foregoing electronically through the CM/ECF system, which caused the following counsel to be served by electronic means.

Robert David Rosenbaum (robert_rosenbaum@aporter.com)
Counsel for National Parks Conservation Association

David S. Baron  (dbaron@earthjustice.org)
Douglas L. Honnold  (dhonnold@earthjustice.org)
Sean M. Helle  (shelle@earthjustice.org)
Counsel for Greater Yellowstone Coalition

Barry A. Weiner  (barry.weiner@usdoj.gov)
Guillermo A. Montero  (Guillermo.montero@usdoj.gov)
Luther L. Hajek  (luke.hajek@usdoj.gov)
Counsel for Federal Defendants




_/s/ David E. Lampp____ _____
David E. Lampp

William P. Horn (DC Bar No. 375666)
David E. Lampp (DC Bar No. 480215)
Birch Horton Bittner & Cherot, PC
1155 Connecticut Ave. NW, Suite 1200
Washington, DC  20036
Telephone:  (202) 659-5800
Facsimile:  (202) 659-1027

*Attorneys for Defendant Intervenors*
*International Snowmobile Manufacturer's Association,*
*American Council of Snowmobile Associations,*
*BlueRibbon Coalition, Inc., and Teri Manning*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____
                                                      )
GREATER YELLOWSTONE COALITION, et al.  )
                                                      )
          Plaintiffs,                        )
                                                      )
          v.                                 )          Case No. 1:07-cv-02111 (EGS)
                                                      )
KEMPTHORNE, et al.                           )          Hearing on Motions for Summary
                                                      )          Judgment to be Held on
          Defendants,                        )          August 27, 2008
                                                      )
          and                                )
                                                      )
THE INTERNATIONAL SNOWMOBILE                 )
MANUFACTURER'S ASSOCIATION,                  )
          et al.                             )
                                                      )
          Defendant-Intervenors.             )
_____)

_____
                                                      )
NATIONAL PARKS CONSERVATION                  )
          ASSOCIATION,                       )
                                                      )
          Plaintiff,                         )
                                                      )
          v.                                 )          Case No. 1:07-cv-02112 (EGS)
                                                      )
UNITED STATES DEPARTMENT OF                  )          Hearing on Motions for Summary
          INTERIOR, et al.                   )          Judgment to be Held on
                                                      )          August 27, 2008

| | |
|---|---|
| Defendants, | ) |
| | ) |
| and | ) |
| | ) |
| THE INTERNATIONAL SNOWMOBILE | ) |
| MANUFACTURER'S ASSOCIATION, | ) |
| et al. | ) |
| | ) |
| Defendant-Intervenors. | ) |

**DEFENDANTS-INTERVENORS' RESPONSE TO PLAINTIFF
NATIONAL PARK CONSERVATION ASSOCIATION
STATEMENT OF MATERIAL FACTS**

Defendant-Intervenors' the International Snowmobile Manufacturer's Association, the

American Council of Snowmobile Associations, the BlueRibbon Coalition, Inc., and Teri

Manning (collectively, "Snowmobilers"), through undersigned counsel, pursuant to L. Civ. R. 7

and 56.1, hereby submit the following Statement of Material Facts as to Which There is No

Genuine Dispute in objection to Plaintiffs' Motions for Summary Judgment on Plaintiffs' claims

for relief.

Snowmobilers dispute that this statement of facts is appropriate in this record review

case.  The rules require any party moving for summary judgment to submit a "statement of

material facts as to which the moving party contends there is no genuine issue . . .," and also

requires any party opposing a motion for summary judgment to submit a "separate concise

statement of genuine issues setting forth all material facts as to which it is contended there exists

a genuine issue necessary to be litigated . . . ."  In determining a motion for summary judgment,

the local rules state that the Court "may assume that facts identified by the moving party in its

statement of material facts are admitted, unless such a fact is controverted in the statement of

genuine issues filed in opposition to the motion."  L. Civ. R. 7.

This local rule, and the statement of facts that it requires, have no application in a case governed by the Administrative Procedure Act ("APA") as judicial review under the APA is limited to the agency's administrative record.  Under the APA, the Court may set aside a regulatory decision only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(a); Marsh v. Oregon Natural Resources Council, 490 U.S. 360 (1989).  Under this narrow standard of review, the Court is only empowered to determine whether "the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment."  Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 415-16 (1971); see also Marsh, 490 U.S. at 378.

Accordingly, judicial review of an agency decision under the APA is limited to the administrative record.  Defenders of Wildlife v. Babbitt, 958 F.Supp. 670, 678 (D.D.C. 1997); 5 U.S.C. § 706; see also Camp v. Pitts, 411 U.S. 138, 142 (1973); Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 419-20 (1971).  Thus, this Court is not called on to resolve issues of fact, and Defendant-Intervenors submit that the statements of facts submitted are inconsistent with the APA and governing principles of administrative law.  Nonetheless, and without waiving this objection, Snowmobilers submit the following Response to Plaintiffs' Statement of Material Facts as to Which There is No Genuine Dispute.

1.     Defendant-Intervenors do not dispute this statement.

2.     This statement is incomplete as on October 14, 2004 the 2001 Rule, 2000 EIS, and 2000 ROD were found to be in violation the Administrative Procedure Act and the National Environmental Policy Act, vacated and remanded to the National Park Service ("NPS") by the U.S. District Court in Wyoming.  International Snowmobile Manufacturer's Association, et al v. Norton.  304 F.Supp.2d. 1278 (D. Wy. 2004).

3.      Defendant-Intervenors dispute this statement as it is incomplete. Prior to being vacated in the Wyoming proceeding, the 2001 Rule was stayed pursuant to a June 29, 2001 settlement between the National Park Service and the Plaintiffs and Plaintiff-Intervenors (States of Montana and Wyoming) in the International Snowmobile Manufacturer's Association (ISMA) suit filed against the 2001 in U.S. District Court in Wyoming.  Following the Settlement, NPS completed a Supplemental EIS and the December 11, 2003 regulations.

4.      Defendant-Intervenors do not dispute this statement.

5.      Defendant-Intervenors do not dispute this statement.

6.      Defendant-Intervenors do not dispute this statement.

7.      Defendant-Intervenors do not dispute this statement.

8.      The statement characterizes a small part of the administrative record which speaks for itself and any statements contrary to their plain meaning and context are disputed.

9a.      Defendant-Intervenors object to this statement as this is extraneous extra-record material and not part of the administrative record in this Summary Judgment proceeding.

9b.      Defendant-Intervenors object to this statement as this is extraneous extra-record material and not part of the administrative record in this Summary Judgment proceeding.

10a.      Defendant-Intervenors object to this statement as this is extraneous extra-record material and not part of the administrative record in this Summary Judgment proceeding.

10b.      The statement characterizes a small part of the administrative record which speaks for itself and any statements contrary to their plain meaning and context are disputed.

11.      Defendant-Intervenors object to this statement as this is extraneous extra-record material and not part of the administrative record in this Summary Judgment proceeding.

11a.      Defendant-Intervenors object to this statement as this is extraneous extra-record material and not part of the administrative record in this Summary Judgment proceeding.

11b.    Defendant-Intervenors object to this statement as this is extraneous extra-record material and not part of the administrative record in this Summary Judgment proceeding.

11c.    The statement characterizes a small part of the administrative record which speaks for itself and any statements contrary to their plain meaning and context are disputed.

12.    The statement characterizes a small part of the administrative record which speaks for itself and any statements contrary to their plain meaning and context are disputed.

13.    Defendant-Intervenors do not dispute this statement.

13a.    Defendant-Intervenors do not dispute this statement.

13b.    Defendant-Intervenors do not dispute this statement.

14.    The statement characterizes a small part of the administrative record which speaks for itself and any statements contrary to their plain meaning and context are disputed.

14a.    The statement characterizes a small part of the administrative record which speaks for itself and any statements contrary to their plain meaning and context are disputed.

14b.    The statement characterizes a small part of the administrative record which speaks for itself and any statements contrary to their plain meaning and context are disputed.

15.    Defendant-Intervenors do not dispute this Statement.

15a.    The statement characterizes a small part of the administrative record which speaks for itself and any statements contrary to their plain meaning and context are disputed.

15.b.    The statement characterizes a small part of the administrative record which speaks for itself and any statements contrary to their plain meaning and context are disputed.

15c.    The statement characterizes a small part of the administrative record which speaks for itself and any statements contrary to their plain meaning and context are disputed.

16.    The statement characterizes a small part of the administrative record which speaks for itself and any statements contrary to their plain meaning and context are disputed.

16.a.(1).  The statement characterizes a small part of the administrative record which speaks for itself and any statements contrary to their plain meaning and context are disputed.

16.a.(2).  The statement characterizes a small part of the administrative record which speaks for itself and any statements contrary to their plain meaning and context are disputed.

16.a.(3).  The statement characterizes a small part of the administrative record which speaks for itself and any statements contrary to their plain meaning and context are disputed.

16.b.  Defendant-Intervenors dispute the statement that "the FEIS virtually ignores the NPS's own monitoring data."  The statement characterizes a small part of the administrative record which speaks for itself and any statements contrary to their plain meaning and context are disputed.

16.b.(1).  The statement characterizes a small part of the administrative record which speaks for itself and any statements contrary to their plain meaning and context are disputed.

16.b.(2).  The statement characterizes a small part of the administrative record which speaks for itself and any statements contrary to their plain meaning and context are disputed.

16.b.(3).  The statement characterizes a small part of the administrative record which speaks for itself and any statements contrary to their plain meaning and context are disputed.

16.b.(4).  The statement characterizes a small part of the administrative record which speaks for itself and any statements contrary to their plain meaning and context are disputed.

16.c.   Defendant-Intervenors dispute the statement "by relying on the Volpe modeling so heavily in the FEIS, the NPS also ignored methodological deficiencies identified by several NPS soundscape experts."

16.c.(1).  The statement characterizes a small part of the administrative record which speaks for itself and any statement contrary to their plain meaning and context are dispute.

16.c.(2).  The statement characterizes a small part of the administrative record which speaks for itself and any statement contrary to their plain meaning and context are dispute.

16.c.(3).  The statement characterizes a small part of the administrative record which speaks for itself and any statement contrary to their plain meaning and context are dispute.

No paragraphs 17 through 20.

21.    Defendant-Intervenors dispute this statement.

21.a.    Defendant-Intervenors dispute the statement "this methodology minimizes the impact of the Winter Use Plan . . .".  The remainder of the statement characterizes a small part of the administrative record which speaks for itself and any statements contrary to their plain meaning and context are disputed.

21.b.    Defendant-Intervenors dispute the statement "The FEIS fails to consider adequately a number of scientific studies that have the interrelationship between wildlife and winter recreation in Yellowstone."  The remainder of the statement characterizes a small part of the administrative record which speaks for itself and any statements contrary to their plain meaning and context are disputed.

21.c.    Defendant-Intervenors dispute the statement "The total population methodology also permits the NPS to exclude the number of OSV's as a significant factor in the analysis." The remainder of the statement characterizes a small part of the administrative record which speaks for itself and any statements contrary to their plain meaning and context are disputed.

22.    The statement characterizes a small part of the administrative record which speaks for itself and any statements contrary to their plain meaning and context are disputed.

7

22.a.    The statement characterizes a small part of the administrative record which speaks for itself and any statements contrary to their plain meaning and context are disputed.

22.b.    Defendant-Intervenors dispute the statement "This modeling understates the impact of snowmobile emissions on quality, in part because it is based on the assumption that the emissions from BAT-certified snowmobiles will actually meet certification requirements." The remainder of the statement characterizes a small part of the administrative record which speaks for itself and any statements contrary to their plain meaning and context are disputed.

22.c.    The statement characterizes a small part of the administrative record which speaks for itself and any statements contrary to their plain meaning and context are disputed.

23.a.    The statement characterizes a small part of the administrative record which speaks for itself and any statements contrary to their plain meaning and context are disputed.

23.b.    The statement characterizes a small part of the administrative record which speaks for itself and any statements contrary to their plain meaning and context are disputed.

24.    Defendant-Intervenors do not dispute this statement.

25.    Defendant-Intervenors dispute the statement "although the NPS had flatly rejected, by adopting the 2006 Management Policies, the notion that the Organic Act permitted the balancing of supposedly 'dual' purposes of conservation and recreation, the 2007 ROD claimed the power to permit serious adverse impacts in order to provide greater recreational opportunities." The remainder of the statement characterizes a small part of the administrative record which speaks for itself and any statements contrary to their plain meaning and context are disputed.

26.    Defendant-Intervenors do not dispute this statement.

26.a.    The statement characterizes a small part of the administrative record which speaks for itself and any statements contrary to their plain meaning and context are disputed.

8

26.b.    Defendant-Intervenors do not dispute this statement.

DATED:    June 16, 2008

Respectfully submitted,

_/s/ William P. Horn_____
William P. Horn
District of Columbia Bar No. 375666
David E. Lampp
District of Columbia Bar No. 480215
1155 Connecticut Avenue, N.W.
Washington, DC  20036
Telephone: (202) 659-5800
Facsimile: (202) 659-1027

*Attorneys for Defendant Intervenors
International Snowmobile Manufacturers
Association, American Council of
Snowmobile Associations, BlueRibbon
Coalition, and Terri Manning*

9

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on the 16th day of June, 2008, I filed the foregoing electronically through the CM/ECF system, which caused the following counsel to be served by electronic means.

Robert David Rosenbaum  (Robert_rosenbaum@aporter.com)
Counsel for National Parks Conservation Association

Barry A. Weiner  (barry.weiner@usdoj.gov)
Guillermo A. Montero  (Guillermo.montero@usdoj.gov)
Luther L. Hajek  (luke.hajek@usdoj.gov)
Counsel for Federal Defendants

_/s/ David E. Lampp____   _____
David E. Lampp

G:/101238/12/00003091.DOC

William P. Horn (DC Bar No. 375666)
David E. Lampp (DC Bar No. 480215)
Birch Horton Bittner & Cherot, PC
1155 Connecticut Ave. NW, Suite 1200
Washington, DC  20036
Telephone:  (202) 659-5800
Facsimile:  (202) 659-1027

*Attorneys for Defendant Intervenors*
*International Snowmobile Manufacturer's Association,*
*American Council of Snowmobile Associations,*
*BlueRibbon Coalition, Inc., and Teri Manning*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____
                                                    )
GREATER YELLOWSTONE COALITION, et al.  )
                                                    )
      Plaintiffs,                          )
                                                    )
      v.                                      )          Case No. 1:07-cv-02111 (EGS)
                                                    )
KEMPTHORNE, et al.                          )          Hearing on Motions for Summary
                                                    )          Judgment to be Held on
      Defendants,                          )          August 27, 2008
                                                    )
      and                                     )
                                                    )
THE INTERNATIONAL SNOWMOBILE        )
MANUFACTURER'S ASSOCIATION,        )
      et al.                                    )
                                                    )
      Defendant-Intervenors.           )
_____)

_____
                                                    )
NATIONAL PARKS CONSERVATION        )
      ASSOCIATION,                        )
                                                    )
      Plaintiff,                             )          Case No. 1:07-cv-02112 (EGS)
                                                    )
      v.                                      )          Hearing on Motions for Summary
                                                    )          Judgment to be Held on
                                                    )          August 27, 2008

UNITED STATES DEPARTMENT OF    )
      INTERIOR, et al.               )
                                   )
    Defendants,                   )
                                   )
    and                           )
                                   )
THE INTERNATIONAL SNOWMOBILE    )
      MANUFACTURER'S ASSOCIATION,   )
      et al.                         )
                                   )
    Defendant-Intervenors.         )
_____)

### DEFENDANT-INTERVENORS' RESPONSE TO PLAINTIFF GREATER YELLOWSTONE COALITION STATEMENT OF MATERIAL FACTS AS TO WHICH THERE IS NO GENUINE ISSUE

Defendant-Intervenors the International Snowmobile Manufacturers' Association, the American Council of Snowmobile Associations, the BlueRibbon Coalition, Inc. and Teri Manning (collectively, "Snowmobilers"), through counsel and pursuant to the Federal Rules of Civil Procedure and Local Rules and Orders of this Court, hereby submit their Response to Greater Yellowstone Coalition's Statement of Material Facts as to Which There Is No Material Dispute.

Snowmobilers dispute that the statements of fact called for by L. Civ. R. 7 and 56.1 are appropriate in this administrative record review. We hereby incorporate by reference the objections and arguments presented in our response to plaintiff National Park Conservation Association's similar statement of facts.  (ECF Number to be determined.)

Notwithstanding those objections and without waiving those objections, the following are Snowmobilers' responses to Greater Yellowstone Coalition's statement of facts:

1

1.      Defendant-Intervenors dispute the statement that "recreational snowmobiling has caused significant adverse impacts to Yellowstone National Park's resources and values." The remainder of the statement characterizes a small part of the administrative record that speaks for itself and any statements contrary to their plain meaning and context are disputed.

a.      The statement characterizes a small part of the administrative record that speaks for itself and any statements contrary to their plain meaning and context are disputed.

b.      Defendant-Intervenors dispute the statement that "Park Service biologists recommended in a 2006 study that oversnow vehicle numbers be maintained 'at or below' recent levels in order to minimize disturbance of the Park's winter-stressed animals and thereby avoid adverse fitness effects." The remainder of the statement characterizes a small part of the administrative record that speaks for itself and any statements contrary to their plain meaning and context are disputed.

c.      The statement characterizes a small part of the administrative record that speaks for itself and any statements contrary to their plain meaning and context are disputed.

2.      Defendant-Intervenors dispute the statement that "the administration's plan will accordingly result in a substantial increase in the adverse environmental impacts caused by snowmobile use in the Park." The remainder of the statement characterizes a small part of the administrative record that speaks for itself and any statements contrary to their plain meaning and context are disputed.

a.      The statement characterizes a small part of the administrative record that speaks for itself and any statements contrary to their plain meaning and context are disputed.

b.      The statement characterizes a small part of the administrative record that speaks for itself and any statements contrary to their plain meaning and context are disputed.

2

      c.      Defendant-Intervenors dispute the statement that "accordingly the challenged plan is likely to result in even greater emissions increases over current levels." The remainder of the statement characterizes a small part of the administrative record that speaks for itself and any statements contrary to their plain meaning and context are disputed.

      3.      Defendants-Intervenors dispute this statement.

      a.      The statement characterizes a small part of the administrative record that speaks for itself and any statements contrary to their plain meaning and context are disputed.

      b.      The statement characterizes a small part of the administrative record that speaks for itself and any statements contrary to their plain meaning and context are disputed.

      c.      The statement characterizes a small part of the administrative record that speaks for itself and any statements contrary to their plain meaning and context are disputed.

      4.      Defendant-Intervenors dispute this statement.

DATED:   June 16, 2008

Respectfully submitted,

  /s/ William P. Horn
William P. Horn
District of Columbia Bar No. 375666
David E. Lampp
District of Columbia Bar No. 480215
1155 Connecticut Avenue, N.W.
Washington, DC  20036
Telephone: (202) 659-5800
Facsimile: (202) 659-1027

*Attorneys for Defendant Intervenors*
*International Snowmobile Manufacturers*
*Association, American Council of*
*Snowmobile Associations, BlueRibbon*
*Coalition, and Terri Manning*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 16th day of June, 2008, I filed the foregoing electronically through the CM/ECF system, which caused the following counsel to be served by electronic means.

David S. Baron  (dbaron@earthjustice.org)
Douglas L. Honnold  (dhonnold@earthjustice.org)
Sean M. Helle  (shelle@earthjustice.org)
Counsel for Greater Yellowstone Coalition

Barry A. Weiner  (barry.weiner@usdoj.gov)
Guillermo A. Montero  (Guillermo.montero@usdoj.gov)
Luther L. Hajek  (luke.hajek@usdoj.gov)
Counsel for Federal Defendants


_/s/ David E. Lampp____  _____
David E. Lampp

William P. Horn (DC Bar No. 375666)
David E. Lampp (DC Bar No. 480215)
Birch Horton Bittner & Cherot, PC
1155 Connecticut Ave. NW, Suite 1200
Washington, DC  20036
Telephone:  (202) 659-5800
Facsimile:  (202) 659-1027

*Attorneys for Defendant Intervenors*
*International Snowmobile Manufacturer's Association,*
*American Council of Snowmobile Associations,*
*BlueRibbon Coalition, Inc., and Teri Manning*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____
                                                  )
GREATER YELLOWSTONE COALITION, et al.  )
                                                  )
        Plaintiffs,                          )
                                                  )
        v.                                   )          Case No. 1:07-cv-02111 (EGS)
                                                  )
KEMPTHORNE, et al.                          )          Hearing on Motions for Summary
                                                  )          Judgment to be Held on
        Defendants,                          )          August 27, 2008
                                                  )
        and                                  )
                                                  )
THE INTERNATIONAL SNOWMOBILE        )
MANUFACTURER'S ASSOCIATION,          )
        et al.                               )
                                                  )
        Defendant-Intervenors.               )
_____)

_____
                                                  )
NATIONAL PARKS CONSERVATION         )
        ASSOCIATION,                         )
                                                  )
        Plaintiff,                           )          Case No. 1:07-cv-02112 (EGS)
                                                  )
        v.                                   )          Hearing on Motions for Summary
                                                  )          Judgment to be Held on
                                                  )          August 27, 2008

UNITED STATES DEPARTMENT OF            )
      INTERIOR, et al.                              )
                                                              )
      Defendants,                                     )
                                                              )
      and                                                   )
                                                              )
THE INTERNATIONAL SNOWMOBILE          )
      MANUFACTURER'S ASSOCIATION,        )
      et al.                                                )
                                                              )
      Defendant-Intervenors.                    )
_____)

## PROPOSED ORDER

      Upon consideration of Defendants' and Defendant-Intervenors' (Snowmobilers')

Memoranda in Opposition to Plaintiffs' Motions for Summary Judgment, it is hereby

      ORDERED that the Greater Yellowstone Coalition Plaintiff's Motion for Summary

Judgment is DENIED; and

      FURTHER ORDERED that the National Parks Conservation Association Plaintiff's

Motion for Summary Judgment is DENIED.

      SO ORDERED this _____ day of _____, _____.


                                     _____
                                     EMMET G. SULLIVAN
                                     United States District Judge