IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                                            )
GREATER YELLOWSTONE COALITION,          )
et al.,                                                        )
                                                            )
                  Plaintiffs,                              )
                                                            )        Case No. 07-cv-2111 (EGS)
       v.                                                  )
                                                            )        [Hearing on Motions for Summary
DIRK KEMPTHORNE, et al.,                         )        Judgment on August 27, 2008]
                                                            )
                  Defendants.                            )
_____)


_____
                                                            )
NATIONAL PARKS CONSERVATION           )
ASSOCIATION,                                        )
                                                            )
                  Plaintiff,                               )
                                                            )        Case No. 07-cv-2112 (EGS)
       v.                                                  )
                                                            )        [Hearing on Motions for Summary
UNITED STATES DEPARTMENT OF THE      )        Judgment on August 27, 2008]
INTERIOR; NATIONAL PARK SERVICE       )
                                                            )
                  Defendants.                            )
_____)


**FEDERAL DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF CROSS-MOTION FOR SUMMARY JUDGMENT
AND IN OPPOSITION TO GREATER YELLOWSTONE COALITION'S
MOTION FOR SUMMARY JUDGMENT, RE CASE NO. 07-CV-2111 (EGS)**

## TABLE OF CONTENTS

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

FACTUAL BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

    I.     Prior Winter Use Litigation and Development of the Temporary
           Winter Use Plan . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

    II.    The 2007 Winter Use Plan . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

LEGAL BACKGROUND

    I.     National Environmental Policy Act . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

    II.    National Park Service Organic Act . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

    III.   Yellowstone Enabling Act . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

ARGUMENT

    I.     Standards of Review . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

          A.    Standard of Review in a Motion for Summary Judgment . . . . . . . . . . . . 8

          B.    Standard of Review under the Administrative Procedure Act . . . . . . . . . 8

    II.    GYC's Claims Under the Organic Act, Yellowstone Act, Executive
           Orders, and 36 C.F.R. §2.18 Have No Merit . . . . . . . . . . . . . . . . . . . . . . . . . . 9

          A.    The Winter Use Plan Does Not Violate The Organic Act . . . . . . . . . . . . 9

                1.    The Conservation Mandate . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

                2.    The Service's Finding That The Winter Use Plan
                      Would Not Result in "Unacceptable Impacts" Is
                      Fully Supported By The Record . . . . . . . . . . . . . . . . . . . . . . . . 12

                3.    GYC's Assertion That The Service Has Violated
                      The Organic Act's Conservation Mandate Has No Merit . . . . . . 14

          B.    The Winter Use Plan Does Not Violate Executive Orders 11644
               and 11989 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

          C.    The Winter Use Plan Complies With The Service's Regulations . . . . . . 18

          D.    To The Extent This Court Perceives a "Departure" From The
               2001 Final Rule, That Departure Is Fully And Adequately
                Explained In The Decision Documents And Administrative Record . . . 20

III.    The FEIS Fully Complies With NEPA And Provides An Adequate Basis
        For the Park Service's Management Actions Under the Organic Act . . . . . . . . . 23

        A.    Analysis Was Not Improper Merely Because It Compared
              Forecasted Impacts to Historical Conditions . . . . . . . . . . . . . . . . . . . . . . . 25

        B.    The Service's Thorough Analysis of Soundscape Impacts
              Satisfied NEPA . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

        C.    The Service's Thorough Analysis of Air Quality Impacts
              Satisfied NEPA . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

        D.    The Analysis of Impacts to Wildlife Under the Alternative
              Considered in the EIS Was Proper . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

              1.    The Analysis of Impacts to Bison and Other Wildlife
                    From OSV Use . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

              2.    GYC's Arguments Regarding the Analysis of Wildlife
                    in the EIS Are Without Merit . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

                    a.    The Service Analyzed Impacts to Both Populations
                          and Individuals of Species . . . . . . . . . . . . . . . . . . . . . . . 38

                    b.    The Service's Analysis Is Consistent With the
                          Findings of the Relevant Studies Conducted by
                          the Service's Scientists . . . . . . . . . . . . . . . . . . . . . . . . . . 39

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

**INTRODUCTION**

Federal Defendants, the United States Department of the Interior and the National Park Service (collectively "Federal Defendants" or "Service"), respectfully submit the following memorandum of points and authorities in support of the Service's cross-motion for summary judgment and in opposition to plaintiff Greater Yellowstone Coalition's ("GYC") motion for summary judgment.

GYC makes three primary arguments: (1) that the Winter Use Plan governing the use of recreational snowmobiles in Yellowstone National Park violates the National Park Service Organic Act and related authorities; (2) that the Plan constitutes an unexplained departure from the Service's previous decisions in violation of the Administrative Procedure Act ("APA"); and (3) that the Service prepared an inadequate environmental analysis under the National Environmental Policy Act ("NEPA"). As explained in detail below, none of these arguments has merit. The Winter Use Plan – a policy decision by which the competing uses of natural resources have been reconciled – fully complies with the substantive requirements of all relevant environmental statutes and regulations. In addition, the Winter Use Plan is based on the thorough and painstaking environmental analysis that is summarized in the Service's Final Environmental Impact Statement ("FEIS"). That analysis, which includes the actual monitoring of a managed over snow vehicle program over the last three winter seasons, provides a rational basis for the Service's decision, fully explains any perceived departure from the Service's previous decisions, and more than satisfies the procedural requirements of NEPA. Accordingly, NPCA's motion for summary judgment should be denied, and the Service's motion for summary judgment should be granted.

**FACTUAL BACKGROUND**

I.      **Prior Winter Use Litigation and Development of The Temporary Winter Use Plans**

The existence and regulation of snowmobile use has a long history in Yellowstone National Park (hereinafter "the Park" or "Yellowstone"). Only three snowmobiles entered the Park during the entire winter of 1963, but that number grew rapidly to the point where as many as 1700

snowmobiles would access Yellowstone and two contiguous units of the National Park System (Grand Teton National Park and the John D. Rockefeller, Jr. Memorial Parkway) on peak days. See Fund for Animals v. Norton, 294 F. Supp.2d 92, 98-99 (D.D.C. 2003).

This rapid rise in visitation created a variety of issues, including air quality, soundscape, visitor experience, and wildlife concerns. AR 117160 at 5. These issues led to litigation and, ultimately a settlement agreement whereby the Service committed to prepare a new winter use plan and a corresponding environmental impact statement. Fund for Animals, 294 F. Supp.2d at 99. The environmental impact statement and record of decision were issued in 2000, and a Final Rule was published in 2001 that mandated a complete elimination of snowmobile use for the 2003-2004 winter season. Id. at 100. In support of its decision, the Service recognized that Yellowstone saw an average of more than 800 snowmobile entries per day. 65 Fed. Reg. 80,908, 80,913 (Dec. 22, 2000). The Service explained that the adverse impacts to Yellowstone's air quality, natural soundscape, and wildlife resulting from that level of snowmobile use had resulted in the impairment of Park resources and values in violation of the Organic Act. Fund for Animals, 294 F. Supp.2d at 106; see also 65 Fed. Reg. at 917. The Service recognized that newer snowmobile technologies had the potential to reduce impacts, but at the time felt that the extent of that potential was unclear due to the lack of any emission standards, testing, and certification for snowmobiles at that time. See 66 Fed. Reg. 7260 (Jan. 22, 2001). It also found that newer snowmobile technologies would not significantly reduce impacts to wildlife because most impacts to wildlife were caused by inappropriate use of snowmobiles rather than by the machines themselves. See id. The EIS did not analyze the use of a guiding requirement to reduce those impacts.

In December, 2003, however, the Service replaced the 2001 Rule with a new Final Rule, which authorized up to 950 snowmobiles to enter the Park each day, provided that they comply with specific air and noise emissions requirements (generally referred to as best available technology standards or "BAT"). Fund for Animals, 294 F. Supp.2d at 101. The 2003 Rule implemented a monitoring and adaptive management program, and required that 80% of snowmobile entries be

accompanied by commercial guides. Id.; see also 68 Fed. Reg. 69,268, 69,283-84 (Dec. 11, 2003). The remaining 20% was allowed to enter with non-commercial guides.

This Court ultimately vacated the 2003 Rule on grounds that it represented an unexplained departure from the Service's previous position, and reinstated the previous (2001) Rule in its place. Fund for Animals, 294 F. Supp.2d at 108. A subsequent ruling by the District Court for the District of Wyoming, however, prohibited the Service from implementing the 2001 Rule and, accordingly, the Service was left without an operative rule to govern winter use of the Park during the 2003-04 season. See Fund for Animals v. Norton, 323 F. Supp.2d 7, 10 (D.D.C. 2004). The Service, therefore, prepared temporary winter use plans in 2004. The temporary plans were intended to provide a framework for managing winter use in the three units of the National Park System for a period of three years while the Service prepared an environmental impact statement and long-term winter use plan for the Parks that would address the issues identified by the two district courts. See Fund for Animals v. Norton, 390 F. Supp.2d 12, 14 (D.D.C. 2005).

On November 10, 2004, the Service issued the Temporary Rule, which authorized up to 720 snowmobile entries per day in Yellowstone. 69 Fed. Reg. 65,348. As with the 2003 Rule, the Temporary Rule required that all recreational snowmobiles meet BAT standards. In addition, the Temporary Rule imposed a 100% commercial guidance requirement. This rule remained effective through the winter season of 2006–2007.

Though the Temporary Rule authorized up to 720 snowmobiles per day, actual snowmobile use in Yellowstone during that period was much lower. In the winter of 2006-07, an average of 290 snowmobiles and 32 snowcoaches per day (the highest for the three winters) entered Yellowstone. On the peak day that winter, 542 snowmobiles entered Yellowstone. AR 126288. Under the Temporary Rule, Yellowstone saw significant improvements in air quality, fewer wildlife disturbances, and a reduction in sound impacts compared with historic unregulated use. AR 117160 at 93-95, 143; AR 119777-78.

**II.    The 2007 Winter Use Plan**

The Service conducted public scoping for the 2007 EIS from June 24 through September 1, 2005. It entered into memoranda of understanding with ten cooperating agencies and held more than fifty informational meetings with those cooperating agencies and other stakeholders. The Draft EIS was published on March 27, 2007, and public comments were accepted until June 5, 2007. The Service also held four public meetings during the comment period. AR 126499 (ROD) at 36-38. The 2007 Final EIS, which was released on September 24, 2007, considered all of the comments submitted. AR 117160 ("FEIS") at 383-94 & Appendix I; AR 121306 (Public Comment Report). A total of 122,190 letters were submitted, 116,910 of which were form letters. AR 121306 at 20. Among those comments was a letter from former directors of the National Park Service objecting to the preferred alternative in the DEIS, which would have permitted 720 snowmobiles per day. AR 120940. Taking its analysis and the public comments into consideration, the Service lowered the daily snowmobile limit in the final Winter Use Plan to 540, and released the FEIS on September 24, 2007. AR 117160 at 63.

The 2007 FEIS analyzed seven alternatives for winter use in Yellowstone. Alternative 1 would have continued winter use largely as it was under the Temporary Rule. Alternative 2 would have eliminated snowmobile use and continued snowcoach use, similar to the 2001 Rule. Alternative 3 included two related alternatives, one of which would have eliminated most road grooming in Yellowstone, and the other of which (the no-action alternative) would have eliminated all recreational oversnow vehicle use. Alternative 4 would have expanded snowmobile use and loosened the guiding requirement. Alternative 5 would have snowmobile numbers similar to the preferred alternative but would have allowed them to be counted on a more flexible seasonal basis, and would also have loosened the guiding requirement. Alternative 6 would have plowed many of Yellowstone's roads in winter to allow for wheeled vehicle access, while allowing for oversnow vehicle access in other areas. Alternative 7 was the selected alternative. AR 117160 at S-7 to S-9; AR 117160.

The Record of Decision ("ROD") for the 2007 FEIS was approved on November 20, 2007. The ROD calls for a daily limit of 540 snowmobiles and 83 snowcoaches per day in Yellowstone. With few exceptions, all recreational snowmobiles are immediately required to meet BAT standards, as are all snowcoaches beginning in 2011-12. In addition, all snowmobilers in Yellowstone must travel with a commercial guide. The ROD provides for an intensive adaptive management program. It also calls for temporal and spatial zoning on several side roads to facilitate a variety of uses. AR 126499.

The proposed rule was published on May 16, 2007. 72 Fed. Reg. 27,499. Comments were accepted until July 16, 2007. Id. The 2007 Final Rule, which implements those portions of the 2007 ROD for which a special regulation was necessary or appropriate, was published on December 13, 2007. 72 Fed. Reg. 70,781.

## LEGAL BACKGROUND

### I. National Environmental Policy Act

NEPA serves the dual purpose of, first, informing agency decision-makers of the significant environmental effects of proposed major federal actions and, second, insuring that relevant information is made available to the public so that they "may also play a role in both the decisionmaking process and the implementation of that decision." See Robertson v. Methow Valley Citizens Council, 490 U.S. 332, 349 (1989). To meet these dual purposes, NEPA requires that an agency prepare an Environmental Impact Statement ("EIS") for "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C); 40 C.F.R. § 1501.4.

The Council on Environmental Quality's regulations implementing NEPA provide guidance as to the nature and content of an EIS. See 40 C.F.R. Pt. 1502 (addressing requirements for an EIS). Those regulations direct the preparer to include an analysis of alternatives to the proposed action in an EIS, see id. § 1502.14, and further instruct that the document should include discussions of direct, indirect, and cumulative impacts, id. §§ 1502.16 (a)-(b), 1508.7, 1508.8, as well as means to mitigate adverse environmental impacts from the proposed action. Id. § 1502.16(h). The regulations,

however, clarify that agencies must discuss impacts only in proportion to their significance. Id. § 1502.2.

In reviewing the sufficiency of an EIS, a court is charged only with ensuring that the agency has presented a "reasonably thorough discussion of the significant aspects of the probable environmental consequences." California v. Block, 690 F.2d 753, 761 (9th Cir. 1982). Thus, "a reviewing court may not 'fly speck' an EIS and hold it insufficient on the basis of inconsequential, technical deficiencies." N. Plains Resource Council v. Lujan, 874 F.2d 661, 665 (9th Cir. 1989); Sierra Club v. Adams, 578 F.2d 389, 393 (D.C. Cir. 1978) ("We are not to 'fly speck' the statement."). While it "is . . . always possible to explore a subject more deeply and to discuss it more thoroughly," the "line-drawing decisions necessitated by this fact of life are vested in the agencies, not the courts." Coal. on Sensible Transp. v. Dole, 826 F.2d 60, 66 (D.C. Cir. 1987).

In addition, a reviewing court may not force an agency to elevate environmental concerns over other appropriate considerations. Stryker's Bay Neighborhood Council, Inc. v. Karlen, 444 U.S. 223, 227 (1980). "Other statutes may impose substantive environmental obligations on federal agencies, but NEPA merely prohibits uninformed – rather than unwise – agency action." Methow Valley, 490 U.S. at 350. "NEPA does not require that certain outcomes be reached as a result of the evaluation." Natural Res. Def. Council, Inc. v. EPA, 822 F.2d 104, 129 (D.C. Cir. 1987) (internal citation omitted). Rather, "[o]nce satisfied that a proposing agency has taken a 'hard look' at a decision's environmental consequences, the review is at an end." Block, 690 F.2d at 761 (citing Kleppe v. Sierra Club, 427 U.S. 390, 410 n.21 (1976)).

## II.    The National Park Service Organic Act

The National Park Service Organic Act provides that the Service is to "promote and regulate the use" of national parks in such a way as to conform to the "fundamental purpose" of the parks. This fundamental purpose is defined in the Act as follows:

> [T]o conserve the scenery and the natural and historic objects and the wild life therein and to provide for the enjoyment of the same in such manner and by such means as will leave them unimpaired for the enjoyment of future generations.

16 U.S.C. § 1 (emphasis added).[1/]  While the Organic Act directs the Service to regulate the parks

pursuant to this broad "non-impairment" standard, it is silent as to the specifics of park management.

See S. Utah Wilderness Alliance v. Dabney ("SUWA I"), 222 F.3d 819, 826 (10th Cir. 2000) ("It is

unclear from the statute itself what constitutes impairment, and how both the duration and severity

of the impairment are to be evaluated or weighed against the other value of public use of the park.").

Thus, "the Park Service has broad discretion in determining which avenues best achieve the Organic

Act's mandate."  Bicycle Trails Council of Marin v. Babbitt, 82 F.3d 1445, 1454 (9th Cir. 1996)

(quotations omitted).  The Organic Act, therefore, provides the Service authority to make such

regulations as it deems "necessary or proper for the use and management of the parks."  16 U.S.C.

§ 3.  Regulations promulgated under this authority are found in Title 36 of the Code of Federal

Regulations.  In addition to these regulations, the Service has issued a Service-wide policy document

entitled the "Management Policies," which informs and directs the management of park resources

under the Organic Act. See Mgmt. Pol. (AR 120645) at 4-5; available at www.nps.gov/policy/

MP2006.pdf.  The most recent version of the Management Policies was issued in 2006, and the

interpretations and policies articulated therein are entitled to substantial deference.  See Davis v.

Latschar, 202 F.3d 359, 365 (D.C. Cir. 2000) ("Because the Organic Act is silent as to the specifics

_____

[1/]      In addition to the "non-impairment" standard, the Organic Act prohibits the Service from
authorizing activities that "derogate" park values.  The non-derogation mandate is set out in the
Organic Act as follows:

> The authorization of activities shall be construed and the protection, management,
> and administration of these areas shall be conducted in light of the high public value
> and integrity of the National Park System and shall not be exercised in derogation
> of the values and purposes for which these various areas have been established,
> except as may have been or shall be directly and specifically provided by Congress.

16 U.S.C. § 1a-1.  As is evident from the legislative history for the amendment that added the
"derogation" standard to the Organic Act, however, the derogation and impairment terms "define
a single standard for the management of the national park system – not two separate standards."
Mgmt. Pol. § 1.4.2 (emphasis added).

of park management, the Secretary has especially broad discretion on how to implement his statutory mandate.").

## III.    Yellowstone Enabling Act

The Yellowstone Enabling Act, 16 U.S.C. § 21 et seq., sets apart a vast expanse of land lying in Wyoming, Montana, and Idaho "as a public park or pleasuring ground for the benefit and enjoyment of the people" of the United States.  Id. § 21.  The Act requires the Secretary of the Interior to preserve "from injury or spoliation" the "wonders" of Yellowstone National Park and to ensure "their retention in their natural condition." Id. § 22.  The Secretary is also required to "provide against the wanton destruction of the fish and game found within the park, and against their capture or destruction for the purposes of merchandise or profit." Id.  Finally, the Act authorizes the Secretary to issue "such rules and regulations as he may deem necessary and proper for the management and care of the park . . . ." Id. § 26.

## ARGUMENT

## I.    Standards of Review

### A.    Standard of Review in a Motion for Summary Judgment

Summary judgment is appropriate where there are no genuine issues of material fact.  Fed. R. Civ. P. 56(c).  In Administrative Procedure Act ("APA") actions, the Court reviews the agency's administrative record, and may not "find" underlying facts. The only issues presented are issues of law.  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); see also Nat'l Ass'n of Home Builders v. U.S. Army Corps of Eng'rs, 417 F.3d 1272, 1282 (D.C. Cir. 2005) ("'[C]laims that an agency's action is arbitrary and capricious or contrary to law present purely legal issues.'") (quoting Atl. States Legal Found. v. E.P.A., 325 F.3d 281, 284 (D.C. Cir. 2003)).

### B.    Standard of Review under the Administrative Procedure Act

Challenges to agency actions taken pursuant to NEPA and the Organic Act are subject to the review provisions of the Administrative Procedure Act.  See Town of Stratford, Conn. v. F.A.A., 285 F.3d 84, 88 (D.C. Cir. 2002) (NEPA); Sierra Club v. Mainella, No. Civ.A. 04-2012 JDB, 2005

WL 3276264, at *8 n.6 (D.D.C. Sept. 1, 2005) (Organic Act).  The APA allows review of "agency action," dictating the type of agency action that is judicially reviewable, when agency action is judicially reviewable, the scope of review permitted, and the standard to be applied by a reviewing court.  5 U.S.C. §§ 701-706; <u>Darby v. Cisneros</u>, 509 U.S. 137, 146 (1993).  In evaluating the legal sufficiency of informal agency actions, the Court must apply the "arbitrary and capricious" standard of the APA, 5 U.S.C. § 706(2)(A).  This standard is a narrow one whereby "[t]he court is not empowered to substitute its judgment for that of the agency."  <u>Citizens to Preserve Overton Park, Inc. v. Volpe</u>, 401 U.S. 402, 416 (1971).  Rather, a court's role is to decide whether "the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment."  <u>Id.</u>; <u>see also</u> <u>Marsh v. Or. Natural Res. Council</u>, 490 U.S. 360, 378 (1989); <u>Balt. Gas & Elec. Co. v. Natural Res. Def. Council, Inc.</u>, 462 U.S. 87, 97-98 (1983); <u>H&F Enterprises, Ltd. v. United States</u>, 973 F. Supp. 170, 173 (D.D.C. 1996) ("Court is expected to exercise restraint in deciding whether to set aside agency actions.").  Deference to an agency's decision is especially appropriate when courts review the agency's technical analysis and judgments involving the evaluation of complex scientific data within the agency's technical expertise.  <u>See</u> <u>Marsh</u>, 490 U.S. at 377.

The scope of a court's review under the APA is limited to the administrative record that was before the decision-maker.  <u>See</u> <u>Fla. Power & Light Co. v. Lorion</u>, 470 U.S. 729, 743 (1985); <u>Camp v. Pitts</u>, 411 U.S. 138, 142 (1973).

## II.    GYC's Claims Under The Organic Act, Yellowstone Act, Executive Orders, and 36 C.F.R. § 2.18 Have No Merit

### A.    The Winter Use Plan Does Not Violate The Organic Act

The Organic Act imposes two independent mandates on the Park Service.  The first is a duty to ensure that park resources and values are left "unimpaired" unless a particular law directly and

specifically provides otherwise.  16 U.S.C. § 1; see also Mgmt. Pol. § 1.4.4.[2/]  This non-impairment mandate is described as "the cornerstone of the Organic Act" which "establishes the primary responsibility of the National Park Service."  Mgmt. Pol. § 1.4.4.  The second mandate is a duty to "conserve" the park resources and values.  The Management Policies explain that this conservation duty "is independent of the separate prohibition on impairment," and that it "applies all the time with respect to all park resources and values, even when there is no risk that any particular park resources or values may be impaired."  Id.

GYC does not contend in its summary judgment motion that the Winter Use Plan will "impair" Park resources and values, despite having alleged impairment in its First Amended and Supplemental Complaint.  Compare GYC Br. at 18-25 with 07-cv-2111, Dkt. #13 ¶44 (First Cause of Action).  Accordingly, any potential claim of impairment has been waived.  See Students Against Genocide v. Dep't of State, 257 F.3d 828, 835 (D.C. Cir.2001) (arguments first raised in reply brief are ordinarily waived); see also Sanjour v. E.P.A., 984 F.2d 434, 437 n.7 (D.C. Cir. 1993) vacated by 984 F.2d 434 (D.C. Cir. 1993) (declining to address an issue that was not raised in appellants' initial brief because "[judges are not like pigs, hunting for truffles buried in briefs") (internal quotations marks omitted).

Instead, GYC asserts only that the Winter Use Plan violates the Service's "conservation" mandate, because it adversely impacts some of Yellowstone National Park's resources and values. This claims lacks merit, however, because the Service's exhaustive environmental analysis confirms

---

[2/]    This Circuit has established that the Management Policies are not enforceable against the Service.  See The Wilderness Soc'y v. Norton, 434 F.3d 584, 596-597 (D.C. Cir. 2006).  Thus, insofar as GYC attempts to enforce any provision of the Management Policies, that attempt must fail because "the only agency action that can be compelled under the APA is action legally required."  Norton v. Southern Utah Wilderness Alliance, 542 U.S. 55, 63 (2004). Notwithstanding, Part 1.4 of the Management Policies presents the Service's interpretation of the various statutory authorities that Congress has charged it with implementing.  That part of the Management Policies is therefore entitled to substantial deference.

that the impacts flowing from the Winter Use Plan are acceptable and well within the scope of the Service's management discretion under the Organic Act.

### 1.    The Conservation Mandate Defined

GYC places heavy reliance on Section 1.4.3 of the Management Policies 2006, which interprets the Organic Act as assigning priority to the "conservation" of park resources and values whenever a "conflict" arises between providing for their enjoyment and ensuring their conservation. See GYC Br. at 19. This provision, however, must be interpreted in harmony with the rest of the Management Policies. See United Sav. Assn. of Tex. v. Timbers of Inwood Forest Assocs., Ltd., 484 U.S. 365, 371 (1988) ("Statutory construction . . . is a holistic endeavor."); Roberto v. Dep't of the Navy, 440 F.3d 1341, 1350 (Fed. Cir. 2006) ("The rules of statutory construction apply when interpreting an agency regulation."). As the Management Policies make clear, not every adverse impact constitutes a "conflict" with the Service's conservation mandate.

Indeed, the Management Policies recognize that "[v]irtually every form of human activity that takes place within a park has some degree of effect on park resources or values, but that does not mean the impact is unacceptable or that a particular use must be disallowed." Mgmt. Pol. § 1.4.7.1. Thus, forms of use that cause some adverse impacts can occur without necessarily creating the kind of "conflict" between conservation and enjoyment that is described in Section 1.4.3. In order to distinguish between those adverse impacts that conflict with the Organic Act's conservation mandate and those that do not, the Management Policies uses a graphic image, which is depicted at AR 120645 at 14. The bottom of the image represents impacts that flow from "appropriate" uses of the parks. Those impacts are still subject to the Service's overarching conservation mandate, and therefore must be avoided or minimized to the extent practicable, see Mgmt. Pol.§ 1.4.3, but they do not create the sort of conflict that would render a particular use inappropriate and require that it be disallowed. Rather, it is only when an impact rises to the level of "unacceptable impact" on this graphic image that a "conflict" arises, triggering the requirement that the Service prioritize the conservation of park resources and values over providing for their enjoyment. See Mgmt. Pol.§

1.4.7.1 (describing factors to be considered in determining whether an action rises to the level of an "unacceptable impact").

Thus, while the statutory mandates described in the Organic Act impose two independent duties – i.e., non-impairment and conservation – the duties are nonetheless interrelated and complementary. As the Management Policies explain, "the impact threshold at which impairment occurs is not always readily apparent." Mgmt. Pol. § 1.4.7.1. Through the exercise of its conservation mandate, therefore, the Service employs a precautionary standard whereby it avoids impacts that it deems "unacceptable" even if they do not rise to the level of impairment. Id.; see also Mgmt. Pol. § 1.5 (reiterating that "[w]hen proposed park uses and the protection of park resources and values come into conflict, the protection of resources and values must be predominant," but explaining in the very next sentence that "[a] new form of park use may be allowed within a park" if "it will not result in unacceptable impacts."). This is precisely the approach taken by the Service in the instant case. See AR 126499 at 30 (stating that the protection of park resources and values "must be predominant" whenever it conflicts with a proposed park use, and explaining that this goal is achieved by ensuring that a proposed park use "will not result in unacceptable impacts"); AR 117160 at 5 ("Appropriate winter recreation is that which does not cause unacceptable impacts on unique characteristics of winter settings within the parks, while permitting their enjoyment and protection").

### 2. The Service's Finding That The Winter Use Plan Would Not Result In "Unacceptable Impacts" Is Fully Supported By The Record

In order to apply the above principles to the Winter Use Plan, the Service prepared an environmental impact statement, referred to herein as the "FEIS." As part of this process, the Service exhaustively studied the impacts of seven alternative proposed management plans, many of which were designed to provide park visitors with a range of appropriate winter recreational opportunities. See AR 117160 at 4, 7. The FEIS describes the impacts of each alternative with respect to visitor access and circulation, visitor experience, air quality, wildlife, health and safety,

and the natural soundscape.  AR 117160 at 170-363.  This thorough analysis provided the Service

with a means of determining whether any of the alternatives would result in unacceptable impacts

to any of the Park's resources and values.  See AR 117160 at 364-373.

With respect to Alternative 7 (ultimately selected as the Winter Use Plan), the Service

concluded that no "unacceptable impacts" would occur because the actions in Alternative 7:

> would not (1) be inconsistent with [the] park's purposes and values; (2) impede the
> attainment of [the] park's desired future conditions for natural and cultural resources
> as identified through the parks' planning process; (3) create an unsafe or unhealthy
> environment for visitors or employees; (4) diminish opportunities for current or
> future generations to enjoy, learn about, or be inspired by park resources or values;
> or (5) unreasonably interfere with park programs or activities; an appropriate use of
> the parks; the atmosphere of peace and tranquility; or the natural soundscape
> maintained in wilderness and natural, historic, or commemorative locations within
> the parks.

AR 117160 at 373; see also AR 126499 at 29, 32-34; Mgmt. Pol. § 1.4.7.1.  The Service explained

that, "[a]lthough adverse impacts could occur under this alternative to wildlife, air quality, noise,

and visitor experience, impacts are at acceptable levels and may be mitigated through management

actions."  AR 117160 at 373; see also AR 126499 at 32.  In addition, the FEIS and ROD describe

a process by which the Service will continue to conduct intensive monitoring in order to assess the

impacts of the preferred alternative on Park resources and values.  The results of this monitoring will

alert the Service if and when an adjustment to winter use management or an emergency action to

protect Park resources and values becomes necessary.  AR 117160 at 373; AR 126499 at 21.

The Service's conclusion that the implementation of the Winter Use Plan will not result in

unacceptable adverse impacts is entitled to substantial deference, and the mere fact that GYC would

prefer a lower level of impacts than what was identified in the FEIS and ROD does not mean that

the Service's determination should be overturned.  Sierra Club v. Andrus, 487 F. Supp. 443, 448,

450 (D.D.C. 1980) ("The standard of review is a highly deferential standard which presumes agency

action to be valid, forbids a court's substituting its judgment for that of the agency, and requires

affirmance if a rational basis exists for the agency's decision.").

3.     **GYC's Assertion That The Service Has Violated The Organic Act's Conservation Mandate Has No Merit**

Despite the above findings, GYC argues that the Winter Use Plan is prohibited by the Organic Act's conservation mandate.  This argument stumbles out of the gate, however, because GYC fails to identify, let alone apply, the "unacceptable impacts" threshold, preferring instead to create its own standards.  For example, GYC attempts to rely on Section 8.2.3 of the Management Policies in support of its assertion that the Organic Act allows the Service to authorize only "the least impacting" means of motorized access to the Park.  See GYC Br. at 20, 23.  This Circuit, however, has held that the Management Policies "does not create enforceable regulations or modify existing legal rights."  The Wilderness Soc'y, 434 F.3d at 596-597.  Moreover, while Part 1.4 of the Management Policies provides the Service's official interpretation of the Organic Act, the language that GYC quotes does not appear in Part 1.4 of the Policies.  Accordingly, GYC's attempts to enforce the non-binding internal guidance that appears outside of Part 1.4 cannot be sustained.[3/]  See GYC Br. at 20 (citing Mgmt. Pol. §§ 4.4.1, 4.7.1, 4.9, 8.2.3) (interpreting non-binding internal guidance as legal standards that allegedly constrict the Service's discretion with respect to its analysis of air quality, the natural soundscape, and wildlife).

GYC also attempts to enforce the adaptive management thresholds contained in the temporary winter use plans that governed snowmobile use during the 2004-2005 through 2006-2007 winter seasons, by arguing with respect to noise that "the Park Service's own 'adaptive management' thresholds were exceeded numerous times in multiple locations."  GYC Br. at 21.

_____

[3/]     Even if the GYC could somehow enforce that out-of-context language in this Court, a more careful reading of the Management Policies demonstrates that the Winter Use Plan is fully consistent with those Policies.  The aspirational language that GYC cites is found in Section 8.2.3 of the Management Policies, which provides that "[u]ses and impacts associated with the use of motorized equipment will be addressed in park planning processes."  The Winter Use Plan is just such a process.  Moreover, that general section, which addresses the use of motorized equipment, is followed by a section specifically concerning snowmobile use, see Mgmt. Pol. § 8.2.3.2, thus belying GYC's implication that Section 8.2.3 somehow precludes the use of snowmobiles.

GYC, however, provides no basis for its assumption that those adaptive management thresholds coincided with the threshold for unacceptable impacts, nor could it. As the ROD explains, such "preliminary thresholds are established to . . . be one of the many guides for possibly taking actions if a problem is perceived." AR 126499 at 40. The thresholds are also "preliminary in nature." Id. Thus, while the adaptive management thresholds are designed to indicate when "conditions could be moving away from those that are desirable," they do not set the standard for impacts that the Service would deem "unacceptable." Id.

Finally, GYC argues that some of the impacts corresponding to the current use scenario will increase under the Winter Use Plan, and on that basis asks this Court to simply decree that the Winter Use Plan "cannot be reconciled with the Organic Act's overriding conservation mandate." GYC Br. at 22.[4] GYC, however, offers no basis for its assertion that those impacts are "unacceptable" with in the meaning of the Organic Act or Management Policies Part 1.4.[5]

_____

[4]     As discussed more fully in Section II.D infra, GYC fails to provide any support for its insistence that the Winter Use Plan will result in an average of 540 daily snowmobile entries, as opposed to the much lower average daily entries witnessed during the 2004-2007 winter seasons, when the cap was 720. AR 120174 at 4.

[5]     For example, while GYC argues that "health thresholds for formaldehyde and benzene were approached or exceeded with only 180 to 250 snowmobiles entering the Park's West Entrance," see GYC Br. at 21, a 2005 Spear and Stephenson study shows that benzene did not exceed the minimum risk levels (MRLs) on eleven of the thirteen times it was sampled. See AR 117160 at 98-99; AR 117370 at 39. Moreover, the two samples with slightly elevated benzene levels were short-term samples, not the long-term samples (i.e. 8 hours) needed to show an exceedence of MRLs. AR 117160 at 98-99 ("While the two benzene samples averaged slightly higher than the MRL, employees would have to be exposed to these levels every day of the year (which they are not) for a concern to be present."); AR 117413 at 16, 37. In the end, the benzene studies revealed that the mean concentration levels of 0.0032 were well below the MRL for benzene and do not pose a concern to worker safety. Id. Similarly, GYC's claims regarding formaldehyde emissions are not supported by air emissions studies in the administrative record. Studies of formaldehyde emissions reveal that all measurements were well below the recommended exposure level (REL). AR 117370 at 4, 136-37; AR 117160 at 231. In fact, these studies confirm that "[a]ll employee exposure to the above air contaminants [including benzene and formaldehyde] and noise were well below established Occupational Safety and Health Administration (OSHA) Permissible Exposure Limits (PELs) and other established recommended exposure limits." AR 117370 at 4.

- 15 -

GYC's confusion as to the applicable legal standard is most evident in its accusation that the Winter Use Plan "cannot be reconciled with the Organic Act's overriding conservation mandate" <u>because</u> wildlife impacts will be kept to merely "acceptable levels." GYC Br. at 22 & n. 5. As explained above, the Service's determination that impacts to wildlife would be "acceptable" is fully consistent with – indeed, constitutes full compliance with – the Service's conservation mandate under the Organic Act. The same is true for the Service's finding of "acceptable impacts" with respect to each of the resources and values examined in the FEIS. <u>See</u> AR 117160 at 234-236 (air quality), 257-301 (wildlife), 311-339 (natural soundscape), 353-74 (visitor experience). Unless and until the threshold of "unacceptable impacts" is reached, the Service retains discretion to allow recreational use. <u>See</u> Mgmt. Pol. §§ 1.4.7.1, 1.5; AR 126499 at 30; <u>see also</u> <u>Terbush v. U.S.</u>, 516 F.3d 1125, 1130 (9th Cir. 2008) ("Much of the [Service's] work is 'grounded' in the Organic Act's broad mandate to balance conservation and access."). Accordingly, summary judgment on GYC's "conservation" claim should be entered for the Defendants.

### B. The Winter Use Plan Does Not Violate Executive Orders 11644 and 11989

GYC's reliance on Executive Orders 11,644 and 11,989 (hereinafter "E.O. 11644" or "E.O. 11989") must also be rejected. <u>See</u> GYC Br. at 26-27 (citing Exec. Order No. 11,644, 37 Fed. Reg. 2877 (Feb. 8, 1972); Exec. Order 11,989, 42 Fed. Reg. 26,959 (May 24, 1977)). The core provision of E.O. 11644 requires affected agencies to develop regulations to govern the "designation of <u>specific areas and trails</u> on public lands on which the use of off-road vehicles may be permitted . . . ." E.O. 11644 § 3 (emphasis added). This Order therefore addresses what was perceived in 1972 as a potential conflict between environmental values and the growing popularity of off-road vehicles ("ORVs"), by establishing standards that govern the Service's authorization of ORV use on "trails" and "areas" within the public lands. <u>Id.</u> § 3 & Preamble. Contrary to NPCA's assertions, however, E.O. 11644 does not directly prohibit (or even regulate) the general use of snowmobiles in the national parks. Rather, the Order directs the Secretary of the Interior to "develop and issue

regulations . . . to provide for the administrative designation of specific areas and trails" on which off-road vehicles may be permitted.  Id. § 3(a).

The Service has implemented E.O. 11644 with respect to snowmobiles through the promulgation of 36 C.F.R. § 2.18(c), which prohibits snowmobile use on "trails" and "areas" within the meaning of the Order.  Section 2.18(c) provides in relevant part that snowmobile use may be authorized only on established roads that are used by motor vehicles during seasons other than the winter.  Consistent with Section 2.18, the Winter Use Plan as implemented by the 2007 Final Rule provides with respect to Yellowstone that "snowmobiles and snowcoaches . . . continue[] to be[] restricted to designated routes that are the same as roads that are used by motor vehicles during other seasons of the year."  72 Fed. Reg. at 70,791 (Response to Comment 35).  By prohibiting snowmobile use on "trails" or "areas" within the meaning of E.O. 11644, and by requiring instead that snowmobile use be limited to the same established roads that are used by wheeled vehicles during other seasons, the Service has fully complied with E.O. 11644.

Even if GYC could directly challenge the Winter Use Plan under the standards of E.O. 11644, however, the administrative record and the discussion throughout this brief concerning the Service's thorough environmental analysis demonstrate that, by designating only established roads for snowmobile use and by imposing significant other mitigation measures, the Service has "minimized harassment of wildlife," has "minimized damage to soil, watershed, vegetation, and other resources of the public lands," and has avoided the occurrence of unacceptable impacts to the Park's natural, aesthetic, and scenic values within the meaning of E.O. 11644 §§ 3(a)(1)-(2), 4.

GYC's reliance on E.O. 11989 is similarly misplaced because that Order merely requires that the Secretary of the Interior close the areas or trails designated for off-road vehicle use "whenever he determines that the use of off-road vehicles will cause or is causing considerable adverse effects on the soil, vegetation, wildlife, wildlife habitat or cultural or historic resources" of those "areas or trails."  See Exec. Order 11,989 § 9.  As explained above, neither Section 2.18 nor the Winter Use Plan authorize snowmobile use on "areas or trails" within the meaning of E.O. 11644.  Moreover,

even if established roads could be considered "areas or trails" within the meaning of E.O. 11989, the FEIS and ROD clearly establish that all impacts to Park resources and values as a result of the Winter Use Plan will be acceptable.  See Section III, infra.  GYC's claim under the Executive Orders therefore fails.

### C.    The Winter Use Plan Complies With The Service's Regulations

GYC next argues that, by issuing the Final Rule authorizing the Winter Use Plan, the Service violated 36 C.F.R. § 2.18(c).  GYC Br. at 26.  That section provides that:

> The use of snowmobiles is prohibited, except on designated routes and water surfaces that are used by motor vehicles or motorboats during other seasons.  Routes and water surfaces designated for snowmobile use shall be promulgated as special regulations.  Snowmobiles are prohibited except where designated and only when their use is consistent with the park's natural, cultural, scenic and aesthetic values, safety considerations, park management objectives, and will not disturb wildlife or damage park resources.

36 C.F.R. § 2.18(c).  GYC does not dispute that the Winter Use Plan complies with the first part of the regulation.  Nor can it because oversnow vehicle ("OSV") use is only permitted on roads within Yellowstone that are used by other motor vehicles during the non-winter seasons, and only to the extent those roads have been specifically designated for OSV use.  See 36 C.F.R. §§ 7.13(l)(7)(I); 7.21(a)(7)(I); 7.22(g)(7)(I).  Rather, GYC argues that, "[a]t authorized levels, snowmobiles are inconsistent with Yellowstone's 'natural, cultural, scenic and aesthetic values'" and the plan will not leave "wildlife undisturbed."  GYC Br. at 26.  GYC's argument is without merit.

GYC puts forth no analysis and no support for its bald assertion that the Service is in violation of this regulation.  To the contrary, as with GYC's argument under the Executive Orders, the instant claim fails because the Service's exhaustive environmental analysis, which is detailed throughout this brief (See, e.g., Section III, infra), shows that the Winter Use Plan is fully consistent with Yellowstone's values and park management objectives.  In addition, the FEIS demonstrates that impacts to wildlife will be minimal.  See, e.g., AR 117160 at 125-26 (showing that any displacement potentially caused by snowmobiles will be temporary, is not likely to be injurious, and is not likely to induce measurable stress reactions); id. at 129 (showing that displacement effects are localized

and do not translate into large-scale patterns of habitat avoidance); id. at 112 (showing that only 7% of all encounters between bison and OSVs resulted in an active response based on a data set that spans managed and unmanaged OSV use in Yellowstone).

At bottom, GYC apparently asks this Court to find that Section 2.18 is violated whenever an individual animal is disturbed by snowmobile use, however slightly, or when adverse impacts to the Park's animals are increased, however incrementally. If this broad reading were adopted, however, it would convert Section 2.18 into a de facto ban on snowmobiles in all park units. Because Section 2.18 clearly contemplates that snowmobile use may be authorized by special regulation and subject to certain limitations, see 36 C.F.R. § 2.18(c)-(e), GYC's interpretation of that regulation as a de facto ban on snowmobile use must be rejected. See Gregory v. Mo. Pac. R.R. Co., 32 F.3d 160, 165 (5th Cir. 1994) ("It goes without saying that, in construing a . . . regulation, we seek to avoid imposing [absurd] results."). Indeed, the Service has interpreted Section 2.18, its own regulation, to permit snowmobiles in the Parks in accordance with the requirements of the Winter Use Plan. That interpretation, which is consistent with the Service's mandate to provide opportunities for the use and enjoyment of the parks without impairing park resources, is entitled to deference from this Court. Auer v. Robbins, 519 U.S. 452, 461, 117 S.Ct. 905, 911 (1997) (an agency's interpretation of its own regulation is entitled to substantial deference and should only be overturned if it is "plainly erroneous or inconsistent with the regulation") (citations omitted). Accordingly, GYC's argument that the Service has not complied with Section 2.18 should be rejected.[6/]

---

[6/]     GYC's reliance on Mausolf is misleading. See GYC Br. at 26 (relying on that case for the proposition that "snowmobiling is generally prohibited in national parks"). In Mausolf, the Court recognized that Section 2.18(c) as written presumptively prohibits snowmobile use in the National Parks unless and until a "designation" is made. 125 F.3d at 668; see also 36 C.F.R. § 2.18(c). On that basis, the Court observed that "snowmobile use is generally prohibited . . . ." Id. When read in context, it is evident that the Court's statement was intended merely to describe the default situation (absent "designation"), and that the Court was not offering a broader interpretation of Section 2.18 or the Organic Act.

**D.** **To The Extent This Court Perceives a "Departure" From The 2001 Final Rule, That Departure Is Fully And Adequately Explained In the Decision Documents And Administrative Record**

GYC next argues that the Service violated the APA by failing to provide a "cogent, supported explanation" for its reversal of the 2001 Rule, which had provided for a complete elimination of snowmobile use for the 2003-2004 winter season. GYC Br. at 27-31. In so arguing, GYC is attempting to leverage the decision in <u>Fund for Animals v. Norton</u>, 294 F. Supp.2d 92 (D.D.C. 2003), where under very different circumstances, this Court found that the Service had arbitrarily departed from its previous finding that snowmobile use at historical levels constituted impairment. GYC's reliance on <u>Fund for Animals</u> is misplaced, however, because the FEIS and administrative record in <u>this</u> case clearly support the Service's decision and fully explain the Service's apparent departure from its previous findings.

As this Court noted in <u>Fund for Animals</u>, the Service had issued a Rule in 2001 (hereinafter the "Snowcoach Rule") that mandated significant reductions in permitted snowmobile use for the 2002-2003 winter season, and a complete elimination of snowmobile use in favor of snowcoach use by the season of 2003-2004.[7] <u>See Fund for Animals</u>, 294 F. Supp.2d at 100. In the Record of Decision corresponding to the Snowcoach Rule, the Service explained that the decision was necessary because "the overall adverse impacts associated with snowmobile use in the Parks" at that time "were deemed to rise to the level of 'impairment' of the Parks' resources and values, thus violating the Organic Act." <u>Id.</u> at 106 (quoting 65 Fed. Reg. at 80,915). Based on this finding, the Court held that the successor to the Snowcoach Rule (the "2003 Rule") – which permitted up to 950

---

[7]     While the Service's NEPA analysis fully and adequately explains the Service's "reversal" of the 2001 Final Rule, it must also be noted that GYC's reliance on the 2001 Snowcoach Rule is misplaced, because that Rule was vacated and remanded by the United State District Court for the District of Wyoming in <u>Int'l Snowmobile Manufacturers Ass'n, Inc. v. Norton</u>, 340 F. Supp. 2d 1249 (D. Wyo. 2004). In addition to finding violations of NEPA, the court in that case held <u>that the 2001 Rule itself constituted an unexplained and radical departure from the Service's previous policy</u> of allowing recreational snowmobile use in the Park for almost forty years. <u>Id.</u> 1264-65. Thus, contrary to GYC's arguments, the 2001 Rule cannot serve as a "benchmark" for the Service's compliance with the Organic Act.

snowmobiles to enter Yellowstone Park each day – was so stark a reversal that it triggered the need

for a reasoned explanation. Id. at 105. The Court also held that the Service's reliance on BAT

technology, guiding requirements, and a daily cap of 950 did not satisfy the Service's burden of

providing the requisite "reasoned explanation" for its departure. Id. at 106-108.

     The present case is very different. First and foremost, the Service implemented a managed,

limited program of OSV access for three years prior to making the decision at issue in this case. As

a result of that experience, the Service was able to observe and monitor a managed program, and to

compare the results of the program to the historical unmanaged use of recreational OSVs in the Park.

Thus, unlike the 2003 Final Rule, which this Court vacated and remanded, the Winter Use Plan is

based on an extensive environmental analysis which includes the actual monitoring of a managed

OSV program. The Service's determination that impacts from the Winter Use Plan are "acceptable"

is based on this thorough analysis and is entitled to substantial deference. See Motor Vehicle Mfrs.

Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 57 (1983) ("An agency's view of what it in

the public interest may change, either with or without a change in circumstances. But an agency

changing its course must supply a reasoned analysis."); see also River Runners for Wilderness v.

Martin, No. CV-06-894-PCT-DGC, slip. op., 2007 WL 4200677, at *10 (D. Ariz. Nov. 27, 2007)

("The question posed by this lawsuit . . . is not whether the 2006 [management plan] differs from

past Park Service decisions, but whether it is arbitrary and capricious in light of the facts in the

administrative record and the reasoning of the FEIS.").

     GYC's attempts to analogize the Winter Use Plan to the historic conditions that the Service

addressed in its 2001 Rule are not persuasive. The Winter Use Plan imposes a cap on snowmobile

entries into the Park of 540. This cap is almost 45% lower than the cap of 950 that was rejected by

this Court in 2003. Thus, while in Fund for Animals this Court found that the cap of 950 daily

entries "d[id] not actually appear to reduce snowmobile use" vis-a-vis the historical averages which

had been found to result in impairment, there can be no dispute that the current cap of 540 marks

a sharp reduction in the permitted snowmobile entries, from both an average and peak perspective.

- 21 -

The Service's no-impairment determination also reasonably relies on the fact that all recreational snowmobiles are required to travel with commercial guides. This guiding requirement significantly mitigates impacts to soundscapes and wildlife because it has the effect of forcing snowmobiles to travel in groups, thereby reducing the amount of time that OSVs are audible as well as the total number of encounters with wildlife. See 72 Fed. Reg. at 70,785. In addition, commercial guides are able to ensure that their clients adhere to speed limits, thereby reducing the sound levels emitted by snowmobiles. See id. at 70,786; AR 117160 at 305 (distinguishing between "percent time audible" and "sound level"). Guides have also proven extremely effective at managing wildlife encounters by ensuring that Park visitors pass wildlife on the road with a minimum of adverse visitor-wildlife interaction. See AR 117160 at 120-121, 250, 365; see also 72 Fed. Reg. at 70,786 ("This guiding requirement [for snowmobiles] will reduce conflicts with wildlife along roadways because guides are trained to lead visitors safely around the park with minimal disturbance to wildlife."); AR 119778. Thus, while this Court had expressed skepticism about the potential effectiveness of the guidance requirement in its 2003 opinion, see Fund for Animals, 294 F. Supp.2d at 107, the data gathered over the past three years confirm that the guiding requirement is enormously successful. See, e.g., AR 119778 at 3.

The Service's no impairment determination is also supported by the fact that recreational OSVs are required to meet BAT standards under the Winter Use Plan. The implementation of a BAT requirement for recreational snowmobiles has resulted in 90% reduced hydrocarbons, a 70% reduction in carbon monoxide emissions, and a sound level reduction of 10 dBA relative to the conventional two-stroke snowmobiles that were previously used in the Park. See AR 117160 at 36 (showing reduced emissions); id. at 140 (comparing sound levels for 2-stroke and 4-stroke snowmobiles). These benefits are compounded by the fact that the Winter Use Plan imposes BAT requirements on OSVs generally, including snowcoaches and administrative snowmobiles. See AR 126499 at 15, 21. By requiring that recreational snowmobiles *and* snowcoaches *and* administrative

OSVs meet BAT requirements, the Winter Use Plan imposes a significant mitigation that was not under consideration in 2001.

Finally, GYC can provide no support for its apparent assumption that the Park's average daily volume will reach or even approach 540. As GYC concedes, an average of only 290 snowmobiles accessed Yellowstone during the 2006-2007 season, despite a cap of 720. AR 113572 at 25. GYC has provided no explanation for its insistence that the Service, by <u>reducing</u> its daily cap from 720 to 540, will somehow cause actual daily entries to "double" in volume, nor could it. While the FEIS discloses that some increase in volume is expected, <u>see</u> AR 117160 at 153-154, the actual use under the Winter Use Plan will likely be far lower than the maximum of 540 – a number which was designed in part to accommodate the surge of visitors that occurs during the winter holidays, but which is absent during the remainder of the winter season. <u>See</u> AR 120099 (showing that holidays saw substantially higher visitation rates than all other days during the 2006-2007 season); AR 120174 at 4 (indicating that the 540 limit under the Winter Use Plan corresponds to peak visitation number of 542 during the 2005-2006 winter season).

In sum, the FEIS and administrative record provide ample explanation for the Service's conclusion that snowmobile use, when properly regulated, will not lead to the impairment (or unacceptable impacts to) Yellowstone Park's resources and values. GYC's attempt to characterize the 2007 Final Rule as an "unexplained departure" from the 2001 Rule must therefore be rejected.

## III. The FEIS Fully Complies With NEPA And Provides An Adequate Basis For The Park Service's Management Actions Under the Organic Act

The FEIS in this case has been prepared as part of an ongoing process to assess the potential impacts of the Winter Use Plan. The FEIS describes the purpose and need for the proposed action as "provid[ing] park visitors with a range of appropriate winter recreational opportunities, while ensuring that these activities do not lead to unacceptable impacts or the impairment of park resources and values." AR 117160 at 4; <u>see also</u> 40 C.F.R. § 1502.13. In furtherance of this purpose and need, the FEIS examines seven alternatives in depth, including a no-action alternative. 40 C.F.R.

§ 1502.14.  Of relevance here, the Service's preferred alternative (Alternative 7) strikes a balance between snowmobile and snowcoach use while reducing the daily number of snowmobiles (from that permitted by the Draft EIS preferred alternative) to better protect park soundscapes and other resources.  Alternative 7 allows a maximum of 540 snowmobiles and 83 snowcoaches to enter Yellowstone Park each day.  AR 117160 at 60-65.

Through this NEPA process, the Service analyzed the direct, indirect, and cumulative impacts of the proposed action and its alternatives on a variety of the Parks' various resources and values, including those of most interest to the GYC plaintiffs: air quality, wildlife, and natural soundscapes.  See AR 117160 at 215, 248, 301; 40 C.F.R. §§ 1502.16 (a)-(b), 1508.7, 1508.8.  In addition, that document includes discussion of the various means that would be used to mitigate the adverse environmental impacts resulting from the proposed action.  See, e.g., AR 117160 at 35-37; 40 C.F.R. § 1502.16(h).  The results of this rigorous examination are presented in comparative form, thus complying with NEPA's requirement that a clear basis for choice among the alternatives be provided to the agency decision-maker and the public.  See FEIS 170-363; 40 C.F.R. § 1502.14. Finally, the FEIS and ROD describe a process by which the Service will continue to conduct intensive monitoring in order to assess the impacts of the preferred alternative on Park resources and values.  The results of this monitoring will alert the Service if and when an adjustment to winter use management or an emergency action to protect Park resources becomes necessary.  AR 117160 at 373 and Appendix E; AR 126499 at 21.

In addition to complying with the requirements of NEPA, this thorough analysis provided the Service with a means of determining whether the proposed Winter Use Plans would result in an "impairment" of (or unacceptable impacts to) Park resources and values.[9]  As explained more fully

---

[9]     The Management Policies 2006 provide the following guidance concerning the Park Service's use of NEPA documents in meeting its duties under the Organic Act: "In making a determination of whether there would be an impairment [or unacceptable impacts], an NPS decision-maker must use his or her professional judgment.  This means that the decision-maker must consider [inter alia] any environmental assessments or environmental impacts statements

below, the FEIS supported the conclusion that the proposed levels of OSV use would not result in the impairment of Park resources, and would not severely affect a resource or value whose conservation is: (1) necessary to fulfill specific legislative purposes; (2) key to the natural or cultural integrity of the Parks or to opportunities for enjoyment of the Parks; or (3) identified as a goal in the Parks' general management plan or other relevant planning documents.  AR 117160 at 373.  As explained in Section II.A.2 supra, the FEIS also supported the conclusion that the proposed levels of OSV use would not result in unacceptable impacts to Park resources and values.  See AR 117160 at 373; see also AR 126499 at 29, 32-34.

### A.    Analysis Was Not Improper Merely Because it Compared Forecasted Impacts to Historical Conditions

GYC accuses the Service of obscuring the adverse impacts corresponding to each of the seven alternatives in the FEIS by comparing them to the impacts associated with historic conditions. GYC Br. at 33.  Contrary to GYC's assertions, however, it was perfectly appropriate for the Service to compare the impacts of the Winter Use Plan to historic conditions, in light of this Court's opinion in Fund for Animals v. Norton, 294 F. Supp.2d 92 (2003).  There, this Court held that the 2003 Final Rule constituted an "unexplained departure" from the Service's prior finding that similar volumes of snowmobile use had caused the impairment of Park resources and values.  See id. at 105-108. The Court vacated the 2003 Rule on those grounds, and remanded to the Service for further proceedings "not inconsistent with" the Court's Opinion.  Id. 115.  By comparing the Winter Use Plan's impacts to historical conditions, the Service provides the required explanation.

In addition, GYC's narrow view of the FEIS does not mean that the Service simply ended its analysis after providing this explanation.  To the contrary, the Service analyzed impacts to each of the Park's resources and values against a number of benchmarks, including historic conditions, current conditions, objective criteria (such as state and federal air quality standards), and others.

---

required by the National Environmental Policy Act of 1969 . . . ."  Mgmt. Pol. § 1.4.7.

Examples of this analysis and the various benchmarks employed are described at length in discussion that follows.  See Sections III.B, III.C, & III.D, infra.

### B.      The Service's Thorough Analysis of Soundscape Impacts Satisfied NEPA

Recognizing that the natural soundscape is a key resource, as well as an expected element of the Park visitor experience, the Service thoroughly analyzed the impacts to the natural soundscape that could result from the implementation of each of the seven alternatives.  AR 117160 at 20, 301-342.  As part of this analysis, the Service conducted soundscape monitoring during the past four winter seasons.  AR 117160 at 137-138.  The data collected as a result of this effort – which constitutes "one of the most extensive national park acoustic datasets in existence," AR 117160 at 139 – forms the basis for the Service's characterization of existing and historic soundscape conditions.  AR 117160 at 138-141.

During the 2005-2006 winter season, this monitoring focused on five Yellowstone sites that were representative of the various developed areas and travel corridor management zones within the Park: Old Faithful Weather Station; Old Faithful Upper Basin; Spring Creek; West Thumb Geyser Basin; and a point 2.3 miles west of Madison Junction.  AR 117160 at 143.  This monitoring showed that, on average, snowmobiles were audible for more time than snowcoaches, although snowcoaches in general produced higher sound levels, especially at higher speeds.  In addition, the monitoring revealed that the sound level and the percent of time in which OSVs were audible remained substantially lower than during the 2002-2003 winter use season, during which an average of 583 snowmobiles accessed Yellowstone Park each day.  The FEIS explains that the reduced sound and audibility levels were largely caused by a lower average number of OSVs during the 2005-2006 season (256 snowmobiles and 32 snowcoaches), the change from two-stroke to four-stroke engine technology, and the requirements that snowmobiles travel in guided groups.  AR 117160 at 143.

In addition to monitoring, the Service enlisted the U.S. Department of Transportation to conduct acoustical modeling using the Federal Aviation Administration's ("FAA") Integrated Noise Model ("INM"), as adapted for use with oversnow vehicles.  AR 117160 at 301.  The INM was used

to model various vehicle types consistent with the scenarios described in each of the seven examined alternatives, including two- and four- stroke snowmobiles, various models of snowcoaches, and wheeled vehicles. Id. The development of this modeling tool was critical to the Service's analysis because, unlike historical monitoring data, the INM allowed the Service to compare the potential environmental impacts corresponding to each of the seven alternatives.

Based on the information produced by the INM, the Service was able to predict for each alternative (1) the total percentage of area within the Parks that would have any level of OSV audibility, however slight;[9] (2) the percentage of time that OSVs would be audible, as measured both Park-wide [10] and at representative points throughout the Parks;[11] and (3) the intensity (decibel level) of the sound that would be caused by OSVs at various points within the Parks.[12] AR 117160 at 303, 305-08. The modeled impacts were then compared to pre-determined thresholds, thereby allowing the Service to determine whether the impact level of each alternative would be negligible, minor, moderate, or major. AR 117160 at 304 (Table 4-48). On this basis, the FEIS concludes with respect to Alternative 7 (the preferred alternative) that the authorization of up to 540 snowmobiles and 83 snowcoaches will cause a moderate, adverse, short-term, and direct impact with respect to

---

[9]       See, e.g., AR 117160 at 306 (Figure 4-1) (indicating percentage of Yellowstone in which recreational OSVs were audible for all alternatives).

[10]      See, e.g., AR 117160 at 307 (Tables 4-49, 4-50) (indicating the percentage of Yellowstone and the number of square miles within Yellowstone, respectively, in which recreational OSVs are audible under each examined alternative – where the rows represent the percentage of the eight-hour day in which audibility was present); AR 117160 at 335 (Figure 4-16) (map indicating "audibility contours" which illustrate the percent time audible along travel corridors and transition areas).

[11]      See AR 117160 at 308 (describing analysis for "selected sites" as opposed to "park wide").

[12]      With respect to "intensity," the model predicted the seconds out of each hour during which OSV sounds would be within specified dBA intervals for each of the thirteen points illustrated in the AR 117160 at 309. The product of this modeling for recreational OSV traffic from 9:00 A.M to 10:00 A.M. in Alternative 7 is illustrated in the AR 117160 at 337 (Table 4-64).

Park-wide audibility; a major impact with respect to percent time audible; and a minor, adverse, and short term impact with respect to maximum sound levels.  AR 117160 at 339.

Against this backdrop, GYC contends that the soundscape analysis is inadequate because it allegedly uses a deceptive metric to present the impacts corresponding to the Winter Use Plan.  See GYC Br. at 36-39.  Specifically, GYC argues that a metric used to assess noise impacts – hereinafter the "Park-wide" metric (AR 117160 at 304, Table 4-48, column 2) – was engineered to dilute the impacts of recreational OSVs on the areas most frequented by Park visitors by focusing instead on the total area of Yellowstone.  GYC Br. at 38 ("In relying on a soundscape metric indifferent to [the areas most accessed by the Park's visitors], the FEIS wholly obscures the noise impacts of the various alternatives.").  In so doing, however, GYC illustrates precisely why courts should be at their "most deferential" when reviewing an agency's technical analysis and judgments involving the evaluation of complex scientific data.  See Balt. Gas and Elec. Co. v. Nat'l Res. Def. Council, Inc., 462 U.S. 87, 103 (1983).

First, GYC's arguments in this context focus exclusively on the impacts of OSV noise on visitor experience. The Service, however, is charged both with protecting the recreational interests of GYC's constituents and conserving the Park's natural soundscape and ecosystems.  Thus, while certain parts of the Park may not see high volumes of visitors, the Service's FEIS must nonetheless address and communicate the impacts of recreational OSV use on the entire Park.  The Service accomplished this task by using the Park-wide metric.  Contrary to GYC's accusations, therefore, the Park-wide metric was not a deliberate attempt to obfuscate the results of its impact analysis.

Second, GYC's interpretation of the soundscape analysis is simply wrong.  As explained above, the INM was used to predict information relating to the two essential features in a soundscapes analysis.  The first, "percent time audible," reflects the percentage of time in which sound generated by recreational OSV use is perceptible to the human ear.  See AR 117160 at 305. The second feature, "sound level," reflects what is best described in laymen terms as the absolute "loudness" of a sound, as measured in A-weighted decibels ("dBA").  Id.  By combining these

- 28 -

features with other elements, including different locations and management zones, the Service was able to devise a number of metrics that facilitated the translation of modeled outputs into impact categories.  Table 4-48 (AR 117160 at 304) illustrates how the Service plotted the three primary metrics used to measure impacts in the FEIS (columns 2, 4, and 5) against four separate impact categories (column 1).  Thus, the Service did not simply end its analysis after predicting the percentage of Park-wide area in which recreational OSV use would be audible.  Rather, the Service designed two additional metrics, each of which was used to determine the relative impact of the proposed action and its alternatives.  An impact category was then assigned to each alternative based on the metric that produced the highest impact level.  See AR 117160 at 304 ("[S]hould the assessed impact level (i.e., negligible, minor, moderate, or major) for one [metric] be higher than for another, the overall impact is judged to be at the higher level." (emphasis added).  In addition, the Service studied audibility and sound levels at eight different points, each of which was selected to represent either developed and travel corridor management zones.  See AR 117160 at 308.

Indeed, GYC cannot credibly maintain that the Service "obfuscated" the results of its analysis, given that GYC itself relies on the "audibility contour" maps in the FEIS – one of the formats that the Service used in an effort to present the soundscape data in usable forms – to support its argument that sounds from OSVs are concentrated around the areas "most accessible by the vast majority of park visitors."  GYC Br. at 37-38.  In its zeal to condemn the Service's analysis, GYC simply failed to realize that these audibility contour maps target precisely the kind information that GYC has accused the Service of withholding or "obfuscating."[13/]  See, e.g., Volpe Report at 94-99,

---

[13/]     GYC's wrongly accuses the Service of ignoring the 2007 Natural Soundscape Monitoring Report, which stated that "reducing the total number and reducing single and small groups of OSVs" would minimize impacts to natural soundscapes.  See GYC Br. at 37 n.10.  In fact, that Report contained a menu of recommendations, most of which were adopted, including improvements to snowcoach sound emissions, the elimination of 2-stroke snowmobiles use by employees, contractors, and concessionaires, and the reduction of administrative OSV use at all times.  Compare AR 125292 at 47 with AR 126499 at 21.  Moreover, the 100% guiding requirement eliminates the use of single snowmobiles by forcing Park visitors to tour the Park in groups.

Figures 58-63 (showing percent time audible as modeled at different hours of the day for Alternative 7 in the Draft EIS). GYC's soundscape arguments, therefore, find no support in the record.[14]

C.     The Park Service's Thorough Analysis of Air Quality Impacts Satisfies NEPA

For the Service's air quality studies, the Service calculated maximum predicted ambient concentrations of pollutants using a modeling system approved by the EPA and widely used for evaluating air quality impacts throughout the country. AR 117160 at 216-17. These models are commonly referred to as EPA's CAL3QHC and Industrial Source Complex Short-term (ISCST3), and are used to predict concentrations of pollutants for a short-term basis at specific locations. Id.

As recommended by EPA, this modeling system employs a series of conservative assumptions for meteorology, traffic conditions, and existing background concentration levels that result in a conservative, yet realistic, estimate of expected pollutant concentrations from winter use vehicle emissions. Id. For example, in determining the locations for modeling, the Service selected four areas that were expected to generate the most elevated air quality impacts based on expected vehicle traffic. Id. at 217. These locations were: Yellowstone's West Entrance, West Entrance to

_____

[14]     GYC also posits that Service's analysis was arbitrary and capricious because it "fail[ed] to reconcile its 75 percent 'adaptive management' threshold with the FEIS's more stringent 40 percent threshold for 'major' noise impacts." See GYC Br. at 21. This argument, however, reflects GYC's fundamental misunderstanding of the Service's modeling process. The INM considered only those sounds expected to be produced by recreational OSVs, to the exclusion of all other ambient sound sources. By contrast, monitoring – which provides the means of determining whether an adaptive management threshold is exceeded – records both ambient noise and the noise produced by recreational OSVs. AR 117160 at 302, 305. As the FEIS explains, the <u>discrepancy between the two was addressed by a downward adjustment to the impact thresholds</u> used for modeling in the AR 117160 at 304 (Table 4-48) vis-a-vis the thresholds used during the monitoring stage of the Service's analysis. See AR 117160 at 303 ("The specific thresholds consider only visitor (recreation) sound impacts and not those of administrative travel; <u>therefore, the thresholds are reduced accordingly</u>.") (emphasis added); <u>Compare</u> AR 125050 at 12 (Burson Report 2006, Table 1, columns 3-4) (using the impact thresholds depicted in columns 3-4 to gauge the relative impact on soundscapes of all ambient sound sources, regardless or whether they relate to recreational OSV use) <u>with</u> AR 117160 at 304, Table 4-48, columns 4-5 (using much lower impact thresholds than in the Burson Report 2006, to control for the fact that ambient noise sources were not considered during the modeling process).

Madison Junction, Old Faithful Staging Area, and the Flagg Ranch Staging Area.  Id.  At each site, multiple receptors were modeled for CAL3QHC at spaced intervals, and the receptor with the highest predicted concentration was used to represent each modeling site.  Id.  In addition, at each site, dispersion modeling was conducted for the peak-hour periods (highest levels of vehicle traffic) because those periods present the greatest potential for air quality impacts.  Id. at 219.  Conservative meteorological conditions were also selected for modeling, consistent with EPA guidelines, in order to produce the highest modeled ambient concentrations.  AR 111561 at 11-23; see, e.g., id. at 21-22 (modeling "worst-case" pollutant concentrations at each of the four modeling sites by assuming a low wind speed and angle as part of the CAL3QHC pollutant computations and, accordingly, very limited wind dispersion of pollutants).  Finally, background conditions were added to the modeling results to obtain total pollutant concentrations at the modeling sites.[15]  AR 117160 at 220, 222.  The FEIS demonstrates the reliability of the model by comparing monitored versus modeled concentrations of pollutants.  AR 117160 at 220-221(Tables 4-29 and 4-30).[16]

_____

[15]     As with the Service's modeling of soundscape impacts, the air quality model is not intended to predict the exact emissions corresponding to each of the seven alternatives.  Rather, modeling allows the Service to objectively compare the hypothetical scenarios presented by the broad range of alternatives under consideration.  Id. at 220.  Monitoring, by contrast, can only provide information regarding past emissions.  However, unlike the modeling of soundscape impacts, see Section II.B at 31 n.14 supra, the Service was able to add background conditions to the modeled results in order to predict total pollutant concentrations at the prediction sites.  Id. at 217, 220.  In this respect, the modeled results provide reliable predictions of the actual emissions for each alternative.

[16]     For both CO and particulate matter, modeled concentrations were relatively similar to monitored values.  AR 117160 at 220.  For example, the 8-hour CO concentration levels at the West Entrance were monitored at 1.0 ppm and modeled at 1.2 ppm.  Thus, the Service's modeling system was effective in predicting emissions from OSV use in the Park.  While the model underestimated CO emissions vis-a-vis monitored results at Old Faithful, and underestimated PM2.5 concentrations at both Old Faithful and the West Entrance,  see AR 117160 at 221 (Tables 4-29; 4-30), the FEIS explains that: "[G]iven that the modeling approach must employ a series of assumptions and approximations of actual conditions, utilizing the best available emission factors and other input parameters, etc., compared with monitored concentrations, the modeling results are within a reasonable range of possibility . . . ."  AR 117160 at 220.

As the FEIS and Management Policies explain, the Clean Air Act gives the highest level of air quality protection to National Parks exceeding 6000 acres, which are deemed Class I areas. AR 117160 at 92; Mgmt. Pol. § 4.7.1. In addition, Montana has adopted air quality standards for carbon monoxide ("CO") that are more stringent than the applicable federal standard. The results of the Service's air quality modeling analysis revealed that none of the alternatives were likely to exceed or even approach the National Ambient Air Quality Standards ("NAAQS") or the Montana or Wyoming ambient air quality standards for CO and particulate matter. See AR 117160 at 223-227, 233 (Tables 4-32; 4-33; 4-36; 4-39). Specifically with respect to Alternative 7, the Service determined that 1-hour concentrations of CO would reach a maximum of only 5.7 parts per million ("ppm") at the busiest entrance to the Park (West Entrance), well below the NAAQS of 35 ppm. AR 117160 at 223, Table 4-32. The Service's determinations for maximum predicted 8-hour CO concentrations (1.9 ppm), maximum predicted 24-hour PM2.5 concentrations (8.6 micrograms per cubic meter, or "$\mu g/m^3$"), and 24-hour PM10 Prevention of Significant Deterioration ("PSD") increment consumption (6.2 $\mu g/m^3$) were equally favorable as compared to the corresponding NAAQS and PSD standards (9 ppm, 65 $\mu g/m^3$, and 150 $\mu g/m^3$, respectively) when measured at the West Entrance under Alternative 7. See AR 117160 at 223-227, Tables 4-32, 4-33, 4-36, 4-39. These same comparisons were even more favorable when measured at all other modeled sites (West Entrance to Madison; Old Faithful Staging Area; Flagg Ranch Staging Area). Id.[17]

Finally, the Service has identified threshold levels well below both federal and state air quality standards at which adaptive management action would be taken to ensure no impairment occurs under the proposed action. Compare id. at 93, Table 3-8 (showing NAAQSs for maximum

---

[17]    Rather than compare the modeled emissions to the NAAQSs, state ambient air quality standards, and PSD standards, GYC cites to the percentage increase vis-a-vis current conditions in an attempt to make the very limited increase in emissions appear more adverse than it really is. See GYC Br. at 22. As the above discussion shows, however, the modeled emissions do not represent significant increases, and the air quality under the Winter Use Plan would continue to be excellent and under all relevant standards.

1-hour and 8-hour concentrations of CO, maximum predicted 24-hour PM2.5 concentrations, and 24-hour PM10 PSD increment consumption) with AR 126499 at 41-42 (showing adaptive management thresholds for each pollutant that are much lower than the corresponding NAAQSs). Under these circumstances, the Service's air quality analysis fully satisfied NEPA and permitted the agency to reach an informed decision that cannot be considered arbitrary and capricious.

GYC challenges the sufficiency of the Service's air quality analysis on grounds that the agency allegedly considered only "park-wide" impacts when assessing each alternative, or that it failed to compare its modeling data to current air quality conditions. GYC Br. at 33-34 and 39. The record, however, demonstrates that the Service undertook a comparative analysis of the modeled air emissions for each alternative in relation to both historic and current conditions. AR 117160 at 223-236. The modeling results for pollutants are documented in tables that compare the predicted air emissions for each alternative to both historic and current conditions. Id. at 223-36 (Tables 4-32 to 4-44).[18] In addition to this comparative analysis, the Park Service considered an objective standard – NAAQS and state ambient air quality standards – in order to assess the potential impacts of each alternative. Id. at 222. The modeled results indicate that winter use vehicle emissions from the proposed action would not result in any exceedances of the most stringent federal and state air quality standards. Id. at 222. Thus, GYC's assertion that the Service failed to consider current conditions in its analysis is wrong.

Similarly incorrect is GYC's claim that the Park Service considered only "Park-wide" impacts when assessing each alternative. GYC Br. at 39. As the administrative record reflects, the Park Service selected four areas that were expected to generate the most elevated air quality impacts based on expected winter vehicular traffic. AR 117160 at 217. These locations include the most visited and traveled areas in the Parks, including Yellowstone's West Entrance, the West Entrance

---

[18] The FEIS explains that the juxtaposition of historic conditions to desired conditions served to "illustrate the need for . . . a winter use plan," given that historic conditions were caused by the largely unregulated use of OSVs. See AR 117160 at 4.

to Madison Junction, the Old Faithful Staging Area, and the Flagg Ranch Staging Area. Id. At each site, multiple emissions receptors were installed and the one with the highest predicted concentration was used to represent each modeling site. Id. The results of the modeling for each location is provided in the FEIS and documents that no emissions would exceed federal or state air quality standards. Id. at 222-236. Furthermore, the Park Service has identified threshold levels well below both federal and state air quality standards at which adaptive management action would be taken to ensure no impairment occurs from winter vehicle use. Id. at E-3 to E-4. The threshold levels are developed with respect to specific areas in the Parks and permit preventive action to be undertaken before impairment occurs. Id. Thus, GYC's claim that the Park Service's analysis failed to consider "whether any of the alternatives would unacceptably impact those areas where visitors congregate" finds no support in the administrative record.

Finally, GYC alleges that the Service failed to explain how compliance with federal and state air quality standards satisfies the Management Policies, which state that "the Service will seek to perpetuate the best possible air quality in [the] parks." GYC at 39-40 (citing Mgmt. Pol. § 4.7.1). As explained above, at least one of the named plaintiffs in this case (The Wilderness Society) is well aware that the various provisions of the Management Policies are not enforceable against the Service. See The Wilderness Soc'y v. Norton, 434 F.3d 584, 596-597 (D.C. Cir. 2006) ("[T]he conclusion is inescapable that the Management Polices is a nonbinding, internal agency manual intended to guide and inform Park Service managers and staff. There is no indication that the agency meant for these internal directives to be judicially enforceable . . . ."). Notwithstanding this, the FEIS clearly evaluates air quality impacts against Class I standards, which apply to national parks and wilderness areas, and concludes that no visibility impairment will occur. AR 117160 at 92. Last, the FEIS demonstrates that both carbon monoxide and particulate levels were modeled at concentrations well below national and state thresholds, with carbon monoxide levels a tenth of the NAAQS and particulate levels less than one-fourth of the NAAQS. Id. at 222-227. This exhaustive

analysis complies with NEPA and fully supports the Service's determinations under the Organic Act.

### D. The Analysis of Impacts to Wildlife Under the Alternative Considered in the EIS was Proper

The FEIS presents a thorough analysis of the potential impacts to wildlife resulting from the Winter Use Plan. See AR 117160 at 111-136, 248-301. That analysis is focused especially on impacts to bison, as that issue has attracted a great deal of attention from the scientific community, the public, and this Court. See Fund for Animals v. Norton, 294 F. Supp. 2d 92, 108-11 (D.D.C. 2003). Notwithstanding this, the FEIS also thoroughly determines and discloses the effects of the proposed Winter Use Plan on elk and other species of concern, including lynx, grizzly bears, gray wolves, bald eagles, coyotes, and ravens. AR 117160 at 111-36. The Service's analysis included a review of extensive data concerning interactions between OSVs and wildlife, See id. at 111-115 (Borkowski 2006 and White 2006), as well as a large body of research concerning bison travel, the use of groomed roads, bison energy use, and other related issues. Id. [19]

The FEIS discloses potential impacts to both individuals and populations of wildlife species in the Parks. The Service considered events that may cause direct mortality to individuals, such as vehicle collisions, as well as interactions that could lead to long term effects, such as habitat displacement or elevated energy expenditure. AR 117160 at 249. The Service's analysis also includes appropriate assumptions, based on the relevant scientific data, including: that the likelihood of wildlife response increases as the number of vehicles increases; that snowcoaches, because they

---

[19]    The Gates Report, commissioned by the Service, and other recent studies, Bruggeman 2006, Coughenour 2005, Fuller 2007, and Wagner 2006, address the issue of whether road grooming adversely affect bison ecology and spatial dynamics. See EIS at 111-25. The issue of whether road grooming itself, not interactions with OSVs, adversely affects bison ecology and spatial dynamics, was raised by Fund for Animals in prior litigation dating back to 1997 and also was discussed in this Court's 2003 opinion. See Fund for Animals, 294 F. Supp. 2d at 108-11.

are bigger than snowmobiles, are more likely to elicit an active response from individual animals; and that mandatory guiding reduces harmful interactions with wildlife.  Id. at 250.

In order to analyze the impacts of each of the proposed alternatives in the EIS, the Service rated impacts to wildlife species using five criteria: 1) vehicle-caused mortality to individual animals, 2) displacement impacts, 3) behavioral responses of wildlife groups to OSVs and associated human activities, 4) physiological responses of wildlife to OSVs and associated human activities, and 5) demographic effects at the population level.  Id. at 251.  For each wildlife species of concern, the Service analyzed each of the alternatives based on the five factors defined above, and categorized impacts to species under each of those factors and provided a cumulative impact rating. Id. at 257-301.  This level of analysis thoroughly satisfies the requirements of NEPA.

### 1.    The Analysis of Impacts to Bison and Other Wildlife From OSV Use

As the FEIS explains, the bison population in Yellowstone has risen steadily since the cessation of herd control in the late 1960s.  Id. at 116, 120.  Since 1980, the population has fluctuated between 2,500 and 4,900 animals, and the number in late summer 2006 was 3,900.  Id. The rising population of bison has coincided with the increase in OSV recreation in Yellowstone. Id.  Between 1968 and 2004, the number of winter visitors increased from 5,000 to nearly 100,000 people.   Id.; see also AR 125625 at 1922 (Borkowski 2006, noting increase in OSV use corresponding with increase in bison population).  During that same time period, the bison population increased from approximately 400 to 3,400 animals.  AR 117160 at 127.  Much of the increased use of Yellowstone has been concentrated in the west-central area of Yellowstone, where bison are common.  Id.  The increased use of the Park, and the lack of a mandatory guiding requirement through the 1990's, resulted in frequent conflicts between wildlife and visitors that had to be resolved by Park Rangers.  Id.  Among the most common problems were snowmobilers attempting to pass through or around herds of bison.  Id. at 120-21.  The implementation of a mandatory guiding requirement in recent winters has substantially reduced these incidents.  Id. at 121; AR 119778 (Taber 2006 Report); see also AR 125625 at 1923-24 (Borkowski 2006, noting that

winter visitors traveling on OSVs were confined to groomed roads and typically behaved properly around wildlife).

The Service considered these and other findings in the FEIS, see AR 117160 at 111-29, and acknowledged evidence showing that, under historic conditions (i.e., unregulated OSV use), some ungulates were displaced from roadways. Id. at 126, 128.  However, the relevant studies also show that such displacement was temporary, was not likely to be injurious to individual animals, and was not likely to induce measurable stress reactions. Id. at 125-26.  In addition, displacement has been localized and has not translated into large-scale patterns of habitat avoidance. Id. at 129.  The weight of the scientific evidence also shows that human disturbance is not a primary motivator for ungulate distribution and movement within the park. Id. at 126, 129.  Rather, the most recent research by the Service's scientists concluded that factors other than human disturbance, such as snowpack, population density, and drought are the primary influences on herd distribution, movements, and foraging behavior in the winter. Id.

Finally, the Service and Montana State University conducted two extensive studies in order to determine the nature of wildlife responses during interactions with OSVs.[20]  See AR 117160 at 154.  The first, Borkowski 2006, analyzed more than 6500 interactions between bison or elk and OSVs over a five year period (1999-2000, 2002-2004).  AR 117160 at 112; AR 125625 at 1911.  Each interaction was grouped into one of three categories: (1) no visible response – meaning no reaction whatsoever from the animal; (2) a vigilance response – meaning that the animal directs its attention toward the OSV, but does not move; and (3) an active response – meaning walking or running from or towards an OSV. See AR 117160 at 115, Table 3-18.  The results of the study indicated that bison exhibit no response to OSVs 80% of the time, a vigilance response 12% of the time, and an active response only 7% of the time. Id.  The percentage of instances in which elk

---

[20]    These studies span periods of both unmanaged use (1999-2003) and managed use (2004-2006) and both high and low average snowmobile entries (87,206 total entries in the 2001-2002 season, and 24,049 total entries in the 2004-2005 season). See AR 117160 at 154, Table 3-20.

exhibited no response or only a vigilance response was 93.3. <u>Id.</u>  The same figure for trumpeter swans, bald eagles and coyotes was 89.5%, 89.8%, and 76%, respectively. <u>Id.</u> The second study, White 2006, analyzed over 5500 records of interaction during the 2003-2006 winter seasons, <u>Id.</u> at 114, and produced very similar results.  <u>See id.</u> at 115, Table 3-18.  Both White and Borkowski concluded that there was no evidence that snowmobile use over the past 35 years has adversely affected the demography or population dynamics of bald eagles, bison, elk, or trumpeter swans.  <u>Id.</u> at 115; AR 125701 at 20 (White); AR 125625 at 1924 (Borkowski).[21/]

> ### 2.    GYC's Arguments Regarding the Analysis of Wildlife in the EIS Are Without Merit

GYC argues that the Service has not properly analyzed the alternatives in the EIS with respect to their impacts to wildlife for two reasons:  (1) "the FEIS improperly relies on a population-based metric indifferent to impacts on individual animals," and (2) the EIS "disregards the recommendations of park service biologists."  GYC Br. at 40.  GYC is wrong factually on both counts and, therefore, neither of these arguments has merit.

> #### a.    The Service Analyzed Impacts to Both Populations and Individuals of Species

GYC argues that the FEIS is inadequate because it analyzes only impacts to populations, not individuals, of wildlife species, but this argument is belied by record evidence.  GYC Br. at 40.  The Service expressly acknowledges in the FEIS that "adverse impacts to individual animals should be

---

[21/]     Each year, the Service also compiles its own monitoring data regarding wildlife responses to OSVs.  In 2007, the Service winter use crews conducted 208 surveys of road segments, covering 5,514 kilometers and observed 1,663 groups of wildlife, 983 interactions with OSVs, 111 wheeled vehicle interactions, and 16 pedestrian interactions.  AR 125741 at 9.  Overall, the responses of wildlife observed were: 76 % no apparent response, 18 % look/resume, 1 % attention/alarm, 4 % travel, and 1% flight.  <u>Id.</u> at 9-10.  In interactions with snowmobiles, the following bison reactions were observed: 90.2 % no response, 6.7 % look/resume, 1.5 % travel, 0.8 % alarm/attention, 0.8 % flight.  <u>Id.</u> at 24.  Bison reactions to snowcoaches were almost identical: 92.4 % no response, 6.9 % look/resume, 0.7 % flight.  <u>Id.</u> at 26.  Elk responded to snowmobiles as follows: 55.1 % no response, 44.9 % look/resume.  <u>Id.</u> 24.  Elk responses to snowcoaches were: 67.2% no response, 32.8% look/resume.  <u>Id.</u> at 26.

minimized." AR 117160 at 251. Thus, in addition to analyzing population level effects, the Service specifically considered effects on individuals, including injury or death from collisions with vehicles, displacement from habitat, behavioral responses, and physiological responses. AR 117160 at 251-256. Indeed, the record discloses that during the period from 1989-98 – a decade of unmanaged and, therefore, relatively high snowmobile use – 10 bison, 3 elk, 2 coyotes, and 1 moose were killed by snowmobiles in Yellowstone (none were killed by snowcoaches). AR 125701 at 17; see also FEIS 251, 269. As this disclosure demonstrates, the study of effects on population-level demographics was but one component of the Service's analysis. Id. at 255-56.

### b. The Service's Analysis Is Consistent With the Findings of the Relevant Studies Conducted by the Service's Scientists

GYC further argues that the Service's analysis of impacts is inconsistent with the findings of the scientists who participated in the research and drafting of the White 2006 study, because the authors of that study recommended that park managers consider maintaining OSV traffic levels "at or below" those observed during the monitoring stage. GYC Br. at 40 (citing AR 125701); see also Borkowski 2006, AR 125625 at 1924 ("Thus, we recommend park managers consider maintaining OSV traffic levels at or below those observed during our study."). GYC's argument, however, is predicated on a false factual assumption, i.e., that the level of OSV use during the White and Borkowski studies was 260 snowmobiles per day and 29 snowcoaches per day. Id. In fact, those numbers are found nowhere in the White and Borkowski studies and represent the average daily entries for the 2006 season only. AR 117160 at 76. Borkowski examined data from the winters of 1999-2000 and 2002-04, during which the daily average OSV levels at the West entrance alone were: 514, 486, 593, 320, and 178. AR 125625 at 1915. During those same years, the maximum daily numbers at the West Entrance were 1168, 1010, 1874, 573, and 330, respectively. Id. Given the cap of 300 entries at the West Entrance, the actual use numbers under the Winter Use Plan will likely be much lower than those observed during the Borkowski study.

With respect to the White study, White examined data for the years 2003-06, where the OSV entry figures for the West entrance were 320, 178, 156, and 181. AR 125701 at 11. By comparison, the Service's preferred alternative permits up to 300 snowmobiles and 37 snowcoaches daily from the West entrance. AR 117160 at 63. Given this cap on daily entries at the West Entrance under the Winter Use Plan, actual use levels will likely be similar to the OSV entry figures observed at the West Entrance during the last three years of the White study. See AR 120099 (showing that the high visitation rates present during holiday weekends are not present during the remainder of the 2006-2007 season); AR 120174 at 4 (indicating that the 540 limit under the Winter Use Plan corresponds to peak visitation number of 542 during the 2005-2006 winter season). GYC's assertion that the Service has ignored the findings of its scientists is therefore false.

## CONCLUSION

For the foregoing reasons, Federal Defendants respectfully submit that Defendants' motion for summary judgment should be granted, and NPCA's motion for summary judgment should be denied.

Respectfully submitted this 16th day of June, 2008.

RONALD J. TENPAS
Assistant Attorney General

 /s/ Guillermo A. Montero
GUILLERMO A. MONTERO
BARRY A. WEINER
LUTHER L. HAJEK
United States Department of Justice
Environment and Natural Resources Division
Post Office Box 663
Washington, D.C. 20044-0663
Telephone: (202) 305-0469
Fax: (202) 305-0274
OF COUNSEL:                                      Guillermo.Montero@usdoj.gov
JASON WAANDERS
U.S. Department of the Interior
Office of the Solicitor                          Attorneys for the Defendants
Division of Parks and Wildlife

- 40 -

1849 C St., N.W., MS-3230
Washington, D.C.  20240
Tel: (202) 208-7957

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____ )
GREATER YELLOWSTONE COALITION,            )
et al.,                                    )
                                           )
                Plaintiffs,                )
                                           )          Case No. 07-cv-2111 (EGS)
        v.                                 )
                                           )          [Hearing on Motions for Summary
DIRK KEMPTHORNE, et al.,                   )          Judgment on August 27, 2008]
                                           )
                Defendants.                )
_____)


_____ )
NATIONAL PARKS CONSERVATION               )
ASSOCIATION,                               )
                                           )
                Plaintiff,                 )
                                           )          Case No. 07-cv-2112 (EGS)
        v.                                 )
                                           )          [Hearing on Motions for Summary
UNITED STATES DEPARTMENT OF THE           )          Judgment on August 27, 2008]
INTERIOR; NATIONAL PARK SERVICE           )
                                           )
                Defendants.                )
_____)


**[PROPOSED] ORDER GRANTING FEDERAL DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT, RE CASE NO. 07-CV-2111 (EGS)**

On consideration of the Federal Defendants' Motion for Summary Judgment, the opposition

thereto, and the entire Record, it is hereby ORDERED that the motion is GRANTED;

It is further ORDERED that the Greater Yellowstone Coalition's Motion for Summary

Judgment is DENIED.


Dated:_____          _____
                                    United State District Court Judge

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

———————————————————————  )
                                                       )
GREATER YELLOWSTONE COALITION,    )
et al.,                                                )
                                                       )
                  Plaintiffs,                          )
                                                       )         Case No. 07-cv-2111 (EGS)
         v.                                            )
                                                       )         [Hearing on Motions for Summary
DIRK KEMPTHORNE, et al.,                    )         Judgment on August 27, 2008]
                                                       )
                  Defendants.                          )
———————————————————————  )


———————————————————————  )
                                                       )
NATIONAL PARKS CONSERVATION        )
ASSOCIATION,                                  )
                                                       )
                  Plaintiff,                           )
                                                       )         Case No. 07-cv-2112 (EGS)
         v.                                            )
                                                       )         [Hearing on Motions for Summary
UNITED STATES DEPARTMENT OF THE    )         Judgment on August 27, 2008]
INTERIOR; NATIONAL PARK SERVICE     )
                                                       )
                  Defendants.                          )
———————————————————————  )


**FEDERAL DEFENDANTS' STATEMENT OF MATERIAL FACTS
AS TO WHICH THERE IS NO GENUINE ISSUE**

         The parties in this case are currently briefing cross-motions for summary judgment under

Federal Rule of Civil Procedure 56.  Local Rules 7(h) and 56.1 require the submission of a statement

of material facts as to which the moving party contends that there is no genuine issue. For the

reasons explained below, however, a statement of facts is inappropriate in this case.

         It is well established that, in cases such as this one – where Plaintiffs seek judicial review

under the Administrative Procedure Act ("APA"), 5 U.S.C. § 706 – the scope of that judicial review

is properly limited to the administrative record that was before the agencies at the time the decisions

were made.  See, e.g., Florida Power & Light Co. v. Lorion, 470 U.S. 729, 743 (1985); Camp v.

Pitts, 411 U.S. 138, 142 (1973).  "The task of the reviewing court is to apply the appropriate APA

standard of review, 5 U.S.C. § 706, to the agency decision based on the record the agency presents

to the reviewing court."  Florida Power & Light Co., 470 U.S. at 743-44.

Accordingly, judicial review of final agency action on summary judgment is different in

nature from the procedures used to resolve civil actions within the original jurisdiction of the federal

district courts.  See Defenders of Wildlife v. Babbitt, 130 F. Supp. 2d 121, 124 (D.D.C. 2001)

("Summary judgment is an appropriate procedure for resolving a challenge to a federal agency's

administrative decision when review is based on the administrative record . . . , even though the

Court does not employ the standard of review set forth in Rule 56, Fed. R. Civ. P.").  In APA cases,

the district court sits as an appellate tribunal.  University Medical Center of Southern Nevada v.

Shalala, 173 F.3d 438, 440 n.3 (D.C. Cir. 1999) (citing Marshall County Health Care Auth. v.

Shalala, 988 F.2d 1221, 1225-26 (D.C.Cir.1993).  Thus, judicial review is confined to the

administrative record already in existence, and does not contemplate a factual record developed *de*

*novo* in federal district court.  Community for Creative Non-Violence v. Lujan, 908 F.2d 992, 998

(D.C. Cir. 1990).  "As all material facts are within the administrative record, no material facts are

in dispute."  LeBoeuf, Lamb, Greene & MacRae, LLP v. Abraham, 215 F. Supp. 2d 73, 84 (D.D.C.

2002); see also National Ass'n of Home Builders v. U.S. Army Corps of Engineers, 417 F.3d 1272,

1282 (D.C. Cir. 2005) (recognizing that the D.C. Circuit has repeatedly held that claims asserting

"an agency's action is arbitrary and capricious or contrary to law present purely legal issues").

Because there are no material facts for the Court to resolve in the first instance here, a

Statement of Material Facts as contemplated by Local Rules 7(h) and 56.1 is inapposite.  The Court

should confine its review of the National Park Service's actions to the certified Administrative

Record as Supplemented, lodged with the Court on April 22 and May 15, 20008 (referred to herein

as "AR").  Nonetheless, to ensure strict compliance with the local rules, the Defendants submit the

following Statement of Material Facts As To Which There is No Genuine Issue in support of their Motion for Summary Judgment:

1.    This case involves the National Park Service's Winter Use Plan for Yellowstone National Park, Grand Teton National Park and the John D. Rockefeller, Jr. Memorial Parkway ("the Parks"). On March 27, 2007, the National Park Service issued a draft environmental impact statement for the Winter Use plan. AR 117061. Comments were accepted until June 5, 2007. NPS also held four public scoping meetings during the comment period. AR 126499 (Record of Decision) at 36-38.

2.    On May 16, 2007, the National Park Service issued a proposed rule regarding its Winter Use Plan. Special Regulations, Areas of the National Park Service, Proposed Rule, 72 Fed. Reg. 27,499 (May 16, 2007). Comments on the proposed rule were accepted until July 16, 2007. Id. at 27,500.

3.    On September 24, 2007, after considering the comments submitted by the public and other government entities, the National Park Service issued the final environmental impact statement for the Winter Use Plan. AR 117160.

4.    On November 20, 2007, the National Park Service issued a record of decision adopting Alternative 7 in the final environmental impact statement. AR 126499. The record of decision permits 540 snowmobiles and 83 snowcoaches to enter Yellowstone National Park per day, requires that nearly all recreational snowmobiles be equipped with the best available technology and requires that snowcoaches adopt best available technology by 2011, imposes a mandatory guiding requirement on all recreational snowmobile use, and adopts an adaptive management plan, among other conditions. See id. at 5-18.

5.    On December 13, 2007, the National Park Service issued a final rule implementing the Winter Use Plan set forth in the record of decision. Special regulations; Areas of the National Park System, Final Rule, 72 Fed. Reg. 70781 (December 13, 2007).

6.     All material facts in this action are contained in the AR.

Respectfully submitted this 16th day of June, 2008.

<div style="margin-left: 45%;">

RONALD J. TENPAS
Assistant Attorney General

 /s/ Guillermo A. Montero
GUILLERMO A. MONTERO
BARRY A. WEINER
LUTHER L. HAJEK
United States Department of Justice
Environment and Natural Resources Division
Post Office Box 663
Washington, D.C. 20044-0663
Telephone: (202) 305-0469
Fax: (202) 305-0274
Guillermo.Montero@usdoj.gov

</div>

OF COUNSEL:
JASON WAANDERS
U.S. Department of the Interior                    Attorneys for the Defendants
Office of the Solicitor
Division of Parks and Wildlife
1849 C St., N.W., MS-3230
Washington, D.C.  20240
Tel: (202) 208-7957

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

———————————————————     )
                                                           )
GREATER YELLOWSTONE COALITION,     )
et al.,                                                    )
                                                           )
                  Plaintiffs,                    )
                                                           )     Case No. 07-cv-2111 (EGS)
        v.                                            )
                                                           )     [Hearing on Motions for Summary
DIRK KEMPTHORNE, et al.,                )     Judgment on August 27, 2008]
                                                           )
                  Defendants.                  )
———————————————————     )


———————————————————     )
                                                           )
NATIONAL PARKS CONSERVATION     )
ASSOCIATION,                                    )
                                                           )
                  Plaintiff,                       )
                                                           )     Case No. 07-cv-2112 (EGS)
        v.                                            )
                                                           )     [Hearing on Motions for Summary
UNITED STATES DEPARTMENT OF THE  )     Judgment on August 27, 2008]
INTERIOR; NATIONAL PARK SERVICE    )
                                                           )
                  Defendants.                  )
———————————————————     )


**FEDERAL DEFENDANTS' RESPONSE TO GREATER YELLOWSTONE
COALITION PLAINTIFFS' STATEMENT OF MATERIAL FACTS
<u>AS TO WHICH THERE IS NO GENUINE ISSUE</u>**

The parties in this case are currently briefing cross-motions for summary judgment under

Federal Rule of Civil Procedure 56. Local Rules 7(h) and 56.1 require the submission of a response

to the statement of material facts submitted by an opposing party. For the reasons explained below,

however, both a statement of facts and a response thereto are inappropriate in this case.

It is well established that, in cases such as this one – where Plaintiffs seek judicial review

under the Administrative Procedure Act ("APA"), 5 U.S.C. § 706 – the scope of that judicial review

is properly limited to the administrative record that was before the agencies at the time the decisions were made.  See, e.g., Florida Power & Light Co. v. Lorion, 470 U.S. 729, 743 (1985); Camp v. Pitts, 411 U.S. 138, 142 (1973).  "The task of the reviewing court is to apply the appropriate APA standard of review, 5 U.S.C. § 706, to the agency decision based on the record the agency presents to the reviewing court."  Florida Power & Light Co., 470 U.S. at 743-44.

Accordingly, judicial review of final agency action on summary judgment is different in nature from the procedures used to resolve civil actions within the original jurisdiction of the federal district courts.  See Defenders of Wildlife v. Babbitt, 130 F. Supp. 2d 121, 124 (D.D.C. 2001) ("Summary judgment is an appropriate procedure for resolving a challenge to a federal agency's administrative decision when review is based on the administrative record . . . , even though the Court does not employ the standard of review set forth in Rule 56, Fed. R. Civ. P.").  In APA cases, the district court sits as an appellate tribunal.  University Medical Center of Southern Nevada v. Shalala, 173 F.3d 438, 440 n.3 (D.C. Cir. 1999) (citing Marshall County Health Care Auth. v. Shalala, 988 F.2d 1221, 1225-26 (D.C.Cir.1993).  Thus, judicial review is confined to the administrative record already in existence, and does not contemplate a factual record developed de novo in federal district court.  Community for Creative Non-Violence v. Lujan, 908 F.2d 992, 998 (D.C. Cir. 1990).  "As all material facts are within the administrative record, no material facts are in dispute."  LeBoeuf, Lamb, Greene & MacRae, LLP v. Abraham, 215 F. Supp. 2d 73, 84 (D.D.C. 2002); see also National Ass'n of Home Builders v. U.S. Army Corps of Engineers, 417 F.3d 1272, 1282 (D.C. Cir. 2005) (recognizing that the D.C. Circuit has repeatedly held that claims asserting "an agency's action is arbitrary and capricious or contrary to law present purely legal issues").

Because there are no material facts for the Court to resolve in the first instance here, a statement of material facts and response thereto, as contemplated by Local Rules 7(h) and 56.1, are inapposite.  The Court should confine its review of the National Park Service's actions to the certified Administrative Record as Supplemented, lodged with the Court on April 22 and May 15, 20008 (referred to herein as "AR").  However, because the Greater Yellowstone Coalition et al.

("GYC") Plaintiffs have submitted a Statement of Material Facts, and to ensure strict compliance with the local rules, Federal Defendants submit this response to Greater Yellowstone Coalition Plaintiffs' Statement of Material Facts as to Which There Is No Genuine Issues ("GYC's SOF").

With respect to the factual allegations in each numbered paragraph in GYC's Statements, Federal Defendants respond that all material facts in this action are contained in the certified AR. The documents in the AR speak for themselves. The material facts should be identified by the parties through citations to the AR in the parties' summary judgment motions and responses. To the extent GYC's Statement of Material Facts mischaracterizes documents in the AR, it should be disregarded by the Court. Likewise, to the extent GYC's Statement of Material Facts refers to matters outside the AR, those statements also should be disregarded by the Court. For the reasons stated above, Federal Defendants do not here provide specific responses to the particular factual assertions contained in GYC's Statement of Material Facts. In the event the Court determines that such responses are required in this case, Federal Defendants respectfully request an opportunity to file such a response within one week from the Court's order so providing.

Respectfully submitted this 16th day of June, 2008.

RONALD J. TENPAS
Assistant Attorney General

/s/ Guillermo A. Montero
GUILLERMO A. MONTERO
BARRY A. WEINER
LUTHER L. HAJEK
United States Department of Justice
Environment and Natural Resources Division
Post Office Box 663
Washington, D.C. 20044-0663
Telephone: (202) 305-0469
Fax: (202) 305-0274
Guillermo.Montero@usdoj.gov

OF COUNSEL:
JASON WAANDERS
U.S. Department of the Interior          Attorneys for the Defendants
Office of the Solicitor
Division of Parks and Wildlife
1849 C St., N.W., MS-3230

Washington, D.C.  20240
Tel: (202) 208-7957