# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____
                                       )
GREATER YELLOWSTONE                    )
COALITION, *et al*.,                   )
                                       )
      Plaintiffs,                )        Civ. No. 07-2111 (EGS)
                                       )
      v.                         )        [Hearing on Motion for Summary
                                       )         Judgment on August 27, 2008]
DIRK KEMPTHORNE, *et al*.,             )
                                       )
      Defendants.                )
_____)
                                       )
NATIONAL PARKS CONSERVATION            )
ASSOCIATION,                           )
                                       )
      Plaintiff,                 )        Civ. No. 07-2112 (EGS)
                                       )
      v.                         )        [Hearing on Motion for Summary
                                       )         Judgment on August 27, 2008]
UNITED STATES DEPARTMENT               )
OF THE INTERIOR, *et al*.,             )
                                       )
      Defendants.                )
_____)


## GREATER YELLOWSTONE COALITION PLAINTIFFS'
## OPPOSITION TO FEDERAL DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
## AND REPLY IN SUPPORT OF GREATER YELLOWSTONE COALITION
## PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

## TABLE OF CONTENTS

INTRODUCTION ....................................................................................................................1

ARGUMENT ..........................................................................................................................2

    I.      IN ELECTING TO COMPROMISE YELLOWSTONE'S RESOURCES BY
          AUTHORIZING EXPANDED SNOWMOBILE ACCESS TO THE PARK,
          THE ADMINISTRATION VIOLATED PARK SERVICE MANDATES ...........2

          A.     The Challenged Snowmobile Plan Violates the Park Service's
                Conservation  Mandate ...............................................................................2

          B.     The Challenged Snowmobile Plan Violates Park Service Regulations
                and Governing Executive Orders.................................................................6

          C.     ISMA's Arguments Are Unmoored from Park Service Mandates and
                the Administrative Record .......................................................................10

    II.     THE ADMINISTRATION FAILED TO OFFER A REASONED
          EXPLANATION FOR ITS CONCLUSION THAT EXPANDED
          SNOWMOBILE USE WITHIN YELLOWSTONE WILL COMPLY
          WITH PARK SERVICE MANDATES ..............................................................14

          A.     The Administration Failed to Reconcile Expanded Snowmobile Use
                with the Park Service's Statutory Mandates and Related Management
                Policies ....................................................................................................14

                1.     The Challenged Winter Use Plan Arbitrarily Fails to Minimize
                       Adverse Impacts to Park Resources and Values, Contrary to
                         the Park Service's Own Interpretation of Its Conservation
                         Mandate...........................................................................................15

                2.     Under the Management Policies, the Park Service's
                         Conservation Mandate Is Not Secondary to the
                         "Unacceptable Impacts" Standard ..................................................17

                  3.     The Administration Failed to Offer a Reasoned Explanation
                           for Its Determination that Expanded Snowmobile Use within
                           Yellowstone Will Not Result in "Impairment" or
                           "Unacceptable Impacts".................................................................19

          B.     The Administration Failed to Offer a Reasoned Explanation for Its
                  Determination that Expanded Snowmobile Use Will Be Consistent
                  with Park Service Regulations and Governing Executive Orders .............22

C.      The Administration Failed Again to Offer a Reasoned Explanation
        for Its Departure from the Park Service's 2001 Impairment
        Determination and Snowcoach Rule..........................................................23

III.    The Challenged FEIS Fails to Assess How the Considered Alternatives
        Will Comply with Park Service Mandates, in Violation of NEPA.......................29

        A.      The FEIS's "Historic Conditions" Analysis Arbitrarily Obscures the
                Substantial Differences Among the Considered Alternatives and Fails
                to Articulate Why Each Would Be Consistent with Park Service
                Mandates ................................................................................................30

        B.      The FEIS's Reliance on a "Park-Wide" Sound Metric Arbitrarily
                Obscures the Substantial Differences Among the Considered
                Alternatives and Fails to Articulate Why Each Would Be
                Consistent with Park Service Mandates.....................................................32

        C.      The FEIS's Reliance on a "Park-Wide" Air Impacts Metric and
                Inapposite Air Quality Standards Arbitrarily Obscures the Substantial
                Differences Among the Considered Alternatives and Fails to Articulate
                Why Each Would Be Consistent with Park Service Mandates.................35

        D.      The FEIS's Wildlife Analysis Arbitrarily Obscures the Substantial
                Differences Among the Considered Alternatives and Fails to Articulate
                Why Each Would Be Consistent with Park Service Mandates.................36

IV.     CONCLUSION.....................................................................................................39

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Daingerfield Island Protective Soc'y v. Babbitt,
    40 F.3d 442 (D.C. Cir. 1995) ................................................................ *passim*

Edmonds Inst. v. Babbitt,
    42 F. Supp. 2d. 1 (D.D.C. 1999) ....................................................................3

*Fund for Animals v. Norton,
    294 F. Supp. 2d 92 (D.D.C 2003) .............................................................. *passim*

Fund for Animals v. Norton,
    323 F. Supp. 2d 7 (D.D.C. 2004) ..................................................................24

Mausolf v. Babbitt,
    125 F.3d 661 (8th Cir. 1997) .......................................................................7

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co.,
    463 U.S. 29 (1983) ................................................................................ *passim*

National Rifle Ass'n of Am. v. Potter,
    628 F. Supp. 903 (D.D.C. 1986) ....................................................................3

PPL Wallingford Energy LLC v. FERC,
    419 F.3d 1194 (D.C. Cir. 2005) ..................................................................21

SEC v. Chenery Corp.,
    332 U.S. 194 (1947) .............................................................................. *passim*

Sierra Club v. Andrus,
    487 F. Supp. 443 (D.D.C.1980) .....................................................................3

*Sierra Club v. Mainella,
    459 F. Supp. 2d 76 (D.D.C. 2006) .............................................................. *passim*

U.S. Air Tour Ass'n v. FAA,
    298 F.3d 997 (D.C. Cir. 2002) ....................................................................34

Wilderness Society v. Norton,
    434 F.3d 584 (D.C. Cir. 2006) ....................................................................16

## STATUTES AND LEGISLATIVE MATERIALS

Administrative Procedure Act,
    5 U.S.C. § 706(2)(A) ................................................................................ *passim*

16 U.S.C. § 1 ................................................................................................ *passim*
    § 1a-1 ...................................................................................................... 3
    § 22 ......................................................................................................... *passim*
    § 160h .................................................................................................... 7

## REGULATIONS AND ADMINISTRATIVE MATERIALS

36 C.F.R. § 2.18(c) ..................................................................................... *passim*

40 C.F.R. § 1502.2(d) ................................................................................. *passim*
    § 1502.14 ............................................................................................... *passim*
    § 1502.16(c) ........................................................................................... *passim*
    § 1502.24 ............................................................................................... 34, 38

37 Fed. Reg. 2,877 (Feb. 8, 1972) ............................................................. 7

42 Fed. Reg. 26,959 (May 24, 1977) ......................................................... 7

65 Fed. Reg. 80,908 (Dec. 22, 2000) ........................................................ *passim*

66 Fed. Reg. 7,260 (Jan. 22, 2001) ........................................................... 25

68 Fed. Reg. at 69,268 (Dec. 11, 2003) .................................................... 29

72 Fed. Reg. 70,781 (Dec. 13, 2007) ........................................................ *passim*

## MISCELLANEOUS

NPS Management Policies,
    § 1.4.3 .................................................................................................... *passim*
    § 1.4.7.1 ................................................................................................. *passim*
    § 4.4.1 .................................................................................................... 15
    § 4.7.1 .................................................................................................... 15, 16, 35
    § 4.9 ....................................................................................................... 15, 16
    § 8.2.3 .................................................................................................... 15, 16

**INTRODUCTION**

In recent winters, recreational snowmobile use has caused significant, adverse, and unexpected impacts on Yellowstone National Park's resources and values—impacts that have breached the administration's own noise thresholds, exceeded federal health standards, and prompted Park Service biologists to recommend that vehicle numbers be kept "at or below" recent levels in order to protect Park wildlife. The administration has nonetheless authorized a doubling of snowmobile use—and the associated noise, air, and wildlife impacts. In so doing, the administration rejected a snowcoach alternative that would have minimized these impacts while providing equal access to Yellowstone's "wonders" and "curiosities." Confronted with the significant, adverse impacts of snowmobile access and the opportunity to avoid them, the administration failed to protect the Park.

The administration's new snowmobile plan is both arbitrary and unlawful. In attempting to defend the decision—the last of the current administration's efforts to reverse the Park Service's 2001 phase-out rule—federal defendants and defendant-intervenors offer a divergent set of arguments. According to the government, the administration conducted a thorough environmental analysis and, from it, reasonably concluded that expanded snowmobile use will not impair or unacceptably impact the "quiet, solitude, and clean air" Yellowstone was set aside to secure. See National Park Service, Winter Use Plans, Record of Decision (Nov. 20, 2007) (AR 126499) ("2007 ROD"), at 34. According to the snowmobile intervenors ("ISMA"), quiet, solitude, and clean air have been irretrievably lost along Yellowstone's snowmobiling routes— "the few visitors seeking wilderness, solitude, and natural quiet in Yellowstone" must find it in the Park's "vast backcountry[.]" See ISMA Br. at 2-3. Both of these arguments are incorrect. When presented with the significant, adverse impacts of snowmobile use and a means of

avoiding them while providing equal access to the Park, the administration was obligated to protect the Park.  As it failed to do so—and failed to offer a reasoned explanation for its determination that expanded snowmobile use within Yellowstone will somehow comply with Park Service mandates—the administration's decision should be set aside.  Accordingly, federal defendants' cross-motion for summary judgment should be denied, and judgment entered for the Greater Yellowstone Coalition plaintiffs ("GYC").[1]

## ARGUMENT

I.    **IN ELECTING TO COMPROMISE YELLOWSTONE'S RESOURCES BY AUTHORIZING EXPANDED SNOWMOBILE ACCESS TO THE PARK, THE ADMINISTRATION VIOLATED PARK SERVICE MANDATES**

In the past seven years, the present administration has demonstrated a firm belief that the Park Service has largely unbridled discretion to compromise Yellowstone's "curiosities" and "wonders" in order to secure the ability to enter the Park by snowmobile.  In the present case, federal defendants and ISMA seek to have this view affirmed.  Their arguments, however, cannot be reconciled with the mandates by which the Park Service is bound.

### A.    **The Challenged Snowmobile Plan Violates the Park Service's Conservation Mandate**

The administration's winter use decision violates the Park Service's fundamental legal mandate.  Yellowstone—the nation's first national park—was set aside by Congress "for the preservation, from injury or spoliation, of all … natural curiosities, or wonders, within the park, and their retention in their natural condition."  16 U.S.C. § 22.  The National Park Service, as steward of the Park, is charged with this preservation.  Indeed, under its own Organic Act, the Park Service is required to "promote and regulate" all of the national parks "by such means and measures as conform to [their] fundamental purpose …, which purpose is to conserve the

---

[1] ISMA has not filed a cross-motion for summary judgment.

scenery and the natural and historic objects and the wild life therein and to provide for the enjoyment of the same in such manner and by such means as will leave them unimpaired for the enjoyment of future generations." Id. § 1. As "reaffirm[ed], declare[d], and direct[ed]" by Congress in 1978,

> the promotion and regulation of the various areas of the National Park System … shall be consistent with and founded in the purpose established by [the Organic Act], to the common benefit of all the people of the United States. The authorization of activities shall be construed and the protection, management, and administration of these areas shall be conducted in light of the high public value and integrity of the National Park System and shall not be exercised in derogation of the values and purposes for which these various areas have been established, except as may have been or shall be directly and specifically provided by Congress.

Id. § 1a-1.

While these provisions afford the Park Service discretion in its management of Yellowstone, that discretion is bounded by a conservation mandate. The Park Service has "broad, but not unlimited discretion in determining what actions are best calculated to protect Park resources." Daingerfield Island Protective Soc'y v. Babbitt, 40 F.3d 442, 446 (D.C. Cir. 1995) (emphasis added) (internal quotations omitted) (holding that the Park Service had not violated its discretion in selecting an alternative with "the least deleterious effect on the environment"); see also Fund for Animals v. Norton, 294 F. Supp. 2d 92, 105 (D.D.C. 2003) ("NPS is bound by a conservation mandate and that mandate trumps all other considerations.") (citing National Rifle Ass'n of Am. v. Potter, 628 F. Supp. 903, 909 (D.D.C. 1986)); id. at 113 ("[T]he NPS' conservation command could not be more clear: the NPS is absolutely charged with preserving the natural wonders of the Parks."); Edmonds Inst. v. Babbitt, 42 F. Supp. 2d. 1, 15 (D.D.C. 1999) (quoting Daingerfield Island Protective Soc'y, 40 F.3d at 446); Potter, 628 F.

Supp. at 909 (holding that the Organic Act "speaks of but a single purpose, namely, conservation"); Sierra Club v. Andrus, 487 F. Supp. 443, 448-49 (D.D.C. 1980) (the Park Service has "broad" but "not unlimited" discretion in <u>determining what actions are best calculated to protect Park resources</u>," consistent with its "'<u>absolute duty … to take whatever actions … as will safeguard the units of the National Park System</u>'") (emphasis added) (quoting S. Rep. No. 95-528, at 9 (1977)), <u>aff'd sub nom.</u> Sierra Club v. Watt, 659 F.2d 203 (D.C. Cir. 1981). The Park Service made no such determination in this case. Rather, in authorizing a doubling of the already significant and adverse impacts caused by snowmobile use within Yellowstone despite the availability of an alternative that would have minimized such impacts while providing equal access to the Park, the administration elected to further compromise the Park's resources and values in furtherance of snowmobiling. The administration's decision is accordingly arbitrary and unlawful.

In recent winter seasons, monitoring within Yellowstone has demonstrated that the use of snowmobiles—even at reduced levels—results in significant, adverse impacts on park resources and values. The scale of the impacts documented surprised even the Park Service. See 2007 ROD at 20; see also Special Regulations, Areas of the National Park System, 72 Fed. Reg. 70,781, 70,782-83 (Dec. 13, 2007) ("2007 Rule") (arguing that the challenged authorization of expanded snowmobile access to Yellowstone is, somehow, a reduction that "will reduce the impacts on the natural soundscapes of the park, which the NPS found to be somewhat greater than expected even with the reduced number of snowmobiles that used the park over the last several winters"). The administration's own audibility thresholds have been breached a number of times in a number of locations; federal health standards for formaldehyde and benzene have been approached or exceeded; and Park Service biologists have recommended that oversnow

vehicle numbers be kept "at or below" the levels of recent seasons in order to minimize impacts on Yellowstone's winter-stressed wildlife. See GYC Mem. in Supp. at 20-21.

The administration's authorization of expanded snowmobile use promises to exacerbate these problems. Relative to current levels, the challenged plan will result in at least an 18-percent increase in carbon monoxide emissions; a 33-percent increase in benzene emissions; a 50-percent increase in hydrocarbon emissions; a 60-percent increase in formaldehyde emissions; a 100-percent increase in particulate matter emissions; a tripling of the area in which oversnow vehicles are audible during half or more of the day; and an increase in wildlife mortality, displacement, and energy expenditure. See GYC Mem. in Supp. at 21-22.

Such impacts, however, were avoidable. The snowcoach alternative rejected by the administration—an alternative fully satisfying the purpose and need underlying the administration's planning process and providing essentially identical access to the Park[2]—would have minimized the adverse sound and wildlife impacts of motorized access to Yellowstone while producing approximately one-fourth the carbon monoxide and particulate matter; one-tenth the benzene; one-twelfth the hydrocarbons; and one-seventeenth the formaldehyde produced under the challenged plan. See National Park Service, Winter Use Plans, Final Environmental

---

[2] The administration's half-hearted attempt to justify snowmobile access as faster and more independent is arbitrary. See GYC Mem. in Supp. at 23-25; see also 2007 ROD at 23. "[S]nowcoach operators offer full-day tours that are nearly identical to the most popular snowmobile tours and visitors could travel to the same attractions such as Old Faithful and the Lower Falls." FEIS at 346; see also id. at J-1 (June 13, 2007 letter from EPA Deputy Regional Administrator Kerrigan Clough to Superintendents Suzanne Lewis and Mary Gibson Scott, at 7) (noting that draft EIS cited "no studies or visitor surveys" in support of its assertion that "snowcoach visitors are adversely affected by snowcoach speed"). As to autonomy, the FEIS acknowledges that "those who value the experience of traveling independently (that is, without a guide) on a snowmobile" cannot do so under the challenged winter use plan. Id. at 347, 350.

Impact Statement (Sep. 2007) (AR 117160) ("FEIS"), at 4, 44; GYC Mem. in Supp. at 22-23.[3]

In defending the challenged winter use plan, federal defendants do not contest the fact that Yellowstone's resources will, in fact, be further compromised by the expansion of snowmobile use authorized by the administration. Nor do they protest the FEIS's conclusion that snowcoaches could provide essentially identical access to the Park while significantly minimizing the detrimental impacts of that access. Rather, they contend—like ISMA—that the Park Service acted within its discretion in authorizing the expanded snowmobile use at issue in this case. See Fed. Br. at 9-16; see also ISMA Br. at 14-18. In making this argument, federal defendants and defendant-intervenors disregard the nature of the decision challenged here. Having determined the form of motorized access "best calculated to protect Park resources[,]" see Daingerfield Island Protective Soc'y, 40 F.3d at 446 (internal quotations omitted)—that is, snowcoaches—the administration opted instead to authorize expanded snowmobile use and, with it, further degradation of Yellowstone. Because the administration's decision is accordingly arbitrary and irreconcilable with the Park Service's conservation mandate, it should be vacated. See 16 U.S.C. §§ 1, 22; 5 U.S.C. § 706(2)(A).

## B.      The Challenged Snowmobile Plan Violates Park Service Regulations and Governing Executive Orders

The Park Service's discretion to allow the use of snowmobiles within Yellowstone is not

---

[3] ISMA's characterization of snowcoaches as "much louder" and "more polluting" than snowmobiles—made without reference to the record—is meritless. See ISMA Br. at 3. As aptly summarized by the FEIS, it is "because snowmobiles would be banned from the parks" under the snowcoach alternative that "there would be increased opportunities for quiet and solitude and clean air." FEIS at 355; see also, e.g., id. at 229, 231, 307. While the administration's most recent ROD states that recent exceedances of the "sound level (loudness)" threshold "were primarily attributable to snowcoaches and road grooming equipment[,]" the ROD itself acknowledges that the snowcoaches at issue were "particularly the older model Bombardiers." 2007 ROD at 20-21. Under the rejected snowcoach alternative, Bombardiers would have continued to be converted into "best available technology" ("BAT") machines, addressing any such issues. See id. at 21; FEIS at 44-45.

limited by statute alone—a fact ignored by ISMA and evaded by federal defendants.  Under

Executive Order 11,644, snowmobiles may be permitted in the nationals parks only when their

use "will not adversely affect [the parks'] natural, aesthetic, or scenic values[;]" under Executive

Order 11,989, public lands must be closed to snowmobile use when it would cause "considerable

adverse effects on the soil, vegetation, wildlife, wildlife habitat or cultural or historic resources

of particular areas or trails of the public lands[.]"  Exec. Order No. 11,644, §§ 3(a)(4), 9(a), 37

Fed. Reg. 2,877 (Feb. 8, 1972), as amended by Exec. Order No. 11,989, 42 Fed. Reg. 26,959

(May 24, 1977) ("E.O. 11,644").  The Park Service implemented these Orders by promulgating

36 C.F.R. § 2.18(c).  The Service's regulation is strict, providing that:

> The use of snowmobiles is prohibited, except on designated routes
> and water surfaces that are used by motor vehicles or motorboats
> during other seasons.  Routes and water surfaces designated for
> snowmobile use shall be promulgated as special regulations.
> Snowmobiles are prohibited except where designated and only
> when their use is consistent with the park's natural, cultural, scenic
> and aesthetic values, safety considerations, park management
> objectives, and will not disturb wildlife or damage park resources.

36 C.F.R. § 2.18(c) (emphasis added); see also Mausolf v. Babbitt, 125 F.3d 661, 668 (8th Cir.

1997) ("Snowmobiling is a prohibited activity in national parks except where the NPS has

promulgated special regulations designating areas open to snowmobiling, and even then it is

allowed only where such 'use is consistent with ... park management objectives, and will not

disturb wildlife or damage park resources.'") (quoting 36 C.F.R. § 2.18(c)).[4]

---

[4] While federal defendants protest reliance on Mausolf's statements that "'snowmobiling generally is prohibited in national parks,'" see Fed. Br. at 19 n.6, that general prohibition is stronger in this case.  In Mausolf, the Court upheld snowmobiling restrictions within Voyageurs National Park, the enabling legislation of which explicitly allows for snowmobile use.  See Mausolf, 125 F.3d at 663 (citing 16 U.S.C. § 160h).  "Although snowmobiling generally is prohibited in national parks," the Court noted, citing Section 2.18(c), "the Voyageurs Park enabling legislation authorized the Secretary of the Interior to permit snowmobiling in the Park." Id.; see also id. at 668.  As Yellowstone's enabling legislation provides, instead, "for the

The challenged winter use plan violates these provisions.  With the plan, the administration authorized a doubling of snowmobile levels that have already been shown to have "adversely affect[ed] [Yellowstone's] natural, aesthetic, [and] scenic values[,]" see E.O. 11,644 § 3(a)(4); 36 C.F.R. § 2.18(c); to have caused "considerable adverse effects on the soil, vegetation, wildlife, [and] wildlife habitat" of the Park, see E.O. 11,644 § 9(a); and to have "disturb[ed] wildlife" and "damaged park resources[,]" see 36 C.F.R. § 2.18(c).  The administration's decision, therefore, should be set aside as arbitrary and unlawful under these authorities as well.

Federal defendants attempt to avoid these provisions.   With respect to Section 2.18(c), federal defendants contend that GYC has interpreted the regulation as being "violated whenever an individual animal is disturbed by snowmobile use, however slightly, or when adverse impacts to the Park's animals are increased, however incrementally"—an interpretation, federal defendants argue, at odds with language "clearly contemplat[ing] that snowmobile use may be authorized."  Fed. Br. at 19.  In authorizing a doubling of snowmobile use within Yellowstone, however, the administration ignored the recommendation of Park Service biologists that vehicle levels be kept "at or below" those of recent seasons in the interest of wildlife.  See AR 125701, at 1, 20 (P.J. White et al., Behavioral Responses of Wildlife to Snowmobiles and Coaches in Yellowstone (Oct. 17, 2006)).  Federal defendants' effort to diminish the plan's impacts on Yellowstone's winter-stressed wildlife as "slight[]" or "minimal" is accordingly at odds with the record.  See Fed. Br. at 18-19.  Moreover, federal defendants' argument fails to address Section 2.18(c)'s prohibition on snowmobile "damage [to] park resources."  See Fed. Br. at 18-19.  As

---

preservation, from injury or spoliation, of all … natural curiosities, or wonders, within the park, and their retention in their natural condition[,]" 16 U.S.C. § 22, Section 2.18(c)'s general prohibition applies even more forcefully here.

documented during recent winter seasons, snowmobile use at half the level authorized in the challenged plan has resulted in significant damage.

Federal defendants' attempt to avoid the mandates of Executive Orders 11,644 and 11,989 is no more successful.  According to the government, as the Orders govern the "designation of the specific areas and trails on public lands on which the use of off-road vehicles may be permitted," E.O. 11,644 § 3(a) (emphasis added), they are inapplicable here because the challenged winter use plan merely authorizes the use of snowmobiles on roads.  See Fed. Br. at 16-17; see also ISMA Br. at 17 n.16 (asserting that the Orders are inapplicable to road use).  This post-hoc reading of the provisions is erroneous.  See SEC v. Chenery Corp., 332 U.S. 194, 196 (1947).  First, federal defendants' contention that the Orders "do[] not directly prohibit (or even regulate) the general use of snowmobiles in the national parks[,]" see Fed. Br. 16-18, is at odds with the Park Service's prior interpretation of the Orders.  In 2000, the Park Service determined that then-existing snowmobile use on Yellowstone's roads was inconsistent with the Orders' requirements.  National Park Service, Record of Decision, Winter Use Plans for the Yellowstone and Grand Teton National Parks and John D. Rockefeller, Jr. Memorial Parkway, 65 Fed. Reg. 80,908, 80,916 (Dec. 22, 2000) ("2000 ROD").  Moreover, Section 2.18(c)—promulgated by the Park Service in order to implement Executive Order 11,644, see Fed. Br. at 17—itself applies the Orders' substantive requirements to snowmobiling routes designated on established park roads. Compare 36 C.F.R. § 2.18(c) with E.O. 11,644 § 3(a)(4).

Second, federal defendants' interpretation of the Orders cannot be squared with their purpose.  Executive Orders 11,644 and 11,989 were issued in order to "ensure that the use of off-road vehicles on public lands will be controlled and directed so as to protect the resources of those lands, to promote the safety of all users of those lands, and to minimize conflicts among

the various uses of those lands."  E.O. 11,644 § 1 (emphasis added).  To this end, the Orders

require that federal land agencies designate the locations where off-road vehicles (including

snowmobiles) may and may not be used—that is, "the specific areas and trails on public lands on

which the use of off-road vehicles may be permitted, and areas in which the use of off-road

vehicles may not be permitted"—"based upon the protection of the resources of the public lands,

promotion of the safety of all users of those lands, and minimization of conflicts among the

various uses of those lands."  Id. § 3(a).  Under the government's reading of this provision—one

premised upon a distinction between "trails" and "roads" nowhere made in the Orders—off-road

vehicle use is exempt from scrutiny so long as it is "limited to the same established roads that are

used by wheeled vehicles during other seasons[.]"  Fed. Br. at 17.  As such an exemption cannot

be squared with either the language of the Orders' or their broad purpose of "controll[ing] and

direct[ing] … the use of off-road vehicles on public lands[,]" see E.O. 11,644 § 1, the

government's interpretation should be rejected.  See Fund for Animals, 294 F. Supp. 2d at 102

(noting that the Orders "specifically address the use of snowmobiles in the Parks"); id. at 106

("[T]wo Executive Orders, as well as NPS regulations, demand that if it is determined that

snowmobile use has an adverse effect on the Park's resources, or disturbs wildlife, the

snowmobile use must immediately cease.").

## C.     ISMA's Arguments Are Unmoored from Park Service Mandates and the Administrative Record

According to ISMA, plaintiffs' "unreasonable, absolutist interpretation" of the Park

Service's mandates—one that ISMA claims would "shut down the entire National Park

System"—disregards the agency's "broad discretion" in the management of Yellowstone

National Park.  See ISMA Br. at 14-18.  Yellowstone, in ISMA's view, is actually "two parks"—

one established by Congress in 1872 (what ISMA refers to as the "second park"); the other

established by Army road builders in subsequent decades (the "first park," presumably).  See ISMA Br. at 2-3.  The "second park," in ISMA's view—the Yellowstone of Old Faithful, Grand Prismatic Spring, the Grand Canyon of the Yellowstone, and other "curiosities" and "wonders"—may be given over to the snowmobiles.  Id. at 23-24.  Those "seeking wilderness, solitude, and natural quiet" can locate such things in Yellowstone's "vast backcountry"—the "second park"—satisfying, according to ISMA, the requirements of the Park Service's various mandates.  Id.  ISMA's arguments fail on a number of grounds.

First, in articulating its theory of unbridled Park Service discretion, ISMA disregards the requirements of Section 2.18(c) and Executive Orders 11,644 and 11,989.  See ISMA Br. at 11, 14-18 (failing to explain the challenged plan's consistency with Section 2.18(c)); see also id. at 7 n.16 (declaring that "Executive Orders 11644 and 11989 … are not applicable to this case").  These provisions place substantial limitations on the Park Service's authority to allow snowmobile use within the national parks.  As ISMA's argument ignores these limitations, it cannot be sustained.

Second, ISMA wrongly contends that GYC has offered an "unreasonable, absolutist interpretation" of the Park Service's conservation mandate that would "shut down the entire National Park System[.]"  See ISMA Br. at 18.  GYC does not contend that "any visitor activity that causes any negative impact must be barred" under the Service's conservation mandate.  See id.; see also id. at 14-15, 17, 21 (challenging the notion that the Organic Act and Yellowstone's enabling legislation preclude "any" adverse impacts).  GYC argues that the administration acted arbitrarily and unlawfully in determining that snowcoaches provide the form of access "best calculated to protect Park resources[,]" and nonetheless authorizing an expansion of snowmobile use within Yellowstone.  See Daingerfield Island Protective Soc'y, 40 F.3d at 446; see also

ISMA Br. at 15, 19, 22, 23, 26 (relying on <u>Daingerfield</u>).

Third, ISMA's "two-park" theory—a striking innovation offered without citation to the record or relevant authority—cannot be reconciled with Park Service mandates.  According to ISMA, "there has been no natural quiet or solitude along the Yellowstone road system" for a century; natural soundscapes and other "wilderness/backcountry … resources and values[,]" it argues, cannot be preserved in populated portions of the Park.  <u>Id.</u> at 3, 23.  This, in ISMA's view, must serve as "the baseline of NPS winter use planning and action[;]" to require otherwise, ISMA argues, would force all forms of motorized access out of Yellowstone.  <u>Id.</u>  "For the few winter visitors seeking wilderness, solitude, and natural quiet in Yellowstone, these values can be found in the vast backcountry"—the "second park."  <u>Id.</u> at 3.

This notion—that park resources and values have been irretrievably lost in Yellowstone's most-visited regions, allowing such areas to be written off in furtherance of snowmobiling—is unfounded.  While ISMA may believe "strongly" that Yellowstone's solitude and quiet cannot be at all maintained in the Park's most-visited areas, <u>see</u> ISMA Br. at 23, the record does not support such a conclusion.  <u>See, e.g.</u>, FEIS at 355 (noting "increased opportunities for quiet and solitude and clean air" under the snowcoach alternative "because snowmobiles would be banned").  More importantly, Park Service mandates preclude the abandonment of Park lands that ISMA advocates.  Under the Organic Act itself, national parks are to be "conserve[d]" and "le[ft] … unimpaired[,]" 16 U.S.C. § 1—a principle that leaves no room for ISMA's "leave-impaired" rule.  <u>See also, e.g.</u>, 16 U.S.C. § 22 (Yellowstone to be managed "for the preservation, from injury or spoliation, of all … natural curiosities, or wonders, within the park, and their retention in their natural condition"); 2006 NPS Management Policies ("NPS Policies" or "2006 NPS Policies") § 1.4.7.2 ("[T]he Service will strive to restore the

integrity of park resources that have been damaged or compromised in the past."); FEIS at 137 ("Natural quiet, or natural sound conditions that would prevail without human presence, is an appropriate baseline from which to gauge the impacts of human use.").

Recognizing Yellowstone as a single park unsuited to snowmobiles does not, as ISMA argues, imperil all forms of motorized access at all times of the year.  See ISMA Br. at 23.  First, ISMA's arguments disregard the nature of Yellowstone's winters, which uniquely stress the Park's wildlife and uniquely embody solitude and quiet.  See, e.g., FEIS at 5 (noting that Yellowstone's wildlife are "highly vulnerable to natural stressors" during winter); id. at 129 ("In the context of a severe winter, … even short-term habitat displacement can be detrimental to wildlife survival."); id. at 138 ("Some of the quietest sound levels ever measured in natural environments have been recently documented during the winter in YNP[.]").  Second, ISMA disregards the unique impacts of snowmobiles which, among other things, emit more pollutants than do automobiles.  See, e.g., id. at 103 ("A common misperception is that the many more automobiles entering the park during summer months contribute more pollutants than do snowmobiles….  Although BAT snowmobiles typically use modern computer controlled engines, they lack catalytic converters and therefore produce more emissions than automobiles.").  In recognition of their disproportionate impacts, the Park Service promulgated a regulation generally prohibiting the use of snowmobiles within the national parks—a regulation violated by the administration in authorizing expanded snowmobile access to Yellowstone.  See 36 C.F.R. § 2.18(c).  Finally, ISMA ignores the fundamental problem in this case.  In adopting the challenged winter use plan, the administration rejected a snowcoach alternative affording equal access to Yellowstone while significantly reducing adverse impacts to park resources and values.  As ISMA has failed to identify a similar summer alternative, its argument is ultimately

hollow.

## II.   THE ADMINISTRATION FAILED TO OFFER A REASONED EXPLANATION FOR ITS CONCLUSION THAT EXPANDED SNOWMOBILE USE WITHIN YELLOWSTONE WILL COMPLY WITH PARK SERVICE MANDATES

While offering a number of arguments in support of the administration's new snowmobile plan, federal defendants ultimately contend that the Park Service conducted a "thorough and painstaking environmental analysis" and, from it, reasonably concluded that an expansion of snowmobile use within Yellowstone would comply with Park Service mandates. See Fed. Br. at 1.  This argument cannot be sustained.  As in Sierra Club v. Mainella, 459 F. Supp. 2d 76 (D.D.C. 2006), the challenged environmental analysis and decision offer "little or no explanation" for the administration's repeated, conclusory declarations that expanded snowmobile use will be entirely consistent with the Organic Act, Yellowstone's enabling legislation, Park Service regulations, and governing Executive Orders.  Accordingly, the administration's decision should be set aside.

### A.   The Administration Failed to Reconcile Expanded Snowmobile Use with the Park Service's Statutory Mandates and Related Management Policies

In arguing that the challenged plan is consistent with the Park Service's conservation mandate, federal defendants contend that the administration reasonably concluded that expanded snowmobile use within Yellowstone would not "unacceptably impact" the Park's resources and values, satisfying the Park Service's obligations.  See Fed. Br. at 9-16.  This contention fails, however, as it arbitrarily disregards the Park Service's obligation to "avoid, or to minimize to the greatest extent practicable, adverse impacts on park resources and values[,]" NPS Policies § 1.4.3; arbitrarily conflates the Park Service's "conservation" and "impairment" mandates; and ultimately relies on the administration's unreasoned conclusion that the challenged plan will not

impair or unacceptably impact park resources or values.[5]

**1.** ***The Challenged Winter Use Plan Arbitrarily Fails to Minimize Adverse Impacts to Park Resources and Values, Contrary to the Park Service's Own Interpretation of Its Conservation Mandate***

First, the winter use plan flies in the face of the Park Service's own interpretation of the conservation mandate established by governing law. With the 2006 Management Policies—Policies repeatedly reaffirmed in the challenged decision—the present administration recognized that "[t]he fundamental purpose of the national park system, established by the Organic Act and reaffirmed by the General Authorities Act, … begins with a mandate to conserve park resources and values." NPS Policies § 1.4.3. In the words of the Policies, this mandate—"independent of the separate prohibition on impairment"—requires the Park Service to "always seek ways to avoid, or to minimize to the greatest extent practicable, adverse impacts on park resources and values." Id.; 2007 ROD at 26-27 (same); Fund for Animals, 294 F. Supp. 2d at 113 ("[T]he NPS' conservation command could not be more clear: the NPS is absolutely charged with preserving the natural wonders of the Parks. Indeed, the NPS itself officially interprets its Organic Act mandate to require that NPS managers 'always seek to avoid, or minimize to the greatest degree practicable, adverse impacts on park resources and values.'") (quoting 2001 NPS Policies § 1.4.3) (emphasis in original); see also, e.g., NPS Policies §§ 4.4.1, 4.7.1, 4.9, 8.2.3. The challenged winter use plan arbitrarily casts aside this requirement, authorizing expanded snowmobile use within Yellowstone despite the availability of a snowcoach alternative that would afford equal access to the Park while avoiding the significant, adverse impacts that come

---

[5] The government argues erroneously that GYC "waived … any potential claim of impairment[.]" Fed. Br. at 10. There is no waiver here. GYC contends that the administration arbitrarily concluded that the challenged winter use plan will not impair park resources and values.

with snowmobiles.[6]

Rather than contending that the administration's plan somehow avoids or minimizes the significant, adverse impacts stemming from snowmobile use within Yellowstone, federal defendants attempt to avoid the standard. The government argues unevenly that GYC has either "create[d] its own standards" or improperly attempted to enforce portions of the Park Service's own Management Policies that fall outside "the Service's official interpretation of the Organic Act" in Management Policies Part 1.4[7]—among them, the requirements that the Park Service "seek to perpetuate the best possible air quality in parks[,]" NPS Policies § 4.7.1; "preserve, to the greatest extent possible, the natural soundscapes of parks[,]" id. § 4.9; and use "the least impacting equipment, vehicles, and transportation systems … [w]here [motorized] use is necessary and appropriate," id. § 8.2.3. See Fed. Br. at 14; see also GYC Mem. in Supp. at 20. This is wrong. Consistent with Wilderness Society v. Norton, 434 F.3d 584 (D.C. Cir. 2006), GYC does not seek to enforce directly the Park Service's Management Policies. In this case, the Park Service has previously utilized its Management Policies to find impairment, and has again arbitrarily failed to explain its departure from that finding. See 2000 ROD, 65 Fed. Reg. at 80,913-15. Moreover, each of the identified standards was relied upon in the challenged environmental analysis, decision, or both, and the administration cannot not disavow what was a central rationale for its determination that the challenged winter use plan is consistent with Park

---

[6] Section 1.4.3 notes that "the laws do give the Service the management discretion to allow impacts to park resources and values when necessary and appropriate to fulfill the purposes of a park, so long as the impact does not constitute impairment of the affected resources and values." NPS Policies § 1.4.3 (emphasis added). Since the snowcoach alternative satisfies the "purpose and need" of the winter planning process, see FEIS at 4, 44, there can be no argument here that the adverse impacts of snowmobiling are "necessary" to fulfill Yellowstone's purposes.

[7] Elsewhere in its brief, the government asserts more broadly that the "interpretations and policies articulated [in the 2006 Management Policies] are entitled to substantial deference." Fed. Br. at 7.

Service mandates.  See, e.g., GYC Mem. in Supp. at 20; 2007 ROD at 26 ("This decision fully

complies with the Management Policies 2006."); see also Sierra Club, 459 F. Supp. 2d at 79 n.1

("NPS relied on statements and interpretations in the Management Policies in making the

decisions under review, and the Court will refer to the Management Policies insofar as the

decisions under review have done so."); Fund for Animals, 294 F. Supp. 2d at 106 n.8 ("[T]he

NPS continually relied on the Management Polices throughout the rulemaking process.…  Post-

hoc arguments by NPS's counsel cannot negate this reliance.").  Finally, the fundamental

requirement at issue—that "'NPS managers … always seek ways to avoid, or to minimize to the

greatest extent practicable, adverse impacts on park resources and values'"—appears within Part

1.4 Policies, which are "the Service's official interpretation of the Organic Act[.]"  NPS Policies

§ 1.4.3; Fed. Br. at 14; see also Fund for Animals, 294 F. Supp. 2d at 113.  Accordingly, the

administration cannot evade the Management Policies that further demonstrate the arbitrariness

of its decision.

> **2.      Under the Management Policies, the Park Service's Conservation Mandate Is Not Secondary to the "Unacceptable Impacts" Standard**

In further seeking to avoid the conservation mandate recognized in the Park Service's

own Management Policies, federal defendants suggest that the Park Service's independent

obligation to conserve park resources and values is fully satisfied by a determination that an

authorized action will not "unacceptably impact" park resources and values.  See Fed. Br. at 11-

12; id. at 16 (contending that GYC is "confus[ed] as to the applicable legal standard" as "the

Service's determination that impacts to wildlife would be 'acceptable'… constitutes full

compliance with … the Service's conservation mandate under the Organic Act").  This

argument, however, impermissibly attempts to conflate the Park Service's "conservation" and

"non-impairment" mandates, which constitute independent standards.

As federal defendants initially acknowledge in their brief, "[t]he Organic Act imposes two <u>independent</u> mandates on the Park Service[,]" Fed. Br. at 9-10 (emphasis added)—"a non-impairment requirement and a broader conservation mandate," <u>Fund for Animals</u>, 294 F. Supp. 2d at 103; <u>see also</u> 16 U.S.C. § 1; NPS Policies § 1.4.3 ("Th[e] [conservation] mandate is independent of the separate prohibition on impairment[.]").  Unlike the non-impairment mandate, the Park Service's conservation mandate "'applies all the time, with respect to all park resources and values, <u>even when there is no risk that any park resources or values may be impaired</u>.'" <u>Fund for Animals</u>, 294 F. Supp. 2d at 103 (quoting 2001 NPS Policies § 1.4.3) (emphasis in original); <u>see also</u> 2006 NPS Policies § 1.4.3 (same).  Accordingly, the Park Service must <u>both</u> conserve park resources and leave them unimpaired.

The Management Policies' "unacceptable impacts" standard addresses only one of these duties.  It was established to ensure that park resources and values are left unimpaired.  As the Management Policies themselves explain in Section 1.4.7.1 (a subsection of Section 1.4.7, "Decision-making Requirements to Identify and Avoid Impairments"):

> The impact threshold at which impairment occurs is not always readily apparent.  Therefore, the Service will apply a standard that offers greater assurance that impairment will not occur. The Service will do this by avoiding impacts that it determines to be unacceptable.

NPS Policies § 1.4.7.1.

The conservation mandate, again, "is independent of the separate prohibition on impairment and applies all the time with respect to all park resources and values, even when there is <u>no risk</u> that any park resources or values may be impaired." <u>Id.</u> § 1.4.3 (emphasis added).  Accordingly, the government's post-hoc effort to submerge the Park Service's larger conservation mandate within the Management Policies' more limited "unacceptable impacts"

standard cannot be sustained.  See Chenery Corp., 332 U.S. at 196.

**3.**     ***The Administration Failed to Offer a Reasoned Explanation for Its Determination that Expanded Snowmobile Use within Yellowstone Will Not Result in "Impairment" or "Unacceptable Impacts"***

Even if federal defendants were correct in arguing that a reasoned "no unacceptable impacts" determination could satisfy the Park Service's conservation mandate—which they are not—the determination relied upon in this case is arbitrary.  According to the government, the Park Service prepared a final environmental impact statement ("FEIS") that "exhaustively studied the impacts of seven alternative proposed management plans" and concluded that the impacts of the administration's plan would be acceptable.  Fed. Br. at 13.  Expanded snowmobile access to Yellowstone, the FEIS concluded:

> would not (1) be inconsistent with [the] park's purposes and values; (2) impede the attainment of [the] park's desired future conditions for natural and cultural resources as identified through the parks' planning process; (3) create an unsafe or unhealthy environment for visitors or employees; (4) diminish opportunities for current or future generations to enjoy, learn about, or be inspired by park resources or values; or (5) unreasonably interfere with park programs or activities; an appropriate use of the parks; the atmosphere of peace and tranquility; or the natural soundscape maintained in wilderness and natural, historic, or commemorative locations within the parks.

Id. (quoting FEIS at 373); see also NPS Policies § 1.4.7.1 (defining "unacceptable impacts").

In arguing that this conclusion is owed "substantial deference," however, see Fed. Br. at 13, the government asks that deference be paid to an arbitrary decision.  In its environmental analysis and decision, the administration confirmed the significant, adverse impacts stemming from recent levels of snowmobile use within Yellowstone; the administration did not, however, offer a reasoned explanation as to why "unacceptable impacts" or "impairment" would nonetheless be avoided by authorizing a doubling of snowmobile use, and its associated adverse

19

impacts, within the Park.  See Sierra Club, 459 F. Supp. 2d at 98-103 (rejecting a Park Service

non-impairment determination where the agency had offered "little or no explanation" of how it

reached its conclusion, having relied instead on repeated, conclusory declarations that the

impacts at issue would not result in impairment); see also Motor Vehicle Mfrs. Ass'n v. State

Farm Mut. Auto Ins. Co., 463 U.S. 29, 48 (1983) ("[A]n agency must cogently explain why it

has exercised its discretion in a given manner[.]"); Fund for Animals, 294 F. Supp. 2d at 110

(rejecting defendants' unexplained decision to credit certain experts over others "in light of the

agency's mandate to protect the parks," as the absence of a "clear rationale" left the Court "at a

loss to understand the agency decision").

        The administration's treatment of the noise impacts of snowmobiles offers a notable

example.  In recent seasons, the Park Service's own "adaptive management" audibility

thresholds were exceeded numerous times in several locations.  See FEIS at 143-47; 2007 ROD

at 20-21.  A violation of these thresholds "indicates that conditions could be moving away from

those that are desirable, and in some cases … that impacts are unacceptable or are causing

impairment."  See 2007 ROD at 40.  In such circumstances, the administration's own "adaptive

management" program calls for the Park Service to respond with new technology requirements,

"[a]djust[ed]" daily entry limits, or "timed-entry" requirements.  See FEIS at E-5; see also 2007

ROD at 40 ("Monitoring and adaptive management, and management action if these thresholds

are violated, will ensure the parks' obligation to preserve resources and values in an unimpaired

and acceptable condition is achieved, while allowing for winter use of the parks.").  Here,

however, the administration instead opted to increase its "audibility" threshold by half, authorize

a doubling of recreational snowmobile use within Yellowstone, and declare that its new winter

use plan will not result in impairment or unacceptable impacts.  See 2007 ROD at 33-34; id. at

40 (declaring that "[t]he natural soundscapes thresholds were adjusted in this decision to reflect the additional knowledge that has been gained over the past years"); GYC Ex. B at B-3 (2004 EA); GYC Ex. A at A-2 (2003 ROD). As the administration elected to "change the goalposts" regarding noise impacts without any reasoned explanation, both its non-impairment determination and the underlying "adaptive management" framework are arbitrary. See, e.g., PPL Wallingford Energy LLC v. FERC, 419 F.3d 1194, 1198 (D.C. Cir. 2005) ("To survive review under the arbitrary and capricious standard, an agency must 'examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made.'") (quoting State Farm, 463 U.S. at 43).[8]

The administration took a similarly arbitrary approach in addressing benzene and formaldehyde emissions. In recent seasons, health standards for formaldehyde and benzene have been approached or exceeded with only 180 to 250 snowmobiles entering Yellowstone through the Park's West Entrance. See FEIS at 99-100 (noting that "one of the tradeoffs in converting to BAT is that four-stroke machines produce more benzene (and some other hazardous air pollutants) than the two stroke engines used historically"); 2007 ROD at 21-22. Though acknowledging these problems, the administration failed to offer a reasoned explanation as to why increased benzene and formaldehyde emissions will not result in impairment or unacceptable impacts to park resources and values. See, e.g., FEIS at 99; 2007 ROD at 21-22; see also NPS Policies § 1.4.7.1 (defining "unacceptable impacts" as those that would "create an

---

[8] In their brief, federal defendants do not contend that the administration did, in fact, offer a reasoned explanation for its decision to increase the adaptive "audibility" threshold by half and declare that expanded snowmobile access would not result in impairment or unacceptable impacts. See Fed. Br. at 30 n.14. Rather, they argue that the 35-percent gap between the administration's new, arbitrary adaptive threshold and the "major" impact threshold used in the FEIS was adequately explained by the limitations of the FEIS's sound modeling. See id. This argument misses the point, however, as it leaves the administration's decision to increase the adaptive "audibility" threshold unexplained.

unsafe or unhealthful environment for visitors or employees").

In place of a reasoned impairment analysis, the administration offers proclamations. While the administration parroted the Management Policies' definitions of "impairment" and "unacceptable impacts" in declaring that neither will occur under the new snowmobile plan, see Fed. Br. at 13, the administration's FEIS and ROD offer no real assessment of the impacts, resources, and values at issue here in light of these definitions. See, e.g., 2007 ROD at 28-34; FEIS at 373-74. Because the administration's conclusory declarations of "no impairment" and "no unacceptable impacts" fail to disclose "the rationale behind NPS's decisionmaking[,]" they are by definition arbitrary. See Sierra Club, 459 F. Supp. 2d at 103; see also State Farm, 463 U.S. at 48 ("[A]n agency must cogently explain why it has exercised its discretion in a given manner[.]"); Sierra Club, 459 F. Supp. 2d at 100 ("Merely describing an impact and stating a conclusion of nonimpairment is insufficient, for this merely sets forth 'the facts found' and 'the choice made,' without revealing the 'rational connection'—the agency's rationale for finding that the impact described is not impairment.").

**B.      The Administration Failed to Offer a Reasoned Explanation for Its Determination that Expanded Snowmobile Use Will Be Consistent with Park Service Regulations and Governing Executive Orders**

The administration's declarations that expanded snowmobile use within Yellowstone will be consistent with Park Service regulations and governing Executive Orders are similarly arbitrary. With respect to Section 2.18(c), the challenged FEIS and ROD fail to explain why expanded snowmobile use will be "consistent with [Yellowstone's] natural, cultural, scenic and aesthetic values, safety considerations, [and] park management objectives," and how it "will not disturb wildlife or damage park resources[.]" See 36 C.F.R. § 2.18(c); see also, e.g., 2007 ROD at 28; FEIS at 373-74. As a result, the government's contention that the interpretation of Section

2.18(c) inherent in the challenged winter use plan is somehow owed deference cannot be sustained. See Fed. Br. at 19; see also State Farm, 463 U.S. at 48 ("[A]n agency must cogently explain why it has exercised its discretion in a given manner[.]"). With respect to Executive Orders 11,644 and 11,989, the challenged FEIS and ROD fail to explain why expanded snowmobile use will not "cause … considerable adverse effects on the soil, vegetation, wildlife, wildlife habitat or cultural or historic resources of particular areas" within the Park. See E.O. 11,644 § 9(a); see also, e.g., 2007 ROD at 28; FEIS at 373-74.

While federal defendants appear to rely on the administration's "no unacceptable impacts" determination in arguing that the FEIS and ROD do, in fact, establish the consistency of expanded snowmobile use with these provisions, see Fed. Br. at 16-19; see also 2007 ROD at 28 (suggesting that the requirements of Section 2.18(c) and the Orders will be satisfied under the challenged plan due to the absence of unacceptable impacts), this argument fails. First, as demonstrated above, the administration's "no unacceptable impacts" determination is itself arbitrary. Second, the administration has offered no explanation as to why the Management Policies' "unacceptable impacts" standard—one established to ensure compliance with the Park Service's non-impairment mandate, see NPS Policies § 1.4.7.1—is adequate to assess compliance with the requirements of Section 2.18(c) and the relevant Executive Orders. The administration's arbitrary declarations of compliance, therefore, should be rejected. See, e.g., Sierra Club, 459 F. Supp. 2d at 103 ("The Court will not defer to the agency's conclusory or unsupported assertions.").

### C. The Administration Failed Again to Offer a Reasoned Explanation for Its Departure from the Park Service's 2001 Impairment Determination and Snowcoach Rule

The administration's failure to offer a reasoned explanation for its determination that

expanded snowmobile use will be consistent with Park Service mandates is further underscored by its unexplained reversal of the Park Service's 2001 impairment determination and snowcoach rule.  In arguing that the administration "fully explain[ed] the Service's apparent departure from its previous [impairment] findings" in authorizing a doubling of recent snowmobile levels within Yellowstone, federal defendants rely on the monitoring and "extensive environmental analysis" the administration has conducted since 2003.[9]  See Fed. Br. at 20-23.  In the wake of the Court's 2003 opinion, the government contends,

> the Service implemented a managed, limited program of [oversnow vehicle ("OSV")] access for three years prior to making the decision at issue in this case.  As a result of that experience, the Service was able to observe and monitor a managed program, and to compare the results of the program to the historical unmanaged use of recreational OSVs in the Park.  Thus, unlike the 2003 Final Rule, which this Court vacated and remanded, the Winter Use Plan is based on an extensive environmental analysis which includes the actual monitoring of a managed OSV program. The Service's determination that impacts from the Winter Use Plan are "acceptable" is based on this thorough analysis and is entitled to substantial deference.

Id. at 21.

Substantial deference, again, is inappropriate here.  Far from indicating that a doubling of snowmobile use is warranted, the monitoring and analysis of recent seasons has merely confirmed the significant, adverse impacts of existing snowmobile access to Yellowstone.  In the

---

[9] In an aside, the government erroneously suggests that "reliance" on the Park Service's 2001 rule is "misplaced" as the regulation has been vacated by the Wyoming District Court.  See Fed. Br. at 20.  In its most recent planning process, however, the administration reaffirmed the Park Service's prior impairment determination.  See, e.g., 2007 ROD at 30.  Moreover, in remanding the administration's prior decision, this Court demanded the explanation the administration had failed to provide, see Fund for Animals, 294 F. Supp. 2d at 108; the Wyoming decision does not affect that Order, see Fund for Animals v. Norton, 323 F. Supp. 2d 7, 10 (D.D.C. 2004) ("Federal Defendants still have an obligation to conduct the new rule-making process in a manner consistent with, and addressing the concerns delineated in, the Court's December 2003 Opinion and Order.").

face of this information, the administration has offered no reasoned explanation as to how expanded snowmobile use will be consistent with governing legal mandates. Indeed, the administration's legal conclusions run counter to the record evidence in this case—the very mark of an arbitrary decision. See State Farm, 463 U.S. at 43 (action arbitrary where an agency "offered an explanation for its decision that runs counter to the evidence before the agency"); see also Fund for Animals, 294 F. Supp. 2d at 108 (emphasizing the administration's obligation to explain its reversal of the 2001 impairment determination and snowcoach rule in light of the Park Service's "clear conservation mandate"); Sierra Club, 459 F. Supp. 2d at 98-103.[10]

Federal defendants' attempts to distinguish the administration's new winter use plan from that remanded by the Court in 2003 are no more successful. With respect to the plan's restriction on the number of daily snowmobile entries into Yellowstone, the government does not argue that a 540-snowmobile cap constitutes the sort of "very strict limit[]" deemed necessary by the Park Service in 2001. See Special Regulations, Areas of the National Park System, 66 Fed. Reg. 7,260, 7,262 (Jan. 22 2001) ("2001 Rule") (noting, in rejecting proposals for limited snowmobile entries into the Park, that "[a]chieving compliance with the applicable legal requirements while still allowing snowmobile use would require very strict limits on the numbers of both snowmobiles and snowcoaches"). Instead, the government contends that the cap "marks a sharp reduction" from the number allowed under the unlawful and invalidated 2003 rule. Fed. Br. at

_____

[10] In summarizing the results of sound monitoring during the 2005-2006 winter season, the government asserts that "[t]he FEIS explains that the reduced sound and audibility levels were largely caused by a lower average number of OSVs during the 2005-2006 season (256 snowmobiles and 32 snowcoaches), the change from two-stroke to four-stroke engine technology, and the requirements that snowmobiles travel in guided groups." Fed. Br. at 26 (emphasis added) (citing FEIS at 143). The FEIS, however, is more specific, explaining that "[t]he reduced sound and audibility levels were largely explained by fewer snowmobiles, the change from two- to four-stroke engine technology, and the guided group requirements." FEIS at 143 (emphasis added).

21.  This argument, however, says nothing of the significant, adverse impacts that have been seen within Yellowstone during recent seasons—seasons in which snowmobile entries have averaged around half the level authorized under the challenged plan.  It disregards the recommendation of Park Service biologists that oversnow vehicle numbers be kept "at or below" those seen in recent years.  See AR 125701, at 1, 20 (P.J. White et al., Behavioral Responses of Wildlife to Snowmobiles and Coaches in Yellowstone (Oct. 17, 2006)).  And it ignores the administration's failure to offer any reasoned explanation as to how the number was determined, much less why it conforms with Park Service mandates.  See 2000 ROD, 65 Fed. Reg. at 80,915-16 (noting the absence of "carrying capacity studies" addressing snowmobile use in the Parks).  As a result, the 540-snowmobile cap included within the challenged plan cannot explain the administration's determination that expanded snowmobile use within Yellowstone is consistent with the Park Service's prior impairment determination and governing law.[11]

---

[11] Federal defendants wrongly suggest that the administration responded to the concerns voiced by seven former National Park Service Directors by authorizing 540 daily snowmobile entries rather than 720.  See Fed. Br. at 4 (citing AR 120940 (March 2007 letter from seven former Directors of the National Park Service)).  In arguing that a system of snowcoach access to Yellowstone would minimize the impacts of motorized access on the Park, as required by the administration's own 2006 Management Policies, the Directors protested any increase in snowmobile use:

> The latest National Park Service study illuminates in detail that allowing Yellowstone's current average of 250 snowmobiles per day to increase—to as many as 720 snowmobiles—would undercut the park's resurgent natural conditions.  Specifically, the study reveals that snowmobile noise would return to areas of the park where visitors are currently able to enjoy natural sounds and quiet. It demonstrates that exhaust would increase in Yellowstone's air. It sidesteps a recent recommendation made by Park Service scientists: that in order to minimize disturbance of the park's wildlife, traffic should be kept at or below current levels, not expanded.  The study also provides clear evidence that reducing snowmobile numbers still further—from 250 per day to zero—while expanding public access on modern snowcoaches, would further improve the park's health.

In an effort to avoid the full weight of the administration's decision, federal defendants argue that average snowmobile numbers are, in fact, unlikely to "reach or even approach 540" in the Park. Fed. Br. at 23. This argument—founded on conjecture—misses the point. The administration's new winter use plan authorizes 540 snowmobiles to enter Yellowstone each winter day. The question in this case, therefore, is whether that authorization can be (or has been) reconciled with the requirements of the Organic Act and other Park Service mandates. The government cannot avoid this question by positing that "actual use under the Winter Use Plan will likely be far lower than the maximum of 540[.]" See Fed. Br. at 23. If use levels below 540 snowmobiles per day are necessary to comply with legal mandates—as all available evidence indicates—then the Park Service should have mandated such lower use levels, and not merely hoped for them to happen.

While federal defendants continue to rely on the challenged plan's guided group requirement, the deficiencies noted by the Court in its 2003 opinion remain. According to the government,

> [t]he Service's no-impairment determination also reasonably relies on the fact that all recreational snowmobiles are required to travel with commercial guides. This guiding requirement significantly mitigates impacts to soundscapes and wildlife because it has the effect of forcing snowmobiles to travel in groups, thereby reducing the amount of time that OSVs are audible as well as the total number of encounters with wildlife.

Fed. Br. at 22. However, the administration's new snowmobile plan—like the previous plan remanded by this Court—places no bottom limit on the size of the guided groups allowed into the Park, "essentially eliminat[ing]" the "group" requirement and "the benefit of 'group' travel." See Fund for Animals, 294 F. Supp. 2d at 107; 2007 Rule, 72 Fed. Reg. at 70,798 (36 C.F.R. §

---

AR 120940 at 1. The administration's decision to authorize twice the snowmobile use of recent seasons is entirely at odds with these concerns.

7.13(l)(9)(ii)) ("Snowmobile parties must travel in a group of no more than 11 snowmobiles, including that of the guide."). Moreover, the plan again allows groups to stretch to a third of a mile in length, raising the same communications concerns earlier identified by this Court. See Fund for Animals, 294 F. Supp. 2d at 107; 2007 Rule, 72 Fed. Reg. at 70,798 (36 C.F.R. § 7.13(l)(9)(iii)). While the government notes that commercial guides "manag[e] wildlife encounters" and "are able to ensure that their clients adhere to speed limits," see Fed. Br. at 22, this in no way distinguishes the administration's new plan from its predecessor. The challenged plan's guiding requirement, therefore, is inadequate to explain the administration's departure from the Park Service's prior impairment determination.

Finally, with respect to the plan's "best available technology" requirements, the government points to the same snowmobile emissions standards deemed inadequate by this Court to justify the administration's 2003 "no impairment" determination and rule. See Fed. Br. at 22; see also Fund for Animals, 294 F. Supp. 2d at 106 (rejecting the administration's explanation that its "decision to now allow snowmobiling [was] based on the availability of 'cleaner, quieter snowmobiles'" as "[t]he possibility of improved technology was explicitly considered in the 2000 ROD, and just as explicitly rejected as an inadequate solution for reducing the negative impacts of snowmobiling"). While the government argues that the new plan further provides for BAT snowcoaches and administrative snowmobiles, Fed. Br. at 22-23, this argument, too, fails to explain the departure. The Park Service has, in fact, provided for a transition to BAT administrative snowmobiles since 2000. See, e.g., 2000 ROD, 65 Fed. Reg. at 80,911; GYC Ex. A at 10, 11, D-8 (2003 ROD); 2007 ROD at 12; see also 2007 Rule, 72 Fed. Reg. at 70,785 ("Since 2001, the Parks have been converting their own administrative fleet of snowmobiles to four-stroke machines[.]"). As to snowcoaches, the 2003 decision provided for a

transition to BAT machines; the challenged plan merely adds a deadline for the conversion of those historic snowcoaches still used in the Park.  See Special Regulations, Areas of the National Park System, 68 Fed. Reg. 69,268, 69,272-73, 69,282-83 (Dec. 11, 2003) ("2003 Rule"); GYC Ex. A at 15 (2003 ROD).  Rather than justifying the administration's desired expansion of snowmobiling within Yellowstone, moreover, improved snowcoach technologies only underscore the arbitrariness of the administration's decision to again reject a plan providing for access to the Park by cleaner, quieter snowcoaches.  Because the administration has again failed to offer a reasoned explanation for its departure from the Park Service's 2001 impairment determination, its new snowmobile plan should be set aside.

## III. THE CHALLENGED FEIS FAILS TO ASSESS HOW THE CONSIDERED ALTERNATIVES WILL COMPLY WITH PARK SERVICE MANDATES, IN VIOLATION OF NEPA

Federal defendants equally fail to justify the administration's analysis under NEPA. According to federal defendants, the challenged FEIS engaged in a "rigorous examination" of the various winter use plans under consideration and, as a result, provided "the agency decision-maker and the public" with "a clear basis for choice among the alternatives[.]"  Fed. Br. at 23-25. In the government's view, the FEIS therefore satisfied the requirements of NEPA and "provided the Service with a means of determining whether the proposed Winter Use Plans would result in an 'impairment' of (or unacceptable impacts to) Park resources and values."  Id. at 24.

This argument describes a much different document than the one at issue in this case. While the challenged FEIS clearly states the administration's ultimate conclusion that none of the considered alternatives would impair or unacceptably impact park resources and values— even an "expanded recreational use" alternative providing for snowmobile numbers in excess of those seen historically, only 75 percent of which would be guided, see FEIS at 48-52, 369-370—

it fails, again, to articulate why. See 40 C.F.R. § 1502.2(d) ("Environmental impact statements shall state how alternatives considered in it and decisions based on it will or will not achieve the requirements of [NEPA] and other environmental laws and policies."); id. § 1502.16(c) (an EIS must discuss "[p]ossible conflicts between the proposed action and the objectives of Federal … land use plans, policies and controls for the area concerned"); see also id. § 1502.14 (an EIS "should present the environmental impacts of the proposal and the alternatives in comparative form, thus sharply defining the issues and providing a clear basis for choice among options by the decisionmaker and the public").

### A. The FEIS's "Historic Conditions" Analysis Arbitrarily Obscures the Substantial Differences Among the Considered Alternatives and Fails to Articulate Why Each Would Be Consistent with Park Service Mandates

In place of a reasoned impairment analysis, the administration's FEIS offers something else entirely: repeated reassurances that none of the alternatives it considered would prove as bad as Yellowstone's deplorable "historic conditions." See GYC Mem. in Supp. at 33-36. The FEIS makes pervasive use of this "historic conditions" analysis, going so far as to calculate "historic conditions circa 2010" and to declare that none of the considered alternatives would be as bad as this hypothetical future in which snowmobiles would again be unmanaged as they were in the past. See FEIS at 365; 2007 ROD at 31. This analysis, however, is ultimately useless, inviting decisionmakers and the public to conclude that impairment and unacceptable impacts will be avoided so long as some sort of improvement over unmanaged "historic conditions" is achieved within the Park. Missing from the FEIS is any attempt to identify the level of impact at which impairment would actually occur—the metric required to assess how each of the considered alternatives "w[ould] or w[ould] not achieve the requirements" of the Organic Act's impairment mandate. See 40 C.F.R. § 1502.2(d). The FEIS's "historic conditions" analysis

obscures the differences among the considered alternatives and fails to assess the extent to which each is consistent with Park Service mandates, in violation of NEPA.

Rather than defending the merits of the analysis, federal defendants erroneously argue that the FEIS's "historic conditions" framework was necessary to provide the "explanation … required" by this Court's 2003 opinion. Fed. Br. at 25. In remanding the administration's 2003 environmental analysis, decision, and regulation, however, this Court required the Park Service to provide a reasoned explanation for its newfound belief that continued and extensive snowmobile use within Yellowstone would not result in impairment. See Fund for Animals, 294 F. Supp. 2d at 105-108. The FEIS's "historic conditions" framework obscures, rather than illuminates, the impairment issue. In employing the "historic conditions" yardstick, the FEIS indicates only whether any improvement over deplorable historic conditions would be achieved—not whether park resources and values would be protected and preserved such that impairment would be avoided. This is arbitrary and inconsistent with NEPA. See 40 C.F.R. §§ 1502.2(d), 1502.16(c); see also State Farm, 463 U.S. at 43 (agency action arbitrary where it "entirely fail[s] to consider an important aspect of the problem"); Sierra Club, 459 F. Supp. 2d at 99-103.

Federal defendants contend that the FEIS included a number of other "benchmarks" as well—including "objective criteria (such as state and federal air quality standards), and others." Fed. Br. at 25-26. There are two difficulties with this argument. First, as discussed below, the FEIS's additional "benchmarks" are similarly incapable of assessing the consistency of the various considered alternatives with Park Service mandates. Second, and more importantly, the "historic conditions" analysis pervades the FEIS and ROD, serving as the central component in the administration's impairment analysis, notwithstanding any assessment of other

"benchmarks."  See GYC Mem. in Supp. at 33-36; see also, e.g., 2007 ROD at 28-32; FEIS at

235 ("Th[e] [1,025-snowmobile, expanded-use] alternative would result in an adverse impact

compared to current conditions but would be a beneficial impact relative to historic use

conditions.  Overall, this alternative's impact on air quality would be major [and] adverse….

Impairment of park resources would not occur[.]").  The government's attempt to defend the

resulting nonimpairment determinations on other grounds, therefore, cannot be sustained.

> **B.**     **The FEIS's Reliance on a "Park-Wide" Sound Metric Arbitrarily Obscures the Substantial Differences Among the Considered Alternatives and Fails to Articulate Why Each Would Be Consistent with Park Service Mandates**

The FEIS's noise impacts analysis is similarly flawed.  Federal defendants offer two

arguments in defense of the assessment:  first, that the FEIS's "total-park" metric was used in

order to satisfy the Park Service's obligation to assess the impacts of motorized access "on the

entire Park" and, second, that "GYC's interpretation of the soundscape analysis is simply

wrong."  Fed. Br. at 28-30.  These arguments are incorrect.

According to federal defendants, the administration utilized the "total-park" metric not to

assess the alternatives' impacts on the visitor experience but, rather, to "address and

communicate the impacts of recreational OSV use on the entire Park."  Fed. Br. at 28.  The FEIS,

however, focuses its soundscapes analysis on the visitor experience.  See, e.g., FEIS at 137.

More fundamentally, the "total-park" metric is incapable of communicating the impacts of

recreational OSV use even on "the entire Park."  NEPA, again, requires an EIS to determine an

action's consistency with legal mandates—including, here, the mandate to avoid impairment of

park resources.  See 40 C.F.R. § 1502.2(d).  The conditions deemed by the Park Service to have

impaired the Yellowstone's natural soundscape in 2001 resulted in oversnow vehicle audibility

(according to recent modeling) across 16.2 percent of the Park.  FEIS at 306-07 (Figure 4-1 and

Table 4-49).  Remarkably, in the administration's new FEIS, oversnow vehicle audibility across

16.2 percent of Yellowstone is deemed—without explanation—a "moderate" impact.  Id. at 304

(Table 4-48).  This unreasoned conversion of soundscape impacts from impairment to

"moderate"—by definition, arbitrary—renders the FEIS incapable of informing decisionmakers

and the public of the various alternatives' consistency with Park Service mandates.  See 40

C.F.R. §§ 1502.2(d); 1502.16(c).

In contending that GYC is "simply wrong" in claiming that the FEIS's use of the "total-

park" metric obfuscated the impacts of and differences among the considered alternatives, the

government argues that "the Service did not simply end its analysis after predicting the

percentage of Park-wide area in which recreational OSV use would be audible"—having instead

continued to assess "percent time audible" and "sound level" factors.  Fed. Br. at 28-29.  This

argument, however, is erroneous.  While the FEIS's discussion of individual alternatives

references their "percent time audible" and "maximum sound level" impacts, see, e.g., FEIS at

334-39, the document's conclusion section—that providing the requisite comparison of

alternatives—focuses on park-wide audibility, see FEIS at 339-42; see also id. at 308 ("In

addition to the impact assessment for the modeled percent of park area at which OSVs are

audible, the differences in audibility among alternatives at eight selected sites within

Yellowstone and Grand Teton were analyzed….  Because the small sample size of selected

locations may not represent other locations within the same management zone, these results are

included in the discussion  below, but not in the conclusions table (Table 4-66).").[12]  Federal

---

[12] The government's remaining contentions are meritless.  While the FEIS notes that oversnow
vehicle noise is concentrated around travel corridors, see Fed. Br. at 29-30, it ultimately relies on
a "total-park" metric indifferent to this fact—obscuring the impacts of the alternatives and their
consistency with Park Service mandates.  Similarly, while the government argues that the FEIS
addressed a monitoring report recommendation that OSV numbers be reduced by adopting other

defendants' attempt to avoid the FEIS's reliance on the "total-park" metric, therefore, cannot be sustained.

The FEIS's use of the "total-park" metric is all the more arbitrary as the result of a deficiency uncontested by federal defendants. While each of the considered alternatives included the possibility that Yellowstone's Madison-to-Norris road segment would be closed in order to assess the impacts of road grooming on bison, the FEIS itself utilized modeling data that treated the road as closed under only one of the alternatives—that selected by the administration. See FEIS at 334-35; cf. id. at 316 (map showing the road segment as "open" for purposes of modeling the impacts of the snowcoach alternative); GYC Mem. in Supp. at 38 n.12. By arbitrarily reducing the modeled noise impacts of the administration's selected alternative but failing to treat other alternatives comparably, the FEIS further obscured the differences among the alternatives. See, e.g., FEIS at 339 ("Closure of the … Madison to Norris road segment[] … removes OSV operations that would otherwise contribute to sound impacts."); see also 40 C.F.R. § 1502.24 ("Agencies shall insure the professional integrity, including scientific integrity, of the discussions and analyses in environmental impact statements.").

In placing such reliance on the "total park" metric, in short, the FEIS obscured the significant differences among the considered alternatives and their consistency with Park Service mandates, contrary to NEPA and the APA. See 40 C.F.R. §§ 1502.2(d), 1502.14, 1502.16(c); 5 U.S.C. 706(2)(A); cf. U.S. Air Tour Ass'n v. FAA, 298 F.3d 997, 1017-18 (D.C. Cir. 2002) (rejecting a soundscape metric measuring park noise impacts based on an "annual average day," as "the use of an annual average does not correspond to the experience of the Park's actual visitors").

---

suggestions made in the report, see Fed. Br. at 29 n.13, this disregards the FEIS's failure to discuss the reduction recommendation at all, see GYC Mem. in Supp. at 37 n.10.

      **C.**    **The FEIS's Reliance on a "Park-Wide" Air Impacts Metric and Inapposite Air Quality Standards Arbitrarily Obscures the Substantial Differences Among the Considered Alternatives and Fails to Articulate Why Each Would Be Consistent with Park Service Mandates**

Federal defendants' arguments in defense of the FEIS's air quality analysis are similarly in error. First, in defending the "park-wide" metric utilized by the FEIS to assess the magnitude of the alternatives' air quality impacts—an amorphous standard defining as "major" only those impacts that are "substantial and highly noticeable park-wide[,]" FEIS at 222 (Table 4-31) (emphasis added)—the government notes that the Park Service modeled air pollutant concentrations at four locations within Yellowstone (and determined that emissions would not exceed federal or state air quality standards). See Fed. Br. at 33-34. This only underscores the inadequacy of the FEIS's "major" impact metric, however, as the standard disregards the localized impacts that most directly impact visitors' experiences within the Park, at locations such as Old Faithful, thereby obscuring the substantial differences among the considered alternatives and their consistency with Park Service mandates. See 40 C.F.R. §§ 1502.2(d); 1502.14; 1502.16(c); see also Sierra Club, 459 F. Supp. 2d at 100-102 (rejecting amorphous Park Service impact definitions).

Federal defendants' attempt to defend the FEIS's reliance upon federal and state air quality standards fares no better. According to federal defendants, there was nothing inappropriate about this reliance as there is nothing enforceable about the Management Policies' provision for "'the best possible air quality in [the] parks'"—and, regardless, the FEIS "exhaustive[ly]" demonstrated that the challenged plan will comply with Clean Air Act Class I standards and other requirements. See Fed. Br. at 34-35 (quoting NPS Policies § 4.7.1). First, the challenged FEIS and ROD themselves rely on the Management Policies, see, e.g., 2007 ROD at 27, rendering arbitrary the government's attempts to disavow them now. See Fund for

Animals, 294 F. Supp. 2d at 106 n.8.  Second, in emphasizing the challenged plan's compliance

with federal and state air quality standards, the government ignores the FEIS's failure to explain

why impairment will be avoided so long as such standards are met.  Indeed, Clean Air Act

standards were satisfied even under historic conditions—conditions that violated the Organic Act

by the Park Service's own admission.  See ISMA Br. at 24-26; see also FEIS at 94-95.[13]

In relying on a "park-wide" metric and federal and state air quality standards, the FEIS

again obscured the significant differences among the considered alternatives and the alternatives'

consistency with Park Service mandates, contrary to NEPA and the APA.  See 40 C.F.R. §§

1502.2(d); 1502.14; 1502.16(c); 5 U.S.C. § 706(2)(A).[14]

### D.     The FEIS's Wildlife Analysis Arbitrarily Obscures the Substantial Differences Among the Considered Alternatives and Fails to Articulate Why Each Would Be Consistent with Park Service Mandates

The government's arguments in defense of the FEIS's wildlife analysis are similarly

flawed.  In addressing the FEIS's standard for "major" wildlife impacts—one requiring "a

substantial and possibly permanent consequence to [a] population[,]" FEIS at 257 (Table 4-47)

(emphasis added)—federal defendants note, first, the FEIS's "acknowledge[ment] … that

'adverse impacts to individual animals should be minimized.'"  Fed. Br. at 38-39 (quoting FEIS

---

[13] Rather than salvaging the FEIS's air quality analysis, the ROD's inclusion of adaptive management thresholds "well below both federal and state air quality standards[,]" see Fed. Br. at 32-34, underscores the inadequacy of that analysis.  Unlike federal and state air quality standards, the ROD's lower air quality thresholds are designed to "indicate[] [when] conditions could be moving away from those that are desirable, and in some cases ... [when] impacts are unacceptable or are causing impairment."  2007 ROD at 40.  Nevertheless, the FEIS evaluated the alternatives against the air quality standards, not more protective thresholds.  In assessing the alternatives against federal and state air quality standards well above the adaptive management thresholds without offering a reasoned explanation for doing so, the FEIS arbitrarily obscured the impacts of the alternatives and the alternatives' consistency with Park Service mandates.

[14] GYC has not asserted that the FEIS "fail[s] to consider current conditions" in its air quality analysis, as the government states in its brief.  See Fed. Br. at 33.

at 251). This acknowledgement, however—the latter half of a sentence conceding that "the focus of [the document's wildlife] analysis is predominantly the impact on wildlife populations," FEIS at 251—simply underscores the inadequacy of the challenged assessment. <u>Cf.</u> GYC Ex. D at 206 (2003 SEIS) ("[P]ark policies, regulations, and EOs clearly state that disturbance to wildlife, regardless of population level effects, is unacceptable in the national parks."). While Park Service mandates require that individual animal impacts be minimized, <u>see, e.g.</u>, 36 C.F.R. § 2.18(c), the FEIS disregards this in assessing the magnitude of the alternatives' wildlife impacts. <u>See</u> FEIS at 257 (Table 4-47). This deficiency is not mended by the FEIS's discussion of individual animals' responses to oversnow vehicles and the record's disclosure of the number of animals killed by snowmobiles in Yellowstone. <u>See</u> Fed. Br. at 39. Under the FEIS's population-level analysis, such impacts are ultimately dismissed as "negligible," <u>see</u> FEIS at 257 (Table 4-47), obscuring the impacts of the alternatives and the alternatives' consistency with Park Service mandates, including 36 C.F.R. § 2.18(c).[15]

The government's efforts to avoid the recommendation of Park Service biologists that oversnow vehicle numbers be kept "at or below" those of recent seasons are similarly flawed. <u>See</u> Fed. Br. at 39-40. The government focuses its argument on an earlier wildlife study not referenced in GYC's brief. <u>See id.</u> at 39 (discussing Borkowski study (Feb. 2006), AR 125625); GYC Mem. in Supp. at 40 (discussing White study (Oct. 2006), AR 125701). In that study, researchers examined behavioral data from earlier winter seasons, during which oversnow vehicle numbers had been higher, and recommended that "park managers consider maintaining OSV traffic levels at or below those observed during [the] study." AR 125625 at 1924; <u>see also</u>

---

[15] The government asserts that "GYC's argument … is predicated on [the] false factual assumption … that the level of OSV use during the White and Borkowski studies was 260 snowmobiles per day and 29 snowcoaches per day." Fed. Br. at 39. These numbers, however, are not included within GYC's brief. <u>See</u> GYC Mem. in Supp. at 40-41.

Fed. Br. at 39. The government—noting that this recommendation was made by a number of the same scientists who participated in the later study cited by plaintiffs—contends that "actual use numbers under the Winter Use Plan will likely be much lower than those observed during the [earlier] study" and, as a result, the FEIS's wildlife analysis is entirely adequate. Fed. Br. at 39. This argument is in error. First, the Borkowski study discussed by the government in no way alters the scientists' October 2006 recommendation that oversnow vehicle numbers be kept "at or below" the levels seen in 2004, 2005, and 2006, when daily snowmobile entries through the Park's West Entrance averaged 178, 156, and 181, respectively. AR 125701 at 11, 20. As the government concedes, the challenged winter use plan authorizes 300 daily snowmobile entries through the West Entrance, see Fed. Br. at 40; 2007 ROD at 8—a substantial expansion of snowmobile use in contravention of the biologists' recommendation.[16] Second, there appears to be no record evidence demonstrating that federal defendants based their FEIS analysis on the post-hoc arguments advanced by their counsel. See Fed. Br. at 39-40; Chenery Corp., 332 U.S. at 196. By failing to even mention the October 2006 recommendation of Park Service scientists, the FEIS failed to provide decisionmakers and the public with a reasoned explanation for its determination that expanded snowmobile access would be consistent with Park Service mandates, in violation of NEPA and the APA. See 40 C.F.R. §§ 1502.2(d), 1502.14, 1502.24; see also Fund for Animals, 294 F. Supp. 2d at 108-111 (noting, with respect to an agency's choice of expert, that an "agency 'must cogently explain why it has exercised its discretion in a

---

[16] Federal defendants mischaracterize the biologists' recommendation by noting that an average of 320 snowmobiles entered Yellowstone through the West Entrance during 2003, the first year of the White study. See Fed. Br. at 40. The White study concluded that oversnow vehicle numbers should be maintained "at or below those observed during the last 3 years of [the] study (i.e., <50,000 over-snow visitors)"—meaning 2004, 2005, and 2006. See AR 125701 at 20 (emphasis added); see also id. at 17 (noting that 2003 was a "high visitation year[,]" with 72,560 visitors, while visitor numbers were "<49,000" during the "relatively low visitation years of 2004-2006").

given manner'") (quoting <u>State Farm</u>, 463 U.S. at 52).

## IV.    CONCLUSION

For the reasons set forth above, the Greater Yellowstone Coalition plaintiffs request that the Court deny federal defendants' cross-motion for summary judgment and enter judgment for the Greater Yellowstone Coalition plaintiffs.

Respectfully submitted this 11th day of July, 2008.

/s/     Sean M. Helle
Douglas L. Honnold (D.C. Bar # 468323)
dhonnold@earthjustice.org
Sean M. Helle (D.C. Bar # 490085)
shelle@earthjustice.org
Earthjustice
209 South Willson Avenue
Bozeman, MT  59715
(406) 586-9699
Fax: (406) 586-9695

David S. Baron (D.C. Bar # 464222)
dbarron@earthjustice.org
Earthjustice
1625 Massachusetts Ave., NW, Ste. 702
Washington, DC 20036
(202) 667-4500

*Attorneys for Plaintiffs*
*Greater Yellowstone Coalition, et al.*

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

———————————————————— )
                                                              )
GREATER YELLOWSTONE                       )
COALITION, *et al*.,                                   )
                                                              )
            Plaintiffs,                                      )        Civ. No. 07-2111 (EGS)
                                                              )
            v.                                                 )        [Hearing on Motion for Summary
                                                              )         Judgment on August 27, 2008]
DIRK KEMPTHORNE, *et al*.,                    )
                                                              )
            Defendants.                                   )
————————————————————)
                                                              )
NATIONAL PARKS CONSERVATION         )
ASSOCIATION,                                         )
                                                              )
            Plaintiff,                                        )        Civ. No. 07-2112 (EGS)
                                                              )
            v.                                                 )        [Hearing on Motion for Summary
                                                              )         Judgment on August 27, 2008]
UNITED STATES DEPARTMENT             )
OF THE INTERIOR, *et al*.,                       )
                                                              )
            Defendants.                                   )
————————————————————)


**GREATER YELLOWSTONE COALITION PLAINTIFFS'
RESPONSE TO FEDERAL DEFENDANTS' STATEMENT OF MATERIAL FACTS
AS TO WHICH THERE IS NO GENUINE ISSUE**


            Pursuant to Local Civil Rules 7(h) and 56.1, the Greater Yellowstone Coalition plaintiffs

hereby respond to federal defendants' Statement of Material Facts as to Which There Is No

Genuine Issue.

            Judicial review under the Administrative Procedure Act generally does not require the

resolution of factual issues, "the function of the district court [being] to determine whether or not

as a matter of law the evidence in the administrative record permitted the agency to make the decision it did." Baystate Med. Ctr. v. Leavitt, 545 F. Supp. 2d. 20, 34-35 (D.D.C. 2008) (internal quotations omitted). Accordingly, "[c]ourts in this Circuit have repeatedly recognized that summary judgment is an appropriate procedure when a court reviews an agency's administrative record." Fund for Animals v. Norton, 294 F. Supp. 2d 92, 104 (D.D.C. 2003).

Federal defendants have submitted a Statement of Material Facts setting forth the recent procedural history of the challenged environmental analysis and decision. The referenced documents speak for themselves; any mischaracterizations should be disregarded by the Court. To the extent federal defendants attempt to foreclose consideration of documents relating to the Park Service's prior winter use decisions by stating that "[a]ll material facts in this action are contained in the AR[,]" Fed. Defs.' Statement of Material Facts as to Which There Is No Genuine Issue ¶ 6, they are in error. At issue in this case is the administration's failure to explain its departure from the Park Service's prior impairment determination. Materials related to that determination are accordingly required to resolve the Greater Yellowstone Coalition plaintiffs' claims.

Respectfully submitted this 11th day of July, 2008.


        /s/     Sean M. Helle        
Douglas L. Honnold (D.C. Bar # 468323)
dhonnold@earthjustice.org
Sean M. Helle (D.C. Bar # 490085)
shelle@earthjustice.org
Earthjustice
209 South Willson Avenue
Bozeman, MT  59715
(406) 586-9699
Fax: (406) 586-9695

David S. Baron (D.C. Bar # 464222)
dbarron@earthjustice.org
Earthjustice
1625 Massachusetts Ave., NW, Ste. 702
Washington, DC 20036
(202) 667-4500

*Attorneys for Plaintiffs*
*Greater Yellowstone Coalition, et al.*